UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA



ANDREW S. HENNIGAN,

*Plaintiff,*

-against-

MCKINSEY & CO., INC.; MCKINSEY
HOLDINGS, INC.; MCKINSEY &
COMPANY INC. UNITED STATES;
MCKINSEY RECOVERY &
TRANSFORMATION SERVICES U.S.,
LLC; DOMINIC BARTON;
PROSKAUER ROSE; ROTHSCHILD
& CO.; CITIGROUP; BANK OF
AMERICA; ERNST & YOUNG;
KEVIN CARMODY; JON GARCIA;
SETH GOLDSTROM; ALISON
PROSHAN; ROBERT STERNFELS;
JARED D. YERIAN, *et al.* (see
attached)

*Defendants.*

## AMENDED COMPLAINT

Jury Trial Demanded

Case No. 2:20-cv-01582-VAP-
RAO

ANDREW S. HENNIGAN, ESQ.
928 W. HUNTINGTON DRIVE, APT. 21
ARCADIA, CA 91007

## TABLE OF CONTENTS

*NATURE OF PROCEEDING* ......................................................................................... **9**

*PARTIES* ................................................................................................................. **16**

*JURISDICTION AND VENUE* ..................................................................................... **37**

*STATEMENT OF FACTS* ........................................................................................... **37**

    **I.**    **Plaintiff's Experience in Bankruptcy** .......................................................... **37**
        a.    Legal Education ....................................................................................... 37
        b.    Bankruptcy Clerkship in the SDNY ......................................................... 38
        c.    Nature of Plaintiff's Assignments at Paul Hastings ............................... 39

    **II.**    **U.S. Bankruptcy Law and Fraud** .............................................................. **41**
        a.    Major Historical Developments .............................................................. 41
        b.    Criminal Prosecutions ............................................................................. 44
        c.    Recent Developments in Bankruptcy Law .............................................. 44

    **III.**    **McKinsey & Co., Generally** ....................................................................... **45**
        a.    Background .............................................................................................. 45
        b.    MIO: McKinsey Investment Office, Generally ........................................ 45
        c.    MIO's Corporate Governance .................................................................. 47
        d.    Compass Funds ........................................................................................ 48

    **IV.**    **As the World's Largest Consulting Firm, McKinsey Knows that Professionals Providing Bankruptcy Consulting Services Must Be Transparent about Their Connections and Have Undivided Loyalty to Their Debtor-Clients** ................................................................................................ **50**

    **V.**    **From 2001 through 2013, Defendants Engaged in a Pattern of Racketeering Activity that Involved Crimes Related to Submitting False Statements in Order to Evade Disqualification as Bankruptcy Professionals** ............................................................................................. **56**
        a.    Defendants Unlawfully Concealed McKinsey's Connections and Affirmatively Misrepresented that McKinsey Was Disinterested ......................................................................... 57
        b.    Defendants Have Unlawfully Concealed All of McKinsey's Connections to Interested Parties through Its Investment Arm, MIO. ......................................................................................... 71

    **VI.**    **Alix Confronts Barton and Sternfels, and McKinsey and AP Reach an Agreement.** .............. **73**
        a.    Barton Admits McKinsey's Pay-to-Play Scheme ................................... 75
        b.    McKinsey and Alix Agree to a Resolution .............................................. 76

    **VII.**    **Despite Barton's Representations to Alix, Defendants Unlawfully Conceal McKinsey's Disqualifying Connections in *NII Holdings*** .................................................................... **79**

    **VIII.**    **Defendants Continue Their Racketeering Activity in Standard Register** .............................. **81**

    **IX.**    **Defendants' Racketeering Activity Continues in *Alpha Natural Resources*** .............................. **87**
        a.    McKinsey RTS's Failure to Disclose Its Connections in Alpha Natural Resources .............. 88
        b.    McKinsey Simultaneously Represents the Debtor and United States Steel, a Concealed McKinsey Client, in Contract Negotiations ................................................................................................. 94

   c.    Defendants Mislead and Fraudulently Induce the U.S. Trustee to Withdraw Two Separate Motions Challenging McKinsey RTS's Disclosure Declarations .................................................................................. 97

   d.    Defendants Fail to Disclose McKinsey's Direct Financial Interest in the Outcome of the Alpha Natural Resources Bankruptcy ............................................................................................................................ 100

**X.**    **Bankruptcy Fraud and Other Crimes in *SunEdison* ................................................................ 104**

   a.    Defendants Unlawfully Conceal McKinsey's Connections in *SunEdison* ............................................. 105

   b.    McKinsey Unlawfully Conceals Fraudulent Pre-petition Payments that It Orchestrated from SunEdison Affiliates ................................................................................................................................................... 111

   c.    McKinsey Contemporaneously Purchases and Sells Securities of SunEdison Through MIO ................. 116

   d.    McKinsey Unlawfully Conceals Pertinent Facts Regarding its "Business Arrangement" with SunEdison's Former CEO ........................................................................................................................................... 117

**XI.**    **Defendants Unlawfully Conceal McKinsey's Connections and Commit Bankruptcy Fraud in *GenOn* ................................................................................................................................................. 121**

   a.    Defendants Unlawfully Conceal that NRG Entergy Is a Current or Former McKinsey Client While McKinsey RTS Is Investigating GenOn's Claims against NRG Energy .................................................... 122

   b.    Defendants Unlawfully Conceal that NRG Entergy Is a McKinsey Client While McKinsey RTS Is Negotiating on Behalf of GenOn for GenOn's Separation from NRG Energy. ........................................ 125

   c.    Defendants Unlawfully Conceal the Depth of McKinsey's Connections to NRG Energy and the Transactions and Bankruptcies that Created GenOn ............................................................................. 126

   d.    McKinsey Receives Avoidable Preference Payments from GenOn to Avoid Disqualification as a GenOn Creditor, thereby Concealing an Interest Adverse to the Bankruptcy Estate ........................................ 128

**XII.**    **McKinsey's and the Houston Astros' Honest Services Fraud in Major League Baseball ..... 133**

**XIII.**    **Defendant Underwriters .................................................................................................... 137**

   a.    Act 39: Corrupt Influence Over Puerto Rico Legislation ...................................................................... 137

   b.    Bond Issuances .................................................................................................................................... 137

   c.    Termination Fees ................................................................................................................................. 138

   d.    Opinion Letters .................................................................................................................................... 139

   e.    Citibank's Concealment of Its Fiduciary Role as Municipal Advisor .................................................... 140

**XIV.**    **Major Banks Antitrust Activities and Fraudulent Conduct ................................................ 143**

   a.    Coordination Amongst Conspirator Banks .......................................................................................... 143

   b.    Coordination Among Hedge Funds and Financial Institutions ............................................................. 148

**XV.**    **The Debt Adjustment Proceedings of the Commonwealth of Puerto Rico ......................... 149**

   a.    Enactment of PROMESA ....................................................................................................................... 149

   b.    Formation of the Oversight Board ....................................................................................................... 150

   c.    GDB and AAFAF ................................................................................................................................... 151

   d.    The Oversight Board's Certification of Fiscal Plans and Budgets ......................................................... 152

   e.    PROMESA's Requirement of Compliance with Federal Laws ............................................................... 153

   f.    Section 109 of PROMESA: Ethics ......................................................................................................... 153

   g.    Section 208 of the United States Criminal Code .................................................................................. 153

   h.    Section 209 of the United States Criminal Code .................................................................................. 154

   i.    The Position of Revitalization Coordinator Under PROMESA ............................................................... 155

   j.    The Appointment of Aaron Bielenberg as Revitalization Coordinator .................................................. 158

   k.    The Conclusion of Bielenberg's Tenure as Revitalization Coordinator ................................................ 160

   l.    Ethics Advisor's Letter Dated September 4, 2017 ............................................................................... 161

   m.    November 2017 Oversight Board Senior Staff Compensation Table ..................................................... 161

   n.    General Counsel El Koury's Letter to U.S. Attorney General Jeff Sessions dated May 8, 2018 ............ 162

   o.    Concealment of McKinsey's Involvement ........................................................................................... 162

   p.    The Conclusion of Bielenberg's Tenure as Revitalization Coordinator ................................................ 165

3

|     | q.   | January 2018 Announcement of the Initial Critical Projects .................................................. | 165 |
|     | r.   | Compass Funds ........................................................................................................................ | 165 |
| **XVI.** |      | **McKinsey's Involvement in Puerto Rico's Debt Adjustment Proceedings.......................** | **169** |
|     | a.   | The Oversight Board's RFP for Strategic Advisor .................................................................... | 169 |
|     | b.   | The Amendment to the RFP for Strategic Advisor.................................................................. | 170 |
|     | c.   | The Initial McKinsey Contract with the Oversight Board ........................................................ | 171 |
|     | d.   | McKinsey's Secret Economist December 7, 2017 Meeting ..................................................... | 175 |
|     | e.   | Letter from FOMB to Gov. Rossello Dated January 18, 2017 .................................................. | 176 |
| **XVII.** |      | **Misrepresentations, Omissions, and Errors in LSE's McKinsey & Co. Report ....................** | **177** |
|     | a.   | 18 U.S.C. § 1001: Statements or entries generally ................................................................ | 177 |
|     | b.   | LSE McKinsey Report ............................................................................................................... | 178 |
|     | c.   | McKinsey's role and influence over the COFINA plan of adjustment ..................................... | 178 |
|     | d.   | Information sharing that occurred between MIO and McKinsey employees and partners ................ | 182 |
|     | e.   | The applicability of statutes and regulations ........................................................................ | 186 |
|     | f.   | Whether McKinsey had a conflict of interest ......................................................................... | 186 |
|     | g.   | MIO's ability to exercise control or influence third-party funds ........................................... | 188 |
|     | h.   | Conclusions Were Purportedly Based on Sufficient Evidentiary and the Independent Judgment of LSE 189 |  |
|     | i.   | 3.13.19 LSE McKinsey Report Hearing .................................................................................... | 193 |
|     | j.   | The Oversight Board's RFP Process and False Statements in McKinsey's Application ....................... | 194 |
| **XVIII.** |      | **Fixing of Professional Fees .........................................................................................** | **196** |
|     | a.   | GSA Report ............................................................................................................................. | 196 |
|     | b.   | Price-Fixing Among Advisors .................................................................................................. | 206 |
|     | c.   | *In re Dendreon* Pharmaceuticals. ......................................................................................... | 213 |
|     | d.   | McKinsey's Service Contract with the Oversight Board ......................................................... | 215 |
|     | e.   | March 9, 2018 Hearing .......................................................................................................... | 215 |
|     | g.   | The Fee Examiner's Third Report .......................................................................................... | 218 |
|     | h.   | The Fee Examiner's Response to the IG Report ..................................................................... | 222 |
|     | i.   | The Fee Examiner's Second Response to the IG Report ......................................................... | 223 |
|     | j.   | 8.16.16 Kevin Carmody Deposition ....................................................................................... | 225 |
|     | k.   | 6.27.16 ANR Hearing ............................................................................................................. | 228 |
|     | l.   | US Trustee Request for MIO Information ............................................................................... | 228 |
|     | n.   | 9.12.18 Jon Garcia Declaration .............................................................................................. | 229 |
|     | o.   | 9.12.18 Lipscomb Declaration ............................................................................................... | 230 |
|     | p.   | 11.12.18 Jon Garcia Supplemental Declaration..................................................................... | 231 |
|     | q.   | 11.9.18 Casey Lipscomb Supplemental Declaration .............................................................. | 233 |
|     | r.   | 9.12.18 Kevin Carmody Declaration ...................................................................................... | 234 |
|     | s.   | Tippet's Deposition ................................................................................................................ | 234 |
| **XIX.** |      | **The Unlawful COFINA Settlement and Bond Issuance .................................................** | **234** |
|     | a.   | Ponzi Scheme Defined ........................................................................................................... | 234 |
|     | b.   | The Inception of the COFINA Ponzi Scheme.......................................................................... | 236 |
|     | c.   | Additional COFINA Background ............................................................................................. | 241 |
|     | d.   | Appointments of UCC and Bettina Whyte .............................................................................. | 247 |
|     | e.   | UCC Complaint Against COFINA ............................................................................................. | 248 |
|     | f.   | UCC Motion for Summary Judgment...................................................................................... | 249 |
|     | g.   | COFINA Negotiations .............................................................................................................. | 250 |
|     | h.   | Ill-gotten Profits..................................................................................................................... | 253 |
|     | j.   | Criminal Enterprise Bribe to Government Official Irizarry ..................................................... | 257 |
|     | k.   | Other COFINA-Related Misrepresentations ........................................................................... | 258 |

**XX.**     **Corrupt Activities Involving BDO** .................................................................... **262**

a.     Hiring of BDO and Its Scope of Services ....................................................... 263

b.     The Arrest of BDO Puerto Rico President ..................................................... 263

c.     Prolonged Delay of Investigation into BDO ................................................. 266

**XXI.**    **Misappropriation of Federal Funds and Fraud in GDB Title VI Proceedings** ...................... **267**

a.     Scheme Overview .......................................................................................... 267

b.     EPA Federal Funds Legal Restrictions ........................................................... 270

c.     EPA Federal Funds Regulatory Restrictions .................................................. 272

d.     Administration of Puerto Rico's State Revolving Funds ................................ 275

e.     EPA Allotment of Drinking Water Funds to Puerto Rico ............................... 275

f.     EPA Allotment of Clean Water Funds to Puerto Rico .................................... 276

g.     Public Money, Property or Records: 18 U.S.C. § 641 .................................... 276

h.     18 U.S.C. § 1001 ............................................................................................. 277

i.     4.26.17 EPA Report, "Over $774 Million of Puerto Rico State Revolving Funds at Risk" ...... 278

j.     PROMESA, Fiscal Plans, and the Puerto Rico Budget ................................... 283

k.     FOMB's Actions Constituted a Usurpation of the Legislative Assembly's Power ............... 297

l.     3.13.17 Commonwealth Fiscal Plan ............................................................... 300

m.     Bank Liability Release Motions ..................................................................... 300

n.     PRASA Fiscal Plans ......................................................................................... 303

o.     GDB Fiscal Plans ............................................................................................. 311

p.     5.10.18 Oversight Board Letter to Then-Governor Rosselló ......................... 315

q.     Puerto Rico FY2019 General Fund Budget .................................................... 321

r.     GDB RSAs ........................................................................................................ 338

s.     5.2.19 Congressional Testimony of Governor Rosselló ................................. 344

t.     5.3.19 Notes of the Basic Financial Statements June 30, 2016 ..................... 345

u.     Oversight Board's Cash Restriction Analysis Reports ................................... 346

v.     Transfer of ERS Funds to the Commonwealth .............................................. 350

w.     Plaintiff's Deposit Accounts Assignments .................................................... 350

x.     Grogan's Disclosure of Federal Funds Misappropriation at GDB .................. 351

y.     Other Potential Misrepresentations in Title III Proceedings Concerning Federal Funds ........ 354

z.     12.19.17 Oversight Board's RFP for Forensic Accounting of GDB Bank Accounts .............. 354

aa.     Engagement Letter between Oversight Board and D&P ............................ 355

bb.     Second Amendment to Letter of Engagement for D&P ............................ 356

cc.     Duff & Phelps Report on Bank Accounts ..................................................... 358

dd.     12.6.19 Ambac's Response to Mediation Team ......................................... 362

ee.     2.9.20 Oversight Board Letter to AAFAF ..................................................... 362

**XXII.**    **Plaintiff's Hiring, Employment and Unlawful Discharge** ................................................ **363**

a.     The Hiring Process ......................................................................................... 363

b.     Denial of Reasonable Accommodation Request ........................................... 365

c.     The Plaintiff was an Officer of the Title III Court .......................................... 369

d.     The Directive to Falsify Evidence .................................................................. 371

e.     The Sham Email Controversy ........................................................................ 373

f.     Wrongful Termination ................................................................................... 379

***FIRST CAUSE OF ACTION***

***VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)*** ............................................................. ***400***

***SECOND CAUSE OF ACTION***

***VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)*** ............................................................. ***453***

*THIRD CAUSE OF ACTION*

*VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)..................................................................... 468*

*FOURTH CAUSE OF ACTION*

*VIOLATIONS OF RICO, 18 U.S.C. § 1962(d) ............................................................. 495*

*FIFTH CAUSE OF ACTION*

*VIOLATIONS OF RICO, 18 U.S.C. § 1962(a), (b), (c), & (d)........................................................ 509*

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*In re Citation Corp.*,
   493 F.3d 1313, 1321 (11th Cir. 2007) ................................................................................50

*In re Granite Partners, L.P.*,
   219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998) ...........................................................................49

*Armstrong v. Collins*, 01 Civ. 2437 (PAC), 2010 U.S. Dist. LEXIS 28075, 2010 WL 1141158, at \*22 (S.D.N.Y.
   Mar. 24, 2010) ....................................................................................................................233

*Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*,
   526 U.S. 434, 444 (1999) ....................................................................................................41

*Case v. L.A. Lumber Prods. Co.*,
   308 U.S. 106, 117, 60 S. Ct. 1, 8 (1939) ("*LA Lumber*") ..................................................41

*Czyzewski v. Jevic Holding Corp.*,
   137 S. Ct. 973, 978 (2017) ..................................................................................................43

*Czyzewski v. Jevic Transp., Inc. (In re Jevic Holding Corp.)*,
   656 F. App'x 617, 618 (3d Cir. 2016) ................................................................................43

*Eberhard v. Marcu*,
   530 F.3d 122, 132 n.7 (2d Cir. 2008) ...............................................................................233

*In re AFI Holding, Inc.*,
   530 F.3d 832, 845 (9th Cir. 2008) ......................................................................................49

*In re Am. Int'l Refinery, Inc.*,
   676 F.3d 455, 461 (5th Cir. 2012) ......................................................................................49

*In re Bernard L. Madoff Inv. Sec. LLC*,
   654 F.3d 229, 232 (2d Cir. 2011) ......................................................................................233

*In re BH & P Inc.*,
   949 F.2d 1300, 1308 (3d Cir. 1991) ...................................................................................48

*In re Crivello*,
   134 F.3d 831, 835 (7th Cir. 1998) ......................................................................................49

*In re Glenn Elec. Sales Corp.*,
   99 B.R. 596, 601-02 (D.N.J. 1988) .....................................................................................51

*In re Matco Elecs. Grp., Inc.*,
   383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008) ..................................................................50

*In re Olsen Indus., Inc.*,
   222 B.R. 49, 60 (Bankr. D. Del. 1997) ...............................................................................50

*United States v. Cherek,*
  734 F.2d 1248 (7th Cir. 1984)..................................................................................42

*United States v. Ellis,*
  50 F.3d 419 (7th Cir. 1995)......................................................................................42

*United States v. Gellene,*
  182 F.3d 578 (7th Cir. 1999)................................................................................42, 51

*United States v. Jackson,*
  836 F.2d 324 (7th Cir. 1987)....................................................................................42

*United States v. Key,*
  859 F.2d 1257 (7th Cir. 1988)..................................................................................42

*United States v. Lindholm,*
  24 F.3d 1078 (9th Cir. 1994)....................................................................................42

*United States v. McIntosh,*
  124 F.3d 1330 (10th Cir. 1997)................................................................................42

*United States v. Moloney,*
  287 F.3d 236, 242 (2d Cir.)....................................................................................233

*United States v. Newton,*
  326 F.3d 253, 255 n.2 (1st Cir. 2003)........................................................................9

*United States v. Phillips,*
  606 F.2d 884 (9th Cir. 1979)....................................................................................42

*United States v. Yagow,*
  953 F.2d 427 (8th Cir. 1992)....................................................................................42

8

Plaintiff Andrew S. Hennigan (the "Plaintiff"), filing his Amended Complaint *pro se,* against Defendants McKinsey & Co., Inc. ("**McKinsey & Co.**"); McKinsey Holdings, Inc. ("**McKinsey Holdings**"); McKinsey & Company Inc. United States ("**McKinsey US**"); McKinsey Recovery & Transformation Services U.S., LLC ("**McKinsey RTS**" and, collectively with McKinsey & Co., McKinsey Holdings, and McKinsey US, "**McKinsey**"); Dominic Barton; Kevin Carmody; Jon Garcia; Seth Goldstrom; Alison Proshan; Robert Sternfels; Jared D. Yerian; and all defendants named in the attached "List of Defendants" alleges as follows:

## NATURE OF PROCEEDING

1.      This amended complaint is the result of an approximately 18-month private attorney general investigation conducted by the Plaintiff commencing in August 16, 2018 pursuant to Title 18 U.S.C. §§ 1961-1964, known as the Racketeer Influenced and Corrupt Organizations ("RICO") Act.

2.      To carry out their unlawful scheme, the named Defendants have conducted a criminal enterprise through a pattern of racketeering activity in violation of RICO as a hub-and-spoke enterprise in-fact (the "Hub-and-Spoke Enterprise," the "Hub-and-Spoke Conspiracy" or, alternatively, the "Defendants").

3.      As explained by the First Circuit,

> *[i]n a "hub-and-spoke conspiracy," a central mastermind, or "hub," controls numerous "spokes," or secondary co-conspirators. These co-conspirators participate in independent transactions with the individual or group of individuals at the "hub" that collectively further a single, illegal enterprise.[1]*

4.      Similarly, albeit with greater legal gloss, the 9th Circuit has explained that

> *[a] traditional hub-and-spoke conspiracy has three elements: (1) a hub, such as a dominant purchaser; (2) spokes, such as competing*

---

[1] *United States v. Newton*, 326 F.3d 253, 255 n.2 (1st Cir. 2003) (emphasis added).

*manufacturers or distributors that enter into vertical agreements with the hub; and (3) the rim of the wheel, which consists of horizontal agreements among the spokes.*

5.      Between 2001 and the present, Defendant McKinsey and its various affiliates initiated and formed the Hub-and-Spoke Enterprise, a widespread, elaborate, and dangerous conspiracy whereby McKinsey is situated as the so-called "hub," serving as central planner and primary information conduit of the enterprise. Over the years, the Hub-and-Spoke Enterprise has grown to include a vast array of law firms, financial institutions, accounting firms and other commercial entities, including those engaged in corporate espionage, that constitute the so-called "spokes" of the Hub-and-Spoke Enterprise.

6.      Between 2001 and the present, the Hub-and-Spoke Enterprise conspired to commit and, in fact, committed egregious acts in furtherance of six interlocking conspiracies, including those

- (1) ***to commit rapacious fraud upon the Judicial Branch, including the Federal Bankruptcy Court System, through the filing of false declarations and presenting deliberate misrepresentations of law, including the omission of controlling authority***;

- (2) ***to defraud the United States through the misappropriation of federal funds allocated to clean water and drinking water funds for the benefit of the citizens of Puerto Rico***;

- (3) ***to commit bank fraud through misappropriation of deposit accounts held by the GDB***;

- (4) ***to price-fix restructuring professional fees in restraint of trade***;

10

- (5) *to perpetrate securities fraud upon innocent bondholders by and through a Ponzi scheme dealing in Puerto Rico bonds*;

- (6) *to engage in cover-up by disseminating disinformation and by injuring witnesses, including officers of the court, capable of exposing conspiracies 1 through 5*.

7.     Concerning the conspiracy to commit rapacious fraud against the federal bankruptcy system, between 2001 and the present, at the least, the Defendants have engaged in an unlawful pay-to-play scheme whereby McKinsey & Co. makes offers to bankruptcy attorneys to arrange exclusive meetings between bankruptcy counsel and high-level executives from McKinsey's most valued clients in exchange for (i) exclusive referrals of bankruptcy assignments from those attorneys, (ii) the express or implied promise not to object to McKinsey's fee applications; and (iii) the express or implied promise that those attorneys will fix legal outcomes in favor of the banks and corporate clients which McKinsey & Co. serves.

8.     Concerning matters effecting the United States of Puerto Rico, between 2014 and the present, Defendants have knowingly and intentionally made false and materially misleading statements to United States executive and judicial branch officials, including those at the EPA, FEMA, and the United States Trustee.  In addition, the Hub-and-Spoke Enterprise has filed false and materially misleading affidavits and declarations *under oath* in the Title III and Title VI debt adjustment proceedings of the Commonwealth of Puerto Rico ("Puerto Rico's Bankruptcy") pursuant to the Puerto Rico Organization, Management, and Economic Stability Act ("PROMESA").  Further, the Hub-and-Spoke Conspirators entered into an unlawful agreement to not seriously challenge, if at all, the false representations made by other co-conspirators. **And, most troubling, co-conspirator law firms entered into an unlawful agreement to fix legal**

11

**outcomes in Puerto Rico's Bankruptcy, and committed acts in the performance of said unlawful agreement, in order to enrich members of the Hub-and-Spoke Enterprise**.

9.      The unlawful scheme to fix legal outcomes has three main facets:

- (1) The sharing of work product, *i.e.*, inside information, among the Law Firm Conspirators even when each represent separate clients with adverse interests to one another;[2]

- (2) Knowingly and intentionally weakening legal arguments that favor their respective clients in order to give an exaggerated impression of "litigation risk"; and

- (3) the settlement of claims before the legal merits of the dispute can be adjudicated in public court.

10.      In addition, to ensure the survival of the Hub-and-Spoke Conspiracy and to avoid civil and criminal liability, the Defendants' entered into an unlawful agreement to engage in cover-up of wrongdoing, working separately and, when necessary, in conjunction to prevent the wrongdoing from coming to light.  Among other things, this agreement resulted in Paul Hastings and certain partners, including Luc Despins and Leslie Plaskon to terminate the Plaintiff's employment for (i) writing certain memoranda containing legal conclusions harmful to the conspiracy to fix-legal outcomes, including a memorandum on the Puerto Rico constitutional debt limit and a memorandum on whether deposit accounts were subject to modification under Title VI of PROMESA; (ii) for discovering Paul Hastings' senior litigation partner James Bliss knowingly and intentionally omitted controlling authority in the Title III adversary proceeding

---

[2] *See e.g.*, Ex. F – Email from Newman and Excerpt from Quinn Emanuel's Unfiled GDB RSA Brief.

*Official Committee of Unsecured Creditors v. Bettina Whyte*;[3] and (iii) the learning and recording of material facts that could expose the scheme to misappropriate at least $241 million in federal funds earmarked to provide clean drinking water to the citizens of Puerto Rico. Significantly, the omitted controlling authority was not only dispositive *but also favored* Paul Hastings' titular client, *i.e.*, the Unsecured Creditors' Committee of the Commonwealth of Puerto Rico.

11.     Among other things, the scheme to cover-up also functioned to whitewash reporting in the New York Times and the Wall Street Journal from 2017-2019 establishing that McKinsey and its partners had direct conflicts of interest as between serving as the Commonwealth's financial advisor and their equitable interests in MIO Partners which manages and controls various investment vehicles branded "Compass"[4]("CSS"), a bondholder and creditor of Commonwealth bonds.  In addition, these McKinsey and its partners also had indirect conflicts of interest as between (a) serving as the Commonwealth's financial advisor and (b) their equitable interests in MIO Partners, which held an over $300 million investment in Whitebox, which itself held millions of dollars in Puerto Rico bonds;[5] and (c) Strategic Value Partners LLC; and (d) Pandora Select Fund Ltd., managed by Whitebox and Compass ESMA LP.

12.     In 2018, Defendant Luskin, Eisner & Stern was retained by the Oversight Board to investigate, among other things, "whether or not McKinsey has any conflicts of interest, and *if it does, what McKinsey and the Oversight Board have done and will do to mitigate their*

---

[3] *See e.g.*, Second Amended Complaint in *The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico, as agent of The Financial Oversight and Management Board for Puerto Rico, as representative of The Commonwealth of Puerto Rico v. Bettina Whyte, at agent of the Financial Oversight and Management Board for Puerto Rico, as presentative of, The Puerto Rico Sales Tax Financing Corporation*, Case No. 17-00257, Dkt. 221, at 31-34, ¶¶ 142, 145 (filed on 1/16/18) (hereinafter, the "COFINA Complaint") (citing state supreme court cases when senior partner James Bliss was aware of controlling U.S. Supreme Court cases).
[4]  McKinsey-MIO Report, at 6 ("Compass CSS High Yield Fund LLC, Compass ESMA LP, and Compass TSMA LP").
[5]  As discussed below, Citigroup [and others had similar conflicts of interests].

*impact*."[6] Regrettably, the LSE McKinsey Report is a wholly fraudulent document containing

scores of false and materially misleading statements meant to deceive the Title III Court.  It is an

abomination, constituting a total and utter fraud upon a federal court, and must be denounced.

13.     In participating in a pattern of racketeering activity, among other things, the

Defendants' crimes include:

- Bankruptcy fraud in violation of 18 U.S.C. §§ 152(2), 152(3), and 152(6);

- Mail fraud in violation of 18 U.S.C. § 1341;

- Wire fraud in violation of 18 U.S.C. § 1343;

- Bank fraud in violation of 18 U.S.C. § 1344;

- Obstruction of justice in violation of 18 U.S.C. §§ 1503(a) and 1512(c);

- Witness tampering in violation of 18 U.S.C. § 1512(b); and

- Unlawful monetary transactions in violation of 18 U.S.C. § 1957(a).

14.     The racketeering activity perpetrated by McKinsey's Hub-and-Spoke Enterprise

was aimed to enrich the hub-and-spoke conspirators and to eliminate threats to its existence by

means of retaliation against those, such as the Plaintiff, who might shine a light on it. Defendants

knew that if the enormity of their unlawful acts were to see public light, the Defendants would

face civil and criminal liability, and a great fall in the estimation of their friends, family and

colleagues. Defendants thus saw no fraudulent misrepresentation, omission or retaliatory act –

including filing false declarations under penalty of perjury in U.S. Federal Court and willfully

harming the Plaintiff – was too large or irreprehensible to keep the conspiracy going.  Without

performing such unlawful acts, the Defendants would have lost, in the aggregate, billions in

profits to law abiding businesses. Absent Defendants' unlawful conduct, *the entire population of*

_____
[6] Case:17-03283-LTS Doc#:5154, at [] (filed 2/18/19).

*Puerto Rico*, as well as good faith purchasers of Puerto Rico bonds, would have more of their rightful property; a government without corruption; and a vastly better future in prospect. Less importantly, but of provincial concern, the Plaintiff would remain gainfully employed as a restructuring attorney in New York and would not have been subject to wrongful discharge, coercion, harassment and invasion of privacy but for the unlawful acts of the Defendants. Through Defendants various unlawful schemes, McKinsey, through its investment arm, MIO Partners ("MIO") has alone profited by receiving hundreds of millions of dollars in ill-gotten gains through inflated bankruptcy fees, manipulation of stock prices and engaging in the restraint of trade in coordinated efforts with banks and its long list of Fortune 500 clientele.

15.     The Plaintiff is an injured party as a direct consequence of the Defendants' unlawful scheme and its execution. Defendants' criminal enterprise has caused the Plaintiff to lose his employment and income, resulting in serious injury to the business reputation which he earned through hard work, not fraud. If not for the Defendants' unlawful scheme, the Plaintiff would still be receiving an income commiserate with that of a restructuring attorney in Manhattan and would still enjoy an earning capacity consistent with (i) his experience as a bankruptcy clerk in the Southern District of New York; (ii) his publication in the Norton Journal of Bankruptcy Law and Practice; (iii) his educational training; and (iv) his experience having worked on the Puerto Rico Bankruptcy, the largest governmental bankruptcy in U.S. History. However, because the Plaintiff persisted in pursuing a course of conduct consistent with the legal profession's ethical and moral imperatives, he was retaliated against in the interest of McKinsey's Hub-and-Spoke Enterprise, depriving him of his salary, good business reputation, and the earning capacity which he obtained through diligence and conducting his business affairs in a truthful and honorable manner. Had the Defendants complied with the law and conducted

15

their business affairs in a truthful and honorable manner, Puerto Rico citizens, the American taxpayer, the U.S. bankruptcy system and, less importantly, the Plaintiff would not have suffered such devastating injuries.

16.     Through Defendants' racketeering scheme, the Hub-and-Spoke Conspirators have received billions in profits.  In the Puerto Bankruptcy, the Hub-and-Spoke Conspirators have obtained hundreds of millions, if not billions, in professional fees, ill-gotten profits by illegally trading Puerto Rico bonds on inside information and by perpetrating a massive Ponzi scheme using a securitization structure created in 2007 called COFINA.  In addition, the Hub-and-Spoke Conspirators have granted themselves full and complete mutual releases from liability effectively eliminating billions of dollars of civil liability arising from their unlawful schemes.

17.     The Plaintiff seeks compensation for damages he incurred as a result of the Defendants' racketeering activity as provided for in 18 U.S.C. § 1964(a); an injunction prohibiting McKinsey from further participation in the Puerto Rico Bankruptcy; and other relief as provided for by law and in equity.

**PARTIES**

18.     Plaintiff Andrew Hennigan is a resident of Arcadia, California.

19.     Defendant McKinsey & Co. is a New York corporation with its principal place of business in New York, New York.

20.     Defendant McKinsey Holdings is a Delaware corporation with its principal place of business in New York, New York. It is a wholly-owned subsidiary of McKinsey & Co.

21.     Defendant McKinsey US is a Delaware corporation with its principal place of business in New York, New York. It is a wholly-owned subsidiary of McKinsey & Co.

22.     Defendant McKinsey RTS is a limited liability company organized under the laws of Delaware with its principal place of business in New York, New York. Its sole member is McKinsey US.

23.     Defendant Dominic Barton, an individual, is a Canadian citizen domiciled in London, United Kingdom. Barton was the Managing Partner of McKinsey & Co. from 2009 until mid-2018.

24.     Defendant Kevin Carmody, an individual, resides in Illinois. Carmody is a Senior Partner of McKinsey & Co. and the global leader of McKinsey RTS's corporate restructuring practice.

25.     Defendant Jon Garcia, an individual, resides in the District of Columbia. Garcia is a founder and the President of McKinsey RTS. Garcia is also a Senior Partner of McKinsey & Co., and from 2006 to 2017 served as a member of the board of directors of McKinsey's investment arm, MIO.

26.     Defendant Seth Goldstrom, an individual, resides in Georgia. Goldstrom is a Senior Partner of McKinsey & Co., the global leader of McKinsey & Co.'s enterprise transformation practice, and a board member of McKinsey RTS.

27.     Defendant Alison Proshan, an individual, resides in New York. Proshan is a Senior Vice President of and Associate General Counsel to McKinsey & Co., and, in that capacity, provides extensive legal and management services to McKinsey RTS.

28.     Defendant Robert Sternfels, an individual, resides in California. Sternfels is a Senior Partner of McKinsey & Co. and a member of McKinsey & Co.'s Shareholders' Council.

29.     Defendant Jared D. Yerian, an individual, resides in Illinois. Until March 2016, Yerian was a Partner of McKinsey & Co., and was a founder of and Practice Leader at McKinsey RTS.

30.     Defendant Ricardo Rosselló Nevares, former Governor of Puerto Rico, resides in Puerto Rico and is the highest-ranking official of the Executive Branch of the Commonwealth, and is sued in his official capacity.

31.     Defendant Gerardo Portela Franco resides in Puerto Rico and is a member of the Board of Directors of Defendant GDB, a member of the Board of Directors of COFINA, and the Executive Director of Defendant AAFAF.  In his capacity as Executive Director of AAFAF, Mr. Portela has been tasked by Defendant Rosselló Nevares with leading negotiations related to the restructuring of Puerto Rico's debts, including Defendant GDB's obligations.

32.     Defendant Christian Sobrino Vega resides in Puerto Rico and is the President of Defendant GDB, a member of the Board of Directors of Defendant GDB, a member of the Board of Directors of COFINA, President of the Board of Directors of Defendant AAFAF, and the ex-officio Member of Defendant Oversight Board.

33.     Defendant Alberto C. Rodríguez Pérez resides in Puerto Rico and is the Chairman of the Board of Directors of Defendant GDB.

34.     Defendant Gabriel Olivera Magraner resides in Puerto Rico and is the Vice-Chairman of the Board of Directors of Defendant GDB.

35.     Defendant Rafael L. Rovira Arbona resides in Puerto Rico and is a member of the Board of Directors of Defendant GDB.

36.     Defendant José B. Carrión III resides in Puerto Rico and is a member and the Chair of Defendant Oversight Board, and is sued in his official capacity. Richard Carrion is family member who is chairman of the board for Banco Popular.

37.     Defendant Andrew G. Biggs is a member of Defendant Oversight Board, and is sued in his official capacity.

38.     Defendant Carlos M. García resides in Puerto Rico and is a member of Defendant Oversight Board.

39.     Defendant Arthur J. González is a member of Defendant Oversight Board.

40.     Defendant José R. González  resides in Puerto Rico and is a member of Defendant Oversight Board.

41.     Defendant Ana J. Matosantos is a member of Defendant Oversight Board.

42.     Defendant David A. Skeel, Jr. is a member of Defendant Oversight Board.

43.     Defendant Natalie Jaresko is the Executive Director of Defendant Oversight Board.

44.     Defendant Jorge L. Padilla is a member of the Board of Trustees of the GDB Debt Recovery Authority.

45.     Defendant Matthew Karp is a member of the Board of Trustees of the GDB Debt Recovery Authority.

46.     David Pauker is a member of the Board of Trustees of the GDB Debt Recovery Authority, and is sued in his official capacity.

47.     Defendant Carlos Garcia resides in Puerto Rico and is a member of the Oversight Board.  Between 1995-1997, C. Garcia worked for Defendant Popular Securities. Between 1997-2008, C. Garcia served as an executive vice president (EVP) and chief operating officer (COO)

19

of Defendant Santander Bancorp and then as President of Defendant Banco Santander. From 2009 to 2011, he served as Chairman, President and CEO of GDB. Then, from 2011 to 2013, C. Garcia served as Senior EVP and board member for Defendant Santander Holdings USA and Defendant Santander Bank, N.A. (2011-2013).

48.     Defendant Jose Carrion resides in Puerto Rico and is a member of the Oversight Board. His family founded Defendant Banco Popular and J. Carrion is related to Richard Carrion, CEO of Banco Popular.

49.     Defendant José Gonzalez resides in Puerto Rico and is a member of the Oversight Board. From 1996 to 2001, J. Gonzalez served as the CEO of Defendant Santander Securities. From 2002 to 2006, he serves as CEO of Defendant Santander Bankcorp.

50.     Defendant Jose Coleman Tio resides in Puerto Rico and is President of RCT Advisors, which is a consultant for the Oversight Board. Tio was hired as a consultant for the Oversight Board in 2016 for $18,500 per month, after having served as EVP and general counsel for the GDB from 2013-15. In 2017, J. Coleman accepted an offer to lead the legal division of Defendant Banco Popular.[7]

51.     Defendant Juan Carlos Batlle resides in Puerto Rico and is a senior managing director of Defendant Ankura. From 1997 to 2011, J. Batlle served as CEO of Defendant Santander Asset Management and Managing Director of Defendant Santander Securities. From 2011 to 2012, he served as President of the GDB.

52.     Defendant Fernando Batlle resides in Puerto Rico and is a senior managing director of Defendant Ankura. From 2009 to 2011, F. Batlle served as EVP of Finance and

---

[7] See UCC Omnibus Reply to Various Objections and Responses to Committee Motion, Case No. 17-03283, Dkt. 1080, at 32 of 39 (filed August 18, 2017); see also Luis J. Valentín Ortiz, "Fiscal Oversight board reveals nearly 20 contracts," caribbeanbusiness.com (February 28, 2017) (last accessed February 9, 2020) (*available at* https://caribbeanbusiness.com/fiscal-oversight-board-reveals-nearly-20-contracts/).

Treasury at the GDB.  From 2011 to 2016, F. Battle served as CRO of Defendant Santander
Securities.

53.     Defendant Alfredo Salazar resides in Puerto Rico and was President of Banco de
Ponce (purchased by Banco Popular) from 1983 to 1993.  He then served as President of GDB
from 2005 to 2007.

54.     Defendant Alejandro Ballester resides in Puerto Rico and was Director of GDB in
2009.  From 2010 to the present, he served on the board of directors of Banco Popular.

55.     Defendant Jamie El Koury resides in New York and serves as general counsel for
the Oversight Board.

56.     Defendant Andrea Bonime-Blanc resides in New York and serves as the
Oversight Board's ethics advisor.

### ***Co-Conspirator Law Firms***

57.     Defendant Proskauer Rose LLP ("Proskauer"), 11 Times Square, New York, New
York 10036, represents and conspired with Defendant the Oversight Board as co-conspirators.

58.     Defendant Brian Rosen resides in New York and is a partner at Proskauer.

59.     Defendant Paul Hastings LLP ("Paul Hastings") is an international corporate law
firm that is headquartered in Los Angeles, California.[8]  It maintains twenty-two offices
worldwide, including in New York, Chicago, Shanghai, China, and Brussels.[9]  On information
and belief, Paul Hastings employs approximately 921 attorneys, in addition to a large number of

---

[8] https://en.wikipedia.org/wiki/Paul_Hastings.
[9] https://en.wikipedia.org/wiki/Paul_Hastings.

administrative personnel.[10] In 2017, Paul Hastings earned approximately $1.118 billion in gross

revenue.[11]

      60.     Defendant Marc Bernstein ("Bernstein") resides in New York is an attorney

licensed to practice in the State of New York and partner in Paul Hastings' employment law

department in New York, which he chairs.[12]  Prior to joining Paul Hastings in March of 2010,

Bernstein served as Associate General Counsel at the American International Group, Inc.

("AIG") from 1995-2010.  While at AIG, Bernstein led AIG's labor and employment legal group

and advised AIG's management on employment issues. At Paul Hastings, Bernstein has

represented clients including, among others, AIG, Alliance Industries, Inc., and Chartis Global

Investigations, Inc.

      61.     Defendant James R. Bliss ("Bliss") resides in New York and is an attorney

licensed to practice in the State of New York and partner in Paul Hastings' litigation department

in New York.[13]  In addition, Bliss headed the litigation department in Paul Hastings'

representation of the Official Committee of Unsecured Creditors in debt adjustment proceedings

of the Commonwealth of Puerto Rico and its various instrumentalities, including the

Government Development Bank (the "GDB").

      62.     Defendant Luc A. Despins ("Despins") resides in New York and is an attorney

licensed to practice in the State of New York and partner in Paul Hastings' litigation department

in New York.  Despins serves as the chair of the Global Restructuring practice.  On information

and belief, Despins' compensation in 2017 was approximately $9 to 11 million.

---

[10] https://www.law.com/legal-week/2018/03/02/revenue-profits-per-partner-hit-new-highs-at-paul-hastings/
[11] https://www.law.com/legal-week/2018/03/02/revenue-profits-per-partner-hit-new-highs-at-paul-hastings/
[12] http://www.paulhastings.com/professionals/details/marcbernstein
[13] http://www.paulhastings.com/professionals/details/jamesbliss

63.     Defendant Leslie A. Plaskon ("Plaskon") resides in New York and is a licensed attorney in the State of New York, former partner in Paul Hastings' Finance and Restructuring practice, and current partner at Sidley Austin.

64.     Defendant Cheryl R. Saban ("Saban") resides in New York and is a licensed attorney in the State of New York and a partner in the Employment Law practice of Paul Hastings in New York.  She also serves as "global employment counsel" to the firm.

65.     Defendant Stephen H. Harris ("Harris") resides in or near Los Angeles, California, and is a licensed attorney in both State of New York and State of California and a partner in the Employment Law Department of Paul Hastings.  Based in Los Angeles, Harris also serves as co-chair of the firm's Global Compensation, Benefits, and ERISA practice.  As recent September 2018, Harris served as a managing partner for Paul Hastings.

66.     Defendant G. Alex Bongartz ("Bongartz") resides in New York and is a licensed attorney in the State of New York and is of counsel in the Finance and Restructuring practice of Paul Hastings in New York.  According to Paul Hastings website, Bongartz has "significantly involved" in bankruptcy cases including Semcrude, L.P., and Lehman Brothers Holdings Inc., among others.  In addition, Bongartz plays an instrumental role, answering directly to Despins, in Paul Hastings' representation of the Official Committee of Unsecured Creditors in debt readjustment proceedings of the Commonwealth of Puerto Rico and its various instrumentalities, including the GDB.

67.     Defendant Ashley Kelloff ("Kelloff") resides in or near Los Angeles, California, and is the Chief Talent Officer at Paul Hastings, based in Los Angeles.  Prior to her arrival to Paul Hastings in June of 2018, Kelloff served as the Senior Vice President of Human Resources at Citigroup.

23

68.     Defendant Martin J. Bienenstock resides in New York and is a partner at
Proskauer.

69.     Defendant O'Neill & Borges LLC, 250 Muñoz Rivera Ave., Suite 800, San Juan,
PR 00918- 1813, [Hermann D. Bauer, Esq.] represents and conspired with Defendant the
Oversight Board as co-conspirators, in addition to other members of the hub-and-spoke
conspiracy.

70.     Defendant Luskin, Stern & Eisler is a law firm located at 11 8th Ave # 16F, New
York, NY 10036 is a co-conspirator of the hub-and-spoke conspiracy.

71.     Defendant Marini Pietrantoni Muniz, LLC, MCS Plaza, Suite 500, 255 Ponce de
León Ave., San Juan P.R. 00917 represents and conspired with Defendant AAFAF as co-
conspirators.

72.     Defendant O'Melveny & Myers LLP ("OMM"), Times Square Tower, 7 Times
Square, New York, NY 10036, represents and conspired with AAFAF as co-conspirators.

73.     Defendant John J. Rapisardi resides in New York and is a partner at OMM.

74.     Defendant Suzzanne Uhland resides in California and is a partner in OMM's San
Francisco and New York offices.

75.     Defendant Diana M. Perez resides in New York and is a partner at OMM.

76.     Defendant Paul Hastings LLP, 200 Park Ave., New York, NY 10166, represents
the Official Committee of Unsecured Creditors and are co-conspirators of the hub-and-spoke
conspiracy.

77.     Defendant Kramer Levin Naftalis & Frankel LLP ("Kramer Levin"), 1177
Avenue of the Americas, New York, NY 10036. Kramer Levin represents and conspired with
Defendants Oppenheimer, including Oppenheimer Funds and OFI Global Institutional, Inc. and

the First Puerto Rico Family of Funds, which include Defendants Franklin Advisers and Santander Asset Management, in addition to other members of the hub-and-spoke conspiracy.

78.     Defendant Thomas Moers Mayer resides in New York and is a partner at Kramer Levin.

79.     Defendant Amy Caton resides in New York and is a partner at Kramer Levin.

80.     Defendant Douglas Buckley resides in New York and is a partner at Kramer Levin.

81.     Defendants Davis, Polk & Wardwell LLP ("Davis Polk), 450 Lexington Avenue, New York, NY 10017. Davis Polk represents and conspired with Defendants Bonistas del Patio, Inc. as co-conspirators, in addition to other members of the hub-and-spoke conspiracy.

82.     Defendant Douglas Buckley resides in New York and is a partner at Davis Polk.

83.     Defendant Brian Resnick resides in New York and is a partner at Davis Polk.

84.     Defendants Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), One Bryant Park, New York, NY 10036. Akin Gump represented and conspired with Defendants GoldenTree Asset Management, Inc. as co-conspirators, in addition to other members of the hub-and-spoke conspiracy.

85.     Defendant Ira S. Dizengoff resides in New York and is a partner at Akin Gump.

86.     Defendant Philip C. Dublin resides in New York and is a partner at Akin Gump.

87.     Defendants Simpson Thacher & Barlett LLP ("Simpson Thacher"), 425 Lexington Avenue, New York, NY 10017.  Simpson Thacher represents and conspired with Defendants Tilden Park Captial Management LP. as co-conspirators, in addition to other members of the hub-and-spoke conspiracy.

88.     Defendant Sandy Qusba resides in New York and is a partner at Simpson

Thacher.

89.     Defendant Nicholas Baker resides in New York and is a partner at Simpson

Thacher.

90.     Defendants Stroock & Stroock & Lavan LLP ("Stroock & Stroock"), 180 Maiden

Lane, New York, NY 10038, Stroock & Stroock represents and conspired with Defendants

Tilden Park Captial Management LP. as co-conspirators Whitebox Advisors LLC, in addition to

other members of the hub-and-spoke conspiracy.

91.     Defendant Daniel A. Fliman resides in New York and is a partner at Stroock &

Stroock.

92.     Defendant Norton Rose Fulbright US LLP ("Norton Rose"), 1301 Avenue of the

Americas, New York, NY 10019, Norton Rose represents and conspired with the bondholder

group the "Insured Senior Holders," in addition to other members of the hub-and-spoke

conspiracy.

93.     Defendant Lawrence A. Larose resides in New York and is a partner at Norton

Rose.

94.     Defendant Eric Daucher resides in New York and is a partner at Norton Rose.

95.     Defendant Tilden Park Captial Management LP. as co-conspirators Whitebox

Advisors LLC.

96.     Defendant White & Case LLP, 200 South Biscayne Boulevard, Miami, FL 33131,

[ John K. Cunningham, Esq. and Fernando de la Hoz, Esq.]. White & Case represents and

conspired with the bondholder group the "Puerto Rico Funds," in addition to other members of

the hub-and-spoke conspiracy.

97.     Defendant Lawrence A. Larose resides in Florida and is a partner at White &
Case.

98.     Defendant Fernando de la Hoz resides in Florida and is a partner at White & Case.

99.     Defendant McDermott, Will & Emery LLP ("McDermott"), 444 West Lake
Street, Chicago, IL 60606, [William P. Smith, Esq., David L. Taub, Esq., and Alexandra C.
Scheibe, Esq.] Represented and conspired defendant Goldman Sachs Asset Management, in
addition to other members of the hub-and-spoke conspiracy.

100.    Defendant William P. Smith resides in New York and is a partner at McDermott.

101.    Defendant David L. Taub resides in New York and is a partner at McDermott.

102.    Defendant Alexandra C. Scheibe resides in New York and is a partner at
McDermott.

103.    Defendant Quinn Emanuel Urquhart & Sullivan, LLP ("Quinn Emanuel"), 51
Madison Avenue, New York, NY 10010, Attn: Susheel Kirpalani, Esq. and Eric Kay, Esq.
Represented and conspired with the Senior COFINA Bondholders, in addition to other members
of the hub-and-spoke conspiracy.

104.    Defendant Susheel Kirpalani resides in New York and is a partner at Quinn
Emanuel.

105.    Defendant Eric Kay resides in New York and is a partner at Quinn Emanuel.

106.    Defendant the Law Office of James G. McCarney, 29 Broadway, Suite 1400, New
York, New York 10006.

107.    Defendant Oversight Board was established under PROMESA § 101 "to provide
a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets." 48
U.S.C. § 2121.  Among its duties, Defendant Oversight Board is responsible for issuing

27

Voluntary Agreement Certifications pursuant to PROMESA § 104(i) and for acting as

Administrative Supervisor pursuant to and under PROMESA Title VI, including by issuing the

certifications required by PROMESA §§ 601(g) and (m). See 48 U.S.C. §§ 2124(i) & 2231.

108.    Defendant Bonistas del Patio is incorporated and headquartered in Puerto Rico.

109.    Defendant BDO Puerto Rico is incorporated and headquartered in Puerto Rico.

### The Underwriter Defendants[14]

110.    Defendant Citigroup Global Markets Inc. ("Citigroup Global Markets") is an

SEC-registered broker-dealer headquartered at 388 Greenwich Street, New York, NY 10013.

Citigroup Global Markets is organized under the laws of the state of New York and has its

principal place of business in New York. It is an indirect wholly-owned subsidiary of non-party

Citigroup Global Markets Holdings Inc., which in turn is a wholly-owned subsidiary of non-

---

[14] The Underwriter Defendants who participated in the 2014 GO Bond issuance shall be referred to as the "2014 GO Bond Underwriters." The Underwriter Defendants who participated in the GO Bond Series 2012A shall be referred to as the "2012 Series A GO Bond Underwriters." The Underwriter Defendants who participated in the GO Bond Series 2012B shall be referred to as the "2012 Series B GO Bond Underwriters." The Underwriter Defendants who participated in the Series 2011 A shall be referred to as the "2011 Series A Bond Underwriters." The Underwriter Defendants who participated in the Series 2011 C shall be referred to as the "2011 Series C Bond Underwriters." The Underwriter Defendants who participated in the Series 2011 D shall be referred to as the "2011 Bond Series D Underwriters." The Underwriter Defendants who participated in the Series 2011 E shall be referred to as the "2011 Series E Bond Underwriters." The Underwriter Defendants who participated in the PBA Bond Series 2012 U shall be referred to as the "2012 Series U PBA Bond Underwriters." The Underwriter Defendants who participated in the PBA Bond Series 2011 R  shall be referred to as the "2011 Series R PBA Bond Underwriters." The Underwriter Defendants who participated in the PBA Bond Series 2011 S shall be referred to as the "2011 Series S PBA Bond Underwriters." The Underwriter Defendants who participated in the PBA Bond Series 2011 T shall be referred to as the "2011 Series T PBA Bond Underwriters." The Underwriter Defendants who participated in the GO Bond Series 2009A shall be referred to as the "2009 Series A GO Bond Underwriters." The Underwriter Defendants who participated in the GO Bond Series 2009B shall be referred to as the "2009 Series B GO Bond Underwriters." The Underwriter Defendants who participated in the GO Bond Series 2009C shall be referred to as the "2009 Series C GO Bond Underwriters." The Underwriter Defendants who participated in the 2009 PBA Bond Series P and Q shall be referred to as the "2009 Series P and Q PBA Bond Underwriters." The Underwriter Defendants who participated in the 2009 PBA Bond Series K shall be referred to as the "2009 Series K PBA Bond Underwriters." The Underwriter Defendants who participated in the ERS Bond Series A shall be referred to as the "ERS Series A Bond Underwriters." The Underwriter Defendants who participated in the ERS Bond Series B and C shall be referred to as the "ERS Series B and C Bond Underwriters." The Underwriter Defendants who participated in the GO Bond Series 2007A-4 shall be referred to as the "2007 Series A-4 GO Bond Underwriters."

party Citigroup Inc. Citigroup Global Markets has been a registered broker-dealer in Puerto Rico
since September 1, 1984.

111.    Defendant Citigroup Global Markets ("Citigroup") underwrote Commonwealth
Public Improvement Refunding Bonds, Series 2003C and 2007A; PRHTA, Highway Revenue
Refunding Bonds, Series AA; PRHTA, Transportation Revenue Bonds, Series J; PRHTA,
Transportation Revenue Refunding Bonds, Series L and N; PREPA, Power Revenue Bonds,
Series NN and RR; PREPA, Power Revenue Refunding Bonds, Series OO, SS, UU, and VV;
COFINA, Sales Tax Revenue Bonds, Series 2007A; the Commonwealth's 2003 GO Bond
issuance, Series B and C; GO Bond Series 2012 A and B; GO Bond Series 2011 A, C, D, and E;
GO Bond Series 2009 C; PBA Bond Series 2011 R and S; PBA Bond Series 2012 U; and ERS
Bond Series 2008 A.

112.    Defendant Citigroup Global Markets acted as lead underwriter for the following
bonds: PRHTA, Highway Revenue Refunding Bonds, Series AA; PRHTA, Transportation
Revenue Bonds, Series J; and PRHTA, Transportation Revenue Refunding Bonds, Series L and
N.

113.    Defendant Goldman Sachs & Co. LLC ("Goldman Sachs LLC") is an SEC-
registered broker-dealer headquartered at 200 West Street, New York, NY 10282. Goldman
Sachs LLC is organized under the laws of the state of New York and has its principal place of
business in New York. Goldman Sachs LLC is a subsidiary of non-party Goldman Sachs Group,
Inc. ("Goldman Sachs"), which, subject to certain exceptions, has guaranteed the payment
obligations of Goldman Sachs LLC. Formerly known as Goldman Sachs & Co., in April 2017, it
converted from a limited partnership to a limited liability company. Its activities include
investment banking, institutional client services, investing and lending, and investment

management. Goldman Sachs LLC is the primary U.S. broker-dealer of non-party Goldman Sachs and has been a registered broker-dealer in Puerto Rico since September 1, 1984.

114.    Defendant Goldman Sachs LLC underwrote Commonwealth Public Improvement Refunding Bonds, Series 2002A, 2003C, and 2007A; PRHTA, Highway Revenue Refunding Bonds, Series AA; PRHTA, Transportation Revenue Bonds, Series J; PRHTA, Transportation Revenue Refunding Bonds, Series L and N; PREPA, Power Revenue Bonds, Series LL, NN, and RR; PREPA, Power Revenue Refunding Bonds, Series MM, OO, SS, UU, and VV; and COFINA, Sales Tax Revenue Bonds, Series 2007A. Goldman Sachs LLC acted as lead underwriter for PRHTA, Transportation Revenue Refunding Bonds, Series N; Commonwealth Public Improvement Refunding Bonds, 2003C; PREPA, Power Revenue Bonds, Series LL, MM, and NN; and COFINA Sales Tax Revenue Bonds, Series 2007A.

115.    Defendant UBS Financial Services, Inc. ("UBS Financial Services") is a broker-dealer registered with the Securities and Exchange Commission ("SEC") and headquartered at 1200 Harbor Blvd, Weehawken, NJ 07086. UBS Financial Services is organized under the laws of the state of Delaware and has its principal place of business in New Jersey. Formerly known as UBS PaineWebber Inc., it is a wholly- owned subsidiary of non-party UBS Americas Inc., which in turn is a wholly-owned subsidiary of non-party UBS Americas Holding LLC, which in turn is a wholly-owned subsidiary of non-party UBS AG, which in turn is a wholly-owned subsidiary of non- party UBS Group AG, the ultimate parent. UBS Financial Services has been a registered broker-dealer in Puerto Rico since September 1, 1984.

116.    Defendant UBS Securities LLC ("UBS Securities") is an SEC-registered broker-dealer headquartered at 1285 Avenue of the Americas, New York, NY 10019. UBS Securities is organized under the laws of the state of Delaware and has its principal place of business in New

York. Formerly known as UBS Investment Bank, it is a subsidiary of non-party UBS Americas Inc., which in turn is a wholly-owned subsidiary of non-party UBS Americas Holding LLC, which in turn is a wholly-owned subsidiary of non-party UBS AG, which in turn is a wholly-owned subsidiary of non- party UBS Group AG, the ultimate parent. UBS Securities has been a registered broker-dealer in Puerto Rico since June 4, 1992.

117.    Defendant UBS Financial Services and UBS Securities (collectively, the "UBS Defendants") underwrote Commonwealth, Public Improvement Refunding Bonds, Series 2002A, 2003C, and 2007A; PRHTA, Highway Revenue Refunding Bonds, Series AA; PRHTA, Transportation Revenue Bonds Series J; PRHTA, Transportation Revenue Refunding Bonds Series L and N; PREPA, Power Revenue Bonds Series LL, NN, and RR; PREPA, Power Revenue Refunding Bonds Series MM, OO, SS, UU, and VV; and COFINA, Sales Tax Revenue Bonds, Series 2007A. UBS Financial Services acted as lead underwriter for Commonwealth, GO Bond Series 2012 A and B; GO Bond Series 2011 A, C, D, and E; GO Bond Series 2009 A, B, and C, and the 2014 GO Bond issuance; PBA Bond Series 2011 R, S, and T; PBA Bond Series 2012 U; PBA Bond Series 2009 P and Q; and ERS Bond Series 2008 A, B and C; Public Improvement Refunding Bonds, 2002A and PREPA, Power Revenue Refunding Bonds, Series VV. UBS Securities acted as lead underwriter for Commonwealth, Public Improvement Refunding Bonds Series, 2007A and PRHTA, Revenue Refunding bonds, Series L.

118.    Defendant UBS Financial, in addition to being an underwriter of bonds issued by the Commonwealth, its agencies, the public corporations that provided utilities services and other public corporations and instrumentalities of the Commonwealth ("Public Entities"), was an interest rate swap counterparty to the Commonwealth that was paid termination fees from the

proceeds of the 2014 GO Bond issuance. As a swap counterparty, UBS received $93,132,840 in termination fees paid for swaps between 2006 and 2014.

119.    Defendant Barclays Capital ("Barclays") is a British multinational investment bank providing advisory, financing, and risk management services. Barclays was a lead underwriter of the 2014 GO Bond issuance. It was also an underwriter for the GO Bond Series 2012 A and B; GO Bond Series 2011 A, C, D, and E; GO Bond Series 2009 A, B, and C; PBA Bond Series 2011 R and S; PBA Bond Series 2012 U; and PBA Bond Series 2009 P and Q.

120.    Defendant Jefferies Group LLC ("Jefferies") is a United States-based multinational investment bank and financial services company. Jefferies was an underwriter of the 2014 GO Bond issuance and was also an underwriter of the GO Bond Series 2012 A; GO Bond Series 2011 C, D, and E; PBA Bond Series 2011 S; and PBA Bond Series 2012 U.

121.    Defendant Mesirow Financial, Inc. ("Mesirow") is a United States financial services company providing investment management, capital markets, and investment banking services. Mesirow was an underwriter of the 2014 GO Bond issuance.

122.    Defendant Morgan Stanley & Co. LLC ("Morgan Stanley LLC") is an SEC-registered broker-dealer headquartered at 1585 Broadway, New York, NY 10036. Morgan Stanley LLC is organized under the laws of the state of Delaware and has its principal place of business in New York. It is a wholly-owned subsidiary of non-party Morgan Stanley Domestic Holdings, Inc., which in turn is a wholly-owned subsidiary of non-party Morgan Stanley Capital Management, LLC, which in turn is a wholly-owned subsidiary of non-party Morgan Stanley, the ultimate parent. Morgan Stanley LLC engages in securities underwriting and distribution and financial advisory services. It is a primary U.S. broker-dealer of non-party Morgan Stanley and has been a registered broker-dealer in Puerto Rico since November 8, 1985.

123.     Defendant Morgan Stanley LLC underwrote Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2002A, 2003C, and 2007A; PRHTA, Highway Revenue Refunding Bonds, Series AA; PRHTA, Transportation Revenue Bonds, Se- ries J; PRHTA, Transportation Revenue Refunding Bonds, Series L and N; PREPA, Power Revenue Bonds, Series LL, NN, and RR; PREPA, Power Revenue Refunding Bonds, Series MM, OO, SS, UU, and VV; and COFINA, Sales Tax Revenue Bonds, Series 2007A. Morgan Stanley LLC acted as lead underwriter for PREPA Revenue bonds Series RR and SS, and Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2003C.

124.     In addition to being an underwriter of bonds issued by the Debtors, Morgan Stanley was a swap counterparty to the Debtors that received $299,409,992 in termination fees for swaps from 2006 to 2014.

125.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is an SEC-registered broker-dealer headquartered at One Bryant Park, New York, NY 10036. Merrill Lynch is organized under the laws of the state of Dela- ware and has its principal place of business in New York. It operates as a subsidiary of non-party BAC North America Holding Company, which in turn operates as a subsidiary of non-party NB Holdings Corporation, which in turn operates as a subsidiary of non-party Bank of America Corporation, the ultimate parent. Merrill Lynch is the primary U.S. broker-dealer of non-party Bank of America. It has been a registered broker-dealer in Puerto Rico since September 1, 1984 and maintains an office in Puerto Rico located at 15 Second Street, Suite 210, Guaynabo, PR 00968.

126.     Defendant Merrill Lynch underwrote Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2002A, 2003C, and 2007A; PRHTA, Highway Revenue Refunding Bonds, Series AA; PRHTA, Transportation Revenue Bonds Series J; PRHTA,

Transportation Revenue Refunding Bonds, Series L and N; PREPA, Power Revenue Bonds, Series LL, NN, and RR; PREPA, Power Revenue Refunding Bonds, Series MM, OO, SS, UU, and VV; and COFINA, Sales Tax Revenue Bonds, Series 2007A.

127.    In 2010, Merrill Lynch became the successor by merger to Banc of America Securities LLC ("Banc of America Securities"). Banc of America Securities underwrote Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2002A, 2003C, and 2007A; PRHTA, Highway Revenue Refunding Bonds, Series AA; PRHTA, Transportation Revenue Bonds, Series J; PRHTA, Transportation Revenue Refunding Bonds, Series L and N; PREPA, Power Revenue Bonds, Series LL, NN, and RR; PREPA, Power Revenue Refunding Bonds, Series MM, OO, SS, UU, and VV; and COFINA, Sales Tax Revenue Bonds, Series 2007A.

128.    In 2009, Merrill Lynch became the successor by merger to Banc of America Investment Services, Inc., which had previously acquired LaSalle Financial Services, Inc., formerly known as ABN AMRO Financial Services, Inc. ("ABN AMRO"). ABN AMRO underwrote Commonwealth of Puerto Rico, Public Improvement Refunding Bonds, Series 2002A; PREPA, Power Revenue Bonds, Series LL; and PREPA, Power Revenue Refunding Bonds, Series MM.

129.    Defendant Merrill Lynch was an interest rate swap counterparty to the Debtors that was paid termination fees from the proceeds of the 2014 GO Bond issuance. As a swap counterparty, it received $1,807,880 in termination fees for swaps from 2006 to 2014.

130.    Defendant RBC Capital Markets LLC ("RBC Capital Markets") is an SEC-registered broker-dealer headquartered at 200 Vesey Street, New York, NY 10281. RBC Capital Markets is organized under the laws of the state of Minnesota and has its principal place of

business in New York. It is a subsidiary of non-party RBC USA Holdco Corporation, which in

turn is a subsidiary of non-party RBC US Group Holdings LLC, which in turn is a subsidiary of

non-party Royal Bank of Canada, the ultimate parent. In February 2008, RBC Capital Markets

changed its name from RBC Dain Rauscher Inc. to RBC Capital Markets Corporation. In

November 2010, the company converted from a corporation to a limited liability company. RBC

Capital Markets has been a registered broker-dealer in Puerto Rico since May 16, 1997.

131.   Defendant RBC Capital Markets underwrote PRHTA, Transportation Revenue

Refunding Bonds, Series N; PREPA, Power Revenue Refunding Bonds, Series UU and VV;

COFINA, Sales Tax Revenue Bonds, Series 2007A; Commonwealth, Public Improvement

Refunding Bonds, Series 2007A; Commonwealth, GO Bond Series 2012 A; GO Bond Series

2011 A, C, D, and E; PBA Bond Series 2011 S; and PBA Bond Series 2012 U.  RBC Capital

Markets acted as lead underwriter for PRHTA, Transportation Revenue Refunding Bonds, Series

N; and as a senior managing underwriter on the Commonwealth, 2014 GO Bond issuance.

132.   Defendant BMO Capital Markets ("BMO") is the investment banking subsidiary

of Canadian Bank of Montreal. BMO Capital Markets served as a GO Bond underwriter for GO

Bond Series 2012 A, GO Bond Series 2011 C, D, and E; PBA Bond Series 2011 S; and PBA

Bond Series 2012 U.

133.   Defendant Santander Securities ("Santander") was an underwriter of the 2014 GO

Bond issuance.  It was also an underwriter of the GO Bond Series 2012 A and B; GO Bond

Series 2011 C, D, and E; GO Bond Series 2011 A; GO Bond Series 2009 C; PBA Bond Series

2011 R, S, and T; PBA Bond Series 2012 U; PBA Bond Series 2009 P and Q; and ERS Bond

Series 2008 A, B, and C.

134.    Defendant Scotia Capital Inc. is a multinational Canadian bank headquartered at 40 King St. West, Scotia Plaza 33rd Floor Toronto, Ontario, Canada M5w 2x6.  Its wholly owned subsidiary, Scotia MSD, headquarters are located at 290 Jesus P Pineiro Avenue 11th Floor San Juan, Puerto Rico 00918.

135.    Defendant Scotia MSD served as an underwriter for GO Bond Series 2012 A and B; GO Bond Series 2011 C, D, and E; PBA Bond Series 2011 R and S; PBA Bond Series 2012 U; and ERS Bond Series 2008 A.[15]

136.    Defendant VAB Financial ("VAB") is a Puerto Rico-based financial broker and dealer. It served as an underwriter for GO Bond Series 2012 A; GO Bond Series 2011 C, D, and E; PBA Bond Series 2011 S; and PBA Bond Series 2012 U.

137.    Defendant Lazard Financial Advisory is located at 1999 Avenue of the Stars #1800, Los Angeles, CA 90067.

138.    Defendant Sidley Austin LLP ("Sidley Austin") is a United States-based law firm headquartered in Chicago, Illinois. It served as underwriters' counsel during the 2014 GO Bond offering, bond counsel for the PBA Bond Series 2012 U; and underwriters' counsel for ERS Bond Series 2008 A, B and C.

### *Honest Services Fraud Defendants*

139.    Defendant Houston Astros LLC is a limited liability company with headquarters in Houston, Texas.  Upon information and belief, Defendant has member-investors who reside in Los Angeles, CA and who were involved in the fraudulent conduct at issued in this action.

140.    Defendant Jeff Luhnow is a resident of Houston, Texas.

141.    Defendant A.J. Hinch is a resident of Houston, Texas.

---

[15] On February 22, 2017, Scotia MSD filed with the SEC a Notice of Withdrawal from Registration as a Municipal Securities Dealer pursuant to Rule 15Bc3-1.

142.     Defendant DOES 1-500 include other member-investors and affiliates of the Defendant who were involved with and/or aided and abetted the Honest Services Fraud scheme. The names and identities of the Does are not yet known.  Upon further inquiry, investigation, and discovery their names will be added once determined.

## JURISDICTION AND VENUE

143.     This court has jurisdiction over the subject matter of this civil proceeding under for damages and injunctive relief against Defendants for multiple violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq*., in particular, §§ 1962(c), (d); and 1964.  The court has supplemental jurisdiction over the Plaintiff's California statutory and common law claims pursuant to 28 U.S. Code § 1367(a).

144.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) as a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

145.     Venue is also proper under 18 U.S.C. § 1965(a) because Defendants transact their affairs in this District.

## STATEMENT OF FACTS

**I.      Plaintiff's Experience in Bankruptcy**

　　　　　**a.   Legal Education**

146.     From 2013-2015, the Plaintiff provided research services relating to civil jurisdiction and bankruptcy law for Oregon Law's bankruptcy professor.

147.    From January through May 2015, the Plaintiff served as the legal extern for U.S. Bankruptcy Judge Thomas M. Renn and former Bankruptcy Judge Frank Alley of the District of Oregon, where he assisted in writing bench memoranda.

148.    In 2016, the Plaintiff commenced studies at St. John's School of Law Bankruptcy LL.M. program.  While there, he took classes on complex subject matter, including, among other things, securitizations, reorganizations under chapter 11, asset sales under 11 U.S.C. § 363, executory contracts under 11 U.S.C. § 365, bankruptcy taxation, and the drafting of bankruptcy agreements, such as Debtor in Possession loans and § 363 asset purchase agreements.  The Plaintiff also participated in a course where students assisted in drafting an amicus brief submitted to the Supreme Court in *Jevic* before attending oral argument in December 2016.  The Plaintiff wrote his masters thesis on rejection of oil and gas leases pursuant to § 365(g).  The plaintiff was the recipient of the 2016 Professor Richard Lieb Scholarship.

149.    Several of the courses were taught by prominent bankruptcy judges, including Judge Shannon of Delaware, Judge Carey of Delaware, and Judge Alan Trust of the Eastern District of New York.  In addition, at the time, several of the professors were former and current partners at prestigious Manhattan firms, including Professor Alec Ostrow (partner at Glynn, Muffly, Chassin & Hosinski LLP), Professor Ray Warner (partners at Greenberg Traurig and former director of the American Bankruptcy Institute), and Professor Richard Lieb (former partner at Cooley).

b.    **Bankruptcy Clerkship in the SDNY**

150.    From December 2016 through September 2017, the Plaintiff served as a bankruptcy clerk for the Honorable Robert D. Drain of the Southern District of New York in White Plains.

151.    During this time, the Plaintiff drafted bench memorandum for Judge Drain and wrote the first draft of an opinion.  The amount of work associated with drafting bench memoranda was substantial as the number of cases on the SDNY docket was second only to the District of Delaware.

152.    The Plaintiff worked on dozens of cases where the debtor or debtors had assets and liabilities in excess of hundreds of millions or, in several cases, billions of dollars.  As such, the Plaintiff had to conduct research and legal analysis on complex legal issues, often involving securitizations, multiple lien lenders, or fraudulent transactions.  On several occasions, the Plaintiff provided legal analysis relating to required disclosures and conflicts of interest in bankruptcy.  The Plaintiff also staffed Judge Drain during private mediation sessions.

c.  **Nature of Plaintiff's Assignments at Paul Hastings**

153.    While at Paul Hastings, the Plaintiff was assigned to work on projects of central importance to the Puerto Rico Bankruptcy.

154.    Among other things, the Plaintiff received assignments which included drafting memoranda on Puerto Rico's constitutional debt limit, plan feasibility, the Takings Clause, certificate of participation bonds, and the treatment of deposit accounts in the GDB's Title VI proceedings pursuant to PROMESA.

155.    In June 2018, the Plaintiff was assigned to write the first draft of the UCC's complaint against the GDB, a case with billions of dollars hanging in the balance, along with Danny Newman.

156.    The significance of the Plaintiff's work is reflected in the amount Paul Hastings billed the Commonwealth for the Plaintiff's legal services.  For example, the Paul Hastings billed

Puerto Rico over $125,000 for the Plaintiff's drafting of the constitutional debt limit memorandum and the GDB Complaint/Objection.

### d. **Proof of Plaintiff's High Performance**

157.    As part of the Plaintiff's application for admission to the New York State Bar, the Plaintiff obtained and submitted signed affidavits from certain individuals of whom had experience working with the Plaintiff.  These individuals include, without limitation, (i) the Honorable Robert D. Drain; (ii) the Honorable Thomas M. Renn; the law professors for whom the Plaintiff had conducted research services for while at Oregon law, (iii) bankruptcy law professor Andrea Coles-Bjerre and (iv) commercial law professor Carl Bjerre; (v) Shlomo Maza, an attorney in Paul Hastings' bankruptcy practice; and (vi) Claire Bartels, Director of Finance for the City of Los Angeles.

158.    Concerning the affidavit completed and executed by the Honorable Judge Robert D. Drain, the question of whether the Plaintiff's "duties were satisfactorily performed is answered "Yes," in the affirmative.  In addition, Judge Drain wrote "Mr. Hennigan was an excellent judicial clerk. I have no basis whatsoever to question his qualification, moral character and fitness to practice law."

159.    Concerning the affidavit completed and executed by the Honorable Judge Robert D. Drain, the question of whether the Plaintiff's "duties were satisfactorily performed is answered "Yes," in the affirmative.  In addition, Judge Drain wrote "Mr. Hennigan was an excellent judicial clerk. I have no basis whatsoever to question his qualification, moral character and fitness to practice law."

160.    Concerning the affidavit completed and executed by professor Andrea Coles-Bjerre, the question of whether the Plaintiff's "duties were satisfactorily performed is answered

40

"Yes," in the affirmative.  In addition, professor Andrea Coles-Bjerre wrote "Andrew is sure to be an asset to the NY bar!"

161.    Concerning the affidavit completed and executed by professor Carl Bjerre, the question of whether the Plaintiff's "duties were satisfactorily performed is answered "Yes," in the affirmative.  In addition, professor Carl Bjerre wrote " Applicant's qualifications are high and his personal qualifications are exemplary based on my experience."

162.    Concerning the affidavit completed and executed by Shlomo Maza, the question of whether the Plaintiff's "duties were satisfactorily performed is answered "Yes," in the affirmative.  In addition, Claire Bartels wrote " Mr. Hennigan's qualifications, moral character, and fitness to practice meet the standards for admission into the New York Bar."

163.    Concerning the affidavit completed and executed by Claire Bartels, the question of whether the Plaintiff's "duties were satisfactorily performed is answered "Yes," in the affirmative.  In addition, Claire Bartels wrote "**Outstanding moral character and very fit to practice. I would be willing to hire him again if I could. I am the Director of Finance, City of Los Angeles**."[16]


## II.    U.S. Bankruptcy Law and Fraud

### a.    Major Historical Developments

164.    The Article I, Section 4, Clause 4 of the United States Constitution endows Congress with the power "to establish…uniform Laws on the subject of Bankruptcies throughout the United States."[17]

---

[16] (emphasis added).
[17] The "Bankruptcy Clause."

41

165.     The only mention of the Bankruptcy Clause in the Federalist Papers is found in

James Madison's Federalist No. 42, published in the New York Packet on Tuesday, January 22,

1788.  Therein, Madison identifies fraud prevention as a principle purpose of the Bankruptcy

Clause, providing a necessary bulwark against the fraudulent manipulation of insolvency laws,

explaining

> *[t]he power of establishing uniform laws of bankruptcy is so
> intimately connected with the regulation of commerce, and will
> prevent so many frauds where the parties or their property may lie
> or be removed into different States, that the expediency of it seems
> not likely to be drawn into question.*[18]

166.     A little more than a century later, Congress exercised its this power for the first

time to enact permanent bankruptcy laws, *i.e.*, the Bankruptcy Act of 1898.[19]   The Bankruptcy

Act's was enacted against a background of nationwide financial frauds involving national

financial institutions, railroad corporations (i.e., shareholders and management), and corrupt state

and local officials that fraudulently issued bonds knowing such issuances breached constitutional

debt limits set by individual states, leaving local taxpayers on the hook and state and local

treasuries in financial ruin.[20]   Compounding matters, the financial institutions and railroad

management would then conspire to manipulate state insolvency laws to ensure senior creditors

and equity holders, often times management, would not suffer much losses, if any, and that

junior unsecured creditors, such as small businesses and their employees, would suffer the

heaviest losses.[21]   These corrupt practices ultimately compelled the U.S. Supreme Court to

intervene, announcing of the Absolute Priority Rule in *LA Lumber* which ensured junior creditors

---

[18] Madison, James, Federalist Papers (No. 42) (emphasis added).
[19]
[20] [see SOCTUS cases]
[21] *See* H. R. Doc. No. 93-137, pt. I, at 255 (1973) (discussing problem of "the ability of a few insiders, whether
representatives of management or major creditors, to use the reorganization process to gain an unfair advantage").

would receive payment in accord with their state law priorities and that equity holders would not receive payment unless and until <u>all</u> creditors received payment in full.[22]

167.    A half a century later when Congress overhauled the bankruptcy system with the enactment of the Bankruptcy Act of 1978, codified in Title 11 of the United States Civil Code (the "Bankruptcy Code"), it made sure to explicitly and comprehensively prohibit all manner of fraud in section 152.  Among other things, section 152 imposes <u>criminal</u> liability on a person who

> *(1) knowingly and fraudulently **conceals...any property** belonging to the estate of a debtor;*
>
> *(2) knowingly and fraudulently **makes a false oath or account** in or in relation to any case under title 11...*
>
> *(3) knowingly and fraudulently **makes a false declaration, certificate, verification, or statement under penalty of perjury**...*
>
> *(4) knowingly and fraudulently **presents any false claim for proof** against the estate of a debtor...*
>
> *(5) knowingly and fraudulently **receives any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11**;*
>
> *(6) knowingly and fraudulently **gives, offers, receives, or attempts to obtain any money or property, remuneration, compensation, reward, advantage, or promise thereof for acting or forbearing to act** in any case under title 11...*
>
> *(8) after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently **conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor**; or*
>
> *(9) after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other*

---

[22] *Case v. L.A. Lumber Prods. Co.*, 308 U.S. 106, 117, 60 S. Ct. 1, 8 (1939) ("*LA Lumber*"); *see also Bank of Am. Nat'l Tr. & Sav. Ass'n v. 203 N. Lasalle St. P'ship*, 526 U.S. 434, 444 (1999) (*discussing* Absolute Priority Rule and *LA Lumber*).

*officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of a debtor[.]*

b. **Criminal Prosecutions**

168.     Between Bankruptcy Code's enactment to the late 1990s, the U.S. Department of

Justice frequently brought charges against those suspected of committing fraud in bankruptcy.[23]

169.     In 1996, then Attorney General Janet Reno announced, "Operation Total

Disclosure," which utilized experts and law enforcement officials from various federal agencies

to crackdown on bankruptcy fraud.[24] By April 1998, the operation resulted in 134 defendants

charged and convicted of bankruptcy fraud.[25]

170.     In 1996, Wall Street attorney John Gellene of Milbank and Tweed was convicted

of filing a false Rule 2014 disclosure declaration in violation of § 18 U.S.C. 152(3) and

sentenced to fifteen months in prison.[26]

c. **Recent Developments in Bankruptcy Law**

171.     In 2017, the U.S. Supreme Court in *Czyzewski v. Jevic* invalidated a structured

dismissal containing priority-skipping distributions that had been previously upheld by the

3rd Circuit.[27]  In its reasoning, the Supreme Court explained that such a departure from the

Absolute Priority Rule could have "potentially serious" consequences that "include risks of

---

[23] *See e.g., United States v. Phillips*, 606 F.2d 884 (9th Cir. 1979); *United States v. Cherek*, 734 F.2d 1248 (7th Cir. 1984); *United States v. Jackson*, 836 F.2d 324 (7th Cir. 1987); *United States v. Key*, 859 F.2d 1257 (7th Cir. 1988); *United States v. Yagow*, 953 F.2d 427 (8th Cir. 1992); *United States v. Lindholm*, 24 F.3d 1078 (9th Cir. 1994); *United States v. Ellis*, 50 F.3d 419 (7th Cir. 1995); and United States v. McIntosh, 124 F.3d 1330 (10th Cir. 1997).
[24] Ex. [x], Paul Kiel, "How to Get Away with Bankruptcy Fraud," at 12, ProPublica.com (Dec. 22, 2017) (last accessed on 8/13/18) (*available at* https://www.propublica.org/article/how-to-get-away-with-bankruptcy-fraud).
[25] Taliani Rasnak & Joe Brown, Our First Line of Defense in Bankruptcy Fraud: The U.S. Trustees, Bus. Credit, April 1998, at 2.
[26] *United States v. Gellene*, 182 F.3d 578 (7th Cir. 1999).
[27] *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 978 (2017); and *Czyzewski v. Jevic Transp., Inc.* (*In re Jevic Holding Corp.*), 656 F. App'x 617, 618 (3d Cir. 2016).

collusion, *i.e.*, senior secured creditors and general unsecured creditors teaming up to squeeze

out priority unsecured creditors."[28]

### III.   McKinsey & Co., Generally

#### a.   Background

172.   McKinsey & Co. is an international management consulting firm with 127 offices

in locations including New York, California, Beijing, Azerbaijan, Luxembourg, Qatar and

Ukraine, among other places.

173.   McKinsey employs approximately 17,000 consultants.

174.   Eighty of the top 120 banks and financial services firms, nine of the eleven largest

chemical companies, and fifteen of the twenty-two biggest healthcare and pharmaceutical are

McKinsey clients.

175.   In 1984, McKinsey's McKinsey Investment Office ("MIO"), a wholly owned

subsidiary which manages approximately $26 billon on behalf of McKinsey's current and former

partners, family members, and employees.[29]

176.   A significant amount of McKinsey's revenue derives from its restructuring

advisory business, which is carried out by and through its wholly owned subsidiaries, McKinsey

RTS, McKinsey D.C., among others.

177.   McKinsey, through its investment arm MIO, regularly invests in securities in the

bankrupt debtor in which it is also advising as part of the Title 11 proceedings.  In other cases,

McKinsey, through MIO, invests in the securities of the entity which purchases the assets of the

bankrupt debtor.

#### b.   MIO: McKinsey Investment Office, Generally

---

[28] *Jevic*, 137 S. Ct. at 987.
[29] See Section [X].

45

178.    MIO is an SEC-registered investment advisor.  Its corporate parent is MIO Group,
Inc., of which it shares corporate offices.

179.    Prior to November 1, 2017, all members of the MIO Board were current or former
McKinsey partners.[30]

180.    As of November 1, 2017, the MIO Board had ten current or former McKinsey
partners, and two outside directors.  As of August 31, 2018, the MIO Board has nine current or
former McKinsey partners, and two outside directors.[31]

181.    MIO functions to serve in several capacities.  First, it is the trustee of the
McKinsey Master Retirement Trust (MMRT).  In this role, it manages approximately $6 billion
dollars on behalf of MMRT's beneficiaries, *i.e.*, current and former McKinsey partners and
employees.

182.    Second, MIO serves as trustee to McKinsey's SSALT Fund. In this role, it
manages approximately $19 billion dollars on behalf of SSALT's investors, which include
current and former McKinsey partners, employees, and immediate family members.  Together,
MIO directs the investments of $26 billion in MMRT and SSALT funds (the "McKinsey
Funds").  Accordingly, MIO owes fiduciary duties to the beneficiaries and investors of the
McKinsey Funds.

183.    In carrying out its fiduciary duties, MIO manages the McKinsey Funds by
investing them through three channels; *two direct, one indirect*.

184.    The first direct channel is through MIO's direct purchase of securities from
dealers.

[30] Alpha Natural Resources, Case 15-33896-KRH Doc 4152 Filed 09/12/18 Entered 09/12/18 20:25:38 Desc Main
Document Page 2 of 4.
[31] Alpha Natural Resources, Case 15-33896-KRH Doc 4152 Filed 09/12/18 Entered 09/12/18 20:25:38 Desc Main
Document Page 2 of 4.

185.     The second direct channel is through its affiliated Compass-branded funds, such as Compass CSS High Yield, Compass ESMA, and Compass TSMA.  These Compass funds are wholly-owned subsidiaries of MIO, which serves as a managing member for each Compass fund. MIO claims it invests approximately 40-50% of McKinsey Funds through its Compass funds.

186.     Finally, the indirect channel MIO Partners also invests McKinsey Funds through is third-party funds, such as BlackRock and Whitebox.  MIO claims it invests approximately 50% through third-party funds.

187.     Through these direct and indirect channels, MIO had taken significant equity positions in many of McKinsey's clients.

188.     Apart from its management of McKinsey Funds, MIO employees provide current and former McKinsey partners with individualized investment advice.  In practice, this means that MIO professionals interact with McKinsey partners at in-person meetings or communicate by phone or email in the ordinary course of doing business.

189.     McKinsey asserts that its policy of only sharing information on a "need to know" basis that renders it "impossible" for MIO professionals and McKinsey partners to improperly sharing information during such exchanges.[32]

c.   **MIO's Corporate Governance**

190.     MIO's board of directors is primarily composed of current and former McKinsey partners.  Up until 2017, each member of the board was a current or former McKinsey partner, including Jon Garcia.

191.     More specifically, from 2008 through June of 2017, Garcia served on the board of directors of MIO, as well as its subcommittee on investments (the "Investments Subcommittee").

---

[32] Carmody Declaration,

Until September 2017, the Investments Subcommittee ratified each investment decision made by MIO. In contrast, CIO Tibbets "is overseeing all of MIO Partners, so he would be overseeing all of Compass MAV."

192.    In addition, MIO has a Chief Investment Officer ("CIO"), who is responsible for approving of each investment made by MIO.[33] MIO's current CIO is Todd Tibbets.

### d. **Compass Funds**

193.    Strictly speaking, MIO assigns its "investment discretion" in managing Compass funds to third-party investment managers (the "Third-Party Advisors").  In other words, the third-party advisor is a "subadvisor" endowed with ultimate decision-making authority in selecting or withdrawing investments in Compass Funds.[34]  For example, MIO uses a third-party investment advisor firm called ESM to advise and make investment decisions on behalf of Compass MAV.  According to MIO, it contractually assigned to ESM "investment discretion" over Compass MAV funds.

194.    However, practically speaking, MIO exercises material control and influence over how the McKinsey Funds are invested by its Compass funds.

195.    In fact, the Compass Third-Party Advisors never exercise custody over McKinsey Funds.[35]  In reality, the McKinsey Funds invested through Compass funds are, irrespective of the Third-Party Advisor, remain in the custody of banks such as Goldman Sachs, Citigroup, or

---

[33] See Meyer Depo., at 18 (describing CIO Tibbets as "overseeing all of MIO Partners, so he would be overseeing all of Compass MAV").
[34] See Meyer Deposition, at 518.
[35] Meyer Depo., at 16.

Morgan Stanley.[36]  Therefore, it is relatively easy for MIO to disengage with a Third-Party Advisor and to redeploy funds with another

196.    According to ESM president Eric Meyer, in his capacity of Third-Party Advisor, he would speak with his MIO supervisor, Daniel Fryxell, "every month or so about the portfolio, what I see in the market." [37]  In addition, Meyer sworn testimony reveals that ESM's investment discretion was actually limited by MIO from the outset because Meyer describes Fryxell "as my supervisor"[38] at MIO and then adds that Fryxell supervised "only certain kinds of investments, investment strategies" at MIO.[39]

197.    In addition, Meyer represented that MIO will redeploy funds from one Compass fund to another Compass fund depending on an on-going assessment of returns of particular investments.  So, in his case, the amount of funds MIO invested in Compass MAV from 2016 to 2018 dropped 60% from $100 million to $40 million.[40]

198.    In a recent deposition, Mayer revealed that each Compass fund registered in the United States has a "sister" off-shore fund which makes parallel investments of its on-shore counterpart.  Specifically, the deposition reads,

> Q. ...Does ESM manage money from funds other than CMAV under the MIO umbrella?
>
> A. Yes. They -- we manage for somebody called Compass OMAV, which is the offshore version of CMAV, or COMAV. So they're kind of like sister companies, and we try to maintain the same strategy between the two.

---

[36] Meyer Depo., at 525-26; Carmody Declaration, Case 15-33896-KRH Doc 4195 Filed 01/16/19 Entered 01/16/19 14:00:31 Desc Main Document Page 20 of 21.
[37] Meyer Depo., at 16.
[38] Meyer Depo., at 14.
[39] See Mayer Deposition, at 18.
[40]

IV.   **As the World's Largest Consulting Firm, McKinsey Knows that Professionals
Providing Bankruptcy Consulting Services Must Be Transparent about Their
Connections and Have Undivided Loyalty to Their Debtor-Clients**

199.    Since 2001, in thirteen Chapter 11 bankruptcies involving billions of dollars in

assets, McKinsey US and McKinsey RTS have sought and obtained employment as bankruptcy

"professionals" as that term is defined in the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

200.    Pursuant to 11 U.S.C. § 327(a), bankruptcy professionals must be persons "that do

not hold or represent an interest adverse to the estate" and who are "disinterested persons."

Under 11 U.S.C. § 101(14), a "disinterested person" is:

> *a person that—(A) is not a creditor, an equity security holder, or
> an insider; (B) is not and was not, within 2 years before the date of
> the filing of the petition, a director, officer, or employee of the
> debtor; and (C) does not have an interest adverse to the interest of
> the estate or of any class of creditors or equity security holders, by
> reason of any direct or indirect relationship to, connection with, or
> interest in, the debtor, or for any other reason.*

Subsection C of this definition embraces any "interest or relationship that would even faintly

color the independence and impartial attitude required by the Code.[41]

201.    In assessing whether a professional is disinterested, bankruptcy courts consider

multiple factors, including i) whether the professional possesses or asserts for a client ***any***

***economic interest*** that would tend to lessen the value of the bankruptcy estate ***or create either an***

***actual or potential dispute*** in which the estate would be a rival claimant;[42] ii) whether the

professional possesses a predisposition under the circumstances to be biased against the estate;[7]

iii) whether the professional has ***some interest or relationship that would even faintly color the***

***independence and impartial attitude required by the Bankruptcy Code***;[8] iv) whether it is likely

---

[41] *In re BH & P Inc.*, 949 F.2d 1300, 1308 (3d Cir. 1991).
[42] *See, e.g., In re Am. Int'l Refinery, Inc.*, 676 F.3d 455, 461 (5th Cir. 2012); *In re AFI Holding, Inc.*, 530 F.3d 832,
845 (9th Cir. 2008); and *In re Crivello*, 134 F.3d 831, 835 (7th Cir. 1998).

that the professional will be placed in a position permitting it to favor one interest over an impermissibly conflicting interest;[9] v) whether the professional is serving the debtors with undivided loyalty and providing untainted advice and assistance;[10] and vi) the likelihood that a potential conflict might turn into an actual one or the influence that a conflict might have on the **_party in interest, their respective attorneys and accountants_**[.]" Fed. R. Bankr. P. 2014 (emphasis added).

202.    The term "connections" is interpreted broadly and encompasses all relationships that are not considered *de minimis*.[43] Statements detailing connections must be explicit and disinterestedness and lack of adverse interests.[44] disclose <u>all</u> facts and relationships that might potentially bear on their qualification for retention.[45] Disclosure requirements are broader than the rules governing disqualification, and bankruptcy professionals must disclose connections regardless of whether the connections would constitute disqualifying interests under Section 327(a).[46] Accordingly, a bankruptcy professional cannot exercise discretion and decide itself whether connections are irrelevant or trivial.[47] Nor can it invent special methods of disclosure, such as "disclosure by category," to avoid the disqualification that would ensue if it complied with the statute and implementing rule's strict disclosure requirements. *See* Joint Declaration, attached hereto as "**Exhibit C**" ("**Ex. C**") ¶¶ 22, 39, 45-48. Nor can it make incomplete

---

[43] *See, e.g., Leslie Fay*, 175 B.R. at 536.

[44] *See, e.g., Lewis Rd.*, 2011 WL 6140747, at *8.

[45] *See, e.g., Lewis Rd.*, 2011 WL 6140747, at *8; *see also In re Granite Partners, L.P.*, 219 B.R. 22, 35 (Bankr. S.D.N.Y. 1998).

[46] *See, e.g., In re Olsen Indus., Inc.*, 222 B.R. 49, 60 (Bankr. D. Del. 1997).

[47] *See, e.g., In re Citation Corp.*, 493 F.3d 1313, 1321 (11th Cir. 2007) ("bankruptcy court, not the professionals, must determine which prior connections rise to the level of an actual conflict or pose the threat of a potential conflict . . . professional must disclose all of its previous contacts with any party in  interest"); *Rome*, 19 F.3d at 59 (noting that the "decision should not be left to . . . [the professional], whose judgment may be clouded by the benefits of the potential employment").

disclosures and later claim exoneration by virtue of the court's or other stakeholders' failure to demand additional information.[48]

203.    Rule 2014 imposes an independent duty of full disclosure on professionals seeking employment in bankruptcy cases, as well as a continuing obligation to investigate all of their possible connections and to supplement their disclosures in a timely, if not immediate, fashion if, and when, additional connections arise.[49]

204.    Bankruptcy professionals' declarations pursuant to Rule 2014 must be made under penalty of perjury, pursuant to 28 U.S.C. § 1746.

205.    Often, bankruptcy professionals must be disqualified because of a *potential* conflict.[50] Regardless of whether a professional's judgment actually has been or will be compromised, courts are required to maintain the credibility and integrity of the bankruptcy system.[51] Thus, the bankruptcy system must be transparent and provide a level field for all creditors and stakeholders. Those goals require strict enforcement of Rule 2014, and bankruptcy courts are required to review professionals' Rule 2014 disclosures and determine whether the professional is "disinterested" within the meaning of Section 327(a).[52]  These rules protect the integrity of the federal bankruptcy system from fraud and corruption.

---

[48] *See e.g., In re Matco Elecs. Grp., Inc.*, 383 B.R. 848, 853-54 (Bankr. N.D.N.Y. 2008) (Rule "2014 is not intended to condone a game of cat and mouse where the professional seeking appointment provides only enough disclosure to whet the appetite of the UST, the court or other parties interest, and then the burden shifts to those entities to make inquiry in an effort to expand the disclosure.").

[49] *See, e.g., Granite Partners*, 219 B.R. at 35.

[50] *See, e.g., In re Glenn Elec. Sales Corp.*, 99 B.R. 596, 601-02 (D.N.J. 1988).

[51] See e.g., Glenn, 99 B.R. at 601-02; United States v. Gellene, 182 F.3d 578, 588 (7th Cir. 1999) ("The Code reflects Congress' concern that any person who might possess or assert an interest or have a predisposition that would reduce the value of the estate or delay its administration ought not have a professional relationship with the estate").

[52] Additionally, the Local Rules for the United States Bankruptcy Court for the District of Delaware (where the Hayes, Harry & David, and Standard Register bankruptcies were filed) provide that "[p]romptly after learning of any additional material information relating to such employment (such as potential or actual conflicts of interest) the professional employed or to be employed shall file and serve a supplemental affidavit setting forth the additional information."

206.    Without bankruptcy professionals' full and truthful disclosure of all their connections in their Rule 2014 disclosures, the bankruptcy court is rendered unable to accurately assess professionals' qualifications to serve as fiduciaries for the estate, stymieing the effectuation of the bankruptcy court's mandate to authorize the employment of only disinterested professionals.

207.    McKinsey & Co. is the world's largest standalone business management consulting firm. It serves many of the world's largest corporations, including eighty of the top 120 banks and financial services firms, nine of the eleven largest chemical companies, and fifteen of the twenty- two biggest healthcare and pharmaceutical concerns. McKinsey's connections are extensive. According to its website, McKinsey provides services to the following business sectors: (1) Advanced Electronics; (2) Aerospace & Defense; (3) Automotive & Assembly; (4) Capital Projects & Infrastructure; (5) Chemicals; (6) Consumer Packaged Goods; (6) Electric Power & Natural Gas; (7) Financial Services; (8) Healthcare Systems & Services; (9) High Tech; (10) Media & Entertainment; (11) Metals & Mining: (12) Oil & Gas; (13) Paper & Forest Products; (14) Pharmaceuticals & Medical Products; (15) Private Equity & Principal Investors; (16) Public Sector; (17) Retail; (18) Semiconductors; (19) Social Sector; (20) Telecommunications; and (21) Travel, Transport & Logistics.

208.    McKinsey also has 30,000 "alumni"—former McKinsey employees—most of whom are now employed in other businesses or government. More Fortune 500 CEOs are alumni of McKinsey than of any other company. McKinsey actively develops and exploits its alumni for new business investment and referrals and facilitates alumni job placement.

209.    McKinsey has its own exclusive, high-performing internal investment funds, managed by MIO. MIO is a wholly-owned subsidiary of McKinsey & Co. that serves as McKinsey's investment arm. According to its most recent Form ADV 2A filed with the United States Securities and Exchange Commission, MIO invests approximately $25 billion on behalf of McKinsey's current and former partners and employees. MIO has taken significant equity positions in many of McKinsey's clients.

210.    As a highly sophisticated international corporation, McKinsey has ready access to the most sophisticated legal advice available—both as a client of and as advisor to major law firms—and is well aware of the foregoing disclosure requirements in the bankruptcy profession. Additionally, some McKinsey partners and employees who perform McKinsey's bankruptcy work are themselves attorneys, including Defendants Jon Garcia and Seth Goldstrom. Several McKinsey bankruptcy professionals also have extensive work experience at other bankruptcy consulting firms where they became familiar with Bankruptcy Code Section 327 and Bankruptcy Rule 2014, including Defendants Kevin Carmody and Jared Yerian, who worked for AP before joining McKinsey. While not an attorney, Yerian holds finance and accounting degrees and is a faculty member at the Practicing Law Institute. Regardless, McKinsey is required and presumed to know the law applicable to its employment as a bankruptcy professional. Yet McKinsey has purposefully maintained a substandard system for identifying conflicts. McKinsey does not use a centralized conflicts identification process. Maintaining a centralized conflict checking database with conflict checking software is the industry practice among professional firms that seek employment in large bankruptcy cases. McKinsey refuses to maintain a basic, centralized conflicts checking system despite having the expertise and means needed to create one. Instead, McKinsey simply emails employees and then waits for responses. Moreover, McKinsey's

emails, which are sent to only relatively few employees, only address some, very specific connections, contrary to the expansive disclosure requirement of Rule 2014. McKinsey's system of checking for conflicts by email is inadequate by design and intended to conceal rather than uncover adverse interests and is in stark contrast to every other professional who seeks employment subject to § 327 and who understands the necessity of complying with Rule 2014.

211.    As alleged in detail *below*, Defendants have repeatedly, flagrantly, and deliberately flouted the laws applicable to professionals acting in bankruptcy matters. McKinsey's extreme aversion to disclosure has been a persistent theme of its interactions with the bankruptcy system. In fact, McKinsey formed McKinsey RTS so that, *inter alia*, it could make "limited" disclosures of only those connections specific to McKinsey RTS itself and avoid disclosure of connections to other McKinsey entities. The Bankruptcy Code, however, does not permit professionals to pick and choose which of their affiliates' connections to disclose and which to withhold; indeed, professionals are required to disclose *all* connections, including any connections of their affiliates. In other words, McKinsey RTS was founded for the express purpose of skirting the Bankruptcy Code's disclosure rules.

212.    Throughout the course of McKinsey's various bankruptcy assignments, the topic of disclosure has been repeatedly discussed by and among senior leadership at McKinsey & Co., including, upon information and belief, Garcia, Goldstrom, Sternfels, and Barton, who have consistently sought to prevent McKinsey US and McKinsey RTS from making the substantive disclosures that the law requires—namely, all pertinent connections of McKinsey & Co. and its affiliates. The foregoing individuals and the other individual Defendants have all deliberately conspired to circumvent the requirements of Rule 2014 under the guise of protecting "client confidentiality." As set forth in greater detail *below*, Carmody, Goldstrom, Garcia, Proshan,

55

Sternfels, Yerian, and others peculiarly known to McKinsey, have intentionally and unlawfully devised ways for McKinsey US and McKinsey RTS, to participate in the bankruptcy consultancy marketplace without adhering to the applicable bankruptcy law and rules, including Rule 2014.

**V.     From 2001 through 2013, Defendants Engaged in a Pattern of Racketeering Activity that Involved Crimes Related to Submitting False Statements in Order to Evade Disqualification as Bankruptcy Professionals**

213.     From 2001 to 2013, in eight separate bankruptcy proceedings, Defendants repeatedly and deliberately violated disclosure obligations under bankruptcy law by submitting, or causing to be submitted, false disclosure affidavits and declarations, in order to avoid disqualification of McKinsey US and/or McKinsey RTS and to unlawfully deprive AP of valuable assignments.

214.     During that thirteen-year window, McKinsey US and/or McKinsey RTS accepted the following seven lucrative bankruptcy assignments:

  a.   *In re Hayes Lemmerz International, Inc.*, No. 01-BK-11490 (Bankr. D. Del.), filed on December 5, 2001 (hereafter "***Hayes Lemmerz***" or "***Hayes***");

  b.   *In re Mirant Corp.*, No. 03-BK-46590 (Bankr. N.D. Tex.), filed on July 14, 2003 (hereafter "***Mirant***");

  c.   *In re Lyondell Chemical Co.*, No. 09-BK-10023 (Bankr. S.D.N.Y.), filed on January 6, 2009 (hereafter "***Lyondell Chemical***" or "***Lyondell***");

  d.   *In re Harry & David Holdings, Inc.*, No. 11-BK-10884 (Bankr. D. Del.), filed on March 28, 2011 (hereafter "***Harry & David***");

  e.   *In re AMR Corp.*, No. 11-BK-15463 (Bankr. S.D.N.Y.), filed on November 29, 2011 (hereafter "***AMR***" or "***AMR Corp.***");

     f.   *In re AMF Bowling Worldwide, Inc.*, No. 12-BK-36495 (Bankr. E.D. Va.), filed

on November 13, 2012 (hereafter "***AMF Bowling***"); and

     g.   *In re Edison Mission Energy*, No. 12-BK-49219 (Bankr. N.D. Ill.), filed on

December 17, 2012 (hereafter "***Edison Mission Energy***" or "***Edison Mission***").

215.    In each of these seven cases, McKinsey's disclosure affidavits and declarations

violated Rule 2014. They were also false and misleading in numerous respects, detailed *seriatim*

*below*.[53]

     a.  **Defendants Unlawfully Concealed McKinsey's Connections and
        Affirmatively Misrepresented that McKinsey Was Disinterested.**

216.    In each of the eight above-listed bankruptcy cases, in the disclosure affidavits and

declarations submitted on behalf of McKinsey US and/or McKinsey RTS, Defendants concealed,

and failed to name, almost every one of McKinsey's connections, relationships, and conflicts and

affirmatively misrepresented McKinsey's disinterestedness under the law. Defendants also failed

to describe with adequate detail the nature of McKinsey's connections, relationships, and

conflicts.

217.    In contrast to McKinsey US and McKinsey RTS, the disclosure declarations filed

by every other counsel for the debtor, counsel for the creditor, and their respective financial

advisors retained in these seven bankruptcy cases contained exhaustive lists that identified, by

name, the numerous connections that Rule 2014 required them to disclose, and described the

nature of the professionals' relationships with each connection. Excluding McKinsey US and

McKinsey RTS, bankruptcy professionals specifically identified an average of 185 connections

---

[53] McKinsey's disclosure affidavits and declarations in those eight cases are identified as items No. 1-22 in Exhibit
A hereto. Specific false and misleading statements in those affidavits and declarations are set forth in pages 1-17 of
Exhibit B hereto.

per case. McKinsey US and McKinsey RTS, however, disclosed *no* connections by name in its initial declarations for these seven cases, and only in two cases (*UAL* and *Harry & David*), through a Supplemental Declaration and a Second Supplemental Declaration, respectively, did it disclose any connections at all.

218.     Given the size and complexity of McKinsey's business and business relationships, its Rule 2014 disclosure declarations should have been voluminous. McKinsey's declarations should have clearly named and described the nature of any of McKinsey's connections to any Interested Parties in those cases, regardless of whether those connections were creditors, suppliers, customers, or competitors of the Chapter 11 debtors, and regardless of whether the connection was a McKinsey client (or affiliate thereof), service provider (or affiliate thereof), investment-related, or an employee relationship. McKinsey also should have any connections or referrals that led to it obtaining employment in each case. As detailed below, Defendants unlawfully failed to disclose McKinsey's connections, which included many dozens, if not hundreds, of connections to Interested Parties, including financial institutions and other clients in the wide range of industries that McKinsey serves. *See* Ex. C ¶¶ 40-41.

> i.  *In re Hayes Lemmerz*

219.     The *Hayes Lemmerz* bankruptcy was filed in the United States Bankruptcy Court for the District of Delaware on December 5, 2001. In *Hayes*, McKinsey US filed three disclosure affidavits: an initial affidavit in support of the retention of McKinsey US as a management consultant, filed on December 27, 2001; a supplemental affidavit, dated February 13, 2002; and a second supplemental affidavit, dated March 13, 2002. McKinsey US's fees in *Hayes* were approved on May 12, 2003. McKinsey US's disclosure affidavits are identified as items No. 1-3

in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 1-2 of Exhibit B hereto.

220.   Despite filing three affidavits in *Hayes*, McKinsey US failed to name a ***single*** connection to any Interested Parties. By doing so, McKinsey US unlawfully omitted and concealed its connections to likely dozens of Interested Parties. *See* Ex. C ¶ 40.

221.   McKinsey US unlawfully failed to disclose several major connections to Interested Parties in *Hayes* even though they were ***current McKinsey clients***, including, *inter alia*, the following connections:

| Entity | Interested Party Role (*Hayes*) | McKinsey Connection |
|---|---|---|
| Bank One Corporation | Secured Creditor | Client |
| Bank One Trust Company, N.A. | Major Bondholder | Client and/or Subsidiary and Affiliate of Clients (*Bank One Corporation*) |
| Chase Bank of Texas, N.A. | Major Bondholder | Client and/or Subsidiary and Affiliate of Clients (*Bank One Corporation*) |
| Chase Manhattan Bank | Major Bondholder | Client and/or Subsidiary and Affiliate of Clients (*Bank One Corporation*) |
| MDFC / Boeing | Major Lessor | Client and/or Subsidiary of Client (*The Boeing Company*) |

222.   All or any one of McKinsey's undisclosed connections would have disqualified McKinsey US from employment as a bankruptcy professional in *Hayes*. However, because of Defendants' fraudulent concealment of those connections, neither the bankruptcy court, the U.S. Trustee, nor any of the Interested Parties could meaningfully assess the nature and extent of McKinsey's conflicts. *See* Ex. C ¶¶ 26, 40-44.

223.    Defendants, including McKinsey & Co. and McKinsey US, also concealed additional conflicts and connections to Interested Parties in *Hayes*. However, Defendants' dishonest course of conduct makes it difficult to determine the exact number and nature of what were undoubtedly numerous undisclosed conflicts and connections to Interested Parties. The facts needed to ascertain all these numerous conflicts and connections are peculiarly within the knowledge of Defendants, including McKinsey & Co. and McKinsey US, but will be proven through discovery.

   ii.   *In re Mirant*

224.    The *Mirant* bankruptcy was filed in the United States Bankruptcy Court for the Northern District of Texas on July 24, 2003, just months after McKinsey US filed its February 27, 2003 affidavit in *UAL*. In *Mirant*, McKinsey US submitted just one disclosure affidavit, which it filed three months after the commencement of the case, on October 27, 2003. McKinsey US's fees for *Mirant* were approved on December 9, 2005. McKinsey US's disclosure affidavit in *Mirant* is identified as item No. 6 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 5-6 of Exhibit B hereto.

225.    In *Mirant*, Defendants (including McKinsey & Co. and McKinsey US) continued their pattern of unlawful dissemblance and complete disregard for Rule 2014 obligations. In its disclosure affidavit, McKinsey US failed to name ***a single connection*** to any Interested Parties. Defendants unlawfully omitted and concealed McKinsey's connections to numerous Interested Parties in *Mirant* that were ***current clients*** of McKinsey, including, *inter alia*:

| Entity | Interested Party Role (*Mirant*) | McKinsey Connection |
|---|---|---|
| Bank One Corporation | Lender; Bondholder | Client |
| Bank One NA | Top 50 Unsecured Creditor | Client and/or Subsidiary of Clients |

| | | (*Bank One Corporation*) |
|---|---|---|
| Kreditanstalt fur Wiederaufbau | Lender; Indenture Trustee | Client |

226. McKinsey US was required by law to disclose all of these McKinsey connections to *Mirant* Interested Parties in its disclosure affidavit, *see* Ex. C ¶¶ 26-35, 45, but Defendants (including McKinsey & Co. and McKinsey US) willfully and fraudulently concealed them instead.

227. Once again, McKinsey US falsely stated in its *Mirant* disclosure affidavit that "[b]ecause of its responsibility to maintain strict client confidentiality, McKinsey cannot disclose the services performed, or even in some instances the fact that services were provided for clients." *Mirant*, Dkt. 1457 ¶ 16. Again, this statement was false or misleading because McKinsey's engagement agreements in fact permit disclosures necessary to comply with the law. *See, e.g.*, Ex. C ¶ 49-50.

228. McKinsey US's decision to disclose some connections by name months earlier in *UAL* while disclosing none in *Mirant* was driven by the severity of the conflicts represented by the undisclosed connections in the context of the *Mirant* bankruptcy. All or any one of McKinsey's undisclosed connections would have disqualified McKinsey US from employment as a bankruptcy professional in *Mirant*. However, because of Defendants' (including McKinsey & Co. and McKinsey US) fraudulent concealment of those connections, neither the bankruptcy court, the U.S. Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey US's potential conflicts. *See* Ex. C ¶¶ 26, 40-44.

229. Defendants (including McKinsey & Co. and McKinsey US) also concealed additional conflicts and connections to the hundreds of Interested Parties in *Mirant*. The facts

needed to ascertain these connections are peculiarly within the knowledge of Defendants,
including McKinsey & Co. and McKinsey US, but will be proven through discovery.

### iii.  In re Lyondell Chemical

230.    The *Lyondell Chemical* bankruptcy was filed in the United States Bankruptcy
Court for the Southern District of New York on January 6, 2009. In *Lyondell*, McKinsey US
filed two disclosure affidavits: an initial affidavit dated June 17, 2009, and a supplemental
affidavit dated September 11, 2009. McKinsey US's fees for *Lyondell* were approved on April
23, 2010. McKinsey US's disclosure affidavits in *Lyondell* are identified as items No. 7-8 in
Exhibit A hereto, and specific false and misleading statements therein are identified at pages 6-7
of Exhibit B hereto.

231.    In *Lyondell*, Defendants (including McKinsey & Co. and McKinsey RTS)
continued their pattern of unlawfully failing to disclose all of McKinsey's connections to
Interested Parties. In its initial affidavit dated June 17, 2009, McKinsey US once again failed to
name a ***single*** connection to any of the Interested Parties in *Lyondell*—apart from a footnote
stating that one McKinsey partner had previously worked at the law firm Skadden, Arps,
Meagher & Flom LLP as a summer associate eight years earlier, in 2001—disingenuously
suggesting that McKinsey US had conducted a thorough, searching inquiry into McKinsey's
many conflicts that yielded only a tenuous connection in the form of a single summer internship.
That clearly was not the case. And in its supplemental affidavit filed three months later,
McKinsey US named no connections to Interested Parties.

232.    In *Lyondell*, Defendants (including McKinsey & Co. and McKinsey U.S.)
unlawfully concealed McKinsey's connections to at least a dozen Interested Parties, including,
*inter alia*:

a.  Allianz Global (*Bondholder*)

b.  Allianz Global Investors Kapitalanlagegesellschaft (*Bondholder*)

c.  Allianz Insurance Company (*Insurer*)

d.  Allianz Netherlands (*Insurer*)

e.  Allianz Paint Insurance Claim (*Litigation Adversary*)

f.  BlackRock (*Bondholder*)

g.  Citibank / Citibank International (*Lender and Co-Defendant*)

h.  Citigroup Global Markets, Inc. (*Lender and Co-Defendant*)

i.  Citigroup, Inc. (*Lender and Co-Defendant*)

j.  OHCCF CBNA Loan Funding (*Lender*)

k.  Protean CBNA Loan Funding (*Lender*)

l.  Prudential Financial, Inc. (*Bondholder*)

233.   McKinsey US was required all of these connections in its submissions in *Lyondell*, *see* Ex. C ¶¶ 26-35, 45, but Defendants (including McKinsey & Co. and McKinsey US) instead willfully and fraudulently concealed them.

234.   As it did in its *Mirant* filings, McKinsey US again sought to excuse its lack of specificity with the false or misleading assertion that "[b]ecause of its responsibility to maintain strict client confidentiality, McKinsey US cannot disclose the services performed, or even in some instances the fact that services were provided for clients." *Lyondell*, Dkt. 2090 ¶ 17.

235.   All or any one of McKinsey's undisclosed connections would have disqualified McKinsey US from employment as a bankruptcy professional in *Lyondell*. However, because of Defendants' (including McKinsey & Co. and McKinsey US) fraudulent concealment of those

63

connections, neither the bankruptcy court, the U.S. Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey US's potential conflicts. *See* Ex. C ¶¶ 26, 40-44.

236.    Defendants (including McKinsey & Co. and McKinsey US) also concealed additional McKinsey conflicts and connections to Interested Parties in *Lyondell*. The facts needed to ascertain these additional connections are peculiarly within the knowledge of Defendants, including McKinsey & Co. and McKinsey US, but will be proven through discovery.

> iv.   *In re Harry & David*

237.    The *Harry & David* bankruptcy was filed in the United States Bankruptcy Court for the District of Delaware on March 28, 2011. In *Harry & David*, McKinsey RTS filed three false and misleading disclosure declarations, all sworn to and signed by Defendant Seth Goldstrom: an initial Declaration filed on April 4, 2011; a Supplemental Declaration dated April 19, 2011; and a Second Supplemental Declaration dated June 17, 2011. McKinsey RTS's fees in *Harry & David* were approved on August 29, 2011. McKinsey RTS's disclosure declarations in *Harry & David* are identified as items No. 9-11 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 7-11 of Exhibit B hereto.

238.    In his initial declaration in *Harry & David* filed on April 4, 2011, Goldstrom failed to name *a single connection* between McKinsey and any Interested Parties, thereby continuing Defendants' unlawful pattern of failing to disclose McKinsey's connections. Two weeks later, on April 19, 2011, in his First Supplemental Declaration, Goldstrom again failed to name a single McKinsey connection. Two months later, on June 17, 2011, in his (final) Second Supplemental Declaration, Goldstrom named *one* McKinsey connection, stating that until

November 30, 2008, the Pension Benefit Guaranty Corporation had been a client of "an affiliate

of McKinsey RTS." This single disclosure was woefully inadequate and misleading, as it

purposefully gave the false impression that McKinsey RTS's disclosures in *Harry & David* were

so diligent and thorough that they even included all Interested Parties who were past McKinsey

clients from three years earlier. In reality, Goldstrom failed to disclose even McKinsey's

connections to *recent* past clients—much less McKinsey's *current* clients or any other

connections to Interested Parties. For instance, until in or around October 2009, McKinsey had

been engaged by the parent company of at least ***thirteen companies*** named as Interested Parties

in *Harry & David*. Even a cursory effort by Defendants to comply with their disclosure

obligations would have revealed McKinsey's connections to those Interested Parties.

Goldstrom's disclosures on behalf of McKinsey RTS should have disclosed these recent

connections. *See* Ex. C ¶¶ 26-35, 45. Their failure to do so despite McKinsey's experience in

multiple bankruptcy cases by this point is further evidence of Defendants' willful disregard of

the law regarding conflicts of interest and their serial, unlawful failure to disclose McKinsey's

connections to Interested Parties.

239.    Defendants (including McKinsey and Goldstrom) also concealed additional

conflicts and connections to Interested Parties in *Harry & David*. The facts needed to ascertain

the full extent of these additional connections are peculiarly within Defendants' knowledge but

will be proven through discovery.

        *v.   In re AMR*

240.    The *AMR* bankruptcy was filed in the United States Bankruptcy Court for the

Southern District of New York on August 29, 2011. In *AMR*, McKinsey submitted seven

disclosure declarations in support of the retention of McKinsey RTS, McKinsey US, and McKinsey & Co., Inc. Japan, and at least four other McKinsey affiliates.[54] All seven of McKinsey's disclosure declarations were sworn to and signed by Goldstrom: an initial Declaration, filed on January 10, 2012; a First Supplemental Declaration, filed on January 20, 2012; a Second Supplemental Declaration, filed on February 27, 2012; a Third Supplemental Declaration, filed on May 10, 2012; a Fourth Supplemental Declaration, filed on November 13, 2012; a Fifth Supplemental Declaration, filed on February 28, 2013; and a Sixth Supplemental Declaration, filed on April 18, 2013. McKinsey's fees in *AMR* were approved on October 21, 2013. McKinsey's disclosure declarations in *AMR* are identified as items No. 12-18 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 11-14 of Exhibit B hereto.

241.   In addition to Goldstrom, Carmody and Proshan were substantially involved in McKinsey's engagement in *AMR* throughout 2012 and 2013, as reflected in McKinsey's five fee applications in *AMR*. The detail for McKinsey's fee applications in *AMR* reflects that Proshan was the primary person responsible for preparing and revising Goldstrom's disclosure declarations (including gathering relevant information) and that Proshan was in frequent communication with Goldstrom and Carmody as part of that process.

242.   In *AMR*, McKinsey, Goldstrom, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, and Sternfels, intentionally concealed McKinsey's connections to Interested Parties. In his initial disclosure declaration in *AMR*, filed on January 10, 2012, Goldstrom failed to name a single connection between McKinsey and any Interested Parties. In

---

[54] In McKinsey's Fourth Supplemental Declaration in *AMR*, it amended its disclosures to include, among the McKinsey entities that were retained in that matter, McKinsey & Company Canada; McKinsey & Company, Inc. Belgium; McKinsey & Company, Inc. Italy; and McKinsey & Company, S.L.

his First Supplemental Declaration, filed on January 20, 2012, Goldstrom disclosed that until

March 2011, McKinsey & Co.'s former Managing Director (Rajat Gupta, whom McKinsey did

not actually name) had been a board member of the debtor, AMR Corporation ("**AMR**")—a fact

that was known to McKinsey on the August 29, 2011 bankruptcy filing date and should have

been disclosed in Goldstrom's initial declaration. Goldstrom also disclosed that two unnamed

McKinsey employees had "de minimis" holdings in AMR, which they had been directed to sell

down. Once again, Goldstrom's disclosures gave the purposefully false impression that

Defendants had conducted a thorough search for McKinsey's connections to Interested Parties

and fully disclosed such connections when they had done neither of those things.

243.    In his Second Supplemental Declaration in *AMR*, filed on February 27, 2012,

Goldstrom failed to name any further McKinsey connections. The same is true of his Third

Supplemental Declaration, filed on May 10, 2012. In his Fourth Supplemental Declaration, filed

on November 10, 2012, Goldstrom disclosed, for the first time, vendor contracts with the debtors

dating back to 2010. In his Fifth Supplemental Declaration, filed on February 28, 2013,

Goldstrom did not name any McKinsey connections. Finally, in his Sixth Supplemental

Declaration, filed on April 18, 2013, Goldstrom disclosed that McKinsey had been retained by

AMR and US Airways to assist in implementing a merger agreement between the two

companies.

244.    To avoid disqualification, Defendants clearly made no serious effort to uncover or

disclose McKinsey's conflicts and connections to Interested Parties in *AMR*. For instance, by

early January 2012—just two months after *AMR* was filed—McKinsey & Co. was hired by

Royal Bank of Scotland to assist it with downsizing. Royal Bank of Scotland was named as an

Interested Party (Aircraft Lenders and Lessors) in *AMR*, yet Goldstrom never disclosed that Royal Bank of Scotland was a ***current client*** of McKinsey during the *AMR* bankruptcy.

245.    Defendants McKinsey, Goldstrom, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, and Sternfels, also concealed additional disqualifying conflicts and connections to Interested Parties in *AMR*. The facts needed to ascertain the full extent of these connections are peculiarly within Defendants' knowledge but will be proven through discovery.

246.    All or any one of McKinsey's undisclosed connections would have disqualified McKinsey RTS, McKinsey US, and McKinsey's other affiliates from employment as bankruptcy professionals in *AMR*. *See* Ex. C ¶ 26. However, because of knowingly fraudulent concealment of those connections by Defendants (including McKinsey, Goldstrom, Proshan, and Carmody, authorized and aided and abetted by Garcia, Barton and Sternfels) neither the bankruptcy court, the U.S. Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey's potential conflicts in order to assess its qualifications or appoint AP or another competitor in McKinsey's stead. *See* Ex. C ¶¶ 26, 40-44.

        vi.   *In re AMR*
       vii.   *In re AMF Bowling*

247.    The *AMF Bowling* bankruptcy was filed in the United States Bankruptcy Court for the Eastern District of Virginia on November 13, 2012. In *AMF Bowling*, McKinsey RTS filed one disclosure declaration, sworn to and signed by Carmody, on November 21, 2012. McKinsey RTS's fees in *AMF Bowling* were approved on June 25, 2013. McKinsey RTS's

disclosure declaration in *AMF Bowling* is identified as item No. 19 in Exhibit A hereto, and specific false and misleading statements therein are identified at page 15 of Exhibit B hereto.

248.    In addition to Carmody, Proshan had substantial involvement in the *AMF Bowling* matter. The detail for McKinsey RTS's fee applications in *AMF Bowling* reflects that Proshan was the primary person responsible for preparing and revising disclosure affidavits (including gathering relevant information) in that case, and that Proshan was in frequent communication with Carmody and also in communication with Goldstrom as part of that process.

249.    In McKinsey RTS's disclosures in *AMF Bowling*, Defendants (including McKinsey, Carmody, Proshan, and Goldstrom, authorized and aided and abetted by Garcia, Barton, and Sternfels) failed to name a connection to a single Interested Party, thereby concealing McKinsey's connections to likely dozens of Interested Parties. The facts needed to ascertain the full extent of these specific connections are peculiarly within the knowledge of Defendants, including McKinsey, Carmody, Proshan, Garcia, and Goldstrom, but will be proven through discovery.

### viii.    In re Edison Mission Energy

250.    The *Edison Mission Energy* bankruptcy was filed in the United States Bankruptcy Court for the Northern District of Illinois on December 17, 2012. In *Edison Mission*, McKinsey RTS filed three disclosure declarations, sworn to and signed by Defendant Jared Yerian: an initial declaration filed on December 28, 2012; a First Supplemental Declaration, filed on May 15, 2013; and a Second Supplemental Declaration, filed on November 23, 2013. McKinsey RTS's fees in *Edison Mission* were approved on March 11, 2014. McKinsey RTS's disclosure declarations in *Edison Mission* are identified as items No. 20-22 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 15-17 of Exhibit B hereto.

251.    The detail for McKinsey RTS's fee applications for *Edison Mission* reflects that
Proshan was instrumental in preparing and revising McKinsey RTS's false and fraudulent
disclosures for that case, and that Proshan was in communication with Garcia and Yerian during
that process.

252.    Yerian was an experienced bankruptcy professional, having worked for twelve
years in AP's restructuring practice. In particular, during his tenure at AP, Yerian participated
numerous times in the gathering of disclosure information for Rule 2014(a) submissions and, as
a condition of his employment as an AP bankruptcy team member, was familiar with the
compliance and disclosure obligations to which bankruptcy professionals are subject. Despite
this experience, in McKinsey RTS's disclosures in *Edison Mission*, Yerian disingenuously failed
to name a ***single*** connection to any Interested Parties, and Defendants (including McKinsey,
Yerian, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, Goldstrom,
and Carmody) thereby concealing connections to likely dozens of Interested Parties. The facts
needed to ascertain all these specific connections are peculiarly within the knowledge of
Defendants but will be proven through discovery.

253.    Due to Defendants' years-long pattern of unlawfully omitting and concealing
McKinsey's connections to Interested Parties, the full extent of McKinsey's failures to disclose
remains unknown. However, particularly given McKinsey RTS's much lengthier disclosures
(which it began to file only after challenges by Alix) in its most recent cases, *Alpha Natural
Resources*, *SunEdison*, and *GenOn Energy*, discussed *infra*, McKinsey's undisclosed conflicts
and connections to Interested Parties likely number in the hundreds, in addition to those
identified herein.

254.    Due to Defendants' unlawful concealment of all but a handful of McKinsey's numerous connections in the eight bankruptcy cases discussed above, AP, the bankruptcy courts, the U.S. Trustee, and the Interested Parties were all unable to determine the nature and scope of McKinsey's conflicts and connections to Interested Parties and, therefore, the qualifications of McKinsey US, McKinsey RTS, or any other McKinsey entity to serve as a bankruptcy professional in those cases. Many of McKinsey's undisclosed connections constituted ongoing and actual conflicts that, if disclosed, would have required McKinsey's disqualification from employment in these cases. Instead, McKinsey obtained employment by virtue of Defendants' unlawful scheme to deliberately conceal McKinsey's numerous conflicts and connections to Interested Parties.

255.    McKinsey's twenty-two false and incomplete Rule 2014 declarations under penalty of perjury in those eight cases, as well as witness testimony, demonstrate that the failure to disclose McKinsey's connections was a conscious, intentional choice by Defendants. Simply stated, Defendants violated black-letter law so blatantly and so consistently that their actions could only have been deliberate and knowing.

        b.  **Defendants Have Unlawfully Concealed All of McKinsey's Connections to Interested Parties through Its Investment Arm, MIO.**

256.    Defendants have also consistently and unlawfully concealed McKinsey's connections to Interested Parties through its subsidiary MIO, both in its initial eight cases and in its subsequent five engagements, as discussed further *below*.

257.    MIO, which is wholly owned by McKinsey & Co., manages billions of dollars in assets for the benefit of both current and former McKinsey employees and partners.

71

258.    MIO is governed by a board of twelve directors that includes both current and former senior partners of McKinsey & Co. Garcia, who is a director and officer of McKinsey RTS and a Senior Partner of McKinsey & Co., and who (as President of McKinsey RTS) was involved in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, was also a member of MIO's board of directors from 2006 to 2017—a fact that he had a duty to disclose (but never did).

259.    Many of McKinsey's 30,000 former employees for whom MIO manages assets now work in senior positions at major corporations and government agencies all over the world. From 2001 through the present, McKinsey's disclosure declarations have consistently concealed connections to former McKinsey employees and partners, as well as MIO's connections to Interested Parties in the bankruptcies in which McKinsey has been employed.

260.    As one concrete example, MIO has over $600 million invested in BlackRock funds. Forms filed by McKinsey with the Department of Labor show that MIO has maintained investments in BlackRock since at least 2011. Since 2011, BlackRock entities have been listed as Interested Parties in four bankruptcies in which McKinsey RTS was hired: *NII Holdings*, *SunEdison*, *Alpha Natural Resources*, and *GenOn*. However, McKinsey RTS did not disclose this connection in <u>any</u> of those four cases. Nor did McKinsey RTS disclose this connection in *SunEdison* when Longroad Energy, which is identified on the *SunEdison* Interested Parties list as a partner of a BlackRock subsidiary, BlackRock Infrastructure, purchased SunEdison's assets in bankruptcy. And prior to 2011, when BlackRock was named as an Interested Party in *Lyondell*, McKinsey US failed to disclose that BlackRock was a service provider for MIO.

261.    Section 327 of the Bankruptcy Code prohibits McKinsey, as a bankruptcy professional, from imposing on debtor-clients and the debtors' creditors the risk that MIO's investment in BlackRock might impact their professional judgment. Had Defendants properly disclosed the facts regarding MIO that Rule 2014 requires, McKinsey would and should have been disqualified under Section 327 in each of these cases. *See* Ex. C ¶ 65.

## VI.   Alix Confronts Barton and Sternfels, and McKinsey and AP Reach an Agreement.

262.    On multiple occasions beginning in September 2014, Alix confronted Barton and Sternfels with evidence of McKinsey's repeated violations of bankruptcy law. As discussed below, during the remainder of 2014 and over the course of the next year, Alix spoke with Barton about McKinsey's conduct in bankruptcy consulting cases on at least eleven occasions, including three lengthy in-person meetings and eight substantive and lengthy telephone conferences. Sternfels participated in at least two of those exchanges.

263.    Alix also advised Barton and Sternfels that he had learned of an unlawful "pay-to-play" scheme whereby McKinsey made offers to bankruptcy attorneys to arrange exclusive meetings between bankruptcy counsel and high-level executives from McKinsey's most valued clients in exchange for exclusive referrals of bankruptcy assignments from those attorneys. These McKinsey clients did not necessarily have current bankruptcy issues, but the introductions were valuable currency to trade for early access and "sole source" selection of McKinsey for the bankruptcy attorneys' matters. It was also valuable to the firm attorneys without bankruptcy practices to gain access to referrals from bankruptcy attorneys. Alix advised Barton and Sternfels that McKinsey's "pay-to-play" offers were illegal. Such trafficking in bankruptcy cases is expressly prohibited under 18 U.S.C § 152(6). *See* Ex. C ¶¶ 87-91.

264.    Throughout these interactions, Alix explained to Barton (and Sternfels when present) the absolute necessity that McKinsey comply with Rule 2014 and cease its illegal "pay-to-play" marketing scheme. He also explained the grave potential consequences of McKinsey's serious past misconduct.

265.    Alix and Barton first met on September 3, 2014 in the Manhattan office of the law firm Gibson, Dunn & Crutcher LLP. At the time, they were in the midst of litigating a dispute involving McKinsey RTS's poaching of AP employees (one of whom, while he was a McKinsey RTS partner, had spoliated evidence while the litigation was pending) who had stolen trade secrets and other confidential information from AP, which they had taken to McKinsey RTS. Sternfels participated by telephone in that first meeting, which lasted from approximately 4:00 p.m. until approximately 6:00 p.m. Subsequently, Alix and Barton met in person on October 16, 2014 and October 15, 2015. Sternfels participated in and/or was advised by Barton regarding the issues of illegality that were discussed during those meetings.

266.    During the September 3, 2014 meeting, Alix explained McKinsey's disclosure obligations under bankruptcy law at length to Barton and Sternfels. Alix provided a lengthy and detailed exposition of the relevant legal principles and demonstrated how all of McKinsey's past disclosure declarations were non-compliant and illegal because they failed to identify connections by name and failed to describe connections in sufficient detail. Alix also raised McKinsey's pay- to-play scheme and explained to Barton and Sternfels why it, too, was illegal.

267.    Alix further advised Barton and Sternfels that McKinsey's pay-to-play scheme and concealment of connections in its bankruptcy engagements constituted serious and obviously intentional misconduct and that such misconduct could potentially expose the entire firm to criminal prosecution. Alix explained that McKinsey's representatives had signed inadequate and

74

false disclosure declarations under penalty of perjury and that the bankruptcy process is administered and overseen by the Department of Justice, including the U.S. Trustee, and that failure to fully and truthfully disclose connections is a serious matter. Alix even apprised Barton and Sternfels of the famous case *United States v. Gellene*, 182 F.3d 578 (7th Cir. 1999), in which a prominent New York City bankruptcy attorney was convicted of filing a false Rule 2014 disclosure declaration in violation of 18 U.S.C. § 152(3) and sentenced to fifteen months in prison.

268.    Nothing that Alix told Barton and Sternfels on September 3, 2014 should have come as a surprise. McKinsey is a company with around $10 billion in revenue, another $25 billion in investment assets, and ongoing access to some of the most sophisticated legal counsel in the world. And internally at McKinsey RTS, Garcia, who runs all of McKinsey RTS, holds a JD from Harvard Law School, while Goldstrom, who runs McKinsey RTS's domestic operations, was at the top of his class at the University of Virginia School of Law and is a member in good standing of the Georgia bar.

269.    In response to the information provided by Alix, Barton frankly expressed doubt about McKinsey RTS as a business, while Sternfels expressed support for it and asserted that any illegalities could be rectified.

270.    On the following day, September 4, 2014, Barton called Alix to thank him for the meeting and to advise him that he would look into the issues raised by Alix and they would talk again.

    a.   **Barton Admits McKinsey's Pay-to-Play Scheme**

271.    On October 16, 2014, Alix and Barton met in person a second time, at McKinsey

& Co.'s offices in London. During that meeting, Barton informed Alix that he had looked into

Alix's allegations regarding McKinsey's pay-to-play scheme. Barton revealed that he had been

upset and angry to learn that McKinsey had, in fact, been making pay-to-play offers to

bankruptcy lawyers. Barton told Alix that he had consulted Eric Friedman, a senior partner at the

law firm Skadden, Arps, Meagher & Flom LLP, who advised him that the scheme was illegal.

Barton expressed incredulity that Garcia, Goldstrom, and the McKinsey RTS staff would have

engaged in such conduct, acknowledged it was wrong, and confirmed that it never should have

happened. Barton added that Virginia Molino, General Counsel of McKinsey & Co., agreed with

his assessment.

### b.  **McKinsey and Alix Agree to a Resolution**

272.    Both before and after their October 2014 meeting, Barton expressed to Alix his

personal disdain for, and grave doubts about, the wisdom of the McKinsey RTS business. Barton

said he did not understand why McKinsey was in the bankruptcy business at all. He told Alix

that many McKinsey partners questioned why McKinsey RTS was created and why McKinsey

had gotten involved in the bankruptcy business in the first place. Barton further stated three times

that he personally did not believe McKinsey RTS should continue performing bankruptcy work,

which he viewed as inconsistent with McKinsey's "brand." Barton went on to explain his view

that the disclosures legally required of bankruptcy professionals were inconsistent with

McKinsey's business model and, accordingly, he did not believe McKinsey should be engaged in

businesses where such broad disclosures were required, thereby unwittingly revealing

McKinsey's motive for flouting the Bankruptcy Code's disclosure requirements.

273.    Barton proceeded to explain that his re-election as Global Managing Partner of McKinsey & Co. would occur in three months, in January 2015. He represented that his re-election would solidify his ability to rectify the issues raised by Alix, and implored Alix to hold off on taking action and continue to be patient. Previously, Barton had asked Alix to be patient and not act on his concerns while Barton looked into the matter. Barton assured Alix that after his re- election, he would be able to change the situation very quickly, and said he had consulted his predecessor, Ian Davis, who advised him that the way to change problems at McKinsey was to change the people. Alix responded that he could be patient only if Barton was going to make a meaningful attempt to have McKinsey make full disclosure and comply with the law. In response, Barton promised that McKinsey would not enter into any further bankruptcy engagements prior to his re-election.

274.    At the October 2014 meeting, Barton (acting on behalf of McKinsey & Co., McKinsey Holdings, and McKinsey US) agreed with Alix (acting on behalf of AP) that within thirty days of Barton's re-election in January 2015, the senior leadership of McKinsey RTS (including Garcia, Carmody, Goldstrom, Mark Hojnacki, and Doug Yakola) would be removed on account of their illegal behavior. Barton and Alix further agreed that by March 2015, McKinsey would exit the bankruptcy consulting business (including by withdrawing from active McKinsey RTS bankruptcy consulting engagements due to numerous undisclosed conflicts) and transfer McKinsey RTS's personnel to other McKinsey units. In exchange, Alix agreed to remain patient and refrain from acting at that time on the issues he had raised, including forbearance from legal action. Alix did so because he believed that no legal action he could take would resolve McKinsey's conduct any quicker than the actions that Barton had promised. Barton and

Alix each intended to bind their respective firms to this contract and had the requisite authority to do so.

275.     Barton was re-elected on January 30, 2015 but failed to act on his promises to Alix that he would remove Garcia and Goldstrom within thirty days of his re-election. In March 2015, Alix called Barton to remind him of their agreement. Barton advised Alix that he would not be able to move as quickly as he had assured Alix he would, but Barton said he would remove Garcia and Goldstrom from their positions by the end of May 2015.

276.     Barton broke his promise. Garcia and Goldstrom remain in leadership positions at McKinsey RTS, and Defendants continue to conduct their criminal enterprise to the present day.

277.     At 11:00 a.m. on Thursday, October 15, 2015, Alix met with Barton at McKinsey & Co.'s offices in New York City for their eleventh interaction and their third and final in-person meeting. Once again, Alix confronted Barton regarding McKinsey RTS's continued violations of its disclosure obligations, but Barton deflected Alix's expressions of concern. Instead, he offered Alix bribes to keep quiet. Specifically, Barton offered to introduce AP to Fortescue, a large iron ore mining company in Australia that needed consulting services. Alix immediately declined. Barton then offered to introduce AP to Volvo in Europe, saying they needed AP's help. Again, Alix immediately declined Barton's offer, which he viewed as a shocking and improper attempt to bribe him. In over four decades of experience in bankruptcy consulting, no competitor had ever offered Alix any restructuring assignment or introduction of any kind, let alone two very large international consulting assignments during the same meeting. Barton's offers were blatant attempted pay-offs and bribes offered in return for Alix dropping the issues he had raised concerning McKinsey's acknowledged pay-to-play scheme and its illegal disclosure declarations. Indeed, these offers followed the same pattern as the pay-to-play allegation that Alix had raised.

278.    As detailed below, it is now abundantly clear that Barton and McKinsey never

intended to honor their commitments, but instead made false representations in order to forestall

corrective actions by Alix as long as possible, thereby maximizing their fees and increasing

McKinsey RTS's foothold in the high-end bankruptcy business at AP's expense.

## VII.    Despite Barton's Representations to Alix, Defendants Unlawfully Conceal McKinsey's Disqualifying Connections in *NII Holdings*

279.    As Alix subsequently learned, during Barton and Alix's agreed-upon forbearance

period, McKinsey RTS was retained as an advisor in the *NII Holdings (Nextel)* bankruptcy,

which was filed in the United States Bankruptcy Court for the Southern District of New York on

September 15, 2014. Although AP sought an opportunity to bid or make a pitch for that

assignment, it was never given any opportunity to do so. As an industry leader, AP is typically

afforded at least an opportunity to make a pitch for high-end restructuring assignments such as

the *NII Holdings* case. That AP was denied such an opportunity for the *NII Holdings* matter

strongly suggests that the influence of McKinsey's illegal "pay-to-play" scheme resulted in a

pre-selection of McKinsey RTS.

280.    In *NII Holdings*, Carmody filed two disclosure declarations on behalf of

McKinsey RTS: his initial disclosure declaration on October 23, 2014, and a First Supplemental

Declaration on November 6, 2014. Those declarations are identified as items No. 23-24 in

Exhibit A hereto, and specific false and misleading statements therein are identified at pages 18-

22 of Exhibit B hereto. McKinsey RTS's fees in *NII Holdings* were approved on June 19, 2015.

281.    The difference between the disclosures that Carmody filed on behalf of McKinsey

RTS in *NII Holdings* and other matters and those he filed while employed by Alix Partners is

striking. When Carmody submitted declarations on Alix Partners' behalf in his previous

employment, he fully complied with Rule 2014's requirements and regularly identified all of AP's relevant connections by name and in detail. For example, in *In re American Safety Razor*, No. 10-BK-12351 (Bankr. D. Del.), Carmody, while still working for Alix Partners, filed a lengthy Rule 2014 statement that contained seven full pages disclosing specific connections by name and describing the nature of the connection to each party so disclosed.

282.    As in McKinsey's seven previous bankruptcy cases, Carmody's Rule 2014 disclosure declarations in *NII Holdings* unlawfully concealed all of McKinsey's conflicts and connections to Interested Parties. Once again, McKinsey RTS's disclosures did not identify even a single connection by name, but instead offered vague descriptions of some connections to certain *categories* of Interested Parties, and Carmody represented under oath that McKinsey RTS was "disinterested." This statement of disinterestedness was false. Had McKinsey RTS and Carmody told the truth, they would have revealed, *inter alia*, McKinsey's connection to BlackRock Fund Advisors, which was identified on the *NII Holdings* Interested Parties list as a Major Noteholder. In concealing this conflict in *NII Holdings*, Defendants overlooked MIO's disclosure of its BlackRock investment to the U.S. Department of Labor in its required Form 5500. But for that disclosure, which was entirely unrelated to the *NII Holdings* bankruptcy, McKinsey's BlackRock conflict would still be hidden.

283.    Had Carmody disclosed all of McKinsey's connections, all or any one of them would have disqualified McKinsey RTS from employment as a bankruptcy professional in *NII Holdings*. However, because of Defendants' (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) fraudulent concealment of those connections, neither the bankruptcy court, the U.S. Trustee, nor any of the

Interested Parties could assess the nature and extent of McKinsey RTS's potential conflicts. *See* Ex. C ¶¶ 26, 40-44.

284.    Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) also concealed additional conflicts and connections to Interested Parties in *NII Holdings*. The facts needed to ascertain these connections are peculiarly within the knowledge of Defendants but will be proven through discovery.

285.    On November 3, 2014, Alix called Barton to discuss *NII Holdings*. Barton claimed that he was unaware of the matter, despite his earlier commitment to track all future McKinsey bankruptcy cases, his detailed discussions with Alix regarding McKinsey's inadequate disclosure declarations in other cases, and his promises to rectify McKinsey's illegal conduct. Barton promised Alix that he "would look into" McKinsey RTS's involvement and disclosures in *NII Holdings*. Barton never followed up, and McKinsey RTS and Carmody never disclosed any connections by name in *NII Holdings*.

## VIII.   **Defendants Continue Their Racketeering Activity in Standard Register**

286.    As subsequently disclosed in Carmody's disclosure declaration in *Standard Register*, in or about January 2015, McKinsey RTS was engaged for pre-petition work (and later for the bankruptcy assignment) on yet another bankruptcy case, *Standard Register*. The *Standard Register* bankruptcy was filed in the United States Bankruptcy Court for the District of Delaware on March 12, 2015. McKinsey RTS filed one disclosure declaration in *Standard Register*, on March 23, 2015. That declaration is identified as item No. 25 in Exhibit A hereto and specific false and misleading statements therein are identified at pages 22-23 of Exhibit B hereto. In

connection with *Standard Register*, McKinsey RTS continues to perform work on claims

management and claims evaluation.

287.    The detail for McKinsey RTS's fee applications in *Standard Register* reflects that,

in addition to swearing to and signing McKinsey RTS's disclosure declaration, Carmody

performed substantial work on the engagement, including by serving as the debtor's Chief

Restructuring Officer.

288.    In *Standard Register*, Carmody, on behalf of McKinsey RTS, once again

submitted an unlawfully vague, non-specific Rule 2014 disclosure declaration. As in *NII

Holdings*, Carmody and McKinsey RTS failed to identify by name a single connection to any

Interested Parties, and Carmody falsely represented under oath that McKinsey RTS was

"disinterested."

289.    In *Standard Register*, Carmody failed to disclose (*inter alia*) that the United

States Department of Defense, which was on the Interested Parties list, was a major McKinsey

client that had paid McKinsey millions of dollars in recent years. In September 2014 alone,

McKinsey had been awarded two two-year contracts worth more than $11 million combined, and

in October 2013, it had been awarded a contract worth nearly $16 million.

290.    Carmody also failed to disclose McKinsey's connection to another Interested

Party, Southern California Edison, a subsidiary of Edison International. Less than two years

earlier, McKinsey RTS had been hired for the bankruptcy of Edison Mission Energy—also a

subsidiary of Edison International. This recent connection, like McKinsey's multiple large

contracts with the Department of Defense, was required to be disclosed and would have been

obvious had Defendants made any real efforts to comply with their Rule 2014 obligations.[55]

291.    Had McKinsey RTS and Carmody disclosed McKinsey's connections, all or any

one of those connections likely would have disqualified McKinsey RTS from employment as a

bankruptcy professional in *Standard Register*. However, because of Defendants' (including

McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton,

Sternfels, and Goldstrom) fraudulent concealment of those connections, neither the bankruptcy

court, the U.S. Trustee, nor any of the Interested Parties could assess the nature and extent of

McKinsey RTS's potential conflicts. *See* Ex. C ¶¶ 26, 40-44.

292.    Defendants (including McKinsey, Carmody, and Proshan, authorized and aided

and abetted by Garcia, Barton, Sternfels, and Goldstrom) also concealed many other connections

to Interested Parties in *Standard Register*. The facts needed to ascertain those connections are

peculiarly within Defendants' knowledge but will be proven through discovery. However, the

insufficiency of Carmody's disclosures in *Standard Register* is made even more apparent by the

disclosures that McKinsey RTS later made in *Alpha Natural Resources* and *SunEdison*,

beginning with Carmody's initial disclosure declaration in *Alpha Natural Resources* just seven

months after McKinsey RTS filed its last fee application in *Standard Register* on October 28,

2015. In *Alpha Natural Resources* and/or *SunEdison*, McKinsey RTS disclosed that, *inter alia*,

the following entities—all of which were named as Interested Parties in *Standard Register*—

were **McKinsey clients** or service providers:

---

[55] Carmody also failed to disclose, inter alia, that multiple McKinsey alumni were employed by Bank of Montreal, the parent of BMO Harris Bank N.A., which was identified on the Interested Party list as a Landlord; or that Sidley Austin LLP, identified as an Ordinary Course Professional, was a service provider to McKinsey's investment arm, MIO.

| Entity | Interested Party Role(s) (Standard Register) | McKinsey Connection(s) (as disclosed in *Alpha Natural Resources* and/or *SunEdison*) |
|---|---|---|
| Allianz SE | Insurer | Client and/or Affiliate of Client (*Allianz Global US*) |
| Bank of America Corp. | 50 Largest Unsecured Creditors; Largest Customers | Client |
| Bank of America, N.A. | Secured Creditor | Client |
| Ernst & Young LLP | Ordinary Course Professional | Service Provider |
| McGuire Woods LLP | Ordinary Course Professional | Service Provider |
| Monsanto Company | Parties relating to significant litigation involving the debtors | Client and/or Affiliate of Client since 2009 (*Monsanto Electronic Material Company, predecessor of SunEdison, Inc.*) |
| Monsanto Research Company | Parties relating to significant litigation involving the debtors | Client and/or Affiliate of Client since 2009 (*Monsanto Electronic Material Company, predecessor of SunEdison, Inc.*) |
| Skadden, Arps, Slate, Meagher & Flom LLP | Counsel and other advisors retained by other significant parties | Service Provider |

293.    In the declarations that it filed in *Alpha Natural Resources* and *SunEdison*,

McKinsey RTS did not specify the relevant dates for its disclosed connections. It merely stated

that the disclosed entities had, at some point within the past two years, been McKinsey clients or

service providers. Given the close proximity of *Standard Register* to McKinsey RTS's filings in

*Alpha Natural Resources* and *SunEdison*, it is highly likely that many, if not all, of the above-

listed connections also should have been disclosed in *Standard Register*. Further, it is

implausible that McKinsey first contracted with all of the above entities in the intervening

months between *Standard Register* and McKinsey RTS's disclosures in *Alpha Natural*

*Resources* and *SunEdison*.

294.     In Carmody's Rule 2014 declarations filed on behalf of McKinsey RTS in

*GenOn*, Carmody does not specify the relevant dates for McKinsey's belatedly disclosed

connections. Instead, Carmody merely states that those entities were, at some point in the past

two years, McKinsey clients or service providers. Given the close proximity of *GenOn* to

*Standard Register* and McKinsey RTS's failure to name a single connection in *Standard*

*Register*, McKinsey's *GenOn* connections almost certainly existed at the time it was required to

make its *Standard Register* disclosures, but Carmody failed to disclose those connections. In

*Standard Register*, Bank of America was a particularly significant concealed connection because

it was one of the debtors' fifty largest unsecured creditors and one of the debtors' largest

customers. Another significant concealed McKinsey client was IBM, which was one of the

debtors' largest vendors and subcontracting vendors.

295.     In addition, although Carmody admitted in purposefully vague terms in his

*Standard Register* disclosure declaration that McKinsey was serving clients with interests

adverse to the debtors, Defendants (including McKinsey, Carmody, and Proshan, authorized and

aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) concealed both the identities of

these clients and the actual nature of these adverse interests. Carmody's declaration in *Standard*

*Register* stated only: "Certain members of McKinsey RTS's Staff serving the debtors currently

serve or in the past three years have served one of the Parties relating to significant litigation

involving the debtors." Carmody also stated (without disclosing any names or the nature of the

work performed): "Members of McKinsey RTS currently serve or in the past three years have

served seven of the Parties relating to significant litigation involving the debtors and three

affiliates of Parties relating to significant litigation involving the debtors." In each instance,

Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by

Garcia, Barton, Sternfels, and Goldstrom) concealed the facts necessary to ascertain whether

these matters—which were litigation matters involving the debtors—posed disqualifying

conflicts.

296.    Again, all or any one of the foregoing undisclosed connections would have

disqualified McKinsey RTS from acting as a bankruptcy professional in *Standard Register*.

However, because of Defendants' fraudulent concealment, neither the bankruptcy court, the U.S.

Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey's

conflicts and connections to Interested Parties. *See* Ex. C ¶¶ 26, 40-44.

297.    Defendants (including McKinsey, Carmody, and Proshan, authorized and aided

and abetted by Garcia, Barton, Sternfels, and Goldstrom) also concealed additional conflicts and

connections to Interested Parties in *Standard Register*. The facts needed to ascertain these

connections are peculiarly within Defendants' knowledge but will be proven through discovery.

298.    Absent Defendants' misconduct, there is a strong likelihood that AP would have

been employed in *Standard Register*, particularly given its market position and the fact that AP

had provided services to Standard Register in the past.

299.    Alix confronted Barton regarding McKinsey RTS's *Standard Register*

engagement during a phone call on May 14, 2015. As with the *NII Holdings* engagement, Barton

told Alix that he had been unaware of the case and promised that he would look into it and

follow up. Barton also told Alix that he would announce his decision to terminate Garcia as

86

President of McKinsey RTS internally on or by May 29, 2015. He asked Alix to remain quiet
until then, as his plan had not yet been announced within McKinsey.

300.     Barton broke those promises to Alix. Garcia continues to lead McKinsey RTS,
and McKinsey RTS never submitted adequate disclosures in *Standard Register*.


## IX.     Defendants' Racketeering Activity Continues in *Alpha Natural Resources*

301.     Alpha Natural Resources filed for bankruptcy in the United States Bankruptcy
Court for the Eastern District of Virginia on August 3, 2015. Carmody filed five disclosure
declarations on behalf of McKinsey RTS in that case: an initial declaration, filed on August 24,
2015; a First Supplemental Declaration, filed on November 9, 2015; a Second Supplemental
Declaration, filed on March 25, 2016; a Third Supplemental Declaration, filed on May 19, 2016;
and a fourth supplemental declaration, filed on August 5, 2016. Those declarations are identified
as items No. 26-28, 30, and 33 in Exhibit A hereto, and specific false and misleading statements
therein are identified at pages 24-56 of Exhibit B hereto.

302.     In *Alpha Natural Resources*, Defendants (including McKinsey, Carmody, and
Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) not only
continued, but accelerated, their racketeering activity. As discussed below, Defendants' crime
and racketeering activity in *Alpha Natural Resources* included:

> **a.** Submitting declarations that unlawfully concealed and falsely denied
> McKinsey's connections to Interested Parties;
>
> **b.** Submitting declarations that unlawfully concealed McKinsey's connection to
> its client United States Steel Corporation ("**United States Steel**"), which was a
> major coal customer of debtor Alpha Natural Resources, and which McKinsey

87

was simultaneously assisting in reducing its coal costs at Alpha Natural Resources' expense; and

**c.** Making false statements to the U.S. Trustee's Office, which is part of the United States Department of Justice, regarding the completeness of McKinsey RTS's disclosure declarations in order to induce the U.S. Trustee to withdraw its motion to compel McKinsey RTS to comply with Rule 2014.

### a. <u>McKinsey RTS's Failure to Disclose Its Connections in Alpha Natural Resources</u>

303.    On August 24, 2015, Carmody filed an initial disclosure declaration on behalf of McKinsey RTS in support of its application for employment in *Alpha Natural Resources*. As in the disclosures submitted by McKinsey in previous bankruptcy cases, Carmody described McKinsey's connections only in vague and generic terms. For example, Carmody merely revealed that McKinsey had a connection to a "Major Customer" or "Major Competitor"—rather than identifying any of those connections by name as required by law. Indeed, Carmody did not even describe McKinsey's pre-petition relationship with the debtor, Alpha Natural Resources, as required by law.

304.    In the year that followed his initial declaration, Carmody filed *four* supplemental declarations in *Alpha Natural Resources*. Yet he failed to name *any* of McKinsey's connections to Interested Parties until he was forced to do so after the U.S. Trustee filed a motion to compel against McKinsey RTS, which led to Carmody filing his Third Supplemental Declaration on May 19, 2016, nine-and-a-half months after his initial declaration. In his extremely belated disclosures,

88

305.    On August 24, 2015, Carmody filed an initial disclosure declaration on behalf of Carmody revealed (*inter alia*) that at least eighteen (18) Interested Parties were current or very recent McKinsey *clients*, including eight Secured Term Loan Lenders; eight Revolving Facility Lenders; five Depository and Disbursement Banks; four Major Competitors; three Major Equity Holders; a Major Unsecured Noteholder; a Professional, Consultant, or Service Provider; a Lender under A/R Facility; a Party to a Joint Venture; a Major Customer; a Second Lien Noteholder; and an Insurer.

306.    Carmody's initial and supplemental declarations were drafted in close consultation with Proshan with the intent of minimizing McKinsey RTS's disclosures, in flagrant and deliberate violation of Section 327 and Rule 2014.

307.    The bulk of Carmody's disclosures by name in *Alpha Natural Resources* were not made until August 5, 2016—***more than eleven months*** after his initial inadequate disclosure, and almost one month after the bankruptcy plan was confirmed and the case was effectively over. In his extremely belated disclosures, Carmody further revealed ***more than two dozen additional McKinsey clients***, including six Major Customers; five Insurers; five Parties to Material Unexpired Leases with the Debtors; three Revolving Facility Lenders; three Major Equity Holders; three Major Unsecured Noteholders; two Beneficiaries of Letters of Credit; two Secured Term Loan Lenders; one of the "Largest Unsecured Creditors (Excluding Noteholders)"; one Party to a Material Contract with Debtors; one Party to a Joint Venture; one Material Surety; one Second Lien Noteholder; and one Major Competitor. Carmody also revealed that more than a dozen entities identified as Professionals, Consultants and Service Providers in *Alpha Natural Resources* were also current or recent service providers to McKinsey, and at least three of them were also McKinsey clients.

89

308.     By engaging in extreme delay in submitting McKinsey RTS's required disclosures in *Alpha Natural Resources*, Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) acted in bad faith and ensured that McKinsey RTS would be too entrenched to be dismissed on conflict grounds at that point, with its work largely completed, and millions of fees already charged. *See* Ex. C ¶ 33.

309.     Moreover, despite submitting *five* declarations by Carmody in *Alpha Natural Resources* and purporting to have exhaustively searched for and named all its connections to Interested Parties, McKinsey RTS clearly failed to do so once again—even though it was compelled three times to do so by the U.S. Trustee and by order of the bankruptcy court. For instance, in the Interested Parties list for *Alpha Natural Resources*, BlackRock Advisors LLC was named as a Major Unsecured Noteholder and BlackRock Fund Advisors was named as a Major Equity Holder. Yet McKinsey RTS and Carmody failed to disclose that McKinsey's investment

310.     McKinsey's known but undisclosed connections in *Alpha Natural Resources* arm, MIO, **holds investments in BlackRock, and BlackRock is a McKinsey client**.  include, *inter alia*:

| Entity | Interested Party Role (Alpha Natural Resources) | McKinsey Connection(s) |
|---|---|---|
| BlackRock Advisors LLC | Major Unsecured Noteholders | Investment (through MIO); Client or Affiliate of Client |
| BlackRock Fund Advisors | Major Equity Holder | Investment (through MIO); Client or Affiliate of Client |
| Pinebridge Investments LLC | Secured Term Loan Lender | Non-Executive Chairman of Pinebridge Investments LLC, *John L. Thornton*, was also a member of the McKinsey Advisory Council |

90

| RBC Global Asset Management, Inc. | Major Equity Holder | *Toos Daruvala*, a McKinsey partner who is now Co-CEO of MIO, began serving on the board of directors of parent company the Royal Bank of Canada since 2015. |
|---|---|---|
| SSgA Funds Management, Inc. | Major Equity Holder | Investment (through MIO) |
| UBS Financial Services, Inc. | Major Equity Holder | Investment (through MIO) |

311.    McKinsey RTS was required by law to disclose all Parties, including those described above, *see* Ex. C ¶¶ 29-34, 45, but Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) willfully and fraudulently concealed them instead.

312.    169. Additionally, at least one Interested Party in *Alpha Natural Resources*, Duke Energy Progress (identified as a Major Customer), was disclosed months later as a McKinsey client (or affiliate thereof) in *GenOn*. And in September 2016, Ulster Bank, a Royal Bank of Scotland subsidiary and affiliate of Interested Party RBS Greenwich Capital (a Revolving Facility Lender) was publicly reported as being a McKinsey client. The proximity of these announcements to McKinsey RTS's disclosures in *Alpha Natural Resources* suggests these contacts may have also been disclosable in *Alpha Natural Resources*.

313.    All or any one of McKinsey's undisclosed connections would have disqualified McKinsey RTS from employment in *Alpha Natural Resources*. However, because of Defendants' (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) fraudulent concealment of those connections, neither the bankruptcy court, the U.S. Trustee, nor any of the Interested Parties could assess the nature and extent of McKinsey RTS's potential conflicts. *See* Ex. C ¶¶ 79-80.

314.    Defendants (including McKinsey, Carmody, and Proshan, authorized and aided
and abetted by Garcia, Barton, Sternfels, and Goldstrom) also concealed additional connections
to Interested Parties in *Alpha Natural Resources*. The facts needed to ascertain these connections
are peculiarly within Defendants' knowledge but will be proven through discovery.

315.    In *Alpha Natural Resources*, McKinsey RTS also began its practice of disclosing
connections in stages, waiting until the case had progressed significantly and its own position
was deeply entrenched before identifying any connections to significant Interested Parties by
name.

316.    For example, in his third supplemental declaration filed on behalf of McKinsey
RTS on May 19, 2016, after Alpha Natural Resources' plan had already been negotiated and
circulated to creditors, Carmody belatedly disclosed that ***McKinsey, in fact, represented most of
Alpha Natural Resources' first-lien lenders***, including the following entities:

- Apollo Global Management LLC (*Secured Term Loan Lender; Revolving Facility
  Lender*)

- Bank of America, N.A. (*Secured Term Loan Lender*)

- Citigroup Global Markets, Inc. (*Revolving Facility Lender*)

- UBS Stamford Branch TRS (*Revolving Facility Lender*)

317.    Although all of these entities were named as Interested Parties at the outset of the
case, Carmody failed to disclose them (or to name any other significant Interested Parties) in his
initial disclosure declaration—or in his First Supplemental Declaration, or in his Second
Supplemental Declaration. Even worse, McKinsey's undisclosed clients included at least one
additional creditor that acquired Alpha Natural Resources' assets in bankruptcy: Wells Fargo.
McKinsey RTS and Carmody *never* disclosed that Wells Fargo was a McKinsey client, even

92

though Wells Fargo was listed as an Interested Party at the outset of *Alpha Natural Resources*—and even though Carmody supplemented his disclosures on behalf of McKinsey RTS four times, for a total of five declarations in that case.

318.   Defendants' motivation for the egregious delays and omissions in Carmody's disclosures in *Alpha Natural Resources* is obvious. McKinsey RTS's undisclosed creditor connections were disqualifying under the law because they rendered McKinsey incapable of offering undivided loyalty to debtor Alpha Natural Resources. The interests of a bankruptcy estate and its various creditors are classically adverse. As a bankruptcy fiduciary, McKinsey RTS was charged with maximizing the value of the estate for the benefit of all creditors; its advice and recommendations become tainted when McKinsey also provides service to *particular* estate creditors and has undisclosed relationships from which it benefits.

319.   Apart from the fact that McKinsey RTS and Carmody failed to disclose that numerous creditors were McKinsey clients, they also failed to disclose that numerous McKinsey alumni were employed by various creditors as executives. These connections further undermined McKinsey RTS's representation of Alpha Natural Resources and should have been disclosed. Disclosure of these connections was required because such creditors have a potential strategic advantage by virtue of their inside knowledge of, and concealed relationships with, McKinsey, which they could leverage in negotiations over the structure of the bankruptcy plan. These interpersonal connections could also impact McKinsey RTS's structuring of the bankruptcy plan, as McKinsey and its former employees have ongoing financial and referral relationships that extend beyond any particular bankruptcy at hand. McKinsey is likely to be sensitive to the future success and influence of its former employee network and this may color any particular

93

recommendation to Alpha Natural Resources, with McKinsey having an eye to advancing the
interests of strategically positioned former employees.

320.    Had McKinsey RTS and Carmody timely disclosed McKinsey's extensive
connections to Interested Parties in *Alpha Natural Resources*, McKinsey RTS would have been
disqualified from employment. *See* Ex. C ¶¶ 79-80. Instead, Defendants (Defendants (including
McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton,
Sternfels, and Goldstrom) concealed these connections, even as McKinsey met numerous times
with its own clients (to whom it owed separate duties) to negotiate those clients' acquisition of
the debtor Alpha Natural Resources' property while McKinsey RTS was earning millions in fees
from Alpha Natural Resources' bankruptcy estate.

### b.  McKinsey Simultaneously Represents the Debtor and United States Steel, a Concealed McKinsey Client, in Contract Negotiations

321.    One of the many connections that Defendants (including McKinsey, Carmody,
Garcia, and Proshan) are known to have unlawfully concealed for nearly a year in *Alpha Natural
Resources*, United States Steel, constituted yet another one of McKinsey RTS's irreconcilable
and disqualifying conflicts of interest. While McKinsey RTS was obligated to work to use its
best efforts to maximize the value of Alpha Natural Resources' bankruptcy estate, McKinsey
was *simultaneously* assisting one of Alpha Natural Resources' largest customers, United States
Steel, in reducing the amount it paid to its coal suppliers, including Alpha Natural Resources.
Accordingly, although McKinsey was being paid to maximize the value of Alpha Natural
Resources' assets, it was simultaneously being paid to diminish the value of one of those same
assets: its supply contract with United States Steel. This undisclosed connection was a flagrant,

direct, intentional, and disqualifying conflict of interest and a clear, unconscionable breach of

McKinsey RTS's duty of loyalty to Alpha Natural Resources—a direct conflict. For nearly an

entire year, until August 5, 2016, McKinsey RTS and Carmody failed to disclose that United

States Steel was a client. Absent this unlawful failure to disclose this disqualifying connection,

AP likely would have received the business.

322.    Moreover, at least two senior McKinsey RTS consultants with leadership

positions on the *Alpha Natural Resources* bankruptcy engagement played roles on ***both sides*** of

Alpha Natural Resources' sales of coal to United States Steel during that period. In connection

with the *Alpha Natural Resources* bankruptcy, Rajesh Krishnan, a McKinsey Senior Vice

President and McKinsey & Co. partner, and Richard Sellschop, a McKinsey & Co. partner and

Practice Leader, billed Alpha Natural Resources almost $2 million in bankruptcy fees on behalf

of McKinsey RTS. ***At the same time***, Krishnan and Sellschop were also billing United States

Steel on its coal cost reduction project. Although other McKinsey consultants warned Krishan

and Sellschop that this was a direct conflict, they proceeded anyway, with the support of senior

leaders at McKinsey. If these connections and conflicts of interest had been disclosed, McKinsey

RTS would have been disqualified.

323.    McKinsey RTS's egregious conflict of interest with respect to United States Steel

was never disclosed. Carmody's references to this clear conflict in his disclosure declarations in

*Alpha Natural Resources* were deliberately vague, misleading, parsed, inadequate, and plainly

designed to mislead and conceal. In both his initial declaration and his First Supplemental

Declaration in *Alpha Natural Resources*, Carmody stated: "Members of McKinsey RTS, in the

past three years, have served one Major Customer of the Debtors on procurement in the coal

sector generally but with no specific focus on the Debtors or these chapter 11 cases." As an

95

initial matter, this disclosure was plainly deficient because it failed to name the "Major Customer" referenced. Even more egregiously, Carmody's seemingly innocuous disclosure about "general" work that McKinsey RTS team members had performed "in the past three years" was materially misleading because it failed to disclose that McKinsey RTS members were engaged in ***current*** work that was adverse to and sought to directly impact the value of the bankruptcy estate. *See* Ex. C ¶¶ 79-80.

324.    In his fourth supplemental declaration, filed on August 5, 2016, Carmody named United States Steel as a current or recent client of McKinsey. However, Carmody failed to identify United States Steel as the "Major Customer" that McKinsey had advised on coal procurement strategy, or that McKinsey's work was in fact concurrent with, and adverse to, McKinsey RTS's engagement in *Alpha Natural Resources*.

325.    Thus, Carmody's statements in *Alpha Natural Resources* were designed to mislead and conceal pertinent facts in several respects:

a. By failing to name the "Major Customer," United States Steel (an industrial powerhouse and a major, long-term client of McKinsey), Carmody's declarations concealed the magnitude and significance of this serious conflict; By stating that McKinsey RTS members "have served" an unnamed "Major Customer" of the debtor "in the past three years," Carmody's declarations concealed that McKinsey RTS members ***were currently serving*** that Major Customer;

b. By stating that McKinsey RTS members "have served" an unnamed "Major Customer" of the debtor "in the past three years," Carmody's declarations concealed that McKinsey RTS members ***were currently serving*** that Major Customer;

c. By referring to an unspecified project generally involving "procurement in the coal sector," Carmody's declarations concealed that the project was, in fact, an explicit ***cost-reduction*** project aimed at reducing Alpha Natural Resources' income from United States Steel; and

d. Carmody's representation that McKinsey's engagement involving "procurement in the coal sector" had "no specific focus on the Debtors" was false. The fact that the United States Steel project did not focus on Alpha Natural Resources ***alone*** does not mean that it did not have a "specific focus" on reducing United States Steel's payments to Alpha Natural Resources and, therefore, a direct impact on Alpha Natural Resources' revenue as it struggled to survive through Chapter 11.

### c. **Defendants Mislead and Fraudulently Induce the U.S. Trustee to Withdraw Two Separate Motions Challenging McKinsey RTS's Disclosure Declarations**

326.    On May 3, 2016, after having been alerted of McKinsey RTS's wrongdoing by bankruptcy system." *Alpha Natural Resources*, Dkt. 2308 at 2. The U.S. Trustee further stated that "McKinsey RTS's disclosures are insufficient to satisfy Bankruptcy Rule 2014" and Carmody's disclosure declarations on behalf of McKinsey RTS "***give the appearance of compliance without actually complying with Bankruptcy Rule 2014***." *Id.* at 11 (emphasis added).

327.    While that motion was pending, McKinsey RTS made representations to the U.S. Trustee that it would file a full and detailed supplemental disclosure declaration that complied with the law. Based on those representations, the U.S. Trustee withdrew its motion to compel.

97

328.    However, McKinsey RTS's amended disclosure declaration, Carmody's Third Supplemental Declaration, filed on May 19, 2016, more than eight months after McKinsey RTS's retention, continued to conceal a significant number of McKinsey's connections in violation of Rule 2014. Carmody's Third Supplemental Declaration only identified by name only a small number of McKinsey's dozens of currently known connections to Interested Parties in *Alpha Natural Resources*.

329.    On June 6, 2016, Alix, through his affiliate, Mar-Bow Value Partners, LLC ("**Mar- Bow**"), filed a motion to compel McKinsey RTS to disclose the numerous connections that it had knowingly failed to disclose in its four prior submissions in *Alpha Natural Resources*. No Interested Parties joined Mar-Bow's motion.

330.    On July 1, 2016, the *Alpha Natural Resources* court granted Mar-Bow's motion to compel. In so doing, the bankruptcy court expressly ruled that McKinsey's longstanding and self-invented approach to Rule 2014—disclosure by "descriptive category" rather than by specific identification of connections by name—was invalid.

331.    Thus, on August 5, 2016, under intense pressure from Mar-Bow, the U.S. Trustee, and the bankruptcy court, in his fourth supplemental declaration submitted on behalf of McKinsey RTS in *Alpha Natural Resources*, Carmody further identified some additional connections by name, but continued to conceal others, misleading the court, the U.S. Trustee, and all other parties.

332.    The many additional disclosures made in Carmody's third and fourth supplemental declarations in *Alpha Natural Resources*, made only after motions to compel were brought against McKinsey RTS, demonstrate that Defendants (including McKinsey, Carmody and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom)

98

misled and induced the U.S. Trustee to abandon its motion to compel, and were acting pursuant

to a deliberate scheme to evade McKinsey's Rule 2014 obligations, complying only when forced

by an adverse federal court order, and even then only partially and incrementally.

333.   Despite the bankruptcy court's order compelling McKinsey RTS to supplement its

disclosures, Defendants persisted in concealing that McKinsey was simultaneously assisting

United States Steel in reducing the price it would pay Alpha Natural Resources for coal ***and***

representing Alpha Natural Resources as a fiduciary in the bankruptcy. Indeed, throughout the

bankruptcy case, Defendants (including McKinsey, Carmody and Proshan, authorized and aided

and abetted by Garcia, Barton, Sternfels, and Goldstrom) continued to conceal the fact that

McKinsey had ***any*** connections with United States Steel until Carmody's ***fifth*** disclosure

declaration, which was filed more than one month ***after*** the bankruptcy case ***was over*** and Alpha

Natural Resources' plan of reorganization had been confirmed—approximately twelve months

after McKinsey RTS had been hired and filed Carmody's initial disclosure declaration.

334.   Defendants (including McKinsey, Carmody and Proshan, authorized and aided

and abetted by Garcia, Barton, Sternfels, and Goldstrom) also continued to conceal McKinsey's

connection to NRG Energy, even though NRG Energy's subsidiary or affiliate NRG Power

Marketing, LLC was listed as a Major Customer on the Interested Parties list at the outset of the

*Alpha Natural Resources* bankruptcy. NRG Energy and its affiliate NRG Yield, Inc. were current

or recent clients of McKinsey, and NRG Energy had purchased assets of several companies that

McKinsey had previously represented in bankruptcy and which were current or recent past

clients of McKinsey.

335.   As the bankruptcy process drew towards completion, Alpha Natural Resources'

debtor-in-possession lenders—at least some of whom were also McKinsey clients—ultimately

acquired nearly all of Alpha Natural Resources' assets. Ultimately, with McKinsey RTS's "turnaround" help, Alpha Natural Resources transferred its best assets to McKinsey's banking clients, most of whom Defendants concealed throughout the case. Had McKinsey RTS and Carmody properly disclosed these client relationships as mandated by law, McKinsey RTS would have been disqualified.

### d. **Defendants Fail to Disclose McKinsey's Direct Financial Interest in the Outcome of the Alpha Natural Resources Bankruptcy**

336.    At the conclusion of the *Alpha Natural Resources* bankruptcy, a company named Contura, on behalf of Alpha Natural Resources' First Lien Lenders, acquired Alpha Natural Resources' most valuable assets pursuant to the plan of reorganization. Contura was incorporated in the State of Delaware on June 10, 2016 for the specific purpose of acquiring and operating Alpha Natural Resources' core coal operations as part of Alpha Natural Resources' restructuring. On July 26, 2016, Contura acquired certain assets of Alpha Natural Resources, including its ongoing coal mining operations, and began coal mining operations that same day. This date, July 26, 2016, coincided with Alpha Natural Resources' emergence from Chapter 11 bankruptcy protection.

337.    In furtherance of Alpha Natural Resources' bankruptcy restructuring, hedge fund company Whitebox Advisors LLC ("**Whitebox**") purchased enough First Lender Lien claims to receive 11% of the original shares of the newly formed Contura. The price of Contura's shares, which traded at $16.88 on August 18, 2016, rose to $71.00 per share on December 30, 2016, a mere four months later. This represented an increase of 321%.

338.    Incredibly, McKinsey Master Retirement Trust, which is administered by the nine current and three former senior leaders at McKinsey who comprise MIO's board, owned a $110

100

million interest in Whitebox. Whitebox, in turn, owned an 11.1% interest in Contura, and McKinsey's investment in Whitebox increased in value by $50,488,357 as a result of its interest in Contura between its first trading date in mid-2016 and the end of 2016.

339.    In *Alpha Natural Resources*, McKinsey RTS was required to disclose its connection with Whitebox and the First Lien Lender claims that resulted in Contura shares under the plan to the bankruptcy court and the U.S. Trustee *in camera*, pursuant to the bankruptcy court's order granting Mar-Bow's motion to compel. Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) deliberately ensured that McKinsey RTS failed to do so.

340.    Throughout the *Alpha Natural Resources* bankruptcy, Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) unlawfully concealed McKinsey's disqualifying connections with Whitebox and the First Lien Lender claims that resulted in Whitebox acquiring Contura shares under the plan. By the time the plan took effect, Whitebox was one of the largest First Lien Lenders. That position enabled Whitebox to acquire over 11% of Contura's common stock through Alpha Natural Resources' plan.

341.    On July 6, 2016, Carmody provided critical written "feasibility" testimony29 supporting confirmation of Alpha Natural Resources' reorganization plan—a plan that ultimately profited McKinsey (as an investor) by over $50 million. Then, one month later, during his deposition on August 16, 2016, Carmody confirmed his knowledge of this undisclosed but immensely profitable McKinsey connection:

Q. . . . Well, do you know who any of the first lien lenders are in the ANR case or were?
A. Yeah. I have a few of the names, yeah.

Q. Okay. Tell us the names you do have.

A. So Highbridge was involved in the first lien. ***Whitebox would have been another fund that was in the first lien.*** Davidson Kempner. I think at some point Citi. I'm not sure if they still are, but they were involved in the first lien. Those are the four that come to mind right now.

342.     Carmody and McKinsey RTS violated their fiduciary obligations to the bankruptcy court and their disclosure obligations under Rule 2014 when they concealed from the bankruptcy court at plan confirmation their knowledge that Whitebox was a first lien creditor; that as a result, Whitebox would acquire a valuable equity position in Contura; and that MIO had an undisclosed $110 million investment in Whitebox and, therefore, a financial stake in Contura.

343.     Notably, if McKinsey RTS and Carmody had timely disclosed McKinsey's known connections to Whitebox, then McKinsey's connection to the First Lien Lender claims that resulted in McKinsey's interest in Contura shares under the plan through Whitebox would also have come to light. As Defendants knew, those disclosures necessarily would have resulted in McKinsey RTS's disqualification under 11 U.S.C. § 327. *See* Ex. C ¶¶ 79-80.

344.     As a June 19, 2018 Wall Street Journal article revealed, McKinsey's investments in Whitebox also gave it a stake in five other bankruptcies in which Defendants concealed McKinsey's connection to Whitebox: *UAL*, *AMR*, *Edison Mission*, *NII Holdings*, and *SunEdison*.

345.     Although the *Alpha Natural Resources* court and the U.S. Trustee were actually deceived by Defendants into concluding that McKinsey RTS was disinterested and proceeded to finalize Alpha Natural Resources' reorganization, the Whitebox revelations set forth above eventually became public. As a result, on July 31, 2018, the U.S. Trustee acknowledged that McKinsey RTS's disclosures in *Alpha Natural Resources* were inadequate and warrant additional investigation. Specifically, regarding the ties between McKinsey RTS, Whitebox, and

Contura, the U.S. Trustee stated, in its July 31, 2018 filing supporting the re-opening of *Alpha Natural Resources*:

346.    In its Motions, Mar-Bow has raised new allegations that may call into question both the settlement of the Motion to Compel and this Court's finding of disinterestedness. Thus, the U.S. Trustee supports the Motion to Reopen in order to investigate these previously unknown allegations.

347.    In particular, Mar-Bow alleges that "McKinsey profited over $50 million for its partners and other pension beneficiaries as a result of its interest in Whitebox" and, further, that "McKinsey's ownership interest in Whitebox and thus indirect acquisition of estate assets under the plan has a direct bearing on McKinsey's disinterestedness and had to be fully disclosed." Judgment Relief Motion, pp. 4-5.

348.    In making these allegations, Mar-Bow asserts that RTS had knowledge of an MIO investment in Whitebox. By contrast, RTS has maintained throughout these cases that it had no information about or access to MIO's investments because MIO operates as a blind trust.

349.    The Judgment Relief Motion shows that at least some MIO investment information is available through MIO's public reports to the United States Department of Labor (the "Labor Department"). The Labor Department has described its reporting form as, among other things, "a disclosure document for plan participants and beneficiaries . . . to protect the rights and benefits of participants and beneficiaries under employee benefit plans." Department of Labor, Instructions for Form 5500 Annual Return/Report of Employee Benefit Plan at 40 (2016), https://www.dol.gov/sites/ default/files/ebsa/employers-and-advisers/plan-administration-and- compliance/reporting-and-filing/form-5500/2016-instructions.pdf.

350.    At a minimum, the Labor Department disclosures raise new questions about whether RTS and its employees had knowledge about MIO's investments in interested parties when it made both its public and its in-camera disclosures in this case.

351.    For these reasons, the U.S. Trustee supports the Motion to Reopen because doing so will allow the U.S. Trustee an opportunity to undertake an independent investigation.[56]

## X.    **Bankruptcy Fraud and Other Crimes in *SunEdison***

352.    SunEdison, Inc. ("SunEdison") filed for bankruptcy in the United States Bankruptcy Court for the Southern District of New York on April 21, 2016 and retained McKinsey RTS as its restructuring advisor. In *SunEdison*, McKinsey RTS submitted five disclosure declarations: an initial declaration, filed on May 5, 2016; an Amended Declaration, filed on June 6, 2016; a First Supplemental Declaration, filed on June 14, 2016; a Second Supplemental Declaration, filed on December 21, 2016; and a Third Supplemental Declaration, filed on March 30, 2017. McKinsey RTS's fees in *SunEdison* were approved on July 25, 2017.

353.    Once again, McKinsey RTS only belatedly revealed its connections to significant Interested Parties, after its role in the bankruptcy proceedings was deeply entrenched. McKinsey's habit of filing multiple amended disclosure declarations, particularly in McKinsey RTS's more recent cases, is unusual in bankruptcy proceedings, and is further evidence of Defendants' deliberate scheme to conceal McKinsey's connections, with McKinsey only appearing to comply with its disclosure obligations.

354.    McKinsey RTS's fee applications reveal that Sternfels played a major role in McKinsey RTS's engagement for the SunEdison bankruptcy; that Sternfels and others consulted Proshan and Goldstrom regarding McKinsey RTS's disclosures in that matter; and that Carmody

---

[56] Alpha Natural Resources, Dkt. No. 4126 at 2-3 ¶¶ 3-8 (footnotes and citations omitted).

104

also worked on McKinsey RTS's retention application. 206. Defendants' (including McKinsey, Sternfels, Carmody, Goldstrom, and Proshan, authorized and aided and abetted by Garcia and Barton) crimes in the *SunEdison* case include:

      **a.**    Submitting declarations that unlawfully concealed and falsely denied dozens of McKinsey's known connections through vague and intentionally misleading disclosures;

      **b.**    Orchestrating a series of improper and deceptive pre-petition transfers from the debtor and non-debtor affiliates totaling at least $10 million to avoid disqualification and evade preference liability;

      **c.**    Submitting declarations that unlawfully concealed MIO's connections with Interested Parties, including Blackrock, which was a SunEdison creditor; and

      **d.**    Submitting a declaration that unlawfully concealed likely disqualifying facts about an undefined "business arrangement" between McKinsey and the former CEO of SunEdison.

      a.   **Defendants Unlawfully Conceal McKinsey's Connections in *SunEdison***

355.    At the outset of SunEdison, Defendants (including McKinsey, Carmody, Proshan Goldstrom, and Sternfels, authorized and aided and abetted by Garcia and Barton) unlawfully concealed McKinsey's numerous known connections to Interested Parties. Although McKinsey RTS supplemented its disclosures four times, for a total of five declarations in SunEdison, dozens of McKinsey connections to Interested Parties ultimately remained undisclosed. In its initial disclosure declaration in SunEdison, dated May 5, 2016, McKinsey RTS identified only twenty-three of its several dozen known connections.

356.     On May 12, 2016, after having been presented with a detailed analysis prepared by retired United States bankruptcy judges Steven Rhodes and Judith Fitzgerald and others, the U.S. Trustee filed an objection to McKinsey RTS's retention in SunEdison, on the basis that its disclosure declarations were incomplete and inadequate under Rule 2014, and "gave the appearance of compliance without actually complying with Bankruptcy Rule 2014."

357.     In response to the U.S. Trustee's objection, on June 6, 2016, McKinsey RTS filed a second declaration, disclosing an additional eighteen connections to Interested Parties in SunEdison. However, dozens of connections remained undisclosed.

358.     On August 5, 2016, in Alpha Natural Resources, the U.S. Trustee—relying on McKinsey RTS's June 6, 2016 disclosures in SunEdison—stated to the Alpha Natural Resources bankruptcy court that in SunEdison, McKinsey RTS had "disclosed the identity of every connection before its retention was approved." This statement was incorrect. In fact, Defendants were still unlawfully from the U.S. Trustee concealing dozens of McKinsey's connections in SunEdison. In making this incorrect statement to Alpha Natural Resources court, the U.S. Trustee relied in good faith on McKinsey RTS's knowingly false statements that it had disclosed all of its connections in SunEdison. McKinsey RTS has never addressed nor corrected the statement that the U.S. Trustee made in reliance on McKinsey RTS's false representation that it had disclosed all of its connections SunEdison. In short, by falsely representing to the U.S. Trustee RTS had fully disclosed its connections in SunEdison, Defendants perpetrated a fraud on two separate bankruptcy courts and the Department of Justice. 212. On December 21, 2016, McKinsey RTS identified seventeen more connections in the SunEdison case. On March 20, 2017, in its final disclosure in SunEdison, McKinsey RTS disclosed two more connections by

name. However, Defendants continued to unlawfully conceal dozens of connections that

McKinsey RTS ultimately never disclosed in SunEdison

359.    In June and August of 2016, after McKinsey RTS was hired by SunEdison and

before McKinsey filed its Second and Third Supplemental Declarations in SunEdison, McKinsey

and Carmody disclosed two dozen connections in Alpha Natural Resources that Defendants

unlawfully concealed (and never did reveal) in SunEdison. Those cases were pending

concurrently, and these McKinsey connections appeared on the Interested Parties lists in both

cases. This demonstrates not only that McKinsey RTS's disclosures were incomplete, but also

that Defendants' illegal scheme included concealing a connection when they believed it was

likely to lead to disqualification but revealing the same connection in cases where they believed

it posed no danger of disqualification in that particular matter.

360.    The dozens of entities that Defendants are known to have unlawfully omitted and

concealed in SunEdison include, *inter alia*,

| Entity | Interested Party Role(s) | McKinsey Connections |
|---|---|---|
| Aon Risk Services Central | Vendor | Affiliate of Aon Consulting, a Service Provider to MIO |
| Banco Popular | Depository Bank | Bank Client |
| BAML | Institutional Shareholders > 1% | Client and/or Subsidiary of Client (*Bank of America*) |
| BlackRock, Inc. BlackRock Financial Management | Convertible Note Holder | Investment (MIO) |
| BlackRock Institutional Trust Company, N.A. | Institutional Shareholders > 1% | Investment (MIO) |
| Cerberus | Second Lien Lender | Investment (MIO) |
| Cerberus Institutional Partners | Second Lien Lender | Investment (MIO) |
| Cerberus Institutional Partners VI, L.P. | Second Lien Lender | Investment (MIO) |

| Entity | Interested Party Role(s) | McKinsey Connections |
|---|---|---|
| Citibank | Customer<br>Depository Bank | Client and/or Affiliate of Client<br>(*Citigroup Global Markets, Inc.*) |
| Citigroup Global Markets Inc. | Second Lien Holder | Client |
| Citigroup, Inc. | Convertible Note Holder | Client and/or Parent of Client<br>(Citigroup Global Markets, Inc.) |
| Davis Polk & Wardwell LLP | "2002 List" | Service Provider |
| Jones Day LLP | "2002 List" | Service Provider |
| K Special Opportunity Fund L.P. | Second Lien Lender | Investment (MIO)<br>(Blackrock) |
| Longroad Energy Partners LLC / BlackRock Infrastructure | Bidder | Investment (MIO)<br>(Blackrock) |
| Managed Account Advisors LLC | Convertible Note Holder | Client and/or Subsidiary of Client (Bank of America) |
| Moody's Investors Services Inc. | "2002 List" | Service Provider |
| Norton Rose Fulbright US LLP | "2002 List" | Service Provider |
| State Street Global Advisors (US) | Institutional Shareholders > 1% | Client |
| UBS Securities | Institutional Shareholders > 1% | Client and/or Subsidiary and Affiliate of Clients (UBS; UBS Financial Services, Inc.; UBS Stamford Branch TRS) |

361.    Defendants (including McKinsey, Sternfels, Carmody, Goldstrom, Barton, Garcia, and Proshan) were aware of all of these dozens of connections when McKinsey RTS filed each of its declarations in SunEdison. Defendants' concealment of the connections was,

108

therefore, intentional and unlawful. 216. Despite McKinsey RTS's multiple supplemental disclosure declarations in SunEdison and repeated assurances that it would "further supplement its declarations in the event it [became] aware of any relationship or other information that requires disclosure," Defendants nonetheless unlawfully concealed McKinsey's connections to dozens of Interested Parties in SunEdison. Moreover, the inconsistency of McKinsey's disclosures among different bankruptcy proceedings indicates a deliberate policy by Defendants to conceal a connection where it posed a severe conflict in a particular context. At a bare minimum, it shows that McKinsey's disclosures were false.

362.     As evidenced by the scope of McKinsey RTS's services in *SunEdison*, these undisclosed connections were disqualifying. See Ex. C ¶¶ 41, 78, 84. McKinsey RTS's declaration, dated May 5, 2016 in *SunEdison* case states:

> McKinsey RTS will perform a broad range of services during these Chapter 11 Cases, including, without limitation, the following:
>
> a. supporting the development of a strategic business plan with the Company's Chief Restructuring Officer and other key functional leaders that can be used to facilitate discussions with the Company's lenders and certain other stakeholders;
>
> b. assisting the Company's Chief Restructuring Officer and Chief Financial Officers with matters related to financial planning and analysis, as requested;
>
> c. assisting in developing a short-term cash flow forecasting process and implementing cash management strategies, tactics, and processes and working with the Company's treasury department and other professionals and coordinating the activities of the representatives of other constituencies in the cash management process;
>
> d. assisting with the Company's financial and treasury functions as they respond to the analytical requests and other requests for information that are placed upon the Company;

e. along with management, developing and establishing a weekly financial reporting package that provides additional transparency into the Company's near term cash position, including a forecast to actual variance analysis;

f. providing strategic advice to support the overall restructuring process;

g. in cooperation with the Company's officers, investment bankers and other engaged professionals and counsel, developing and preparing a Chapter 11 plan of reorganization;

h. assisting the Company in managing its bankruptcy process including managing outside stakeholders and their professionals;

i. assisting with the evaluation of certain near term operational cost reduction and value enhancement opportunities (e.g., SG&A, fixed costs and procurement);

j. planning and executing the  Company's business support functions reorganization and cost reduction goals; k. working with the Company's counsel ("Counsel") on supporting data in order for Counsel to prepare first day motions, the petitions for relief and other documents and evidence needed to implement any Chapter 11 bankruptcy case filed by the Company;

l. assisting the Company with developing a detailed communications plan;

m. providing local support with development of various strategic and restructuring alternatives for international operations;

n. providing testimony and other litigation support as requested by Counsel in connection with matters upon which McKinsey RTS is providing Services; and

o. assisting with all such other restructuring matters as may be requested by Counsel and/or the Board that fall within McKinsey RTS's expertise and that are mutually agreed upon between the Parties.

110

363.    As McKinsey RTS itself notes, this is "a broad range of services." Whether in relation to SunEdison's new business plan, its cash management strategies, its Chapter 11 plan, its cost reduction strategies, or testimony and litigation support all of which McKinsey RTS committed to provide for SunEdison—any service that McKinsey RTS provided to SunEdison would directly and financially affect every one of its connections. That is true regardless of whether McKinsey's services for its connections were on matters "unrelated to the debtors."

364.    Section 327 of the Bankruptcy Code prohibits McKinsey RTS from imposing on the SunEdison bankruptcy estate the conflicts, questions, and concerns that arise because McKinsey RTS has so many connections across so wide a scope of constituents. Defendants knew that McKinsey RTS was not qualified to serve in the SunEdison case as a bankruptcy professional and fiduciary but sought and obtained employment for McKinsey RTS nonetheless by concealing its conflicts and connections and falsely representing that it was disinterested.

b.    **McKinsey Unlawfully Conceals Fraudulent Pre-petition Payments that It Orchestrated from SunEdison Affiliates**

365.    McKinsey RTS's fraudulent Rule 2014 filings also enabled McKinsey to orchestrate a series of complex and improper pre-petition transfers from non-debtor affiliates of SunEdison totaling over $10 million to evade disqualification and to hide its preference liability under 11 U.S.C. § 547(b).

366.    In the ninety days before SunEdison filed for bankruptcy, SunEdison paid McKinsey RTS a total of $6,250,965 for its prepetition services. Thus, when SunEdison filed for Chapter 11 relief, McKinsey RTS faced (a) a potential loss of over $6 million because of its liability to SunEdison for these preference payments; and (b) disqualification from the

SunEdison case because that liability was clearly an interest adverse to the bankruptcy estate under Bankruptcy Code Section 327(a).

367.    In addition to the fraud described in the preceding paragraph, using its insider status and knowledge, McKinsey orchestrated a complex fraud to evade disqualification whereby it completely rearranged the nature of other debts owed by SunEdison to McKinsey RTS and then falsely re-invoiced to collect that debt from four non-debtor affiliates of SunEdison: Granite Mountain Holdings, LLC; Iron Springs Holdings, LLC; Comanche Solar PV, LLC; and Four Brothers Solar, LLC (collectively, the "Non-Debtor Affiliates"). These sham transactions enabled McKinsey RTS to secure and retain the bankruptcy assignment with SunEdison when it otherwise would have been disqualified.

368.    Specifically, detailed forensic analysis derived from McKinsey RTS's First Supplemental Declaration in *SunEdison*, SunEdison's application to employ McKinsey RTS (SunEdison, Dkt. 322), and a report from FTI Consulting that was commissioned by SunEdison's board of directors regarding the company's internal operations. and financial controls, reveal that McKinsey RTS retroactively and falsely re-invoiced work that was actually done for SunEdison in the first instance as work done for the Non-Debtor Affiliates.

369.    Relying on this artifice, McKinsey RTS falsely represented to the *SunEdison* court that it did not owe a preference to the estate and was not an estate creditor. Absent this fraud, McKinsey RTS would have been disqualified for holding an interest adverse to the estate. See Ex. C ¶ 81, 84. In short, McKinsey designed and committed a series of complex financial frauds to wrongfully secure and retain McKinsey RTS's lucrative consultancy assignment in the SunEdison bankruptcy.

112

370.    More specifically, McKinsey (through McKinsey RTS) had sent invoices to SunEdison for the months of September, October, and December 2015. The services covered by those invoices were provided pursuant to a services agreement between SunEdison and McKinsey RTS. In approximately late December 2015 or early January 2016, McKinsey RTS still had not been paid for those services. Because SunEdison was insolvent, McKinsey and SunEdison decided that McKinsey RTS would recall its earlier invoices to SunEdison and falsely re-issue the invoices to the Non-Debtor Affiliates, who would then satisfy the outstanding balances even though none of them had hired McKinsey RTS and thus had no legal liability to, or contractual privity with, McKinsey RTS.

371.    In yet other instances in early 2016, SunEdison actually had paid McKinsey RTS's invoices. In those instances, McKinsey RTS also issued false invoices to the Non-Debtor Affiliates. The Non-Debtor Affiliates then made payments on the false, re-issued invoices, even though they were not liable for McKinsey RTS's fees and had no contract with McKinsey RTS. At that point, having been paid twice (once by SunEdison and once by the Non Debtor Affiliates), McKinsey RTS returned SunEdison's original payments.

372.    Because the Non-Debtor Affiliates were not Chapter 11 debtors, they had no ability to claim a return of the payments as preferences to McKinsey RTS. Through this means, McKinsey fraudulently re characterized the obvious and disqualifying preference payments from SunEdison as payments from the Non-Debtor Affiliates, and McKinsey again fraudulently laundered disqualifying preference payments from SunEdison into "clean" payments from the Non-Debtor Affiliates.

373.    McKinsey's complex invoicing fraud in SunEdison occurred from approximately September 2015 until April 2016. All told, detailed forensic analysis discloses $10,645,166.78 of

improper "round-trip" and retroactively "re-invoiced" transactions involving SunEdison and the Non-Debtor Affiliates during that period.

374.    When McKinsey orchestrated the "re-invoiced" and "round trip" payments with SunEdison's Non-Debtor Affiliates, McKinsey possessed and used insider knowledge that SunEdison was severely insolvent and suffering from an extreme liquidity shortage. McKinsey used its insider knowledge to gain a $10,645,166.78 advantage over SunEdison's other creditors. Functionally, SunEdison's payments to McKinsey RTS, through the fraudulent use of the Non-Debtor Affiliates' funds, were effectively fraudulent transfers and backdoor preference payments.

375.    Defendants (including McKinsey, Proshan, Sternfels, Goldstrom, and Carmody, authorized and aided and abetted by Garcia and Barton) concealed this ongoing complex fraud in McKinsey RTS's initial disclosures and then continued their deception by falsely representing in McKinsey RTS's First Supplemental Declaration in SunEdison that the "round trip" payments were, in fact, owed by the Non-Debtor Affiliates in the first instance and McKinsey RTS's services had been provided for the benefit of the Non-Debtor Affiliates. In reality, however, this was revisionist history to cover up McKinsey's financial manipulations and to conceal the preference and the disqualifying interest that it created.

376.    Although McKinsey RTS's disclosure declarations admitted to a September 2015 engagement letter between McKinsey RTS and SunEdison, they failed to provide a copy of that document or any necessary detail regarding McKinsey RTS's original billings to SunEdison, such as the true nature of the services that McKinsey RTS had provided. McKinsey RTS's declarations also failed to explain how its services could have been for the Non-Debtor Affiliates when they were originally provided to and paid for by SunEdison pursuant to a contract between

114

McKinsey RTS and SunEdison, and no contract between McKinsey RTS and the Non-Debtor Affiliates existed.

377.    A McKinsey employee, in an internal email, admitted that McKinsey's re-invoicing and round-trip payment scheme through SunEdison's Non-Debtor Affiliates was improper, and noted that significant resistance should be expected from the Non-Debtor Affiliates' Project Managers.

378.    Further, in connection with the SunEdison bankruptcy, in an independent report to the Audit Committee of the Board of Directors of SunEdison, investigators flagged the above described payments as irregular and highly questionable, as referenced in the employee email described above.

379.    If payment of McKinsey RTS's fees by SunEdison's Non Debtor Affiliates was legitimate, as McKinsey RTS represented to the court and the U.S. Trustee, while being questioned by the U.S. Trustee, presumably McKinsey RTS would have come forward with evidence that members of the Non-Debtor Affiliates had approved the payments. It never did so.

380.    As a result of McKinsey's fraudulent financial scheme and Defendants' concealment thereof, McKinsey's liability to the SunEdison estate is as much as $22,255,246.76. This liability is an interest adverse to the SunEdison bankruptcy estate and is disqualifying under Section 327 of the Bankruptcy Code. McKinsey RTS's representations to the bankruptcy court and the U.S. Trustee that it did not hold an interest adverse to the estate were false. Had McKinsey fully disclosed the extent of its involvement, McKinsey RTS would have been disqualified from employment in SunEdison. See Ex. C ¶ 81, 84. It also likely would have been ordered to return funds to the SunEdison estate.

115

c.   **McKinsey Contemporaneously Purchases and Sells Securities of SunEdison Through MIO**

381.    From at least 2015 through 2016, Compass TPM LLC and Compass Offshore TPM LP held equity interests in Visium Asset Management, LP ("Visium"), and served as managers for the Visium.

382.    As reflected on Visium's SEC Form 13F, almost every purchase of stock directed by Compass TPM and Compass Offshore TPM coincided with a larger purchase of the same stock by Visium in its sole discretion.  For example, in the first quarter of 2015, the Visium held stock in 352 companies that were purchased as a result of the Compass TPM's and Compass Offshore TPM's investment discretion.  In almost all cases, 350 of 352, Visium had made a significantly larger purchase of the same stock.

383.    Similarly, the timing of Visium's purchase and sale of SunEdison stock around SunEdison's filing for bankruptcy and McKinsey's retention as management consultant demonstrates wrongdoing.  In the 4th quarter of 2015, Compass TPM and Compass Offshore TPM directed Visium to purchase 198,393 shares of SunEdison Inc.  Also in the 4th quarter, Visium purchased an additional 1,515,607 shares in its sole discretion.[57]

384.    In addition, Compass TPM and Compass Offshore TPM directed Visium to purchase 29,800 call orders of SunEdison stock.  Visium purchased an additional 1,515,607 call orders of SunEdison stock in its sole discretion.[58]  In the 1st quarter of 2016, Visium had liquidated all shares of SunEdison it held, those purchased at the Compass funds discretion and those purchased in Visium's sole discretion.  However, it purchased additional call orders of SunEdison stock, both at the direction of the Compass funds, and in its sole discretion.

---

[57] SEC Form 13F (12.31.15), at 49.
[58] SEC Form 13F (12.31.15), at 49.

385.    In the 2nd quarter of 2016, SunEdison filed its chapter 11 petition on April 21,

2016.

386.    In the same quarter, all of the call option contracts held by Visium either expired

or were liquidated.  If the call option contracts expired prior to April 21, 2016 by their own

terms, this fact would indicate that McKinsey, through MIO, through Compass, misappropriated

inside information that SunEdison would be filing for bankruptcy at or around April 21, 2016

and then traded on that inside information.  Therefore, these facts need to be developed through

discovery.

387.    Both the correlation between Compass directed purchases and Visium purchases

and the correlation between the liquidation of certain investments and the proximity in time to

the filing of the SunEdison bankruptcy strongly suggest that McKinsey – through MIO, then

through its Compass funds – was able to exercise a large degree of control over the investment

discretion of Visium.  Whether this situation represents an aberration or the standard dynamic

between McKinsey and third-party funds is a factual matter that needs to be developed through

discovery.


     d.  **McKinsey Unlawfully Conceals Pertinent Facts Regarding its "Business
        Arrangement" with SunEdison's Former CEO**

388.    The SunEdison bankruptcy court authorized McKinsey RTS's employment on

June 23, 2016. In its initial disclosure declaration to obtain that employment, filed on May 5,

2016

389.    McKinsey RTS made the following inadequate and misleading disclosure: "One

member of McKinsey RTS serving the debtors has known the Debtor's CEO, Ahmad Chatila,

from past professional relationships prior to 2009." This minimal disclosure regarding Chatila

conceals the identity of the "[o]ne member of McKinsey RTS serving the debtors[.]" The unnamed "member of McKinsey RTS" was, in fact, Defendant Robert Sternfels. Defendants' concealment of Sternfels's name and the true nature of his relationship with Chatila raises serious questions as to why McKinsey RTS would conceal Sternfels's identity and the attendant details, and whether there was anything disqualifying about the relationship.

390.    Moreover, subsequent events gave rise to the very pointed and troubling question. of whether Chatila, while CEO of SunEdison, caused SunEdison to retain McKinsey RTS on the premise that Sternfels would assist Chatila in obtaining new employment should he be fired from the insolvent SunEdison, and whether such assistance was a quid pro quo for Chatila's assistance in engineering the "re-invoiced" and "round-trip" payments referenced above.

391.    Nine months after SunEdison filed for bankruptcy, on March 20, 2017, McKinsey RTS made a second cryptic disclosure regarding Chatila. McKinsey RTS's Third Supplemental Disclosure Declaration revealed in vague terms that McKinsey had entered into an unidentified and unexplained "business arrangement" with Chatila. McKinsey RTS's disclosure, however, provided no supporting details with which the bankruptcy court, the U.S. Trustee, or the Interested Parties could ascertain whether McKinsey's unspecified "business arrangement" with Chatila was disqualifying. See Ex. C ¶¶ 82-83.

392.    In fact, Chatila is a longtime personal friend of Sternfels, who was instrumental in Chatila's elevation to CEO of SunEdison. Shortly after McKinsey succeeded in its scheme to retain its prepetition preference payments from SunEdison (discussed supra) and as it became clear that Chatila would likely be forced out of SunEdison, Sternfels told his colleagues at McKinsey that they needed to help his friend Chatila find another position after he left SunEdison. 241. When McKinsey RTS revealed McKinsey's "business arrangement" with

118

Chatila on March 20, 2017, its disclosure declaration unlawfully concealed the following

pertinent facts:

> **a.** The identity of the "entity for which Ahmad Chatila is a senior officer" and the
>
> nature of its business;
>
> **b.** Chatila's position and responsibilities with that entity;
>
> **c.** The nature of the "business arrangement";
>
> **d.** The identity of the "affiliate of McKinsey RTS US";
>
> **e.** When the "business arrangement" was entered into;
>
> **f.** Why McKinsey RTS delayed disclosing the "business arrangement" until
>
> March 20, 2017;
>
> **g.** Whether any McKinsey personnel who were assigned to serve the SunEdison
>
> debtors were also assigned to work on the "business arrangement";
>
> **h.** The manner in which Chatila personally benefited from the "business
>
> arrangement" (including any compensation or other benefits that Chatila received
>
> as a result of the arrangement);
>
> **i.** Who was involved in the discussions and negotiations leading to the "business
>
> arrangement";
>
> **j.** Whether the "business arrangement" involved any parties in the SunEdison
>
> case;
>
> **k.** Whether the "business arrangement" involved any competitors of the debtors;
>
> **l.** Whether the "business arrangement" involved any creditors or investors of
>
> SunEdison;

**m.** Whether the "business arrangement" involved Chatila's use of any
confidential information of the debtors;

**n.** Whether the "business arrangement" involved use by McKinsey, Sternfels, or
any other Defendants, of any information, confidential or otherwise, that
McKinsey RTS had obtained from SunEdison; and

**o.** Whether MIO or one of its affiliates or connections financed the "business
arrangement."

393.    As discussed below, Defendants' unlawful concealment of these pertinent facts
was likely another part of Defendants' scheme to hide, obfuscate, withhold information, evade
disqualification, and enable McKinsey RTS to remain in the SunEdison engagement and thereby
improperly collect millions of dollars in bankruptcy fees.

394.    McKinsey RTS attempted to minimize the potential conflict created by this
"business arrangement," stating simply in its Third Supplemental Declaration in SunEdison that
"[a]n affiliate of McKinsey RTS US entered into a business arrangement unrelated to SunEdison,
Inc. with an entity for which Ahmad Chatila is a senior officer."

395.    The entity with which McKinsey entered into its "business arrangement" with
Chatila is likely FTC Solar, Inc. ("FTC Solar"), for which Chatila is one of four founding
directors. A review of public records has yielded no other information regarding Chatila's
activities or any other potential "business arrangements" since his departure from SunEdison.
FTC Solar was incorporated in Delaware on January 3, 2017 and, shortly thereafter, on January
30, 2017, it purchased approximately $35 million worth of SunEdison's assets for a mere $6
million. David Springer, the SunEdison executive who approved the "re-invoicing" and "round
trip" payments scheme in conjunction with McKinsey executive Matthew Parsons, now serves as

the CEO of FTC Solar. If McKinsey entered into its "business arrangement" with Chatila in
connection with FTC Solar, then McKinsey RTS's statement to the bankruptcy court that this
arrangement was "unrelated to SunEdison" was materially false. If McKinsey did, in fact, have a
connection with FTC Solar, then McKinsey RTS's failure to disclose this relationship despite
FTC Solar's purchase of the assets of its fiduciary client represented yet another egregious and
disqualifying conflict of interest.

## XI.    Defendants Unlawfully Conceal McKinsey's Connections and Commit Bankruptcy Fraud in *GenOn*

396.    GenOn filed for bankruptcy in the United States Bankruptcy Court for the
Southern District of Texas on June 14, 2017. To date, Carmody has submitted four disclosure
declarations on behalf of McKinsey RTS in the *GenOn* bankruptcy: an initial declaration, filed
on June 23, 2017; a First Supplemental Declaration, filed on July 13, 2017; a Second
Supplemental Declaration, filed on September 15, 2017; and a Third Supplemental Declaration,
filed on February 7, 2018. The *GenOn* bankruptcy is ongoing.

397.    Carmody submitted his first two Rule 2014 declarations on behalf of McKinsey
RTS in *GenOn* before the bankruptcy court authorized McKinsey RTS's employment, on June
23, 2017 and July 13, 2017. Relying on these declarations, on July 13, 2017, the bankruptcy
court authorized GenOn to employ McKinsey RTS as its restructuring advisor.

398.    In addition to Carmody, Proshan prepared McKinsey's disclosures in the *GenOn*
matter.

399.    Had Defendants fully and honestly complied with Rule 2014, McKinsey RTS
would have been disqualified and never hired in *GenOn. See* Ex. C ¶¶ 85-86.

400.    As discussed below, Defendants' (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) crimes and racketeering activity in *GenOn* include:

    a.    Submitting false declarations that unlawfully concealed the fact that NRG Energy, GenOn's parent company, against whom McKinsey RTS was investigating a multi-million dollar claim on behalf of GenOn and with whom McKinsey RTS was negotiating GenOn's separation, was also a current or former McKinsey client;

    b.    Submitting false declarations that unlawfully concealed the depth of McKinsey's connections to GenOn's parent company, NRG Energy, and to the transactions and bankruptcies that had created GenOn;

    c.    Submitting a declaration that falsely represented that McKinsey RTS was disinterested after it received preference payments totaling $4,512,000, which gave rise to a disqualifying interest adverse to the bankruptcy estate; and Submitting false declarations that unlawfully concealed and falsely denied McKinsey's disqualifying connections to dozens of other Interested Parties.

    d.    Submitting false declarations that unlawfully concealed and falsely denied McKinsey's disqualifying connections to dozens of other Interested Parties.

    a.    **Defendants Unlawfully Conceal that NRG Entergy Is a Current or Former McKinsey Client While McKinsey RTS Is Investigating GenOn's Claims against NRG Energy**

122

401.     Carmody's disclosure declarations on behalf of McKinsey RTS in *GenOn*
unlawfully concealed that when McKinsey was investigating GenOn's potential multi-million
dollar fraudulent transfer claims against NRG Energy, McKinsey was investigating its own
longstanding client.

402.     In March 2016, an ad hoc group of noteholders of GenOn Unsecured Senior
Notes and GenOn Americas Generation Unsecured Senior Notes (the "**Noteholder Group**")
began a conversation with GenOn regarding potential claims for fraudulent transfer, breach of
fiduciary duty, and other claims that GenOn may hold against NRG Energy and current and
former GenOn directors and officers, among others. GenOn, with assistance from McKinsey
RTS and AP, began identifying and evaluating potential claims. GenOn's potential claims
concerned contracts between GenOn and NRG Energy, certain sales of GenOn power plants to
NRG Energy's affiliates and third parties, and certain development projects between GenOn and
NRG Energy.

403.     In June 2016, GenOn and its attorneys retained both McKinsey RTS and AP to
investigate GenOn's potential claims against NRG Energy arising from the same factual
circumstances as the Noteholders' claims. That investigation continued through GenOn's
Chapter 11 bankruptcy case, which was filed a year later in June 2017. McKinsey RTS's post-
petition fee statements reflect that, as part of the investigative team, McKinsey RTS conferred
with GenOn noteholders about the potential claims, requested and reviewed thousands of
documents from NRG Energy, and interviewed numerous NRG Energy and GenOn
representatives.

404.     In the same month that GenOn retained McKinsey RTS to investigate NRG
Energy (June 2016), in the *SunEdison* case, McKinsey & Co. partner Mark Hojnacki filed an

123

amended declaration on behalf of McKinsey RTS disclosing that NRG Energy was a current or former McKinsey client. However, Defendants unlawfully concealed that connection throughout the course of *GenOn*.

405.    The GenOn Noteholder Group ultimately filed a lawsuit against NRG Energy and GenOn in Delaware state court on December 13, 2016. On April 30, 2017, the Noteholder Group filed an Amended Complaint adding as defendants NRG Yield (an NRG subsidiary), and eight current or former GenOn directors and officers (the "***GenOn* Individual Defendants**"). The GenOn Noteholders' Amended Complaint alleged: (i) NRG Energy had been overcharging GenOn under a Shared Services Agreement since its execution; and (ii) GenOn did not receive reasonably equivalent value from NRG Yield for GenOn's July 22, 2013 sale of the Marsh Landing generating station (a newly developed power plant). The Noteholder Group further alleged that (iii) the GenOn Individual Defendants breached their fiduciary duties by allowing GenOn's purported overpayments under the Shared Services Agreement and by allowing NRG Energy to pursue new business opportunities at GenOn's Canal and Mandalay power plant sites; and (iv) NRG Energy aided and abetted those breaches.

406.    Ultimately, GenOn settled its fraudulent transfer claims against NRG Energy. The money derived from that settlement formed a substantial part of GenOn's Chapter 11 plan and was relied upon by the bankruptcy court and GenOn's other creditors, none of whom were aware of McKinsey RTS's egregious conflict of interest involving NRG Energy.

407.    Despite this clear conflict, Carmody's initial declaration on behalf of McKinsey RTS in *GenOn*, dated June 23, 2017, disclosed only that McKinsey serves or has served "various parties listed" on the Interested Parties List in *GenOn* as "NRG Affiliates" (of which there were over 900). Thus, Defendants (including McKinsey, Garcia, Proshan, and Carmody) unlawfully

concealed the specific and crucial fact that, although McKinsey RTS was in the process of investigating NRG Energy on behalf of GenOn, McKinsey then had or previously had a client relationship with NRG Energy itself.

408.    On July 13, 2017, Carmody filed his First Supplemental Declaration on behalf of McKinsey RTS in *GenOn*, in which Defendants again unlawfully concealed McKinsey's connection to NRG Energy. Carmody made only a minimal disclosure that a member of McKinsey RTS "assisted in maintaining a chart, which includes publicly available information concerning asset sales to NRG Energy, or one of its affiliates for a client that is not on the list of Potential Parties in Interest."

409.    Because NRG Energy, whom McKinsey RTS was investigating for GenOn, was also a significant McKinsey client, McKinsey "represent[ed] an interest adverse to the estate," in contravention of the clear prohibition of 11 U.S.C. § 327(a). McKinsey's connection with NRG Energy created an actual, present, ongoing conflict of interest that required disclosure and disqualification of McKinsey RTS in *GenOn*. *See* Ex. C ¶¶ 85-86.

### b.    Defendants Unlawfully Conceal that NRG Entergy Is a McKinsey Client While McKinsey RTS Is Negotiating on Behalf of GenOn for GenOn's Separation from NRG Energy

410.    While McKinsey was serving GenOn's parent company, NRG Energy, McKinsey RTS was negotiating GenOn's separation from NRG Energy as part of the bankruptcy process.

411.    McKinsey RTS's final fee application in *GenOn*, filed on March 16, 2018 (*GenOn*, Dkt. 1516), states that McKinsey RTS spent 7,595.8 hours and billed $4,049,978.00 in fees for a task it called "separation activity." This was by far the greatest amount billed for any of McKinsey RTS's tasks in *GenOn*. Billing descriptions of "separation activity" included:

125

"Held weekly meetings and planning sessions with the parent company's functional leads and

GenOn leads to advance transition and separation efforts." In other words, McKinsey RTS was

negotiating the separation of its fiduciary client, GenOn, from McKinsey's consulting client,

NRG Energy, with whom it was incentivized to preserve its client relationship, which was in

direct conflict with McKinsey RTS's fiduciary obligation to assure that GenOn was able to

negotiate the most favorable terms possible for the benefit of its creditors.

     c. **Defendants Unlawfully Conceal the Depth of McKinsey's Connections to
NRG Energy and the Transactions and Bankruptcies that Created
GenOn**

  412. Defendants (including McKinsey, Carmody, and Proshan, authorized and aided

and abetted by Garcia, Barton, Sternfels, and Goldstrom) also unlawfully concealed the facts

surrounding McKinsey's history of representing NRG Energy through various mergers and

acquisitions in the energy sector, including in transactions involving GenOn. Again, this allowed

McKinsey to simultaneously profit from its fiduciary relationship with GenOn and receive

bankruptcy fees, while also acting to benefit its long-standing client, NRG Energy.

  413. Prior to *GenOn*, NRG Energy had acquired assets from at least three entities in

the power and energy industries in which McKinsey US or McKinsey RTS had served as a

fiduciary in three separate Chapter 11 bankruptcy cases: *Mirant*, *Edison Mission Energy*, and

*SunEdison*.

  414. Specifically:

    a. NRG Energy purchased most of the assets of Edison Mission Energy in

      the latter's 2012 bankruptcy while Edison Mission Energy was a

      McKinsey RTS client;

b. In 2012, NRG Energy purchased GenOn, which was created in a merger between former McKinsey US bankruptcy client Mirant and RRI Energy, Inc. (formerly Reliant Energy, Inc.) in 2010; and

c. During SunEdison's 2016 bankruptcy, NRG Energy purchased at least three of SunEdison's non-debtor affiliates while SunEdison was a McKinsey RTS client.

415.   Of the entities that participated in these transactions, at least five were current or former McKinsey clients: Mirant, NRG Energy, GenOn, Edison Mission Energy, and SunEdison. In *GenOn*, however, Defendants concealed McKinsey's connections to those parties and transactions. Rule 2014 requires bankruptcy professionals to disclose their "connections with the debtor." Rule 2014 thus required McKinsey RTS and Carmody to fully disclose McKinsey's role in those transactions because such disclosure is critical to a full understanding of McKinsey RTS's connection to GenOn itself, as well as any role that McKinsey may have played in GenOn's insolvency. Here, McKinsey's connection to GenOn began years before GenOn retained it to assist with GenOn's insolvency and bankruptcy. That connection began with McKinsey's involvement in the transactions that led to GenOn's creation, and McKinsey's employment by GenOn for GenOn's bankruptcy case is only the latest phase of this longstanding connection. Instead of disclosing the history of McKinsey's connections to GenOn, however, Defendants (including McKinsey, Carmody, and Proshan, authorized and aided and abetted by Garcia, Barton, Sternfels, and Goldstrom) unlawfully concealed all of it.

416.   To enable McKinsey RTS to obtain bankruptcy employment in *GenOn*, Defendants also concealed the extent to which McKinsey was involved in advising the web of entities connected to GenOn and NRG Energy. For example, when NRG Energy purchased

127

assets from McKinsey RTS client Edison Mission Energy, it was advised by multiple advisors that are themselves McKinsey clients or advisers. Meanwhile, Edison Mission Energy was advised by JPMorgan Chase, which is a McKinsey client, and by Kirkland & Ellis, which is a McKinsey service provider. Of these professionals, McKinsey RTS and Carmody have disclosed only JPMorgan Chase as a McKinsey connection in *GenOn*.

417.   A bankruptcy court considering whether to authorize McKinsey RTS's application for employment would likely find these connections disqualifying because they reveal a pattern of McKinsey's clients receiving one another's assets—with the fiduciary, McKinsey, improperly standing in the middle and making money on all sides. A professional seeking bankruptcy employment must not only be disinterested, but also the bankruptcy court must find that the employment would be in the best interests of the estate. Given McKinsey's history of recommending that its undisclosed clients purchase failing entities where McKinsey is a court- appointed fiduciary for other clients selling their assets, the bankruptcy court likely would have found McKinsey RTS's employment not in the best interests of GenOn's bankruptcy estate, if not an actual, direct, and currently undisclosed conflict. *See* Ex. C ¶¶ 85-86.

### d.   **McKinsey Receives Avoidable Preference Payments from GenOn to Avoid Disqualification as a GenOn Creditor, thereby Concealing an Interest Adverse to the Bankruptcy Estate**

418.   Had McKinsey RTS and Carmody made truthful disclosures in *GenOn*, McKinsey RTS also would have been disqualified as either a creditor of GenOn or for preference liability to GenOn. McKinsey ensured that the debts GenOn owed to McKinsey RTS were paid ahead of other creditors before GenOn filed for bankruptcy, in order for McKinsey RTS to avoid

disqualification as a creditor of the estate. Further, to avoid disqualification, McKinsey then falsely treated these payments as ordinary course payments to avoid preference liability.

419.    McKinsey RTS received avoidable preferences totaling $4,512,000 in the ninety days leading up to the *GenOn* petition date. Thus, McKinsey RTS held . . . "an interest adverse to the estate," and was not qualified for employment as a professional under Section 327(a).

420.    GenOn's application to employ McKinsey RTS states that "[d]uring the ninety days prior to the commencement of the Chapter 11 cases, the debtors paid McKinsey RTS a total of $6,012,000 (inclusive of reimbursable expenses) incurred in providing services to the debtors in contemplation of, and in connection with, prepetition restructuring activities[.]"30

421.    More specifically, GenOn (***not*** McKinsey RTS or Carmody) disclosed these five payments to McKinsey RTS totaling $4,512,000 within the ninety days before its bankruptcy filing on June 14, 2017:

422.    $510,000 on April 25, 2017 (for an invoice dated January 15, 2017);

423.    $510,000 on June 5, 2017 (for an invoice dated January 30, 2017);

424.    $900,000 on June 9, 2017 (for an invoice dated June 2, 2017);

425.    $900,000 on June 12, 2017 (for an invoice dated June 5, 2017); and

426.    1,692,000 on June 13, 2017 (for an invoice dated June 12, 2017).

427.    As a result of those concealed payments, McKinsey RTS is not listed as a prepetition creditor in GenOn's bankruptcy schedules. However, none of these payments were made pursuant to ordinary business terms, as required to avoid preference liability under 11 U.S.C. § 547(c)(2). The first two payments were late, having been made more than three and a half months after invoices were issued, while the last three invoices were issued and paid just days before the bankruptcy filing and much quicker than ordinary course for McKinsey RTS and

GenOn. Specifically, the third payment was made seven days after the invoice was issued and

just five days before the bankruptcy filing; the fourth payment was made seven days after the

invoice was issued and just two days before the bankruptcy filing; and the fifth and final

payment was made the day after the invoice was issued and the day before the bankruptcy filing.

Each payment was a voidable preference payment under 11 U.S.C. § 547(b).

428.     These preference payments created "an interest adverse to the estate," thus

disqualifying McKinsey RTS under 11 U.S.C. § 327. In its rush to obtain these prepetition

payments and avoid disqualification as a prepetition creditor, McKinsey merely transformed the

payments into preference payments, which are also disqualifying.

429.     Carmody's declaration to the *GenOn* bankruptcy court on behalf of McKinsey

RTS falsely stated: "We are disinterested." This was an intentionally false statement because

McKinsey RTS knowingly collected preference payments from the debtor on the eve of

bankruptcy in order to eliminate its status as an unsecured creditor and did not advise the

bankruptcy court that it was the recipient of millions of dollars in what were effectively

preference payments, either of which status would have disqualified McKinsey RTS as not

disinterested. Accordingly, Carmody's description of these payments was materially false and

Carmody's affirmative statement that McKinsey RTS was disinterested was an intentionally

false statement that worked a fraud on the bankruptcy court.

**E. Carmody's Declarations on Behalf of McKinsey in *GenOn* Unlawfully Conceal**
**Numerous Connections, Including GenOn Creditors and Possibly Competitors.**

430.     McKinsey RTS's and Carmody's various delayed and incomplete declarations in

*GenOn* ultimately disclosed approximately eighty-five connections with Interested Parties.

However, Defendants continued to conceal many other connections. In Carmody's initial

declaration in *GenOn*, he stated that McKinsey RTS was disinterested because the services it provides to clients who were Interested Parties "specifically do not focus on direct commercial relationships or transactions between such companies and the debtors." Rule 2014, however, does not limit its disclosure requirements to "direct commercial relationships or transactions between such companies and the debtors." Rather, the law mandates that ***all*** connections must be disclosed.

431.    As a result of Defendants' unlawful concealment of McKinsey's connections, Carmody's disclosure declarations on behalf of McKinsey RTS in *GenOn* include numerous false or materially misleading statements.

432.    For instance, Carmody's initial declaration on behalf of McKinsey RTS in *GenOn*, dated June 23, 2017, falsely states that McKinsey has ***no*** connections to the following nine categories of Interested Parties in *GenOn*:

433.    McKinsey's client connections to certain categories of Interested Parties: twelve contractual counterparties; four Significant Vendors; three Utility Providers; three Shippers; two Significant Customers; two Professionals; one Lienholder; one Beneficiary of Letter of Credit; and one Largest Unsecured Creditor. Carmody further disclosed that three law firms listed as Professionals in *GenOn* were also service providers to McKinsey. Carmody stated that McKinsey had ***no further connections***, despite having "***conducted a global database search of the Potential Parties in Interest***" in *GenOn* prior to its engagement. Carmody further stated that McKinsey had "***searched its global client database, which covers clients of all its consulting affiliates, to determine the existence of any client service provided by McKinsey RTS US or affiliates*** within the last two years to Potential Parties in Interest." Based on the demonstrated

extreme and obvious deficiencies in McKinsey's disclosures, both as discussed above and as listed below, Carmody's statements are demonstrably false.

434.    Carmody further contributed to creating a false impression that McKinsey had conducted a diligent, thorough, and exhaustive search of its potential connections by stating that in addition to searching a "global database," McKinsey had also written to both "members of McKinsey RTS" and to "partners at its affiliates worldwide that provide consulting services"— unlawfully excepting MIO and all other McKinsey non-"consulting" affiliates from the scope of its search—in order to ascertain McKinsey's connections to Interested Parties. *See* Ex. C ¶ 31, 54- 67.

435.    McKinsey's known concealed connections in *GenOn* include, *inter alia*:

| Entity | Interested Party Role(s) (in *GenOn Energy*) | McKinsey Connection(s) |
|---|---|---|
| BlackRock | Banks and Indenture Trustees | Investment (MIO) |
| BlackRock Fund Advisors | Major Equity Holder Noteholder | Investment (MIO) |
| Citigroup Global Markets Inc. | DIP Lender; Noteholder; Contractual Counterparty | Client |
| Davis Polk & Wardwell LLP | Professional | Service Provider |
| Kirkland & Ellis LLP | Professional | Service Provider |
| KPMG LLP | Professional | Service Provider |
| Royal Bank of Scotland | Litigation Party | Client and/or Parent of Client (*Ulster Bank*) |
| Royal Bank of Scotland N.V., f/k/a ABN AMRO Bank NV | Litigation Party | Client and/or Affiliate of Client (*Ulster Bank*) |
| Siemens Demag Delaval | Significant Vendor | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*); Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| Siemens Energy Inc. | Largest Unsecured Creditors; Contractual Counterparty | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens* |

| | | Financial Services); Affiliate of Service Provider (*Siemens Industry Pace Global*) |
|---|---|---|
| Siemens Industry Inc. | Significant Vendor | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*); Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| Siemens Power Generation Inc. | Contractual Counterparty | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*); Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| Siemens Westinghouse | Contractual Counterparty | Client and/or Affiliate of Clients (*Siemens Industry Pace Global and Siemens Financial Services*); Affiliate of Service Provider (*Siemens Industry Pace Global*) |
| Southern California Edison Company | Beneficiary of Letter of Credit; Significant Customer; Contractual Counterparty; Utility Provider | Client |
| Standard & Poor's Rating Services | Contractual Counterparty | Service Provider; Employee Relationship |
| State Street Bank and Trust Company | Bank and Indenture Trustees; Contractual Counterparty | Client and/or Affiliate of Client (*State Street Global Advisors*) |
| State Street Bank and Trust Company of CT, N.A. | Contractual Counterparty; Landlord | Client and/or Affiliate of Client (*State Street Global Advisors*) |
| State Street Global Advisors | Noteholder | Client |
| UBS Warburg LLC | Contractual Counterparty | Client and/or Subsidiary and/or Affiliate of Clients (*UBS*; *UBS Financial Services, Inc.*; *UBS Stamford Branch TRS*) |

## XII.   McKinsey's and the Houston Astros' Honest Services Fraud in Major League Baseball

133

436.    In 2017, Defendant Jeff Luhnow, former McKinsey consultant and then-general

manager of the Major League Baseball ("MLB") Houston Astros team (the "Astros") engaged

Defendant McKinsey to conduct an "audit" of the Astros.[59]  According to a report, McKinsey's

services included reviewing the Astros' "scouting departments and its baseball research and

development" in 2017 and "player development" in 2018.

437.    According to a recent Wall Street Journal article, an intern in the Houston Astros

organization showed Luhnow a PowerPoint presentation proposing the scheme using "an Excel-

based application programmed with an algorithm that could decode the opposing catchers' signs.

It was called 'Codebreaker.'"[60]

438.    During the 2017 season, the Astros implemented a sign-stealing scheme named

"Codebreaker."  The scheme involved the Astros' personnel video recording the opposing team's

catcher, applying an electronic "app" containing an algorithm that decoded the catcher's hand

signals to determine the impending pitch, and then relaying to the Astro's batter – in real time –

the type of pitch that was on the way.  The means of relaying that information to the Astro's

batter was either by making "bang" noises on a trash can or by sending pulses through electronic

communication device on the batter's person.[61]

439.    While Luhnow has denied having knowledge of the scheme, there is considerable

evidence directly contradicting that claim.  As pointed out in the WSJ, Tom Koch-Weser, the

team's director of advance information, sent two emails to Luhnow in 2017 that referenced "the

[59] Evan Drellich, "The Astros opened baseball ops to McKinsey consultants, from scouting to R&D and the farm,"
theathletic.com (July 17, 2019) (last accessed on February 10, 2020).
[60] Jared Diamond, "'Dark Arts' and 'Codebreaker': The Origins of the Houston Astros Cheating Scheme," wsj.com
(February 7, 2020) (last accessed on February 10, 2020) (hereinafter, "Dark Arts") (available at
https://www.wsj.com/articles/houston-astros-cheating-scheme-dark-arts-codebreaker-11581112994).
[61] It should be noted that, as of the filing of this complaint, there is only circumstantial evidence indicating the use of
electronic buzzers.  However, the circumstantial evidence is to such a degree that further investigation is not only
warranted but necessary.  Such investigation would naturally include deposing participating players and coaches
under penalty of perjury.

134

system" and "our dark arts, sign-stealing department."[62] Luhnow opened those emails, he claims not to have read to the bottom of the emails.[63]

440.   In fact, in a letter written by MLB Commissioner Manfred to Luhnow during MLB's investigation into the matter, Manfred wrote "there is more than sufficient evidence to support a conclusion that you knew—and overwhelming evidence that you should have known—that the Astros maintained a sign-stealing program that violated MLB's rules."[64]

441.   In a statement by MLB Commissioner Manfred, dated January 13, 2020 (the "Statement"), the report on the investigation into the Astros' sign-stealing scheme (the "MLB Report"), Commissioner Manfred represented that

> *[t]he investigation revealed no evidence to suggest that Luhnow was aware of the banging scheme. The investigation also revealed that Luhnow neither devised nor actively directed the efforts of the replay review room staff to decode signs in 2017 or 2018. Although Luhnow denies having any awareness that his replay review room staff was decoding and transmitting signs, there is both documentary and testimonial evidence that indicates Luhnow had some knowledge of those efforts, but he did not give it much attention....* [65]

Similarly, the Statement also represents that Astros Manager A.J. Hinch "neither devised the banging scheme nor participated in it."[66]

442.   In addition, earlier in the Statement, Commissioner Manfred represented that

> *[In September 2017] I issued a memorandum that same day to all Clubs reiterating the rules regarding the use of electronic equipment to steal signs, and putting all Clubs on notice that future violations would be taken extremely seriously by my office. I specifically stated in the memorandum that the General Manager*

---

[62] *Dark Arts*, at [].

[63] These emails and responses thereto were sent pursuant to a fraudulent scheme or artiface and therefore constitute acts of wire fraud.

[64] *Id.*

[65] *The Statement*, at 6 (available at https://assets.documentcloud.org/documents/6631460/MLB-Issues-Report-Re-Astros-Investigation-011320.pdf).

[66] *Id.* at 7.

> *and Field Manager of Clubs would be held accountable for any*
> *violations of the rules in the future. Thus, all Clubs were put on*
> *notice as of September 15, 2017 that any use of electronic*
> *equipment to steal signs would be dealt with more severely by my*
> *office. Notwithstanding the publicity surrounding the Red Sox*
> *incident, and the September 15th memorandum that I sent to all*
> *Clubs, the Astros continued to both utilize the replay review room*
> *and the monitor located next to the dugout to decode signs for the*
> *remainder of the regular season and throughout the Postseason.* [67]

443.     Based on the investigation led by MLB employees Bryan Seeley and Moira

Weinberg, the MLB Report found that the scheme was "player-driven," suggesting that Astro's

Manager Hinch and Luhnow were not responsible for the scheme's inception or its execution.

444.     In the case of Hinch, this cannot be true because (i) AJ Hinch was in the dugout

during games; (ii) "witnesses made clear that everyone proximate to the Astros' dugout

presumptively heard or saw the banging";  and (iii) as Manager, Hinch has control over his

players and he, at the least, ratified the conduct of the players for having known about the

scheme and failing to direct them from participating in it further.  Notably, the Statement does

not use the words "ratified," "ratification," or any of its variants.[68]

445.     In the case of Luhnow, given that he saw the 2016 PowerPoint presentation in

2016, given that he opened emails referencing the Astros' "dark arts, sign-stealing department,"

and given Luhnow's working history with co-conspirator McKinsey, whose modius operandi is

to market fraud via PowerPoint presentations, the claims that he was oblivious to the sign

stealing scheme or that the scheme was "player-driven" is clearly false.

446.     In a statement released last month, Luhnow represented that, "As the

commissioner set out in his statement, I did not personally direct, oversee or engage in any

misconduct."

---

[67] *Id.* at 3.
[68] *See generally id.*

447.    On information and belief, McKinsey, the Astros, Crane, Luhnow and Hinch
conspired to commit honest services fraud on, among others, customers of MLB who purchased
post-season tickets to MLB games in reliance on the pretense that the playoff series did not
involve systematic cheating.  Further discovery will uncover evidence demonstrating that the
Astros,

## XIII.   **Defendant Underwriters**

### a.   **Act 39: Corrupt Influence Over Puerto Rico Legislation**

448.    In 2006, at the behest of Goldman Sachs and other financial advisors, the
legislature enacted Act 39, authorizing the Commonwealth to enter into certain interest rate swap
agreements, subject to the limitations prescribed in Act 39.

449.    Act 39 expressly authorized swaps to manage "the risks or costs of the
Commonwealth related to the fluctuations in the interest rates, investments, changes in the level
of prices or the credit risks of any obligation."

450.    However, Act 39 prohibited Puerto Rico from entering into a swap transaction
"for the purpose of financial speculation."   Puerto Rico cannot "perform functions as a broker"
with respect to swap transactions. Additionally, the nominal amount of a swap transaction cannot
exceed the principal of the underlying bond obligation.

### b.   **Bond Issuances**

451.    First, affiliates of some underwriters, including a Puerto Rico-based affiliate of
the UBS Defendants, acted as financial advisors to the issuers and charged the issuers fees for
advising that they issue the bonds.[69] This advice was self-interested and allowed those affiliates

---

[69] Special Investigation Report, at 557-58 [the Special Investigation Report is described infra ¶¶ 130-133].

to profit from the issuance of the bonds by obtaining millions of dollars from their self-interested advice.

452.    The net proceeds from the 2014 GO Bonds were applied as follows: **(a) to repay GDB's lines of credit and a deposit to the Commonwealth's Redemption Fund ($1,896,072,196); (b) to repay COFINA bond anticipation notes, which were not obligations of the Commonwealth or guaranteed by the full faith, credit, and taxing power of the Commonwealth ($342,365,760);** (c) to refinance refunded bonds from 2003 that refunded bonds from 1987 and 1989, which were originally underwritten by eleven of the fourteen 2014 GO Bond Underwriters ($466,574,005); (d) **to pay fees owed to interest rate swap counterparties ($90,417,100);** (e) to pay interest on the bonds ($422,749,408); and (f) to pay costs of issuance ($36,821,531).

c.   **Termination Fees**

453.    From 2004 through 2008, with the approval of GDB and the substantial assistance of Underwriter Defendants and Swap Counterparty Defendants, the Commonwealth and the Public Entities entered into at least 77 swap transactions.

454.    The Swap Termination Fees owed to interest rate exchange counterparties were obligations backed by the full faith, credit, and taxing power of the Commonwealth. Nonetheless, Puerto Rico excluded the Swap Termination Fees from its Debt Service Limit calculation.

455.    To avoid costly early termination of the swap agreements, the Commonwealth or the Public Entity issuer was required by the terms of the swap agreements to post collateral as security. As interest rates began to fall, the Commonwealth, acting under the advice of GDB,

138

first attempted to ride out these changes by posting collateral. GDB approved the issuance of additional bonds to generate the cash it needed to satisfy the collateral requirements.

456.   By 2009, the Commonwealth was exposed to over $9 billion in liabilities based on interest rate swaps that had been approved by GDB. Faced with this liability, GDB advised and approved the termination of many swaps, thereby incurring liability for swap termination fees. Thereafter, year after year, the Commonwealth and the Public Entities continued to terminate swaps as their liabilities exceeded their values.

457.   By September 30, 2014, the Commonwealth and the Public Entities had paid over $1.085 billion in net termination fees to the Swap Counterparty Defendants. Proceeds from the GO Bond Series 2014 and 2012A issuances were used to fund the swap termination fees.

458.   [The Commonwealth did not receive reasonably equivalent value for the Swap Termination Fees.]

459.   As a result of their receipt of Swap Termination Fees, the Swap Counterparty Defendants were unjustly enriched.

### d.   **Opinion Letters**

460.   Sidley Austin acted as counsel to the 2014 GO Bond Underwriters in connection with the offering. They were responsible for reviewing the debt limit certification. By participating as counsel to the underwriters of the 2014 GO Bonds, Sidley Austin breached its fiduciary duty to the Commonwealth which it had represented in 2003 in connection with the B and C Public Improvement Refunding Bonds.

461.   Sidley Austin failed to engage in reasonable diligence in respect of assessing whether the 2014 GO Bonds could be issued in compliance with the calculations for the Debt Service Limit.

462.    Indeed, the 2014 GO Bond Underwriters worked with GDB to structure the future

debt service payments to avoid a determination that the Constitutional Debt Service Limit was

violated.

463.    Greenberg Traurig acted as bond counsel on all three deals. In this role, it signed

off on the legal validity of the debt. The large firm did extensive work in Puerto Rico around

other debt deals, too, acting as counsel on 12 bond issuances worth $9 billion (including the three

noted above).

464.    Greenberg Traurig has also been very active in the recent debt restructuring

processes of Puerto Rico's public corporations and the Title III cases. The firm was contracted in

June 2017 by the Puerto Rico Aqueduct and Sewer Authority (PRASA) and the Puerto Rico

Fiscal Agency and Financial Advisory Authority (AAFAF, by its Spanish acronym) for legal

services relating to the corporation's operational and financial restructuring. The PRASA

contract was worth up to $3 million for one year of service.

465.    Greenberg Traurig has also been working for the Puerto Rico Electric Power

Authority (PREPA) since 2017 for the same services. Recently, it renewed its contract until June

2019.

466.    O'Neill & Borges, a law firm based in San Juan, also worked on each deal as

counsel to the underwriters. It has been the local legal adviser of the oversight board since 2016.

Pedro Pierluisi, previous resident commissioner in Washington and brother-in-law of the board's

chair, José Carrión, is a long time member of the firm.

467.    As a result of their receipt of Swap Termination Fees, the Swap Counterparty

Defendants were unjustly enriched.

e.   **Citibank's Concealment of Its Fiduciary Role as Municipal Advisor**