468.    Pursuant to applicable provisions of 1934 Exchange Act and the rules set forth by the Municipal Securities Rulemaking Board ("MSRB"), the Oversight Board and its professional advisors, (*e.g.*, McKinsey and Citigroup) are fiduciaries to the Commonwealth as "municipal advisors." However, the Oversight Board and Citibank attempted to conceal this fact from the Title III Court by misrepresenting its role in the various contracts in which they entered.

469.    On January 27, 2017, the Oversight Board and Citibank entered into a service contract (the "Initial Citibank Contract") providing for Citibank to serve as the Oversight Board's "investment banker and financial advisor" in exchange for fees.[70]

470.    The Initial Citibank Contract states that "Citi welcomes the opportunity to bring our expertise in municipal finance, capital markets, restructuring… and infrastructure and utility finance to bear[.]"[71]

471.    The scope of services section enumerates the following services to be provided by Citi as financial advisor:

> 1.  *Evaluate the Commonwealth's current fiscal situation, and interface with the Board and its other professional advisors in connection therewith;*
>
> 2.  *Review and evaluate the Commonwealth's capital structure and advise the Board on possible restructuring strategies (including developing financing and debt issuance models and alternatives) and in negotiating with the Commonwealth and the Commonwealth's creditors;*
>
> 3.  *Advise the Board on the Commonwealth's ability to access the capital markets, including providing advice on market strategy;*

---

[70] Initial Citibank Contract, at 1.
[71] Initial Citibank Contract, at 1.

> 4. *Undertake discussions on behalf of the Board with rating agencies, creditors, and other third parties as requested by the Board;*
>
> 5. *Perform such other investment banking and financial advisory services as the Board may reasonably request in connection with this engagement, including providing testimony in connection with the services provided under this Agreement.[72]*

472. In the section covering acknowledgements, the Initial Citi Agreement provides,

> *[T]here may be situations where parts of [Citigroup] and/or their clients either now have or may in the future have interests, or take actions that may conflict with the interests of the Commonwealth and its covered entities. **For example, [Citigroup] may, in the ordinary course of business, engage in trading in financial products or undertake other investment businesses for its own account or on behalf of other clients, including, but not limited to, trading in or holding long, short or derivative positions in securities, loans or other financial products of the Commonwealth and its covered entities and any other entities involved in the restructuring of the Commonwealth's debt.***
>
> *Subject to the last sentence of this paragraph, **neither this Agreement, the receipt by [Citigroup] of confidential information nor any other matter shall give rise to any fiduciary, equitable or contractual duties (including without limitation any duty of trust or confidence) that would prevent or restrict [Citigroup] from acting on behalf of other customers or for its own account.** Furthermore, the Board agrees that neither [Citigroup] nor any member or business of [Citigroup] is under a duty to disclose to the Board or use on behalf of the Board any information whatsoever about or derived from those activities or to account for any revenue or profits obtained in connection with such activities....[73]*

---

[72] Initial Citibank Contract, at 1.

[73] Despite asserting that Citi is not bound by any legal or equitable restraint protecting the Commonwealth, the following sentence recognizes Citi's "long standing policy to hold in confidence the affairs of its customers" and states that Citi "will not to use confidential information obtained from the Board except in connection with its services to, and its relationship with, the Board." *Cf.*, "Citi Draws SEC Fine for Unauthorized Trading, Other Violations" Bloomberg.com (August 16, 2018) (*quoting* Marc P. Berger, Director of the SEC's New York Regional Office, "Citigroup's lax supervision and weak internal accounting controls allowed a handful of rogue traders to mismark positions over several years and, separately, resulted in the unnecessary loss of hundreds of millions of dollars of its shareholders' assets to fraud") (*available at* https://www.bloomberg.com/news/articles/2018-08-16/citigroup-fined-10-5-million-in-settlements-with-sec); and "Burner Phones, Leaks to Journalists: Regulators Probe Suspected Insider-Trading Scheme," WSJ Online (June 27, 2019) ("During the trial, the [UK's Financial

473.     In the amended contract, the conspiring parties changed the language in the contract to further obscure its role as municipal advisor.

## XIV.   Major Banks Antitrust Activities and Fraudulent Conduct

### a.   Coordination Amongst Conspirator Banks

474.     On April 11, 2019, the Puerto Rico Government Employers and Judiciary Retirement systems Administration filed an antitrust lawsuit accusing major banks of entering into "a conspiracy to fix the prices and restrain competition in the market for unsecured bonds" by "manipulating…a vast array of financial rates, benchmarks, and instruments."[74]

475.     This lawsuit was consolidated into *In re GSE Bonds Antitrust Litigation*.[75]

476.     Evidence brought to light in the *GSE* Litigation includes transcripts of Bloomberg messaging conversations between bond traders at major banking institutions, including the following conversations:

- **July 2, 2010**

  *UBS Trader 2: less 3.5? or ftt?*

  *DBSI Trader 3:*[76] *YOUR CALL FTT MIGHT BE AN EASIER SALE*

  *UBS Trader 2: i got bberg. thx for joining.*

  *DBSI Trader 3: WHICH FTT -3.5?*

---

Conduct Authority] disclosed that it had received information…that Mr. Fiyaz allegedly had a source inside Citigroup leaking him tips through an intermediary.") (*available at* https://www.wsj.com/articles/former-citigroup-employee-served-as-alleged-middleman-in-insider-trading-scheme-11561677291).
[74] *Puerto Rico Government Employees and Judiciary Retirement Systems Administration v. Bank of America Securities, et al.*, Case No. 1:19-cv-03261-JSR, Dkt. 1, at 2 of 53 (S.D.N.Y. filed on 04/11/19) ("*PR Employees*").
[75] *Second Consolidated Amended Class Action Complaint*, Case 1:19-cv-01704-JSR Document 244 (S.D.N.Y. filed on 07/12/19)
[76] DBSI Trader 3 was previously employed by UBS Securities from approximately July 1998 through April 2009, when he left to join Deutsche Bank. DBSI Trader 3 subsequently left DBSI in approximately May 2011 to join TD Securities. DBSI Trader 3 is identified as TD Securities Trader 2 in Paragraphs 171, 174, below.

*UBS Trader 2*: ftt – 99.70

*DBSI Trader 3*: GOT IT TKS[77]

- **January 20, 2011**

  *BNP Securities Trader 1*: FTT?

  *Credit Suisse Trader 1*: sure. Ftt 8 aoas[10]

  *BNP Securities Trader 1*: 8 AOAS seems a bit cheap, no?: 99.82

  *BNP Securities Trader 1*: I was thinking 99.90

  *DBSI Trader 3*: fft, good luck on these[78]

- **September 1, 2011**

  *DBSI Trader 1*: are we still in synd[ication] on the stepper [i.e. a type of bond]?

  *BNP Securities Trader 1*: I'd say so.

  *BNP Securities Trader 1*: and the .47s.

  *BNP Securities Trader 1*: CF [Cantor Fitzgerald] is out of those.

  *DBSI Trader 4*: want to go FTT on the 0.47's?

  *DBSI Trader 1*: ok so stay in synd[ication] less .25 on the 3yr step [a type of bond].

  *BNP Securities Trader 1*: I was thinking give it a couple hours this morning.

  *BNP Securities Trader 1*: You know I make par sales all day.

  *DBSI Trader 4*: you really think you're going to make some par sales?

  *BNP Securities 1*: Prob right ... 99.925?

  *DBSI Trader 4*: Given our phenomenal distribution to end acc[oun]ts w/ $1.25 in a 2yr bond... we have 2 options: 1) Sell

---

[77] Case 1:19-cv-01704-JSR Document 254 Filed 09/10/19 Page 45 of 101.
[78] Case 1:19-cv-01704-JSR Document 254 Filed 09/10/19 Page 47 of 101.

*bonds to regionals at 99.90 (less 1.00) OR **2) Sell bonds to regionals at 99.925 FTT***.

*DBSI Trader 4: **this way we make .50 instead of .25 :)***

*BNP Securities Trader 1: Well argued*

*BNP Securities Trader 1: **I go #2***

*BNP Securities Trader 1: **FTT.**[79]*

- **February 17, 2012**

  *DBSI Trader 1: How are you guys doing? We have 100mm left*

  *Morgan Stanley Trader: 150mm left*

  *BNP Securities Trader: I'd say free it up given the cheapening trend of FHLB*

  *BNP Securities Trader: $140mm left*

  *Morgan Stanley Trader: I just don't want to create a race to the bottom between the 3 of us, doesn't help anyone.*

  * * *

  *DBSI Trader 1: go out FTT 99.985?*

  *Morgan Stanley Trader: Sure FTT at 99.985*

  *BNP Securities Trader: Good by me.[80]*

477.    Another example, July 12, 2012

**July 12, 2012**

*DBSI Trader 1: shall we go FTT?*

*CS Securities Trader 1: hi*

*Morgan Stanley Trader 1: i vote yes*

---

[79] Case 1:19-cv-01704-JSR Document 254 Filed 09/10/19 Page 43-44 of 101.
[80] Case 1:19-cv-01704-JSR Document 244 Filed 07/12/19 Page 2 of 88.

*DBSI Trader 1: morning*

*CS Securities Trader 1: at -13 I see these 100.018, does that look
right?*

*Morgan Stanley Trader 1:* **i see an upsize px at -13 of 100.02**

*Morgan Stanley Trader 1: so i agree*

*DBSI Trader 1: we have 100.01 so agree*

*Morgan Stanley Trader 1:* **i dont want to sell any below there to
be honest**

*UBS Trader 1:*[81] **FTT we are following**

*CS Securities Trader 1: ok, so fit then. thanks*

*Morgan Stanley Trader 1: fit agreed*

*DBSI Trader 1: agreed.*

- **July 17, 2012**

  *DBSI Trader 4: 99.985 on the FFCB's?*

  *BNP Securities Trader 1: Sounds good here.*

  *DBSI Trader 4: we have FHLB 0.72's (4nc3m, Amer), slightly
  longer settle, that we're showing at 99.85.*

  *Merrill Lynch Trader 1: [O]K*

  *Merrill Lynch Trader 1: i might be a touch higher than u guys but
  def[initely] not going lower.*

  *Merrill Lynch Trader 1: we were 99.875 yesterday right?*

  *DBSI Trader 4: correct.*

  *Merrill Lynch Trader 1: cool.*

  *DBSI Trader 4: you guys all cool w/ that?*

---

[81] UBS Trader 1 previously worked for BNP Paribas as a GSE Bond trader from
approximately November 2010 through July 2013.

*BNP Securities Trader 1*: We made a client sale on the 2.25s this a.m. at 99.75 with 10s at 10.

*Merrill Lynch Trader 1*: yes sir.

*BNP Securities Trader 1*: our live mark right now is 99.66.

*DBSI Trader 4*: I know we're FTT, and anyone can hit any bid, but given that it's day #2 w/ these bonds, figure maybe we at least try and stay on the same page (especially the 3yr). . .less volatile.

*BNP Securities Trader 1*: too cheap?

*DBSI Trader 4*: i buy them

*Goldman Sachs Trader 2*: if we are free to trade, we cannot talk about prices

*DBSI Trader 4*: ok. fair enough. just don't want anyone getting annoyed if someone hits a bi[d].[82]

- **August 22, 2012**

  *First Tennessee Trader 1: FTT 99.95?*

  *BNP Securities Trader 2: I think ftt*

  *DBSI Trader 1: sounds good*

  *DBSI Trader 1: [CGMI Trader 1] – you ok?*

  *CGMI Trader 1: FTT is good. It has been a while since issuance date.*

  *DBSI Trader 1: cool. ftt*

- **September 18, 2013**

  *Goldman Sachs Trader: Winner*

  *Goldman Sachs Trader: I'm calling for cover*

  *DBSI Trader: Ill asnd*

  *DBSI Trader: 1.05 with .80*

---

[82] Case 1:19-cv-01704-JSR Document 254 Filed 09/10/19 Page 42 of 101.

*Goldman Sachs Trader: Topeka.*

*Goldman Sachs Trader: I got asnd queued up*

*Goldman Sachs Trader: I just need CUSIP.*

*DBSI Trader: Ok cool*

*DBSI Trader:* **FTT 99.90?**

*Goldman Sachs Trader: On nim2*

*Goldman Sachs Trader:* **Lets just go 99.925.**[83]

- **October 25, 2013**

  *Morgan Stanley Trader 1: i dont get it. why try to compete when theres no need to make it competitive*

  *Morgan Stanley Trader 1: everyone can do so much better, for themselves and collectively if we all just play nice*

  *DBSI Trader 2: you sound like a european socialist*

  *HSBC Securities Trader 1: ha!*[84]

478.   These conversations reflect the how certain "spokes" of the McKinsey Hub-and-Spoke Conspiracy, in particular, financial institutions, coordinated

### b.   **Coordination Among Hedge Funds and Financial Institutions**

479.   On May 22, 2019, the American Bankruptcy Institute held its New York Bankruptcy Conference, which featured a panel on "Distressed Market Conditions: The Next Bankruptcy Wave" (the "Distressed Market Panel").  Participants in the Distress Market Panel included, Marc Lasry of Avenue Capital and Thomas A. Wagner of Knighthead.  In response to a question about the current state of the market in distress assets, Mr. Lasry made the following admission:

---

[83] Case 1:19-cv-01704-JSR Document 244 Filed 07/12/19 Page 40 of 88
[84] Case 1:19-cv-01704-JSR Document 254 Filed 09/10/19 Page 4 of 101

*I think what has changed, you [Thomas A. Wagner of Knighthead] were at Goldman for a while, Goldman used to be a huge market maker. You could call Goldman, get out of 150 million in bonds, now you call Goldman, and they're like, we'll see what we can do, I'll call you right back, and **then they call Tom, if I'm a seller [Tom: right], they'll call Tom and say "Confidentially, Avenue is selling" [Tom: Yeah, be careful...there's information in that trade]**, and there's... that's all that goes on.*

*And when someone is a seller now—you used to not know who the sellers were—today, every sales person we have, **we're saying "okay, who's the seller," and he's like "look, I can't tell you," and we're like "no, no, seriously, who's the seller?" [Tom: Alright, I'll tell you!] (laughing) Okay, "confidentially, it's Knighthead, but don't tell anybody." Or just "here's what's going on," and that just gives you information. What I think what people have forgotten is, if I know Steve is a seller, and I want to buy, I'll call Steve and he'll say, "I can't tell you" (laughing) or he'll say, "here's why."** Whereas in the past, you had no idea what was going on. And I think today you have a lot more information **and I think we use that information**.*[85]

## XV.    The Debt Adjustment Proceedings of the Commonwealth of Puerto Rico

### a.   Enactment of PROMESA

480.    On June 30, 2016, the U.S. Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. §§ 2101-2241 ("PROMESA") to stabilize Puerto Rico's economy by establishing oversight of the Government's budget and fiscal policies and by providing a mechanism for the Commonwealth to restructure its debts. *See* PROMESA § 201(b)(2); 48 U.S.C. §2141(b)(2).

481.    PROMESA created the Oversight Board, whose express purpose is "to provide a method for [Puerto Rico] to achieve fiscal responsibility and access to the capital markets." PROMESA § 101(a), (b)(1); 48 U.S.C. § 2121(a), (b)(1). Further, PROMESA established that

---

[85] Audio, ABI New York City Bankruptcy Conference, Distressed Market Conditions: The Next Bankruptcy Wave, 34:38 to 35:58 (available at https://insolvencyintel.abi.org/whats-new/nyc19-distressed-market-conditions-the-next-bankruptcy-wave).

the Oversight Board would provide oversight to the Commonwealth's and its covered instrumentalities1 restructuring and revitalization efforts by, among other things: (i) certifying fiscal plans and budgets for the Commonwealth and its covered instrumentalities and (ii) representing the Commonwealth and its covered instrumentalities in any cases commenced under Title III of PROMESA.

482.     In addition, PROMESA established a court-supervised, quasi-bankruptcy process similar to chapter 9 of the Bankruptcy Code to allow the Commonwealth and its covered instrumentalities to restructure their indebtedness pursuant to a plan of adjustment, as well as a framework for the designation, oversight and implementation of critical infrastructure projects aimed at growing the Commonwealth's economy

b.  **Formation of the Oversight Board**

483.     PROMESA section 101(a) established the Oversight Board for the purpose of providing "a method for a covered territory to achieve fiscal responsibility and access to the capital markets." The Oversight Board currently consists of seven voting members appointed by the President of the United States from a bipartisan list of nominees and a non-voting ex officio member appointed by the Governor of Puerto Rico.

484.     On August 31, 2016, President Obama appointed the Oversight Board's seven voting members: (1) José B. Carrión III, (2) Carlos M. García, (3) David A. Skeel, Jr., (4) Andrew G. Biggs, (5) Arthur J. González, (6) José R. González and (7) Ana J. Matosantos. As of August 21, 2019, Elí Díaz serves as the Commonwealth's non-voting ex officio member of the Oversight Board.

485.     Moreover, the Oversight Board also has an executive team, which includes: (i) Natalie A. Jaresko, as Executive Director and Interim Revitalization Coordinator, (ii) Jaime A.

El Koury, as General Counsel, and (iii) Kyle A. Rifkind, as Deputy General Counsel and

Restructuring Officer. Pursuant to the Oversight Board's bylaws, the Executive Director acts as

the chief executive officer of the Oversight Board with general supervision and direction of its

business affairs (including the power to enter into contracts on behalf of the Oversight Board),

subject to the supervision and control of the Oversight Board. The General Counsel acts as the

chief legal officer of the Oversight Board. The Revitalization Coordinator is responsible for

executing the duties prescribed under PROMESA section 503 relating to the identification,

prioritization and implementation of critical infrastructure projects for the Commonwealth.

### c. **GDB and AAFAF**

486.     On information and belief, from 2014-2015, Cleary Gottlieb, Proskauer Rose,

Citibank, Rothchild, KPMG and McKinsey, in their capacities as advisors, corruptly influenced

officials at the GDB to misappropriate federal funds held by the GDB.

487.     Prior to April 2016, GDB served the following roles for the Puerto Rico

Government and its entities: (1) fiscal agent, paying agent, financial advisor, and reporting agent;

(2) depositary and trustee of funds; and (3) lender of money, with and without security, to the

government, its entities, or to external parties including persons, firms, corporations or

organizations.[86]

488.     In April 2016, these responsibilities were transferred to the Fiscal Agency and

Financial Advisory Authority (AAFAF), which was newly created under the Puerto Rico

Emergency Moratorium and Financial Rehabilitation Act.

---

[86] See GAO Report at 37, FN 37.

489.    In January 2017, AAFAF's powers were expanded by the current governor to include collaboration with the Oversight Board as well as responsibility for negotiations with creditors regarding the debt of Puerto Rico's government and its entities.

490.    According to a former Puerto Rico official, some broker-dealers in Puerto Rico underwrote Puerto Rico municipal securities issuances and investment companies managed by affiliated companies of these underwriters purchased the securities, packaged them into funds, and marketed the funds to investors residing in Puerto Rico.[87]

### d.    The Oversight Board's Certification of Fiscal Plans and Budgets

491.    PROMESA's primary mandate is the development, certification and enforcement of fiscal plans and budgets for the Commonwealth and its covered instrumentalities. Such fiscal plans and budgets provide a framework for achieving fiscal responsibility and access to the capital markets. Fiscal plans are short-term and long-term planning tools, covering a period of at least five fiscal years, while budgets cover at least one fiscal year. Budgets must be consistent with the fiscal plan then in effect.

492.    PROMESA contemplates the Oversight Board and the elected government of the Commonwealth will work together to adopt a fiscal plan, but grants the Oversight Board the power to develop and certify its own fiscal plan if the government does not provide it with a proposed fiscal plan it determines to certify. The process begins with the Oversight Board providing the Governor with a schedule for the development, submission, and certification of fiscal plans for the Commonwealth and any covered instrumentality. The Governor is required to submit the proposed fiscal plan in accordance with such schedule. Following submission, the Oversight Board may certify the proposed fiscal plan if it determines that such fiscal plan meets

---

[87] *Id.* at 43.

14 statutory requirements set forth in PROMESA section 201(b), which are designed to "provide a method to achieve fiscal responsibility and access to the capital markets." The fiscal plan must, among other things: (i) provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on (a) applicable laws or (b) specific bills that require enactment in order to reasonably achieve the projections of the fiscal plan; (ii) ensure the funding of essential public services; and (iii) provide adequate funding for public pension systems.

### e.   **PROMESA's Requirement of Compliance with Federal Laws**

493.   Section 7 of PROMESA provides

> *Except as otherwise provided in this chapter, nothing in this chapter shall be construed as impairing or in any manner relieving a territorial government, or any territorial instrumentality thereof, from compliance with Federal laws or requirements or territorial laws and requirements implementing a federally authorized or federally delegated program protecting the health, safety, and environment of persons in such territory.[88]*

### f.   **Section 109 of PROMESA: Ethics**

494.   Section 109 of PROMESA contains two parts.

495.   First, subsection 109(a) subjects "<u>all</u> members and staff of the Oversight Board" to section 208 of the United States Criminal Code.[89]

496.   Second, subsection 109(b) requires "all members and staff <u>designated by</u> the Oversight Board" to disclose financial interests in conformity with the requirements set forth in section 102 the Ethics in Government Act if 1978.[90]

### g.   **Section 208 of the United States Criminal Code**

---

[88] 48 U.S.C. § 2106.
[89] 18 U.S.C. § 109(a) (emphasis added).
[90] 18 U.S.C. § 109(b) (emphasis added).

497.    In relevant part, subsection 208(a) of the United States Criminal Code

criminalizes

> *whoever, an officer or employee of the executive branch of the United States Government, or of any independent agency of the United States…including a special Government employee,[91]* **participates personally and substantially as a Government officer or employee through decision, approval, disapproval, recommendation, the rendering of advice, investigation, or otherwise, in a judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge…or other particular matter**
>
> *in which, to his knowledge, he, his spouse,…general partner,* **organization in which he is serving as officer, director, trustee, general partner or employee***, or any person or organization with whom he is   negotiating or has any arrangement concerning prospective employment,* <u>*has a financial interest*</u>*[.][92]*

498.    In relevant part, subsection 208(b) provides an exemption to the application of

208(a), where

> *the officer or employee first advises the Government official responsible for appointment to his or her position of the nature and circumstances of the judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter and <u>makes full disclosure</u> of the financial interest and receives <u>in advance</u> a written determination made by such official that the interest is not so substantial as to be deemed likely to affect the integrity of the services which the Government may expect from such officer or employee[.][93]*

> ### h.  <u>Section 209 of the United States Criminal Code</u>

---

[91] *See* 18 U.S.C. § 202(a) ("[T]he term 'special Government employee' shall mean an officer or employee of the executive or legislative branch of the United States Government, of any independent agency of the United States or of the District of Columbia, who is retained, designated, appointed, or employed to perform, with or without compensation, for not to exceed one hundred and thirty days during any period of three hundred and sixty-five consecutive days, temporary duties either on a full-time or intermittent basis[.]")

[92] 18 U.S.C. § 208(a) (emphasis added).

[93] 18 U.S.C. § 208(b) (emphasis added).

499.    18 U.S.C. § 209(a) of the United States Criminal Code imposes criminal liability upon

> *Whoever receives any salary, or any contribution to or supplementation of salary, as compensation for his services as an officer or employee of the executive branch of the United States Government, of any independent agency of the United States, or of the District of Columbia, from any source other than the Government of the United States, except as may be contributed out of the treasury of any State, county, or municipality; or*
>
> *Whoever, whether an individual, partnership, association, corporation, or other organization pays, makes any contribution to, or in any way supplements, the salary of any such officer or employee under circumstances which would make its receipt a violation of this subsection—*

500.    Thus, § 209(a) applies criminal sanctions not only to the payee (*i.e.*, those whom receive compensation from any source other the U.S. Government while serving U.S. Government interests), but also to the payor (i.e., persons and entities which pay such officials and employees while serving U.S. Government interests).

### i.    The Position of Revitalization Coordinator Under PROMESA

501.    Section 502(a) of PROMESA establishes the position of the Revitalization Coordinator "under the Oversight Board."[94]

502.    Section 103(b) of PROMESA provides that the "***staff***" of the Oversight Board "***shall include a Revitalization Coordinator*** appointed pursuant to [section 502]."[95]

503.    Section 503 of PROMESA provides that the Revitalization Coordinator is responsible for determining which capital improvement projects qualify as a "critical project" for the purposes of PROMESA.

504.    Among other things, Section 501 provides that

---

[94] 48 U.S.C. § 2212 ("Position of Revitalization Coordinator").
[95] 48 U.S.C.A. § 2123 ("Executive Director and staff of Oversight Board").

*(2) Critical Project*

*The term "Critical Project" means a project identified under the provisions of this subchapter and intimately related to addressing an emergency whose approval, consideration, permitting, and implementation shall be expedited and streamlined according to the statutory process provided by Act 76, or otherwise adopted pursuant to this subchapter….*

*(5) Emergency*

*The term "emergency" means any event or grave problem of deterioration in the physical infrastructure for the rendering of essential services to the people, or that endangers the life, public health, or safety of the population… **This shall include problems in the physical infrastructure for…water**, sewer, solid waste…and other similar infrastructure….*

*(11) Project Sponsor*

*The term "Project Sponsor" means a Puerto Rico Agency or private party proposing the development of an existing, ongoing, or new infrastructure project or Energy Project.[96]*

505.    Section 503(a)(1) of PROMESA requires "Project Sponsors" seeking to obtain the

"Critical Project" designation to expedite its proposed development must submit to the

Revitalization Coordinator for consideration, among other things,

*(A) **the impact the project will have on an emergency**;*

*(B) **the availability of immediate private capital or other funds, including… grants** to implement, operate, or maintain the project; [and]*

*(C) the cost of the project and amount of Puerto Rico government funds, if any, necessary to complete and maintain the project.[97]*

506.    Section 503(a)(2) requires that the Revitalization Coordinator to identify all

Puerto Rico agencies implicated in the permitting process related to that particular project.

---

[96] 48 U.S.C. § 2211 ("Definitions").
[97] 18 U.S.C. § 2213.

156

507.    Section 504(a) provides that, at the request of the Revitalization Coordinator, each federal agency with jurisdiction of the permitting or administrative review of private or public projects in Puerto Rico shall name a point of contract who will serve as the liaison with the Revitalization Coordinator.

508.    Section 505(b) further provides that

*For each Critical Project with a pending or potential Federal grant, loan, or loan guarantee application, the Revitalization Coordinator and the relevant Point of Contact shall cooperate with each other to ensure expeditious review of such application.*

509.    Section 503(a)(3)(a) requires that the Puerto Rico agencies identified by the Revitalization Coordinator propose an expedited permitting process plan within 20 days of its proposed project.[98]

510.    Section 503(a)(3)(C) provides

*The Revitalization Coordinator <u>shall require</u> Puerto Rico Agencies to implement the Expedited Permitting Process for Critical Projects. Critical Projects shall be prioritized to the maximum extent possible in each Puerto Rico Agency regardless of any agreements transferring or delegating permitting authority to any other Territorial Instrumentality or municipality.*[99]

511.    Section 503(b)(1) requires the Revitalization Coordinator to develop a "Critical Project Report" providing, among other things, recommendations by the Revitalization Coordinator and the Governor of Puerto Rico as to whether the project should be considered a "Critical Project."[100]

---

[98] 18 U.S.C. § 2213.
[99] 18 U.S.C. § 2213.
[100] 18 U.S.C. § 2213.

512.    Finally, section 503(c) of PROMESA directs the Oversight Board, after receiving the Critical Project Report," to determine by majority vote whether the particular project shall be deemed a "Critical Project."

513.    Notably, section 506 (a)substantially limits judicial review of decisions or acts made pursuant to Title V by creating a statute of limitations of 30 days following such decision or act.

514.    Significantly, nowhere in PROMESA does it expressly contemplate the existence of an "Interim Revitalization Coordinator," nor does it imply the existence of such a position relative to a "Permanent Revitalization Coordinator."

### j.    The Appointment of Aaron Bielenberg as Revitalization Coordinator

515.    On November 9, 2016, then-current Puerto Rico Governor Alejandro J. García-Padilla appointed Aaron Bielenberg as Revitalization Coordinator pursuant to section 502 of PROMESA.[101]

516.    Governor's letter communicating Bielenberg's appointment further states "[n]ote that *this appointment is a personal designation on a permanent basis not to be delegated to any other person or entity*."[102]

517.    According to the minutes of the Oversight Board's November 16, 2016 meeting ("Nov. 16 Minutes"), items discussed at its third meeting included the appointment of Aaron Bielenberg as Revitalization Coordinator as well as the selection of the Oversight Board's legal counsel and strategic advisors, pending contract negotiations.[103]

---

[101] Letter from Governor Alejandro J. García-Padilla Letter to Aaron Bielenberg dated 11/9/16 Ex. [X].
[102] Id. (emphasis added).
[103] *See* November 18, 2016 Third Meeting Minutes (published on July 14, 2017) (available at https://drive.google.com/file/d/1G_Wq7uffi5MHCiFm7zkpmyJZK3JD25kR/view).

518.    The Nov. 16 Minutes notes that Bielenberg is an "Expert Associate Partner in McKinsey & Co.'s Infrastructure Practice, based in the Washington DC office."[104]

519.    According to the Nov. 16 Minutes, Board Chair Carrión presented a report on the appointment process of the Revitalization Coordinator.  According to Carrión's report, the process involved

- (i) the Board submitting three candidates to then-current Governor of Puerto Rico, Alejandro García Padilla, including Aaron Bielenberg (McKinsey), Joseph Fontana (PwC) and Riz Shah (EY), whom "were selected from a pool of names received from professional services proposals and referrals received by the Board"; and

- (ii) Ten days later, on November 9, 2016, then-current Puerto Rico Governor Alejandro J. García-Padilla appointed Aaron Bielenberg as Revitalization Coordinator.

520.    Moreover, Board Chair Carrión further represented that "Mr. Bielenberg...would provide an initial framework for evaluating critical infrastructure projects within the next 60-90 days."[105]

521.    In addition, the Nov. 16 Minutes state that Board Chair Carrión had

> confirmed that... **the Board had begun a search and selection process... for other important positions** created under PROMESA, including... [a] permanent Revitalization Coordinator.... Mr. Carrión reported that, as part of the executive search process, the Board expects to re-submit to the Governor of Puerto Rico. during the first quarter of 2017, a list of at least three candidates for the position of Revitalization Coordinator **to carry forward the initial foundational work begun by Mr. Bielenberg**.[106]

522.    Thus, it is clear that the Oversight Board contemplated that Mr. Bielenberg's role as Revitalization Coordinator would be limited to the preliminary stages of Puerto Rico's debt

---

[104] See November 18, 2016 Third Meeting Minutes, at 18.
[105] See November 18, 2016 Third Meeting Minutes, at 18 (emphasis added).
[106] See November 18, 2016 Third Meeting Minutes, at 18 (emphasis added).

adjustment proceedings, despite (i) the November 9, 2016 letter of appointment from the

Governor of Puerto Rico stating such appointment was "permanent" and "non-transferable" and

(ii) the absence of statutory authority permitting the appointment of an "interim" revitalization

coordinator.

523.    Concerning the search for legal counsel and strategic advisor, the respective

search committee for each position had unanimously recommended particular firms for the roles

and, further, that the Oversight Board expected to announce the selected firms upon the entering

into contracts with those firms.

524.    Next, the Fee Examiner formulated a "Estimated Total Hours Reported," which

was "based on the assumption that each full-time participant contributes 60 hours per week and

each part-time participant contributes 25 hours per week."

### k.   The Conclusion of Bielenberg's Tenure as Revitalization Coordinator

525.    On July 24, 2017, the Oversight Board published a press release announcing the

appointment of Noel Zamot as the next Revitalization Coordinator.[107]

526.    Among other things, the press release states that

> *Zamot's appointment ends the interim role served by **Aaron C.
> Bielenberg**, who is credited by the Oversight Board for
> developing and putting in place the criteria and processes for the
> Critical Projects Program.*

> *'We thank Mr. Bielenberg for establishing the bases for this
> program, which is paramount to propel short and long-term
> economic development, create jobs and bring back opportunity to
> all in Puerto Rico as soon as possible. **He worked closely with the
> Oversight Board and the Government of Puerto Rico developing
> the fiscal plans for the Commonwealth as well as for key covered
> instrumentalities, such as PREPA, PRASA and the HTA**, laying
> the foundation for the pipeline of P3 and other critical energy and*

---

[107] Press Release Oversight Board Appoints Noel Zamot Revitalization Coordinator (dated 7.24.17) (*available at*
https://drive.google.com/file/d/1bHUK7_gFvLomIm4MzrAuV-0zq3u44XQ2/view).

*infrastructure projects to be expedited in Puerto Rico. His contribution was extremely valuable and **we look forward to having him continue to assist us as part of our consulting team**. The groundwork is in place and we look forward to having Mr. Zamot promptly take it to the next level...' added Oversight Board Executive Director Natalie Jaresko.[108]*

527.     Thus, it is established that Aaron Bielenberg served as Revitalization Coordinator from November 9, 2016 through sometime July 2017.

### l. Ethics Advisor's Letter Dated September 4, 2017

528.     In a letter dated September 4, 2017, Ethics Advisor Andrea Bonime-Blanc, responded to concerns over alleged violations of ethics and conflict-of-interest requirements committed by the Oversight Board.

529.     In the letter, Bonime-Blanc admits that the Revitalization Coordinator is a staff member of the Oversight Board.[109]  Specifically, Bonime-Blanc represents

*The Board, for example, requires all new members and designated staff - including the Board's Executive Director, General Counsel, and Revitalization Coordinator - to make full financial disclosures within thirty (30) days after being appointed and every year thereafter[.][110]*

### m. November 2017 Oversight Board Senior Staff Compensation Table

530.     On November 10, 2017, the Oversight Board posted to its website a document entitled "FOMB Senior Staff Compensation Table."[111]

531.     The document contains the following graph:

---

[108] *Id.* (emphasis added).
[109] Letter of Ethics Advisor Andrea Bonime-Blanc, at 1 (Sept. 4, 2017).
[110] *Id.*
[111] FOMB Senior Staff Compensation Table (November 10, 2017) (*available at* https://drive.google.com/file/d/1mowEU99Vm9vJO66ixP5-WaJREKEPr9-h/view).

161



Financial Oversight & Management Board for Puerto Rico

Senior Staff Compensation Table

| Position | Name | Annual Salary | Starting Date |
|---|---|---|---|
| Executive Director | Natalie A. Jaresko | $625,000 | March 2017 |
| Revitalization Coordinator | Noel Zamot | $325,000 | August 2017 |
| General Counsel | Jaime El Koury | $225,000 | February 2017 |
| Debt Restructuring Director | Armando Silva | $150,000 | October 2017 |
| Fiscal and Implementation Director | Miguel Tulla | $150,000 | September 2017 |
| Deputy General Counsel | Kyle Rifkind | $100,000 | July 2017 |
| Chief of Staff | Rosemarie Vizcarrondo | $120,000 | April 2017 |

n. **General Counsel El Koury's Letter to U.S. Attorney General Jeff Sessions dated May 8, 2018**

532. In a letter dated May 8, 2018, General Counsel El Koury responded to concerns voiced to then U.S. Attorney Jeff Sessions involving alleged violations of ethics and conflict-of-interest requirements by the Oversight Board.[112]

533. Among other things, El Koury states

> *please be assured that each of the Board's members, executive team, and other staff members is deeply committed to transparency and adherence to ethical standards above and beyond what are required by [PROMESA]. The Board, for example, requires all new members and designated staff – including the Board's Executive Director, General Counsel, and Revitalization Coordinator -- to make full financial disclosures within thirty days after being appointed and every year thereafter[.]*[113]

o. **Concealment of McKinsey's Involvement**

534. On April 13, 2018 Natalie Jaresko wrote an email stating "I don't know who inserted a McKinsey name (Aaron Bielenberg) and address for contact with the Board, but I

---

[112] Letter from General Counsel El Koury to U.S. Attorney General Jeff Sessions (May 8, 2018).
[113] *Id.* at 1.

believe it should be deleted and replaced with either me or our General Counsel Jaime El

Koury."

535.    Although this meeting does not appear on the fee applications of the respective

parties, it does appear reflected on the fee application of Phoenix Consulting, the financial

advisers for the mediation team.[114]

536.    Various time entries show that partners at Phoenix travelled to Washington DC on

December 12, 2017 for a meeting.  The same entries, however, redact portions that conceal that

the meeting involved McKinsey or took place at its DC office.[115]

537.    For example, page 106 of 118 reflects

| 12/7/2017 | B Gleason | Project March :I | 1.00 | $54.00 | Train to DC for ▮▮▮▮ meeting |
| 12/7/2017 | M Kopacz | Project March :I | 1.00 | $306.20 | Travel for ▮▮▮▮ meeting) |
| | | | | | Additional fare for ticket change from NYP/RTE |
| | | | | | Amtrak to NYP to DCA ($78) |
| | | | | | Jet Blue DCA to BOS ($228.20) |
| 12/7/2017 | B Gleason | Project March :I | 1.00 | $106.00 | Train from DC for the ▮▮▮▮ meeting |

538.    For example, the expense log covering the relevant time period[116] reflects

| 12/7/2017 | M Kopacz | Project March :I | 1.00 | $107.91 | RE ▮▮▮▮ meeting) |
| | | | | | Cab from hotel to NYP Station ($9.12) |
| | | | | | Cab from ▮▮▮▮ to DCA ($23.79) |
| | | | | | Car from BOS ($85.50 capped at $75) |
| 12/7/2017 | B Gleason | Project March :I | 1.00 | $20.50 | Cab in DC to ▮▮▮▮ office for ▮▮▮▮ meeting _____ |

539.    Similarly, the billable travel time[117] covering the relevant time period reflects



| Thur | 12/7/2017 | M Kopacz | Administration - Billable Travel | | 4.00 | 2.00 | $1,390.00 |
| | | | New York to Washington DC for ▮▮▮▮ ' Meeting - 1.5 billed at 50% | | | | |
| | | | Washington DC to Boston return from ▮▮▮▮ Meeting - 2.5 billed at 50% For ▮▮▮▮ | | | | |

---

114

[115] Phoenix Second Interim Fee Application, Case:17-03283-LTS, Dkt. 2724-1 Filed:03/19/18 Entered:03/19/18
15:55:26 Desc: Exhibit A Page 104 of 116
[116] Phoenix Second Interim Fee Application, Case:17-03283-LTS Doc#:2724-1 Filed:03/19/1815:55:26 Desc:
Exhibit A Page 109 of 116
[117] Phoenix Second Interim Fee Application, Case:17-03283-LTS Doc#:2724-1 Filed:03/19/18 15:55:26 Desc,
Exhibit A Page 38 of 116

540. In addition, the billable hours for Kopacz show that on December 1, 2017,
Phoenix participated in conference calls where, among other things, the agenda of the December
7, 2017 meeting was discussed.[118]

541. Because these phone calls do not appear on Proskauer's billables for the same
period[119] and because the Oversight Board did not participate or appear at the December 7, 2017
McKinsey Meeting, it can be reasonably inferred that the other party or parties involved in the
December 1, 2017 phone call were agents of McKinsey & Co.

542. The pattern of concealment is also readily apparent by a survey of billable time
sheet in various fee application. For example, the table below[120] provides a breakdown of the
amount of times major advisors working in Puerto Rico are mentioned:

|  | Rothschild 1st Fee Application | Rothschild 2nd Fee Application | Rothschild 3rd Fee Application | Total |
|---|---|---|---|---|
| Buckfire | 5 | 3 | 8 | 16 |
| Ankura | 5 | 6 | 11 | 22 |
| FTI | 0 | 4 | 4 | 8 |
| Filsinger | 4 | 6 | 10 | 20 |
| Phoenix | 6 | 3 | 9 | 15 |
| Proskauer | 3 | 7 | 10 | 20 |

[118] Phoenix Second Interim Fee Application, Case:17-03283-LTS Doc#:2724-1 Filed:03/19/18
Phoenix Management Exhibit A Page 53 of 116
[119] *See generally* Case:17-03283-LTS Doc#:2870 Filed:04/09/18 Entered:04/09/18 19:53:34 Desc: Main
Document Page 1 of 41.
[120] First Interim Rothschild Fee Application, Case:17-03283-LTS Doc#:3561 Filed:07/16/18 Entered:07/16/18
Document Page 23 of 30; Second Interim Rothschild Interim Fee ApplicationCase:17-03283-LTS Doc#:4260
Filed:11/16/18 Entered:11/16/18; Third and Final Rothschild Fee Application,
Document Page 1 of 61

| McKinsey | 0 | 0 | 0 | 0 |
|---|---|---|---|---|

p.  **The Conclusion of Bielenberg's Tenure as Revitalization Coordinator**

q.  **January 2018 Announcement of the Initial Critical Projects**

543.  In a press release dates January 8, 2018, the Oversight Board announced a 30-day public comment period for the first critical projects.[121]

544.  None of the critical projects under consideration contemplated the building or maintenance of clean water or drinking water facilities.  Nor are the funds linked to the clean water or drinking SRFs mentioned.[122]

r.  **Compass Funds**

545.  Compass CMAV is a Delaware limited liability company with an office at 245 Park Avenue, 13th Floor, New York, New York, 10167.[123]

546.  One of CMAV's members is Compass Special Situations Fund, which is a Delaware limited liability company.[124]

547.  Among Compass Special Situations Fund's members are hundred of individual investors, at least one of which is a United States citizen domiciled in California.[125]

---

[121] Press Release Oversight Board Opens 30-day Public Comment Period for Projects Being Considered Under PROMESA's Title V Critical Projects Process (dated 1/8/2018) (*available at* https://drive.google.com/file/d/1f5-4utOAZYkW3BQ4uoNm6PiPDEdeFOPW/view).
[122] *Id.*
[123] Complaint, Compass MAV v. BNYM, Case No 161200182, at 1.
[124] *Id.*

548.     According to Meyer, MIO formed Compass MAV in March 2014 and required
ESM to sign a new investment management agreement with MIO Partners to manage those funds
in March 2014. Meyer explained that "before that we had managed essentially the same funds in
a different company called Compass SAV. I'm not sure exactly why MIO Partners decided to
create the new company, but that is what they did."

549.     When asked to identify members of Compass MAV, Meyer responded Well, the
members are -- the limited partners, I believe, are -- let's see. I think the structure - I'm not too
clear on the structure. I think there is another entity that is invested, and the partners of
McKinsey are invested in that other entity.

550.     When asked whether Compass MAV has any individual employees, Meyer
responded "I don't think so."[126]

551.     When asked from whom did Meyer receive permission to file the underlying
lawsuit against BNYM, Meyer responded "I talked to Michael Cooper, who is a lawyer at MIO
Partners, and Daniel Fryxell, who he is sort of -- he is my supervisor there, and the head -- the
chief investment officer at MIO Partners is Todd Tibbetts and I talked to him as well."[127]

552.     When asked about his discussion with Fryxell, Meyer stated "I don't remember. I
probably had some conversations with both he and Michael Cooper, but -- and it might have
arose in passing that I talked to him every month or so about the portfolio, what I see in the
market."[128]

553.     When asked about who would be a corporate representative of Compass MAV,
Meyer stated "I would guess Michael Cooper or Daniel Fryxell, but maybe it would be Todd

---

[125] *Id.*
[126] Meyer July 25, 2018 Depo. Transcript. at 13.
[127] *Id.* at 14-15.
[128] *Id.* at 16.

Tibbetts, because he oversees the whole thing, whereas Daniel Fryxell is supervising only certain kinds of investments, investment strategies, whereas Todd Tibbetts is overseeing all of MIO Partners, so he would be overseeing all of Compass MAV, but I would guess they might designate Michael Cooper who is of counsel."[129]

554.    When asked about the division of labor at ESM between he and his partner, William Van de Water, Meyer stated that "generally, [Van de Water] will be looking at opportunities that brokers send us via e-mail or Bloomberg, and pick through interesting ones, and then show me stuff that he thinks are interesting, and then I follow up and delve into it."[130]

555.    Meyer represented that he would speak directly to BNYM, as trustee, over the phone.[131]

556.    Meyer also represented that MIO, through supervisor Fryxell, required that EMS obtain ten percent returns on investments and that if that kind of investment was unavailable, EMS would return that funds to Compass MAV, which would redeploy the capital.[132]

557.    Meyer explained how EMS was able to obtain nonpublic information about certain investment vehicles, stating

> So the strategy often for a lot of these complicated trades is you buy a small piece and then that gives you the right to get certain documents from the trustee, and certain kinds of information from the trustee and from the collateral manager.[133]

558.    Meyer explained how EMS

> Q. And in the fourth paragraph there you say: Anyway, we think it is a good opportunity to make a ten to fifteen percent total return in a few months, but it would require shorting stock to hedge.

---

[129] *Id.* at 17-18.
[130] *Id.* at 19.
[131] *Id.* at 53.
[132] *Id.* at 110-111.
[133] *Id.* at 155

*A. Correct.*

*Q. So you thought you could get a pretty decent return on this in a pretty short amount of time?*

*A. Yes.*

*Q. And then, actually, right -- the sentence right before that one at the bottom of the third paragraph it says, you said: It looks credible that after fronting a couple of percent in past due expenses, investors can get the stock out on a time scale of 24 months.*

559.    Meyer represented that, as of 2018, ESM had provided continuous services for

MIO spanning a 9-year period, that MIO had represented up to 80 percent of ESM's business,

and that ESM managed investments for both domestic Compass entities as well as "sister"

Compass offshore entities.

*Q. ...Does ESM manage money from funds other than CMAV under the MIO umbrella?*

*A. Yes. They -- we manage for somebody called Compass OMAV, which is the offshore version of CMAV, or COMAV. So they're kind of like sister companies, and we try to maintain the same strategy between the two. But Compass MAV is able to buy certain kinds of securities that Compass -- COMAV is not able to buy. So they're -- it's a little bit different. One is subject to -- one can't buy subordinated bonds or 144A securities, that kind of thing. So we do these kinds of trades in CMAV.*

*Q. So is your -- your -- is ESM's MIO portfolio an even split between CMAV and Compass COMAV or --*

*A. It's about even, yeah.*

560.    Michael Cooper, general counsel at MIO, executed the indemnity agreement

entered into between Compass MAV and BNYM, dated July 5, 2016.  In addition, the agreement

states that all notices, requests, and other communications pursuant to the indemnity agreement
intended for Compass MAV should be sent to MIO Partners at its New York office.[134]

## XVI.   McKinsey's Involvement in Puerto Rico's Debt Adjustment Proceedings

### a.   The Oversight Board's RFP for Strategic Advisor

561.   On October 20, 2016, the Oversight Board issued an RFP seeking a strategic
consultant "to assist the [Oversight] Board carry out its duties in accordance with the
requirements of the PROMESA statute" (the "Strategic Consultant RFP").[135]

562.   The Strategic Consultant RFP enumerates various services to be performed by the
strategic consulting firm for the Oversight Board, including, among other things,

> *4. Assist in the development of a fact-based framework to
> evaluate and certify fiscal plans and annual budgets presented to
> the Board by covered entities under PROMESA, including an
> initial assessment and stress test about the Commonwealth of
> Puerto Rico fiscal year 2017 budget and the Fiscal and Economic
> Growth Plan (FEGP) presented by the Governor of Puerto Rico to
> the Board.*
>
> *5. Collaborate with the Board's legal advisors in the development
> of a framework and guidelines to address litigation and legal
> proceedings....*
>
> *6. Provide a fact-based framework to evaluate critical projects
> under PROMESA.*
>
> *7. Present to the Board a set of initiatives and "quick-wins" for
> Puerto Rico related to: (i) creating the foundation for economic
> growth and (ii) improving government services to the people of
> Puerto Rico, specifically in the areas of technology, welfare
> programs, health, and education.*

---

[134] Exhibit 23, Compass MAV v. BNYM, Case No. 161200182.
[135] See Financial Oversight and Management Board for Puerto Rico, Request for Proposal Strategic Consulting
Firm, at 1 (October 20, 2016).

*8. **Provide a framework and proposed process to address debt restructuring negotiations.**[136]*

563.   In addition, the Strategic Consultant RFP set forth certain criteria upon which the Oversight Board would evaluate and select its strategic consultant, including, among other things, the "[c]ompetitiveness of the proposal," "[e]ngagement cost," "[c]redible plan to rapidly execute in Puerto Rico and to carry out functions in an objective and evidence-based manner," and "[c]onflicts of interest review."[137]

564.   Moreover, the Strategic Consultant RFP directed applicants to

> *[p]lease include also in your submission a list and description of any connections, past and present, with Puerto Rico and any work that your firm has performed or is performing for the Government of Puerto Rico or any of its instrumentalities.*
>
> *Please state if you have <u>any</u> conflict of interest or potential appearance of conflict of interest in taking this engagement <u>by virtue of your firm's current or prior engagements with other parties.</u>[138]*

565.   Concerning fees and expenses, the Strategic Consultant RFP provides

> **The response to the RFP should include a proposed contract complete with terms, conditions and pricing, including the estimated number of hours.** *The response should also contain a list of each person who may perform services and their title,* **the proposed rate or blended hourly rate proposed,** *and the level of involvement anticipated for each component. Notwithstanding the foregoing, the Committee reserves the right to modify the form of proposed contract.*[139]

### b.  <u>The Amendment to the RFP for Strategic Advisor</u>

---

[136] Strategic Consultant RFP, at 1-2.
[137] *Id.* at 2-3 (emphasis added).
[138] *Id.* at 3 (emphasis added).
[139] *Id.* at 3.

566.    On October 24, 2016, the Oversight Board issued an amendment to its RFP seeking a strategic advisor.[140]

567.    Among other things, the amendment provided that

> *3. The Board would like that the leadership team of firms responding to the RFPs include one or more individuals with expertise on revitalization infrastructure, including knowledge and expertise in the planning, predevelopment, financing, development, operations, engineering, or market participation of infrastructure projects. Please provide a resume for such experts and their detailed experience in dealing with revitalization infrastructure.*
>
> *4. The reference to "critical projects" on page 2 of the RFP refers to the PROMESA Act defined term of "critical projects" in Title V, §501 (2).*
>
> ***5. We encourage respondents to provide fixed price proposals.***[141]

568.    The bolded item added to the Strategic RFP effectively repealed the initial RFP's requirement that proposals include "the proposed rate or blended hourly rate proposed."[142] This particular amendment is as bewildering as it is unprecedented in the context of bankruptcy as it would prevent the court from determining whether the proposed fees are reasonable, a determination that almost exclusively relies on comparisons of hourly rates of like professionals.

569.    On information and belief, this particular amendment demonstrates that the Oversight Board agreed to support and, in fact, participated in the Hub-and-Spoke Enterprises' scheme to fix professional fees by adding this amendment, among other things.  Not having to provide hourly rates afforded McKinsey's above-market professional fees cover from scrutiny by the Title III Court.

c.    **The Initial McKinsey Contract with the Oversight Board**

---

[140] *See* Clarifications and Additional Guidelines to the Response to the RFP for Strategic Consultant (October 24, 2016).
[141] *Id.* at 1.
[142] Strategic Consultant RFP, at 3.

171

570.    On November 27, 2016, Tyler Duvall, on behalf of McKinsey DC, and José Carrión, on behalf of the Oversight Board, executed an agreement providing for McKinsey's consulting services (the "Initial McKinsey Contract").[143]

571.    Attached to the Agreement is a document that delineates McKinsey's scope of work (the "Scope of Work").

572.    Among other things, the Scope of Work included the creation of "frameworks to support [Oversight] Board deliberation and decision-making," covering activities such as "Litigation Framework and Strategy," "Fiscal Plan Framework and Stress Testing," and "Restructuring Framework and Processing."[144]

573.    Concerning litigation related activities, the Initial McKinsey Contract sets forth the following:

> • **Litigation Framework and Strategy** *McKinsey will work with Board counsel to build a baseline assessment of legal proceedings and litigation,* **develop a framework and guidelines to enable the Board to develop a strategy for managing existing claims (e.g. Covina**[145] **related claims…and then put in place a robust framework for evaluation of potential litigation risk and trade-offs** *that will support the Board in developing its debt restructuring and stakeholder engagement strategy.*[146]

574.    Concerning its restructuring related activities, the Initial McKinsey Contract sets forth the following

> • **Restructuring Framework and Process**: *Design with the Board a bespoke restructuring process and strategy to restructure Puerto Rico's public debt across all of its sovereign and sub-sovereign issuers, which will require innovative application of key principles of market restructuring practice and will include….*

---

[143] See Initial McKinsey Agreement (November 27, 2016).
[144] Initial McKinsey Agreement, at 5-6.
[145] This is a misspelling of COFINA.
[146] Initial McKinsey Agreement, at 6.

> — *Developing a timeline for the restructuring process*
>
> — *Mapping and evaluation of creditor claims*
>
> — *Based on debt sustainability analysis from other workstreams, developing a creditor engagement strategy across all creditor groups.[147]*

575.    Concerning fiscal plan related activities, the Initial McKinsey Contract sets forth the following:

> • ***Fiscal Plan Framework and Stress Testing****: McKinsey will develop a framework and approach for the Board to evaluate and certify fiscal plans and annual budgets presented to the Board, **stress test the revenue, expenditure and balance sheet of the Government public finances (including an initial assessment of the central Government [and] Aqueduct and Sewer Authority (PRASA)…fiscal plans)**. McKinsey will provide suggested* ***adaptations to the Fiscal Plan framework for other PROMESA covered instrumentalities****. To date, in addition to the central Government, the [Oversight Board] has required separate fiscal plans from: PRASA, PREPA, Government Development Bank….* ***McKinsey will help [the Oversight Board] identify the interconnections between the fiscal plans of covered instrumentalities. McKinsey will conduct a deep-dive of the revenue, expenditure and balance sheet, positioning the findings for the Board in relation to proprietary benchmarks, focusing on the central Government fiscal plan****. In conducting the stress test, McKinsey will….*
>
> — *Build a debt sustainability model as required for the certification of the Fiscal Plan*
>
> — ***Prioritize critical inputs that are non-negotiables to inform scenario testing and outline key assumptions*** *(e.g., future utilities revenues, operating expenses, capital investment, maintenance, pensions and debt coverage)*
>
> — *Identify and assemble structural reforms, including reforms proposed or otherwise successfully executed in other jurisdictions, that could help improve the long-term growth potential of the Puerto Rican economy*

---

[147] Initial McKinsey Agreement, at 6.

*― Outline top risks and recommend ideas for initiatives to mitigate
risks[.][148]*

576.    In addition, the Scope of Work includes "Revitalization Coordinator services,"

providing, among other things, that

> *McKinsey will provide the individual team member selected by the
> Governor of Puerto Rico to engage in Revitalization Coordinator
> activities as part of the Consulting Services.... The Revitalization
> Coordinator activities **for the initial period up to February 28,
> 2017** will be focused on set up of the critical projects process and
> program and shall include development of the critical projects
> framework, processes to be put in place for critical project
> evaluation and approval and workplan for the revitalization
> coordinator and critical projects workstream all to be approved by
> the Board....*
>
> ***The Revitalization Coordinator activities shall be included in the
> scope of consulting services under this contract and shall not be
> considered or be interpreted to be a member of the Board.** The
> Revitalization Coordinator activities shall not include:*
>
> • *Decision-making*
>
> • *Fiduciary duties*
>
> • *Negotiation responsibilities[149]*

577.    The exclusion of these "activities" shows that McKinsey was aware of the nature

of the role of Revitalization Coordinator: that it inherently involved consequential decision-

making, that it inherently involved negotiations with public and private entities and, as a result,

that fiduciary duties would ordinarily be imposed by law on such a decision-maker.

578.    The representations that the Revitalization Coordinator would not engage in either

decision-making or negotiations therefore amount to misrepresentations.  Similarly, the

representation implication that the Revitalization Coordinator would not owe the fiduciary duty

of undivided loyalty is a misrepresentation because § 109 of PROMESA subjects "[a]ll members

---

[148] Initial McKinsey Agreement, at 5-6.
[149] Initial McKinsey Agreement, at 8.

and staff of the Oversight Board" to the Federal conflicts of interest requirements in 18 U.S.C. § 208[150] and the Revitalization Coordinator is a member of the staff under 48 U.S.C. § 2123(b).[151]

579.     Moreover, the representation that the Revitalization Coordinator "shall not be considered or be interpreted to be a member of the [Oversight] Board" is a misrepresentation because it directly contravenes the express language of PROMESA.

### d.  McKinsey's Secret Economist December 7, 2017 Meeting

580.

581.



---

[150] 48 U.S.C. § 2129; and 18 U.S.C. § 208.
[151] 48 U.S.C. § 2123(b) ("The staff shall include a Revitalization Coordinator appointed pursuant to subchapter V of this chapter.").
[152]



582.

583.    A review of the meeting minutes of the Oversight Board for its board meeting on October 31, 2017 and December 5, 2017 does not indicate that the McKinsey Meeting was disclosed publicly.[155] Nor does it appear that the meeting was at a contemporaneous hearing.

e.    **Letter from FOMB to Gov. Rossello Dated January 18, 2017**

584.    In a letter from the Oversight Board to Governor Rossello dated January 18, 2017, the Oversight Board stated that any extension of the deadline for the submission of the government of Puerto Rico's fiscal plan would be contingent upon, among other things, the Government's adherence to

> *a set of conditions and timelines, including....*
>
> •    *The Government and the Board (and their advisors) will establish a clear joint working arrangement, information sharing protocol and work plan to be finalized by January*

---

[153] Zolfo Cooper McKinsey Meeting Email (Dec. 7, 2017); please note that the names within the parentheticals are the parties that were represented by the attendee.  For example, Miller Buckfire is the financial advisor for the Sr. COFINA bondholders.

[154]

[155] See Minutes Version, FOM Eleventh Meeting of the Board (Oct. 31, 2017); and Minutes Version, FOM Eleventh Meeting of the Board (Dec. 5, 2017).

*23, 2017. (Our advisor McKinsey and AAFAF are already
working on these.)*

- *Title VI negotiations conducted by your Administration
will be in joint coordination with the Board and its
advisors, including the participation of the Board and its
advisors in all meeting with creditors. Likewise, the Board
will invite your representatives and advisors to participate
in any meetings with creditors the Board holds pursuant to
its rights and duties under PROMESA.*[156]

585.    Together, the preceding bullet points show that it was the intent of the Oversight

Board that McKinsey would substantively participate in negotiations in carrying out its duties as

strategic advisor.  Significantly, COFINA bonds were eligible for modifications under Title VI

as of the date of this letter.

586.    In addition, attached to the letter is a PowerPoint slide entitled "Fiscal Initiatives

Description and Sizing."  On information and belief, this PowerPoint slide was made by

McKinsey.

587.    Footnote 1 of the slide indicates that the graph "[e]xcludes PREPA and PRASA."


## XVII.   Misrepresentations, Omissions, and Errors in LSE's McKinsey & Co. Report

### a.   18 U.S.C. § 1001: Statements or entries generally

588.    In pertinent part, 18 U.S.C. § 1001 provides

*(a) Except as otherwise provided in this section, whoever, in any
matter within the jurisdiction of the...judicial branch of the
Government of the United States, knowingly and willfully—*

*(1) falsifies, conceals, or covers up by any trick, scheme, or device
a material fact;*

---

[156] FOMB Letter to Gov. Rossello, at 8 (available at https://drive.google.com/file/d/1vGhOSgr0qLHQhxQaHFo
Yxoia3q1qDogk/view.).

*(2) makes any materially false, fictitious, or fraudulent statement
or representation; or*

*(3) makes or uses any false writing or document knowing the same
to contain any materially false, fictitious, or fraudulent statement
or entry;*

*shall be fined under this title, imprisoned not more than 5 years....*

*(b) Subsection (a) does not apply to a party to a judicial
proceeding, or that party's counsel, for statements,
representations, writings or documents submitted by such party or
counsel to a judge or magistrate [United States magistrate judge]
in that proceeding.*

### b. **LSE McKinsey Report**

589.    Luskin, Stern & Eisler report commissioned by the Oversight Board to address

reporting that McKinsey had concealed multiple conflicts of interests (the "LSE McKinsey

Report"), which was not submitted within the context of a judicial proceeding, but, rather, as an

informative motion,[157] contains a number of false statements, omissions, and errors which, taken

together, constitute a fraud on the judicial branch.  These misrepresentations can be broken down

into seven categories: (1) McKinsey's role and influence over the COFINA plan of adjustment;

(2) information sharing that occurred between MIO and McKinsey employees and partners; (3)

the applicability of statutes and regulations; (4) whether McKinsey had a conflict of interest; (5)

MIO's ability to exercise control or influence third-party funds; (6) that LSE engaged in a good-

faith investigation and had sufficient evidentiary support to make certain conclusions; and (7) the

Oversight Board's RFP and False Statements McKinsey's Application.

### c. **McKinsey's role and influence over the COFINA plan of adjustment**

590.    LSE McKinsey Report stated, as a factual matter, that

---

[157] See INFORMATIVE MOTION REGARDING PUBLICATION AND FILING OF FINAL INVESTIGATIVE
REPORT – MCKINSEY & COMPANY, INC., Case No. 17-23283, Dkt. 5154 (filed on February 18, 2019).

> *McKinsey did not work on the Commonwealth-COFINA settlement
> or the COFINA plan of adjustment.  In particular, neither the
> Oversight Board nor McKinsey played any role in negotiating the
> sales and use tax allocation that is at the center of the COFINA
> plan of adjustment.[158]*

591.    Further, the LSE McKinsey Report represents, in a footnote, that the Initial

Consulting Agreement provided that

> *McKinsey **would** work with the Oversight Board's counsel "to
> build a baseline assessment of legal proceedings and litigation,
> develop a framework and guidelines to enable the [Oversight]
> Board **to develop a strategy for managing existing claims (e.g.,
> Covina [sic] related claims and amounts due to contractors and
> taxpayers), and then put in place a robust framework for
> evaluation of potential litigation risk and trade-offs** that will
> support the [Oversight] Board in developing its debt restructuring
> and stakeholder engagement strategy that will support the Board
> in Developing its debt restructuring and stakeholder engagement
> strategy."[159]*

592.    First, the fact that the McKinsey's "Scope of Work" initially included the

obligation to work on COFINA "related claims" is highly relevant and clearly contradicts the

LSE McKinsey's Report's earlier, unequivocal statement that "McKinsey did not work on the

Commonwealth-COFINA settlement or the COFINA plan of adjustment."  Its placement in a

footnote, which wraps around to the next page, is meant to obscure its relevance and to mislead

the reader.

593.    Second, the "Scope of Work" provides that "McKinsey will work with Board

counsel," not that it "would" work.  This is misleading because "will" is a mandatory declarative,

where "would" is not necessarily mandatory, and may be construed as permissive.

594.    Third, the LSE McKinsey Report does not clarify that the Initial McKinsey

Agreement was referring to COFINA when it stated "Covina."  Rather, the agreement merely

---

[158] LSE McKinsey Report, at 10.
[159] LSE McKinsey Report, at 33-44.

notes that there was an error in the original by adding "[sic]." Clearly, COFINA is of particular interest in and by clarifying that it was "COFINA," would have drawn attention to its mention in the footnote or elsewhere. Therefore, the failure to point out this salient fact is tantamount to a fraudulent omission.

595.    Further still, the text in the body of the report (of which the footnote expands upon) gives no indication that the Initial McKinsey Agreement provided that McKinsey was obligated to work on COFINA. Instead, it vaguely describes that, because the Oversight Board's and McKinsey's attention was diverted "

> *as it became clear that McKinsey and the Oversight Board would need to take on additional tasks, **some functions enumerated in the Initial Consulting Agreement fell off the scope of McKinsey's work, including, for example, developing a litigation framework and strategy and a restructuring framework and process**.*

596.    Thus, the LSE McKinsey Report fails to state that the Initial McKinsey Agreement obligated McKinsey to provide litigation and mediation support services in connection with COFINA, which, is a fraudulent omission.

597.    In addition, the LSE McKinsey Report represented that

> *In connection with the Title III cases, the Oversight Board asked McKinsey to educate the Oversight Board's other advisors...about the fiscal plan, **to support litigation, to perform some liquidity planning relating to the implementation of the fiscal plan**, and to support the Oversight Board in mediation sessions, which began soon after the Title III filings. **McKinsey's liquidity planning efforts centered primarily on the Commonwealth** and to a lesser extent on PREPA, **but not GDB**. Although the Title III Consulting Agreement contemplated that McKinsey would provide mediation support, **McKinsey's role in the Commonwealth-COFINA mediation was purely informative**.[160]*

---

[160] LSE McKinsey Report, at 31.

598.     This is a misrepresentation because, as made abundantly clear in the time entries of its co-conspirators, McKinsey, far from providing "some liquidity planning," McKinsey drove the discussions concerning the Commonwealth's liquidity.  Moreover, that "McKinsey's liquidity planning centered primarily on the Commonwealth…but not GDB," is nonsensical because the majority of the Commonwealth's cash was held on account at the GDB, meaning it was the Commonwealth's primary source of liquidity.  Further, because Luskin is part of the Hub-and-Spoke Conspiracy, it knows that McKinsey's role is not "purely informative," but, rather, that McKinsey exercised and exercises overwhelming control and influence on the substantive Title III outcomes.

599.     However, the time sheets for the Oversight Board reveals that McKinsey did participate in litigation matters concerning COFINA.  For example, multiple time entries for January 9, 2019 reflect McKinsey's participation in COFINA litigation, *e.g.*,

- "[t]eleconference with Proskauer, Citi, McKinsey and advisor regarding Alameda report attached to PROSOL-UTIER's objection to confirmation of COFINA's plan of adjustment (1.00)"[161];

- "[a]ttend call with McKinsey regarding PROSOL-UTIER objection to plan confirmation (1.0)."[162]

- 8/17/18 Memorandum to McKinsey regarding fiscal plan and plan support agreement (0.20)[163]

---

[161] Case:17-03283-LTS Doc#:7054-2 Filed:05/21/19 Entered:05/21/19 19:05:04 Desc: Exhibit B Page 348 of 504; see also id. at 351 ("Conference call with McKinsey, Citi et al., regarding Alameda report[.]")
[162] *Id.* at 420.
[163] Fourth Proskauer Fee App, Case:17-03284-LTS Doc#:348-2 Filed:11/16/18 Entered:11/16/18 16:25:07 Desc: Exhibit B Page 67 of 154

- 8/22/18 "Attend conference call with McKinsey regarding preparation of disclosure statement (0.40)"[164]

- 9/13/18 "Participate in call with McKinsey Regarding COFINA fiscal plan (0.30)"[165]

- 9/13/18 "Teleconference with M. Zerjal, S. Ma, McKinsey representatives regarding fiscal plan insert (0.40)"

- 9/24/18 " Meeting with creditors and McKinsey regarding revised structure (0.70)"[166]

600.    As part of the conspirators' agreement to conceal McKinsey's involvement, Phoenix Management (FOMB financial advisor) concealed its participation in McKinsey's "economists meeting" by misrepresenting to the Title III Court that the meeting was part of the mediation process.



601.    The LSE McKinsey Report also represents that "McKinsey played a limited role in the preparation of the COFINA Fiscal Plan _after_ the economics of the COFINA settlement had already been agreed upon."[167] However, this representation is so vague as to its meaning that one may reasonably question its veracity and meaningfulness.

### d.  **Information sharing that occurred between MIO and McKinsey employees and partners**

---

[164] _Id._ at 70.
[165] _Id._ at 98
[166] _Id._ at 115.
[167] Case:17-03283-LTS Doc#:5154 Filed:02/18/19 Entered:02/18/19 10:00:08 Desc: Main Document Page 84 of 102 (emphasis added).

602.    LSE stated that, as a factual matter, "McKinsey employees are not provided with

information related to MIO's underlying investments and have no ability to influence MIO's

investment decisions."[168]

603.    However, this representation is materially misleading because, while it may have

been true as the time LSE wrote the McKinsey Report, at the time in question, *i.e.*, when

Compass and MIO purchased the securities at issue, in or before 2017, Jon Garcia was (i) an

employee of McKinsey; (ii) sat on the MIO Board, which exercised oversight over MIO

investments activities; and (iii) sat on the board Investments Subcommittee, which ratified

investments on quarterly basis.  Thus, in reality, Garcia had an ability to influence MIO's

investment decisions, rendering the previous representation misleading.

604.    LSE purportedly concluded that

> *McKinsey's policies, procedures, and practices ensured and*
> *continue to ensure that McKinsey's consulting work and MIO's*
> *investment management work were and **are separate and that***
> ***there is no information sharing between them**.*[169]

605.    In describing the U.S. Trustee's admonishment of McKinsey in ANR, the LSE

McKinsey Report represents that

> *According to the United States Trustee, McKinsey RTS was "not*
> *forthcoming" about the role Jon Garcia, the president of*
> *McKinsey RTS, played on the MIO Board of Directors.*[170]

606.    This amounts to a misrepresentation because it omits, in sum and substance, the

U.S. Trustee's main concerns about Jon Garcia role at MIO: that he sat on the four-person

Investments Subcommittee; that the Investment Subcommittee ratified investment decisions, and

that it and Jon Garcia directly influenced MIO's investment decisions.

---

[168] LSE McKinsey Report, at 10.
[169] *Id.* at 1-2 (emphasis added).
[170] *Id.* 11.

183

607.    The LSE McKinsey Report further perpetuates the falsehood that MIO operated

on "essentially, a blind trust basis." For example, it represents that

> *[i]n fact, neither the Oversight Board nor McKinsey's consulting
> side learned of this direct investment in COFINA bonds until this
> investigation, and **that is testimony to the effectiveness of the
> information barriers** between MIO's investment business and
> McKinsey's consulting business.*[171]

608.    The LSE McKinsey Report admits that, in March 2018, following the reporting

that McKinsey was profiting from Puerto Rico bonds through Compass, that "McKinsey

provided the Oversight Board certain information regarding McKinsey's corporate structure, the

separation of MIO from McKinsey's consulting business, and MIO's investments in

Whitebox."[172]

609.    In addition, the LSE McKinsey Report represents that

> *According to its publicly-available website, MIO "makes
> investments essentially on a 'blind trust' basis, with MIO investors
> having no access to information about the underlying holdings in
> the third-party funds. This helps McKinsey partners and staff
> minimize any perceived or actual conflict of interest associated
> with investing themselves."*[173]

610.    The accompanying footnote further represents that "McKinsey's characterization

of this relationship as a 'blind trust' has been criticized by the United States Trustee and the

Court in ANR," before referring to the earlier description discussed above."[174]

611.    While generally true, this description is a vast understatement of the U.S.

Trustee's admonishment of McKinsey's misrepresentation. The U.S. Trustee found that MIO

was not a blind trust and concealed that fact for over three years. Further, to uncritically quote

---

[171] *Id.* at 3.
[172] *Id.* at 36.
[173] *Id.* at 48.
[174] *Id.* at 48.

the "blind trust" representation, knowing that it is not a meritorious claim, is clearly meant to lend plausibility to the claim. Thus, it is materially misleading and constitutes a misrepresentation.

612.    The LSE McKinsey Report represents that

> *The Collaboration Policy includes an "information barrier" between McKinsey's consulting activities and MIO's investment activities and dictates that the two must be managed independently and with separate operations, including separate offices, IT systems (including email servers) and, **with limited exceptions (e.g., certain employees of the McKinsey legal department)**, employees.*[175]

613.    This sentence contains several mispresentation. First, grossly understates the extent to which Lipscomb, as McKinsey's <u>and</u> MIO's general counsel, is an exception to the claim that there is no information sharing between McKinsey and MIO. Lipscomb is employed by both entities and may access information, formally and informally, from either entity and share that information with the other. Thus, stating that a "limited exception" to the "information barrier" includes "(e.g., certain employees of the McKinsey legal department)," is misleading because it suggests that the exception is so limited that it does not even warrant identifying individuals such as Lipscomb who transcend the information barrier.

614.    Second, the sentence misleadingly suggests that the LSE investigation verified that the "information barrier" was ensured over "IT systems (including email servers)." However, the maintenance of separate email servers has no bearing on whether information is being improperly shared in emails sent between McKinsey and MIO. Further, the LSE McKinsey Report omits that McKinsey employees communicate with Wickr, an encrypted

---

[175] LSE McKinsey Report, at 59.

messaging app that automatically deletes messages within hours or days. In fact, it has been reported that McKinsey consultants use Wickr to exchange project documents with clients.[176]

615.    LSE McKinsey Report represents that "[t]he Investments Committee consists of four current or former McKinsey partners and one independent director who is not a current or former McKinsey partner."[177]  However, it fails to inform that, during the relevant time period, Garcia sat on the Investments Subcommittee, while also serving as President of McKinsey RTS.

### e.    **The applicability of statutes and regulations**

616.    LSE purportedly concluded that *"McKinsey USG made the disclosures required by the Oversight Board and by applicable law[.]"*[178]

617.    In addition, the LSE McKinsey Report quotes section 109 of PROMESA stating that it "requires the Oversight Board and its staff to comply with 'Federal conflict of interest requirements described in Section 208 of title 18, United States Code.'"[179]  It then represents that section 109 does not apply to McKinsey "by its clear terms."[180]

618.    However, the LSE McKinsey Report fails to address the conflicting fact that Bielenberg was, indeed, a member of the "staff" of the Oversight, which, by virtue as his status of partner at McKinsey, created a conflict of interest that rendered section 109(a) of PROMESA applicable.  Therefore, representing that section 109 "by its clear terms" did not apply to McKinsey, without equivocation, is false and misleading.

### f.    **Whether McKinsey had a conflict of interest**

---

[176] MacDougall, Ian, New York City Paid McKinsey Millions to Stem Jail Violence. Instead, Violence Soared, propublica.com (Dec. 10, 2019) (*available at* https://www.propublica.org/article/new-york-city-paid-mckinsey-millions-to-stem-jail-violence-instead-violence-soared).
[177] LSE McKinsey Report, at 54.
[178] *Id.* at 1-2.
[179] *Id.* at 84.
[180] *Id.* at 84.

619.   LSE reproduced a substantial excerpt from the McKinsey Response to the Oversight Boards RFP, dated Oct. 27, 2016, which represented

> *McKinsey [USG] does not have any current contracts with the Government of Puerto Rico or any of its instrumentalities. Further, to the best of McKinsey [USG]'s knowledge and belief, McKinsey [USG] does not currently have any conflict of interest or potential appearance of conflict of interest caused by any contract resulting from this request for proposal. Should McKinsey [USG] become aware of any actual or potential conflict of interest, McKinsey [USG] will provide notice to and work with the [Oversight] Board to provide a detailed mitigation plan if requested.[181]*

620.   However, the attached footnote explains

> *According to McKinsey, all of its government contracts are with this entity. McKinsey often uses the acronym "USG" – meaning United States Government – and we have adopted that acronym in this Report.[182]*

621.   Based on this footnote, it appears that the McKinsey's Response to the RFP does not actually indicate that it was completed by McKinsey USG, as suggested by the bracketed "[USG]".  Rather, it was based on some undisclosed McKinsey & Co. source.  Since the McKinsey Report is meant to address conflicts of interests, making what entity participated in certain events important, the addition of multiple "[USG]" brackets is deceptive and materially misleading.  In addition, it is possible that the original text states "McKinsey & Co," thus making the "[USG]" brackets even more deceptive and misleading.  However, this issue would have to be developed through discovery.

622.   Concerning the appointment of Aaron Bielenberg, the LSE McKinsey Report represents that, pursuant to the "Initial Consulting Agreement" between the Oversight Board and McKinsey, "McKinsey would...provide a team member, selected by the Governor of Puerto

---

[181] *Id.* at 22.
[182] *Id.*

187

Rico, to serve as the Commonwealth's interim Revitalization Coordinator." Then, the following

paragraph states

> *McKinsey assembled a team that had familiarity with Puerto Rico,
> as well as expertise in government consulting; infrastructure,
> strategy, and organization; organization and investments of state
> pension funds; sovereign balance sheet and debt management;
> restructuring; and tax.* **Aaron Bielenberg, a McKinsey associate
> principal, was appointed the interim Chief Revitalization
> Officer.**[183]

623.    As written, the sequencing of the text gives the impression that, as a result of the

Initial Consulting Agreement, Aaron Bielenberg was appointed as the Revitalization

Coordinator.  However, that is a false impression because Bielenberg was appointed on

November 9, 2016, *weeks before* the Initial Consulting Agreement was executed and *before*

McKinsey was even purportedly selected as the Commonwealth's strategic advisor.  LSE created

this false impression to obscure the fact that Bielenberg was a staff member of the Oversight

Board before McKinsey signed the Initial Consulting Agreement and, as a consequence, had a

conflict of interest in relation to Bielenberg as Revitalization Coordinator, based on their shared

interest in MIO.

624.    Moreover, Bielenberg was appointed as the Revitalization Coordinator "on a

permanent basis" pursuant to the letter of appointment from then Governor Alejandro García

Padilla.[184]  Therefore, the representation that he was appointed "interim" Revitalization

Coordinator is also false.

### g.  <u>MIO's ability to exercise control or influence third-party funds</u>

---

[183] LSE McKinsey Report, at 25.
[184] Padilla Letter to Bielenberg (November 9, 2016).

625.  The LSE McKinsey Report also represents that

> *MIO is now invested in Aristeia Partners LP and Aristeia International Limited, both of which are feeder funds for Aristeia Master LP (managed by Aristeia), over which MIO has no control or investment discretion.*[185]

### h.   **Conclusions Were Purportedly Based on Sufficient Evidentiary and the Independent Judgment of LSE**

626.  The LSE McKinsey Report was based on an insufficient evidentiary basis, effectively rendering statements that investigators "found no evidence" of certain propositions materially misleading. For example, the LSE McKinsey Report comments that "we have uncovered no evidence that information in MIO's possession concerning these investments was shared with the McKinsey Puerto Rico service team or any other McKinsey consultant."[186] However, considering that the LSE investigators, among other things, (i) did not interview the entire MIO Board; (ii) did not interview the MIO Investments Subcommittee; (iii) did not appear to interview J. Garcia; (iv), as conceded by the McKinsey Report, "[w]e did not serve subpoenas on McKinsey or MIO.  All documents were provided voluntarily";[187] and (v) "*other than information provided in response to this investigation, McKinsey did not provide information concerning MIO's direct investments in Puerto Rico public debt.*"[188]

627.  The LSE McKinsey Report also represents that

> *"We conducted interviews of 13 witnesses, some multiple times. Those witnesses included…[m]embers of the Oversight Board's Selection Committee appointed to conduct the strategic consultant*

[185] *Id.* at 69.
[186] *Id.* at 66.
[187] Case:17-03283-LTS Doc#:5154 Filed:02/18/19 Entered:02/18/19 10:00:08 Desc: Main Document Page 22 of 102
[188] LSE McKinsey Report, at 36 (emphasis added).

189

*RFP process; [t]he Oversight Board's General Counsel [Jamie El Koury]; [t]he Oversight Board's Ethics Advisor [Andrea Bonime-Blanc]; and [t]he Oversight Board's outside counsel at Proskauer[.]*

628.    However, the LSE McKinsey Report fails to indicate that the Oversight Board, El Koury, and Proskauer substantively contributed to the writing of the LSE McKinsey Report.  In fact, the Oversight Board and Proskauer provided "edits" to LSE for it to incorporate into the LSE McKinsey Report.

629.    In its "FOMB Annual Report for Fiscal Year 2019" dated July 31, 2019, the Oversight Board admits that LSE did not independently produce the LSE McKinsey Report.  In reality, LSE worked "in conjunction with the [Independent Ethics Auditor] and the FOMB General Counsel."[189]

630.    In addition, the LSE McKinsey Report represents that

*From the outset, McKinsey team has worked tirelessly – often times around the clock – and provided broad-based experience and expertise across a wide-range of areas to provide a skill set that few can match, and would be impossible for the Oversight Board to replicate internally.*

631.    This is advocacy and demonstrates that LSE McKinsey report lacked independence and was not the result of dispassionate investigation.

632.    LSE's time entries that cover the period in which LSE conducted its investigation and prepared its report, reveal the following facts:

- McKinsey sent LSE a confidentiality agreement at the onset of the investigation;[190]

---

[189] FOMB Annual Report Fiscal Year 2019, at 74.
[190] Case:17-03283-LTS Doc#:5778 Filed:03/18/19 Entered:03/18/19 15:37:00 Desc: Main Document Page 132 of 174

- On October 18, 2018, a Proskauer attorney spoke with S. Luskin "regarding confidentiality of report issued by McKinsey undertaken for Board and background documents."[191]

- On November 5, 2018, LSE conducted at least two telephone conferences with McKinsey relating to various drafts of the agreement;[192] and

- On November 12, 2018, Luskin sent emails concerning the proposed confidentiality agreement and paralegal Catherine D. Trieu reviewed and executed the LSE-McKinsey confidentiality agreement.[193]

633.    The LSE McKinsey Report fails to mention that LSE, the so-called "Independent Investigator," entered into a confidentiality agreement with McKinsey, which was the target of the investigation.[194]

634.    Several of the "witness interviews" occurred over the telephone, with two of the interviews appearing to have occurred simultaneously.[195]

635.    LSE spent a mere 18.4 hours in interviewing all thirteen fact witnesses.[196]

636.    On December 27, 2018, LSE started drafting the recommendations portion of its report following a phone call with Oversight Board members Gonzalez and Steel.  At that moment, LSE was in the middle of its investigation, as it had yet to conduct five of its thirteen witness interviews, including the Oversight Board's appointed ethics advisor.

---

[191] Case:17-03283-LTS Doc#:7045-2 Filed:05/21/19 Entered:05/21/19 18:08:46 Exhibit b Page 72 of 1071
[192] Id.
[193] Case:17-03283-LTS Doc#:5778 Filed:03/18/19 Entered:03/18/19 15:37:00 Desc: Main Document Page 133 of 174.
[194] Case:17-03283-LTS Doc#:5778 Filed:03/18/19 Entered:03/18/19 15:37:00 Desc: Main Document Page 132 of 174
[195] Witness interviews 9 and 10.
[196] See generally, Dkt 5778 and Dkt 7968.

637.    Between November 2018 and February 2019, LSE and members of the Oversight Board or its counsel participated in 27 separate telephone calls, including a weekly telephone conference with the Oversight Board specifically relating to the McKinsey Report.[197]

638.    On January 24, 2019, following a meeting between LSE and the attorneys for McKinsey and MIO regarding LSE's "report and recommendations," Stephan Hornung revised the report.[198]

639.    On January 31, 2019, LSE reviewed "edits" to the McKinsey Report made by the Oversight Board.[199]

640.    On February 4, 2019, Lucia Chapman "revised report conclusions and recommendations to incorporate input from [the Oversight Board]."[200]

641.    On February 8, 2019, ten days before the publication of the McKinsey Report, LSE participated in a meeting with McKinsey and MIO that lasted over two hours.[201]

642.    Following the February 8, 2019 meeting, but before the publication of the McKinsey Report on February 18, 2019, LSE would spend an additional 45 hours revising the McKinsey Report, including revisions following a phone call with the Oversight Board on February 11, 2019,[202] as well as "additional revisions to conform McKinsey information" made on February 17, 2019.[203] On February 18, 2019, the LSE published its LSE McKinsey Report.

643.    In addition, there is a pattern of concealment by Proskauer to obscure its involvement in LSE's investigation of McKinsey.  For example, LSE's fee application covering its investigation references two phone calls in which Bienenstock participated on November 5,

---

[197] See generally, Dkt 5778 and Dkt 7968.
[198] Case:17-03283-LTS Doc#:5778 Filed:03/18/19 Entered:03/18/19 15:37:00 Document Page 171 of 174
[199] Case:17-03283-LTS Doc#:5778 Filed:03/18/19 Entered:03/18/19 15:37:00 Document Page 173 of 174
[200] Case:17-03283-LTS Doc#:7968 Filed:07/15/19 Entered:07/15/19 16:18:13 Document Page 56-57 of 121
[201] Case:17-03283-LTS Doc#:7968 Filed:07/15/19 Entered:07/15/19 16:18:13 Document Page 57 of 121
[202] Case:17-03283-LTS Doc#:7968 Filed:07/15/19 Entered:07/15/19 16:18:13 Document Page 58 of 121.
[203] Case:17-03283-LTS Doc#:7968 Filed:07/15/19 Entered:07/15/19 16:18:13 Document Page 57-60 of 121.

2018[204] and January 25, 2019.[205]  However, Proskauer's time sheets covering the same period omit those phone calls.[206]  Another example involves the time entries relating to a November 26, 2018 conference call involving LSE and members of the Oversight Board.  While LSE's fee application does not indicate that Proskauer participated, Proskauer's fee application shows that, on that day and for the same duration of time (0.6 hrs), Proskauer attorney Brian Rosen participated in a "[c]onferance call with N. Jaresko and advisors regarding open issues and strategy."[207]  On information and belief, the LSE time entry and Proskauer time entry refer to the same conference call in which both parties participated.

644.    Moreover, the McKinsey Report does not disclose that Proskauer, in conjunction with KLD Discovery, created, maintained, and controlled the electronic platform that provided LSE access to McKinsey documents.  Moreover, Proskauer employees also conducted research services on behalf of LSE related to McKinsey.[208]

645.    On November 28, 2018, a Proskauer employee sent emails to KLDiscovery "regarding migration of McKinsey documents from PROMESA workspace to new McKinsey workspace," as well as emails "regarding copy of certain McKinsey domain documents from PROMESA workspace to new LSE workspace for review by LSE counsel."[209]

i.  **3.13.19 LSE McKinsey Report Hearing**

---

[204] Case:17-03283-LTS Doc#:5778 Filed:03/18/19 Entered:03/18/19 15:37:00 Document Page 172 of 174
[205] Case:17-03283-LTS Doc#:5778 Filed:03/18/19 Entered:03/18/19 15:37:00  Document Page 172 of 174
[206] *See generally*, Proskauer 5th Interim Fee Application, Case:17-03283-LTS Doc#:7045 Filed:05/21/19 Entered:05/21/19 18:08:46 Document Page 1 of 76
[207] Case:17-03283-LTS Doc#:7045-2 Filed:05/21/19 Entered:05/21/19 18:08:46 Desc: Exhibit b Page 332 of 1071
[208] Case:17-03283-LTS Doc#:7045-2 Filed:05/21/19 Entered:05/21/19 18:08:46 Desc:
Exhibit b Page 400 of 1071 (11/21/18 Run McKinsey searches for request from Luskin, Stern & Eisler (1.50)"); Dkt. 7045-2 Filed:05/21/19 Entered:05/21/19 18:08:46 Desc: Exhibit b Page 401 of 1071 ("11/21/18 Review search results for McKinsey search request from Luskin, Stern & Eisler (0.30)").
[209] Case:17-03283-LTS Doc#:7045-2 Filed:05/21/19 Entered:05/21/19 18:08:46 Desc:
Exhibit b Page 403 of 1071.

LSE McKinsey Report Hearing

646.   At the March 13, 2019 hearing, Luskin made the following representation

> *There was a time when McKinsey had direct investment in Puerto
> Rico public debt, since disposed of, and it did and does and
> presumably will continue to have indirect investments through
> third-party funds over which it has no discretion and no control,
> and that's not an unfamiliar structure. The difference in
> McKinsey's case is that there is common ownership at the very top
> of the investment vehicle or the investment business.[210]*

j.   **The Oversight Board's RFP Process and False Statements in McKinsey's**

   **Application**

647.   Omission: the LSE McKinsey Report acknowledges that "[o]n October 24, 2016,

the Oversight Board issued clarifications and additional guidelines to the Initial Consultant

RFP." However, it fails to mention the following relevant facts: (i) "clarifications and additional

guidelines" encouraged applicants to submit "fixed price" bids; (ii) that the Oversight Board had

not made a similar request in any other RFP; and (iii) that such a request was not only

exceedingly unusual but also counterintuitive given how the evaluation of the reasonableness of

attorneys' fees is based primarily on a comparison of hourly rates of professionals in their

practice and locality.

648.   The LSE McKinsey Report states that the application for the RFP required the

applicant to "state if you have any conflict of interest or potential appearance of conflict of

interest in taking this engagement by virtue of your firm's current or prior engagements with

other parties."[211]

---

[210] Transcript, March 13, 2019 Hearing, Case:17-03283-LTS Doc#:5969 Filed:03/21/19 Entered:03/21/19 11:13:24
Desc: Main Document Page 44 of 83.
[211] LSE McKinsey Report, at 27 of 102.

649.    According to the LSE McKinsey Report, McKinsey represented that it was "not conflicted" and that it could "credibly act without conflicts or bias."[212]  Moreover, McKinsey represented that

> *McKinsey did not disclose the existence or ownership of MIO or its place in McKinsey's corporate structure or its relationship to McKinsey USG, or its purpose as an investment vehicle for current and former McKinsey partners and their families. Nor did McKinsey USG disclose that MIO was invested (both directly and through third-party funds) in Puerto Rico public debt.*

650.    However, the LSE McKinsey Report excuses McKinsey's failure to disclose its conflict of interest on the RFP application because it "did not specifically ask applicants about their affiliates or whether applicants had an investment arm or whether they had pension funds or other investment vehicles with investments in Puerto Rico public debt."[213]

651.    This amounts to a misrepresentation because whether the RFP application specifically asked about affiliates or investment funds is irrelevant to whether McKinsey had a conflict of interest because of MIO's investment in Puerto Rico debt or whether McKinsey falsely claimed that it was "not conflicted" and "could credibly act without conflicts or bias" on the RFP application.  The LSE McKinsey Report misleading implies that McKinsey was not required to disclose the conflict because the RFP did not specifically state which McKinsey entities were relevant to the conflict analysis.  However, even if that were true, and McKinsey were not required to disclose the conflict, it still had a conflict of interest, through MIO, which violated section 109(a) of PROMESA and, by extension, 18 U.S.C.S. § 208(a).  Suggesting that the fact that the RFP application's failure to identify specific affiliates or investment funds is outcome determinative is, therefore, false and misleading.

---

[212] LSE McKinsey Report, at 29 of 102.
[213] LSE McKinsey Report, at 27 of 102.

195

## XVIII. <u>Fixing of Professional Fees</u>

### a.  <u>GSA Report</u>

652.     On July 23, 2019, the Office of the Inspector General issued its report "Improper

Pricing on the McKinsey Professional Services Contract May Cost the United States an

Estimated $69 Million"[214] in relation to a 2016 GSA services contract award to McKinsey DC by

the Federal Acquisition Service ("FAS").[215]

653.     Among other things, the IG's Report concluded that the award of the McKinsey

contract for consulting services violated "applicable laws, regulation, and policies," citing the

use of "invalid price comparisons, reliance on "unsupported information, and "insufficient

analyses to justify the awarded contract pricing."[216]

654.     The IG's Report made four major findings, including

a.   *<u>Finding 1</u>* – "Awarded contact services to no comply with regulations for

Federal Supply Schedule contracts."[217]

b.   *<u>Finding 2</u>* – "The Division Direct Performed Invalid and Unsupported Price

Analyses."[218]

c.   *<u>Finding 3</u>* – "The Division Director violated the standards of ethical conduct

by advocating on behalf of McKinsey."[219]

---

[214]GSA Report, "Improper Pricing on the McKinsey Professional Services Contract May Cost the United States an Estimated $69 Million," gsaig.gov (July 23, 2019) (last accessed February 12, 2020) (hereinafter, the "IG's Report") (*available at* https://www.gsaig.gov/sites/default/files/audit-reports/A170118_1.pdf).
[215] GSA Contract Number GS-10F-01185 (hereinafter, the "McKinsey Contract")
[216] IG's Report, at 5.
[217] *Id.* at 5.
[218] *Id.* at 6.
[219] *Id.* at 9.

    d. **_Finding 4_** – "The Division Director impeded the audit of the proposed pricing by failing to take appropriate action to obtain required data to complete the preaward audit.[220]

655.    The IG's Report also found that the potential cost to taxpayers is "an additional $69 million over the course of the option period."

656.    The IG's Report set forth relevant background details, including

> *On January 27, 2006, FAS awarded Contract Number GS-10F-0118S to McKinsey. The contract was for 5 years with three 5-year renewal options. Under its contract, McKinsey offers management consulting services to improve performance issues related to strategy, organization, operations, and business technology. McKinsey's contract offers weekly team- based pricing as opposed to hourly labor category-based pricing. The current contract option expires on January 26, 2021.*

> *In July 2015, as part of its offer to renew the contract, McKinsey proposed no change to its existing weekly team-based rates for the option period. The contracting officer awarded the contract option effective January 27, 2016, with no change in pricing pending the results of a preaward audit.*

> *The preaward audit of McKinsey's proposal was performed and the report was issued on March 24, 2016. The report found that McKinsey's proposal did not provide sufficient information for the government to evaluate the offered pricing or establish fair and reasonable contract prices. **The audit determined that McKinsey should provide either related party commercial sales from its parent company, McKinsey & Company, Inc., or cost buildup information to support its proposed pricing. McKinsey refused to provide either.** As a result, the report advised the contracting officer to require McKinsey to provide this information or cancel McKinsey's contract. On May 19, 2016, the initial contracting officer formally agreed with the preaward audit findings and attempted to obtain the required audit information.*

> *Subsequently, between July 6 and July 15, 2016, McKinsey exchanged several emails with the FAS Chief of Staff and the GSA Administrator's assistant regarding concerns about its contract*

---

[220] *Id.* at 13.

*and the contracting officer. The Administrator's assistant engaged
the FAS Chief of Staff to look into the issue. The FAS Chief of Staff
repeatedly encouraged McKinsey to address its concerns with the
contracting officer. The FAS Regional Commissioner agreed and
on July 13, 2016, emailed the FAS Chief of Staff stating, "[S]enior
GSA Leadership should not be involved in this." Following this
communication, the GSA Administrator's office and the FAS Chief
of Staff became less involved in the contract. On the same day, the
Division Director began assisting the contracting officer with
contract negotiations.*

*On July 28, 2016, the Division Director asked the audit team for a
list of information needed for the audit so he could forward it to
McKinsey. The audit team provided the list to the contracting
officer.* ***However, the Division Director subsequently altered the
list by deleting the requests for information from McKinsey's
parent company and deleting any references to cost buildup
information.*** *The altered list was forwarded to McKinsey on
August 2, 2016. On August 4, 2016, the audit team learned about
the altered list and contacted the contracting officer because the
audit team disagreed with the changes and sought to clarify the
request. On August 29, 2016, McKinsey provided information in
response to the altered list.*

***On August 30, 2016 – while the Division Director was
negotiating the option pricing – the FAS Regional Commissioner
met with McKinsey's Senior Partner at McKinsey's Washington,
D.C. offices.*** *The FAS Regional Commissioner told us this was a
one-on-one meeting and that they did not discuss anything specific
to the contract.*

*On August 31, 2016, the audit team informed the contracting
officer that the information McKinsey provided was not responsive
to the audit requests Although the Division Director did not obtain
the information the audit team needed. he moved forward with
negotiating the contract pricing. On September 21, 2016, the
Division Director provided the audit team with the draft pricing
award documents.* ***On the same day, the Division Director wrote a
memorandum which formally reassigned the contract
negotiations from the contracting officer to himself. On
September 28, 2016, the audit team informed the Division
Director that the draft pricing award documents did not address
the audit findings. Despite the outstanding audit issues, the
Division Director awarded the pricing modification to McKinsey
on October 5, 2016.***

*The awarded pricing was at least 10 percent higher than the rates originally proposed by McKinsey.[221]*

**i.   Finding 1: Awarded Contract Services Do Not Comply with Regulations for Federal Supply Schedule Contracts**

657.    The IG's Report concluded that the McKinsey's consulting "contract terms, conditions, and offered services do not comply with applicable laws and regulations."[222]

658.    Specifically, the IG's Report cites Federal Acquisition Regulation 8.404(d),[223] providing

> *Use of Federal Supply Schedules. Services offered on the schedule are priced either at hourly rates, or at a fixed price for performance of a specific task (e.g., installation, maintenance, and repair)."*

659.    The IG's Report determined that (i) the McKinsey services contract was subject to the regulation and (ii) failed to comply with FAR 8.404(d).[224]

660.    According to the IG's Report, the GSA Division responsible for awarding the contract was unable to identify basic terms of the contract when interviewed:

> *[the Division Director] could not define what specific task the government would receive for a week of McKinsey's services or what constituted "full-time" or "part-time" staff as included in the contract. When questioned how many hours are included in McKinsey's weekly rates, the Division Director responded that the number of hours is irrelevant because McKinsey provides services without defined hours. However, the Division Director could not identify any contract clause that would hold McKinsey accountable for performance of any specific task.[225]*

---

[221] *Id.* at 1-3.
[222] *Id.* at 5.
[223] FAR 8.404(d) ("FAR").
[224] *Id.* at  ("McKinsey's contract is a services contract, but it does not meet these requirements. The contract includes team-based weekly rates but does not define the number of people on each team, the number of hours each employee is required to work, or specific tasks to be performed.").
[225] *Id.* at 5 (emphasis added).

ii. **Finding 2: The Division Director Failed to Comply with Regulations for**

**Federal Supply Schedule Contracts**

661.     Among other things, the IG's Report found that the Division Director "performed

invalid, unsupported, and insufficient analysis of McKinsey's proposed contract rates" and "did

not appropriately determine the negotiated rates as fair and reasonable." Therefore, the IG's

Report concluded, "the Division Director's determination that McKinsey's contracting pricing is

fair and reasonable is <u>baseless</u>."[226]

662.     In support of its conclusion, the IG's Report cited "numerous problems with the

price analysis performed in awarding the contract pricing modification," including

- *Used unsupported information to convert the proposed weekly rates to hourly rates;*
- *Performed invalid price comparisons of the proposed rates to future competitor rates;*
- *Performed invalid price comparisons of the proposed labor categories to competitor labor categories requiring more experience;*
- *Manipulated the GSA Pricing Tool to skew the price analysis;*
- *Analyzed an outdated pricing proposal;*
- *Overestimated weekly rates for McKinsey competitors;*
- *Failed to consider information showing pricing exceeds market rates; and*
- *Incorrectly claimed cost savings despite the substantial increase in government costs.*[227]

663.     Concerning the claim that the Division Director used unsupported information to

justify McKinsey's rates, the IG's Report states that Division Director had

> *converted McKinsey's weekly rates to hourly rates by assuming McKinsey team members work 65 hours per week. In an interview, the Division Director acknowledged that he had <u>no support</u> for using a 65-hour week. By using the 65-hour week, the Division*

---

[226] *Id.* at 9.
[227] *Id.* at 6.

200

> *Director's computed hourly rates <u>appeared more reasonable</u> compared to a standard 40-hour week. However, these computed <u>hourly rates were still high</u>: the Division Director calculated rates for an Associate with 1 year of experience at $467 per hour ($1.6 million per year) and an Engagement Manager with 2 years of experience at $1,046 per hour ($3.5 million per year).[228]*

84.     According to the IG's Report own analysis, the McKinsey's rate increases throughout the original contract period exceeded market rates by 43 to 53 percent, while the existing contract rate exceeded market prices by as much as 193 percent.[229] "However, the Division Director disregarded this information in evaluating both the 10 to 11 percent price increase and the subsequent 3 percent increase."[230]

### iii.   <u>Finding 3: The Division Director Violated the Standards of Ethical Conduct by Advocating on Behalf of McKinsey</u>

664.     The IG's Report found that that the Division Director had advocated on behalf of McKinsey and thereby violated applicable standards of ethical conduct.[231]

665.     For example, the IG's report cites as applicable FAR 3.101-1 *Standards of Conduct – General*, providing

> *Government business shall be conducted in a manner above reproach and, except as authorized by statute or regulation, with complete impartiality and with preferential treatment for none.* **Transactions relating to the expenditure of public funds require the highest degree of public trust and an impeccable standard of conduct. The general rule is to avoid strictly any conflict of interest or even the appearance of a conflict of interest in Government- contractor relationships.** *While many Federal laws and regulations place restrictions on the actions of Government personnel, their official conduct must, in addition, be such that*

---

[228] *Id.* at 6-7 (emphasis added).
[229] *Id.* at 8.
[230] *Id.* (emphases added).
[231] *Id.* at 9-10.

> *they would have no reluctance to make a full public disclosure of
> their actions.*[232]

666.    In addition, the IG's Report cites as applicable the Standards of Ethical Conduct

for Employees of the Executive Branch which provides "[e]mployees shall endeavor to avoid

any actions creating the appearance that they are violating the law or the ethical standards."[233]

667.    In support of its conclusion that the Division Director advocated for McKinsey on

the GSA contract, the IG's Report details the following facts and circumstances:

> *At McKinsey's request, the Division Director acted on behalf of
> the contractor to help it obtain a separate contract with FAS's
> Schedule 70 for information technology professional services. **The
> Division Director intervened in the matter to assist McKinsey
> even though he was not the assigned contracting officer and
> could not justify his involvement in the contract award.***
>
> *McKinsey failed multiple times to obtain a Schedule 70 contract
> through FAS's Fort Worth, Texas office. The Fort Worth
> contracting officer handling these offers told us **she could not
> determine McKinsey's offer to be fair and reasonable, stating
> McKinsey's rates were "ridiculous" and unsupported**. She also
> stated that McKinsey's consultant told her if she kept rejecting the
> offers, **McKinsey would continue resubmitting until it received a
> contract**.*
>
> *After failing to persuade the Fort Worth contracting officer to
> accept its offer, McKinsey asked the Division Director to
> intervene.*
>
> ***On September 8, 2016, a McKinsey representative sent the
> following memo to the Division Director****:*
>
> > We would really appreciate it if you could assist us
> > with our Schedule 70 application. In particular,
> > given that you understand our model, it would be
> > enormously helpful if you could help the Schedule
> > 70 Contracting Officer understand how it benefits
> > the government.

---

[232] *Id.* at 10 (emphasis added).
[233] *Id.*

202

**On November 28, 2016, the Division Director sent an email to GSA's FAS Washington Branch Chief and other GSA personnel, stating**:

> [McKinsey] told us [the Schedule 70 offer] was rejected due to issues in pricing documentation. We went through an audit with [McKinsey] and have just updated pricing. They would like to get on [Schedule] 70, and asked us if we could reach out and walk you through how we were able to substantiate the pricing.

**On February 13, 2017, the Division Director and the Washington Branch Chief met with McKinsey representatives in Washington, D.C.** On February 24, 2017, McKinsey resubmitted its Schedule 70 offer and sent the Washington Branch Chief an email notifying him of the submission.

Schedule 70's normal practice is to assign resubmitted offers to the contracting officer who handled the previous rejection. **However, the McKinsey Schedule 70 offer was not handled according to this practice. Instead of being assigned to the Fort Worth contracting officer, it was assigned to the Washington, D.C. office.**

The Washington Branch Chief told us he did not know why the contract was transferred to his office. **However, GSA emails show that on the same day the Washington Branch Chief received notice from McKinsey of its resubmitted offer, the Branch Chief sent an email to the responsible Schedule 70 analyst specifically requesting assignment of the offer to the Washington Branch.**

The Washington Branch Chief also stated he did not know the contract was previously rejected by the Fort Worth office. **However, he was included in the Division Director's November 28, 2016, email described above regarding the rejection of McKinsey's previous offers**. The same November 28, 2016, email chain discussed Schedule 70's practice of assigning resubmitted offers to the contracting officer who handled the previous rejection....

When we asked the Division Director about his involvement with McKinsey's Schedule 70 offer, he initially told us that he called the Washington Branch Chief to offer assistance in leveraging the work the Division Director had already done. He later stated, "My only interest is helping out my contractor."

203

> *In this instance, the Division Director acted as an advocate for*
> *McKinsey by contacting Schedule 70 personnel regarding*
> *McKinsey's proposal. In addition,* **the Washington Branch Chief**
> **deviated from Schedule 70's normal procedure without a valid**
> **explanation to award the contract to McKinsey and provided**
> **inaccurate information in response to our inquiries regarding his**
> **involvement in the Schedule 70 contract award.**[234]

668.    In support of its conclusion that the Division Director advocated for McKinsey to

secure non-GSA contracts with other federal agencies, the IG's Report details the following:

> *McKinsey also requested the Division Director's help in obtaining*
> *various non-GSA contracts. For example, GSA documents show*
> *that McKinsey asked the Division Director to contact the National*
> *Oceanic and Atmospheric Administration (NOAA) to provide*
> *information on McKinsey's pricing structure in connection with*
> *McKinsey's efforts to secure a contract with that agency.*
>
> ***In an email exchange with a McKinsey representative dated***
> ***February 14, 2017***, *the Division Director stated:*
>
>> The below [table] helped us "deconstruct" the team
>> and price it based upon our typical market survey
>> methodology. We also analyzed financial
>> information from the financial statements
>> provided...**I have a feeling NOAA would like this**
>> **information, but we would not provide without**
>> **further discussion with McKinsey.**
>
> ***The McKinsey representative replied:***
>
>> Thank you for yesterday and for talking to NOAA.
>> We are comfortable with you sharing the table with
>> NOAA. **If you could add the following, that**
>> **would be great.**
>>
>> *McKinsey prices on a firm-fixed price basis and
>> not on an hourly basis. The estimated hours are not
>> a commitment but are reflective of the average time
>> spent on similar projects and are for evaluation
>> purposes only. We would prefer to not share
>> financials unless asked.[235]

---

[234] *Id.* at 10-12 (emphasis added).
[235] *Id.* at 12 (emphasis added).

*Similarly, McKinsey requested the Division Director's assistance with its efforts to obtain a contract with the Department of Interior.*

**On April 16, 2018, the McKinsey representative sent an email to the Division Director** *stating:*

> I hope all is well. I just left you a voicemail. We would really appreciate your help in talking to the person listed below from the Department of the Interior. She is asking for hourly information that we don't have (as you know well), and we thought maybe talking to you would be helpful. Would you be willing to call her and explain how you were able to do a price justification?

*GSA documents reflect that McKinsey made similar requests of the Division Director in early 2018 with respect to its efforts to obtain a contract with the Centers for Medicare and Medicaid Services.*

**The Division Director acknowledged to the OIG that he contacted other agencies at McKinsey's request** *and discussed McKinsey's pricing structure with them. When we asked why he did this, he said that he "talk[ed] with contractors all the time."* **However, he said he could not recall sharing pricing information with other agencies at any other contractor's request**. *We asked multiple contracting officers if it was normal for a contractor to request their assistance in obtaining another federal contract.* **We were repeatedly told it is not, and it would be "inappropriate" and "a conflict of interest."**[236]

#### iv.  Finding 4: The Division Director Impeded the Audit of the Proposed Pricing

669.    The IG's Report concluded that the Division Director "impeded the audit of the proposed pricing by failing to take appropriate action to obtain required data to complete the preaudit award."[237]

670.    In support of this conclusion, the IG's Report sets forth the following facts and circumstances:

---

[236] *Id.* at 12-13 (emphasis added).
[237] *Id.* at 13.

- [A] preaward audit was performed on McKinsey's proposal to extend the contract for the current option and the audit report was issued on March 24, 2016;

- The audit found that McKinsey's proposal did not provide sufficient information to evaluate the offered pricing or establish fair and reasonable contract prices;

- The audit determined that McKinsey should provide either related party commercial sales from its parent company, McKinsey & Company, Inc., or cost buildup information to support its proposed pricing;

- However, McKinsey refused [to provide the requested information].

- As a result, the audit advised the contracting officer to require McKinsey to provide this information or cancel McKinsey's contract;

- The initial contracting officer agreed with the preaward audit findings and attempted to obtain the required audit information.

- However, the Division Director removed the initial contracting officer from the contract.

- Then, on October 5, 2016, the Division Director awarded contract pricing at rates at least 10 percent higher than McKinsey originally proposed.[238]

b. **Price-Fixing Among Advisors**

671.    McKinsey sets the professional fees by coordinating with other advisors.  This fact is made obvious by reviewing the time sheets submitted by various advisors.

---

[238] *Id.* (formatting and punctuation modified).

672.    For example, on March 8, 2018, O. Shah of McKinsey shared a phone call with P. Nielsen of Ankura "to discuss the revised fiscal plan assumptions related to professional fees." Following the phone call, Nielson performed the following legal services: (i) "[r]evise[d] professional fees forecast based on latest call with O. Shah (McK) to be incorporated in the revised fiscal plan; and (ii) "[r]evise[d] professional fees presentation for review of McKinsey **in order to agree on the assumed level of professional fees** in the revised fiscal plan."[239] Later the same day, Nilsen had a follow-up phone call with O. Shah and J. Reed of McKinsey to discuss "professional fees assumptions within the revised fiscal plan."  In addition, D. Batlle, senior managing director at Ankura, held a conference call with "representatives of McKinsey...related to professional fees to be incorporated in the revised fiscal plan."

673.    These admissions establish that McKinsey and Ankura sought to enter into an illegal agreement to fix professional fees and provides probative evidence of the wider hub-and-spoke scheme to fix professional fees.  In addition, phone calls made pursuant to this illegal scheme constitute wire fraud.[240]

674.    On March 9, 2018, the following day, Nilsen "[r]evise[d] the professional fees forecast within the revised fiscal plan ***based on assumptions provided by J. Reed (McKinsey)***.[241] That same day, F. Batlle shared a phone call with Defendant G. Portella of AAFAF to discuss "discuss professional fees projection worksheet and assumptions."

675.    On March 15, 2018, F. Batlle and P. Nilsen participated in a conference call with "representatives of McKinsey regarding the latest update to the professional fees forecast."  The

---

[239] *See* Third Interim Fee Application of Ankura Consulting Group, LLC For Compensation For Services Rendered And Reimbursement Of Expenses As Financial Advisors To The Commonwealth of Puerto Rico For The Period February 1, 2018 Through May 31, 2018, Case No. 17-03283-LTS, Dkt. 3564, at 145 (July 16, 2018) (emphasis added) (hereinafter, "Ankura Third Fee App").
[240] *See* 18 U.S.C. § 1343.
[241] Ankura Third Fee App, at 148.

same day, Nilsen again "[r]evise[d] professional fees forecast based on latest update from McKinsey regarding creditor advisory fees."

676.    The very next day, on March 16, 2018, F. Batlle and P. Nilsen participated in yet another conference call with "representatives of McKinsey regarding the inclusion of the latest version of the professional fees forecast within the revised fiscal plan." Also on the same day, Nilsen "[r]eview[ed] the latest version of the professional fees forecast ***provided by J. Reed (McK) for inclusion*** in the revised fiscal plan."

677.    Then on March 16, 2018, Nilsen "[r]eview[ed] the latest version of the professional fees professional fees forecast ***provided by J. Reed (McK) for inclusion*** in the revised fiscal plan." In addition, on March 21, 2018, P. Nilsen "[r]eview latest professional fee presentation ***provided by FOMB***."

678.    On April 3 and 4, 2018, P. Nilsen "[c]orrespond[ed] with J. Rodriguez (BAML) regarding the methodology for BAML professional fees." On information and belief, the correspondence referenced here relates to an email or messenger exchange between P. Nilsen and J. Rodriguez coordinating the execution of the unlawful price-fixing scheme. Also on April 4, 2018, P. Nilsen "[r]evise[ed] the professional fees estimate based on comments provided by J. Rodriguez (BAML)." This admission establishes an illegal agreement between conspirators Ankura and BAML to fix professional fees and provides probative evidence of the wider professional price-fixing scheme.

679.    On April 9 and 24, 2018, D. Mondell of Rothschild participated in meetings described as "[m]eeting re fee application process." The corresponding time entries do not identify the other parties that participated in these meetings. Similarly, on May 29, 2018, D. Mondell and B. Meisel of Rothschild participated in a meeting described as "[m]eeting re fee

208

application process." The corresponding time entry does not identify which other parties

participated in this meeting.  Notably, on May 31, 2018, Reorg.com published an article entitled

"AAFAF Lowers Rothschild Compensation Cap Amid Cost-Savings Efforts." On information

and belief, these meetings included, as a minimum, AAFAF, and involved  discussions in

furtherance of the unlawful professional price-fixing scheme.

680.    These admissions show that (i) McKinsey and Ankura had reached an initial

agreement on the amount(s) at which professional fees would be set; (ii) on information and

belief, Ankura communicated McKinsey's assumptions, *i.e.*, the agreed upon fixed-price for

professional fees, to co-conspirator Portella at AAFAF, J. Gavin at Citi, J. Rodriguez at BAML

in furtherance of the unlawful price-fixing scheme; and (iii) McKinsey and other co-conspirators

modified the amounts at which professional fees would be set from time to time.

681.    On March 29, 2018, F. Batlle shared a phone call with Defendant J. Gavin of

Citigroup "to discuss various topics including professional fees, plan of adjustment strategy." On

information and belief, F. Batlle communicated McKinsey's assumptions, *i.e.*, the agreed upon

fixed-price for professional fees, to co-conspirator J. Gavin in furtherance of the unlawful

professional price-fixing scheme.

682.    Although not an exhaustive, the following is an illustrative sample set of

communications and work assignments between McKinsey and other members of the hub-and-

spoke conspiracy that demonstrates the existence of the unlawful agreement to fix professional

fees during the Title III proceedings and, as such, (i) establishes that calls made in furtherance of

the scheme constitute instances of wire fraud and (ii) instances of revisions made to fiscal plan

incorporating the scheme demonstrate an intent to defraud and further establishes that the

mailing of those revised fiscal plans constitute mail fraud:

## Price-Fixing Communications Table

| No. | Date | Parties | Hours | Description |
|-----|------|---------|-------|-------------|
| 1. | 3/1/18 | McKinsey (O. Shah), Ankura (Batlle, Fernando) | 0.1 | Participate on call with O. Shah (McK) to review professional services fees forecast.[242] |
| 2. | 3/3/18 | McKinsey (O. Shah), Ankura (Batlle, Fernando) | 0.1 | Participate on call with O. Shah (McK) to discuss professional fees projection.[243] |
| 3. | 3/6/18 | McKinsey (O. Shah), Ankura (P. Nilsen) | 0.7 | "Participate on a call with O. Shah (McK) to discuss the revised fiscal plan assumptions related to professional fees"[244] |
| 4. | 3/8/18 | McKinsey (O. Shah), Ankura (P. Nilsen) | 1.3 | "Revise professional fees forecast based on latest call with O. Shah (McK) to be incorporated in the revised fiscal plan"[245] |
| 5. | 3/8/18 | McKinsey (O. Shah), Ankura (P. Nilsen) | 1.2 | "Revise professional fees presentation for review of McKinsey **in order to agree** on the assumed **level of professional fees** in the revised fiscal plan"[246] |
| 6. | 3/8/18 | McKinsey (O. Shah, J. Reed), Ankura (P. Nilsen) | 0.6 | Participate on a call with O. Shah (McK) and J. Reed (McK) regarding professional fees assumptions within the revised fiscal plan.[247] |
| 7. | 3/8/18 | Ankura (P. Nilsen) | 1.3 | Revise professional fees forecast based on latest call with O. Shah (McK) to be incorporated in the revised fiscal plan.[248] |
| 8. | 3/8/18 | Ankura (F. Batlle), others | 0.5 | Participate in conference call with representatives of McKinsey to discuss assumptions to related to professional fees to be incorporated in the revised fiscal plan.[249] |
| 9. | 3/9/18 | Ankura (P. Nilsen) | 2.0 | Revise the professional fees forecast within the revised fiscal plan **based on assumptions provided by J. Reed (McKinsey)**.[250] |
| 10. | 3/9/18 | Ankura (Batlle, Fernando), AAFAF (G. Franco) | 0.2 | Participate on call with G. Portela (AAFAF) to discuss professional fees projection worksheet and assumptions.[251] |
| 11. | 3/13/18 | McKinsey, Ankura (F. Batlle) | 0.8 | Participate on conference call with representatives from McKinsey to discuss |

---

[242] Third Interim Ankura Fee App, at 131.
[243] Id. at 133.
[244] Id. at 138.
[245] Id. at 144.
[246] Id. at 145.
[247] Id. at 146.
[248] Id. at 144.
[249] Id. at 147.
[250] Id. at 148.
[251] Id. at 151.

| No. | Date | Parties | Hours | Description |
|---|---|---|---|---|
| | | | | professional fee projections assumptions included in the revised fiscal plan.[252] |
| 12. | 3/15/18 | McKinsey, Ankura (F. Batlle, P. Nilsen) | 0.9 | Participate on phone call with F. Batlle (ACG) and representatives of McKinsey regarding the latest update to the professional fees forecast.[253] |
| 13. | 3/15/18 | Ankura (Nilsen, Patrick) | 1.5 | Revise professional fees forecast based on latest update from McKinsey regarding creditor advisory fees.[254] |
| 14. | 3/16/18 | McKinsey, Ankura (F. Batlle, P. Nilsen) | 0.8 | Participate on phone call with P. Nilsen (ACG) and representatives of McKinsey regarding the inclusion of the latest version of the professional fees forecast within the revised fiscal plan.[255] |
| 15. | 3/16/18 | Ankura (P. Nilsen) | 0.4 | Review the latest version of the professional fees *forecast provided by J. Reed (McK) for inclusion* in the revised fiscal plan.[256] |
| 16. | 3/20/18 | McKinsey (O. Shah), Ankura (F. Batlle) | 0.4 | Participate on telephone call with O. Shah (McK) to discuss professional fee projection assumptions and status of open items in fiscal plan.[257] |
| 17. | 3/21/18 | Ankura (P. Nilsen) | 1.5 | Review latest professional fee presentation *provided by FOMB*. |
| 18. | 3/22/18 | McKinsey (O. Shah), Ankura (Nilsen, Patrick) | 0.3 | Correspond with O. Shah (McK) regarding FOMB professional fee assumptions.[258] |
| 19. | 3/23/18 | Ankura (P. Nilsen) | 1.6 | Revise the professional fees estimate based on the latest information from McKinsey and the FOMB. |
| 20. | 3/23/18 | Ankura (P. Nilsen) | 1.0 | Review FY18 Title III payments to create a FY18 forecast for professional fees. |
| 21. | 3/29/18 | Citi (J. Gavin), Ankura (F. Batlle) | 1.2 | Participate in meeting with J. Gavin (Citi) to discuss various topics including professional fees, plan of adjustment strategy.[259] |
| 22. | 4/3/18 | AAFAF (M. Yassin), Ankura (P. Nilsen) | 3.1 | Revise the professional fees estimate based on comments provided by M. Yassin (AAFAF) for inclusion within the revised fiscal plan. |
| 23. | 4/4/18 | McKinsey (J. Reed), Ankura (F. Batlle) | 0.5 | Participate on call with J. Reed (McK) to discuss professional fees projections update.[260] |
| 24. | 4/4/18 | McKinsey (J. | 0.4 | Participate on call with J. Reed (McK) to review |

[252] *Id.* at 155.
[253] *Id.* at 161.
[254] *Id.* at 160.
[255] *Id.* at 164.
[256] *Id.* at 165.
[257] *Id.* at 172.
[258] *Id.* at 178.
[259] *Id.* at 187.
[260] *Id.* at 211.

| No. | Date | Parties | Hours | Description |
|---|---|---|---|---|
| | | Reed), Ankura (F. Batlle) | | professional fees projection changes, disaster spend timing and other open items related to fiscal plan.[261] |
| 25. | 4/3/18 | BAML, Ankura (P. Nilsen) | 0.3 | Correspond with J. Rodriguez (BAML) regarding the methodology for BAML professional fees. |
| 26. | 4/4/18 | BAML, Ankura (P. Nilsen) | 0.4 | Correspond with J. Rodriguez (BAML) **regarding the** methodology for BAML professional fees.[262] |
| 27. | 4/4/18 | AAFAF (G. Franco, Ankura (F. Batlle) | 0.8 | Participate in meeting with M. Yassin (AAFAF) to discuss professional fee estimates. |
| 28. | 4/4/18 | Ankura (P. Nilsen) | 0.8 | Revise the professional fees estimate based on comments provided by J. Rodriguez (BAML). |
| 29. | 4/5/18 | McKinsey (J. Reed), Ankura (F. Batlle) | 0.7 | Participate on telephone call with J. Reed (McK) regarding the professional fees estimate included in the revised fiscal plan.[263] |
| 30. | 4/5/18 | Ankura (P. Nilsen) | 1.6 | Revise the professional fees estimate based on the latest FOMB estimate provided by J. Reed (McK).[264] |
| 31. | 4/9/2018 | Rothschild (D. Mondell) | 0.5 | Meeting re fee application process |
| 32. | 4/11/18 | McKinsey, Ankura (D. Barrett) | 4/11/18 | Participate on call with representatives from Ankura and McKinsey about professional fee schedule in revised fiscal plan. |
| 33. | 4/13/18 | Ankura (F. Batlle) | 0.4 | Update professional fees schedule to reflect revised liability management fees.[265] |
| 34. | 4/24/18 | Rothschild (D. Mondell) | 0.5 | Meeting re fee application process |
| 35. | 5/29/18 | Rothschild (D. Mondell, B. Meisel) | 0.5 | Meeting re fee application process |
| | | **5/31/2018: Reorg Article** **"AAFAF Lowers Rothschild Compensation Cap Amid Cost-Savings Efforts"** | | |
| 36. | 10/5/18 | McKinsey (O. Shah), Ankura, Battle, Fernando) | 0.4 | Participate on call with O. Shah (MCK) to discuss professional fees build and FY19 budget in the fiscal plan. |
| 37. | 10/15/18 | Ankura, (F. Battle) | 0.2 | Review revised professional fees schedule to be included in new fiscal plan. |
| 38. | 10/17/18 | McKinsey (O. | 0.1 | Participate on call with O. Shah (MCK) to |

---

[261] *Id.* at 212.
[262] *Id.* at 212.
[263] *Id.* at 212.
[264] *Id.* at 213.
[265] *Id.* at 217.

| No. | Date | Parties | Hours | Description |
|---|---|---|---|---|
|  |  | Shah), Ankura (F. Battle) |  | discuss professional fees included in revised fiscal plan. |
| 39. | 10/17/18 | Hacienda (O. Rodriguez), Ankura (F. Battle) | 0.1 | Participate on call with O. Rodriguez (Hacienda) to discuss revised professional fees budget. |
| 40. | 11/2/18 | AAFAF (S. Torres), Ankura (F. Battle) | 0.1 | Participate on call with S. Torres (AAFAF) regarding professional fees. |
| 41. | 11/2/18 | McKinsey (O. Shah), Ankura (F. Battle) | 0.1 | Participate on call with O. Shah (MCK) to discuss professional fee schedule. |
| 42. | 11/2/18 | Hacienda (O. Rodriguez), Ankura (F. Battle) | 0.1 | Participate on call with O. Rodriguez (Hacienda) to discuss professional fees budget. |
| 43. | 11/2/18 | Hacienda (O. Rodriguez), Ankura (F. Battle) | 0.1 | Participate on call with O. Rodriguez (Hacienda) to discuss revised professional fees schedule. |
| 44. | 11/6/18 | Hacienda (O. Rodriguez), Ankura (F. Battle) | 0.1 | Participate on call with O. Rodriguez (Hacienda) to discuss professional fees budget. |
| 45. | 12/10/18 | McKinsey (O. Shah), Ankura (F. Battle) | 0.2 | Participate on call with O. Shah (MCK) to discuss professional fees budget. |

### c.   *In re Dendreon* Pharmaceuticals

683.    Lazard was the financial adviser who marketed Dendreon (the Debtor) and

matched Valeant's subsidiary, Drone Acquisition Sub Inc., as the purchaser of the debtor.[266]

684.    On November 11, 2014, Skadden filed the debtors' motion to retain Lazard Freres

& Co., LLC, as investment banker to provide marketing services in connection to the

contemplated § 363 sale of all or substantially all of the debtors' assets.[267]

---

[266] See Objection to Motion to Stay, *In re Dendreon Corp., et al.*, Case 14-12515-LSS Doc 554 Filed 04/07/15 Page 3 of 10 ("Mr. Aebersold is a Managing Director at Lazard Freres & Co. LLC ("Lazard"), the Debtors' investment banker, and has been one of the principal personnel working on Lazard's engagement with the Debtors... Among other things, Mr. Aebersold testified to the extensive and public marketing process for the Acquired Assets and his conclusion that the Sale Transaction represented the highest and best offer attainable for the Acquired Assets) (internal citations omitted).
[267] *In re Dendreon*, Case 14-12515-PJW Doc 73 Filed 11/12/14.

685.    According to the US Trustee for Region 3, the UST had consented to the terms of the proposed Lazard's retention order in a November 24, 2014 email to Skadden (i.e., counsel for the debtors).[268]

686.    On December 8, 2014, Skadden attorney Sarah E. Pierce certified that she was "aware of no formal or informal objection or response" to Lazard's Retention Application.[269]

687.    In addition, Pierce certified that

> *proposed counsel for the Debtors [i.e., Skadden] has communicated with a representative from the Office of the United States Trustee, proposed counsel for the Creditors' Committee, and counsel for the Unaffiliated Noteholders, and each has approved the proposed Order as revised.*[270]

688.    However, Skadden added material terms to the proposed retention order filed with the court on December 8, 2015.[271]

689.    Specifically, the modified retention order added to paragraph 4 that Lazard would be entitled to an additional fee of $1.8 million, on top of a fixed fee of $5.5 million.  Further, paragraph 6 added the following language "…Lazard shall not be entitled to a Sale Transaction Fee, but shall be entitled to an Additional Fee as described above."[272]

690.    According to the U.S. Trustee, Skadden had "not discussed or disclosed to the U.S. Trustee" the additional terms prior to the December 8 filing of (i) the proposed order or (ii) Pierce's certification indicating the U.S. Trustee's approval.[273]

691.    The disclosure statement filed in support of the Amended Plan of Reorgnaization fails to acknowledge that McKinsey & Co. advised Dendreon prior to its filing for bankruptcy.[274]

---

[268] *In re Dendreon*, Case 14-12515-LSS Doc 859, at 3, FN 2 Filed 08/21/15.
[269] Certification of Counsel to Debtors' Application for Order Authorizing Retention of Lazard Frères & Co., Case No. 14-12515, Dkt. 145, at 1.
[270] Case 14-12515-PJW Doc 145 Filed 12/08/14 Page 2 of 3.
[271] Case 14-12515-PJW Doc 145 Filed 12/08/14 Page 2 of 3.
[272] Case 14-12515-PJW Doc 145 Filed 12/08/14 Page 2 of 3.
[273] Case 14-12515-PJW Doc 145 Filed 12/08/14 Page 2 of 3.

### d. **McKinsey's Service Contract with the Oversight Board**

692.     The Executive Director of the Oversight Board executed the Consulting Agreement, effective on July 3, 2017, on September 12, 2017. McKinsey executed the agreement on September 8, 2017. The Consulting Agreement has been renewed and amended several times.[275]

### e. **March 9, 2018 Hearing**

693.     During the hearing, the Fee Examiner Williamson represented to the Title III Court that,

> [t]he first is the particular challenge presented by McKinsey's work. It appears to be very high quality work, **but because of their internal system, put bluntly, they don't keep time like Mr. Bienenstock's firm keeps time. So that makes our job difficult, because there are no objective metrics.**[276]

694.     This representation is clearly false and materially misleading because McKinsey had, as recent as November 2016, provided hourly time sheets as part of their fee applications in bankruptcy proceedings, provided hourly rates and, therefore, could have produced such an objective metric to enable the Title III Court to determine whether the fees were reasonable.

695.     Instead, Williamson told the Title III Court that

> we suggest to the Court that there are two possibilities. One is simply for the Oversight Board, which receives McKinsey's work product, to, in a word, vouch for McKinsey. The other possibility is for us, under the Court's ultimate supervision, to work with McKinsey to provide some form of metric.
>
> And again, it's something that we think needs to be addressed because of the importance, and quite frankly, the expense of McKinsey's work and its importance to this whole process.

---

[274] Disclosure Statement for Amended Plan of Reorganization, Case 14-12515-LSS Doc 606 Filed 04/16/15.
[275] Case:17-03283-LTS Doc#:8330, at 2, FN2.
[276] Hearings Transcript March 6, 2018, Case:17-03283-LTS Doc#:2696 Filed:03/09/18 Entered:03/09/18 12:13:58 Desc: Main
Document Page 20 of 90

696.    Moreover, Williamson represented to the Title Court that

> **The number of skilled and gifted professionals in this case is really quite remarkable.** *And when, of course, I use the term professionals, I don't just mean counsel, I mean the financial advisors, the accounting firms, the consulting firms.* **Their services, as we say in the preface to the report, are absolutely essential to the island's recovery, and prospectively to its economic health.**
>
> **The skilled and gifted professionals** *who work with the Court and everyone on the island are entitled to be compensated fairly, at market rates, as long as their services are reasonable and necessary to the estate.*[277]

697.    These comments reveal that Williamson was, in fact, engaged in advocacy for McKinsey and that he lacked the objectivity and impartiality required of a fee examiner. Furthermore, the comments show which party was truly directing and controlled the fee application process: McKinsey.

### f.   June 6, 2018 Hearing on McKinsey's Fee Application

698.    On June 6, 2018, the Title III Court held a hearing on McKinsey's fee applications, among other things.

699.    At the hearing, Katherine Stadler, on behalf of the fee examiner, told the court that the fee examiner and McKinsey had "reached an impasse" over McKinsey's refusal to provide time sheets identifying the services rendered and the time spent in sufficient detail to permit the fee examiner to evaluate the reasonableness and necessity of such charges.[278]

700.    According to Stadler, the fee examiner concluded that, because "the contract that McKinsey has with the Oversight Board simply does not lend itself to that type of analysis," the solution was to "to place the obligation for verifying reasonableness and necessity of that

---

[277] (emphasis added).
[278] Case:17-03283-LTS Doc#:3278 Filed:06/08/18 Entered:06/08/18 16:07:27 Desc: Main Document Page 52, 53 of 174.

particular professional's services on the party most familiar with those services, **which would be the Board**."[279]

701.    However, the Title III Court, however, declined to delegate the reasonability to the Oversight Board, explaining that it has a "built-in interest in saying that everything's come out fine" since it "hired and signed that contract in the first place[.]"[280]

702.    Instead, the Title III Court directed the fee examiner to require that McKinsey submit objective metrics as part of its application, including the "numbers of people involved in project, in some sort of meaningful numbers, the amount of time spent on particular projects during particular periods, identifying deliverables." Only such by relying on such "benchmarks" would the fee examiner "be able to make some sort of recommendation to the Court on McKinsey's flat fee application.

703.    At no time during the hearing did the fee examiner inform the Title III Court that, as recent as March 2016, McKinsey had provided detailed time sheets, including a description of the services rendered, documentation of time spent, and an hourly rate, as part of their fee applications in its bankruptcy work.[281]

704.    Furthermore, at no time during the hearing did the fee examiner inform the Title III Court that prior to McKinsey's selection as strategic consultant, on October 24, 2016, the Oversight Board issued its "CLARIFICATIONS AND ADDITIONAL GUIDELINES TO THE

---

[279] June 6, 2018 Hearing Transcript, Case:17-03283-LTS Doc#:3278 Filed:06/08/18 Entered:06/08/18 16:07:27, Document Page 53 of 174 (emphasis added).
[280] June 6, 2018 Hearing Transcript, Case:17-03283-LTS Doc#:3278 Filed:06/08/18 Entered:06/08/18 16:07:27 Desc: Main Document Page 55 of 174.
[281] See Alpha Natural Resources, Case 15-33896-KRH Doc 1781, at 44-459 Filed 03/16/16 Entered 03/16/16 18:18:20 44-459

RESPONSE TO THE RFP FOR STRATEGIC CONSULTANT," providing, among other things,

"5. *We encourage respondents to provide fixed price proposals*."[282]

### g. The Fee Examiner's Third Report

705.    On October 31, 2018, the Fee Examiner in the Puerto Rico Bankruptcy filed its

"*Third Interim Report on Professional Fees and Expenses*" (the "Third Report") in which it

proposed special treatment when evaluating McKinsey fee applications, among other things.[283]

706.    The Third Report[284] states McKinsey's fee applications require less demanding

treatment when determining the reasonableness of its fees because

> [McKinsey's] billing practices do not lend themselves to analysis
> under the standards in sections 316 and 317 of PROMESA. Those
> standards include "the time spent on such services," "the rates
> charged for such services" and "whether the services were
> performed within a reasonable amount of time...."[285]

707.    In lieu, the Fee Examiner consulted with McKinsey "to develop a process to

evaluate, however imperfectly, McKinsey's work under PROMESA's reasonableness

standards."[286]

708.    Further, the Third Report represented that the developed process had yielded

positive results, enabling the Fee Examiner to evaluate whether McKinsey fees were reasonable

because, in part, it had "provided much more detailed pricing information than that originally

included in the fee applications, including a reference at the [GSA] to verify McKinsey's

representations about the basis for its fees."[287]

---

[282] Available at https://drive.google.com/file/d/1AHqf1Q8xaWt6B8BYcdwA-SWMJueTPVrE/view (emphasis added).
[283] *Id.* at 10-15 (covering February 1, 2018 through May 31, 2018).
[284] The Fee Examiner is Brady Williamson, who is represented by counsel Katherine Stadler.
[285] At 10.
[286] *Id.*
[287] *Id.* [] (emphases added).

218

709.    In describing McKinsey's September 2017 contract with the Oversight Board, the

Third Report represents

> *The Agreement provides for services under three distinct "Scope of
> Work" documents: Commonwealth, PREPA, and HTA. Each
> group's compensation was set on a "firm fixed price" basis based
> on a Federal Supply Services schedule with the GSA (the
> "Pricelist").[288]*

710.    In addition, Fee Examiner notes the GSA Pricelist "represents the U.S.

government's negotiated 'most favorable customer pricing' applicable to all GSA users,"

indicating that it is to be relied upon as an objective metric in determining reasonableness.[289]

711.    In addition, a footnote expands on the GSA Price, stating

> *[t]he Oversight Board does not appear on the GSA list of eligible
> users, though it is entitled to request administrative support
> services from the GSA...As such, the Pricelist is not a cap on
> McKinsey's pricing, but it represents a floor beneath which the
> McKinsey rates could not fall without adjusting the pricing of all
> government contracts.[290]*

712.    According to the Third Report, McKinsey assigned separate working groups for

the Commonwealth, HTA, and PREPA.  Each working group consists of "a full-time

Engagement Manager and two full time Associates or Business Analysts, two Partners or Senior

Partners to manage the engagement, content experts, a research team, and any outside

consultants necessary," which apparently correlates to McKinsey's "Team B" pricing.

713.    The Third Report makes the unsourced and unsupported claim that "[t]hough the

Consulting Agreement does not explicitly so state, the Oversight Board initially engaged 'Team

B' for each of the three working groups."[291]

---

[288] Third Report, at 11 (emphasis added).
[289] *Id.*
[290] *Id.* It is unclear what the legal and factual basis is for making this assertion.
[291] Notably, the Third Report does not identify the source of information whereby the Fee Examiner was able to
determine that the Oversight Board had initially engaged "Team B."

219

714.     However, this claim is belied by the representation made in footnote 13, which states "[t]he starting monthly fee for the Oversight Board engagement was **approximately seven percent higher** than the GSA Pricelist weekly charge for Team B."[292]  Also problematic, the Third Report fails to provide the percentage difference between GSA Pricelist and McKinsey's monthly fees *after* their substantial increase starting in November 2017.

715.     In addition, footnote 13 claims that the difference is a result of, in part, that "[g]overnment contracts with McKinsey do not include travel expenses, whereas the Oversight Board's contract does[.]" However, the Third Report fails to cite any of the Oversight Board-McKinsey contracts which states that travel expenses incurred by McKinsey would be offset by enlarging McKinsey's service fee or reimbursed by any other means. Indeed, none of the Oversight-McKinsey contracts even mention travel expenses.

716.     Concerning the analysis of McKinsey's fees, the Third Report represents that the GSA Pricelist "establishes the minimum weekly cost of Team B, and the Scope of Work documents translate that into a monthly fee."[293] This statement is an admission that the Fee Examiner used the GSA Pricelist amount as an input in its calculation of the purported "monthly fee."

717.     Next, the Fee Examiner formulated a "Estimated Total Hours Reported," which was "based on the assumption that each full-time participant contributes 60 hours per week and each part-time participant contributes 25 hours per week." According to a footnote, the basis for the 60-hour assumption relies is a claim that "[a]t McKinsey, a full-time position comes with the reported expectation that the employee will work 60 or more hours per week."[294]  However, this

---

[292] Third Report, at 12, FN13 (emphasis added).
[293] *Id.* at 12.
[294] *Id.* at 11.

claim is unsourced and, even if true, does not provide evidence that McKinsey employees worked on Puerto Rico matters for that amount of time in reality.[295]

718.    The Fee Examiner then divided the aggregate monthly cost (based on the GSA Pricelist) of all three working groups <u>by</u> the "Estimated Total Hours Reported" to arrive at the "Estimated Blended Rate."[296] According to the Fee Examiner's calculations, the Estimated Blended Rate amounted to $689.38 per hour.[297]

719.    On information and belief, the source of "reported expectation" was McKinsey.  It is highly probable that McKinsey proposed that the Fee Examiner apply the 60-hour per week assumption in his calculation of the estimated blended hourly rate, especially since the FAS Division Director unjustifiably used a virtually similar assumption of 65 hours per week when determining the reasonableness of McKinsey fees under GSA contracts.

720.    In relying upon the $689.38 blended hourly rate calculation, the Third Report found that "**this hourly rate does not appear unreasonable** compared to other advisors and consultants submitting fees through the Title III fee process."[298]

721.    Then, in the paragraph *immediately following* that sentence, the Fee Examiner concluded that McKinsey's $27,437,000 in fees were reasonable "based on a review of McKinsey's work records, [a] site visit, [] client interviews and expressed satisfaction, and the fee applications themselves[.]"[299]

---

[295] *Id.*
[296] *See* Exhibit B, Case:17-03283-LTS, Dkt. 4126, at 19-21 of 23 (filed on August 31, 2018).
[297] Third Report, at 13; and Ex. B, at 21 of 23.
[298] *Id.* at 13 (emphasis added).
[299] *Id.*

221

722.    The logical progression of the Third Report's shows that the its ultimate conclusion that McKinsey fees were reasonable was, in fact, premised on the Third Report's finding that the hourly rate – itself based on the purported GSA Pricelist – was not unreasonable.

723.    In addition, the Third Report also cites as relevant statements made by the Oversight Board and Proskauer promoting McKinsey: "McKinsey's services are, according to many, both central and indispensable to the Oversight Board's work."[300]

724.    Moreover, the Fee Examiner again delves into improper advocacy on behalf of McKinsey, stating

> *McKinsey's work is not only necessary but essential to the administration of the Title III cases. It is clear that the parameters of McKinsey's work— which are both broad and dynamic—are established and directed by the Oversight Board in furtherance of its statutory mandate.*[301]

### h.   **The Fee Examiner's Response to the IG Report**

725.    On July 31, 2019, the Fee Examiner filed its "*Informative Motion of the Fee Examiner on Review Status of Applications of McKinsey & Company, Inc. as Consultant to the Financial Management and Oversight Board.*"[302]

726.    In its motion, the Fee Examiner notes that "[e]arlier this year," an investigator at the IG's office notified the Fee Examiner of its ongoing investigation into McKinsey's GSA contract pricing and provided a summary of the investigation.[303]

727.    According to the motion, McKinsey referred the Fee Examiner to GSA's service contract pricing as support of the reasonableness of its requested professional fees.[304]

---

[300] *Id.* at 10.
[301] *Id.*
[302] Case:17-03283-LTS Doc#:8330 (filed 7/31/19).
[303] *Id.* at 4.
[304] *Id.* at 3.

222

728.    Although the Fee Examiner's motion does not identify the GSA employee that McKinsey stated would support the reasonableness of McKinsey's pricing, it is believed that GSA employee is the Division Director cited in the IG's Report.

729.    Moreover, the Fee Examiner admits that the GSA services contract pricing was "a factor in the Fee Examiner's process, recommendations and conclusions" and that the findings of the IG's Report "could materially affect" the ultimate recommendations provided by the Fee Examiner.[305]

730.    Following the release of the IG's Report, the motion notes that the Fee Examiner, its counsel "have been in discussions with the [Oversight Board's] general and special counsel, the Debtors' counsel, and McKinsey about appropriate next steps."[306]

i.    **The Fee Examiner's Second Response to the IG Report**

731.    On September 3, 2019, the Fee Examiner filed its *Preliminary Status Report on Continuing Review Process for McKinsey & Co., Inc., As Consultant to the Financial Oversight and Management Board* (the "Preliminary Report").[307]

732.    Significantly, the Preliminary Report concedes that the Third Report's conclusion that McKinsey's fees were reasonable "was based on the assumption 'that each full-time team participant contributes 60 hours per week and each part-time team participant contributes 25 hours per week,' but the Fee Examiner could not independently verify that assumption."[308]

733.    Among other things, the Preliminary Report also admits that

---

[305] *Id.* at 4.
[306] *Id.* (emphasis added).
[307] Case No.17-03283-LTS, Dkt. 8588 (filed on September 3, 2019).
[308] *Id.* at 10, ¶33.

- (i) McKinsey "introduced" the GSA Pricelist to the Fee Examiner as proof of the reasonableness of its requested fees;[309]

- (ii) McKinsey "specifically recommended" that the Fee Examiner's counsel contact the GSA reference, proving "the name and contact information of the **(now discredited)** GSA Reference";[310]

- (iii) the Fee Examiner "relied on the GSA Reference to… corroborate McKinsey's representations about the GSA Pricelist" and "to obtain a point of comparison for the fixed fee team composition and pricing under the FOMB-McKinsey Contract," among other things.

734.    Despite these admissions and despite the fact the Fee Examiner used the GSA Pricelist in formulating the "not unreasonable" "Estimated Blended Hourly Rate" appearing in its Third Report, the Fee Examiner nevertheless represents that "**[n]either the GSA Pricelist nor the GSA Reference was a primary factor in the Fee Examiner's assessment**."[311]  Similarly, the Fee Examiner insists that the IG's Report did "not change the Fee Examiner's conclusions."[312]

735.    In addition, the Fee Examiner states that "McKinsey's non-disclosure of the facts and circumstances surrounding the Preaward Audit does not amount to an affirmative misrepresentation."  However, this bare legal conclusion is unsupported by legal analysis or citation to legal authority warranting such a conclusion.

---

[309] *Id.* at 9.
[310] *Id.* (emphasis added).
[311] *Id.* at 5; *Id.* at 6 (stating, "the GSA Pricelist was not a significant basis for the recommendations to this Court").
[312] *Id.* at 8.

736.    Finally, the Fee Examiner again finds occasion to advocate on behalf of McKinsey, stating that "McKinsey's services and institutional knowledge most certainly are necessary to the administration of these cases—perhaps more so now than at any other time."[313]

j.    **8.16.16 Kevin Carmody Deposition**

737.    On August 16, 2016, Carmody was deposed as part of a contested matter in *In re Alpha Natural Resources ("ANR")*.[314]

738.    During the deposition, Carmody was reminded that Judge Huennekens' had stated that McKinsey RTS was a fiduciary to the *ANR* bankruptcy estate despite language in McKinsey's engagement letter with the debtor asserting that McKinsey would not be deemed to be a fiduciary nor could its conduct in the bankruptcy proceedings give rise to a fiduciary relationship.[315]

739.    Also during the deposition, Carmody revealed how McKinsey has certain rules and protocols when asked whether how McKinsey RTS, as financial advisor to the debtors, interacted with second lien noteholders:

> THE WITNESS: **The interaction – the interactions my team were more with the advisors**. So Houlihan Lokey [the financial advisor for] the second lien noteholders, **that's where our primary point contact, if there was one, would be with**. Some of these folks I'm sure were involved in discussions, phone conversations or a few in-person --
>
> BY MR. RHODES:
>
> Q. Which ones are you sure were?

---

[313] *Id.* at 10, ¶29.
[314] Case 15-33896-KRH Doc 3360-1 Filed 09/01/16 Entered 09/01/16 18:45:17 Exhibit(s) 1 - Transcript of Carmody Deposition Page 2 of 189 (hereinafter, "Carmody Deposition").
[315] Carmody Deposition, at 46 of 189

*A. Well, I don't know. I'm just guessing. Actually...I don't know that for sure.... We didn't have direct interaction with these lenders as a general rule.*

*Q. Okay. I'm not asking about direct interactions.*

*A. I don't know.*

*Q. Just to be clear, you don't know whether –*

*A. Yeah, I don't know.*

*Q. – RTS staff on this case performed services that it billed for that involved [the second lien noteholders]?*

*A. Yeah, I'm sure. I mean if we were interacting with Houlihan Lokey and they had questions about – and they were advising the second lien noteholders, then that would involve these lenders. **Now, whether we had direct conversations with those lenders would be a different story.**[316]*

740.   On information and belief, McKinsey adopted a general rule against directly contacting individual lenders to conceal (i) its interactions with co-conspirators, whom, otherwise, would appear on McKinsey's timesheets; (ii) actions performed in furtherance of the conspiracy; and (iii) the existence of the criminal enterprise.

741.   Also, it is not clear why Carmody was eager to draw the distinction between direct conversations with the second lien noteholders and those through the noteholder's financial advisor, Houlihan Lokey.

742.   In addition, Carmody was asked about an earlier representation he had made in a declaration concerning whether MIO was "essentially a blind trust":

*[Q.] Your third supplemental declaration of May 19th, third declaration of May 19th, Paragraph 20 states, quote, MIO investors mike investments with MIO "essentially on a blind trust basis." Did you put the word essentially in that statement to mean almost or to suggest that there was something about the investment*

---

[316] Carmody Deposition, at 133-134 of 189.

*arrangements that were not exactly as a blind trust would be arranged?*

*A. My understanding was it was a blind trust, so.*

*Q. What was the word "essentially" in there for?*

*A. I'm not sure as I sit here.*

*Q. You're not sure why it's there, even though it's your declaration?*

*A. I just think it was -- no. **When I spent time with legal on it, we wanted to make sure that it was a blind trust. So it was meant to say that is a blind trust. That's why it's in there.**[317]*

743.    On information and belief, certain attorneys, including Martin Bienenstock, drafted or reviewed, approved and ratified the Carmody declaration (i) knew and understood, given their sophisticated legal knowledge and understanding, the legal requirements of a "blind trust"; (ii) knew that Jon Garcia simultaneously served as the president of McKinsey RTS and sat on the board of MIO, as well as the Subcommittee on Auditing and Investments; (iii) knew and understood, therefore, that MIO was not a "blind trust"; (iv) intended to use the term "blind trust" in a false and misleading way; and (v) intended to use the term "essentially" as a means to plausible deny against potential claims of falsity or intentional misrepresentation.

744.    Also of note, opposing counsel asked questions referencing McKinsey's billed hours and was able to do so because McKinsey had filled time sheets as part of their interim fee applications.[318]

745.    On information and belief, following this experience, McKinsey, in consultation with Proskauer, decided to enter into a scheme to conceal McKinsey's actions and conduct in the Puerto Rico bankruptcy by withholding such information from the Title III Court.

---

[317] Carmody Deposition, at 144.
[318] Carmody Deposition, at 130, 134 of 189.

### k.  **6.27.16 ANR Hearing**

746.    On June 28, 2016, the ANR Court held a hearing on McKinsey's disclosures, among other things.

747.    At that hearing, Bienenstock represented that MIO, "[t]he investment arm or entity[,] is walled off. We cannot search it. We know nothing about it. There's no way we can find out about their investments, and we don't know about their investments….[W]e have no ability to get their information."[319] The Court then asked for clarification,

> THE COURT: We being who?
>
> MR. BIENENSTOCK: McKinsey RTS.[320]

748.    In addition, Rhodes, on behalf of MarBow, asserted that McKinsey had directly participated in negotiations with creditors in ANR.  In support of this allegation, he cited as evidence McKinsey's second fee application showing details McKinsey's various interactions with lenders, including phone calls and physical meetings concerning the plan of adjustment.[321]

749.    Bienenstock denied that McKinsey had been involved in the negotiations.

### l.  **US Trustee Request for MIO Information**

750.    On July 31, 2018, the United States Trustee filed a response, seeking information from Jon Garcia and Casey Lipscomb information relating to, among other things, the following questions:

---

[319] Tr. p. 142 6/28/16, [Docket No. 4117].
[320] Tr. p. 142 6/28/16, [Docket No. 4117].
[321] Case 15-33896-KRH Doc 2834 Filed 06/29/16 Entered 06/29/16 12:36:13 Desc Main Document Page 146, 147 of 194

a. *The interactions between RTS employees and MIO, including investment decision making and reporting and whether there are any procedures or policies that restrict RTS employees from accessing MIO investment information;*

b. *Whether any RTS employee, including Mr. Jon Garcia, ever discussed or otherwise knew about an MIO investment in Whitebox, whether potential or actual; [and]*

m. *The powers and duties of MIO board members, including, but not limited to, the process for engaging and supervising third party investment managers and the process for when MIO directs an investment with its investment discretion[.]*[322]

n. **9.12.18 Jon Garcia Declaration**

751.    On September 12, 2018, Jon Garcia submitted a declaration to the ANR Court, made under penalty of perjury.

752.    Garcia represented that MIO managed money for MMRT but failed to indicate that MIO managed upwards of $19 billion in SSALT monies.[323] [fraudulent omission]

753.    Garcia represented that he served on the Investment Subcommittee but failed to disclose that the Investment Subcommittee ratified MIO's investments.[324] [fraudulent omission]

754.    Concerning Whitebox, Garcia represented

> *In the course of my tenure on the board, I was provided lists of MIO's third party fund managers. I now know some of the lists may have included Whitebox funds. Because MIO typically invests in more than one hundred fund managers and underlying funds, their individual names had little significance to me. It was rare that I discussed an individual fund inside MIO, and I have no recollection of ever discussing Whitebox*

---

[322] Case 15-33896-KRH Doc 4126 Filed 07/31/18 Entered 07/31/18 14:49:18 Desc Main, Document Page 4 of 11
[323] Case 15-33896-KRH Doc 4151 Filed 09/12/18 Entered 09/12/18 20:22:45 Desc Main Document Page 2 of 4
[324] Case 15-33896-KRH Doc 4151 Filed 09/12/18 Entered 09/12/18 20:22:45 Desc Main Document Page 2 of 4.

755.    At this point, MIO had been invested in various Whitebox entities for over nine years.  In addition, assuming the lists were provided in alphabetical order, Whitebox, starting with a "W," would tend to be at the end of the list and to stick out.

### o.  **9.12.18 Lipscomb Declaration**

756.    On September 12, 2018, Casey Lipscomb submitted a declaration to the ANR Court, made under penalty of perjury.[325]

757.    Lipscomb represented that MIO typically invests in, among other things,

> *limited partnership interests or interests in other limited liability vehicles established and operated by asset managers that are neither owned nor controlled directly or indirectly by MIO or McKinsey ("Fund Investments").*[326]

758.    This is contradicted by practice of Compass funds of tipping off third-party funds by having the Compass fund direct the third-part fund to purchase a small quality of security. The third-party fund will then purchase a large quantity of such security "in its sole discretion." See Visium SEC F13.

759.    In addition, Lipscomb represented

> *the MIO Board delegates responsibility for making investment decisions on behalf of the Plans and the Funds, and engaging and supervising Third Party Managers, to MIO's professional staff. The staff is responsible for principally using **third party fund managers who make investment decisions based on their own investment discretion, without input from or consultation with, MIO[.]**[327]*

---

[325] Case 15-33896-KRH Doc 4152 Filed 09/12/18 Entered 09/12/18 20:25:38 Desc Main Document Page 1 of 4.
[326] Case 15-33896-KRH Doc 4152 Filed 09/12/18 Entered 09/12/18 20:25:38 Desc Main Document Page 2 of 4.
[327] Case 15-33896-KRH Doc 4152 Filed 09/12/18 Entered 09/12/18 20:25:38 Desc Main Document Page 3 of 4 (emphasis added).

760.    Lipscomb represents that "Jon Garcia served as a Director of MIO from December 8, 2006 through June 9, 2017."

761.    In addition, Lipscomb represented that

> *Through its oversight and supervisory functions or other board activities, members of the MIO Board may become aware of MIO Direct Investments, the identities of Third Party Managers with whom money has been invested, and individual investments made by such Third Party Managers.*

762.    Despite these disclosures, however, Lipscomb fails to disclose the existence of the Investments Subcommittee, its influence over investment decisions, and Garcia's personal role on the Investments Subcommittee. Therefore, Lipscomb's omission is clearly materially misleading.

p.   **11.12.18 Jon Garcia Supplemental Declaration**

763.    On November 12, 2018, Jon Garcia submitted a supplemental declaration to the ANR Court, made under penalty of perjury.

764.    For the first time, Garcia revealed the existence of the Investments Subcommittee, that it ratified MIO investment decisions, and that he himself sat on the four-person Investments Subcommittee. Garcia also made representations about the nature of the Investments Subcommittee's authority, role, and decision-making.

> *4. During my time on the MIO Board, I was a member of the Investments Committee, a subcommittee of the full Board that would meet to discuss issues related to investments, including the ratification of certain investment decisions made by MIO 's professional staff. I understood ratification in this context to mean the approval of fund-level allocation and redemption decisions made by MIO's professional staff in the previous quarter. Allocations and redemptions are increases and reductions in the amount of money designated for a third-party managed fund.... Because the MIO Board delegated responsibility for making*

231

> *investments to MIO's professional staff, we reviewed those investments at a high level, to exercise our fiduciary responsibilities.* **Unless an investment posed a specific issue- for example, an investment in a particular fund that brought MIO close to a preestablished risk threshold- we typically did not discuss these investments at board meetings.**[328]

765.    It is not readily apparent how the risk associated with particular investments could be evaluated without knowing what invests the third-party managed fund held. [this appears to render other statements about lack of knowledge untrue]. Also, what would the investment subcommittee do if not discuss the kinds of investments.

766.    In addition, Garcia represented that

> *[t]he Investments Committee would from time to time discuss whether or not to invest with a new third-party fund manager. These conversations were about general issues related to the manager's track record and performance* **rather than information about particular investments the manager made or planned to make.** *It was rare for discussions about a particular manager to take up significant time during board or committee meetings.*[329]

767.    Concerning himself, Garcia represented "[t]o the best of my recollection, **I was never asked to ratify allocation or redemption decisions related to specific investments made by the third-party managers.**"[330]

768.    This is misleading because MIO limited the kinds of investments that each Compass fund could invest in, meaning the Investments Subcommittee would essentially ratify specific investments made by third-party managers because those managers were allowed only to purchase certain kinds of investments. [misrepresentation]

---

[328] Case 15-33896-KRH Doc 4159 Filed 11/09/18 Entered 11/09/18 19:13:52 Desc Main Document Page 2 of 4
[329] Case 15-33896-KRH Doc 4159 Filed 11/09/18 Entered 11/09/18 19:13:52 Desc Main Document Page 2 of 4
[330] Case 15-33896-KRH Doc 4159 Filed 11/09/18 Entered 11/09/18 19:13:52 Desc Main Document Page 2 of 4 (emphasis added).

232

### q. **11.9.18 Casey Lipscomb Supplemental Declaration**

769. On November 9, 2018, Casey Lipscomb submitted a supplemental declaration to the ANR Court, made under penalty of perjury.

770. In addition, Lipscomb represented that

> *On a quarterly basis, consistent with their fiduciary duties to the Funds managed by MIO, the Investment Committee of the MIO Board reviews a list of redemption and allocation decisions made by MIO's professional investment staff. Redemptions are decisions to reduce the amount of, or eliminate, an investment in a fund or Separate Account managed by a Third-Party Manager, and allocations are decisions to establish, or increase the amount of, an investment in a fund or Separate Account managed by a Third-Party Manager. In connection with this quarterly process, the Investment Committee reviews materials prepared by the MIO staff.*[331]

771. In a footnote, in direct contradiction to the representation made in his previous declaration that "third party fund managers… make investment decisions based on their own investment discretion, **without input from or consultation with, MIO**," Lipscomb now admits that

> *[t]he MIO investment staff, of course, confers on an as needed basis with Third-Party Managers in the exercise of their oversight responsibilities, including about particular investments in some cases.*[332]

772. In addition, Lipscomb represented that

> *As of 2015, certain of the Investable Compass Funds invest in private equity funds managed by Third-Party Managers (the "Compass Private Investment Funds"). Those externally managed private equity funds generally purchase portfolio companies, attempt to increase the value of those companies through active management, and then sell those companies at a profit.*[333]

---

[331] Case 15-33896-KRH Doc 4160 Filed 11/09/18 Entered 11/09/18 19:15:20 Desc Main Document Page 4 of 9.
[332] Case 15-33896-KRH Doc 4160 Filed 11/09/18 Entered 11/09/18 19:15:20 Desc MainDocument Page 5 of 9.
[333] Case 15-33896-KRH Doc 4160 Filed 11/09/18 Entered 11/09/18 19:15:20 Desc Main Document Page 9 of 9.

r.  **9.12.18 Kevin Carmody Declaration**

773.  In Carmody's declaration executed on 9.11.18, he represented that "no one at McKinsey (other than people affiliated with MIO) knew the identities of MIO's third party fund managers or direct investments. Therefore, it would be impossible for us to talk about them."

774.  Furthermore, according to Carmody,

- McKinsey RTS relied solely on the "Interested Parties" list provided by Alpha Resources' attorneys.[334]

- McKinsey RTS took no part in the development or maintenance of the "Interested Parties" list and failed to undertake any efforts to determine whether the list was sufficiently complete.[335]

775.  In addition, Carmody represented that he had no personal knowledge of why the list provided to RTS did not include Whitebox even though other estate professionals had contemporaneously used an alternative version of the "Interested Parties" list that did include Whitebox.[336]

s.  **Tippet's Deposition**

776.  In a recent deposition in connection with a contested matter in Westmoreland, Tippets admitted that, in some cases, MIO money represents 90-100 percent of a third-party manager's assets under management.[337]

XIX.  **The Unlawful COFINA Settlement and Bond Issuance**

a.  **Ponzi Scheme Defined**

---

[334] Case 15-33896-KRH Doc 4150 Filed 09/12/18 Entered 09/12/18 20:19:05 Document Page 2 of 4.
[335] Case 15-33896-KRH Doc 4150 Filed 09/12/18 Entered 09/12/18 20:19:05 Desc Main Document Page 2 of 4.
[336] Case 15-33896-KRH Doc 4150 Filed 09/12/18 Entered 09/12/18 20:19:05 Desc Main Document Page 3 of 4.
[337] Audio, at 31:43 (*available at* https://ecf.txsb.uscourts.gov/doc1/178044626248).

234

777.    The Second Circuit has defined "Ponzi scheme" in legal terms thusly:

> *A 'Ponzi scheme' typically describes a pyramid scheme where earlier investors are paid from the investments of more recent investors, rather than from any underlying business concern, until the scheme ceases to attract new investors and the pyramid collapses.*[338]

778.    Similarly the Second Court has also recognized that

> *A Ponzi scheme by definition uses the purportedly legitimate but actually fraudulently obtained money to perpetuate the scheme, thus attracting both further investments and, in many cases, new investors to defraud.*[339]

779.    Consistent with the Second Circuit, various federal courts have applied a four-factor test in determining whether a Ponzi scheme exists:

- (1) deposits were made by investors;

- (2) the Debtor conducted little or no legitimate business operations as represented to investors;

- (3) the purported business operation of the Debtor produced little or no profits or earnings; and

- (4) the source of payments to investors was from cash infused by new investors.[340]

780.    According to Kathy Bazoian Phelps & Steven Rhodes, in *the Ponzi Book: a Legal Resource for Unraveling Ponzi Schemes*, other courts have identified "badges" that weigh in

---

[338] *Eberhard v. Marcu*, 530 F.3d 122, 132 n.7 (2d Cir. 2008); *accord In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229, 232 (2d Cir. 2011), cert. denied, 134 S. Ct. 117, 187 L. Ed. 2d 36 (2012).

[339] *United States v. Moloney*, 287 F.3d 236, 242 (2d Cir.), *cert. denied*, 537 U.S. 951, 123 S. Ct. 416, 154 L. Ed. 2d 297 (2002).

[340] *Armstrong v. Collins*, 01 Civ. 2437 (PAC), 2010 U.S. Dist. LEXIS 28075, 2010 WL 1141158, at *22 (S.D.N.Y. Mar. 24, 2010) (quoting *Forman v. Salzano* (*In re Norvergence, Inc.*), 405 B.R. 709, 730 (Bankr. D.N.J. 2009) (quoting *Rieser v. Hayslip* (*In re Canyon Sys. Corp.*), 343 B.R. 615, 630 (Bankr. S.D. Ohio 2006)); *accord Carney v. Lopez*, 933 F. Supp. 2d 365, 379 (D. Conn. 2013); *Wiand v. Waxenberg*, 611 F. Supp. 2d 1299, 1312 (M.D. Fla. 2009); *Kapila v. TD Bank, N.A.* (*In re Pearlman*), 440 B.R. 900, 904 (Bankr. M.D. Fla. 2010); and *Floyd v. Dunson* (*In re Ramirez Rodriguez*), 209 B.R. 424, 431 (Bankr. S.D. Tex. 1997).

favor of finding a Ponzi scheme, including the absence of any legitimate business connected to the investment program, the unrealistic promises of low risk and high returns, commingling investor money, the use of agents and brokers paid high commissions to perpetuate the scheme, misuse of investor funds, the "payment" of excessively large fees to the perpetrator and the use of false financial statements.[341]

### b.   The Inception of the COFINA Ponzi Scheme

781.   According to numerous witness accounts, Lehman Brothers initially proposed to GDB the concept of COFINA, *i.e.*, securitizing future tax revenue, in early 2005.[342]

782.   According to numerous witness accounts, Goldman Sachs also consulted the GDB on creating securitizing future tax revenue in early 2005.[343]

783.   According to numerous witnesses, in 2005, Goldman was aggressively lobbied not only GDB Board, but also directly to members of the Puerto Rico legislature and executive branch.[344]

784.   In a contemporaneous email sent in 2005, a high-ranking member of GDB's management expressed frustration at expresses frustration at Goldman directly marketing Swaps to the Executive and Legislative Branches, and characterizes Goldman as going behind GDB's in lobbying the Secretary of Treasury and the legislature that the proposed Basis Swap could be a means of providing budget relief.

785.   On August 1, 2005, the Puerto Rico legislature enacted Act 39, providing purported legal authority to enable the Commonwealth to enter into swaps.  The legislation's

---

[341] Kathy Bazoian Phelps & Steven Rhodes, [*t*]*he Ponzi Book: a Legal Resource for Unraveling Ponzi Schemes*, §2.03 [1][b], at 2-8 to 2-9 (2012).
[342] Kobre & Kim, *The Financial Oversight & Management Board for Puerto Rico, Independent Investigator, Final Investigative Report*, at 142 (August 20, 2018) (hereinafter, the "Final Investigative Report").
[343] Final Investigative Report, at 164.
[344] Final Investigative Report, at 421.

"Statement of Motives" states that the purpose of Act 39 was to expressly authorize Puerto Rico to enter into swaps in order to effectively manage interest rate fluctuations.

786. Act 39 also states that the calculation of the Constitutional Debt Limit would exclude payments made in connection with terminating swaps.

787. Moreover, Act 39 purportedly waived Puerto Rico's sovereign immunity and allowed for the swap agreements to be guaranteed by some designated security interest, either property or sources of income or revenue of Puerto Rico.

788. In an internal memorandum dated August 18, 2005, a high-level GDB manager warned that swaps carried significant risks and that the GDB lacked the ability to effectively manage those risks.

789. In addition, the same high-ranking GDB manager would later allege that Goldman Sachs had contacted an analyst at S&P to discuss Goldman's proposed basis swap, prompting the S&P to contact GDB to warn it that entering into a basis swap would result in a credit downgrade.[345]

790. In or about September 2005, the high-ranking GDB manager resigned once it was decided that the GDB would enter into the basis swap with Goldman.[346]

791. On July 1, 2006, the GO Basis Swaps with Goldman and Morgan Stanley as another counterparty, became effective. Puerto Rico received an upfront cash benefit of approximately $100 million.[347]

792. In February 2008, Goldman proposed another Basis Swap with an upfront payment, but this time for PBA ("PBA Basis Swap"). Goldman offered GDB a $70 to $75

---

[345] *Id.* at 424.
[346] *Id.* at 98.
[347] *Id.* at 427.

237

million upfront payment in connection with the Basis Swap. At that time, according to GDB's swap advisor, Puerto Rico's existing GO Basis Swap with Goldman "was now at risk of forcing a collateral call for the Commonwealth."[348]

793.    In September 2005, GDB issued its "Master Swap Policy," which was to serve as regulatory framework governing swaps.

794.    Among other things, the "Master Swap Policy" required the GDB, in conjunction with its legal and financial advisors, to factor the appropriateness of the transaction and the impact on the total amount of debt exposure when authorizing the GDB to enter into swap agreements.

795.    In addition, the "Master Swap Policy" limited the use of swaps and other derivative transactions to the following uses: managing exposure to floating and fixed interest rates; locking in fixed rates in current markets for use at a later date; reducing the cost of fixed or floating rate debt; managing the exposure to the risks of changes in the legal and regulatory treatment of tax exempt bonds; and managing the credit exposure to financial institutions.

796.    In addition, the "Master Swap Policy" required that the GDB perform a detailed risk assessment of each swap prior to entering into the swap.  Such risks include, among other things, risk associated with potential termination of the swap, entailing significant fees and penalties, and risk associated with the potential of having to collateral posting risk (i.e., the risk that the Puerto Rico-Related Entity will have to post collateral in the event of a credit downgrade or a market change).

---

[348] *Id.*

797.    On March 8, 2006, Daniel Hiemowitz, a banker at Lehman Brothers, sent Alfredo Salazar, a GDB official, an email following their morning meeting concerning the securitization scheme.[349]

798.    After recommending Nixon Peabody, among others, as bond counsel, Hiemowitz wrote

> At this point **it would be very helpful to work with counsel to develop the draft language necessary to include in the sale tax legislation** in order to assure that a new highly rated credit can be properly created.
>
> **Specifically, the legislation needs to make clear** that sales taxes would first be deposited in a Trust for the benefit of any outstanding bonds and that revenues would flow out of the Trust to the general fund only after any required set-asides for debt service are made.
>
> We understand that **Hawkins, Delafield and Wood has looked at this issue for GDB in the past and we think that we could work with them**, or other counsel if you prefer, to expeditiously draft the appropriate statutory language.

799.    On March 10, 2006, Salazar responded to Hiemowitz, stating

> Tks. 1 was somewhat surprised at the rec of in-house counsel that according to the PR const, the. Sales tax cannot be diverted away from the General Fund. It appears the wording in our Const is different from that of NY. We are consulting a special lawyer to interpret the Constitution for us.

800.    Also on March 10, 2007, Hiemowitz replied to Salazar's response, stating

> Alfredo - We have been working on the Sales Tax Securitization far more than a year and presented the concept to GDB **only after getting a clear and unambiguous legal analysis as to its constitutionality.** We worked with local counsel in Puerto Rico and with Hawkins, Delafield and Wood.

---

[349] Case:17-00257-LTS Doc#:345-5 Filed:03/05/18 Entered:03/05/18 16:58:01 Desc: [Unredacted] Exhibit 3 Page 2-3 of 4.

> *As you may or may not know, at the request of GDB **in early 2005**, **Hawkins prepared a memorandum evaluating the strategies to accomplish securitization and concluded that securitization is achievable under the Constitution…***
>
> *We have **extensive experience** working with Hawkins on similar transactions elsewhere and also know that they are **well versed in Puerto Rico Constitutional law and we find their analysis of this securitization fully satisfactory**.*
>
> ***Dick Van Dusen at Hawkins has confirmed to us today that they fully stand by their prior analysis and stand ready to support the effort in whatever way would be most helpful**. If you would like us to arrange a meeting while you are here in New York, they can make themselves available today or alternatively we can arrange a meeting at your convenience in San Juan.[350]*

801.    In May 16, 2006, Goldman Sachs & Co. and the GDB hosted an investor conference call to discuss, among other things, GDB's balance sheet and Puerto Rico's "extra constitutional" debt.[351]

802.    Somehow, the K&K Debt report claims that in March of 2006, the

> *At that time, [the sales tax securitization] was not specifically tied to refinancing the existing extraconstitutional debt. The relation between the sales tax securitization and extraconstitutional debt did not come until later.[352]*

803.    On June 30, 2006, it was determined that the Commonwealth could not issue more debt without breaching the constitutional debt limit.

804.    COFINA issued bonds, and the outstanding amount of COFINA's Bond debt was approximately $17.6 billion. With respect to the last debt issuances, in 2011, COFINA issued four (4) series of COFINA Bonds (Series 2011A-D) in the aggregate amount of approximately $1.8 billion. According to the offering documents, the proceeds of those bonds were used for

---

[350] Case:17-00257-LTS Doc#:345-5 Filed:03/05/18 Entered:03/05/18 16:58:01 Desc: [Unredacted] Exhibit 3 Page 2 of 4 (emphasis added).
[351] Final Investigative Report, at 168, FN 50, 51.
[352] *Id.* at 166.

various purposes, including <u>to repay extraconstitutional debt and refinance existing COFINA</u>

<u>subordinated debt</u>. Significantly, with respect to the $1 billion Series C issuance, the deal

documents reflect that about <u>$400 million of proceeds were used to pay termination fees under</u>

<u>COFINA Swap agreements</u>.[353]

805.  According to the K&K Debt Report,

*We interviewed the **lead banker on Goldman's Puerto Rico team
in 2005**, who was identified by GDB management and in
contemporaneous documents, as having proposed the legislation
or advocated for the Swaps. When we asked this senior Goldman
investment banker if he was involved in drafting or commenting on
the 2005 legislation, **he told us he did not recall**. We also asked
him if someone on his team would have been designated to
comment on or draft the legislation. **He told us he did not recall**.
When we asked the senior Goldman investment banker about the
GO Basis Swaps specifically, **he told us he did not recall** the
specifics of any Swap transaction, including where an Issuer
received upfront money as part of a Swap, and **did not recall** any
pitches Goldman made in connection with a Swap.[354]*

c.  **Additional COFINA Background**

806.  On May 13, 2006, the Puerto Rico legislature passed Act 90-2006, which

authorized the GDB to loan to the Department of Treasury $741 million to repay

"extraconstitutional debt."[355]

807.  Also on May 13, 2006, the Puerto Rico legislature passed Act 91-2006, which

created the "Urgent Interest Fund" into which revenues from Puerto Rico's sales tax "to be

approved" would be deposited.[356]

---

[353] *Id.* at 534.
[354] *Id.* at 427.
[355] Act of May 13, 2006, No. 90, Statement of Motives, 2006 P.R. Laws.
[356] Act of May 13, 2006, No. 90, Statement of Motives, 2006 P.R. Laws.

808.    Act 91-2006 required that the money from the fund first be used to pay advanced fees "advanced" related to the financial transaction and to "pay or refinance the extraconstitutional debt in existence as of June 30, 2006."[357]

809.    In May 16, 2006, then-current GDB Executive Vice President for Financing, Jorge Irizarry, participated in Goldman Sachs & Co. Government Development Bank for Puerto Rico Investor Conference Call and admitted that Puerto Rico had recently created $2.2 billion in "extraconstitutional debt," which cost Puerto Rico $532 million annually to service.[358]

810.    On information and belief, the concept of "extraconstitutional debt" was conceived and designed to fraudulently conceal that the Government of Puerto Rico was in violation of its constitutional debt limit.[359]

811.    On May 16, 2006, Jorge Irizarry was asked whether the sales tax revenue "could be segregated out and bonded out as a sales tax revenue bond?"[360]

812.    Irizarry answered, stating

> *Well in terms of the—I think you are referring to the structure. Yes.* **We may in our restructuring of this debt create a sales tax bond** *so to speak, as other jurisdictions have done. But we don't—you know we don't see this—* **it would only be used to substitute existing debt. Not to increase it.** *"[361]*

813.    Irizarry's statement shows two important admissions:

- (i) those behind COFINA understood that it was a vehicle to alter existing state law priorities ("restructuring of this debt") of existing creditors, in

---

[357] [357] Act of May 13, 2006, No. 90, Statement of Motives, 2006 P.R. Laws [X]
[358] Final Investigative Report, at 168, FN
[359] *But see* Final Investigative Report, at 171 ("We found no evidence that the purpose of the UIF or the sales tax securitization structure that eventually became COFINA was to evade the Constitutional Debt Limit, and witnesses denied that that was its purpose.").
[360] Final Investigative Report, at 171.
[361] *Id.* at 171.

242

violation of the prohibition against the impairment of contracts by states found

in the U.S. Constitution;[362] and

- (ii) that Puerto Rico's constitutional debt limit had been violated, which is
  why Irizarry was compelled to explain that the upfront proceeds "would only
  be used to substitute existing debt. Not to increase it." If the debt limit had
  not been exceeded, then there would be no reason for Irizarry make such an
  unsolicited distinction.

814.    On the same investor conference call, Salazar Conde explained that GDB would

make a loan to Puerto Rico $741 million to close its budget deficit for fiscal year 2006.  Of that

$741 million, $500 million would be refinanced by COFINA bonds.[363]  However, Conde also

claimed that it was merely "coincidental that…the legislature approved the GDB loan to the

government of 741 million."[364]

815.    In December 2006, P.R. Law 91, as amended, created the public corporation

known as COFINA in order to "pay the extraconstitutional debt of the government of the

Commonwealth, including the sums advanced by the Government Development Bank for Puerto

Rico,"[365] and thereby alter the state-law priorities of Commonwealth creditors, including

bondholders.

816.    In addition, Act 91 provided for the creation of a "special fund"[366] that would

funnel 1% of the Commonwealth sales use tax revenues collected during each fiscal year to pay

and secure newly issued "COFINA Bonds."  The proceeds from selling the new COFINA Bonds

---

[362] U.S. Constitution, Article 1, Section 10, Clause 1 (the "Contracts Clause").
[363] Final Investigative Report, at 168-69, FN 61.
[364] *Id.* at 168-69, FN 60.
[365] Act of May 13, 2006, No. 91, Statement of Motives, 2006 P.R. Laws 1.
[366] The "special fund" would ultimately be known as the "Dedicated Sales Tax Fund."

would then be used to satisfy the Commonwealth's so-called extraconstitutional debt in existence as of June 30, 2006.

817.     Pursuant to Act 117-2006, Each month, merchants and retailers are required to file sales tax returns and pay all sales tax revenues collected during the prior month to Banco Popular de Puerto Rico ("Banco Popular"). Banco Popular is required to transfer all SUT revenues to a joint collection account (the "Sales Tax Account") in the name of COFINA and the Government Development Bank.

818.     Once the moneys are deposited in the Sales Tax Account, Banco Popular then transfers, on a daily basis (with a 2-day delay), to the account established pursuant to Act 91 (the "Dedicated Sales Tax Fund") and held at Banco Popular's Trust Department in the name of COFINA.

819.     On the first day of each fiscal year, July 1 (the "Fiscal Year"), Banco Popular then transfers all cash on deposit in the Dedicated Sales Tax Fund to the BNYM held in trust for COFINA (the "Revenue Account") until an amount equal to the Pledged Sales Tax Base Amount has been deposited therein.

820.     Once the Pledged Sales Tax Base Amount has been reached, the remaining collected Dedicated Sales Tax revenues for that fiscal year are distributed to the Puerto Rico Treasury Department for general use by the Commonwealth until the Commonwealth also has received an amount equal to the Pledged Sales Tax Base Amount.

821.     Once such amount has been obtained by the Treasury Department, one-half of all Dedicated Sales Tax revenues collected is transferred to the Revenue Account to serve as collateral for the Existing Securities and the other half is transferred to the Treasury Department for use by the Commonwealth.

244

822.    Act 91 provides that the Dedicated Sales Tax Fund, all funds deposited in the Dedicated Sales Tax Fund, and all future funds that must be deposited into the Dedicated Sales Tax Fund pursuant to the provisions of Act 91, are "the property of COFINA." P.R. Laws Ann. tit. 13, § 12.

823.    On the last business day of each calendar month, amounts deposited in the Revenue Account are transferred to certain debt service accounts and debt service reserve accounts established for the Existing Securities until each debt service account holds sufficient funds to make principal and interest payments for the next 12-month period (or 15-month period for bonds that pay debt service quarterly or monthly) and each debt service reserve account holds an amount calculated under the applicable supplemental resolution adopted by COFINA with respect to each series of Existing Securities issued.

824.    The funds transferred to the debt service accounts are then allocated to a principal subaccount, an interest subaccount, and a holding subaccount (collectively, with the Revenue Account, the debt service accounts, and the debt service reserve accounts, the "Project Accounts"). Payments on the Existing Securities are made from the principal and interest subaccounts. The Project Accounts are accounts of COFINA that are maintained by BNYM and are subject to the lien of the holders of Existing Securities.

825.    In 2007, P.R. Laws 56 expanded the authorized uses of COFINA bond proceeds to include (a) the repayment of funds borrowed by the Commonwealth from the GDB; (b) direct payment of general Commonwealth operating expenses; and (c) the payment of additional extraconstitutional debt.[367]

---

[367] 2007 P.R. Laws 56.

245

826.   In addition, the amendments to Act 91 made liable the Commonwealth for the annual transfer into the Dedicated Sales Tax Fund the greater amount of (a) **50 percent of the sales use tax revenues** collected by the Commonwealth in a fiscal year and (b) a base amount that increases by 4% each fiscal year.[368]  **By 2017, the increase in the base amount contemplated for fiscal year 2018 was $753 million.**[369]

827.   Moreover, P.R. Laws Ann. tit. 13 § 14 imposes certain duties and obligations on the Commonwealth in the following circumstances:

- In the event that the sales use tax collections are insufficient to pay the debt service on COFINA bonds, the Commonwealth must use a greater percentage of its sales use tax collections the following fiscal year;[370]

- In the event that that the sales use tax collections are less than the base amount, the Commonwealth must cover the shortfall from any available funds;[371] and

- In the event that the sales use tax collections exceed the base amount, the Commonwealth must deposit the excess amount into the Dedicated Sales Tax Fund.[372]

828.   Significantly, the amendments required the Commonwealth to pay the transferred amount to COFINA in full before paying any other creditor.[373]

829.   All sales use tax collections would be directed to Banco Popular de Puerto Rico ("Banco Popular") and then deposited into a joint account of the GDB and COFINA at Banco

---

[368] Case:17-00257-LTS Doc#:1, at 8-9 (filed 9/08/17)
[369] *Id.* at 9.
[370] P.R. Laws Ann. tit. 13 § 14(d).
[371] P.R. Laws Ann. tit. 13 § 14(a).
[372] P.R. Laws Ann. tit. 13 § 14(b).
[373] *Id.*

Popular.  Then Banco Popular transfers the sale use tax collection attributable to the

Commonwealth to the Dedicated Sales Tax Fund (under COFINA's name).

830.    Finally, on a daily basis, Banco Popular transfers the SUT collections in the

Dedicated Sales Tax Fund as follows

- First: to BNYM as trustee for the COFINA bondholders up to the Base Amount
  for the then-current fiscal year;

- Second: to the Commonwealth up to the Base Amount for that fiscal year; and

- Third: 50% to BNYM as trustee for the COFINA bondholders and 50% to the
  Commonwealth for the remainder of that fiscal year

831.    In June 2017, COFINA filed its Title III petition.

### d.  **Appointments of UCC and Bettina Whyte**

832.    On August 10, 2017, Judge Swain entered the stipulation and order approving

procedure to resolve Commonwealth-COFINA Dispute (the "Appointment Order").[374]

833.    Among other things, the Appointment Stipulation established (i) the UCC as

agent of Commonwealth with the power to litigate or settle claims on behalf of the

Commonwealth against COFINA; and (ii) Bettina Whyte as agent of COFINA with the power to

litigate or settle claims on behalf of COFINA against the Commonwealth.[375]

834.    In addition, subsection 4(c)(i) provides that the Commonwealth "shall have two

creditor representatives" including one selected by the Ad Hoc Group of GO Bondholders and

Assured Guaranty Corp. and

> *[t]hat for the avoidance of doubt, the Commonwealth Creditor*
> *Representatives that are not statutory committees shall not, by*
> *virtue of their selection for such position or their participation in*

---

[374] Case:17-03283-LTS Doc#:996 Filed:08/10/17
[375] *Id.* at 2-3, 4-6.

247

*settlement discussions, take on any duties to any other person or
entity, including, without limitation, any duty to refrain from
trading any securities (or derivatives of securities), provided,
however, that nothing herein exempts any person or entity from
compliance with all applicable securities laws.*[376]

835.    On September 8, 2017, the UCC, on behalf of the Commonwealth, filed its

complaint against Bettina Whyte as agent for COFINA.

### e.    **UCC Complaint Against COFINA**

836.    On September 8, 2017, the UCC, on behalf of the Commonwealth, filed its

complaint against Bettina Whyte as agent for COFINA.[377]

837.    On October 25, 2017, the UCC filed its amended against Bettina Whyte as agent

of COFINA (the "Amended Complaint").[378]

838.    Buried as its twelfth cause of action, the Amended Complaint argues that Act 91

itself was unconstitutional because its purpose was to circumvent the constitutional debt limit.[379]

839.    More specifically, the Amended Complaint argues

*It cannot be the case that, to evade the Constitutional Debt Limits
or to borrow more money when the market will not support the
issuance of additional general obligation debt, the Commonwealth
can simply go "off balance sheet" by diverting general tax
revenues to a special purpose entity created for the sole purpose of
issuing bonds to pay the Commonwealth's own debts and
expenses.*[380]

840.    In support of this argument, the Amended Complaint cites the following three

nonbinding state supreme court cases in support, including *Crick v. Rash*, 229 S.W. 63, 70 (Ky.

---

[376] *Id.* 4-5.
[377] Case:17-00257-LTS Doc#:1 Filed:09/08/17
[378] Case:17-00257-LTS Doc#:73 Filed:10/25/17
[379] *Id.* at 31-34.
[380] *Id.* at 33, ¶144.

1921); *State ex rel. Wash. State Fin. Comm. v. Martin*, 384 P.2d 833, 842 (Wash. 1963); and

*Morris v. Board of Regents*, 625 P.2d 562, 564 (Nev. 1981).[381]

841.   Similarly, the UCC Complaint further argues

> *if the Commonwealth can render general tax revenues
> "unavailable" simply by dedicating them to a special purpose
> entity that does nothing but issue bonds to pay the
> Commonwealth's own debts and expenses,* **there is no principled
> limit on the Commonwealth's ability to undermine the
> Constitutional Debt Priority**.[382]

842.   In support of this argument, the Amended Complaint cites the following

nonbinding three cases in support: *State ex rel. Shkurti v. Withrow*, 513 N.E.2d 1332, 1336-1337

(Ohio 1987); *State ex rel. Lesmeister v. Olson*, 354 N.W.2d 690, 698 (N.D. 1984); and *Long v.

Napolitano*, 53 P.3d 172, 189 (Ariz. Ct. App. 2002).[383]

843.   Significantly, the Amended Complaint omits the argument that, based on U.S.

Supreme Court precedence, the COFINA Bonds are void *ab initio* because they were issued in

excess of the constitutional debt limit.

### f.   UCC Motion for Summary Judgment

844.   On February 21, 2018, the UCC filed its *Commonwealth Agent's Motion for

Summary Judgment and Incorporated Memorandum of Law*.[384]

845.   Mirroring the UCC Complaint, the motion for summary judgment argues

> *Such "off balance sheet" financing constitutes an unconstitutional
> evasion of the Constitutional Debt Limits, which would be
> rendered meaningless if such financing structures were
> constitutionally permissible.*

---

[381] *Id.* at 32; *see also* at 34, ¶148.
[382] *Id.* at 35 (emphasis in the original).
[383] *Id.*
[384] Case:17-00257-LTS Doc#:322 Filed:02/21/18

846.    In support of this argument, the UCC cited two of the nonbinding state supreme court cases found in the UCC Complaint: *Crick v. Rash*, 229 S.W. 63, 70 (Ky. 1921); and *State ex rel. Wash. State Fin. Comm. v. Martin*, 384 P.2d 833, 842 (Wash. 1963). [385]

847.    In addition, the UCC Complaint omits the argument that, based on U.S. Supreme Court precedence, the COFINA Bonds are void *ab initio* because they were issued in excess of the constitutional debt limit.

### g.  **COFINA Negotiations**

848.    The PSA Parties include the Oversight Board, COFINA, AAFAF, Ambac Assurance Corp., National Public Finance Guarantee, certain Senior COFINA Bondholders, certain Junior COFINA Bondholders, Assured Guaranty Municipal Corp., and Bonistas del Patio.[386]

849.    Among others, the <u>Senior</u> COFINA Bondholders that participated as PSA Parties include Aristeia Capital, GoldenTree Asset Management, Goldman Sachs Asset Management, UBS IRA Select Growth & Income Puerto Rico Fund, Scoggin Management, Taconic Capital Advisors, Taconic Master Fund, Tilden Park Capital Management, and Whitebox Advisors.[387]

850.    Among others, the <u>Junior</u> COFINA Bondholders that participated as PSA Parties include Aristeia Capital, GoldenTree Asset Management, Goldman Sachs Asset Management, UBS IRA Select Growth & Income Puerto Rico Fund, Scoggin Management, Taconic Capital Advisors, Taconic Master Fund, Tilden Park Capital Management, and Whitebox Advisors.[388]

---

[385] *Id.* at 32.
[386] *Amended and Restated Plan Support Agreement*, Case No. 17-00257-LTS, Dkt. 551-2, at 75 of 110 (filed 10/19/18); *Id.* at 15 ("(d) Bonistas do not hold any Junior COFINA Bonds or Senior COFINA Bonds, or any Junior COFINA Bond Claims or Senior COFINA Bond Claims.").
[387] *Id.* at 70-71.
[388] *Id.* at 72-73.

851.    Bonistas del Patio describes itself as a creditor advocacy group that represents local Puerto Rico bondholders, mostly retirees.

852.    Jorge Irizarry, the former GDB President who participated in the 2006 Goldman Investor Call, is an agent of Bonistas del Patio.  Further, Irizarry participated in the COFINA negotiation and signed the COFINA PSA on behalf of Bonistas del Patio.

853.    In an 2018 article, Irizarry pushed back against misgivings allegations that the June 29 fiscal plan contained insufficient resources for debt service because "there are certain surplus items that have not been specified.[389]

854.    According to the article, "Irizarry mentioned that fiscal board Executive Director Natalie Jaresko said in May that there was a surplus that may be used to pay debt."[390]

855.    On February 11, 2019, on the eve of the Order confirming the COFINA Plan, AAFAF, on behalf of the Commonwealth, filed a so-called stipulation requesting that Bonistas del Patio be paid $7 million for services rendered pursuant to the COFINA Settlement and Plan.[391]

856.    The law firm Davis Polk & Wardwell represents Bonistas del Patio in the matter and its attorney, Resnick, filed a declaration in support of the Stipulation to Pay Bonistas $7 million payment.

857.    The Resnick Declaration represents the following:

---

[389] Bonistas del Patio takes a lead in advisory role, Caribbean Business (August 31, 2018) (*available at* https://caribbeanbusiness.com/bonistas-del-patio-takes-a-lead-in-advisory-role/).
[390] *Id.* (emphasis added).
[391] Case:17-03284-LTS Doc#:580-1 Filed:02/11/19 Entered:02/11/19 20:23:46 Desc: Exhibit A- Stipulation Regarding Section 15.2 Expenses Page 2 of 5.

- (i) Bonistas was an early and crucial participant in the negotiation of the GDB qualifying modification and the COFINA Plan of Adjustment[392]

- (ii) Bonistas assisted in the formulation of COFINA Plan and participated in marketing efforts in support of the COFINA Plan targeting local bondholders;[393]

- (iii) Bonistas entered into the COFINA plan support agreement;[394]

- (iv) in August 2018, it was agreed that creditor parties to the PSA would receive additional compensation paid from COFINA coffers;[395]

- (v) also, in August 2018, because Bonistas was not a creditor and thus could not receive the additional compensation, AAFAF, Bonistas del Patio, and Davis Polk struck a side deal where the Commonwealth would pay Bonistas $7 million upon consummation of the COFINA Restructuring;[396]

- (vi) the side deal was disclosed to the Oversight Board in August 2018;[397] and

- (vii) that "all amounts paid to Bonistas del Patio under the Stipulation will be used to pay the fees and expenses of the Professionals, as well as those of the local legal and financial advisors to Bonistas del Patio."[398]

858.    Article VII, section 7.3 provides, in relevant part,

---

[392] Case:17-03284-LTS Doc#:588-1 Filed:02/13/19 Entered:02/13/19 16:59:45 Desc: Exhibit Resnick Declaration Page 10 of 10
[393] Case:17-03284-LTS Doc#:588-1 Filed:02/13/19 Entered:02/13/19 16:59:45 Desc: Exhibit Resnick Declaration Page 7 of 10
[394] Case:17-03284-LTS Doc#:588-1 Filed:02/13/19 Entered:02/13/19 16:59:45 Desc: Exhibit Resnick Declaration Page 7 of 10
[395] Case:17-03284-LTS Doc#:588-1 Filed:02/13/19 Entered:02/13/19 16:59:45 Desc: Exhibit Resnick Declaration Page 8-9 of 10
[396] Case:17-03284-LTS Doc#:588-1 Filed:02/13/19 Entered:02/13/19 16:59:45 Desc: Exhibit Resnick Declaration Page 9 of 10
[397] *Id.*
[398] Case:17-03284-LTS Doc#:588-1 Filed:02/13/19 Entered:02/13/19 16:59:45 Desc: Exhibit Resnick Declaration Page 10 of 10.

> *Good Faith Negotiations. The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received **independent legal advice**...the negotiations related to this Agreement were conducted regularly and **at arm's length**; this Agreement is made and executed by and of each Party's own free will; **each Party knows all of the relevant facts and his, her or its rights in connection therewith, and that he, she or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this Agreement**...The Parties further acknowledge and agree that, in connection with the Title III Case and the negotiation and consummation of this Agreement, including, without limitation, the Term Sheet, the Parties, at all times, acted **(a) in good faith and (b) solely for themselves and not on behalf of or in representation of any other creditors, bondholders or other parties in interest.**[399]*

859.    On June 7, 2018, UCC and the COFINA agent, announced an agreement in principle under which the Puerto Rico would have a 46.35 percent ownership interest in the sales & use tax and COFINA would have a 53.65 percent ownership interest in the tax revenue.

### h.    **Ill-gotten Profits**

860.    Provided here *below* is the basic bankruptcy fraud and securities manipulation scheme,

- Move 1: Announced hiring of restructuring advisor, causing debtor's securities to plummet.

- Move 2: Indirectly purchase those securities at a discounted price.

- Move 3: Negotiate the best recovery for those securities as a retained professional in bankruptcy.

- Move 4: Sell said securities, capturing the difference.

861.    Here,

---

[399] *In re Andrew Stephen Hennigan*, Case No. 2:18-21885-BB, Dkt. 1 (filed on October 10, 2019).

- <u>Move 1</u>: Proskauer, Cleary, and Millstein announced or made it known to certain media outlets that they had been hired by the Puerto Rico Government to consider restructuring; in 2015, the Governor of Puerto Rico announced that Puerto Rico could no longer pay its debts (despite of billions in cash on hand).

- <u>Move 2</u>: Conspirators, such as McKinsey, through MIO, purchased interests in certain Puerto Rico bonds, including COFINA bonds, directly through its Compass funds or indirectly, through third third-party funds, such as Whitebox or Aristeia Capital.

- <u>Move 3</u>: Conspirators, such as McKinsey, unlawfully sought and received retention in the Title III case in order to exercise substantial and material influence over negotiations determining the recovery of securities held by the conspirators.

- <u>Move 4</u>: Once higher recoveries were obtained for the securities in question, conspirators, such as McKinsey, sold those securities at a substantially higher price than at the discounted prices at which they were purchased.  In the case of COFINA, conspirator law firms doubled their investment. See the COFINA Bond Graph *below*.

**COFINA Bond Prices Graph**



i.   **COFINA-Goldman Sachs Settlement**

862.    On July 31, 2007, Goldman Sachs and COFINA entered into an interest rate swap, which provided for unjustifiably large fees upon termination of the swap.[400]

863.    Jorge Iriziarry, then-President of the GDB, executed the master swap agreement dated July 31, 2007 between Goldman Sachs and COFINA.[401]

864.    The 3rd Amended COFINA Plan of Adjustment, effective as of February 12, 2019, provides for individualized treatment of Goldman's claim based on the termination fees related to the 2007 interest rate swap as "Class 8."[402]

---

[400] Case:17-03284-LTS Doc#:436 Filed:01/09/19 Entered:01/09/19 15:56:23 Desc: Main Document Page 24 of 92 16:18:14 Document Page
[401] See Goldman Sachs Bank USA, Claim No. 36364 (dated May 25, 2018), at 33 of 74.

865.    However, on February 11, 2019, Goldman Sachs and COFINA entered into a

stipulation allowing for Goldman Sachs to retain a previously undisclosed $49,938,101.53 it held

pursuant to a "collateral call" provision in connection with the interest rate swap and requiring

COFINA to pay Goldman Sachs an additional $11 million dollars in satisfaction of the claim.[403]

866.    The Goldman COFINA Stipulation also provides that "each shall be deemed to be

discharged and *released of any claims and liabilities to the other arising from or relating to the*

*Swap Agreement.*"[404]

867.    On information and belief, the $49,938,101.53 that Goldman Sachs exercised

custody over had not been previously disclosed.

868.    Because the constitutional debt limit was violated in 2005, the debt arising from

the so-called mater swap transactions is void *ab initio*.

869.    Because the debt is void *ab initio*, the stipulation between Goldman Sachs and

COFINA is fraudulent and void for illegality.  Therefore, in offsetting its claims against the

collateral Goldman Sachs exercised custody over, Goldman unlawfully converted over $60

million in Commonwealth cash to its own accounts.

870.    Moreover, on information and belief, the Hub-and-Spoke Conspirators, including

Lehman Brothers and Goldman Sachs, bribed Irizarry by promising to pay him millions of

dollars as part of the bankruptcy process in exchange for his acceptance of interest rate swap

agreements, including their draconian and unjustified termination provisions.

---

[402] Case:17-03284-LTS Doc#:436 Filed:01/09/19 Entered:01/09/19 15:56:23 Desc: Main Document Page 46 of 92
439 16:18:14 Document Page 50 of 193
[403] Case:17-03284-LTS Doc#:576 Filed:02/11/19 Entered:02/11/19 14:32:39 Desc: Main Document Page 1 of 9.
[404] Case:17-03284-LTS Doc#:576 Filed:02/11/19 Entered:02/11/19 14:32:39 Desc: Main Document Page 5, 6 of 9
(emphasis added).

871.    The graph *below* reflects the correlation between the bankruptcy fraud and securities manipulation scheme and acts taken in furtherance of the scheme:

| Debt Class | Oversight Board Challenged Validity? | UCC Challenged Validity? | Represented by Quinn Emanuel |
|---|---|---|---|
| GO pre 2012 | No | No | Yes |
| GO post 2012 | Yes | Yes | No |
| COFINA Seniors | No | No | Yes |
| COFINA Juniors | No | No | Yes |
| PBA pre 2012 | No | No | Yes |
| PBA post 2012 | Yes | Yes | No |

### j.    Criminal Enterprise Bribe to Government Official Irizarry

872.    Section 15.2 of the Third Amended COFINA Plan provides that the Commonwealth shall pay expenses "incurred by the Commonwealth or COFINA, as the case may be, in connection with the development, negotiation, confirmation and consummation of the Plan and the compromise and settlement of the Commonwealth-COFINA Dispute."[405]

873.    On, February 11, 2019, O'Melveny & Myers, on behalf of AAFAF, filed a motion seeking to pay Bonistas $7,000,000 from Commonwealth funds under Section 15.2 of the COFINA Plan

874.    In addition to failing to disclose the payment's true nature of a bribe for Iziarry's The COFINA settlement does not specifically provide for payment to Bonistas is because it

---

[405] Third Amended Title III Plan of Adjustment for Puerto Rico Sales Tax Financing Corporation dated January 9, 2019, § 15.2 [Docket No. 4658] (the "Plan").

clearly presents a direct conflict of interest, *i.e.*, Bonistas had an incentive to accept less for the

bondholders it purportedly represented and a higher recovery for the Commonwealth through an

increased amount in fees paid by the Commonwealth.

### k.  **Other COFINA-Related Misrepresentations**

875.    The Oversight Board has repeatedly represented that the COFINA deal results in

$17 billion in savings. However, this figure cannot be accurate since

876.    As described in the report "The COFINA Effect: Who Wins, Who Pays"

published by Daniel Santamaría Ots, Senior Public Policy Analyst at Espacios Abiertos ("EA"),

> *COFINA agreement established that the holders of senior and junior COFINA bonds could trade their old bonds for new senior bonds, which would be backed by 54% of the 5.5% IVU revenues. A total of $11.8 billion in interest-bearing bonds, with a coupon of almost 6%, was traded for $9.6 billion in new bonds with an average coupon of 4.5%, and $6 billion in capital appreciation bonds were traded for $2.4 billion in new capital appreciation bonds. The holders of senior bonds received about 93 cents on the dollar, with 2 cents in addition for being members of the negotiating groups, while holders of junior bonds received 56.4 cents on the dollar.*

877.    And as explained in an earlier EA report,

> *The COFINA deal is not a simple exchange of old bonds for new bonds with lower value. With this exchange, bondholders are gaining in important ways. While the old bonds were a mix of senior and junior bonds, the new bonds are all senior. The old junior bonds get the largest reduction but they gain seniority. In effect, the deal has improved rather than decreased the bondholders' expected recovery, as reflected by the increase in the prices of those bonds over the last year due to increasing optimism over the expected recovery—an optimism that was confirmed by the exchange.*
>
> *Even if the considerations above were not taken into account for choosing the discount factor for future debt payments, the government of Puerto Rico's announcement that the deal entails savings of $17 billion is simply wrong. That figure assumes, first, that the future payments scheduled for the old and new COFINA*

*bonds should be discounted at the same rate; and second, it assumes a discount rate of zero. None of those assumptions make [sic] sense.[406]*

878.     The COFINA Bond Prices Graph *above* illustrates the falsity of the $16 billion in savings claim. As explained in the COFINA Effect Report, the graph is

*a consolidation of all the bonds, and one sees that the final price of the new bond is higher than the prices that the markets anticipated before hurricanes Irma and Maria. The pre-hurricane prices reflected what the markets believed was the Puerto Rican government's actual ability to pay the COFINA bonds, and are the levels that should have been used as the starting point in negotiations.*

*Instead, what the COFINA agreement endorsed were the financial markets' expectations about the amounts of post-disaster aid funds to be assigned, amounts that began to be speculated about in federal government spheres at that time. But those funds were to be used for reconstruction, not for higher payments to bondholders. Sadly, what the agreement did was validate the market's expectations instead of taking as reference the pre-hurricane levels.*

*It is stunning that for a debtor as "strapped" (to use a non-technical word for it) as Puerto Rico, a bond in a state of default, like that of COFINA in the consolidated graph below, should go from being worth approximately 30 cents on the dollar weeks before a major hurricane to a worth of 50 cents on the dollar in mid-2018....*

*The agreement, however, did leave in a better situation the New York hedge funds that bought the bonds at 30 cents on the dollar and doubled their investment within months. But the local bondholders, who had bought the bonds years earlier in good faith at 100% and had to sell at 30 cents on the dollar, seeking liquidity in their investments in order to face the sequels of the devastating hurricanes Irma and Maria, were not left so happy. The relief produced by the agreement was not even close to achieving the figures that outside experts considered necessary. The $17 billion*

---

[406] The COFINA Effect: who wins, who pays, at 11-12 (February 2020) (*quoting* "Puerto Rico's Debt Dilemma," Espacios Abiertos, San Juan, PR, May 2019, p. 18).

> *in "savings" that both the Financial Oversight and Management Board and the government announced, and that is still to be seen on the COFINA website, is a figure that experts say makes no sense and that this report confirms is wrong. That this calculation is still defended by both the Board and the government defies the laws of finance, ignores basic principles of asset valuation, and calls into question the capacity or intentions of those who are supposed to be defending the interests of the people of Puerto Rico.[407]*

879.   Based on the foregoing, it is clear that that the Oversight Board's representation that its initiatives are projected provide "$17 billion in savings" is false and constitutes a misrepresentation.  Moreover, given these representations have been made in fiscal plans issued by the Oversight Board pursuant to its duties under PROMESA, such misrepresentations were made with an intent to influence the Title III Court and with an intent to have the Title III Court rely on those misrepresentations in determining whether to approve the incorporating plan of debt adjustment and disclosure statement.  As such, such misrepresentations constitute a fraud on a federal court.

880.   In addition, the Oversight Board has claimed in multiple fiscal plans that its proposed initiatives would result in substantial savings through projected increases in tax revenue.  Its calculations, however, have widely varied and suggests impropriety. To wit, the Oversight Board projected an increase of $1.74 billion in March of 2017, and though remaining relatively constant in the fiscal plans for April and October of 2018, precipitously dropped from $554 million to $509 million in the projections in the 2019 fiscal plan.  This suggests that the Oversight Board may have intentionally made false statements in relation to the projected revenues in one or more fiscal plans.

## l.   <u>GO and PBA Bond Plan Support Agreement and COFINA</u>

---

[407] The COFINA Effect Report, at 12-13.

881.    On February 9, 2020, the Oversight Board, as representative of the Commonwealth, PBA and ERS, entered into a Plan Support Agreement with certain GO Bond Claims, PBA Bond Claims, and/or Commonwealth Guarantee Bond Claims.  On February 14, 2020, the Oversight Board issued its "Notice of Opportunity to Join the Plan Support Agreement," inviting other holders of GO bonds, PBA bonds, and/or PRIFA bond anticipation notes to enter into the agreement.

882.    Of note, as of the date of this PSA, the main debt of the central government is the bonds, which total approximately $18.7 billion (general obligation bonds and those of the PBA). At this juncture, the primary holders of these bonds are hedge funds.

883.    As part of the PSA, the Oversight Board purportedly waive any action to invalidate the bonds, including in the case where such bonds were issued in excess of the Puerto Rico constitutional debt limit.  Existing challenges filed as part of the Title III proceedings total $9 billion, although the dollar amount of bonds issued in excess of the constitutional debt limit is substantially higher since the Hub-and-Spoke Conspiracy agreed only to challenge certain disfavored bond issuances.

884.    In addition, pursuant to the PSA, the Oversight Board not only waived the right to challenge the subject bonds but also considerably increases the payment for them compared to previous proposals.  Bonds previously challenged bonds would receive 65 to 72 cents per dollar under this PSA, whereas unchallenged bonds would receive 75 to 77 cents per dollar.

885.    The oversight board promotes the agreement on the grounds that it cuts 70% of the central government's debt. However, the impairment to these bondholders – who own the main government debt – is a reduction 27% on average.  Put differently, hedge funds a party to the PSA would have an average recovery of 73% under the PSA.

886.    The repayment period under the PSA runs for twenty years, ten years less than the previous proposal.  This term was exchanged for an upfront cash repayment of $3.8 billion to bondholders. The cash contemplated to repay this amount is purportedly held in reserve by Puerto Rico's Department of the Treasury.  As of January 31, 2020 this reserve had $9 billion.

887.    It should be noted that the money from this reserve could be used for the reconstruction of the country that is still recovering from Hurricane Maria and, recently, from the earthquake and its aftershocks. However, the Oversight Board decided it would be better to make cash payments to these hedge funds instead.

888.    The new agreement contemplates that half of the bonds to be restructured will be exchanged for COFINA bonds.  This feature of the restructuring will require the Legislature of Puerto Rico to approve a bill to transfer to COFINA (and its bondholders) a portion of the sales and use tax (SUT) proceeds that belong to the central government. Thus, bondholders would exchange unsecured bonds for secured bonds with the payment of the SUT.

889.    The vast majority of the contemplated reduction in claims – 70 percent – is incurred by three groups of creditors, whose claims together total about $16 billion. On average these creditors will receive a 97% cut.  These creditor groups include (1) ERS bondholders, (2) PRIFA, HTA, and Convention District Authority bondholders, whose sources of repayment heavily rely upon "clawback" revenues, and (3) unsecured creditors such as the companies that offered their services to the government (mostly local businesses), workers to whom the government owes money, and plaintiffs who have won sentences against the government. In the previous plan of adjustment the oversight board offered them up to 1.8 cents per dollar.

## XX.    Corrupt Activities Involving BDO

262

a. **Hiring of BDO and Its Scope of Services**

890.    Between February 2, 2017[408] and January 9, 2019, a span of less than two years, the Oversight Board awarded contracts to BDO Puerto Rico to perform services for the Treasury Department in the amount of $22,222,015.[409]

b. **The Arrest of BDO Puerto Rico President**

891.    On June 24, 2019, then-Secretary of Treasury Raúl Maldonado Gautier said in an interview with radio station WKAQ that the FBI was investigating corrupt officials at the Department of Treasury and proceeded to call the department an "institutional mafia."[410]  More specifically, he alleged that Puerto Rico Government officials at the Treasury Department were engaging in, *inter alia*, "influence peddling, debt erasure, and extortion."[411] Maldonado Gautier added that some of the officials in question are affiliated to the highest levels of the administration.[412]

892.    ***Significantly, Maldonado Gautier was also the then-director of the Puerto Rico OMB***, while also serving as the government's Chief Financial Officer and as Treasury Secretary.[413]

---

[408] However, it should be noted that the Oversight Board Press Release dated February 7, 2020, states that BDO Puerto Rico had performed services for the Commonwealth since 2016, rather than on or after February 2, 2017, which appears to be the date when the Oversight Board awarded BDO Puerto Rico its first contract.
[409] Contract numbers 2017-000198; 2017-000198; 2017-000223; 2017-000224; 2017-000277; 2017-000283; 2018-000097; 2018-000097; 2018-000098; 2018-000155; 2019-000003; 2019-000003; 2019-000025; 2019-000025; 2019-000025; 2019-000026; 2019-000026; 2019-000026; 2019-000145; 2019-000145; 2019-000228; and 2019-000228.
[410] *See* "Governor of Puerto Rico Ricardo Rosselló Is Being Accused of Corruption: A Breakdown, latinorebels.com (June 25, 2019) (last accessed on February 7, 2020) (available at https://www.latinorebels.com/2019/06/25/rossellocorruptionaccusation/).
[411] *Id.*
[412] *Id.*
[413] *Id.*

893.    This radio interview prompted then-Governor Rosselló to demand Maldonado

Gautier's resignation.  In response, the son of the then-Secretary Maldonado Gautier, Maldonado

Nieves, accused Rosselló of corruption and stated that he had evidence of such.

894.    On June 25, 2019, the following day, Maldonado Nieves was interviewed by

radio station WKAQ as well and claimed that the Oversight Board was extorting his father.[414]  In

addition, Maldonado Nieves posted on Facebook that day the following claims:

> *"Clarifying what I said yesterday. I was in a meeting that there
> was no reason for me to be in. I was with my old man after
> exercising, which was the only time I shared with him. I was sitting
> in front of the governor's office. The old man comes in but the
> corrupt one invited me too... I see the president of BDO. I heard
> the real report of how United for PR did things wrong... How they
> stopped the distribution of containers to make the news."[415]*

Then-Governor Rosselló denied the claims as false.[416]

895.    On July 10, 2019, BDO Puerto Rico Managing Partner Fernando Scherrer Caillet,

former education secretary Julia Keleher, former executive director of Health Insurance

Adminstration Ángela Ávila Marrero, among others, were criminally indicted and arrested on

allegations of money laundering, wire fraud, theft, and conspiracy to commit such crimes, among

other things.  Those indicted were accused of unlawfully steering about $15.5 million in federal

contracts to politically connected consultants.  In addition, Velázquez Piño, a consultant with

Azur LLC for, a BDO subcontractor that oversaw the Health Insurance Administration of Puerto

Rico (ASES), was also indicted for wire fraud, theft, money laundering, and conspiracy to

commit such crimes.

---

[414] *Id.*
[415] *Id.*
[416] *Id.*

896.    On August 8, 2019, the Oversight Board published a press release announcing the issuance of an RFP "seeking submissions to conduct a financial examination of audit, accounting and other services performed by BDO Puerto Rico since 2016."[417]

897.    Notably, the Oversight Board begun to enter into recession agreements BDO Puerto Rico to terminate certain agreements among themselves starting in May 2019, *prior to* the revelations that precipitated the Oversight Board's August 2019 RFP.

898.    According to the press release, as of that date, BDO Puerto Rico "held over 95 contracts, subject to over 100 amendments, with the Commonwealth of Puerto Rico and its instrumentalities during that period."[418]  Further, the press release represented that "[t]he purpose of the investigation is to determine whether the integrity of any of the services provided by BDO was affected by alleged fraudulent activities of the firm's former managing partner who was recently charged by federal authorities."[419]

899.    The press release quotes Executive Director Natalie Jaresko, stating

> *"Complete visibility, and accountability for public funds are essential for good governance. The people of Puerto Rico have a right to know that services were provided in accordance with contracts," said the Oversight Board's Executive Director Natalie Jaresko. "If the services required to be provided by BDO Puerto Rico and its affiliates were compromised, the people deserve to know.*

900.    As such, the Oversight Board represented that it "expects to have a final investigation report within 90 days of the commencement of the engagement" and promised to "exercise the full extent of its authorities to perform this investigation."[420]

---

[417] Oversight Board Press Release "Oversight Board to Investigate Services Provided by BDO Puerto Rico: Seeks to Determine if Integrity of Services was Affected by Alleged Fraudulent Activities," at 1 (August 8, 2019).
[418] *Id.*
[419] *Id.*
[420] *Id.* at 1-2.

901.   On January 18, 2020, following an earthquake, a warehouse stocked with emergency resources was discovered near the southern town of Ponce, Puerto Rico.[421] According to a report in the Miami Herald, "[m]uch of the aid, including bottled water and baby food, had been sitting around since the disastrous 2017 hurricane season and was expired. But there were also cots, generators, batteries and emergency radios."[422] Shortly thereafter, another warehouse stocked with supplies was discovered in Guaynabo, Puerto Rico.[423]

### c.   **Prolonged Delay of Investigation into BDO**

902.   On February 7, 2020, the Oversight Board finally announced the retention of auditing firm UHY Advisors Inc. "to review services performed by BDO Puerto Rico since 2016 for the Commonwealth of Puerto Rico and several instrumentalities."[424]

903.   According to the press release issued by the Oversight Board announcing the commencement of its investigation of BDO,

> [t]he purpose of the engagement is to determine whether the integrity of any of the services provided by BDO was affected by alleged fraudulent activities of the firm's former managing partner who last summer was charged by federal authorities.[425]

904.   In the press release, Executive Director Natalie Jaresko maintained that

> [a]ccurate financial reports are fundamental to Puerto Rico's fiscal and economic recovery.... Any doubt about the accuracy of financial reports needs to be investigated to ensure that accounting remains reliable and transparent. PROMESA has given the

---

[421] *See* "Anger grows in Puerto Rico over hidden emergency aid, government corruption," miamiherald.com (January 20, 2020) (last accessed on February 7, 2020) (available at https://www.miamiherald.com/news/nation-world/world/americas/article239469148.html).

[422] *Id.*

[423] *See* "Puerto Rican officials scramble to contain fallout from missing aid scandal," miamiherald.com (January 21, 2020) (last accessed on February 7, 2020) (*available at* https://www.miamiherald.com/news/nation-world/world/americas/article239497583.html).

[424] Oversight Board Press Release "Oversight Board Selects UHY Advisors to Review Services Performed by BDO," at 1 (February 7, 2020).

[425] *Id.*

266

> *Oversight Board a mandate to help Puerto Rico to achieve fiscal responsibility, and financial reports are a big part of that goal.*[426]

905.   Clearly, the concern expressed by Jaresko over the need for accurate financial reports and the importance for an investigation is betrayed by the fact that the Oversight Board failed to meet the 90-day timeframe it set for itself in August 2019, missing the mark by 4 months.  In truth, the 7-month period of time <u>from</u> when the Oversight Board issued the August 2019 RFP to investigate whether and to what extent the integrity of services was affected by the alleged fraudulent practices of BDO Puerto Rico <u>to</u> the hiring of a firm to conduct the investigation reflects the Oversight Board's true lack of concern the integrity of the financial statements produced by BDO Puerto Rico prior to the arrest of its president and strong suggests complicity at the very least.

906.   These press releases constitute fraud upon a federal court because, as Jaresko and the Oversight Board know as co-conspirators, (i) BDO Puerto Rico was/is part of the hub-and-spoke conspiracy; (ii) the Oversight Board did not and does not intend on allowing an investigation of BDO Puerto Rico to expose the criminal conspiracy or the illegal acts performed in furtherance of the criminal conspiracy, and therefore such an investigation would be instituted and carried out in bad faith; and (iii) these press releases were drafted and issued with the intent on having the Title III Court rely on the representations when considering the approval of acts or documents submitted to the Title III Court, even though the Oversight Board knew such a reliance was not grounded in fact.

## XXI.   **Misappropriation of Federal Funds and Fraud in GDB Title VI Proceedings**

### a.   **Scheme Overview**

---

[426] *Id.*

907.    Between 2014 to 2019, certain defendants of the criminal enterprise conspired to commit and executed an unlawful scheme to misappropriate and misuse federal clean water and drinking water funds in order to make unauthorized payments to GDB bondholders.  These defendants include

- Financial Advisors: McKinsey & Co., Rothschild, Ernst & Young, Conway MacKenzie, Ankura, FTI, Zolfo Cooper
- Banks: Citigroup, Bank of America Merrill Lynch
- Law firms: Proskauer Rose, Cleary Gottlieb, O'Melveny & Meyers, Paul Hastings, Greenberg Traurig
- Gov't Entities: AAFAF, GDB, Oversight Board.

908.    Applicable federal statutes and regulations severely limit the transfer or use of funds allocated to clean water state revolving fund (CWSRF) and the drinking water fund (DWSRF) (together, the "Federal Water Funds"), the monies of which may only be used to fund the construction of water facilities (subject to narrow exceptions not relevant here).

909.    Despite these legal prohibitions, however, the criminal defendants knowingly and intentionally engaged in an unlawful scheme to misappropriate CWSRF and DWSRF funds and to impose liability on the Commonwealth, despite the fact the people of Puerto Rico did not benefit from the intended use of the funds.

910.    The unlawful scheme was originally conceived of in or around 2014, when the Commonwealth retained Proskauer Rose, Cleary Gottlieb, and Milstein & Co. (predecessor to Guggenheim Securities Advisors) to assist the Commonwealth deal with liquidity concerns. Once in place, these advisors identified approximately $170 million in federal water funds held at the GDB on behalf of PRASA.

268

911.    On information and belief, it is submitted that these restructuring firms advised or

directed PRASA to cease funding water projects, allowing the Federal Water Funds to grow to

$190 million by 2016.

912.    Based on information and belief, in or around June 2016, the GDB unlawfully

transferred the federal water funds to a newly created Banco Popular bank account.  After some

time having passed, the GDB then transferred the federal water funds from Banco Popular to

GDB bondholders, directly or indirectly, either prior to the filing of the Title III proceedings in

May 2017 or as part of the consummation of the GDB Qualifying Modification in February

2019.

913.    In order to impose liability on the Commonwealth for the misappropriated funds,

co-conspirator law firms unlawfully coordinated legal submissions to ensure the Commonwealth,

rather than liable intermediate transferees or GDB bondholders in receipt of the federal water

funds would be liable for the misappropriated funds.

914.    In carrying out the unlawful scheme, the co-conspirators repeatedly, continuously,

and systematically misled federal authorities including officials at the EPA as well as the Title III

federal court as part of the Commonwealth's debt adjustment proceedings under PROMESA.

Instances of misrepresentations and fraudulent omissions include statements made to the EPA

officials as part of its April 2017 investigative report into whether the federal water funds had

been misappropriated, as well as numerous representations made concerning the

Commonwealth's liquidity during its Title III and Title VI debt adjustment proceedings, such as

the fiscal plans for PRASA and GDB.

915.    Indeed, the theft of the federal funds is readily apparent by tracking the changes

from earlier to more recent PRASA and GDB fiscal plans.  Versions of the fiscal plans from

2017 acknowledge that the GDB was holding approximately $190 million in federal water funds on behalf of PRASA. However, each reference to the $190 million balance was removed from the 2018 versions. To the contrary, the 2018 PRASA and GDB fiscal plans now made mention that the Commonwealth would *repay* the $190 million in order to restore access to federal water funds. Nowhere in official documents is it explained how PRASA's $190 million held on deposit somehow *became a liability* for which the Commonwealth would find itself on the hook.

916.   This omission was no mere oversight. Rather, the conspirators conducted numerous meetings and phone conferences to discuss the existence of these funds, how they could be used, and how the fiscal plans would reflect the disappearance of the misappropriated funds. Billable hour logs submitted by certain defendants to the Title III court establish that that the conspirators were specifically discussing, among other things, a "methodology change involving PRASA allocation of funding," the "state revolving fund payment from General Fund," "the treatment of state revolving funds in fiscal plan," and "state revolving fund payment and inclusion in FY19 general fund budget." In fact, EY created a document in connection with "the FOMB presentation on Federal Funds and variances between the FP and the Gov't submission."

### b.  **EPA Federal Funds Legal Restrictions**

917.   Title VI of the Clean Water Act of 1987 established the Clean Water State Revolving Fund (CWSRF) program, providing financial assistance to fund water pollution control projects.

918.   Separately, the Safe Drinking Water Act Amendments of 1996 established the Drinking Water State Revolving Fund (DWSRF) program to help states implement the public health protection objectives of the act and provide safe drinking water.

270

919.    According to the U.S. Government Accountability Office's "A Glossary of Terms Used in the Federal Budget Process," a revolving fund is

> *[a] fund established by Congress to finance a cycle of businesslike operations through amounts received by the fund. A revolving fund charges for the sale of products or services and uses the proceeds to finance its spending, usually on a self-sustaining basis. Instead of recording the collections in receipt accounts, the budget records the collections and the outlays of revolving funds in the same account. A revolving fund is a form of permanent appropriation.*[427]

920.    The defining feature of a revolving fund is the capitalizing grant from Congress does not create indebtedness for the recipient state.  Instead, the recipient state only incurs indebtedness once it draws down from the revolving fund for the specified use.

921.    33 U.S.C. § 1381 provides the EPA with the authority to make CWSRF capitalization grants to each State[428] "for the purpose of establishing a water pollution control revolving fund to accomplish the objectives, goals, and policies of this Act by providing assistance for projects and activities identified in [33 USC § 1383(c)].[429]

922.    Similarly, 42 U.S.C. § 300j-12, Drinking Water State Revolving Fund (DWSRF) capitalization grants to each State[430] "to further the health protection objectives of this title [and] promote the efficient use of fund resources," among other things.[431]

923.    In relevant part, 33 U.S.C. § 1383(c) limits the use of CWSRF monies to

> ***Projects and activities eligible for assistance***. *The amounts of funds available to each State water pollution control revolving fund shall be used only for providing financial assistance to*

---

[427] GAO-05-734SP Budget Glossary, at 88 (*available at* https://www.gao.gov/new.items/d05734sp.pdf).

[428] 33 U.S.C.S. § 1362 ("The term 'State' means a State, the District of Columbia, the Commonwealth of Puerto Rico, the Virgin Islands, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the Trust Territory of the Pacific Islands.").

[429] 33 U.S.C.S. § 1381 (emphasis in the original).

[430] 42 U.S.C.S. § 300f ("[T]he term "State" means each of the 50 States, the District of Columbia, and the Commonwealth of Puerto Rico.").

[431] 42 U.S.C.S. § 300j-12(a)(1)(A).

> *(1) to any municipality or intermunicipal, interstate, or State agency for construction of publicly owned treatment works…;*
>
> *(2) for the implementation of a management program [thereto];*
>
> *(4) for the construction, repair, or replacement of decentralized wastewater treatment systems that treat municipal wastewater or domestic sewage;*
>
> *(5) for measures to manage, reduce, treat, or recapture stormwater or subsurface drainage water[.]*

924.     Similarly, 42 U.S.C. § 300j-12(A)(2)(B) restricts the use of DWSRF monies, providing

> *Financial assistance under this section may be used by a public water system only for expenditures (including expenditures for planning, design, siting, and associated preconstruction activities, or for replacing or rehabilitating aging treatment, storage, or distribution facilities of public water systems, but not including monitoring, operation, and maintenance expenditures) of a type or category which the [EPA] has determined, through guidance, will facilitate compliance with national primary drinking water regulations… or otherwise significantly further the health protection objectives of this title.*[432]

925.     In addition, 42 U.S.C. § 300j-12(b)(3) provides that "priority for the use of funds be given to projects that…(i) address the most serious risk to human health," "(ii) are necessary to ensure compliance with the requirements of this title," and (iii) "assist systems most in need[.]"[433]

### c.   **EPA Federal Funds Regulatory Restrictions**

926.     The EPA Federal Funds are also subject to various regulations.

---

[432] 42 U.S.C.S. § 300j-12(a)(2)(B).
[433] 42 U.S.C.S. § 300j-12(b)(3).

272

927.    In relevant part, 40 C.F.R. § 35.3115(a) circumscribes the use of the CWSRF funds, providing

> *Funds in the SRF shall not be used to provide grants. SRF balances <u>must be available in perpetuity</u> and <u>must be used solely</u> to provide loans and other authorized forms of financial assistance:*
>
>> *(a) [t]o municipalities, intermunicipal, interstate, or State agencies* ***for the construction of publicly owned wastewater treatment works****…*
>>
>> *(b) [f]or implementation of a nonpoint source pollution control management program…and*
>>
>> *(c) [f]or development and implementation of an estuary conservation and management plan.*[434]

928.    Similarly, 40 C.F.R. § 35.3510(d) circumscribes the use of the DWSRF funds, providing, in relevant part,

> *(d)  Use of funds.*
>
>> *(1) Assistance provided to a public water system from the DWSRF program <u>may be used only for</u> expenditures that will facilitate compliance with national primary drinking water regulations applicable under section 1412 or otherwise significantly further the public health protection objectives of the Act.*[435]

929.    Among other things, 40 C.F.R. § 35.3135(e) conditions the receipt of CWSRF on the following requirements

> *(1) The State must agree to first use funds in the SRF equaling the amount of the grant,* ***all repayments of principal and payments of interest on the initial loans from the grant****, and the state match to address any major and minor publicly owned treatment work… previously identified as part of the National Municipal Policy list for the State….*

---

[434] 40 C.F.R. § 35.3115(a) (emphasis added); see also 40 C.F.R. § 35.3530 (allowing for earned interest on DWSRF monies) .

[435] 40 C.F.R. § 35.3510(d) (emphasis added).

273

> *(4) Other funds in the SRF may be used at any time for the construction of any treatment works on the State's priority list or for activities under sections 319 and 320 of the Act.[436]*

930.   Concerning, 40 C.F.R. § 35.3550(f) conditions the receipt of DWSRF funds upon, among other things, the follow requirements

> *(f) Deposit of funds. A State must agree to promptly deposit DWSRF program funds into appropriate accounts.*
>
> *(1) A State must agree to deposit the portion of the capitalization grant to be used for projects into the Fund.*
>
> *(3) A State must agree to deposit net bond proceeds, interest earnings, and **repayments** into the Fund.[437]*

931.   In other words, (i) SRF monies may only be used to fund clean water or drinking water infrastructure projects; (ii) payments made in satisfaction of loans made using SRF monies must be deposited in the respective CWSRF and the DWSRF accounts; and (iii) such amounts may only be used to fund addition clean water and drinking water infrastructure projects.

932.   In addition, 40 C.F.R. § 35.3120(f) authorizes holders of CWSRF accounts to earn interest on those funds.[438]

933.   To the extent that CWSRF and DWSRF funds are transferable, 40 C.F.R. § 35.3530 permits only transfers between the two funds, subject to certain legal strictures.[439]

934.   In addition, 2 C.F.R. § 200.113 provides that

> *The non-Federal entity or applicant for a Federal award must disclose, in a timely manner, in writing to the Federal awarding agency or pass-through entity all violations of Federal criminal*

---

[436] 40 C.F.R. § 35.3135(e) (emphasis added); *see* 40 C.F.R. § 35.3545(d)(3) (DWSRF functional equivalent, requiring the State "manage the Fund in accordance the requirements and objections of the Act and this subpart); see also 40 C.F.R. § 35.3555(c) (requiring funds be used in compliance with a State's Intended Use Plan, which must include, among other things, the name of the public water system of which the project will become a component part).
[437] 40 C.F.R. § 35.3550(f) (emphasis added).
[438] 40 C.F.R. § 35.3120(f).
[439] 40 C.F.R. § 35.3530.

> *law involving fraud, bribery, or gratuity violations potentially affecting the Federal award. Non-Federal entities that have received a Federal award including the term and condition outlined in Appendix XII--Award Term and Condition for Recipient Integrity and Performance Matters are required to report certain civil, criminal, or administrative proceedings to SAM. Failure to make required disclosures can result in any of the remedies described in § 200.338 Remedies for noncompliance, including suspension or debarment.*

935.   In addition, 2 C.F.R. § 200.300 provides that

> *(a) The Federal awarding agency must manage and administer the Federal award in a manner so as to ensure that Federal funding is expended and associated programs are implemented in full accordance with U.S. statutory and public policy requirements: including, but not limited to, those protecting public welfare, the environment, and prohibiting discrimination. The Federal awarding agency must communicate to the non-Federal entity all relevant public policy requirements, including those in general appropriations provisions, and incorporate them either directly or by reference in the terms and conditions of the Federal award.*

> *(b) The non-Federal entity is responsible for complying with all requirements of the Federal award.*

d.   **Administration of Puerto Rico's State Revolving Funds**

936.   In 1991, the EPA and the Puerto Rico Environmental Quality Board (EQB) entered into an operating agreement for implementing and managing the CWSRF.

937.   In May 1998, the EPA entered into a similar agreement with the Puerto Rico Department of Health (DOH) for the DWSRF.

938.   Thereafter, the EQB and DOH established memorandums of understanding with other entities that assist in the administration of the CWSRF and DWSRF, including the Puerto Rico Infrastructure Financing Authority (PRIFA), PRASA, and the GDB.

e.   **EPA Allotment of Drinking Water Funds to Puerto Rico**

275

939.    For the fiscal years spanning 2010 to 2013, the EPA allotted to Puerto Rico

drinking water funds in the amount of $13,573,000, $9,418,000, $8,975,000, and $8,421,000,

respectively.[440]

940.    For the fiscal years spanning 2014 to 2016, the EPA allotted to Puerto Rico

drinking water funds in the amount of $8,845,000, $8,787,000, $8,312,000, respectively.[441]

941.    For the fiscal years spanning 2017-2019, the EPA allotted to Puerto Rico drinking

water funds in the amount of $8,241,000, $11,107,000, and $11,004,000, respectively.

942.    According to the EPA, the total amount allotted to Puerto Rico in drinking water

funds through fiscal year 2019 is $248,301,000.[442]

### f.    EPA Allotment of Clean Water Funds to Puerto Rico

943.    For fiscal year 2013-2016, the EPA allotted to Puerto Rico clean water funds in

the amount of $17,589,000,[443] $18,472,000,[444] $18,377,000,[445] and $17,602,000,[446] respectively.

944.    For fiscal year 2017-2019, the EPA allotted to Puerto Rico clean water funds in

the amount of $17,467,000,[447] $21,146,000,[448] and $20,933,000,[449] respectively.

945.    For fiscal year 2017-2019, the EPA allotted to Puerto Rico clean water funds in

the amount of $17,467,000, $21,146,000, and $20,933,000, respectively.

### g.    Public Money, Property or Records: 18 U.S.C. § 641

946.    In pertinent part, 18 U.S.C.S. § 641 provides

---

[440] See at https://www.epa.gov/dwsrf/annual-allotment-federal-funds-states-tribes-and-territories#tab-4.
[441] See at https://www.epa.gov/dwsrf/annual-allotment-federal-funds-states-tribes-and-territories#tab-5.
[442] See at https://www.epa.gov/dwsrf/annual-allotment-federal-funds-states-tribes-and-territories#tab-7.
[443] See at https://www.epa.gov/sites/production/files/2015-04/documents/fy_2013_cwsrf_allotments.pdf
[444] See at https://www.epa.gov/sites/production/files/2015-04/documents/fy_2014_cwsrf_allotments.pdf
[445] See at https://www.epa.gov/sites/production/files/2015-07/documents/cwsrf_allotments-2015_with_rescision.pdf
[446] See at https://www.epa.gov/sites/production/files/2016-12/documents/2016_cwsrf_final_allotments.pdf
[447] See at https://www.epa.gov/sites/production/files/2017-07/documents/fy_2017_cwsrf_final_allotments.pdf
[448] https://www.epa.gov/sites/production/files/2018-05/documents/fy_2018_cwsrf_final_allotments.pdf
[449] https://www.epa.gov/sites/production/files/2019-04/documents/fy_2019_cwsrf_final_allotments.pdf

> *Whoever embezzles, steals, purloins, or knowingly converts to his use or the use of another*, *or without authority, sells, conveys or disposes of any record, voucher, money, or thing of value of the United States or of any department or agency thereof, or any property made or being made under contract for the United States or any department or agency thereof; or*
>
> *Whoever receives, conceals, or retains the same with intent to convert it to his use or gain, knowing it to have been embezzled, stolen, purloined or converted—*
>
> *Shall be fined under this title or imprisoned not more than ten years, or both; but if the value of such property in the aggregate, combining amounts from all the counts for which the defendant is convicted in a single case, does not exceed the sum of $1,000, he shall be fined under this title or imprisoned not more than one year, or both.*[450]

### h. __18 U.S.C. § 1001__

947.   In pertinent part, 18 U.S.C. § 1001 provides,

> *(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive…of the Government of the United States, knowingly and willfully—*
>
> *(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;*
>
> *(2) makes any materially false, fictitious, or fraudulent statement or representation; or*
>
> *(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry[.]*

948.   Among other cases, this statute applies to false statements made in response to an investigation where the federal agency is acting as the "supervisor of disbursement" of federal funds,[451] exercising its "ultimate authority to see that the federal funds are properly spent."[452]

---

[450] 18 U.S.C. § 641 (2019) (emphasis added).
[451] United States v. Wright, 988 F.2d 1036, 1039 (10th Cir. 1993) (*quoting United States v. Wolf*, 645 F.2d 23, 25 (10th Cir. 1981)).

i. **4.26.17 EPA Report, "Over $774 Million of Puerto Rico State Revolving Funds at Risk"**

949.    On April 26, 2017, the EPA issued its report entitled "Over $774 Million of Puerto Rico State Revolving Funds at Risk" (the "EPA Report").[453]

950.    According to the EPA Report, the EPA's Office of Inspector General commenced an investigation into financial irregularities with Puerto Rico's Clean Water State Revolving Fund (CWSRF) and Drinking Water State Revolving Fund (DWSRF) after receiving a complaint on its fraud, waste, or abuse hotline on September 16, 2016.[454]

951.    More specifically, the hotline complaint alleged that $188 million in CWSRF and DWSRF monies held entrust at the GDB were missing.[455]  According to the EPA Report, "[t]he EPA was concerned about recovering the balance and the potential commingling and/or misuse of the funds."[456]

952.    According to the EPA Report, the $188 million identified in the hotline complaint referred only to the repayment portion of CWSRF and DWSRF as of August 31, 2016.[457] The EPA Report states as fact that, on November 7, 2016, the combined total balance of the funds equaled $194.5 million.[458]

---

[452] United States v. Wright, 988 F.2d 1036, 1039 (10th Cir. 1993) (*quoting United States v. Baker*, 626 F.2d 512, 514 n.5. (5th Cir. 1980)).
[453] Report No. 17-P-0186 (the "EPA Report").
[454] EPA Report, at 1.
[455] EPA Report, at 1.
[456] EPA Report, at 1.
[457] EPA Report, at 1, FN 1.
[458] EPA Report, at 1, FN 1.

953.    The EPA's investigation included, among other things, interviewing officials at the GDB, as well as Puerto Rico's lead restructuring adviser (at the time), Millstein & Co.[459]

954.    The EPA Report states that its investigators "saw no indication that the managing agencies used the revolving funds for purposes other than those intended."[460]

955.    Moreover, the EPA Report concluded that

*[t]he $194.5 million revolving fund balance at the GDB is not available for use solely because the bank does not have the assets to honor the amount. This is a result of the ongoing financial crisis of the government of Puerto Rico and the GDB. It is highly unlikely that the revolving funds will be* <u>*recovered*</u> *in the near future.* [461]

956.    In fact, according to the EPA Report, "[a]s of November 7, 2016, the total combined revolving fund balance at the GDB was over $194.5 million."[462]

957.    Relatedly, the EPA Report states that in a letter dated March 31, 2016, the EPA sent the Environmental Quality Board (EQB) a letter requesting information concerning the status of the SRFs held at the GDB.[463]

958.    According to the Report, in April 2016, the U.S. Treasury revoked electronic transfers of all federal funds to the GDB.[464]

959.    The EPA Report also states that the EPA revoked the GDB's authority to disburse such funds as well; however, the report fails to provide the date of the purported revocation.[465]

960.    Significantly, according to the EPA Report,

*[o]n April 11, 2016, the EPA wrote a letter to EQB and the GDB, expressing concern with the status of the revolving funds and*

---

[459] EPA Report, at 11.
[460] EPA Report, at 13.
[461] EPA Report, at 6 (emphasis added).
[462] EPA Report, at 19.
[463] EPA Report, at 22.
[464] EPA Report, at 23.
[465] EPA Report, at 23.

*advising that use of the funds for purposes other than the CWSRF and DWSRF would be in noncompliance with federal statutes and regulations.*

*The GDB responded on April 25, 2016, explaining the significance of the April 2016 moratorium and executive order **but not clarifying the use or status of the revolving funds**.*

*On May 6, 2016, the EPA again requested information on the status of the revolving funds from EQB and GDB. **The EPA received no response; however, on May 6 and May 23, 2016, GDB disbursed the federal funds that had been drawn on March 31, 2016, over a month after the federal cash draw**.*

*The EPA met with representatives from the EQB, the Financing Authority and the GDB September 12–15, 2016, to discuss the status of the revolving funds. **At these meetings, the EPA learned that the GDB did not have sufficient cash to honor the revolving funds, and that any future disbursements would be in limited amounts** in accordance with the moratorium.[466]*

961.    Notably, it was one day after the EPA 3-day meeting with the GDB and others that the EPA received the complaint on its hotline on September 16, 2016.[467]

962.    In June 2016, PRIFA opened new CWSRF and DWSRF accounts Banco Popular, according to the EPA Report.[468]

963.    Although it does not appear that PRIFA received permission from the EPA to open such accounts or to transfer cash from old CWSRF and DWSRF accounts to the Banco Popular accounts, the GDB disbursed approximately $1.1 million to the CWSRF and DWSRF accounts held Banco Popular from June 2016 to November 7, 2016. [469]

964.    The EPA Report also states that GDB transferred CWSRF and DWSRF funds to PRASA from April 6, 2016 to November 2016.[470]

---

[466] EPA Report, at 22-23.
[467] EPA Report, at 23.
[468] EPA Report, at 15, FN 8.
[469] EPA Report, at 15.
[470] EPA Report, at 15.

965.     According to the EPA Report, as of July 2, 2016, PRASA was unable to meet its financial obligations, including an $18.5 million loan repayment to the revolving funds.[471]

966.     However, the EPA Report also reveals that the EPA had already entered into a 6-month forbearance agreement with PRIFA, among others, in June of 2016.[472]

967.     On October 3, 2016, the EPA issued notices of noncompliance that the managing agencies were not incompliance with the following requirements:

> *(i) Establish, maintain and credit the revolving funds with repayments, and ensure that the balances will be available in perpetuity;*
>
> *(ii) Maintain the revolving funds in a manner that ensures the funds are used for authorized purposes; [and]*
>
> *(iii) Establish separate revolving fund accounts.[473]*

968.     According to the EPA Report, the last draw down of the SRF funds authorized by the EPA as of the date of the EPA Report was March 31, 2016.[474]

969.     However, the report fails to indicate how much cash, if any, was drawn from the CWSRF and DWSRF on March 31, 2016 and then disbursed prior to April 6, 2016.

970.     In a portion of the EPA report addressing "Puerto Rico's Revolving Fund Project Needs," the following table[475] is provided indicating the number of CWSRF and DWSRF projects "ready to proceed" in 2015:

---

[471] EPA Report, at 12.
[472] EPA Report, at 12.
[473] EPA Report, at 24.
[474] EPA Report, at 24.
[475] EPA Report, at 7.

281

**Table 1: Summary of FY 2015 revolving fund projects ready to proceed**

| Revolving Fund | Number of projects | Total estimated project costs | Total considered for funding |
|---|---|---|---|
| CWSRF | 15 | $86,044,408 | $86,044,408 |
| DWSRF | 31 | 184,663,968 | 20,651,588 |
| **Total** | **46** | **$270,708,376** | **$106,695,996** |

Source: IUPs submitted by EQB and DOH for FY 2015 CWSRF and DWSRF capitalization grants.

971.    The EPA also reports that the directive given by the Puerto Rico Treasury Department to switch accounting methods so that the realizable balance of each account should be determined based on the corresponding repayments received at the end of the government of Puerto Rico's fiscal year on June 30, 2016 and that "difference between the recorded balance amount and the realizable balance should be accounted for as an impairment loss."[476]

972.    As such, the EPA Report represents that

*If applied to the revolving funds, this approach would result in a significant impairment loss to the CWSRF and DWSRF; as of June 30, 2016, the outstanding combined revolving fund balance at the GDB totaled at least $194.5 million.[477]*

973.    In a letter from PRASA to the EPA dated February 26, 2016 (the "February 26 Letter"), PRASA asked the EPA for relief from its payment obligations in connection to the CWSRF and DWSRF.[478]

974.    In addition, the February 26 Letter informed the EPA that PRASA had postponed or terminated virtually all of its activate construction projects in 2015.[479]  Moreover, PRASA

---

[476] EPA Report, at 17.
[477] EPA Report, at 17.
[478] EPA Report, at 17.
[479] EPA Report, at 17.

282

revealed that it owed $140 million to its contractors and suppliers.  At the time, most of the debts
were over 180 days past due, including some year-old defaulted obligations.[480]

### j.   **PROMESA, Fiscal Plans, and the Puerto Rico Budget**

975.   Pursuant to PROMESA's purposes, Congress provided the FOMB with certain
limited powers, which include the authority to approve annual fiscal plans developed by the
Governor of Puerto Rico, (See, PROMESA § 201; 48 U.S.C. § 2121(b)(1), and annual budgets
submitted by the Governor of Puerto Rico to the Puerto Rico Legislature (See, PROMESA §202;
48 U.S.C. §2142).

976.   As stated in House Report 114-602:

> *This section imposes a requirement that the Legislature of a
> territorial government provide a cost estimate with each duly
> enacted law, as well as a certification by the Legislature that such
> law is consistent with the Fiscal Plan. If the law is significantly
> inconsistent with the Fiscal Plan, or does not have a cost estimate
> associated with it, then the Oversight Board is granted the
> authority to 'take such actions as it considers necessary,' including
> preventing enforcement of such laws.*

977.   Under Section 204 of PROMESA, Congress provided the FOMB with an
additional, limited power to review the impact that Commonwealth laws will have "on revenues
and expenditures" 48 U.S.C.A. § 2144 (a) states: (a) Submission of legislative acts to Oversight
Board

> *(1) Submission of acts Except to the extent that the Oversight
> Board may provide otherwise in its bylaws, rules, and procedures,
> not later than 7 business days after a territorial government duly
> enacts any law during any fiscal year in which the Oversight
> Board is in operation, the Governor shall submit the law to the
> Oversight Board.*

---

[480] EPA Report, at 17.

*[...]*

*(5) Failure to comply*

*If the territorial government fails to comply with a direction given by the Oversight Board under paragraph (4) with respect to a law, the Oversight Board may take such actions as it considers necessary, consistent with this chapter, to ensure that the enactment or enforcement of the law will not adversely affect the territorial government's compliance with the Fiscal Plan, including preventing the enforcement or application of the law.*

978.     In drafting Section 204 of PROMESA, Congress did not provide the FOMB with the authority to unilaterally nullify legislative acts or enacted laws, in contrast to Public Law 104-8, which created the oversight board for the District of Columbia. See, H.R. Rep. No. 114-602, at p. 111 (2016) ("[PROMESA] establishes a board that is robust but reasonable. Its powers are far less potent than the powers the Congress conferred upon the board that it established for the District of Columbia in Public Law 104-8 ...."); Id. at 113 ("An earlier version of PROMESA ... required the oversight board to review every legislative act enacted by the Puerto Rico government and to make a determination—in the board's sole discretion—about whether each act was consistent with the certified fiscal plan .... [I]f the board determined that the act was significantly inconsistent with the fiscal plan, the board was required to declare the act "null and void." This was essentially the procedure in place for the District of Columbia under Public Law 104–8 ....").

979.     In contrast to Public Law 104-8, PROMESA requires an interactive process between the FOMB, the Governor and the Puerto Rico Legislature before the FOMB "may take such actions as it considers necessary, . . . to ensure that the enactment or enforcement of the law will not adversely affect the territorial government's compliance with the Fiscal Plan, including

284

preventing the enforcement or application of the law." Id., § 2144(a)(5). To trigger this enforcement provision, however, the law must be "significantly inconsistent with the Fiscal Plan ..." Id., § 2144(a)(4)(B).

980.     Importantly, the FOMB's power under §204(a) is limited to laws enacted "during any fiscal year in which the Oversight Board is in operation[.]" Id., § 2144(a)(1). That is, to laws enacted after, rather than before the FOMB became operational. Had Congress intended to grant the FOMB the power to "prevent the enforcement or application" of Commonwealth laws existing prior to the FOMB becoming operational, it would have said so plainly when it enacted PROMESA. Thus, Congress clearly did not provide the FOMB with boundless authority to invalidate Commonwealth laws, since there is no other provision allowing the FOMB to "prevent the enforcement or application" of Commonwealth laws that are inconsistent with a Fiscal Plan other than section § 204(a) of PROMESA.

981.     Congress also provided the FOMB with the power to submit "recommendations to the Governor or the Legislature on actions the territorial government may take to ensure compliance with the Fiscal Plan, or to otherwise promote the financial stability, economic growth, management responsibility, and service delivery efficiency of the territorial government[.]" See, PROMESA §205(a); 48 U.S.C.A. § 2145(a). The only consequence the Legislature or Governor face for not adopting a recommendation is that "the Governor or the Legislature" submit a statement with "explanations for the rejection of the recommendations . . . to the President and Congress." See, § 205(b)(3); 48 U.S.C.A. § 2145(b)(3). Importantly, PROMESA does not allow the FOMB to impose any punitive measure against any component of the government of Puerto Rico for not adopting a recommendation submitted by the FOMB under § 205 of PROMESA, which is precisely what the FOMB did.

285

982.     The FOMB demanded that the Legislative Assembly approve a bill repealing Law 80 as a condition for the approval of the Commonwealth's budget, and then retaliated after the Legislative Assembly did not repeal Law 80 in the way and manner in which the FOMB dictated.

983.     On April 24, 2018 the FOMB submitted to the Legislative Assembly a labor reform draft bill that included repealing Law 80. 9 The FOMB's draft bill also included (i) amendments to Article 2 of Law No. 180-1998, to increase the minimum wage by $0.25 cents for certain individuals; (ii) a repeal of the Christmas bonus law for employees in the private sector effective September 30, 2018; (iii) amendments aimed to reduce the amount of paid vacation days and the amount of sick leave; and (iv) restrict claims under the local whistleblower statute to employment law violations, reducing the statute of limitations for such claims from three years (3) to one (1) year, and eliminate treble damages.

984.     The proposed legislation in the FOMB's labor reform draft bill stemmed from a Fiscal Plan issued on April 19, 2018 (the "April 2018 Fiscal Plan"). 11 Under the section titled "Structural reform initiatives to change labor conditions" the April 2018 Fiscal Plan states, in relevant part, that:

> To reduce the cost to hire and encourage job creation, including movement of informal jobs to the formal economy, Puerto Rico must become an employment at will jurisdiction, reduce mandated paid leave (including sick leave and vacation pay) by 50%, and make the Christmas Bonus voluntary for employers. At-will employment (in place by January 1, 2019): 49 out of 50 U.S. states are employment-at will jurisdictions, giving employers the flexibility to dismiss an employee without having to first prove just cause. Matching this policy will lower the cost and risk of hiring in Puerto Rico. Reduction of mandated paid leave, including sick leave and vacation pay (effective immediately): Most U.S. states do not mandate any vacation or sick leave. The Government shall halve mandated vacation and sick leave, resulting in 14 days per

286

> *year of vacation and sick leave in a move to align worker protections with typical mainland labor policies. Paid maternity leave under current law will be retained. No mandated Christmas bonuses (eliminated by January 1, 2019): The current requirement to pay an annual Christmas bonus to employees must be eliminated. Employers may continue to pay bonuses on a voluntary basis, as is the case on the mainland.*

985. The April 2018 Fiscal Plan further states that "[t]he New Fiscal Plan is built on the assumption that, by no later than May 31, 2018, the Legislative Assembly of Puerto Rico will pass the Labor Reform Package and present it to the Governor of Puerto Rico for his signature (the "Condition")." 13 The "Labor Reform Package" was defined in the April 2018 Fiscal Plan as "all bills, whether new Commonwealth legislation or amendments to existing Commonwealth legislation, that are necessary and proper to effectuate the Labor Reform Agenda." 14 39. On April 24, 2018, the FOMB submitted a letter to the Governor and the Puerto Rico Legislative Assembly pursuant to § 202(b) of PROMESA with a forecast of revenues for fiscal year 2019 totaling $8,529 million in General Fund Revenue.15

986. The FOMB's labor reform draft bill was introduced in the Senate of Puerto Rico as Senate Bill 919, and referred to the Senate's Committee on Federal, Political and Economic Relations (the "Senate Committee").

987. The Senate Committee immediately scheduled public hearings on the FOMB's labor reform draft bill (Senate Bill 919), and invited the FOMB's Chairman, Mr. José Carrión III to speak in support of it. Mr. Carrión III, however, informed the Senate Committee that he could not attend. 16 On April 30, 2018, the Senate Committee again invited the FOMB's Chairman to speak in support of Senate Bill No. 919, but Mr. Carrión III declined once again, citing § 108 of PROMESA as the reason for declining the Committee's invitation.17

988.    Public hearings regarding the draft bill were held nonetheless on May 9, 2018 and May 15, 2018. The Senate Committee also requested the FOMB to provide the supporting the economic data for the reforms provided in Senate Bill No. 919. 18 In response, on May 28, 2018 (just three days shy of the May 31, 2018 deadline for the "the Legislative Assembly of Puerto Rico [to] pass the Labor Reform Package and present it to the Governor of Puerto Rico for his signature" set in the April 2018 Fiscal Plan) the FOMB forwarded the Senate Committee a memorandum titled "Labor Reform as a Catalyst for Growth" attached to several exhibits.19

989.    Meanwhile, on May 10, 2018, the Oversight Board issued a letter to then-Governor Rosselló, stating that "[t]he Oversight Board requires substantial revisions and additional information from the Government before it could approve the Government's proposed budget and submit it to the Legislature."[481] The letter goes on to identify certain "materials required by the Oversight Board [that] were not provided or included with the proposed budget submitted by the Government," including "***$3.5 mm for State Revolving Funds instead of $114 mm enumerated in the Fiscal Plan***."[482]

990.    On May 30, 2018, the FOMB published a revised Fiscal Plan (the "May 2018Fiscal Plan").20 Chapter 7 of the May 2018 Fiscal Plan maintained the requirement that Puerto Rico become an at-will employment jurisdiction effective January 1, 2019, but omitted the additional reforms of the "Labor Reform Package" outlined in the April 2018 Fiscal Plan, to wit: (i) making the payment of the Christmas bonus for employees in the private sector voluntary instead of mandatory, (ii) reducing the amount of paid vacation and sick leave, and (iii) restricting the retaliation provisions of the local whistleblower statute, Act No. 115-1991. 2 44. Repealing Law 80, according to the May 2018 Fiscal Plan, was needed to "improve job creation"

---

[481]

[482] (emphasis added).

and "increase labor force participation," and was the "single most important reform for long-term economic well-being in Puerto Rico." 22

991.    Repealing Law 80, however, failed to generate <u>any</u> additional revenue for Fiscal Year 2019 according to the May 2018 Fiscal Plan, nor would it create any immediate economic growth.

992.    On May 30, 2018 the FOMB published in its website a document containing an alleged "understanding" (the "May 30, 2018 Understanding") supposedly reached between the Governor and the FOMB, regarding the structural reforms and fiscal measures to be implemented as a condition for the approval of the Commonwealth's budget for fiscal year 2018-2019. The understanding, included, inter alia:

> *"The Legislature shall introduce and the Governor shall sign a bill that repeals Act No. 80 of May 30, 1976 (the "Bill") on or before June 27, 2018, which shall become effective on or before January 1, 2019. The Bill shall be presented to the FOMB prior to its introduction in the Legislature so that the FOMB can confirm that it is consistent with the fiscal plan. The Bill cannot increase the mandatory benefits for private sector employees (e.g., no increase in vacation days, sick days, sick leave, mandated paid leave, Christmas bonus, or minimum wage) or otherwise undermine the goals or intent of the labor reform as provided in Chapter 7 of the New Fiscal Plan. The Bill shall state that, for the avoidance of doubt, an employee hired for an indefinite period of time does not have a cause of action against their employer merely for the employer's termination of the employment relation." 24*

993.    On May 30, 2018, after extensive hearings, and despite economic studies to the contrary, Senate Bill 1011 passed in the Senate of Puerto Rico. The final version of Senate Bill 1011 repealed Law 80 prospectively, rather than retroactively as demanded by the FOMB. Senate Bill 1011 as approved by the Senate of Puerto Rico provided that new employees hired after the Governor signed the bill would not be protected by Law 80.

994.    Meanwhile, the Committee on Government Affairs of the House of Representatives of Puerto Rico (the "House Committee") was evaluating Senate Bill 1011 and House Bill 1634, which also repealed Law 80. On June 4, 2018, the President of the House Government Affairs Committee, Hon. Jorge Navarro, forwarded a letter to the FOMB requesting what would be the effect on the Fiscal Plan and the Budget if the May 30, 2018 Understanding reached between the Governor and the FOMB was not complied with, or the House of Representatives passed Senate Bill 1011 (which repealed Law 80 prospectively).

995.    The FOMB responded by rejecting the manner in which Senate Bill 1011 repealed Law 80 prospectively, without providing a reasoned explanation. Specifically, on June 4, 2018, the FOMB responded that "at a minimum, the Oversight Board would revert to the Fiscal Plan as certified by the Oversight Board on April 19, 2018 (the "April 2018 Fiscal Plan"), and would submit a budget 27 to the Governor and Legislature that is consistent with that Fiscal Plan."

996.    The FOMB's letter specified that "if the Government of Puerto Rico fails to comply exactly with the understanding reached with the Oversight Board concerning the repeal of Law 80, the Oversight Board will amend the Fiscal Plan and Budget to

- (1) Eliminate the annual appropriation for the Christmas bonus for public sector employees;

- (2) Eliminate the annual appropriation of $25 million for student scholarships at the University of Puerto Rico;

- (3) Eliminate the annual appropriation of $50 million for economic development initiatives for municipalities;

290

- **(4) Eliminate the multiyear fund of $345 million for various economic development and reform implementation initiatives as requested by the Government of Puerto Rico;**

- (5) Maintain the elimination of the Christmas bonus for both public sector and private sector employees as well as the reduction in sick days and paid leave for private sector employees, as required by the labor reform outlined in the April 19 Fiscal Plan to facilitate investment and job creation in Puerto Rico[; and]

- (6) Maintain the cuts to the budgets of the Legislature and Judiciary as outlined in the April 19 Fiscal Plan."

997.    On June 6, 2018, the FOMB forwarded the Puerto Rico Legislative Assembly a document titled "Unanimous Written Consent Approving Submission of Commonwealth's Fiscal Year 2019 Budget to the Legislature" attached to a draft of the Joint Budgetary Resolutions totaling $8,749,318,000.00 to be allocated from the General Fund of the State Treasury (the "June 6 Budget").

998.    Significantly, the June 6 Budget reflects ***an allocation to the EQB for $10,980,000 in relation to the "matching of Federal Funds of the State Clean Water Revolving Fund."***[483] This line item is the only reference to the CWSRF in the budget.  There appears to be no reference to the DWSRF.

999.    On June 14, 2018, the Puerto Rico House of Representatives passed Senate Bill 1011 with amendments. The final version of Senate Bill 1011, as approved by the House of

---

[483] Puerto Rico Government Joint Resolution of the general fund budget for fiscal year 2018-2019, at 16 (the "PR General Fund Budget").

Representatives, repealed Law 80 prospectively, 30 but the amendments included by the House version of the Senate's bill were not approved by the Senate. In the end, the Legislative Assembly could not agree to repeal Law 80 retroactively, as demanded by the FOMB.

1000.    On June 29, 2018 – a day before the conclusion of the legislative session pursuant to the Puerto Rico Constitution – the FOMB submitted a letter to the Puerto Rico Legislature and the Governor, stating that the FOMB would follow through with the cost-cutting measures listed in its June 4, 2018 letter sent to the House Government Affairs Committee because the Legislative Assembly did not approve a bill repealing Law 80:

> *"[W]e now know that the Government of Puerto Rico will not implement the New Fiscal Plan in full because the Legislature did not comply with the April 19, 2018 version of the New Fiscal Plan or with the May 30, 2018 version of the New Fiscal Plan. The Legislature failed to pass the most important component of the Labor Reform Package – the repeal of Law 80 and turning Puerto Rico into an at-will employment jurisdiction – as required by the New Fiscal Plan. Accordingly, the Oversight Board will follow through on the commitment that it made in its letter, dated June 4, 2018, to Representative Jorge Navarro Suárez, who had asked the Oversight Board what would happen if the Legislature did not comply with the New Fiscal Plan." 31*

1001.    The cost-cutting measures included, among others, "[r]ight sizing measures will be reinstated for the Legislature and Judiciary. In addition, the letter informs the Puerto Rico Government that there would be changes made to PRASA fiscal plan. The letter vaguely describes the need to change the PRASA fiscal plan as follows:

> *The New Fiscal Plan that the Oversight Board intends to certify on June 29, 2018 will have changes that have **macroeconomic implications**, which will need to be reflected in a revised fiscal plan for PRASA…. The Oversight Board is aware that the **macroeconomics** for the April 19, 2018 fiscal plan for PRASA will not be aligned with those for the New Fiscal Plan that the Oversight Board intends to certify on June 29, 2018. As soon as PRASA can generate a new fiscal plan and budget to reflect these **macroeconomic changes**, but no later than July 12, 2018, the*

292

*Oversight Board will revise the fiscal plan and budget for PRASA
to remedy this inconsistency.[cite]*

1002.   Relatedly, in a document dated June 29, 2018, McKinsey conveyed its

"rightsizing model" (the "Rightsizing Model"), proposing changes in the FY 2018-2019 budget,

to the Oversight Board and at least one advisor.[484]  This version updated a previous rightsizing

model dated May 30, 2018.[485] Further, it is documented that, in or around June 2018, Susan

O'Rourke of McKinsey sent a copy of the Rightsizing Model to Ankura,[486] which was, in whole

or part, subsequently incorporated into the revised fiscal plan.[487]

1003.   The New Fiscal Plan notes that "today Puerto Rico underperforms on all

important measures of a modern economy, including educational attainment, cost of electricity,

***quality of water***, tax compliance, and labor market participation."

1004.   However, the New Fiscal Plan does <u>not</u> contain any express references to either

the CWSRF or the DWSRF.  Nor does it provide a generic reference to such funds, such as

"State Revolving Fund."

1005.   In addition, the New Fiscal Plan suspended the Government's ability to seek

reprogramming for prior fiscal years, stating that "[a]ny power of OMB, [AAFAF] or the

Department of the Treasury, including the authorities granted under Act 230-29 1974, as

amended, known as the "Puerto Rico Government Accounting Act" ("Act 230"), to authorize the

reprogramming or extension of appropriations of prior fiscal years is hereby suspended.

Notwithstanding this section, the appropriations approved in the budget certified by the

Oversight Board may be modified or reprogrammed with the approval of the Oversight Board."

---

[484] Case:17-03283-LTS Doc#:4358 Filed:11/21/18 Entered:11/21/18 19:09:07 Desc: Main Document Page 77 of 222.

[485] *Id.*

[486] *Id.*

[487] *Id.*

1006.   On June 30, 2018, the Oversight Board issued its "Forecasted Statement of Revenues, Expenditures and Changes in Fund Balance for Year Ending June 30, 2019."[488]

1007.   Under the section summarizing significant accounting policies, among other things, the Forecasted Statement describes "Fund Balances" as follows

> *The accompanying forecasted statement of revenues, expenditures and changes in fund balances – governmental fund does not report fund balance amounts that are considered nonspendable, such as fund balance associated with prepaids. Other fund balances are reported as restricted, committed, assigned, and unassigned, based on the relative strength of the constraints that control how specific amounts can be spent, described as follows....*
>
> ***Restricted*** *– Represent resources that can be spent only for the specific purposes stipulated by constitutional provisions, external resource providers (externally imposed by creditors or grantors), or through enabling legislation (that is, legislation that creates a new revenue source and restricts its use). Effectively, restrictions may be changed or lifted only with the consent of resource providers.[489]*

1008.   This description of restricted funds suggests that the Oversight Board may have intended on spending some restricted funds after "resource providers" consented to having applicable restrictions changed or lifted.

1009.   However, it should be noted that the statutes and regulations governing the CWSRF and DWSRF do not provide for such restrictions to be lifted with the consent of the EPA or one of its officials, except in the instance where funds are to be transferred from the CWSRF to the DWSRF and vis-a-versa.

1010.   On June 30, 2018, the Legislative Assembly approved a budget totaling $8,708,623,000.00 to be allocated from the General Fund of the State Treasury (the "FY2019

---

[488] Oversight Board's *Forecasted Statement of Revenues, Expenditures and Changes in Fund Balance for Year Ending June 30, 2019*, at 6-7 (June 30, 2019) (*available at* https://drive.google.com/file/d/1FhlS5RTKptfzG8MeJLvV_0rORZ7TQ7b3/view).
[489] (emphasis added).

294

Legislative Assembly Budget"), which the Governor signed. As announced in the Oversight Board's Unanimous Written Consent dated June 30, 2018, the Oversight Board drafted the FY2019 General Budget and deemed it passed by the Puerto Rico legislature and approved by the Governor.

1011.   On June 30, 2018, the FOMB refused to certify the FY2019 Legislative Assembly Budget and approved its own budget, which, among other things, introduced a $194 million payment from OMB to "State Revolving Funds."

1012.   On information and belief, the "Federal fund matching for Public Assistance" referenced is either the CWSRF or the DWSRF, or both, after monies from those funds were misappropriated and used to pay GDB bondholders.

1013.   Based on the fact that the June 6 Budget did not include $200 million for the purposes of repayment to the SRF funds, it is clear that the Oversight Board inserted this amount in its Certified Budget which was then imposed on the Commonwealth under § 202(e)(3) of PROMESA.

1014.   In addition, the FY2019 FOMB Budget allocated $8,757,524,000.00 from the General Fund of the State Treasury.34 That is, **$48,901,000.00 more than the FY2019 Legislative Assembly Budget**.

1015.   Although more funds were allocated in the 2018-2019 FOMB Budget as compared to the 2018-2019 Legislative Assembly Budget, the 2018-2019 FOMB Budget contained severe budget cuts to the Senate and House of Representatives of Puerto Rico of approximately 20% compared to the FY2019 Legislative Assembly Budget. Specifically, the FOMB reduced the Senate's operational budget by $8,741,000.00 and the House of Representatives operational budget by $10,242,000.00.

295

1016.   Another problematic and potentially unlawful feature of the Special Resolution expenditure for the Institute of Puerto Rican Culture in the amount of $437,000 to fund the "operating expenses of the Luis Muñoz Marin Foundation." Special Resolution § 1(23)(F). On the information and belief of the [PR Gov or Legislature], this expenditure was inserted on the express instructions of one of the Oversight Board Members. The inclusion of a pet project of an Oversight Board Member is inappropriate micro-managing, serves no discernable purpose, and aims to establish a public policy.

1017.   Among other things, the Oversight Board's Certified Commonwealth General Budget included

- "Assignments under the custody of the Office of Management and Budget"[490]
  - $200m "For Federal matching funds Public Assistance"[491]
  - $23m "For the PRASA reserve"[492]
  - $50m "To pay for the PRIFAS Accounting System and costs related to the IT reform"
  - $50m "To create the [Municipal] Economic Development Fund"
  - $50m "To finance programs, reforms and initiatives of economic development, reconstruction and Government Programs"
  - $115m for "Liquidity reserve required by the Fiscal Plan"
  - $122m "For the negotiated police 'Pay Out' (payment for prior year debts)"
  - $2.4m "To cover the costs for professional services contracts related to cybersecurity policies and procedures for the Government of Puerto Rico, as well [as] monitoring"
  - $2m "To improve the procurement system for the [Government] of Puerto Rico"
  - $800k For the configuration of a private data network for the Government of Puerto Rico
  - $600k "to improve the Data Center Communication equipment and data backup system of OMB"
- Puerto Rico EQB[493]

---

[490] Case:18-00081-LTS Doc#:1-21 Filed:07/09/18 Entered:07/09/18 14:08:37 Desc: Exhibit Page 47 of 68
[491] Case:18-00081-LTS Doc#:1-21 Filed:07/09/18 Entered:07/09/18 14:08:37 Desc: Exhibit Page 48 of 68
[492] Case:18-00081-LTS Doc#:1-21 Filed:07/09/18 Entered:07/09/18 14:08:37 Desc: Exhibit Page 48 of 68
[493] Case:18-00081-LTS Doc#:1-21 Filed:07/09/18 Entered:07/09/18 14:08:37 Desc: Exhibit Page 57 of 68

- ○ $10,980,000 "For the matching of Federal Funds of the State Clean Water Revolving Fund 'State Revolving Fund' and for permanent improvements projects"
- ○ $1m "To comply with the Cooperative Agreement and Special Services Fund from USGS"[494]

1018.   The FOMB clearly acted beyond its authority by rejecting the Legislative Assembly's budget because of its refusal to repeal Law 80 retroactively – a matter within the exclusive purview of the Legislative Assembly. Repealing Law 80 was a "recommendation" under § 205 of PROMESA, since it was geared to "promote the . . . economic growth . . . of the territorial government ...[.]" See, PROMESA §205(a). And despite the fact that nothing in PROMESA authorizes the FOMB to require that the Legislative Assembly adopt a recommendation under § 205, the Legislative Assembly accommodated the FOMB through Senate Bill 1011. By doing so, the Legislative Assembly exercised its legislative power, and balanced the public policy goal recommended by the FOMB in the May 2018 Fiscal Plan of promoting new job creation and increase labor force participation, while protecting the rights of employees to which Law 80 currently applied.

### k.   **FOMB's Actions Constituted a Usurpation of the Legislative Assembly's Power**

1019.   As previously discussed, PROMESA does not deprive the Commonwealth's elected Government the power to control its political and governmental functions, except as limited by Titles I and II of PROMESA. 62. Titles I and II provide that upon FOMB's certification of a fiscal plan and budgets, it has certain powers to oversee and enforce compliance with such fiscal plans and budgets. Notwithstanding, the Government retains its political, governmental, and operational powers.

---

[494] [isn't this supposed to be $6m a year? See consent decree]

297

1020.   Under PROMESA section 205(a), the Government can reject FOMB's recommendations. FOMB's powers cannot infringe on the Commonwealth's political or governmental powers.

1021.   FOMB's role is to provide oversight to help Puerto Rico achieve these goals, but governing the Commonwealth is left to Puerto Rico's elected Government. PROMESA § 303; 48 U.S.C. § 2163.

1022.   The FOMB doesn't even have the power to impose penalties on Commonwealth officers or employees. PROMESA leaves that to the Governor, reflecting respect for Puerto Rico's sovereignty. PROMESA § 104(l); 48 U.S.C. § 2124(l). The Oversight Board cannot even remove Government employees from office. See S.B. 2318, § 313(i)(2)(B).

1023.   PROMESA prohibits the FOMB from interfering with the elected Government's actions to "implement territorial laws, which are consistent with a certified Fiscal Plan, that execute Federal requirements and standards." PROMESA § 204(d)(3); 48 U.S.C. § 2144(d)(3).

1024.   FOMB's sole remedy where the Government declines to adopt a recommendation is the requirement that the Government explain its decision to the U.S. President, Speaker of the House, and Majority Leader of the U.S. Senate. See PROMESA § 205(b)(3); 48 U.S.C. § 2145(b)(3).

1025.   PROMESA's reservation of political and governmental powers to the elected Government is evinced, for example, in the Congress' rejection of Senate Bill 2381, dated December 9, 2015, which would have granted FOMB the power to impose the recommendation of the Government over its opposition.

1026.   Therefore, FOMB cannot control the Commonwealth absent a specific authorization in Title I or II. Nothing in Title III gives FOMB the power to control the Commonwealth's political or governmental operations.

1027.   PROMESA does not empower the FOMB to sweep the elected government aside. PROMESA leaves the elected government in place and does not suspend it in favor of direct management by the FOMB.

1028.   Despite the fact that the Legislative Assembly approved a valid budget, consistent with the fiscal plan, due to the Legislative Assembly's disapproval of the bill repealing Law 80 in the way and manner the FOMB wanted, FOMB refused to certify the Commonwealth's budget approved by the Legislative Assembly, and retaliated against it by imposing punitive measures in reducing the Legislative Assembly's operational budget. It's important to highlight that the Legislative Assembly's budget was lower than the FOMB's own approved budget. The FOMB's retaliation constitutes an impermissible imposition of penalties or sanctions against the Commonwealth and/or its officers or employees, which PROMESA does not allow, and in contravention to Puerto Rico's sovereignty.

1029.   The FOMB's acts constitutes an usurpation of the Legislative Assembly's exclusive legislative power and, furthermore, an effort to supplant, bypass, or replace the Commonwealth's elected leaders.

1030.   Therefore, FOMB has unlawfully encroached upon the Legislative Assembly's exclusive legislative power under the Puerto Rico Constitution, and in contravention of the limited powers delegated by Congress to the FOMB.

1031.   The FOMB's retaliation and punitive measures against the Legislative Assembly,
including the delegated power to the People of Puerto Rico of self-government are null, void
and/or unconstitutional.

1032.   The Constitution of Puerto Rico, as approved by Congress, provides in its
foreword that the democratic system is fundamental for the life of the Puerto Rican community.
It is understood that a democratic system is one in which the will of the people is the source of
the political power, where the political power is subordinate to the rights of men and women and
where the free participation of the citizen in collective decisions is assured.

### l.   **3.13.17 Commonwealth Fiscal Plan**

1033.   On March 13, 2017, AAFAF released its initial Commonwealth fiscal plan.

1034.   The Fiscal Plan states that it covers certain major entities, including, among
others, the Puerto Rico Infrastructure Finance Authority ("PRIFA") and GDB, but does not cover
other certain major entities, including, among others, PREPA and PRASA.[495]

1035.   However, a slide covering "Infrastructure/P3 Reform – P3 Program" contains a
pie chart showing "P3 Key Target Areas," which includes apportionments representing water
and water management.  In addition, one of the "Key Considerations in the Overall P3
Implementation" expresses the aim "***to maximize the unused federal funds current[ly]
available***."[496]

### m.   **Bank Liability Release Motions**

#### *1.   5.10.17 Oversight Board's Bank Liability Release Motion*
1036.   On May 10, 2017, Proskauer and O'Neill, as attorneys for the Oversight Board as
representatives of the Commonwealth and COFINA, filed a motion seeking to release financial

---

[495] 3.13.2017 Fiscal Plan for Puerto Rico, at 6.
[496] 3.13.2017 Fiscal Plan for Puerto Rico, at 24 (emphasis added).

institutions from liability for any transfers, deposits, and withdrawals to or from the Debtors' depository, disbursement, and other accounts made occurring before the petition date, among other things (The "First Bank Motion").[497]

1037. Specifically, the First Bank Motion provided

> *the Debtors seek entry of an order confirming the authority of the Banks to continue honoring Instructions and Payment Instruments relating to the Bank Accounts **without incurring any liability therefor**. Such an order can be transmitted to the Banks to demonstrate the Debtors' continued authority with respect to the foregoing, and provide notice of the Banks' authority to (a) receive, process, honor, and/or pay all Instructions and Payment Instruments relating to the Bank Accounts, **whether such instructions, checks, or requests were presented and/or submitted before or after the Petition Date**, and (b) rely on the Debtors' designation of any particular Instruction and Payment Instrument **without any Bank duty of further inquiry and without incurring any liability therefor.**[498]*

1038. In addition, the motion was made with limited notice to the largest creditors, the United States Trustee for Puerto Rico, and major bondholder groups and to the exclusion of the vast majority of creditors because "in light of the nature of the relief requested, no other or further notice be given."[499]

1039. On March 17, 2017, the Title III Court held a hearing in connection with the First Bank Motion.

1040. Bienenstock argued, on behalf of the Oversight Board, that such blanket liability was needed because the banks were concerned over liability arising from certain transactions. Specifically, Bienenstock represented that

---

[497] 4.28.17 GDB Fiscal Plan, at 10.
[498] Case:17-03283-LTS9 Doc#:60 Filed:05/10/17 Entered:05/11/17 16:34:54 Desc: Main Document Page 5 of 7 (emphasis added).
[499] Case:17-03283-LTS9 Doc#:60 Filed:05/10/17 Entered:05/11/17 16:34:54 Desc: Main Document Page 6 of 7.

*And we are hopeful, based on discussions with both sides, that with that, there is no concern about giving the banks comfort that they can honor checks without liability, because **although some of the objections label the banks as intermediate transferees, that's not the way we see it. They're just conduits. It's never their money. It's money going through them from one account to another account.***

*And this is solely -- and as Your Honor can imagine, this was quite a concern. **We were fortunate in convincing the banks that they should continue honoring checks pending this hearing.** If they feel uncomfortable honoring them, that could close down the Commonwealth, which is a horrible event.[500]*

1041.   The Title III court did not rule on the motion, continuing the hearing to a later date.

1042.   On June 29, 2017, the Title III court approved a motion by the Oversight Board seeking to withdraw this motion.[501]

1043.   It should be noted that, while comfort orders are not necessarily uncommon in bankruptcy practice, retroactive immunity covering transactions prior to the petition date appears highly unusual, suspect, and contrary to fundamental bankruptcy law and policy.

### 2.   7.21.17 Oversight Board's Amended Bank Liability Release Motion

1044.   On July 21, 2017, Proskauer and O'Neill, as attorneys for the Oversight Board as representatives of the Commonwealth and COFINA, filed an amended motion seeking to release financial institutions from liability for any transfers, deposits, and withdrawals to or from the Debtors' depository, disbursement, and other accounts made occurring before the petition date, among other things (The "Second Bank Motion").[502]

---

[500] Case:17-03283-LTS Doc#:207 Filed:05/22/17 Entered:05/22/17 15:36:54 Desc: Main Document Page 71-2 of 192
[501] Order, Case:17-03283-LTS, Dkt. 207 (June 29, 2017).
[502] Amended Motion Of Debtors Pursuant To Bankruptcy Code Section 105(A) For Entry Of Order (A) Confirming Authority Of Banks To Continue Honoring Instructions And Payment Instruments With Respect To The Debtors' Bank Accounts Without Incurring Any Liability Therefor, And (B) Directing Banco Popular To Retain Deposited

1045.  In addition to the relief sought in the First Bank Motion, the Second Bank Motion sought

> an order directing Banco Popular to retain and hold all Deposited Funds in the Conduit Account, and to not deposit, transfer, or distribute any such Deposited Funds to any other account until November 30, 2017, without incurring any liability therefor; provided, however that…such Deposited Funds may be used to make a loan from COFINA to the Commonwealth pursuant to further Court order[.][503]

1046.  On information and belief, at the time when the Second Bank Motion was filed, the Conspirators intended on concealing the unlawful transfer of federal funds by giving the appearance that Banco Popular had loaned funds to the Commonwealth, and thereby rendering the Commonwealth liable for the indebtedness.  In reality, however, such funds would not actually be transferred.

1047.  On July 22, 2017, the following day, Proskauer and O'Neill filed a notice of withdraw of the Second Bank Motion.

n.  **PRASA Fiscal Plans**

*1.  4.28.17 Revised PRASA Fiscal Plan*

1048.  On April 28, 2017, PRASA issued its Revised Fiscal Plan, which recognized that that "[h]istorically, PRASA has received federal funds…through State Revolving Fund (SRF) Loans: Granted by the Clean Water State Revolving Fund Programs (CWSRF) and the Drinking Water State Revolving Fund Programs (DWSRF)."[504] To be clear, this is incorrect as these

---

Funds In The Conduit Account Until November 30, 2017, Without Incurring Any Liability Therefor, Case no. 17-03283-LTS, Dkt. 717 (filed on 7/21/17).
[503] Case:17-03283-LTS Doc#:717 Filed:07/21/17 Entered:07/21/17 23:13:27 Document Page 13 of 29.
[504] 4.28.17 PRASA Fiscal Plan, at 78.

federal funds are not loans but capitalization grants, from which PRASA then draws down to

make loans for construction projects and the like.[505]

1049.   In the slide covering financing, the fiscal plan represents that

*Currently, the availability of such funds is frozen, as PRASA's debts with [the SRF] programs are subject to Forbearance Agreements. Additionally, **a very important source of funding related to the Repayment Funds for the SRF Programs (around $190 million) is currently being withheld by GDB due to its liquidity situation** which is also affecting the possibility for the Authority to use such repayment funds from the SRF Program.[506]*

1050.   States that "The SRF Loans…are secured by a guaranty from the Government

under Act No. 45 of the Legislative Assembly of Puerto Rico, approved on July 28, 1994, as

amended."[507]

1051.   Represents that the "current balance outstanding is around $580 for SRF

loans[.]"[508]

1052.   In a slide covering state revolving funds, the Fiscal plan represents

*SRF funds are received through annual grants assigned to the EPA by the US Congress, in an amount of around $30 million for DWSRF and DWSRF Programs, requiring a state match of 20% of the annual grant included as a PRASA's costs and netted from the new funds.*

***PRASA has also the ability to request funds from the Repayment amount (all funds paid by PRASA to the Revolving Program became available for qualified purposes), which currently amounts to around $190 million.***

***There payment funds do not require state match [sic], but are currently deposited at GDB by the Program.   PRASA is***

---

[505] *See e.g.*, 40 C.F.R. § 35.3550(f).
[506] 4.28.17 PRASA Fiscal Plan, at 39 (emphasis added).
[507] 4.28.17 PRASA Fiscal Plan, at 78.
[508] 4.28.17 PRASA Fiscal Plan, at 78.

304

*considering that these funds will not be recovered in its financial
projections.*[509]

1053.   In a slide addressing the "Proposed Initiatives Total Impact," a graph shows that
the "Federal Funds Net Impact" of the fiscal plan's initiatives will result in net-positive of $195.7
million from FY 2017 through FY 2026.[510] For individual fiscal years, the graph indicates that
the that PRASA will receive approximately 13 to 30 million, varying year to year.

### 2.   8.1.17 PRASA Revised Fiscal Plan

1054.   On August 28, 2017, the Oversight Board issued its "PRASA Certified Fiscal
Plan, As Amended," dated August 1, 2017 (the "PRASA Certified Fiscal Plan").[511]

1055.   In this version of the PRASA fiscal plan, the Oversight Board and its advisors
removed <u>all</u> indication that the GDB was holding approximately $190 million in SRF monies on
behalf of PRASA.[512] For example, the 8.1.17 PRASA Revised Fiscal Plan removed statements
from the slide titled "Financing," as demonstrated by Table 2 below:

**Table 2**

---

[509] 4.28.17 PRASA Fiscal Plan, at 81 (emphasis added).
[510] 4.28.17 PRASA Fiscal Plan, at 83.
[511] (available at https://drive.google.com/file/d/1XMuDT0AJJbHTOwk3IBqULXDa3UvGGvIb/view).
[512] 5.28.17 Puerto Rico Gov. PRASA Fiscal Plan, at 71.

305



1056.   In addition, the scrubbing of PRASA SRF monies held by GDB also appears by comparing the two versions' slide covering "New Federal Funds," provided in table 3 below

**Table 3**

---

513 *Id.* (emphasis added).

306