

1057. In the slide addressing the "Proposed Initiatives Total Impact," the modified graph shows that the "Federal Funds Net Impact" of the fiscal plan's initiatives will result in net-positive of $209.3 million from FY 2017 through FY 2026.[516] For individual fiscal years, the graph indicates that the that PRASA will receive approximately 18 to 29 million, varying year to

---

[514] (highlighting added).
[515] PRASA Fiscal Plan Amended to Incorporate Modifications to Certified Fiscal Plan, at 71 (August 1, 2017) (highlighting added).
[516] 4.28.17 PRASA Fiscal Plan, at 83.

year.  In particular, the graph projects federal funds of $27.5 million in FY 2020, $25.9 million in FY 2021, $24.4 million in 2022, and $22.8 million in FY 2023.

### 3.  4.19.18 PRASA Fiscal Plan

1058.   On April 19, 2018, the Oversight Board issued its Certified PRASA New Fiscal Plan.

1059.   In this version of PRASA's fiscal plan, the Oversight Board once again modified the "New Federal Funds" slide, this time adding a statement indicating that it was "expected" that the Commonwealth was going to pay $188 million to PRASA in relation to "SRF repayment funds."  This modification is reflected in the table 4 below:

**Table 4**



1060.   Slide 175 of the PRASA Certified Fiscal Plan dated April 29, 2018 represents that "[a] total of $188M on SRF repayment funds is expected to be received from the Central Government during the projected period."[518]

---

[517] 4.19.18 PRASA Revised Fiscal Plan, at 175 (highlighting added).

1061.   In the slide addressing the "Proposed Initiatives Total Impact," the modified graph has been substantially modified, as the graph covers fewer fiscal years, spanning only FY 2018 through FY 2023.  However, the total impact for federal funds has increased from 190 to $243.7 million despite the decrease in fiscal years covered.  In addition, the range of federal funds that PRASA will receive year to year is dramatically increased, growing from a range of $11 million ($18 to $29 million) to 78.6 million ($7.6 to $ 85.9 million). In particular, the graph projects federal funds of $52.4 million in FY 2020, $85.9 million in FY 2021, $66.5 million in 2022, and $7.6 million in FY 2023.

1062.   In addition, a new item is introduced into the "Proposed Initiatives Total Impact" graph, described as "New Financing."  The amounts of "New Financing" mirrors exactly the amount of "Federal Funds."

1063.   Table 5 below demonstrates the substantial changes to the "Proposed Initiatives Total Impact" slide from the 8.1.17 to the 4.19.18 PRASA Fiscal Plan:

**Table 5**

---

[518] See also June 2018 Zolfo Cooper PRASA Restructuring Discussion PowerPoint, at 7 ("Of $243.7 million of 'Federal Funds' in the plan, $188 million are actually expected from the Commonwealth to maintain PRASA's access to State Revolving Fund ("SRF") loans from the federal government"); *see also* Oversight Board's Revised PRASA Fiscal Plan, at 172 (August 1, 2018).



## 4.  6.25.19 Certified Fiscal Plan for PRASA

1064.   The Oversight Boards 2019 Revised Fiscal Plan for PRASA, dated 6.25.19, represents that

> [t]he [SRF] Repayment Funds are also available, currently with **a balance of around $195 million** to be assigned through new loans for qualifying projects without a state match requirement

---

[519] 8.1.17 PRASA Revised Fiscal Plan, at 73 (highlighting added).
[520] 4.19.18 PRASA Revised Fiscal Plan, at 177 (highlighting added).

> *Current balance of outstanding SRF Loans owed by PRASA is $580 million*
>
> **The Government restored $195 million in Repayment Funds, previously deposited with GDB on December 21, 2018.**[521]

1065. In providing a "New Federal Funds – Overview," the Fiscal Plan states as "accomplishments," among other things "195M from Repayment Funds restored by the Government in the SRF Trusts on 12/21/2018" and "[p]ortion of repayment finds will be allocated to PRASA."[522]

1066. In addition, a graphic on the slide 85 entitled "New Federal Funds" shows that "New Funds" include $227 million into the CWSRF and DWSRF from "Repayment Funds/PY Appropriations."[523]

### o. GDB Fiscal Plans

#### 1. 4.28.17 GDB Fiscal Plan

1067. On April 28, 2017, the GDB submitted its "Government Development Bank for Puerto Rico Fiscal Plan" to the Oversight Board, which provides, among other things, details related to its assets and liabilities, including PRASA deposit accounts holding federal funds.

1068. For example, the slide covering "Fiscal Plan Approach and Assumptions" represents

> **GDB holds certain deposits that are associated with specific federal programs, including approximately $180mm in repayment for the State Revolving Fund loans.** *Once a final resolution of excess cash flow disbursements to depositors and other creditors is determined, an action plan will be prepared together with the Puerto Rico public entity and be presented to the pertinent federal agencies*[.] [524]

---

[521] Oversight Board's 8.1.18 Revised PRASA Fiscal Plan, at 59.
[522] Oversight Board's 8.1.18 Revised PRASA Fiscal Plan, at 85.
[523] Oversight Board's 8.1.18 Revised PRASA Fiscal Plan, at 83.
[524] 4.28.17 GDB Fiscal Plan, at 10 (emphasis added).

311

1069.   In the amended "Current Balance Sheet Information [as of] 2/28/17" slide, which lists GDB's top 20 depositors, an added footnote states that $230 million held on deposit by Puerto Rico's Infrastructure Financing Authority "***includes $180 [million] representing repayments by PRASA to the State Revolving Fund Loans***.[525]

1070.   States "[m]ost Depositors have transitioned their operating accounts away from GDB and have been transacting via commercial banks since April 2016."[526]

### 2.   6.30.17 GDB Revised Fiscal Plan

1071.   On June 30, 2017, AAFAF and the GDB sent the Oversight Board a letter proposing certain modifications to the 4.18.17 GDB Fiscal Plan, which, according to Oversight Board's "Unanimous Written Consent Approving Certified Fiscal Plan, as Revised," was reflected in the "Government Development Bank for Puerto Rico Amended Fiscal Plan," dated June 2017.[527]

1072.   This version of the GDB fiscal plan removes the text for the assumptions slide found in earlier version indicating that the GDB held $180 million in "State Revolving Funds." This modification is reflected in Table 6 below:

**Table 6**

---

[525] 4.28.17 GDB Fiscal Plan, at 36 (emphasis added).
[526] 4.28.17 GDB Fiscal Plan, at 38 (emphasis added).
[527]



1073.   However, the 6.30.17 GDB Revised Fiscal Plan slide  does supplement the slide covering "Current Balance Sheet" by attaching a footnote to the Puerto Rico Infrastructure Financing Authority ("PRIFA") deposit account explaining that the $230 million held on behalf of PRIFA "*includes $180 [million] representing repayments by PRASA to the State Revolving Fund Loans.*"  This additional information is reflected in table 5 below.

---

[528] 4.28.17 GDB Revised Fiscal Plan, at 10 (highlighting added).

313

### 3. 4.20.18 Fiscal Plan for GDB

1074.   Similar changes concerning PRASA funds appear in contemporaneous GDB Fiscal plans.  On April 20, 2018, the Oversight Board issued its "Government Development Bank for Puerto Rico New Fiscal Plan" (the "GDB New Fiscal Plan"). Metadata associated with the GDB New Fiscal Plan reveals that the file was created by Juan Carlos Batlle, Senior Managing Director at Ankura.

1075.   The "Current Balance Sheet Information" slide now indicates that it is "unaudited" and continues to exclude PRASA from its list of GDB's top 20 depositors.

1076.   The list continues to reflect that PRIFA has an outstanding balance of $232 million; *however, the footnote indicating that the $232 million figure "includes $188 [million] representing repayments by PRASA to the State Revolving Fund Loans" has been removed.*[529] This modification is reflected in Table 7 below:

<u>**Table 7**</u>



[529] 8.1.31 GDB Fiscal Plan, at 38.
[530] 6.30.17 GDB Revised Fiscal Plan, at 36 (highlighting added).



### p.   5.10.18 Oversight Board Letter to Then-Governor Rosselló

*1.   Contents*

1077.   On May 10, 2018, the Oversight Board issued a letter to then-Governor Rosselló, stating that "[t]he Oversight Board requires substantial revisions and additional information from the Government before it could approve the Government's proposed budget and submit it to the Legislature." The letter goes on to identify certain "materials required by the Oversight Board [that] were not provided or included with the proposed budget submitted by the Government," including "***$3.5 mm for State Revolving Funds instead of $114 mm enumerated in the Fiscal Plan***."

1078.   This representation is significant for two reasons. First, it shows that the Oversight Board knew that substantial amounts of the federal water funds had been illegally transferred out of their accounts and that those missing funds needed to be replaced. Second, it shows that there was disagreement between the Oversight Board and the Government of Puerto Rico as to whom was responsible for repaying the illegal transferred money. Clearly, the

---

Oversight Board was insisting that the Commonwealth (*i.e.*, Puerto Rico taxpayers) replace the missing funds, whereas the Government of Puerto Rico resisted the imposition.

*2. Contemporaneous Meetings, Calls, and Assignments*

1079.   Prior to the issuance of the letter, from February to May 2018, the federal water fund scheme conspirators interacted on numerous occasions to discuss the drafting of the letter, proposed PRASA and Commonwealth budgets, the Commonwealth's cash position, and other related items, such as the GDB RSA.  Illustrative examples of these interactions, as well as contemporaneous related tasks, are provided in the table *below*:

| No. | Date | Professional | Hours | Description |
|---|---|---|---|---|
| 1. | 2/1/2018 | Citi (T. Green), Proskauer (B. Rosen) | 10.0 | Meetings in NYC re PRASA |
| 2. | 2/6/2018 | Ankura (D. Barrett), McKinsey, Rothschild, DevTech, CM | 1.0 | Participate on call…regarding proposed revisions to the revised fiscal plan. |
| 3. | 2/9/2018 | Ankura (F. Batlle), McKinsey (O. Shah) | 0.8 | Participate on telephone call…to discuss **federal funding bill allocation to Puerto Rico** to be included in the revised fiscal plan. |
| 4. | 2/15/2018 | Proskauer (B. Rosen), Citi (T. Green, J. Gavin), OMM (S. Uhland) | 1.8 | **Meeting with T. Green and J. Gavin regarding plan structures** (0.80); [Memo] to J. Rapisardi regarding meeting on same (0.10); [Memo] to S. Uhland regarding meeting (0.10); Teleconference with creditor regarding plan issues (0.80). |
| 5. | 2/15/2018 | Citi (T. Green), FOMB | 10.0 | FOMB Board Meeting |
| 6. | 2/16/2018 | Ankura (F. Batlle), Moody's, AAFAF, Rothschild, BAML, DevTech | 2.0 | Participate in meeting…to review the revised fiscal plan and debt sustainability analysis.[532] |
| 7. | 2/16/2018 | Paul Hastings (L. Despins, J. Grogan), Rothschild (D. Mondell), OMM (S. Uhland), Zolfo (R. Bingham, C. Flaton) | 1.4 | Meeting at O'Melveny…regarding GDB revised RSA (1.40) |

---

[532] Id. at 73.

| No. | Date | Professional | Hours | Description |
|---|---|---|---|---|
| 8. | 2/26/2018 | Citi (T. Green) | 1.5 | Emails, calls re PRASA Fed creditors |
| 9. | 2/27/2018 | Citi (J. Gavin) | 2.0 | Prasa call re structure |
| 10. | 2/27/2018 | Ankura (F. Batlle), McKinsey, Rothschild, CM | 8.9 | Participate in meeting with representatives from McKinsey, Rothschild, Conway, and Ankura to review the FOMB feedback on the revised fiscal plan measures. |
| 11. | 2/28/2018 | Citi (T. Green) | 0.5 | PRASA Call with Rothschild, BAML |
| 12. | 2/28/2018 | Citi (T. Green) | 0.5 | **Calls re GDB RSA with Rothschild and EY** |
| 13. | 3/8/2018 | Citi (T. Green) | 1.5 | **EPA follow-up work and SRF calls** |
| 14. | 3/15/2018 | Citi (J. Gavin) | 4.0 | **PRASA meeting with EPA/USDA** |
| 15. | 3/15/2018 | Citi (J. Gavin) | 2.0 | **meeting with PRASA/Mckinsey** |
| 16. | 3/15/2018 | Ankura (F. Batlle), McKinsey, Rothschild, CM | 0.6 | Participate on conference…to discuss open items related to PREPA, PRASA and Commonwealth fiscal plans. |
| 17. | 3/23/2018 | Paul Hastings (M. Comerford, L. Despins), Rothschild (D. Mondell), certain creditors | 0.8 | Review bi-weekly update regarding AAFAF, Commonwealth, PREPA and PRASA (.3); update call regarding same…(.3); follow-up correspondence with L. Despins regarding same (.2) |
| 18. | 3/23/2018 | Proskauer (M. Bienenstock), FOMB | 1.3 | Participate in Board calls regarding PRASA and Commonwealth fiscal plans. |
| 19. | 3/27/2018 | Batlle, Fernando | 0.6 | Participate on call…to discuss status of fiscal plan and liquidity forecast. |
| 20. | 3/27/2018 | Rothschild, Bluhaus, CM, DevTech, Ankura (D. Barrett) | 0.4 | Participate on call…about financial model changes. |
| 21. | 3/27/2018 | CM (J. York), AAFAF (A. Mendez), Ankura (F. Batlle) | 0.3 | Participate in conference call…to discuss liquidity forecast and potential inclusion on fiscal plan. |
| 22. | 3/28/2018 | Proskauer (L. Rappaport, M. Firestein) | 0.3 | Review Board letters to Governor regarding Commonwealth, PRASA and PREPA fiscal plans (0.20); Conference with M. Firestein regarding same (0.10). |
| 23. | 3/29/2018 | Ankura (F. Batlle), McKinsey (O. Shah), A. Mendez (AAFAF) | 1.1 | Participate on conference call…to discuss **cash position and next steps in identifying restricted/unrestricted cash** to be included in |

| No. | Date | Professional | Hours | Description |
|---|---|---|---|---|
| | | | | the revised fiscal plan. |
| 24. | 4/4/2018 | Citi (T. Green); Rothschild (D. Mondell); Proskauer (B. Rosen) | 0.8; 0.5; 2.8 | Rothschild reading, calls re PRASA[533]; Call w/Citi[534]; **Conference call with Citi team regarding fiscal plan issues (0.40)**; Draft memorandum to Citi team regarding same (0.30); Review and revise memorandum regarding process (0.40); Memorandum to J. Gavin regarding classification issues (0.10); Revise materials regarding same (1.20); **Teleconference with T. Green regarding classification issues (0.40)**.[535] |
| 25. | 4/4/2018 | Rothschild (D. Mondell), AAFAF, OMM | 0.5 | Call w/ AAFAF and counsel re CDL |
| 26. | 4/4/2018 | Ankura (D. Barrett), McKinsey, AAFAF | 0.2 | Participate on call...**about cost share assumptions and alignment between Commonwealth and PRASA plans.** |
| 27. | 4/4/2018 | Ankura (D. Barrett), Rothschild (J. Kang) | 0.4 | Correspond[ence]...regarding bridging the revised fiscal plan.[536] |
| 28. | 4/5/2018 | Ankura (D. Barrett), Rothschild, CM, BluHaus AAFAF | 0.4 | Participate on government daily update call.... |
| 29. | 4/5/2018 | OMM (J. Rapisardi), Ankura (F. Batlle, D. Barrett) | 0.3 | Participate on call...about differences in agency savings, government plan versus FOMB plan.[537] |
| 30. | 4/5/2018 | Ankura (D. Barrett) | 0.2 | **Review recapitalizing the SRF summary prepared by Rothschild.[538]** |
| 31. | 4/10/2018 | Rothschild (Mondell), Ankura | 0.5 | Call w/ Ankura re forecast modeling[539] |
| 32. | 4/10/2018 | Ankura (F. Batlle); McKinsey (S. O'Rourke, D. Udom, | 0.4 | Participate on conference call...to discuss FEMA public assistance buildup and |

---

[533]
[534]
[535]
[536] Id. at 225.
[537] 3rd Ankura Fee Application, at 212 of 275.
[538] 3rd Ankura Fee Application, at 213 of 275.
[539]

| No. | Date | Professional | Hours | Description |
|---|---|---|---|---|
| | | J. Reed, O. Shah) | | methodology change involving PRASA allocation of funding.[540] |
| 33. | 4/10/2018 | Ankura (D. Barrett), McKinsey (O. Shah) | 0.2 | Participate on call…to discuss general fund expenses build up and presentation in fiscal plan.[541] |
| 34. | 4/10/2018 | Ankura (F. Batlle, D. Barrett) | 3.4 | Participate in working session…to review agency by agency cost savings assumptions including line items included, funding source included to map fiscal plan measures to the FY18 budget.[542] |
| 35. | 4/11/2018 | Citi (F. Chapados, D. Bond), McKinsey, Ankura | 1.0 | FP Model discussion…. |
| 36. | 4/11/2018 | CM, AAFAF, Ankura (Barrett) | | Participate on call…about comparison of expense measures between revised fiscal plan and FOMB fiscal plan in addition to need to push expense measures into each of the agency budgets and line items. |
| 37. | 4/12/2018 | Citi (T. Green) | 0.5 | PRASA call re Federal Funding and Match |
| 38. | 4/13/2018 | Ankura (F. Batlle), AAFAF (J. Mattei) | 0.3 | Participate on call with J. Mattei (AAFAF) to discuss state revolving fund payment from General Fund.[543] |
| 39. | 4/16/2018 | Paul Hastings (L. Despins, M. Comerford), OMM (S. Uhland), N.Mitchell (Greenberg Traurig), Zolfo Cooper (C. Flaton) | 1.6 | Review background regarding proposed loan from Commonwealth to PRASA (.90); Call…regarding same (.50); post-mortem discussion with C. Flaton regarding same (.20) |
| 40. | 4/17/2018 | Ankura (F. Batlle); McKinsey (T. Winder); EY (A. Chepenik); AAFAF (A. Mendez) | 2.2 | Participate in fiscal plan to budget meeting…. |
| 41. | 4/22/2018 | OMM (J. Rapisardi, S. Uhland, B. Sushon), Anukra (D. Barrett, T. Panciera, P. Nilsen), Greenberg Traurig (N. | 1.1 | Participate in conference call…to discuss Section 205 letter strategy. |

[540] 3rd Ankura Fee Application, at 214 of 275.
[541] 3rd Ankura Fee Application, at 214 of 275.
[542] 3rd Ankura Fee Application, at 214 of 275.
[543] Id. at 217.

| No. | Date | Professional | Hours | Description |
|-----|------|-------------|-------|-------------|
|  |  | Mitchell), AAFAF (M. Yassin) |  |  |
| 42. | 4/24/2018 | Citi (J. Gavin), FOMB (C. Garcia) | 1.5 | meeting with Carlos Garcia |
| 43. | 4/24/2018 | Citi (J. Gavin) | 0.5 | Puerto Rico Budget powers call |
| 44. | 4/24/2018 | OMM (Rapisardi, S. Uhland, P. Friedman, B. Sushon), Greenberg Traurig (N. Mitchell, D. Cleary), Ankura (F. Battle, D. Barrett) | 3.0 | Participate in meeting…to discuss approach and items to include in Section 205 letter. |
| 45. | 4/25/2018 | OMM, Greenberg Traurig, Ankura (F. Batlle, D. Barrett) | 1.6 | Participate in meeting…regarding section 205 letters. |
| 46. | 4/28/2018 | Rothschild, OMM, Ankura (D. Barrett) | 0.6 | Participate on call…to review status of 205 letter and discuss items to include in letter. |
| 47. | 4/29/2018 | OMM (J. Rapisardi S. Uhland), Greenberg Traurig (N. Mitchell), AAFAF (G. Portela, M. Yassin, P. Soto), Ankura | 1.1 | Participate in conference call…to discuss COFINA/GO mediation and section 205 letters. |
| 48. | 4/29/2018 | Ankura (F. Batlle) | 1.2 | Revise section 205 letter for updates from J. Rapisardi (OOM) [sic]. |
| 49. | 4/29/2018 | EY (A. Chepenik, J. Santambrogio, S. Panagiotakis, J. Burr, C. Loh); McKinsey (S. O'Rourke, O. Shah, T. Duval, A. Bielenberg, J. Reed, D. Udom, J. Davis); FOMB (M. Tulla, S. Negron, K. Rifkind) | 1.1 | Participate in call…to discuss mapping fiscal plan measures to the budget[544] |
| 50. | 4/29/2018 | Paul Hastings (L. Despins), OMM (J. Rapisardi S. Uhland), Rothschild (D. Mondell),Zolfo (C. Flaton) | 0.6 | Call…regarding [redacted][545] |
| 51. | 4/30/2018 | Ankura (D. Barrett), OMM (J. Rapisardi), | 0.4 | Provide comments to the revised section 205 letter to J. Rapisardi (OMM). |

544
545

| No. | Date | Professional | Hours | Description |
|-----|------|-------------|-------|-------------|
| 52. | 4/30/2018 | Ankura (D. Barrett) | 0.9 | Review revised section 205 letter **prepared by J. Rapisardi (OMM)**. |
| 53. | 5/5/2018 | Ankura (F. Batlle) | 2.1 | Review and revise draft of section 205 letter, **including validating all fiscal plan related numbers** included in letter. |
| 54. | 5/7/2018 | Ankura (F. Batlle), AAFAF, CM (A. Mendez), CM | 0.3 | Participate on telephone call…to discuss FY19 budget process in anticipation of meeting with representatives of FOMB. |
| 55. | 5/7/2018 | Ankura (F. Batlle) | 0.3 | Review draft general fund variance analysis **prepared by B. Biggio (CM)**.[546] |
| 56. | 5/8/2018 | Citi (T. Green, J. Gavin), Proskauer (B. Rosen) | 1.3 | "PRASA meetings with advisors"[547]; "Meeting with J. Gavin and T. Green regarding surplus amounts."[548] |
| 57. | 5/8/2018 | Ankura (F. Batlle, P. Nilsen) | 0.2 | Correspond[ence] regarding **state funding match** and other takeaways from the FY19 budget mapping discussion.[549] |
| 58. | 5/9/2018 | Proskauer (M. Bienenstock), FOMB | 1.2 | Participate in call with Board [,] Commonwealth fiscal plan subcommittee **regarding budget and notice of violations**.[550] |
| 59. | 5/9/2018 | Citi (J. Gavin), Ankura | 0.8 | [C]all with Ankura re restructuring[551] |
| 60. | 5/9/2018 | Ankura (F. Batlle), McKinsey, EY, CM, FOMB, AAFAF, OMB | 1.1 | Participate in meeting…**to discuss budget differences**[552] |
| 61. | 5/9/2018 | Ankura (F. Batlle, P. Nilsen), McKinsey (O. Shah, J. Reed), CM (J. York) | 1.0 | Participate on telephone call…regarding the creditor mediation meeting on 5/15/18.[553] |
| 62. | 5/10/2018 | Section 205 Letter Sent by FOMB to Governor Rosselló | | |

q.  **Puerto Rico FY2019 General Fund Budget**

---

[546]

[547]

[548]

[549] 3rd Ankura Fee Application, at 252 of 275.

[550]

[551]

[552] 3rd Ankura Fee Application, at 253 of 275.

[553] 3rd Ankura Fee Application, at 253 of 275.

321

### 1.   6.2.18 Puerto Rico Legislature FY2019 General Fund Budget

1080.   However, despite the Oversight Board's instruction, the 2019 budget passed by

the Puerto Rico legislature and submitted to the Oversight Board on June 1, 2018, did <u>not</u> include

a payment of $114 million to the state revolving funds.[554]   Instead, this version of the budget

allocates $10,980,000 to the EQB for "the matching of Federal Funds of the State Clean Water

Revolving Fund "State Revolving Fund" and for permanent improvements projects."[555]

### 2.   6.2.18 Puerto Rico Legislature FY2019 General Fund Budget

### 3.   6.29.18 FOMB Letter – Changes to the Certified Fiscal Plan

1081.   In a letter dated June 29, 2018, the Oversight Board informed then-Governor

Rosselló and Puerto Rico Legislature President Rivera Schatz and Speak Mendez Núñez that its

FY2019 budget failed to comply with the Oversight Board's New Fiscal Plan.[556]

1082.   The letter additionally states that, as a result, the Oversight Board "intends to

certify a revised version of the New Fiscal Plan to reflect the following changes relative to the

April 19 and May 30, 2018 versions of the New Fiscal Plan."[557]   Among other things, such

revisions were to include

> *8) Adjustments based on lower FY19 budget submissions: The Governor's budgets submitted on June 1, 2018 and June 22, 2018 allocated less money to certain agencies than the New Fiscal Plan had projected. For those agencies, the budget will be adjusted to match the Governor's submission.*
>
> *10) Technical adjustments based on new information: Various adjustments will be made to align with new factual information from the Government or the federal government, including*

---

[554] See generally FY2019 General Fund Budget (June 2018).
[555] FY2019 General Fund Budget, at 57 of 68.
[556] FOMB Letter – Changes to the Certified Fiscal Plan, at 1/
[557] FOMB Letter – Changes to the Certified Fiscal Plan, at 2.

*information identified through working with the Government in the
budget submission process.[558]*

1083.   The letter concludes by stating that

*[s]hould the Oversight Board determine, in its sole discretion, that
the budget that the Legislature submits on June 30, 2018 is not
compliant with the New Fiscal Plan, as certified on June 29, 2018,
the Oversight Board will certify its own budget on June 30,
2018.[559]*

1084.   The letter is signed by Oversight Board Executive Director Natalie Jaresko.[560]

### 4.   6.30.18 Oversight Board FY2019 General Fund Budget

1085.   In response, the Oversight Board drafted its own version of the FY 2019 budget

and then "deemed" it passed by the Puerto Rico legislature and approved by its Governor. Unlike

the previous version, the Oversight's version budget removed the allocation from the EQB to the

state revolving funds[561] and, in contrast, now included an allocation of $194 million from Puerto

Rico's Office of Budget Management ("OMB") to those funds.[562]  In contrast, the budget passed

by the Puerto Rico legislature did not expressly contemplate any payment from the OMB to the

state revolving funds.[563]

1086.   The appearance of the $194 million allocation to Puerto Rico's state revolving

funds in the Oversight Board's version of the FY2019 budget is significant for several reasons.

First, it demonstrates the Oversight Board's awareness that at least $194 million was missing

from the state revolving funds as of June 2018.

1087.   Second, the amount allocated – $194 million – is consistent with amount reported

missing in the September 2016 EPA hotline complaint, meaning it was likely accurate at the time

---

[558] Id. at 2, 3.
[559] Id. at 4.
[560] Id. at 4.
[561] FY2019 General Fund Budget, at 57 of 68.
[562] FY2019 General Fund Budget, at 57 of 68.
[563]

the complaint was made. If true, that would mean that the EPA's finding that those funds remained held at the GDB was false and that the EPA investigators were deliberately provided with false information by the GDB and its advisors who participated in the investigation.

1088. Even if not true, however, and the funds were actually held at the GDB at the time, those same GDB officials and their advisors essentially mislead the EPA investigators because they intended on unlawfully transferring those funds following the investigation. Either way, EPA investigators were provided with false information, which ultimately formed the basis of the EPA's April 2017 Report.

1089. And third, it provides further evidence that the Oversight Board insisted that the Commonwealth assume ultimate liability for the illegal transfer, even though intermediate transferees were primarily liable and even though the Commonwealth and its citizens did not receive the intended benefit of federal water funds.

### 5. Contemporaneous Meetings, Calls, and Related Assignments

1090. Contemporaneous interactions and related assignments completed by the federal water fund scheme conspirators demonstrate those who participated in the formation of the budget drafted by the Oversight Board. Illustrative examples are provided *below*:

| No. | Date | Professional | Hours | Description |
|-----|------|--------------|-------|-------------|
| 63. | 5/11/2018 | Ankura (F. Batlle), FEMA (S. El Hage[564]) | 0.2 | Participate on telephone call...to review methodology used for build up of FEMA disaster recovery fund estimates. |
| 64. | 5/12/2018 | EY (J. Blur) | 3.6 | Review Sabana Budget file prepared by McKinsey for consistency to the fiscal plan and prepare summary of inconsistencies |
| 65. | 5/12/2018 | EY (S. Panagiotakis) | 1.4 | Prepare a reconciliation of the fiscal plan to the budget for all fund types to determine what the actual budget should be. |
| 66. | 5/14/2018 | EY (J. Blur) | 2.1 | Analyze and prepare follow-up questions for the **McKinsey Fiscal Plan mapping** of the Sabana Budget file ahead of our |

---

[564] S. El Hage is currently an advisor at Horne Consulting.

| No. | Date | Professional | Hours | Description |
|-----|------|--------------|-------|-------------|
| | | | | working meeting |
| 67. | 5/14/2018 | McKinsey (S. O'Roarke); EY (S. Panagiotakis, A. Chepenik, J. Porepa, J. Burr, J. Santambrogio) | 2.0 | Participate in meeting…to discuss budgeting assumptions that relate to the fiscal plan. |
| 68. | 5/14/2018 | McKinsey (S. O'Rourke, A. Bielenberg, J. Reed); Citi (J. Gavin, T. Green); EY (S. Panagiotakis, A. Chepenik, J. Porepa, J. Burr, J. Santambrogio); FOMB (N. Jaresko, P. Pierluisi, K. Rifkind) | 2.0 | Participate in creditor mediation preparation session… |
| 69. | 5/14/2018 | EY (A. Dibala) | 0.5 | Review Fiscal Plan model DRAFT with McKinsey's edits |
| 70. | 5/14/2018 | EY (A. Dibala) | 0.4 | Review PRASA's 13 week cash flow model for fiscal plan purposes |
| 71. | 5/15/2018 | EY (J. Burr), McKinsey (D. Udom) | 0.7 | Participate in call…**to discuss fiscal plan to budget mapping for OMB Custody**, 911 and Tourism |
| 72. | 5/15/2018 | EY (J. Blur) | 0.7 | Prepare summary of historical budgets (FY14 to FY18) to provide to FOMB and McKinsey for fiscal plan building |
| 73. | 5/15/2018 | EY (J. Aldana Herbas) | 0.9 | Prepare revenue bridge from fiscal year 2018 to fiscal year 2019 for PRASA |
| 74. | 5/15/2018 | EY (J. Aldana Herbas) | 1.4 | Prepare list of missing data points on PRASA's submitted financial information |
| 75. | 5/15/2018 | EY (A. Chepenik, S Panagiotakis, J Burr, J Santambrogio), McKinsey (J. Reed, D. Uhum), FOMB (M. Tulla) | 2.7 | Participate in meeting…to discuss remaining **open fiscal plan to budget reconciliations** |
| 76. | 5/16/2018 | EY (J. Blur) | 2.4 | Prepare updated Fiscal Plan budget for comparison to FY19 Sabana file built by McKinsey |
| 77. | 5/16/2018 | EY (J. Blur), McKinsey (S O'Rourke, T. Duvall, J. Reed) | 0.8 | Participate in meeting…to discuss PR restructuring and **allocated budgets for P3 authority and OMB Custody** |

| No. | Date | Professional | Hours | Description |
|---|---|---|---|---|
| 78. | 5/16/2018 | Citi (T. Green) | 1.2 | PRASA DC meeting prep with AAFAF advisors |
| 79. | 5/17/2018 | EY (A. Chepenik, G Malhotra, J. Santambrogio), McKinsey (B. Chapious, T. Duvall, A. Bielenberg, S. O'Rourke, J. Reed), Citi (J. Gavin, T. Green); Proskauer (B. Rosen, M. Bienenstock); FOMB (N. Jaresko, M. Tulla, J. El Koury, K. Rifkin, N. Zamot, A. Wolfe, S. Negron) | 2.9 | Participate in morning FOMB strategy session with FOMB board members to discuss governor and creditor proposal. Discussion led by N Jaresko (FOMB), M. Tulla (FOMB), J El Koury (FOMB), K Rifkind (FOMB), N Zamot (FOMB), with participation from all FOMB advisors, including B Chapious (McKinsey), T Duvall (McKinsey), A Bielenberg (McKinsey), S Oroarke (McKinsey), J Santambrogio (EY), A Chepenik (EY), G Malhotra (EY), T Greene (Citi), J Gavin (Citi), A Wolfe (FOMB), S Negron (FOMB). |
| 80. | 5/17/2018 | Ankura (F. Battle), Rothschild, BAML, Ankura, AAFAF | [Find] | Call "strategy session with FOMB board members to discuss governor and creditor proposal" |
| 81. | 5/17/2018 | Rothschild (B. Meisel), AAFAF | [Find] | POA presentation discussion with AAFAF and advisors |
| 82. | 5/18/2018 | Citi (T. Green) | 4.0 | PRASA DC creditor meetings and travel |
| 83. | 5/19/2018 | Citi (T. Green), Rothschild | 2.3 | Rothschild calls re PROMESA debt |
| 84. | 5/20/2018 | Citi (T. Green), PRASA advisor | 1.3 | PRASA advisor call re next steps |
| 85. | 5/21/2018 | Proskauer (B. Rosen, D. Dunne, M. Bienenstock); Citi (T. Green); McKinsey; | 3.0 | Memorandum to D. Dunne regarding meeting (0.10); Memorandum to T. Green regarding meeting (0.20); Meeting with D. Dunne, et al., (1.10); Office conference with M. Bienenstock regarding same (0.20); Meeting with Mckinsey et al., regarding best interest analysis (1.40). |
| 86. | 5/21/2018 | Proskauer (M. Bienenstock, S. Ma), | 1.8 | Attend conference call with McKinsey and Ernst & Young regarding best interest test analysis[565] (1.80) |

[565] The "best interest test" is a condition for approval of a debtor's plan under section 314(b)(6) of PROMESA. In the context of municipal bankruptcies under chapter 9, the best interest test requires that the proposed plan be better than the alternative that creditors (as a whole) have, namely, dismissal of the case, prompting every creditor "to fend for itself in the race to obtain the mandamus remedy and to collect the proceeds." 6 Collier on Bankruptcy P 943.03 (16th 2019)  Because such an analysis would require an appraisal of all of the Commonwealth's assets, including bank accounts, deliberations concerning the best interest test here would necessarily involve consideration of which funds were available (i.e., unrestricted).  Therefore, it is reasonable to infer that conversations concerning the best interest test involved consideration of the amount of cash held on account of the Commonwealth, including the federal water funds.  See Hearing Tr. Case:17-03283-LTS Doc#:10638-3 Filed:02/03/20 Exhibit C Page 7-8 of 12 (Bienenstock remarking, "what 314(b)(6) is asking this Court to do is to say, well, if the creditors were all free to

| No. | Date | Professional | Hours | Description |
|-----|------|--------------|-------|-------------|
| | | McKinsey, EY | | |
| 87. | 5/21/2018 | Rothschild (D. Mondell), Citi, BAML | 1.0 | Call w/ Citi and BAML re GO / COFINA and PRASA |
| 88. | 5/21/2018 | Rothschild (B. Meisel) | 2.8 | POA meeting with external advisors |
| 89. | 5/21/2018 | Ankura (D. Barrett); AAFAF (O. Pinero, C. Frederique, C. Anton) | 2.0 | Revise implementation oversight framework presentation to incorporate comments from O. Pinero (AAFAF), C. Frederique (AAFAF) and C. Anton (AAFAF). |
| 90. | 5/21/2018 | Ankura (F. Batlle), AAFAF (Mendez, M. Yassin), CM (J. York) | 0.7 | Participate on telephone call…to discuss FOMB/Government agreement and impact on FY19 budget. |
| 91. | 5/21/2018 | Ankura (F. Batlle) | 0.7 | Review PRASA discussion materials related to Commonwealth fiscal plan counterproposal. |
| 92. | 5/21/2018 | Ankura (F. Batlle), AAFAF (Mendez, M. Yassin), CM (J. York) | 0.4 | Participate on telephone call with A. Mendez (AAFAF) and M. Yassin (AAFAF) and J. York (CM) to discuss FOMB/Government agreement and impact on FY19 budget. |
| 93. | 5/21/2018 | Ankura (F. Batlle), AAFAF (G. Loran) | 0.1 | **Participate on telephone call…to discuss treatment of state revolving funds in fiscal plan.** |
| 94. | 5/21/2018 | Ankura (F. Batlle), AAFAF (C. Yamín, M. Yassin), E. Trigo (O'Neill & Borges) | 0.4 | Participate on telephone call…to discuss retained revenues treatment in FY19 budget. |
| 95. | 5/22/2018 | Ankura (F. Batlle), McKinsey (O. Shah) | 0.2 | Participate on telephone call with O. Shah (MCK) to discuss budget and fiscal plan recertification. |
| 96. | 5/22/2018 | Paul Hastings (M. Comerford), Greenberg Traurig (N. Mitchell) | 0.2 | Correspond with N. Mitchell (Greenberg) regarding PRASA DIP and related terms |
| 97. | 5/24/2018 | Citi (T. Green), AAFAF | 1.0 | PRASA call with AAFAF advisors |
| 98. | 5/24/2018 | Ankura (D. Barrett), McKinsey, CM | 0.4 | Correspond with representatives of McKinsey and Conway MacKenzie regarding potential technical adjustments to the certified fiscal plan. |
| 99. | 5/24/2018 | Citi (T. Green) | 0.9 | PRASA Federal Creditors call |
| 100. | 5/24/2018 | Citi (T. Green) | 1.5 | PRASA post-call follow-ups |
| 101. | 6/5/2018 | Citi (T. Green, J. Castiglioni, G. | 1.0 | Rothschild and Citi calls |

enforce their claims under non-bankruptcy law today, what would they end up with? So just imagine, all those bondholders, plus the unsecureds, charge into the courthouse, I want mine").

| No. | Date | Professional | Hours | Description |
|---|---|---|---|---|
| | | Gavin) | | |
| 102. | 6/5/2018 | Rothschild (D. Mondell), AAFAF | 3.0 | <u>Meetings</u> at AAFAF re PRASA |
| 103. | 6/5/2018 | Rothschild (D. Mondell), Citi, Proskauer, PR Gov. advisors | 2.5 | <u>Meeting</u> w/ Proskauer, Citi and Gov advisors re PRASA |
| 104. | 6/5/2018 | Rothschild (D. Mondell), Citi, BAML | 0.8 | <u>Mtg</u> w/ Citi and BAML |
| 105. | 6/5/2018 | Ankura (F. Batlle), Rothschild, BAML, Greenberg Traurig, AAFAF | 1.0 | Participate in <u>meeting</u> with representatives of **AAFAF, Rothschild, BAML, Greenberg Traurig to discuss PRASA restructuring strategy.** [566] |
| 106. | 6/5/2018 | Ankura (F. Batlle), Rothschild, BAML, AAFAF | 1.6 | Participate in <u>meeting</u> with representatives of Rothschild, BAML and AAFAF to discuss plan of adjustment options. |
| 107. | 6/5/2018 | Ankura (F. Batlle), BluHaus, AAFAF | 0.8 | Participate in <u>meeting</u> with representatives Bluhaus and AAFAF debt restructuring team to discuss presentation to legislature leaders on plan of adjustment. |
| 108. | 6/5/2018 | BAML (J. Rodriguez), Ankura (F. Batlle), AAFAF (G. Portela) | 0.5 | Participate in <u>meeting</u> with Portela (AAFAF) and J. Rodriguez (BAML) to discuss modelling of comprehensive debt restructuring for the plan of adjustment |
| 109. | 6/7/2018 | Citi (T. Green, J. Castiglioni, J. Gavin) | 6.0 | PRASA <u>meetings</u> and <u>calls</u> and prep |
| 110. | 6/7/2018 | Citi (T. Green, J. Castiglioni, J. Gavin), FOMB | 2.0 | FOMB Board <u>Call</u> |
| 111. | 6/10/2018 | EY (J. Burr) | 2.3 | Prepare updated FP budget analysis with adjustments **based on comments from the Government on certain federal funds** |
| 112. | 6/11/2018 | EY (S. Panagiotakis) | | **Research additional federal funds** issued to various departments to determine how this should be incorporated in the budget and to which agencies. |
| 113. | 6/11/2018 | Citi (T. Green, J. Castiglioni, J. Gavin) | 1.3 | PRASA Prep for June 12 meeting |
| 114. | 6/11/2018 | Citi (T. Green, J. Castiglioni) | 5.5 | FOMB staff and Board <u>Calls</u> re restructuring |
| 115. | 6/11/2018 | Ankura (F. Batlle); Rothschild, BAML. OMM | 0.7 | Participate in <u>meeting</u>...to prepare for meeting with Commonwealth agents and FOMB advisors regarding debt |

[566] Fourth Interim Ankura Fee App, at 37.

| No. | Date | Professional | Hours | Description |
|-----|------|--------------|-------|-------------|
| | | | | restructuring proposal. |
| 116. | 6/11/2018 | Ankura (F. Batlle); Rothschild, Citi, BAML, Proskauer | 1.1 | Participate in meeting…to review outcome of meeting with agents and discuss next steps. |
| 117. | 6/11/2018 | Ankura (F. Batlle); Citi | 1.0 | Participate in meeting representatives of Citi to discuss debt restructuring proposal and next steps |
| 118. | 6/12/2018 | EY (J. Burr) | 1.3 | Prepare summary slide on **state revolving fund differences in the FP versus the Gov't submission** |
| 119. | 6/12/2018 | EY (J. Burr) | 1.3 | Prepare summary table **for the FOMB presentation on Federal Funds and variances between the FP and the Gov't submission** |
| 120. | 6/12/2018 | McKinsey (J. Reed, T. Duvall, D. Uhum, P. Davidson), EY (J. Santambrogio, A. Chepenik, B. Yano, G. Malhotra), FOMB (N. Jaresko, K. Rifkind, A. Wolfe) | 2.4 | Participate in call…to discuss creditor best interest test analysis and scenario modeling. |
| 121. | 6/12/2018 | McKinsey, Proskauer, Citi EY (J. Santambrogio) | 1.0 | Participate in call with Proskauer, McKinsey and Citi to discuss best interest test analysis |
| 122. | 6/12/2018 | McKinsey, Proskauer, FOMB, EY (J. Santambrogio); Ankura (F. Batlle) Citi (T. Green, J. Castiglioni, J. Gavin) | 1.0; 2.0 | Participate in meeting on CW best interest test (McKinsey), (FOMB), A Wolfe, and Proskauer PRASA Creditor Meeting at Proskauer |
| 123. | 6/12/2018 | Citi (T. Green, J. Castiglioni, J. Gavin) | 2.0 | PRASA prep and post-meeting calls |
| 124. | 6/13/2018 | EY (S. Panagiotakis) | [find] | **Prepare reconciliation of the Fiscal Plan 2.1 to the Budget** submitted in early June to legislature to understand key changes on overall FP and to individual agencies and groupings. |
| 125. | 6/13/2018 | Citi (T. Green, J. Castiglioni, J. Gavin) | 2.0 | **PRASA numbers** and Citi deck review |
| 126. | 6/14/2018 | McKinsey (P. Bailinson), EY (S. Panagiotakis) | [find] | Participate in call…to discuss the files provided that detail changes to the FP for the budget. |

329

| No. | Date | Professional | Hours | Description |
|-----|------|-------------|-------|-------------|
| 127. | 6/14/2018 | McKinsey (P. Bailinson, S. O'Rourke, T. Duvall, T. Wintner); EY (S. Panagiotakis, J. Santambrogio, A. Chepenik, J. Burr); FOMB (N. Jaresko, M. Tulla) | 1.4 | Participate in call…to discuss fiscal plan to budget estimate reconciliations. |
| 128. | 6/14/2018 | McKinsey, CM, FOMB, AAFAF, Ankura (F. Batlle) | 1.2 | Participate on conference call…to discuss and review implementation plan framework and reporting. |
| 129. | 6/14/2018 | Ankura (F. Batlle), AAFAF (G. Portela) | 0.3 | Participate on call with G. Portela (AAFAF) to discuss status of the plan of adjustment presentation. |
| 130. | 6/14/2018 | Rothschild; BAML; OMM; AAFAF; Ankura (F. Batlle) | 0.3 | Participate on conference call…to review first draft of plan of adjustment presentation. |
| 131. | 6/14/2018 | Rothschild; BAML; OMM; Ankura (F. Batlle) | 1.9 | Participate in drafting session for plan of adjustment presentation…. |
| 132. | 6/15/2018 | McKinsey (Bailinson, D. Udom, J. Reed); EY (S. Panagiotakis) | 1.1 | Participate in call…to go through the files we provided summarizing the **changes to the FP based on the budget and changes to individuals agencies and budgets**. |
| 133. | 6/15/2018 | Ankura (F. Batlle), AAFAF (A. Mendez) | 0.2 | Participate on call…to discuss summary of **revisions to proposed budget submitted by FOMB**. |
| 134. | 6/15/2018 | Rothschild, BAML, OMM, AAFAF, Ankura (F. Batlle) | 0.3 | Participate on conference call…**to discuss changes and status of plan of adjustment strategy presentation**. |
| 135. | 6/15/2018 | OMM, Ankura (F. Batlle) | 0.3 | Participate on conference call…to discuss changes to plan of adjustment strategy presentation. |
| 136. | 6/15/2018 | BAML, (J. Rodriguez); Ankura (F. Batlle) | 0.1 | Participate on call…**to discuss plan of adjustment presentation changes**. |
| 137. | 6/17/2018 | Rothschild (D. Mondell), BAML, Ankura | 0.4 | Call w/ BAML and Ankura re financial model scenario |
| 138. | 6/17/2018 | Rothschild (D. Mondell), AAFAF | 0.8 | Call w/ AAFAF team re financial analysis |
| 139. | 6/18/2018 | McKinsey (P. Bailinson, J. Reed, others), EY (A. Chepenik, J. Santambrogio, J. Burr, | 0.4 | Participate in fiscal plan to budget reconciliation discussion led by P Baileston (McKinsey), J Reed (McKinsey), and other McKinsey team members, with A Chepenik (EY), S Panagiotakis (EY), J Burr (EY), J Santambrogio (EY) |

| No. | Date | Professional | Hours | Description |
|---|---|---|---|---|
| | | S. Panagiotakis) | | |
| 140. | 6/18/2018 | McKinsey, Citi, Proskauer, O'Neill, EY (. Chepenik, J. Santambrogio, G. Malhotra, J. Porepa, R. Tague), FOMB (N. Jaresko, S. Negron) | 0.4 | Participate in advisor call to discuss analysis and work being completed with S Negron (FOMB), N Jaresko (FOMB), McKinsey, Citi, Proskauer, O'Neill, A Chepenik (EY), G Malhotra (EY) J Santambrogio (EY), J Porepa (EY) and R Tague (EY). |
| 141. | 6/18/2018 | McKinsey, Proskauer, EY (J. Porepa), FOMB (M. Tulla) | 0.6 | Participate in Advisor call with N. Jaresko (FOMB), M. Tulla (FOMB), McKinsey, Proskauer, J. Porepa (EY) and S. Panagiotakis (EY) to discuss **progress on fiscal plan and budget.** |
| 142. | 6/18/2018 | Ankura (F. Batlle), AAFAF (P. Soto, others) | 3.2 | Participate in meeting…to discuss **FY19 budget variances against fiscal plan.** |
| 143. | 6/18/2018 | CM (J. York), Ankura (D. Barrett) | 0.8 | Participate in discussion…regarding the summary of the **FY19 budget variances.** |
| 144. | 6/18/2018 | Ankura (D. Barrett), CM | 1.9 | Review summary of FY19 budget variances prepared by Conway Mackenzie. |
| 145. | 6/18/2018 | Paul Hastings (M. Comerford), Zolfo (S. Martinez) | 0.2 | Review summary of creditor working group call from S. Martinez (Zolfo Cooper) regarding open issues to address for PREPA and PRASA (.2) |
| 146. | 6/19/2018 | McKinsey, EY (J. Burr, S. Panagiotakis) | 0.4 | Participate in call…to discuss the **budget comparison files prepared to explain variance between the EY and FOMB budgets.** |
| 147. | 6/20/2018 | Citi (T. Green, J. Castiglioni, J. Gavin) | 1.5 | **PRASA EPA term sheet review and calls** |
| 148. | 6/20/2018 | Citi (T. Green, J. Castiglioni, J. Gavin), Rothschild | 1.5 | Rothschild meeting |
| 149. | 6/20/2018 | Rothschild (D. Mondell), Citi, BAML | 1.0 | Meeting w/ Citi and BAML |
| 150. | 6/20/2018 | Rothschild, BAML, OMM, Ankura (F. Batlle), AAFAF | 1.0 | Participate on conference call…to discuss plan of adjustment strategy and GO/Cofina settlement. |
| 151. | 6/20/2018 | Rothschild (S. Bomhard, L. Weinberg) | 1.3 | Advisor strategy meeting |
| 152. | 6/21/2018 | McKinsey (S. Skeates), EY (S. Hurtado), FOMB (E. Arroyo, O | 3.3 | Participate in morning PR FY19 Budget development meeting at BluHaus…**to prepare a compliant and presentable budget comparable to the FP** |

| No. | Date | Professional | Hours | Description |
|-----|------|-------------|-------|-------------|
| | | Cuadrado), BluHaus (A. Toro, AAFAF | | |
| 153. | 6/21/2018 | McKinsey, Citi, Proskauer, OMB, Ankura (F. Battle), House Budget Committee, OMB | 1.6 | Participate in meeting…to discuss budget variances **between fiscal plan and budget.** |
| 154. | 6/21/2018 | Rothschild (J. Kang) | 1.5 | Fiscal plan reconciliation |
| 155. | 6/22/2018 | McKinsey (P. Baliston, K. Hernandez, S. O'Rourke, D. Burr), EY (A. Chepenik, S. Panagiotakis, J. Burr, J. Santambrogio) | 0.6 | Participate in call on **fiscal plan reconciliations and adjustments with McKinsey.** |
| 156. | 6/22/2018 | McKinsey, Citi, Proskauer, EY (A. Chepenik, J. Santambrogio, G Malhotra, R. Tague, and J Porepa), FOMB (N. Jaresko, J. El Koury, A. Wolfe, others) | 1.4 | Participate in FOMB advisors discussion led by N Jaresko (FOMB) and FOMB members to discuss **revisions to fiscal plan process and ties to budget updates**…. |
| 157. | 6/22/2018 | Rothschild (D. Mondell), AAFAF | 0.4 | Meeting at AAFAF re open workstreams |
| 158. | 6/22/2018 | Rothschild (L. Weinberg), AAFAF | 11.0 | POA advisor/AAFAF strategy meeting |
| 159. | 6/22/2018 | Rothschild (V. D'Agata), BAML (J. Rodriguez), OMM (J. Rapisardi), Ankura (F. Batlle) | 0.7 | Participate in meeting…to discuss financial implications of potential fiscal plan options. |
| 160. | 6/22/2018 | McKinsey, CM, Ankura (D. Barrett), FOMB, AAFAF | 1.2 | Participate on conference call…to discuss and review implementation plan framework and reporting |
| 161. | 6/22/2018 | McKinsey, Ankura (D. Barrett), AAFAF (O. Chavez, A. Mendez) | 2.0 | Participate in implementation plan status meeting…. |
| 162. | 6/22/2018 | Rothschild, CM, Ankura (F. Batlle) | 0.3 | Participate on conference call…to prepare for **meeting with representatives of McKinsey to discuss Miller Buckfire projections.** |
| 163. | 6/22/2018 | Greenberg Traurig (N. Mitchell), | 0.2 | Participate on call…to discuss **PRASA restructuring status.** |

| No. | Date | Professional | Hours | Description |
|-----|------|--------------|-------|-------------|
| | | Ankura (F. Battle) | | |
| 164. | 6/22/2018 | Paul Hastings (L. Despins, A. Bongartz), Proskauer (M. Bienenstock, B. Rosen, E. Barak) | 0.8 | Meeting with M. Bienenstock (Proskauer), B. Rosen (Proskauer), E. Barak (Proskauer) and L. Despins **regarding PRASA loan and GDB restructuring** (.8); follow-up discussion with L. Despins regarding same (.2); prepare notes for same (.2); follow-up correspondence with E. Barak regarding GDB restructuring law (.1) |
| 165. | 6/24/2018 | EY (J. Burr), FOMB | 1.7 | Prepare summary of **key budget items to be incorporated in the Fiscal Plan** and send to the FOMB group in preparations for Monday morning meeting |
| 166. | 6/24/2018 | McKinsey (O. Shah), Ankura (F. Batlle) | 0.2 | Participate on call…to discuss fiscal plan certification in light of latest update on Act 80. |
| 167. | 6/24/2018 | EY (J. Burr), FOMB (S. Rodriguez) | 0.8 | Participate in call with…to discuss **FY18 budget transfer impacts on the FP and how they will be incorporated** |
| 168. | 6/25/2018 | McKinsey, EY (J. Burr, S. Panagiotakis) | 1.7 | Participate in meeting with McKinsey and J. Burr and S. Panagiotakis (EY) **to revise the presentation on the potential changes to the budget and fiscal plan.** |
| 169. | 6/25/2018 | EY (R. Tague), McKinsey (P. Bailinson) | 1.9 | Review **Fiscal Plan updates PowerPoint which discusses impacts to FY19 budget** from P. Bailinson (McKinsey) |
| 170. | 6/25/2018 | EY (A. Chepenik) | 3.0 | Travel from Washington, DC to San Juan, PR for prep meetings and actual meetings with retiree committee as well as **fiscal plan to budget compliance analysis and meetings.** |
| 171. | 6/25/2018 | McKinsey, Ankura (F. Batlle), FOMB | 0.4 | Participate in weekly fiscal plan implementation status call with McKinsey and FOMB staff. |
| 172. | 6/25/2018 | Ankura (F. Batlle, D. Barrett) | 0.2 | Participate on call…to prepare for meeting with McKinsey and FOMB regarding fiscal plan implementation. |
| 173. | 6/25/2018 | EY (J. Burr) | 0.4 | **Prepare summary of the FY19 budgets for AAFAF**, Title III professional fees number as provided by the Government to incorporate into the FP |
| 174. | 6/25/2018 | EY (S. Panagiotakis) | 0.9 | Review and comment on the **list of potential changes to the fiscal plan and budget** prepared by McKinsey to prepare for meeting with N. Jaresko (Board) |
| 175. | 6/25/2018 | McKinsey (S. O'Rourke, P. Ballinson, others); EY (J. Porepa, A. Chepenik, S. Panagiotakis, J. Burr) | 1.1 | Participate in meeting…to prepare for meeting with N Jaresko (FOMB) **on fiscal plan to budget mapping and consistency with analysis** |
| 176. | 6/25/2018 | McKinsey (S. O'Rourke, P. | 0.8 | Participate in follow up discussion… to finalize materials for meeting with N Jaresko (FOMB) on |

| No. | Date | Professional | Hours | Description |
|-----|------|--------------|-------|-------------|
| | | Ballinson, others); EY (J. Porepa, A. Chepenik, S. Panagiotakis, J. Burr) | | **fiscal plan to budget mapping and consistency with analysis** |
| 177. | 6/26/2018 | Rothschild (D. Mondell), OMM, AAFAF | 9.0 | All day meeting at OMM with counsel and AAFAF team |
| 178. | 6/26/2018 | McKinsey (D. Keller); EY (S. Panagiotakis) | 0.9 | Participate in meeting with C. Keller (McKinsey) to discuss the reconciliation of the budget to the fiscal plan. |
| 179. | 6/26/2018 | EY (J. Burr) | 0.9 | **Review updated State Revolving Fund documentation provided by the EPA and prepare for incorporation in the FP** |
| 180. | 6/26/2018 | EY (S. Panagiotakis) | 0.6 | Review and edit updated list of FP adjustments for the meeting with N. Jaresko (FOMB) prepared by McKinsey. |
| 181. | 6/26/2018 | McKinsey (S. O'Rourke, P. Bailinson, B. Chapuious); EY (J. Porepa, A. Chepenik, S. Panagiotakis, J. Burr), O'Neill (P. Pierluisi); FOMB (N. Jaresko, J. El Koury, K. Rifkind, S. Negron, S. Rodriguez, M. Tulla, M. Vizcarrondo) | 1.6 | Participate in meeting…**to discuss fiscal plan to budget mapping and consistency with analysis.** |
| 182. | 6/26/2018 | EY (R. Tague, J. Porepa), FOMB (M. Tulla, E. Fritz) | 0.6 | Participate in daily touchpoint meeting…**to discuss public budget presentation content, budget tie-in with fiscal plan** and enforcement language revisions. |
| 183. | 6/26/2018 | McKinsey (S. O'Rourke, P. Bailinson); EY (A. Chepenik, S. Panagiotakis) | 4.3 | Participate in working session…on mapping fiscal plan and budget forecast numbers. |
| 184. | 6/26/2018 | EY (R. Tague), FOMB (N. Jaresko) | 0.3 | Review email related to urgent decisions regarding CW fiscal plan substantive amendments email from N. Jaresko (FOMB) |
| 185. | 6/26/2018 | EY (J. Burr) | 3.2 | **Prepare list of additional expense items that need to be incorporated in the FP (e.g. OMB transfers)** |

334

| No. | Date | Professional | Hours | Description |
|-----|------|--------------|-------|-------------|
| 186. | 6/26/2018 | EY (S. Panagiotakis), McKinsey | 1.3 | Review and revise bridges for certain key agencies prepared by McKinsey to explain budget variances |
| 187. | 6/26/2018 | Citi (T. Green, J. Castiglioni, J. Gavin), FOMB | 1.25 | FOMB calls re CW FP |
| 188. | 6/26/2018 | Rothschild (D. Mondell); EY (A. Chepenik); Ankura (F. Batlle, J. Batlle) | 0.4 | Participate on conference call…**to discuss state revolving fund allocation in FY19 budget.** |
| 189. | 6/27/2018 | Rothschild (D. Mondell, B. Meisel, L. Weinberg), BAML, OMM, Ankura, AAFAF | 5.0; 3.0 | Working session w/ AAFAF team, OMM, BAML and Ankura; Advisor/AAFAF POA strategy meeting |
| 190. | 6/27/2018 | McKinsey (S. O'Rourke, P. Ballinson); EY (A. Chepenik, S. Panagiotakis, J. Burr) | 2.9 | Participate in joint working session…to tie out differences and estimates in fiscal plan and budget. |
| 191. | 6/27/2018 | McKinsey (S. O'Rourke, P. Ballinson); EY (A. Chepenik, S. Panagiotakis, J. Burr, others); FOMB (S. Negron, N. Jaresko, S. Rodriguez, M. Tulla) | 3.7 | Participate in working group meeting…to discuss long-term projections and variances between fiscal plan and budget that need resolution. |
| 192. | 6/27/2017 | EY (S. Panagiotakis) | 0.4 | Review the list of adjustments to budget and fiscal plan to ensure all changes are incorporated. |
| 193. | 6/27/2018 | EY (C. Loh) | 0.6 | **Update FY19 Commonwealth consolidated budget overview by fund and category of spend to reflect latest budget numbers,** after law 80 repeal adjustment |
| 194. | 6/27/2018 | Citi (T. Green, J. Castiglioni, J. Gavin) | 7.0 | Travel to San Juan for FOMB |
| 195. | 6/28/2018 | EY (R. Tague) | 0.4 | Review list of adjustments from FP2.1 to FP3.0vs Mackenzie file |
| 196. | 6/28/2018 | EY (C. Loh) | 1.1 | Prepare slide on the FY19 general fund revenues and adjusted fiscal plan measures impacting the general fund for the FY19 public meeting presentation of the Commonwealth |

| No. | Date | Professional | Hours | Description |
|-----|------|--------------|-------|-------------|
| | | | | budget |
| 197. | 6/28/2018 | McKinsey, EY (S. Panagiotakis) | 1.2 | Participate in meeting with McKinsey to discuss how to incorporate capex allocations and **transfers from OMB to other agencies in the fiscal plan.** |
| 198. | 6/28/2018 | EY (J. Burr) | 1.9 | Prepare a final list of **OMB Custody changes/transfers to be incorporated in the new Fiscal Plan** |
| 199. | 6/28/2018 | EY (S. Panagiotakis) | 0.8 | **Review and update the list of OMB transfers to ensure all transfers have been incorporated and should be reflected in the Fiscal plan.** |
| 200. | 6/28/2018 | EY (A. Chepenik), McKinsey | 3.7 | Work on assisting EY and McKinsey team with updates to linkages between fiscal and budget estimates. |
| 201. | 6/28/2018 | Ankura (F. Batlle), AAFAF (J. Mattei) | 0.1 | Participate on calls…to **discuss state revolving fund payment and inclusion in FY19 general fund budget.** |
| 202. | 6/28/2018 | EY (R. Tague) | 1.1 | Review and analyze documents and process for compliance with Revised New Fiscal Plan and summarize for FY19 budget presentation. |
| 203. | 6/29/2018 | McKinsey; Citi (J. Gavin); EY (A. Chepenik, G. Malhotra); O'Neill; FOMB (N. Jaresko, others) | 7.0; 3.9; 2.3 | FOMB Meeting 9 to 4; Participate in morning portion of all day long Board strategy session to discuss fiscal plan, budget, with FOMB members, N Jaresko (FOMB), Citi, McKinsey, O'Neill, and EY teams. EY participants include: A Chepenik (EY) and G Malhotra (EY); Participate in afternoon portion of all day long Board strategy session to discuss fiscal plan, budget, with FOMB members, N Jaresko (FOMB), Citi, McKinsey, O'Neill, and EY teams. EY participants include: A Chepenik (EY) and G Malhotra (EY). |
| 204. | 6/29/2018 | EY (G. Malhotra) | 3.1 | Work on reviewing EY and McKinsey team analyses **regarding linkages between fiscal and budget estimates.** |
| 205. | 6/29/2018 | Citi (J. Gavin) | 6.0 | Travel to Boston from San Juan |
| 206. | 6/29/2018 | Rothschild, BAML, OMM, Ankura (F. Batlle) | 2.4 | Participate on conference call…to discuss plan of adjustment materials. |
| 207. | 6/29/2018 | CM (J. York); Ankura (F. Batlle) | 0.1 | Participate on call with J. York (CM) to discuss assumptions in revenue forecast using FY18 actuals. |
| 208. | 6/30/2018 | EY (J. Burr) | 0.6 | Review transfers and budget eliminations in the non-GF to make sure the non-GF resolutions are consistent with the FP and agency listing in |

336

| No. | Date | Professional | Hours | Description |
|---|---|---|---|---|
| | | | | FY19 |
| 209. | 6/30/2018 | EY (R. Tague) | 2.3 | <u>Review</u> legislative revisions and compare to previous budget levels **to identify variances from prior version and impact to FP/FY19 certified budget** |
| 210. | 6/30/2018 | EY (J. Burr) | 1.9 | <u>Review</u> **list of FP changes to ensure budget resolutions properly capture transfers** |
| 211. | 6/30/2018 | EY (J. Burr) | 0.6 | **Review OMB custody for consistency with the FP** |
| 212. | 6/30/2018 | EY (S. Panagiotakis) | 1.6 | Review the fiscal plan operating expenses to identify **potential issue with the transfers from agency to agency.** |
| 213. | 6/30/2018 | EY (S. Panagiotakis) | 0.8 | Participate in <u>call</u> with S. Rourke (McKinsey) **to discuss the transfers from agency to agency** and their impact on the fiscal plan. |
| 214. | 6/30/2018 | EY (S. Panagiotakis) | 2.4 | Analyze the UPR, Courts, Education, Police, **OMB budget to ensure that resolution, budget mapping file and fiscal plan are consistent.** |
| | 6/30/2018 | | | **Oversight Board Issues Its FY2019 Budget** |

1091.   These meetings, conference calls and related assignments leading up to the

issuance of the Oversight Board's FY2019 General Fund Budget, which added the $194 million

payment to the state revolving funds, proves that these parties were engaged in a conspiracy to

replace the missing state revolving funds.  By necessary implication, then, these interactions and

related assignments demonstrate that the state revolving funds had been illegally transferred out

of the GDB by virtue of the fact that they were missing and needed to be replenished.  Given the

Government of Puerto Rico's apparent refusal to replenish the state revolving funds, it is evident

that the Oversight Board and its various advisors – particularly McKinsey, Rothschild, EY, and

Proskauer – foisted the scheme upon the Commonwealth in order to facilitate payments of $194

million in unlawful preference payments to GDB bondholders.

337

1092.   Moreover, it is clear that these parties were fully aware that such practices were illegal because the co-conspirators made efforts to conceal these illegal transactions.  The initial fiscal plans for PRASA and GDB referenced the federal funds and even indicated that those funds were available to use for purposes other than legally authorized.  However, these references were scrubbed from later versions of those fiscal plans in order to conceal the nature of the funds being used to pay GDB bondholders, *i.e.*, that they were restricted funds unavailable for such purposes.

1093.   ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

### r.   **GDB RSAs**

#### *1.   5.31.17 GDB RSA*

1094.   On May 15, 2017, the GDB, AAFAF and certain GDB bondholders interested in the GDB Restructuring Support Agreement (the "GDB RSA").[568]  Christian Sobrino, as President of the GDB,[569] and Franco, as President of AAFAF,[570] signed the GDB RSA on behalf of the government parties.

1095.   Among the signatory bondholders were members of the Ad Hoc Group of GDB Bondholders, including Avenue Capital Management II,[571] L.P., Brigade Capital Management,[572]

---

[567]

[568] GDB Restructuring Support Agreement, at [1].

[569] GDB Restructuring Support Agreement, May 15, 2017 with signature pages (redacted), at 25 (available at https://www.drinkerbiddle.com/~/media/files/services/bondholders/government-development-bank-for-puerto-rico/gdb-restructuring-support-agreement-may-15-2017-with-signature-pages-redacted.pdf?la=en).

[570] Id. at 26.

[571] Id. at 28.

[572] Id. at 27.

LP, Fir Tree Partners[573] and Solus Alternative Asset Management LP.[574]  The Ad Hoc Group was represented by Davis Polk, as counsel, and Ducera Partners as, financial advisor.[575] Signatories were provided with a 2% increase for their acceptance. [find citation]

1096.   Subsequent amendments were also executed by Brian Resnick, of Davis Polk, on behalf of the Ad Hoc Group of GDB Bondholders and by agents of Bonistas del Patio.[576]

1097.   The indentured trustee for the outstanding GDB bonds were Wilmington Trust, National Association and UMB Bank, National Association.[577]

1098.   The GDB RSA proposed to transfer all of GDB's assets and liabilities into two entities: (1) a special purpose entity called "New Issuer" and (2) a trust called "Public Entity Trust ("PET").  Pre-Title VI GDB bondholders would exchange their GDB bonds for new bonds issued by New Issuer. By virtue of its first position in a water fall arrangement, the New Issuer would effectively receive all valuable assets of the GDB, including cash and performing loans. In contrast, the PET, created for the benefit of pre-Title VI GDB trust beneficiaries and deposit account holders, would receive poorly or nonperforming loans and no cash.

1099.   Further, the GDB RSA provided that that each New Issuer beneficiary, including municipalities with Municipal Special Property Tax ("CAE") deposits claims, would receive a return of 55 percent secured by all the assets of the Recovery Authority and GDB.  In contrast, the GDB RSA left open the possibility that PET beneficiaries might be entirely wiped out.

---

[573] Id. at 30.
[574] Id. at 29.
[575] See Statement of Ad Hoc Group of GDB Bonholders Regarding Restructuring Support Agreement (May 15, 2017) (*available at* https://www.drinkerbiddle.com/-/media/files/services/bondholders/government-development-bank-for-puerto-rico/statement-of-ad-hoc-group-of-gdb-bondholders-regarding-restructuring-support-agreement-rsa-may-15-2017.pdf?la=en).
[576] *See e.g.*, Second Amendment to Restructuring Support Agreement, Case No. 3:18-cv-01561-LTS, Dkt.1-5, at 7, 10 (Dec. 20, 2017), Third Amendment to Restructuring Support Agreement, Case No. 3:18-cv-01561-LTS, Dkt.1-6, at 7, 8 (March 20, 2018).
[577] AAFAF Letter to Oversight Board (June 30, 2017), at 2.

339

1100.  GDB RSA represents

> *The settlement will release all of GDB's non-loan claims against the Commonwealth and certain agencies, instrumentalities, and affiliates of the Commonwealth, as identified on Schedule 7 to the Restructuring Term Sheet, and allow each of these entities to receive their pro rata share of the beneficial interests in a trust (the "Public Entity Trust") in exchange for releasing their claims against GDB.*
>
> *The assets of the Public Entity Trust are identified on Schedule 8 of the Restructuring Term Sheet and include loans made to certain public entities by GDB, including the Commonwealth, and $50 million in cash.*
>
> *The Public Entity Trust will be structured to provide priority treatment for claims arising from deposits of certain federal funds with GDB. As with the assets constituting New Bond Collateral, certain assets to be placed in the Public Entity Trust are expressly subject to further diligence and recategorization.*[578]

1101.  Among other things, the "Fee and Expenses" section provides for

> *GDB shall pay all reasonable documented fees and expenses incurred in connection with or related to the Restructuring and the New Bonds...of the following professionals: (a) Davis Polk, as legal advisor to the Ad Hoc Group (and the fees and expenses of local counsel to the Ad Hoc Group), (b) Ducera Partners LLC, as financial advisor to the Ad Hoc Group...(g) Atlas Asset Management, LLC, as financial advisor to Alianza, Grupo ES, and other agreed entities (h) Picó & Blanco, as legal advisor to Bonistas del Patio, (i) Jorge Irizarry, as financial advisor to Bonistas del Patio and (j) Carlos Rodriguez, as financial advisor to Bonistas del Patio*

1102.  Jorge Irizarry was the President of the GDB at the time it entered into the interest rate swaps and termination fee agreements with, among others, Lehman Brothers and Goldman Sachs.  It is submitted that this contemplated fee arrangement was, in reality, a bribe to a government official.

---

[578] GDB RSA at 4

1103.   Footnote 11, which identifies certain cash holdings which constitutes "restricted cash," does not mention or refer to either federal water funds water or the state revolving funds. To wit,

> *[r]estricted cash includes cash held in a segregated account separate from Available Cash , in an aggregate amount of approximately $27.5 million, for (i) the Employee's Incentive, Retirement and Retraining Program established under Act 70-2010; (ii) employee benefits under the early retirement windows of 1994, 2000 and 2007; (iii) the Voluntary Pre-Retirement Program established under Act 211-2015; and (iv) the voluntary separation program included in GDB's certified fiscal plan*

1104.   Schedule 7 covering "Public Entity Trust: Public Entity Deposit Claims" reflects balances "post setoff" of $180.8 million held on account of PRIFA and no deposits held on account of PRASA.[579]

1105.   Schedule 8 covering "Public Entity Trust: Collateral Detail" reflects a total cash balance of $50,000,000 in cash.

1106.   Notably, schedule 1 covering "Other Deposits/Claims" reflects a "Bank of New York Mellon as Beneficiary under Letter of Credit re: Puerto Rico Ports Authority" balance of $190,630,000.[580]  This did not appear in the original GDB RSA schedule 1.

### 2.   8.10.18 Fourth Amendment to the GDB RSA

1107.   Schedule 7 covering "Public Entity Deposits" reflects a PRIFA balance of $31,307,999 as of December 12, 2017.[581]  PRASA is not listed.  Unlike the schedule 7 found in the original GSA RSA, this version notes that the amounts provided are "unaudited."

---

[579] GDB RSA, Schedule 7, at 67 of 181
[580] Case 3:18-cv-01561-LTS Document 1-7 Filed 08/10/18 Page 31 of 45.]
[581]

1108.   Schedule 9 covering "Other Federal Funds" reflects a PRASA balance of <u>$46,941</u> as of December 12, 2017.[582]  PRIFA is not listed.  According to a footnote, this information was provided in April 2017, as

> *GDB communicated to all depositors requesting confirmation of balances of federal funds held at GDB, including identification of the sources of such funds. The balances presented are the result of such efforts and subsequent communications.*[583]

1109.   Schedule 7 covering "Public Entity Trust Collateral" indicates the amount of cash is "TBD."[584]

### 3.   8.15.18 UCC Update Regarding the GDB RSA

1110.   On August 15, 2018, Paul Hastings held a "special"[585] conference call with the Creditors' Committee in order to provide it with an update on GDB Issues.[586]

1111.

---

[582] Case 3:18-cv-01561-LTS Document 1-7 Filed 08/10/18 Page 45 of 45.
[583] Id.
[584] Case 3:18-cv-01561-LTS Document 1-7 Filed 08/10/18 Page 40 of 45.
[585] See Paul Hastings 4th Interim Fee Application, Case:17-03283-LTS Doc#:4325-7 Filed:11/16/18 Entered:11/16/18, Page 556 of 795 (providing, Luc Despin's time entry for 8/15/2018: "Outline GDB issues to prepare for special committee call (.60); handle special committee call regarding GDB (1.20)").
[586] Id.; also see,
[587] Id. at 2 (emphasis in the original).



1112.

1113.

1114.

1115.



1116.

**s.   5.2.19 Congressional Testimony of Governor Rosselló**

1117.    On May 2, 2019, then Governor Rosselló testified in front of the U.S. House of Representatives Committee on Natural Resources as part of its hearing, "The Status of the Puerto Rico Oversight, Management and Economic Stability Act (PROMESA): Lessons Learned Two Years Later."

---

[589] Id. at 2-3.

1118.  Among other things, Governor Rosselló made the following recommendation on how Congress could improve PROMESA through amendment:

> • **_Require Oversight Board Transparency_**: *The Oversight Board must be held accountable for its <u>use of public funds</u>. Reports of a <u>lack of transparency and potential conflicts of interests of the Oversight Board's consultants</u> are deeply concerning and not surprising given the way the Oversight Board has conducted itself throughout the process. Our Government also supports efforts to apply basic transparency principles to the Oversight Board through federal legislation.*[590]

t.  **5.3.19 Notes of the Basic Financial Statements June 30, 2016**

1119.  According to the Notes to the Basic Financial Statements, issued by KPMG, June 30, 2016

> *On August 1, 2018 the Oversight Board approved a revised fiscal plan to allow PRASA to continue providing safe and reliable supplies of drinking water and treatment of wastewater.  Also, PRASA will be able to invest in necessary infrastructure to restore the system and ensure compliance with required standards while promoting much need [sic] economic growth through the island.*
>
> <u>**_On December 18, 2018_**</u>**_, a Deed of Trust was entered into, by and among PRIFA, the Puerto Rico Department of Natural and Environmental Resources as successor to EQB, and Banco Popular de Puerto Rico, as trustee of the Clean Water Fund...to create a trust to hold all funds related to the Clean Water Fund in trust separate from the assets of the Commonwealth, its agencies and instrumentalities...and a Dead of Trust was entered into, by and among PRIFA, Commonwealth Department of Health, and Banco Popular de Puerto Rico, as trustee of the Drinking Water Fund...to hold all funds related to the Drinking Water Fund in trust separate from the assets of the Commonwealth, its agencies and instrumentalities (the Drinking Water Fund Trust, and together with the Clean Water Fund Trust, the SRF Trusts)._**

---

[590] Written Testimony of Puerto Rico Governor Rosselló. at 12 (underlining added).

> *During the month of* <u>*February 2019*</u>*, the Commonwealth transferred the amount of 194.5 million to the SRF Trusts. Specifically, approximately $141.2 million was transferred to the Clean Water Fund Trust. These funds were transferred to the SRF Trusts to safeguard the future viability of the State Revolving Funds to ensure continued assistance to communities with critical water and wastewater infrastructure problems.*[591]

1120.   Disclosure Statement list of federal funds omits Clean Water and Drinking Water Funds.[592]

1121.   At the onset of its audit of the Commonwealth's basic financial statements for June 30, 2016, KPMG disclaimed responsibility for auditing "Puerto Rico Water Pollution Control Revolving Fund" and "the Puerto Rico Safe Drinking Water Treatment Revolving Loan Fund." [593]

1122.   Interfund transfer, "(b) Transfer of $286,507 from the General Fund to the debt service fund to make funds available for debt service payments."[594]

1123.   According to the Notes to the Basic Financial Statements, PRASA owed the "Puerto Rico Water Pollution Control Revolving Fund" $392,807 and otherwise owed the Commonwealth $187,205 in "nonmajor proprietary" funds, totaling $580,012.[595]

u.   **Oversight Board's Cash Restriction Analysis Reports**

*1.   10.2.19 Oversight Board's Summary of Cash Restriction Analysis*

1124.   On October 2, 2019, the Oversight Board issued its "Mediation: Summary of Cash Restriction Analysis."[596]

---

[591] Case:17-03283-LTS Doc#:8766-19 Filed:09/27/19 Entered:09/27/19 09:44:05 Desc: Exhibit K-1 - CW CAFR Page 332-33 of 377 (emphasis added).
[592] Case:17-03283-LTS Doc#:8766-12 Filed:09/27/19 Entered:09/27/19 09:44:05 Exhibit F - CW Budget Page 109-111 of 212
[593] Case:17-03283-LTS Doc#:8766-19 Filed:09/27/19 Entered:09/27/19 09:44:05 Exhibit K-1 - CW CAFR Page 7-8 of 377.
[594] Case:17-03283-LTS Doc#:8766-19 Filed:09/27/19 Entered:09/27/19 09:44:05 Desc: Exhibit K-1 - CW CAFR Page 169 of 377.
[595] Case:17-03283-LTS Doc#:8766-19 Filed:09/27/19 Entered:09/27/19 09:44:05 Desc: Exhibit K-1 - CW CAFR Page 171 of 377.

1125.   The Cash Analysis Summary's executive summary represents that the Oversight

Board and its advisors, including Ernst and Young, "conducted an extensive analysis of cash at

the Commonwealth and its related entities to determine relevant restrictions, including, among

other things, "[a]ll accounts at the Commonwealth and its agencies that held over $6.9 billion in

cash or securities were reviewed, or approximately 98% of the total balance."[597]

1126.   However, the slide covering "Methodology and Approach for Assessing

Restrictions," admits that $190 million held in certain accounts had not yet been reviewed."[598]

Rather, the "[a]ccounts will be reviewed on rolling basis to finalize restriction analysis."[599]

1127.   Slide 4, "Summary of Definitions for Account Analysis," categorizes "restricted

Accounts" as including, among other things, "Federal Funds…Funds received from the Federal

Government for specific uses."[600]

1128.   Slide 5, "Sources of Cash: 6/30/19 Measurement Date," also indicates that

accounts holding $190 million were not reviewed.[601] In addition, the cash analysis shows that the

$190 million was not reflected in AAFAF's data as of May 31, 2019.[602]

1129.   In defining relevant terms, Cash Analysis Summary states that "[r]estricted

categories include…federal funds," among other things.  Moreover, it defines federal funds as

"[f]unds received from the Federal Government for specific uses."

1130.   In addition, the Cash Analysis Summary represents that, while $1.975 billion in

accounts of agencies including PRASA, have been subject to review, that $190 million held in

---

[596]

[597] Oversight Board Mediation: Summary of Cash Analysis, at 3.
[598] Oversight Board Mediation: Summary of Cash Analysis, at 4.
[599] Id.
[600] Oversight Board Mediation: Summary of Cash Analysis, at 5.
[601] Oversight Board Mediation: Summary of Cash Analysis, at 5.
[602] Oversight Board Mediation: Summary of Cash Analysis, at 6.

349 accounts have not been reviewed.[603]  It also states that such accounts "will be reviewed on rolling basis to finalize restriction analysis."[604]

1131.  Notably, the Cash Analysis Summary projects that in fiscal year 2020, PRASA will hold $851 million in cash PRASA, none of which constitutes potentially unrestricted cash.[605]

### 2.  10.16.19 Oversight Board's Restricted Cash Analysis Report

1132.  On October 16, 2019, the Oversight Board released its most recent cash analysis of Puerto Rico's government agencies.  This cash analysis used a measuring date of June 30, 2019.

1133.  The Cash Analysis Summary reports that "Puerto Rico is facing several challenges…[including] [p]oor capacity to manage federal funds," adding that "[f]ederal funds…might be withheld or delayed."[606]

1134.  Slide 18 contains a bar graph illustrating "Historical Federal fund."  Although a footnote states that the graph "[e]xcludes federal funds to instrumentalities," the decrease in "Other Federal Funds" (besides Medicaid and the Nutrition Assistance Program) between FY 2017 and FY 2018 is 237 million.

1135.  Unlike its previous cash analysis, this cash analysis purportedly includes PRASA.[607]  However, the cash analysis also represents that seven PRASA bank accounts are "[a]ccounts pending confirmation (active/inactive).[608]

### 3.  10.16.19 Oversight Board's "Bank Account Analysis: Status Update – June 30, 2019 Balances, as of October 2, 2019"

---

[603] Summary of Cash Restriction Analysis, at 3.
[604] Id.
[605] Summary of Cash Restriction Analysis, Appendix A at 8.
[606] October 2019 Cash Analysis, at 5.
[607] October 2019 Cash Analysis, at 18.
[608] October 2019 Cash Analysis, at 23.

1136. On October 16, 2019, the Oversight Board released its most recent cash analysis

of Puerto Rico's government agencies, *"Bank Account Analysis: Status Update – June 30, 2019*

*Balances, as of October 2, 2019."*[609]

1137. The slide covering "Preliminary TSA sweep structure" represents that federal

funds are deposited directly into the Government's Treasury Single Account (TSA) which is

maintained at Banco Popular (BPPR Account ####9458).[610] The slide also indicates that the

TSA has an oversight repo account with Citi (Citi Account ####9458).[611]

1138. The slide covering "List of government agencies included and excluded from cash

reporting" indicates that PRASA is included in the Oversight Board's analysis.[612]

1139. The slide covering "Additional accounts identified" reflects that PRIFA has 22

separate accounts, with total balances of $158.18 million (as of March 31, 2019) and $164.24

million (as of June 30, 2019).[613]

1140. The slide covering "Additional accounts identified (cont.)" indicates that PRASA

had 7 accounts "pending confirmation (active/inactive status)." Further, the graph has a dash, in

lieu of actual balances, to denote that the "balance of these accounts [require] further [financial

institution] information[.]"[614]

1141. The slide covering "Reconciling estimated balance differences" reflects PRASA's

total balance, as of June 30, 2019, to be $418.53 million (according to the Oversight Board) or

$415.84 million (according to AAFAF).[615] In contrast, the slide covering "Reconciling

---

[609] Oversight Board's *Bank Account Analysis: Status Update – June 30, 2019 Balances, as of October 2, 2019*
(October 16, 2019).
[610] Oversight Board's *Bank Account Analysis: Status Update – June 30, 2019 Balances, as of October 2, 2019*, at 11.
[611] Oversight Board's *Bank Account Analysis: Status Update – June 30, 2019 Balances, as of October 2, 2019*, at 11.
[612] Oversight Board's *Bank Account Analysis: Status Update – June 30, 2019 Balances, as of October 2, 2019*, at 18.
[613] Oversight Board's *Bank Account Analysis: Status Update – June 30, 2019 Balances, as of October 2, 2019*, at 23.
[614] Oversight Board's *Bank Account Analysis: Status Update – June 30, 2019 Balances, as of October 2, 2019*, at 21.
[615] Oversight Board's *Bank Account Analysis: Status Update – June 30, 2019 Balances, as of October 2, 2019*, at 24.

estimated confirmed cash differences" reflects an estimated PRASA total balance of $430.26 million.[616]

### v.  **Transfer of ERS Funds to the Commonwealth**

1142.   In or around July 2017, AAFAF Director of Fiscal Agency Mohammad Yassin-Mahmud instructed ERS Administrator L. Rodriguez to transfer $190.48 million to the Department of the Treasury.[617]

1143.   Sometime thereafter, L. Rodriquez executed the instruction, transferring the $190.48 million to the Puerto Rico Treasury Department.[618]

1144.   Given the suspicious timing and the amount, the transfer of these funds might somehow be related to the CWSRF and DWSRF misappropriation scheme.  Additional discovery is needed to fully develop the facts of the matter.

### w.  **Plaintiff's Deposit Accounts Assignments**

1145.



---

[616] Oversight Board's *Bank Account Analysis: Status Update – June 30, 2019 Balances, as of October 2, 2019*, at 25.
[617] See ERS Motion to Appoint ERS Trustee, Dkt. 9391-1, at 14-15 (Deposition transcript of Mr. Luis Collazo Rodriguez, dated June 4, 2019).
[618] See ERS Motion to Appoint ERS Trustee, Dkt. 9391-1, at 14-15 (Deposition transcript of Mr. Luis Collazo Rodriguez, dated June 4, 2019).



x.  **Grogan's Disclosure of Federal Funds Misappropriation at GDB**

1146.

1147.

1148.

1149.

1150.

1151. ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

1152.   Such an outcome was <u>not</u> in the best interest of the party to which the Creditors'

Committee's serves as its fiduciary – the Puerto Rico's unsecured creditor body.

1153.   To the contrary, the Commonwealth's assumption of the debt resulting from the

misappropriation of federal funds held by the GDB, in fact, *injured* the interests of the unsecured

creditor body.  As a result of increasing the amount of unsecured debt owed by the

Commonwealth, each of its unsecured creditors would necessarily receive less in repayment

through the Title III proceedings because the amount of available funds the Commonwealth has

to pay its unsecured debt will be further divided by the additional unsecured debt.

1154.   Moreover, if the Oversight Board or Creditors' Committee prosecuted legal

actions against recipient transferees of the misappropriated federal funds (rather than impose

liability on the faultless Commonwealth), then the amount received by each unsecured creditor

would increase because the recovery of the misappropriated funds through fraudulent transfer

law would increase the amount of the pot of funds available to repay the Commonwealth's

unsecured creditors.

1155.   Instead, those participating in the scheme acted in concert to (i) impose the

liability arising from the misappropriation exclusively on the Commonwealth and  (ii) provide

the parties responsible for the misappropriation, *i.e.*, those who schemed, directed, executed, and

profited from the misappropriation, with blanket releases of liability relating to the unlawful

activity.

1156. 

1157.   However, once the Plaintiff was no longer working at Paul Hastings, the firm decided to take the extraordinary step of <u>deleting</u> the Plaintiff's billable time entries that used those terms or any mention of "J. Grogan" the Plaintiff may have made.[619] It also appears that the firm <u>deleted</u> contemporaneous entries made by James Grogan in connection with the assignment, including the entry relating to the phone call on which Grogan made the assignment to the Plaintiff on or about August 7, 2018.

1158.

1159.   Knowing that such a scheme is unlawful, Paul Hastings then took additional unlawful measures to prevent its public disclosure.  Such measures included deleting the Plaintiff's billable time entries for the relevant time period.

---

[619] *See* Notice of Hearing On Fourth Interim Fee Application Of Paul Hastings LLP, As Counsel To Official Committee Of Unsecured Creditors, For Services Rendered And Reimbursement Of Expenses For Period From June 1, 2018 Through September 30, 2018, Case No. 17-03283-LTS, Dkt. 4325-7, at 400-596 of 795 (November 16, 2018).
[620] *Id.* at 577-578, 582 of 795.

y.  **Other Potential Misrepresentations in Title III Proceedings Concerning**

**Federal Funds**

1160.   In a letter from the Oversight Board to Governor Roselló Nevares dated March 9, 2017, the Oversight Board represented, without explanation, that the Puerto Rico Government's proposed fiscal plan overstated revenues by "at least $250 million in FY19."[621]

1161.   In a letter dated May 31, 2018, the Oversight Board wrote to then current Governor Rosselló and members of the Puerto Rico legislature that the Commonwealth and the Oversight Board researched an agreement to revise the fiscal plan and, as a result, certain changes to the budget's projected revenues needed to be incorporated into the Commonwealth budget.[622]  One such change involved the reduction of $431 million in "Other Fund Revenues." The letter did not identify precipitating cause of the reduction.

z.  **12.19.17 Oversight Board's RFP for Forensic Accounting of GDB Bank**

**Accounts**

1162.   On December 19, 2017, the Oversight Board issued an RFP for an independent forensic analysis team "to carry out an investigation into the liquidity of the Puerto Rico Government."[623]

1163.   According to the RFP, the Oversight Board wanted a "comprehensive inventory of all Government bank accounts, cash equivalents, and investments along with respective account balances…[including] the sources and intended uses of these funds, timeline for creation

---

[621] See FOMB Letter to Governor Roselló Nevares dated 3/9/2017; Case no. 17-00189-LTS, Dkt. 1-13, Ex. M, at 3 of 6 (filed 6/29/17).
[622] See case no. 19+00365-LTS, Dkt. 1-10 (filed 5/20/19), Ex. H FY 2019 Revenue Letter 1-3 of 10.
[623] Oversight Board's Request for Proposal: Independent Forensic Analysis Team, at 1(hereinafter, "Liquidity RFP") (available at https://drive.google.com/file/d/1y28K6seVfUVmAFSHV40GECDjlN6TKATq/view).

354

of existing accounts, and any documented legal restrictions on these funds."[624]  Further, the RFP states that the resulting report "should cover fiscal years 2015, 2016, 2017 and 2018, i.e., July 1, 2014 to date."[625]

    1164.   The RFP states that the scope of work should include

> *(i) A comprehensive inventory of all Cash, Cash equivalents, and Investments of the Puerto Rican Government and its instrumentalities and entities. The inventory should include the Central Government of Puerto Rico, its various funds, component units, agencies, public corporations and proprietary funds, including any deposits held in the Government Development Bank ("GDB").*

> *(ii) An analysis of the sources and intended uses of these funds, timeline for creation of existing accounts, and any documented legal restrictions on these funds.[626]*

### aa. **Engagement Letter between Oversight Board and D&P**

    1165.   On January 31, 2018, the Oversight Board entered into a contract with Duff and Phelps ("D&P"), obligating the latter to produce a report on the Commonwealth's bank accounts in exchange for fees paid by the Commonwealth.[627]

    1166.   Among other things, the proposed scope of the report included

> *(1) Validate with a high level of certainty the completeness of the list of bank accounts in the AAFAF report of January 19, 2018 and the values of those bank accounts as of the reported date…*

> *(3) For all materially sized accounts, and **for a random selection of other accounts identified by the Government as restricted, identify the documented legal restrictions, e.g., federal**, bond-related, local legislature, or local executive.[628]*

---

[624] Liquidity RFP, at 1.
[625] Id.
[626] Id.
[627] Letter of Engagement from D&P to Oversight Board (*available at* https://drive.google.com/file/d/1Gq5jm1zMP2yiDhGj_Vf71_bgnIrIGOW9/view
[628] D&P Engagement Letter, at 7 (emphasis added).

1167.   On information and belief, the Oversight Board and D&P limited the scope of the report to only a "random selection of other accounts identified by the Government as restricted" in order to exclude coverage of PRASA's clean water and drinking water federal funds and thereby concealing the theft of those funds.

## bb. **Second Amendment to Letter of Engagement for D&P**

1168.   On August 16, 2018, D&P and the Oversight Board executed a second amendment to the engagement, which, among other things, amended the scope of services "whereby D&P will provide the design and supervision over Steps 1(a) through 5(b)."[629] By and large, this amendment demonstrates that Oversight Board intended on affecting which account holders would be covered by D&P's Cash Analysis and as well having a say as to the "appropriate definitions and categories of legal restrictions, as (a) federal, (b) bond-related… and classify accounts in the Master Database accordingly."

1169.   In addition, the second amended engagement letter stated that the "[Oversight Board] and its staff will perform those Steps so identified," in the scope of services table attached as appendix II.[630]

1170.   Among other things, the scope of services table includes:

- **Step 1(A)**: "Create a master list of Agencies and Public Corporations for Puerto Rico ('Account Holders') for the periods ending November 30, 2017 and June 30, 2018 ('Measuring Dates')."

---

[629] Amendment No. 2 to Letter of Engagement for Duff & Phelps, LLC-Disputes & Investigations Engagement, at 1 (dated 8/16/2018) (available at https://drive.google.com/file/d/1njp-RHgRFNnIUnQWSncM6wAl08FGsXvM/view).
[630] *Id.*

- o "(i). Create an organization chart of Account Holders from various sources (including but not limited to Department of the Treasury ("Hacienda") and [Oversight Board]....

- o "[(ii)] Request and obtain from [Puerto Rico's Dept. of Treasury] the Comprehensive Annual Financial Reports in finalized, audited form for the fiscal year ending June 30, 2014 and in draft form for the fiscal years ending June 30, 2015 through June 30, 2018."[631]

- **Step 2(C)**: "Receive and process cash and investment account information, as well as information provided by Account holders regarding 'restrictions' and information from each Financial Institutions in a master database ('Master Database')..."[632]

- **Step 2(D)**: "Recover and follow up on missing or incomplete cash and investment information, information regarding 'restrictions' from Account Holders and Financial Institutions."

- **Step 4(A)**: "Determine, in consultation with the [Oversight Board's] counsel, the appropriate definitions and categories of legal restrictions, as (a) federal, (b) bond-related... and classify accounts in the Master Database accordingly."[633]

---

[631] *Id.* at 4.
[632] *Id.*
[633] *Id.*

357

- **Step 4(B)**: "Request and obtain agreements, and legal documents or other supporting information concerning the restricted nature of each material account from the Account Holder and other relevant third-parties."[634]

- **Step 4(C)**: "Collaborate with [Oversight Board] counsel the application of agreed upon definitions to the classification of bank accounts as either restricted or unrestricted."[635]

- **Step 4(D)**: "Test claimed restrictions to Account activities: (i) For material accounts where Account Holders claim 'restricted' status, on a test basis, perform reviews of transactional activities to determine if the account transactions types match the claimed 'restricted' status… [(ii)] Classify accounts in the Included Account Database as restricted or unrestricted, accordingly."[636]

cc. **Duff & Phelps Report on Bank Accounts**

1171.   On March 12, 2019, Duff and Phelps, on behalf of the Oversight Board, published its Bank Accounts Report as of June 20, 2018.[637]

1172.   According to the Bank Accounts Report, the Oversight Board asked D&P to focus its report "***on those Commonwealth instrumentalities identified by [Proskauer and O&B]*** as Title III entities or covered by the Commonwealth Fiscal Plan certified by the FOMB as of October 23, 2018[.]"[638]

1173.   According to the Bank Accounts Report,

---

[634] *Id.*
[635] *Id.*
[636] *Id.*
[637] "IFAT Report on Title III Bank Accounts
[638] Duff and Phelps Bank Accounts Report, at 5.

> *Proskauer and O&B identified which government entities are under a Title III proceeding. D&P regards the CE not identified by Counsel or not covered by the Report...**such as the Puerto Rico Aqueduct and Sewer Authority ("PRASA")...as outside the scope of this Report.**[639]*

1174.   Page 23 of the Bank Report provides the following chart indicating accounts held by financial institutions on behalf of the GDB:

---

*IFAT Report on Title III Bank Accounts*
On Behalf of the FOMB
As of June 30, 2018

**Table 9**: Accounts Held by GDB at the Measurement Date

| AH | FI | Identified Value |
|----|-----|------------------|
| GDB | Banco Popular | $ 199,701,170 |
| GDB | Citibank | $ 125,546,518 |
| GDB | Citibank | $ 60,936,687 |
| GDB | Banco Popular | $ 54,999,970 |
| GDB | BDE | $ 39,353,226 |
| GDB | Banco Popular | $ 18,245,543 |
| GDB | Citibank | $ 12,792,607 |
| GDB | Banco Popular | $ 129,307 |
| GDB | Banco Popular | $ 5,102,398 |
| | | **$ 516,807,427** |

---

1175.   In respect to Table 9, the Bank Account Report makes the following relevant representations

- *Table 9 reflects the funds identified by GDB, which were concentrated in one account and held for costs and mandatory distributions/payments due at closing, including GDB operating funds...*

- *Information provided by GDB confirms that, as of the Measurement Date, GDB did not maintain bank accounts other than the bank accounts identified in Table 9.*

---

[639] Duff and Phelps Bank Accounts Report, at 10.

> • *D&P has been unable to identify FI holding funds claimed by [account holders, such as COFINA] which were in existence as of the Measurement Date at GDB.*

1176.   Attached to the Bank Account Report as Appendix B-6 is "Prioritized Entity List" as of November 16, 2018, which derives from a third amendment to the D&P Engagement letter dated December 11, 2018.[640]

1177.   The "Prioritized Entity List" includes 155 separate Title III entities <u>but</u> omits PRASA.[641]

1178.   Attached to the report is Appendix C-1 "Title III Entities," which provides a table listing the "Original Title III Priority Entity Name (as provided by Proskauer)." The table's listing includes 173 entries <u>but</u> omits PRASA.

1179.   Attached to the Bank Account Report is Appendix C-2, which provides a list of the sources for the Master Database. Includes various Oversight Board related sources, including the "Sept. 30, 2016 List," the Puerto Rico's Department of Treasury "Bank Account Inventory 15-17," and "***Fiscal Plan v3" produced by E&Y and McKinsey.***"[642]

1180.   According to the Bank Account Report

> *At D&P's request, O&B performed legal due diligence ("LDD") for bank accounts with values greater than $35 million as of the Measurement Date. Restricted-Selected Accounts include Commonwealth bank accounts identified as either Restricted or Pooled, and HTA, PREPA, and Retirement Systems bank accounts identified as Restricted. COFINA's Restricted Accounts were not reviewed by O&B given the Settlement Agreement dated October*

---

[640] Third Amendment to D&P Engagement Letter, at 99-102 of PDF.
[641] *Id.*
[642] Bank Account Report, at 110.

360

*19, 2018, between the Oversight Board, on behalf of the Commonwealth, and the COFINA Agent, on behalf of COFINA.[643]*

1181.   In addition, the time sheets in D&P's Fifth Interim Fee Application show that McKinsey directly influenced which entities appeared in D&P's bank account report.  For instance, D&P managing Directors Ann Gittleman and James Feltman had an in person meeting with O&B and McKinsey in Puerto Rico for at least half-an-hour on November 7, 2017 as part of a "[p]rogress discussion."[644]  Moreover, one entry states that Vice President Eric Hornung "Consolidate[d] priority understanding w/ McKinsey list, while another represents that he "Draft[ed] McKinsey v. Fiscal Plan list per FOMB request." To wit,

| Lattner, Kathryn | Director | 11/06/18 | 0.70 | 550.00 | $385.00 | Review memo re priority list and related correspondence. |
|---|---|---|---|---|---|---|
| Feltman, James | Managing Director | 11/06/18 | 1.00 | 650.00 | $650.00 | Mtg. w/ E. Trigo re: title III entities; non-title III entities. |
| Hornung, Eric | Vice President | 11/06/18 | 1.20 | 425.00 | $510.00 | Consolidate priority understanding w/ McKinsey list. |
| Hornung, Eric | Vice President | 11/06/18 | 1.30 | 425.00 | $552.50 | Review McKinsey list. |
| Lattner, Kathryn | Director | 11/06/18 | 1.40 | 550.00 | $770.00 | T/c w/ A. Gittleman, E. Hornung re: t/c w/ E. Trigo, updated tasks re master list. |
| Hornung, Eric | Vice President | 11/06/18 | 1.40 | 425.00 | $595.00 | T/c w/ A. Gittleman, K. Lattner re: t/c w/ E. Trigo, updated tasks re master list. |
| Gittleman, Ann | Managing Director | 11/06/18 | 1.40 | 650.00 | $910.00 | T/c w/ K. Lattner, E. Hornung re: t/c w/ E. Trigo, updated tasks re master list. |
| Hornung, Eric | Vice President | 11/06/18 | 1.50 | 425.00 | $637.50 | Draft prioritization memo. |
| Hornung, Eric | Vice President | 11/06/18 | 1.60 | 425.00 | $680.00 | Draft memo re: McKinsey list. |
| Gittleman, Ann | Managing Director | 11/06/18 | 2.00 | 650.00 | $1,300.00 | Meeting with McKinsey and FOMB. |
| Hornung, Eric | Vice President | 11/07/18 | 0.40 | 425.00 | $170.00 | Update priority entity list summarized by Hacienda balances. |
| Hornung, Eric | Vice President | 11/07/18 | 2.10 | 425.00 | $892.50 | Update priority entity list. |
| Hornung, Eric | Vice President | 11/08/18 | 2.10 | 425.00 | $892.50 | Update prioritized entity list w/ tracker component. |
| Hornung, Eric | Vice President | 11/08/18 | 2.60 | 425.00 | $1,105.00 | Draft memo to FOMB re: priority tasks w/ support. |
| Cieciura, Caroline | Analyst | 11/13/18 | 0.40 | 225.00 | $90.00 | Discuss w/ McKinsey, O'Neill & Borges, FOMB re: priority list. |
| Hornung, Eric | Vice President | 11/13/18 | 0.40 | 425.00 | $170.00 | Discuss w/ McKinsey, O'Neill & Borges, FOMB re: priority list. |
| Lattner, Kathryn | Director | 11/13/18 | 0.50 | 550.00 | $275.00 | Discuss w/ McKinsey, O'Neill & Borges, FOMB re: priority list. |
| Cieciura, Caroline | Analyst | 11/13/18 | 1.40 | 225.00 | $315.00 | Reconcile AHs to unique TeamConnect ID. |
| Hornung, Eric | Vice President | 11/14/18 | 0.50 | 425.00 | $212.50 | Draft master list per E. Arroyo mtg. |
| Hornung, Eric | Vice President | 11/14/18 | 1.10 | 425.00 | $467.50 | Discuss non-priority list w/ E. Arroyo. |
| Hornung, Eric | Vice President | 11/14/18 | 1.20 | 425.00 | $510.00 | Discuss non-priority list w/ E. Arroyo (cont'd). |
| Hornung, Eric | Vice President | 11/14/18 | 2.00 | 425.00 | $850.00 | Discuss non-priority list w/ E. Arroyo (cont'd). |
| Hornung, Eric | Vice President | 11/15/18 | 0.70 | 425.00 | $297.50 | Discuss master list in mtg. w/ McKinsey, O'Neill & Borges; A. Gittleman. |
| Gittleman, Ann | Managing Director | 11/15/18 | 0.70 | 650.00 | $455.00 | Discuss master list in mtg. w/ McKinsey, O'Neill & Borges, E. Hornung. |

| Hornung, Eric | Vice President | 11/12/18 | 0.40 | 425.00 | $170.00 | Review Hacienda v AAFAF account level database prepared by B. Lindquist. |
|---|---|---|---|---|---|---|
| Hornung, Eric | Vice President | 11/13/18 | 1.00 | 425.00 | $425.00 | Draft McKinsey v Fiscal Plan list per FOMB request. |

| Feltman, James | Managing Director | 11/07/18 | 0.50 | 650.00 | $325.00 | Mtg. w/ A. Gittleman re: workstreams/roadblocks |
|---|---|---|---|---|---|---|
| Feltman, James | Managing Director | 11/07/18 | 0.50 | 650.00 | $325.00 | Progress discussion w/ O&B, M. Tulla, McKinsey. |
| Gittleman, Ann | Managing Director | 11/07/18 | 0.50 | 650.00 | $325.00 | Progress discussion w/ O&B, M. Tulla, McKinsey] |

1182.   In conclusion, these facts establish that the Oversight Board, McKinsey, and EY played a role in determining which Commonwealth entities were included in the Cash Analysis

---

[643] Bank Account Report, at 20.
[644] Case:17-03283-LTS Doc#:8866-1 Filed:10/16/19 Entered:10/16/19 12:20:05 Desc: Exhibit Supporting Declaration of Katherine Stadler Page 169-170 of 231; 216220 of 231 (lodging expense)

and, subsequently, PRASA was one of the few Commonwealth entities excluded from the Cash Analysis report.

dd. **12.6.19 Ambac's Response to Mediation Team**

1183.   Ambac ensures a number bonds issued PRIFA, HTA, and CCDA, exposing it to approximately $1.35 billion liabilities. It has alleged that the Commonwealth has been engaging in an unlawful "scheme" in connection with the "diversion of the special revenue streams securing those bonds," adding that it has been deprived of any meaningful understanding of "the financial condition of the Commonwealth, whether the issue is what cash and assets are available to repay creditors, or more localized topics such as the Commonwealth's questionable transfers of hundreds of millions of dollars[.]"[645]

1184.   In connection with the unlawful scheme, Ambac further alleges that the "lack of transparency appears to be part of a larger strategy of the Oversight Board," explaining

> *[a]t every stage of these Title III cases, whether in response to adversary proceedings, contested matters, or efforts to obtain basic Rule 2004 discovery, the Oversight Board has acted to thwart meaningful inquiry into… general facts concerning the financial condition of the Commonwealth. This hostility to informational transparency flies in the face of the very statute that created the Oversight Board, which points to the Commonwealth's "lack of transparency" as one of the factors leading to Puerto Rico's financial emergency and need for federal oversight.[646]*

ee. **2.9.20 Oversight Board Letter to AAFAF**

---

[645] Ambac Assurance Corporation's Response and Reservation of Rights with Respect to the Interim Report and Recommendation of the Mediation Team, *In re Commonwealth of Puerto Rico*, Case No. 17-03283, Dkt. 9504, at 2 (filed on 12/6/19) (hereinafter, "Ambac Response").
[646] Ambac Response, at 3.

1185.   On February 9, 2020, the Oversight Board published on its website a letter from Jaresko to AAFAF responding to an apparent "request to reopen the FY19 and FY20 reserves to be used without prior authorization from the Oversight Board" by AAFAF.[647]

1186.   In the letter, Jaresko represented that

> [i]mmediately after the January 7 earthquake, the Oversight Board made available **_$260 million in reserves set aside in the Certified Budgets of FY19 and FY20 for just this type of crisis situation_**. _As a result of the fiscal planning embedded in the Certified Fiscal Plan and Certified Budgets, the Government was able to access its own funds on a timely basis to help the people of Puerto Rico, rather than be limited in its response in any way. Due to the urgency of the needs, the funds were made available to the Government on the basis of after-the-fact reporting of the expended funds._[648]

1187.   On information and belief, the amount referenced in the letter is a false representation meant to provide a pretext for the missing CWSRF and DWSRF funds.  Given the timing, the Plaintiff believes that the letter was precipitated by the Oversight Board learning that the Plaintiff intended on filing the instant complaint on February 10, 2020.

## XXII.  Plaintiff's Hiring, Employment and Unlawful Discharge

### a.   The Hiring Process

1188.   The Plaintiff interviewed at Paul Hastings' New York office on Friday, July 14, 2018.

1189.   Among others, the Plaintiff interviewed with Mr. Bongartz.

1190.   When the Plaintiff asked Mr. Bongartz about the compensation structure offered by Paul Hastings, he indicated that Paul Hastings offered a bonus for associates who billed 2,000 hours and said it would be "easy" for the Plaintiff to satisfy that requirement because the Puerto

---

[647] FOMB Letter to AAFAF, at 1 (dated February 9, 2020)
[648] *Id.*

363

Rico bankruptcy would generate so much work that Plaintiff was guaranteed to bill over 2,000 hours.

1191.   When Mr. Bongartz was asked by the Plaintiff about what Paul Hastings had to offer, he said, among other things, "the opportunity to work on headline grabbing cases and receive comp[ensation] at market."

1192.   When asked by the Plaintiff whether that included a judicial clerkship bonus, Mr. Bongartz said "yes."

1193.   This is consistent with Paul Hastings' website that features a page dedicated to judicial clerks, stating

> In recognition of a judicial clerk's experience, Paul Hastings *provides* a market competitive bonus for U.S. Federal and State Supreme Court-based clerkships. Paul Hastings *also offers* class year credit on a case-by-case basis to those who join immediately upon completion of their clerkships. Judicial clerks *may also be eligible to receive* a Bar Study Benefit and Bonus to help defray the cost of studying for and taking the bar exam.[649]

1194.   On information and belief, at the time of the interview, the "market" for federal judicial clerks amongst top Manhattan law firms was $50,000.

1195.   On August 4, 2017, Ms. Plaskon called the Plaintiff and orally offered the Plaintiff employment at Paul Hastings as an associate.

1196.   The Plaintiff immediately accepted the offer over the phone.

1197.   The Plaintiff received the letter offer and employment agreement (the "Employment Agreement") by email on August 16, 2017.

1198.   In relevant part, the Employment Agreement provides

> For purposes of compensation and class standing, you will be considered a member of the Class of 2017. Your base salary will

---

[649] (emphasis added) (available at http://www.paulhastings.com/careers/experienced-lawyers/judicial-clerks).

> *be $180,000 per year, payable bi-weekly in 26 pay periods per year ($6923.07 per pay period). Your regular pay day will be every other Friday. Your salary equates to an associate salary for the Class of 2017 set for the Firm's fiscal year commencing February 1, 2017. For future fiscal years, your salary will be set according to the then-current associate salary structure. You will receive a Bar Study Stipend and Bonus in the amount of $17,000 payable with your second paycheck, provided you remain an employee of the Firm through the payment date. Associates also may be eligible to participate in the Firm's year-end discretionary bonus.[650]*

1199. On or about August 16, 2017, the Plaintiff called Paul Hastings and spoke with Elizabeth Black, a recruiting coordinator at Paul Hastings.

1200. The Plaintiff asked Ms. Black whether the lack of the judicial clerkship bonus was an "oversight."

1201. Ms. Black said she did not know whether its omission was intentional, but she would ask the "hiring partners," which included Ms. Plaskon.

1202. On or about August 21, 2017, Black called the Plaintiff and told him the partners had indicated that the omission of the judicial clerkship bonus was intentional. According to Ms. Black, the hiring partners believed that the bonus was not warranted because the interviewing process for the position was "very competitive" owing to the opportunity to work on the Puerto Rico Bankruptcy. Therefore, the Plaintiff was told, he would not receive the clerkship bonus.

1203. On or about August 21, 2017, the Plaintiff submitted the executed Employment Agreement to Paul Hastings.

b. **Denial of Reasonable Accommodation Request**

1204. On or about October 30, 2017, the Plaintiff arrived at Paul Hastings' New York office for his first day of work. He was assigned a desk in the cubicle area located on the north-

---

[650]

east section of the Metlife Building on its 29th floor.  The cubicle area, also known as the "bull

pen," contained three sets of four cubicles, twelve in all.  Intermittent glass walls, providing (in

theory) some degree of sound mitigation, ran against the desks adjacent to the walkway

demarcating the cubicle area from the banc of client services specialists ("CSSs") across the

room.

1205.   In addition to the noise produced by and within the "bull pen," the close

proximity of the "bull pen" to the CSS area was also a constant source of distraction.  The CSSs

provided secretarial services to partners and attorneys, generating significant foot traffic and

conversational cacophony near their desks.  Partners or attorneys would often strike up extended

conversations with the CSSs while seeking to process mailings or expense reimbursements,

among other things.  These distractions were made worse by the location of the printing and

copy machines adjacent to the CSS area; indeed, the continuous flow of foot traffic next to the

Plaintiff's desk provided a constant stream of visual stimulus, which aggravated the Plaintiff's

distractibility.

1206.   On or about November 1, 2017, Plaintiff approached Plaskon near one of the

break areas on the 29th floor and requested the reasonable accommodation of a separate office.

The Plaintiff informed Plaskon that he had Attention Deficit Hyperactivity Disorder ("ADHD")

and that the Plaintiff was experiencing difficulty concentrating while attempting to work in the

"bull pen" area.

1207.   Further, the Plaintiff told Plaskon that he had made the same accommodation

request as a federal judicial clerk; that the accommodation of a separate office was provided; and

that the Plaintiff's ability to concentrate and the quality of his work product greatly improved

after his relocation into a separate office.

366

1208.   Ms. Plaskon told the Plaintiff that she would refer the matter to Mary Jane Artese, who would later speak with the Plaintiff and inform him that Dee Savage in the Los Angeles office would contact him to discuss the possibility of relocating into a separate office.

1209.   At the time that the reasonable accommodation request was made and thereafter, the Plaintiff observed multiple empty offices on the 29th floor and other floors that Paul Hastings occupies.

1210.   Soon thereafter, Savage called the Plaintiff at his desk and said his accommodation request was denied on the sole basis that it was Paul Hastings' policy not to provide offices to first or second-year associates.

1211.   The Plaintiff asked Savage to reconsider given the salutary effects the accommodation of an office had when the Plaintiff was a federal judicial clerk.

1212.   Savage stated that Paul Hastings position was "nonnegotiable," and that no exceptions were to be made.   In addition, Savage indicated that her son also had been diagnosed with ADHD, so she did not have to be "lectured" on it.

1213.   In lieu, Savage indicated that her office would consider purchasing a noise reduction headset sold by Jabra Corp. (one of Paul Hastings' vendors) to mitigate against the noise-related distractions in the "bullpen."

1214.   The Plaintiff informed Savage that he would make a good-faith effort to see if the noise-reduction headphones could provide sufficiently eliminate the distractions. She indicated that I would receive word on the decision within 1-3 business days.  However, Ms. Savage failed to contact the Plaintiff in regard to the decision for approximately 7 days.

367

1215.   Meanwhile, the Plaintiff conducted research into several lines of headsets and discovered that the Jabra headset was considered to be an inferior product to a certain Bose model.

1216.   In the absence of a timely response from Ms. Savage, the Plaintiff purchased the Bose headset believing Paul Hastings would, at a minimum, help defray the costs.  However, after the Plaintiff informed Savage about the purchase, she responded by email stating Paul Hastings would not reimburse him for any portion of the purchase price and that Paul Hastings considered the headset to be his personal property.[651]

1217.   Overall, the human resource administrators who handled the Plaintiff's request displayed a negative attitude about the accommodation request and appeared to consciously avoid putting correspondence into writing (with one exception).[652]

1218.   Paul Hastings' hostility to his accommodation request had a chilling effect which prevented the Plaintiff from further reporting that the noise reduction headset inadequately mitigated against the distractions in and surrounding the cubicle cluster.  In many cases, the Plaintiff could still hear the conversations by those situated near his desk, even when the Plaintiff would pipe-in white noise into the noise-reduction headphones.  Furthermore, extended use[653] of the headphones would cause the Plaintiff discomfort and disorientation.

1219.   In addition, certain employees, including Mr. Alexander Bongartz and Mr. Shlomo Maza, made various disparaging remarks about the Plaintiff's headset while he used them.  Over the phone, Bongartz disparagingly referred to the Plaintiff's headphones as "cheap," "sloppy," and "unprofessional" on several occasions. In one instance, Shlomo Maza, a fellow

---

[651] See email
[652] Id.
[653] Approximately 1-2 hours.

restructuring attorney, observed the Plaintiff's headphones as he passed Maza's office and asked,

"you didn't think we wouldn't make fun of you, did you?"

1220.   Separately, in late 2017, Mr. Bongartz openly ridiculed the Plaintiff before a large

number of other associates in the cubicle area for "taking so long" on an assignment, even

though the Plaintiff missed the set deadline by approximately minutes.[654] This episode prompted

another associate, Christina Lee, to offer her assurances that other attorneys at Paul Hastings

were not as "cruel" or "mean" as Mr. Bongartz.

1221.   On December 7, 2017, the restructuring and litigation groups met for pizza lunch

in one of Paul Hastings' conference rooms.  At the lunch, Despins commented that he noticed

associates wearing headphones at the office and that he could not understand how they could be

productive listening while listening to music.  He admitted, in sum and substance, "I don't know

how they do it; I need silence to concentrate."

### c.   **The Plaintiff was an Officer of the Title III Court**

1222.   In 2017, Paul Hastings was retained to represent the Unsecured Creditors' Committee

(the "UCC") in the Title III and Title V proceedings of the Commonwealth of Puerto Rico.  The

Plaintiff almost exclusively worked on the Title III and Title V proceedings as part of Paul Hastings'

representation of the UCC.

1223.   In *In re Yellowstone Mountain Club, LLC*, the 9th Circuit recognized that

> *UCC members are statutorily obliged to perform tasks related to the
> administration of the estate. They "investigate the acts, conduct,
> assets, liabilities, and financial condition of the debtor, the
> operation of the debtor's business and the desirability of the
> continuance of such business." 11 U.S.C. § 1103(c)(2). They
> "participate in the formulation of a plan." Id. § 1103(c)(3). And*

---

[654] In his view, the Plaintiff's failure to make the deadline was due to his experience with Paul Hastings' electronic
filing system.

369

> *they examine the debtor. Id. § 343; see also 3 Collier on Bankruptcy § 341.02[5][d].*[655]

1224. Federal district courts have held that "those performing duties in the administration of a bankrupt's estate are not acting as private persons, but as officers of the court."[656] Moreover, attorney's representing such officers are, themselves, officers of the court.[657] In *In re Coastal Equities, Inc.*, the district court recognized this principle, stating "an attorney for a debtor-in-possession is an officer of the court and as such, unquestionably has a duty to be perfectly candid regarding his fitness to perform his duties." Similarly, in In re Wilde Horse Enterprises, Inc., the district court held In a Chapter 11 proceeding,

> *the attorney for debtor in possession, as an officer of the court charged to perform duties in the administration of the case, has a high fiduciary duty to the estate represented.*

> *Because the attorney for debtor in possession is a fiduciary of the estate and an officer of the Court, the duty to advise the client goes beyond responding the client's requests for advice. It requires an active concern for the interests of the estate, and its beneficiaries, the unsecured creditors. **Consequently, the attorney may not simply close his or her eyes to matters having a legal and practical consequence for the estate—especially where the consequences may have an adverse effect. The attorney has the duty to remind the debtor in possession, and its principals, of its duties under the Code, and to assist the debtor in fulfilling those duties.** See In re Consupak, Inc., 87 B.R. 529, 548–551 (Bankr.N.D.Ill.1988); In re Sowers, 97 B.R. 480, 488 (Bankr.N.D.Ind.1989). What's more, counsel has a duty to assist and advise debtor respecting the fulfilling of the requirements of the Office of the United States Trustee; unwillingness to do so disqualifies the attorney's representation of debtor. An attorney's duty goes beyond not merely putting false evidence before the*

---

[655] *In re Yellowstone Mountain Club, LLC*, 841 F.3d 1090, 1095 (9th Cir. 2016).

[656] *See e.g., York Int'l Bldg., Inc. v. Chaney*, 527 F.2d 1061, 1068 (9th Cir. 1975); and *Official Creditors' Committee of Fox Markets, Inc. v. Ely*, 337 F.2d 461, 465 (9th Cir.1964).

[657] *In re Coastal Equities, Inc.*, 39 B.R. 304, 308 (Bankr. S.D. Cal. 1984)

370

*court: the duty is greater—the lawyer has a duty to not make
misrepresentations to the court.*[658]

1225.   Therefore, the Plaintiff, as an attorney with fiduciary duties to the UCC, was an

officer of the Title III and Title VI Court.

### d.   <u>The Directive to Falsify Evidence</u>

1226.   ██████████████████████████████████████

███████████████████████████████████████████

████████████████████████

1227.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███████████████████████████████████████████

███████████████████████

1228.   ███████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

---

[658] *In re Wilde Horse Enterprises, Inc.*, 136 B.R. 830, 840 (Bankr. C.D. Cal. 1991) (emphasis added).



1229.

1230.

1231.

1232.

1233.

---

[659] Exhibit [X].
[660] (emphasis added).



1234.

1235.

1236.   However, on information and belief, the Plaintiff has learned that the purpose of the email was to falsify evidence in contemplation of a future investigation in connection with the Paul Hastings deliberate omission of controlling authority as part of the Hub-and-Spoke Conspiracy.

      e.  **Plaintiff's Published Article in Norton Journal of Bankruptcy Law and Practice**

1237.   In April 2018, the Plaintiff submitted his article "The Shareholders' Right to Elect the Board of Directors During Reorganization: A Genealogy," to its editor-in-chief, Richard Lieb.

1238.   In an email dated April 27, 2018, Richard Lieb told the Plaintiff, among other

things,

> *Your article on corporate governance during a bankruptcy case is
> excellent. You have presented a cogent analysis of the deficiency in
> the "clear abuse" approach, and have provided a welcome
> suggested means to limit the shareholders' right to elect new
> director[s].[661]*

1239.   Following this email, on May 3, 2018, the Plaintiff filed a revised version of the

article for publication.

1240.   On May 4, 2018, Richard Lieb emailed the Plaintiff, remarking

> *Thanks very much for the revision. Your article is excellent, and no
> doubt the best written on the governance rights of shareholders
> during a bankruptcy case. You're a fine legal thinker and writer,
> and I have high hopes for your career[.][662]*

### f.   **The Sham Email Controversy**

1241.   ███████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████

1242.   ████████████████████████████████████████

████████████████████████████████████████████

---

[661] Ex. 32.
[662] Ex. 32.



1243. ████████████████████████████████████

1244. ████████████████████████████████████

1245. ████████████████████████████████████

1246. ████████████████████████████████████

1247. ████████████████████████████████████

_____

663 Email at 3.



1248.

1249.

---
664 *In re Dabney*, 417 B.R. 826, 835 (Bankr. N.D. Ga. 2009).



1250.

1251.

1252.

1253.

1254.

1255.

1256.

[665] *Id.* at 2 (emphasis added).

1257.   Several minutes later, Maza sent an email to the Plaintiff accusing him of intentionally omitting controlling authority.  Specifically, after expressing disagreement over the nature of the proposition in *Schold*, Maza added

> *MUCH more importantly – being aware of, and failing to address, contrary controlling authority is just a really bad look, and is actually sanctionable conduct.  This can't happen.*

1258.   The Plaintiff, shocked by Maza's allegation that he somehow acted unethically, sent Maza a diplomatic email explaining why he was mistaken.  In relevant part:

> *Understood.  I would just say that I was under the impression that the assignment's focus was to find examples of the proposition that specificity is required to successfully object to attorneys' fees.  Not, rather, that I was to conduct research to assess the validity of that proposition.  Moreover, I assumed that I wasn't the first/only person on the team to delve into this issue.  In other words, I didn't know what research had been conducted on this issue and what exactly we already were aware of.  I assumed we were aware of this case, which is why I simply referred to it as "that 1st Cit. BAP case" in our conversation.  I didn't reference the case in my previous email because I believed it was out of scope and I wrote it down by hand as insurance in case I was mistaken (which I was).  If I had known these assumptions to be untrue, I assure you, I would have included that case in my email.  And I would certainly have included it if I had the slightest inclination that my research, standing alone, could have made its way into a brief submitted to any court.  Nevertheless, your concerns are well received.[666]*

1259.   Maza did not subsequently respond to the Plaintiff's explanation, either in person or by email.  Nor did he ever explain his basis for alleging that the Plaintiff intentionally omitted controlling authority even though the case was outside the scope of the assignment, as reflected in the Plaintiff's email providing his research results at 8:45 PM on June 26, 2018.  Notably, that email was sent the day before Maza's accused the Plaintiff of intentionally omitting controlling

---

[666] Id. at 1.

authority, meaning the Plaintiff could not of had the motive to misstate or distort the scope of the
assignment in order to defend himself against Maza's allegation.  In addition, the email was sent
a couple of hours after the assignment had made, so it was fresh in the Plaintiff's mind when
wrote the email.

1260.   On or about the same day, the Plaintiff spoke with Ravi Vohra about the incident.
Among other things, Vohra described Maza's allegation as "ridiculous" and questioned Maza's
decision to make a record of the allegation in an email.

g.  **Wrongful Termination**

*1.  Ravi Vohra's Termination*

1261.   On or about July 10, 2018, Ravi Vohra informed the Plaintiff that it was his last
day with Paul Hastings and that he was leaving to work at another firm.

1262.   Sometime mid-afternoon, Vohra and the Plaintiff went to an outside bar located
on the south-east corner of E 45th Street and Vanderbilt Avenue to view part of a World Cup
soccer match and to discuss his impending departure.

1263.   According to Vohra, Plaskon and Despins told him that "things weren't working
out" and asked him to leave in April 2018 at sometime following the conversation the Plaintiff
and Vohra had concerning the revelation that partner James Bliss deliberately omitted controlling
authority.

1264.   According to Vohra, Plaskon had earlier accused him of avoiding work
assignments by "gamming the system."  As proof, Plaskon pointed to the fact that Vohra had
installed a screen deflector on his computer monitor (suggesting that Vohra was attempting to
hide from passers-by that he was not diligently at work) and that Vohra had scheduled several
weekend trips which rendered him unavailable to perform assignments on the weekends.

1265.   The Plaintiff told Vohra that, to the contrary, it was his experience working with Vohra that he had displayed an eagerness to volunteer for assignments and that he seemed to always complete his assignments early or on time.  Furthermore, the Plaintiff could not recall any situation where Vohra's unavailability during a planned weekend trip had caused a problem. Therefore, based on his own experience, the Plaintiff believed the grounds for Vohra's imposed departure were without merit.

### 2.  Plaskon's Informal Reprimand

1266.   On or about July 24, 2018, Plaskon called the Plaintiff and left a message, stating

> Oh, hey, Andrew, it's Leslie Plaskon.  If you can, give me a buzz.
> Just wanted to touch base.  It's extension 6421.  Thanks, bye.[667]

1267.   In the voicemail, the Plaskon's tone was friendly and does not indicate that she was upset or otherwise dissatisfied with the Plaintiff.

1268.   However, when the Plaintiff called Plaskon shortly after listening to the voicemail, Plaskon's tone drastically changed and she now seemed to be very upset.  She immediately asked the Plaintiff why he thought it was okay to submit his article to Norton Journal of Bankruptcy Law and Practice without first receiving approval from a partner at Paul Hastings.

1269.   The Plaintiff was caught off guard by Plaskon's assertion that he was unaware of that there was a policy requiring the approval of a partner before submitting an article. He explained that he had discussed his article with Maza, whose articles had also been published by Norton's Journal, as well as other attorneys at Paul Hastings and in no case was he told of that requirement.

---

[667] The Plaintiff possesses an audio recording of Plaskon's July 24, 2018 voicemail.

1270.   The Plaintiff then reminded Plaskon that he had discussed the very article with Plaskon and Tenzer in an elevator ride in March of 2018.  More specifically, he told the two partners that he was working on the article and that it was to be published in Norton's Journal.  In fact, they discussed the substance of the article as Plaskon, at the time, expressed that she was unaware that shareholders have a right to elect the board of directors during the pendency of a reorganization, which prompted Tenzer to explain that it was one of the areas in bankruptcy law where state law prevails.

1271.   In addition, the Plaintiff reminded Ms. Plaskon that he again mentioned the article to her when the two bumped in each other at the office on a subsequent weekend.  (The Plaintiff remembers this conversation with some vividness because Plaskon was wearing gym clothes at the office, which, although it was the weekend, was something of an unusual sight at the office.)

1272.   In response, Plaskon stated that she did not remember those occasions.

1273.   The Plaintiff also raised the point that he had previously exercised proper care when receiving the approval of Paul Hastings' public relations office in connection with mentioning the firm by name in the marketing materials created by the University of Oregon School of Law.

1274.   Plaskon indicated the she approved of the Plaintiff's action in that regard, but that, in the future, the Plaintiff would have to receive approval before submitting an article for publication.  The Plaintiff agreed and promised to do so in the future.

1275.   Following the phone call, the Plaintiff thought the matter was settled and would not result in further admonishment.  In fact, neither Tenzor or Despins would individually criticize the Plaintiff for having submitted the article without first receiving approval from a partner.

381

### 3. August 15, 2018 Meeting

1276. On August 15, 2018, the Plaintiff received an email from Plaskon directing the Plaintiff to attend a meeting in her office (the "August 15 Meeting") with Despins and Plaskon (the "Coercing Partners").

1277. Up until that point, the Plaintiff had not had a meeting with either Plaskon or Despins, despite the fact that the restructuring group was relatively small (3 partners, 6 attorneys) and despite the fact that Plaskon was the Plaintiff's supervising attorney.

1278. At the meeting, the Coercing Partners told the Plaintiff that "things weren't working out" in regard to the Plaintiff's employment because the Plaintiff had, in their view, displayed "poor judgment" while performing legal services on behalf of Paul Hastings.

1279. As a result, the Coercing Partners proposed a "transition period," whereby the Plaintiff would remain a fully compensated employee of Paul Hastings until the earlier occurrence of (i) the Plaintiff's hiring at another firm; or (ii) the expiration of three months, *i.e.*, November 15, 2018.

1280. In describing the basis of their decision, the Coercing Partners identified two instances where they alleged the Plaintiff had exercised poor judgment: (1) the June 2018 incident where associate Shlomo Maza accused the Plaintiff of intentionally omitting controlling authority in an intra-office research assignment (the "Maza Accusation"); and (2) the submission of the Published Article to Norton Journal of Bankruptcy Law and Practice without first obtaining a Paul Hastings partner for prior authorization.

1281. The Plaintiff told the Coercing Partners that he was surprised to hear the Maza Allegation invoked because he had not received any additional input from Maza or any other superiors following the Plaintiff's emailed refutation to Maza.

1282.   The Plaintiff asked the Firing Partners whether either of them had seen the Plaintiff's response email to Maza.  Eerily, the question was met by momentary silence before Despins asked "we have made up our minds, so what difference would it make?"

1283.   Nevertheless, the Plaintiff told the Coercing Partners that he would forward the response email to following the meeting.

1284.   In addition, the Plaintiff told the Coercing Partners that he was surprised to hear the criticism concerning the alleged failure to obtain the purported required authorization from a Paul Hastings partner.  The Plaintiff told the Coercing Partners that he was unaware of such a requirement and asked Plaskon why she had not told him of that requirement on the previous occasions where two previously discussed his article and the fact it was being published with Norton Journal.  The Plaintiff reminded Plaskon of the specific conversations the two shared (1) in the elevator ride shared with partner Andrew Tenzer; and (2), when the Plaintiff bumped into Plaskon on a subsequent weekend near the elevator bank on the 29th floor.

1285.   In response, Plaskon claimed to have no recollection of those conversations.

1286.   At the conclusion of the meeting, the Plaintiff had accepted the fact that the Coercing Partners had made up their mind about wanting the Plaintiff to leave the law firm and told them that he would start looking for employment with other law firms.

1287.   As the Plaintiff was in the process of leaving Plaskon's office, the Firing Partners scheduled another meeting for the August 16, 2018 – the very *next* day – at 10:00 am.  However, the Coercing Partners did not indicate the purpose of the meeting, other than to "follow-up."

1288.   At no point during the meeting did the Coercing Partners refer to the "transition period" as a resignation nor was the Plaintiff asked to resign.

383

1289.  At no point during the meeting did the Coercing Partners state or imply that the Plaintiff that he would be required to sign a contract memorializing the so-called "transition period."

### 4. Post-First Meeting Events

1290.  Following the meeting, the Plaintiff walked to Doug Barron's nearby office and told him that "I believe I just got fired" and the reason provided to him was "poor judgment."

1291.  Barron responded by stating, in sum and substance, "wow, that's the second person to be forced out for very flimsy reasons."

1292.  On information and belief, the other person referred to by Barron in this comment was Ravi Vohra.

1293.  The Plaintiff asked Barron if he had been asked about the Plaintiff's purported "poor judgment" and he replied "no." He further commented that it was the first time that he had heard that the Plaintiff's employment with Paul Hastings was in jeopardy. The Plaintiff then returned to his desk.

1294.  Approximately 10 minutes following the meeting, the Plaintiff received another email from Plaskon asking that he return to her office.

1295.  Upon entering her office, Plaskon told the Plaintiff that human resources had "just drafted this release form" in reference to a document she was holding. Plaskon then handed the Plaintiff the document, which was entitled, "Confidential Transition Agreement and General Release." Plaskon asked the Plaintiff to review it and sign it. If the Plaintiff had any issues with the so-called agreement, Plaskon added, those issues would be addressed at the meeting scheduled for the next day.

384

1296.   After work, the Plaintiff invited Vohra, who know worked for a different law firm, to his apartment to discuss what had transpired earlier in the day.

1297.   During this occasion, the Plaintiff told Vohra that he did not believe that the Coercing Partners were being truthful and that the reasons they provided for asking him to leave appeared pretextual.

1298.   Vohra had informed the Plaintiff that the Coercing Partners had similarly asked him to "transition" to another firm in April 2018, following their earlier conversation concerning the revelation that Bliss had intentionally omitted controlling authority.

1299.   Unlike the Plaintiff, however, Vohra was allowed to continue working

1300.   Later that night, the Plaintiff wrote a note on his laptop stating, in part, that the Coercing Partners had cited "poor judgment" as the reason for forcing him to leave (the "Post-Meeting Note").

1301.   The Post-Meeting Note also indicates that the Plaintiff spoke with Barron following the meeting and that Barron had indicated that he had not spoken with the partners about the alleged "poor judgment."

### 5.   *August 16, 2018 Meeting*

1302.   On August 16, 2018, the Plaintiff went to Ms. Plaskon's office at 10:00 am for the follow-up meeting.  Plaskon asked the Plaintiff to return at 3:00 pm because she was busy participating in the interviewing process of new applicants.

1303.   The Plaintiff returned at 3:00 pm.

1304.   Early on in the conversation, Ms. Plaskon is unable to answer or otherwise clarify whether the so-called "Confidential Transition Agreement and General Release" was a resignation or something else. To wit:

MR. HENNIGAN:       Right. **So this is not a resignation?**  Do you understand my…

MS. PLASKON:        **Yeah, no, it is.** I mean it's a – what we're doing is **we're agreeing to pay you through 16 November** so that you have time to find something….

MR. HENNIGAN:       But you see my concerns, right? Like **we didn't discuss the resignation.**

MS. PLASKON:        **Well, what we talked about was – we had talked about you transitioning --**

MR. HENNIGAN:       **Transition, yes.**

MS. PLASKON:        -- stepping away from doing the work and that **we would compensate you through November.** You'd still be on the web page[.]

1305.    In addition to the comment immediately preceding this paragraph, Ms. Plaskon further assured the Plaintiff that he would continue to receive his salary and benefits.  To wit:

MS. PLASKON:        And so for that transition period, you're still on the website. **You're still getting your paycheck. You're still getting those benefits**, but you're not coming in -- you know, you're not required to take work, accept work, work --

1306.    However, it soon became clear that there was no legitimate purpose for holding the August 16 meeting.  To wit:

MR. HENNIGAN:       But, yeah, I mean other than [the acceleration clause**], was there anything in particular that you wanted to address**?

MS. PLASKON:        **No**. I think that we're trying to work -- you know, we're trying to work through getting you time to do it.

MR. HENNIGAN:       Right.

MS. PLASKON:        You know, getting you time so that you can find something.

MR. HENNIGAN:       Okay.

386

MS. PLASKON:     When I say "time to do it," I mean time to transition and find something....

MR. HENNIGAN:    **So what were we going to discuss**?

MS. PLASKON:     **Well, just to have you have the chance to look at it.**  Sometimes people are fine, they're comfortable with it. You know, that's your decision as to whether you want to sign it, **consult with somebody or not consult with somebody**...So let me -- **yeah, it was really just to touch base.**

MR. HENNIGAN:    Okay.  So I was going to say like do we need to reschedule with Luc since he's tied down?

MS. PLASKON:     Yeah, no, I don't think so. I mean I think that it probably makes sense for you to talk to -- **we were going to talk a little about transitioning work.**

MR. HENNIGAN:    Right.

MS. PLASKON:     **But I think that it probably makes sense for you and Cheryl to have a conversation first.**

MR. HENNIGAN:    Sure.

MS. PLASKON:     **And then go from there.**

1307.   Subsequently, however, Ms. Plaskon reveals the true reason that the Plaskon and Despins called a second meeting

MS. PLASKON:     No, I understand. I understand. You know, that's part of why we wanted to schedule a follow-up so that you would have a chance to ask questions, you know, have some sense of -- **we thought it would be easier if you saw what people were thinking about.**

1308.   Upon information and belief, the actual reason for the second meeting was to subject the Plaintiff to unwarranted criticisms and ridicule in order to unduly pressure the Plaintiff into resigning.

1309. Plaskon then misrepresented to Hennigan that the firing partners had also cited "poor performance" as a justification for forcing Hennigan to leave at the August 15. To wit:

| | |
|---|---|
| MR. HENNIGAN: | Yeah, no understood. But I would just feel much more comfortable if I signed something that "resignation" on it at or after September 12th, **because since you said at the meeting yesterday you want me to leave because of poor judgment --** |
| MS. PLASKON: | **Poor performance issues, right?** |
| MR. HENNIGAN: | Right.  **Well, we -- what were the performance issues?** |
| MS. PLASKON: | **Well, we can walk through them again.**[668] |
| MR. HENNIGAN: | Sure. |
| MS. PLASKON: | **I'm going to wait for Luc to do this**. |

1310. In addition, Plaskon repeatedly told Hennigan that he would be provided enough time to consult with an attorney.

1311. Once Despins joined the meeting, the Plaintiff reiterated his concern over the unclear terms found in the so-called Confidential Transition Agreement and General Release, which appeared to allow Paul Hastings to accelerate the "separation date" and deprive the Plaintiff of his bargained for consideration for any reason, rendering the contract illusory. The Firing Partners did not comment on the substance of the Plaintiff's concerns or propose a remedy; rather, the Plaintiff is again referred to Cheryl Saban. To wit:

| | |
|---|---|
| MR. HENNIGAN: | **Yeah, but could we just address the acceleration part of it?** |
| MS. PLASKON: | **Yeah, you should talk to Cheryl about that**. |
| MR. HENNIGAN: | Okay. |

---

[668] This is a misrepresentation because, as Plaskon knew, she and Despins had not raised concerns about the Plaintiff's performance at the previous meeting and, therefore, they could not "walk through them <u>again</u>" as Plaskon asserts.

| MS. PLASKON: | I mean I'd have to look at it again. |
|---|---|
| MR. DESPINS: | What is it? What's the acceleration? |
| MR. HENNIGAN: | Well, the day of my separation date will be the earliest November 15th, B, the date you accept other employment, which is basically what we agreed upon yesterday, or C, the date you resign. And nowhere else is the term "resign" used in this document and it's -- I mean the paragraph is titled "Resignation" so that's a huge grey area. |
| MR. DESPINS: | **Okay. That's plumbing. Plumbing that I don't know how to deal with.** So what was – Cheryl Saban -- |
| MS. PLASKON: | **Yeah, I said Cheryl will have to get that**. |

1312.   The conversation then returned to the Plaintiff's request for specific examples of his alleged "poor performance." When asked directly by the Plaintiff, the Firing Partners were unable to identify any specific examples of "poor performance" in relation to the Plaintiff's work product with one exception: Plaskon identifies the Plaintiff's conclusion that the Constitutional Debt Limit argument was "slam dunk," a statement that had been made during a phone call with Maza in March 2018, an entire four months earlier.[669]  To wit:

| MR. HENNIGAN: | …Maybe it's still poor judgment. I understand where you're coming from.  But besides that, like I don't know what -- **I mean you mentioned performance, but I don't know specifically what you're referring to**. So I have no -- |
|---|---|
| MS. PLASKON: | Okay.  Well -- |
| MR. DESPINS: | **These were just examples. They're not exhaustive**. |
| MR. HENNIGAN: | Okay. |
| MR. DESPINS: | But I'm not sure where that's going to lead us, meaning I don't think we're going to change our views. |
| | …. |

---

[669] A comment which was never disproven or even challenged on the merits.

MR. HENNIGAN:     [L]et's park poor judgment -- **what's the poor performance?** I
have not been told ever that I was performing poorly.

MS. PLASKON:      So you've gotten no feedback from associates that have worked
with you?

MR. HENNIGAN:     Correct.

MS. PLASKON:      **That's not we've been told.  You've been directly with [Alex]
and Shlomo and we've been hearing that they've been talking
to you and telling you that we can't call arguments slam-dunks,
this is overstating** or --

MR. HENNIGAN:     What is -- **that was in March.** And if I was told of it at the time, I
addressed that behavior. I don't -- I don't see why -- **that doesn't
add up for me.** Like you say it's because of my performance, and
so it's related to the slam-dunk comment?

MS. PLASKON:      No --

MR. DESPINS:      It's related to a bunch of -- numerous things.

MR. HENNIGAN:     **Well, can you please say one or two things?**

MR. DESPINS:      I think we've given you two, but there have been others. But the
point is that's why I was saying like -- and where do you think
that's going to get us? *Meaning we have no interest in doing what
we're doing,* or do you think we're really -- that's for fun? I mean
no. **There's a judgment call that's been made that there's just a
lack of comfort with the work product you're generating
regularly.**

MR. HENNIGAN:     Right.

MR. DESPINS:      Okay.  **And you're saying "I don't agree with that. Show me
examples." Okay. We can go through that, but to** –

MR. HENNIGAN:     **Okay.  Please** –

MR. DESPINS:      To what end?

1313.   In addition, the Firing Partners and the Plaintiff discussed the emails that the Plaintiff sent to the Firing Partners concerning Maza's allegation of omitting controlling authority.  It is clear that the Firing Partners' criticisms are insincere because both feign ignorance over the common sense distinction between (a) providing analysis in relation to a legal issue and (b) collecting cases on a discrete legal proposition.  To wit:

MR. DESPINS:          **I've read what you sent about Shlomo, and I'm not sure I get the point**, meaning if I ask you to look at only cases that stand for Proposition A, and while doing that, you find a case in the circuit we're in that says Proposition A is wrong, bad, can't follow that, to the opposite of that, and you find that **but you basically decided not to give that because that was not part of the assignment**?

MR. HENNIGAN:      **It was outside of what he had asked. He wanted examples of when a court required specificity.** Those other cases said…that's not a requirement. So why would I include those cases. [sic]

MS. PLASKON:        Is it irrelevant -- was the circuit case relevant to the analysis, the one that he --

MR. HENNIGAN:      **He didn't ask me to do an analysis. He asked for cases.** Judge Drain had asked me to find cases on certain propositions as well. It's not uncommon.

MS. PLASKON:        Right. But when you find something that says the opposite, you usually bring it to the person's attention, right?

MR. HENNIGAN:      That's why I wrote it down by hand and mentioned it to Shlomo. So I don't see what I did wrong. Why would I write the cite down if I was trying to hide it?

MS. PLASKON:        But he said it wasn't conveyed. That's what the email said.

MR. HENNIGAN:      We spoke -- right. I send him the email.

MS. PLASKON:        Right.

MR. HENNIGAN:      And I told him when we're discussing it, **I said "that First Circuit case," and I didn't know he was unaware of it. I wouldn't have said "that First Circuit case," as if he knew what I was discussing**. If he wanted to challenge that fact that I mentioned in

391

the email, he could have. He didn't. My point being is if there was a serious concern about my judgment at that point, why didn't you or Luc come to me and say we have a -- you're my supervising attorney.

MS. PLASKON:   Yeah. Andrew, you've got an email from Shlomo that -- Shlomo is probably one of the most even-keeled, calm persons to work with.

....

MR. HENNIGAN:   Right. Well, I spoke with Ravi and obviously he's no longer with the firm, but he said that it was ridiculous and he would never put that in an email. So there's obviously a difference of opinion here.

MS. PLASKON:   So you have two partners in a law firm saying this is a really -- pretty big deal. Shlomo's understanding of the assignment and what he gave to you and what your decisions were…very different. So even just supposing you're right --

....

MR. HENNIGAN:   So when I did that for Judge Drain, that was unethical?

MR. DESPINS:   No, we didn't talk about Judge Drain. Let's rewind for a second. Obviously, this is a very difficult discussion for you….

1314.   The Firing Partners then admitted to having formed their opinion without having spoken with Barron.  In addition, Plaskon discloses that she spoke with Newman and, notably, does not state whether Newman had made positive or negative comments about the Plaintiff's professional judgment or performance.  To wit:

MR. HENNIGAN:   I don't know, but you said you thought about it a lot yesterday. You did so without speaking to me first. **I don't think you spoke to Doug Barron about it, who I've worked with the most since – like the last four months**. Or did you speak with Danny Newman?

MS. PLASKON:   **I did speak with Danny Newman.**

MR. DESPINS:   But also Doug Barron is a very junior associate. **I mean, first of all, you wouldn't want me to go and see Doug Barron and say**

392

**we have performance issues with** -- how would you feel about that?

1315.   Given the Plaskon did not elaborate on her conversation with Newman and given that the Coercing Partners were attempting to convince the Plaintiff that a significant number of his colleagues had negative views of his professional judgment and performance, the Plaintiff understood that Plaskon intended to imply that Newman had also made negative comments about the Plaintiff's professional judgment and performance.  This suggestion was inconsistent with the Plaintiff's experience, as Newman had appeared pleased with his work, especially since Newman had asked the Plaintiff to work on the GDB complaint after satisfactorily performing other assignments for Newman.

1316.   In regard to Despins' claim about not seeking input from junior associates about the Plaintiff's professional judgment or performance, the Plaintiff was in disbelief because Plaskon had just admitted to seeking the opinion of Newman, who had the same seniority as Barron.[670]  At that moment, the Plaintiff was unsure how to reconcile these conflicting representations of fact.

1317.   The conversation next turned to the Plaintiff's Published Article.  Earlier, the Plaintiff explained to the Firing Partners why he had contacted Paul Hastings' public relations department to request the Published Article be included in the internally circulated "Paul Hastings In the News" email.  To wit:

| MR. HENNIGAN: | The article I submitted for publication I submitted in April, so we're talking about like four months ago now. And -- |
| MS. PLASKON: | Well, we weren't aware of the article. |
| MR. HENNIGAN: | No, understood but....I know, Richard Lieb is not a partner here, so he has a different set of interests, but he read it. He said -- and |

---

[670] See Ex, 3rd fee app, 3568-2, at 1-2 of 5

393

Richard Lieb does not give compliments as a daily thing. **He said it was the best article he had read on state governance in bankruptcy ever. The reason why I wanted it published in that email was I thought it would be a credit to Paul Hastings**....I mean if I thought I wasn't supposed to have done it, I wouldn't have promoted it as such.

1318.   At this point, Plaskon subjected the Plaintiff to additional unwarranted criticism and ridicule by grossly mischaracterizing the substance of his Published Article.  In addition, Despins admits that the publication of the Norton article was not the particular reason why the Plaintiff being forced to leave.  To wit:

MS. PLASKON:          Okay? So the best thing to be getting out of this...now is what can I take from this event. I learned from it. But what's happening now is what you're doing is you're digging in, right, and you're trying -- that article alone, what you -- the fact that you're not seeing -- we regularly are in front of those courts, particularly (indiscernible).

MR. HENNIGAN:       Right.

MS. PLASKON:          **If I wrote an article and the Wall Street Journal called me saying, "What do you think about the big banks?" and I wrote "The banks are evil."** Can --

MR. HENNIGAN:       I didn't say anything remotely that [extreme] -- that is so unfair.

MS. PLASKON:          **Well, no, you actually did. I mean you were insulting and disrespectful to the Second Circuit and the bankruptcy judges.** It is very, very uncomfortable for the partners in the bankruptcy group to read that. That is a judgment issue, though, for -- and you're not hearing that.

MR. HENNIGAN:       **That exception was created in 1930.** That's -- that's the same --

MS. PLASKON:          **It doesn't matter.** It's an article --

MR. HENNIGAN:       I don't really believe you guys.... I think it's -- you're blowing it out of proportion, to be honest. But obviously you made your decision so --

394

MS. PLASKON:        **Making arguments out of thin air was another -- maybe that's -- you've used that, "out of thin air."**

MR. HENNIGAN:       Yeah, that was the one. I thought that's what we were discussing.

MS. PLASKON:        **There were a number -- there were three or four quotes like that where it was very cutting and you know,** I -- maybe that kind of writing is what is expected, if you will, for that publication. But it's not -- we have to -- we take a more measured approach.

MR. HENNIGAN:       Right. Well, Norton's --

MS. PLASKON:        **Because what's concerning me is that you're not hearing the -- we're talking about the judgment.** It's about the measuredness, right? And so that's a trust issue. We have to trust that when you're making these decisions -- so it's --

MR. HENNIGAN:       **And that alone is a fireable offense, is what you're saying.**

MR. DESPINS:        **No, we didn't say that alone.**

1319.   Despins then expanded on his previous comment that "there's just a lack of comfort with the work product you're generating regularly," misrepresenting that there was "a general consensus" about the Plaintiff's (alleged) "lack of competence in [his] work product." To wit:

MR. DESPINS:        And… really don't like where this is going.

MR. HENNIGAN:       Okay.

MR. DESPINS:        Because, as I told you, these were just some examples. I don't think that it makes a lot of sense to go through all the examples, except to tell you that **there is a general consensus that there's a lack of competence in the work product you're generating and that we don't believe that that can be overcome.** So that's -- and you may not accept that, agree with that. You know, that is our conclusion.

1320.   Then, Despins returned to his earlier comment that "we have no interest in doing what we're doing." To wit:

| MR. DESPINS: | And also, just that -- that's what it's asking. **We have no interest in doing this,** meaning like you did clerk for Judge Drain. I'm pretty – I wouldn't say pretty tight with him but I mean I've known him for many, many years. |
|---|---|
| MR. HENNIGAN: | Right. |
| MR. DESPINS: | I respect him a lot. I don't know what he thinks of me, but I certainly -- I'm not keen on potentially you calling him to say "Oh, these guys were really bad to me. I" -- so therefore, think of it this way, we wouldn't do this unless we had thought about this and come to that conclusion, but not lightly. **I mean what would be the angle?** Why would we do this unless we thought that our assessment was accurate and we thought that it could not be overcome? **There's no -- right? I mean why would I do this?** |

### 6. *Phone Call with Danny Newman*

1321.   Following the August 16 meeting, the Plaintiff exited the Metlife building and, while standing outside near its entrance, called Newman to ask him (i) whether he had actually spoken with Plaskon and (ii) whether he had made negative comments about the Plaintiff's professional judgment and performance, as Plaskon had implied.

1322.   Newman's response to whether he spoke with Plaskon was "yes, but it was funny…." Before finishing the thought, he asked the Plaintiff to stay on hold while he turned in his building credentials to building security on account of it being his last day with the firm.[671]

1323.   When Newman returned to the phone, he informed the Plaintiff that Plaskon had, in fact, called Newman for his opinion on the quality of the Plaintiff's work. According to Newman, he described the Plaintiff's work as "satisfactory" and "fine."

1324.   **Then, according to Newman, Plaskon responded to his positive comments about the Plaintiff by stating "well, we have had a series of negative reviews about Andrew, is that consistent with your experience?"**

---

[671] Newman left Paul Hastings to clerk for a judge in the 9th Circuit Court of Appeals (Idaho).

1325.   According to Newman, his response was "no" and that his experience with the Plaintiff had been "a positive one." Newman added, however, that if other attorneys had made negative comments concerning their personal experience of working with the Plaintiff, as asserted by Plaskon, then he could not necessarily dispute those accounts.

1326.   Following the conversation, the Plaintiff excitedly texted Ravi Vohra and asked for him to meet the Plaintiff so he could tell him about what had transpired.  The two met at the South-East corner of 42nd Street and Madison Avenue minutes later.

1327.   Among other things, the Plaintiff told Vohra about the unwarranted criticism that the Plaintiff had received at the 2nd meeting with the Coercing Partners; that the Plaintiff called Newman following the meeting and that his story of events demonstrated that Plaskon contacted him in order to solicit negative comments about the Plaintiff's work; and that, in doing so, Plaskon had likely defamed the Plaintiff by claiming to Newman that there had been "a series of negative reviews" concerning the Plaintiff.

### 7.  Paul Hastings' Retroactive Firing of the Plaintiff

1328.   On August 27, 2018, Kelloff, the head of human resources at Paul Hastings, informed the Debtor via text message that his last day of employment had been August 22, 2018, 5 days earlier.[672]  Up until that point, the Debtor had not been notified that Paul Hastings had terminated their employment relationship as required by the underlying employment agreement ("governed by and construed in accordance with the laws of California") and under California state law.

1329.   Assuming for the sake of argument that Kelloff's August 27, 2018, text messages put the Debtor on legal notice of his termination (a proposition not conceded here), then, at the

---

[672] See attached Kelloff Text Messages to Debtor, at 6.

very earliest, the Debtor's termination took place on August 27, 2018 and the Plaintiff is thus entitled, at a minimum, to the earned but unpaid salary through that date, which approximately amounts to $2,353.76. Instead, the final payment of salary received by the Debtor from Paul Hastings on August 30, 2018, for that pay period was $1,009.98. Therefore, at a minimum, the Plaintiff has a vested property right in $1,343.78 in earned but unpaid salary that Paul Hastings is required to turnover.

1330.   Paul Hastings is currently in possession of and exercising control over property of the Plaintiff.[673] Under California law, employees have a vested property right in earned but unpaid salary.[674] While the actual amount is subject to change because a court must determine on what exact day Paul Hastings legally terminated the employment relationship,[675] at a minimum, Paul Hastings is in possession of $1,343.78 in earned but unpaid salary of which the estate holds a vested property interest.

### h.   **Bad Faith Investigation into Plaintiff's Whistleblower Email**

1331.   On September 18, 2018, Paul Hastings employment partner Kenneth Willner emailed the Plaintiff in response to the Whistleblower Email.

1332.   Mr. Willner's email stated, in full, the following:

> *Dear Mr. Hennigan,*
>
> *I am a partner with Paul Hastings in Washington, D.C. I have been asked to conduct an investigation into matters that you raised*

---

[673] 11 U.S.C. § 541(a)(1) (providing that property of the estate includes "all legal or equitable interests of the debtor [wherever located and by whomever held] in property as of the commencement of the case").
[674] Cal. Lab. Code § 201(a) ("If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."); *see also Reyes v. Van Elk, Ltd.*, 148 Cal. App. 4th 604, 612, 56 Cal. Rptr. 3d 68, 73 (2007) ("Earned but unpaid salary or wages are vested property rights."); *Loehr v. Ventura Cty. Cmty. Coll. Dist.*, 147 Cal. App. 3d 1071, 1080, 195 Cal. Rptr. 576, 581 (Ct. App. 1983) ("Earned but unpaid salary or wages are vested property rights, claims for which may not be properly characterized as actions for monetary damages."); *and Arceo v. Cty. of San Mateo*, 2010 WL 4609272, at *3 (N.D. Cal. Nov. 3, 2010) (following *Loehr*).
[675] Cal. Lab. Code § 2922 (2018 West) ("Termination at will upon notice…An employment, having no specified term, may be terminated at the will of either party on notice to the other.") (emphasis added).

*in an email to Paul Grossman and Marc Bernstein dated August 29, 2018. The Firm takes matters of this kind very seriously and will investigate to get down to the bottom of the matter. I would like to talk with you via telephone about your concerns. Please let me know if you would be available tomorrow afternoon, 12-1 or 3-5. If those times are not available, please let me know when you would be available next week.*

*Thank you very much. I look forward to talking with you.*

*Ken Willner[676]*

1333.  By law, Willner was required to advise the Plaintiff that he, Willner, represented Paul Hastings and advise the Plaintiff to consider retaining counsel.

1334.  Clearly, Willner failed to notify the Plaintiff that he, Willner, represented Paul Hastings and to advise the Plaintiff to consider retaining counsel.

1335.  When the Plaintiff and Willner spoke over the phone, the Plaintiff asked if he could record the phone call for his records.  Mr. Willner refused, stating that he would not participate in the phone call if the Plaintiff were to record it.

1336.  When asked, Willner would not provide a reason for the refusal.

1337.  The Plaintiff complied with Mr. Willner's demand and ceased recording the phone call.

1338.  During the interview, Willner asked questions that did not seem relevant to the substance of the Plaintiff's allegations expressed in the Whistleblower Email.  In particular, Willner asked if he had ever notified a superior that his noise-reduction were inadequate to mitigate the distractions of working in cubicle area.

---

[676] Ex. 24.

399

1339.   The Plaintiff believed that Willner asked this question, as well as others, to
discover information that could later be used against the Plaintiff as a defense for Paul Hastings'
failing to provide a reasonable accommodation, among other things.

1340.   This being the case, the Plaintiff excused himself approximately 45 minutes into
the conversation in order to cease communications, so he could deliberate whether participating
in further conversations with Willner was in the Plaintiff's best interests.

1341.   On September 21, 2018, the Plaintiff the following email to Willner:

> *Mr. Wilner,*
>
> *Since our last telephone conversation, I was informed by Mr.
> Bernstein that my employment with Paul Hastings ended on
> September 14. As such, I have decided that it would be best that I
> suspend my participation in your investigation until I am able to
> receive advisement from my own attorney.*
>
> *Of course, I look forward to working with you thereafter.*
>
>
> *Thank you,*
>
> *Andrew*[677]

1342.

## **FIRST CAUSE OF ACTION**

## **VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)**

### **Against All Defendants [except McKinsey RTS]**

1343.   Paragraphs 1-1319 are incorporated by reference as if fully set forth herein.

1344.   This cause of action is asserted against all Defendants except McKinsey RTS (the
"Count 1 Defendants") and is asserted in addition to and in the alternative to all other causes of
action.

---

[677] Ex. 24, at 1.

1345.   Section 1962(c) of Title 18 of the United States Code makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."

1346.   At all relevant times, each of the Count 1 defendants was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).  At all relevant times, the Plaintiff was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

### a.   The Count 1 RICO Enterprise and Its Effect on Interstate Commerce

1347.   From its formation in or around 2010 and continuing to the present, McKinsey RTS has constituted an enterprise (the "**Count 1 Enterprise**") within the meaning of 18 U.S.C. § 1961(4). McKinsey RTS was, and is, distinct from McKinsey & Co., McKinsey Holdings, McKinsey US, and the other Defendants because McKinsey RTS was formed for the purpose of facilitating, committing, perpetuating, and concealing the fraudulent and other criminal conduct alleged herein with the aim of committing fraud upon bankruptcy courts and to engage in illicit profiteering. By encapsulating bankruptcy consulting activities in a separately incorporated legal entity—McKinsey RTS—McKinsey & Co., McKinsey Holdings, and McKinsey US purported to add a veneer of indirectness between them and bankruptcy debtors and other members of the hub-and-spoke enterprise participating in the same bankruptcy proceedings and used McKinsey RTS as a pretext to withhold their own multiplicity of connections to debtors and bankruptcy proceeding participants. Forming McKinsey RTS also allowed them to conduct the illegal scheme from a separate legal entity, and thereby attempt to wall off its illegal activities from the larger McKinsey operation while concealing their numerous conflicts of interest.

401

1348.   Beginning in or around 2011, McKinsey RTS participated in the following bankruptcy proceedings, involving bankruptcy debtors with assets, liabilities, revenues, employee totals, and states of operations as indicated in the chart below:

| Matter | Assets (Millions) | Liabilities (Millions) | Revenue (Millions) | Employees | No. of Affected States |
|--------|-------------------|------------------------|--------------------|-----------|------------------------|
| *Harry & David* | $243 | $1,050 | $427 | 1,026 | 22 states[678] |
| AMR | $25,088 | $103,000 | $22,170 | 78,250 | Six states and Puerto Rico[679] |
| *AMF Bowling* | $100,000 | $279,000 | $387,000 | 7,000 | 34 states[680] |
| *Edison Mission* | $8,323 | $12,304 | $9,321 | 1,783 | 12 states[681] |
| *NII Holdings* | $2,887 | $4,593 | $4,773 | 3,870 | One state: Virginia *(debtor's headquarters) (Plus state of filing:* New York) |
| *Standard Register* | $481 | $592 | $720 | 3,700 | 50 states[682] |
| *Alpha Natural Resources* | $10,736 | $9,834 | $4,955 | 8,900 | 6 states[683] |

[678] Alabama, California, Colorado, Delaware (state of filing), Florida, Iowa, Illinois, Indiana, Massachusetts, Maryland, Michigan, Minnesota, Missouri, New Jersey, New York, Ohio (debtors' headquarters and main distribution center) Oregon (debtors' headquarters), Pennsylvania, South Carolina, Tennessee, Virginia, and Wisconsin (stores).

[679] Debtor's primary operations in New York (state of filing), California, Illinois, Florida, Missouri, Texas (debtor's headquarters), and Puerto Rico.

[680] Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia (debtors' headquarters and state of filing), Washington, and Wisconsin.

[681] Debtors' headquarters in Illinois (state of filing) and California, and operations in 12 states total according to Plan Sponsor Agreement.

[682] Debtors had operations in all 50 states according to plan documents, including Ohio (debtors' headquarters) and Delaware (place of filing).

[683] Kentucky, Pennsylvania, Tennessee, Virginia (place of filing), West Virginia (debtors' headquarters), and Wyoming.

| | | | | | |
|---|---|---|---|---|---|
| *SunEdison* | $11,500 | $16,100 | $2,484 | 7,260 | 20 states[684] |
| GenOn | $2,435 | $2,131 | $1,862 | 1,581 | 10 states[685] |
| **TOTAL** | **$61,793** | **$149,883** | **$47,099** | **113,370** | **All 50 states plus Puerto Rico** |

1349.   Additionally, the conflicts of interests disqualifying McKinsey RTS from serving the various debtor-clients typically arose from McKinsey's relationships with business entities located in states or nations other than those in which the debtor-clients operated.

1350.   Accordingly, at all relevant times, McKinsey RTS was engaged in, and its activities affected, interstate commerce.

1351.   At all relevant times, the conduct of the Count 1 Defendants and their co-conspirators has taken place in and has directly, substantially, and foreseeably affected and restrained interstate commerce.

### b.   **Pattern of Racketeering Activity**

1352.   Each of the Count 1 Defendants conducted or participated in, directly or indirectly, the management or operation of McKinsey RTS and its affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c); to wit, each has committed multiple predicate acts of racketeering activity within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D), and conspired with other Count 1 Defendants to commit and aid and abet other Count 1 Defendants' commission of the same, since at least 2010 and continuing to the present day.

---

[684] Arizona, California (debtors' operational and solar business headquarters), Hawaii, Idaho, Illinois, Maine, Maryland, Massachusetts, Minnesota, Missouri (debtors' corporate headquarters), Nebraska, Nevada, New York (place of filing), North Carolina, Ohio, Oregon, Texas, Utah, Vermont, and Washington.
[685] California, Florida, Maryland, Massachusetts, Mississippi, New Jersey *(debtors' headquarters)*, New York, Ohio, Pennsylvania, and Texas *(place of filing and headquarters of parent company, NRG Energy, Inc.).*

1353. The Count 1 Defendants played the following roles in the racketeering scheme:

**a.** McKinsey & Co. owns and controls McKinsey Holdings, which, in turn, owns and controls McKinsey US. McKinsey US, in turn, owns and controls McKinsey RTS.

**b.** Directly and through its agent officers, directors, board members, employees, and representatives, McKinsey & Co. (including its subsidiaries McKinsey Holdings and McKinsey US) has been an active participant and central figure in the operation of McKinsey RTS and its affairs, and in the orchestration, planning, perpetuation, and execution of the unlawful scheme to commit fraud on bankruptcy courts:

**i.** McKinsey & Co. owns, either directly or indirectly, all of its affiliates, including McKinsey RTS.

**ii.** A board of thirty shareholders controls McKinsey & Co. and all of its affiliates, including McKinsey RTS.

**iii.** McKinsey & Co.'s subsidiaries all rely on the McKinsey brand for marketing.

**iv.** McKinsey RTS's disclosure declarations, which were submitted as part of the debtors' applications for bankruptcy court authorization of McKinsey RTS's employment, prominently and extensively promote McKinsey & Co.'s skills and staff.

**v.** McKinsey entities share the same in-house counsel. For example, Proshan is a Senior Vice President of and Associate General Counsel to McKinsey & Co. and also serves as counsel for McKinsey RTS.

**vi.** McKinsey RTS is dependent on McKinsey & Co. to provide its

business services in its bankruptcy cases. As a result, McKinsey & Co.

and its subsidiaries provide client service personnel to McKinsey RTS

**c.** Each of the predicate acts alleged herein was performed by McKinsey & Co.,

McKinsey Holdings, or McKinsey US, or employees of those entities acting

within the scope of their employment. McKinsey & Co. personnel (including

Carmody, Goldstrom, and Yerian) filed materially false or incomplete Bankruptcy

Rule 2014 disclosures concealing conflicts of interests and, in some instances,

fraudulent behavior, which, if truthfully and fully disclosed, would disqualify

McKinsey RTS from all or substantially all of the bankruptcy crisis management

and consulting engagements it has secured from 2010 to the present. McKinsey &

Co., McKinsey Holdings, and McKinsey US also initiated the "pay-to-play"

scheme with certain legal professionals, advisory firms, and financial institutions

through which those Defendants engaged in and offered commercial bribes and

failed to disclose those bribes to the various bankruptcy courts despite the

conflicts of interest they created.

**d.** As participants in the Count 1 Defendants' unlawful scheme, as described

below, McKinsey & Co., McKinsey Holdings, and McKinsey US each committed

and aided and abetted acts of bankruptcy fraud, mail and wire fraud, obstruction

of justice, and money laundering in violation of 18 U.S.C. §§ 152(2), 152(3),

152(6), 1341, 1343, 1503(a), and 1957, and committed commercial bribery under

state law in connection with the *Harry & David, AMR, AMF Bowling, Edison*

*Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison,*

and *GenOn* bankruptcies; committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in connection with the *Alpha Natural Resources* and *SunEdison* bankruptcies; committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c) in the *Alpha Natural Resources* bankruptcy; and McKinsey & Co. committed, and McKinsey Holdings and McKinsey US aided and abetted, violations of 18 U.S.C. § 2314.

**e.** Barton was, from the inception of the Count 1 Enterprise through mid-2018, the Managing Partner of McKinsey & Co. and, given his senior-most executive position at McKinsey, he had ultimate executive authority over McKinsey's bankruptcy engagement activities as well as the other individual Defendants in this action. Barton thus had knowledge of the various McKinsey connections and conflicts that McKinsey RTS failed to disclose and facilitated and authorized those unlawful failures to disclose, beginning at least with the *Harry & David* bankruptcy and continuing through the *GenOn* bankruptcy. Barton also personally participated in fraudulent efforts to deflect and delay Alix's 2014-2015 attempt to remediate McKinsey's unlawful bankruptcy consulting practices. This conduct demonstrates Barton's desire and intention that the unlawful activities of the other Defendants succeed and suggests that Barton previously had authorized these activities. At a minimum, Barton had express notice of the unlawful nature of McKinsey's bankruptcy consulting business practices by September 2014 when informed of such by Alix. Despite this knowledge, Barton did nothing to stop McKinsey's unlawful practices. As set forth below, as a participant in the Count 1 Defendants' scheme to defraud, Barton committed and aided and abetted acts of

406

mail and wire fraud and money laundering in violation of 18 U.S.C. §§ 1341, 1343, and 1957, and aided and abetted acts of bankruptcy fraud and obstruction of justice in violation of 18 U.S.C §§ 152(2), 153(3), and 1503(a) in connection with the *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison,* and *GenOn* bankruptcies; aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* and *SunEdison* bankruptcies; aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c) in *Alpha Natural Resources*; and committed and aided and abetted violations of 18 U.S.C. § 2314.

**f.** Sternfels is a Senior Partner of McKinsey & Co. and had, during the relevant period, a high degree of executive authority over the bankruptcy consultancy activities of McKinsey, including the submission of false and misleading Rule 2014(a) declarations by Carmody, Goldstrom, and Yerian and other McKinsey & Co., McKinsey US, and McKinsey RTS employees. Sternfels personally participated in the preparation of false and misleading Rule 2014(a) declarations on behalf of McKinsey RTS in the *SunEdison* bankruptcy. He also personally participated in fraudulent efforts to deflect and delay Alix's 2014-2015 attempt to remediate McKinsey's unlawful bankruptcy consulting practices. At a minimum, Sternfels had express notice of the unlawful nature of the McKinsey's bankruptcy consulting business practices by September 2014 when informed of such by Alix. Despite this knowledge, Sternfels did nothing to stop McKinsey's unlawful practices, even when he became substantially involved in McKinsey RTS's engagement for *SunEdison* and McKinsey RTS's disclosures for that case.

407

Additionally, Sternfels likely participated in an unlawful quid pro quo with
SunEdison CEO Chatila through which McKinsey obtained post-bankruptcy
employment for Chatila in exchange for Chatila's acquiescence in McKinsey's
concealment of voidable preferences through a "re-invoiced" and "round-trip"
payment scheme. Moreover, as a Senior Partner of McKinsey & Co. with a high
level of executive authority over McKinsey RTS and its President, Garcia, during
the relevant period, Sternfels had knowledge of McKinsey RTS's bankruptcy
practices and the various connections and conflicts of McKinsey that McKinsey
RTS unlawfully failed to disclose, and Sternfels facilitated and authorized those
unlawful failures to disclose, beginning at least with the *Harry & David*
bankruptcy and continuing through the present. As set forth below, as a
participant in the Count 1 Defendants' scheme to defraud, Sternfels committed
and aided and abetted acts of mail and wire fraud and money laundering in
violation of 18 U.S.C. §§ 1341, 1343, and 1957, and aided and abetted acts of
bankruptcy fraud and obstruction of justice in violation of 18 U.S.C. § 152(2),
152(3), and 1503(a) in the *Harry & David, AMR, AMF Bowling, Edison Mission,
NII Holdings, Standard Register, Alpha Natural Resources, and GenOn*
bankruptcies; committed and aided and abetted acts of abetting bankruptcy fraud,
obstruction of justice, and witness tampering in violation of 18 U.S.C. §§ 152(2),
152(3), 1503(a), and 1512(b) in the *SunEdison* bankruptcy; violated 18 U.S.C.
§§ 1512(b) and 1512(c) by aiding and abetting witness tampering and obstruction
of justice in the *Alpha Natural Resources* bankruptcy; and aided and abetted
violations of 18 U.S.C. § 2314 by Barton and McKinsey.

408

g. Garcia is a Senior Partner of McKinsey & Co., a founder and the President of

McKinsey RTS; and a former board member (from 2006 to 2017) of MIO and,

from 2009 to 2017, sat on MIO's subcommittee on investments. As such, Garcia

has at all relevant times had a high degree of executive authority over the

bankruptcy consultancy activities of McKinsey RTS, including the knowledge,

facilitation, authorization, and approval of the submission of false and misleading

Rule 2014(a) declarations by Carmody, Goldstrom, Yerian, and others on behalf

of McKinsey RTS, beginning with the *Harry & David* bankruptcy and continuing

through the present. As set forth below, as a participant in the Count 1

Defendants' scheme to defraud, Garcia committed and aided and abetted acts of

mail and wire fraud and money laundering in violation of 18 U.S.C. §§ 1341,

1343, and 1957, and aided and abetted acts of bankruptcy fraud and obstruction of

justice in violation of 18 U.S.C. §§ 152(2), 152(3), and 1503(a) in the *Harry &*

*David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register,*

*Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies; aided and abetted

acts of witness tampering in violation of 18 U.S.C. §§ 1512(b) in the *Alpha*

*Natural Resources* and *SunEdison* bankruptcies; and aided and abetted

obstruction of justice in violation of 18 U.S.C. §§ 1512(c) in *Alpha Natural*

*Resources*.

h. Goldstrom is a Senior Partner of McKinsey & Co. and a board member of

McKinsey RTS and has at all relevant times had a high degree of executive

authority over the bankruptcy consultancy activities of McKinsey RTS.

Goldstrom submitted at least 10 knowingly and materially false and misleading

Rule 2014(a) declarations under penalty of perjury on behalf of McKinsey RTS in

*Harry & David* and *AMR*, in furtherance of the Count 1 Defendants' fraudulent

and unlawful scheme. As set forth below, as a participant in the Count 1

Defendants' scheme to defraud, Goldstrom committed acts of bankruptcy fraud

and obstruction of justice in violation of 18 U.S.C. §§ 152(2), 152(3), and 1503(a)

in the *Harry & David, AMR, AMF Bowling*, and *SunEdison* bankruptcies;

committed and aided and abetted acts of mail and wire fraud and money

laundering in violation of 18 U.S.C. §§ 1341, 1343, and 1957, and aided and

abetted acts of bankruptcy fraud and obstruction of justice in violation of 18

U.S.C. §§ 152(2), 152(3), and 1503(a) in the *Harry & David, AMR, AMF*

*Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural*

*Resources, SunEdison*, and *GenOn* bankruptcies; aided and abetted acts witness

tampering in violation of 18 U.S.C. §§ 1512(b) in the *Alpha Natural Resources*

and *SunEdison* bankruptcies; and aided and abetted obstruction of justice in

violation of 18 U.S.C. §§ 1512(c) in Alpha Natural Resources.

i. Proshan, a Senior Vice President of and Associate General Counsel to

McKinsey & Co., furnishes in-house legal services to McKinsey entities including

McKinsey RTS and knowingly participated in the preparation of materially false

and incomplete Rule 2014(a) submissions by McKinsey RTS on numerous

occasions. As an officer of McKinsey & Co., Proshan has at all relevant times had

a degree of executive authority over the bankruptcy consultancy activities of

McKinsey RTS.  As set forth below, as a participant in the scheme to defraud,

Proshan committed and aided and abetted acts of bankruptcy fraud, mail and wire

410

fraud, obstruction of justice, and money laundering in violation of 18 U.S.C.

§§ 152(3), 153(3), 1341, 1343, 1503(a), and 1957 in connection with the *AMR,*

*AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural*

*Resources, SunEdison,* and *GenOn* bankruptcies; committed and aided and

abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in *Alpha*

*Natural Resources* and *SunEdison;* and committed and aided and abetted

obstruction of justice in violation of 18 U.S.C. § 1512(b) in *Alpha Natural*

*Resources.*

j. Carmody is a Senior Partner at McKinsey & Co. and a senior executive of

McKinsey RTS and has at all relevant times had a high degree of executive

authority over the bankruptcy consultancy activities of McKinsey RTS. Carmody

has submitted at least 13 knowingly and materially false and misleading Rule

2014(a) declarations under penalty of perjury on behalf of McKinsey RTS in the

*AMF Bowling, NII Holdings, Standard Register, Alpha Natural Resources,* and

*GenOn* bankruptcies in furtherance of the Count 1 Defendants' fraudulent and

unlawful scheme. Carmody had previously been employed by Alix Partners and

had signed Rule 2014(a) declarations on Alix Partners' behalf which fully and

lawfully disclosed AP's connections. Carmody also worked closely with attorney

Proshan in preparing his Rule 2014(a) declarations, including the decision to

disclose particular connections. Accordingly, Carmody was fully aware of the

deficient nature of McKinsey's disclosure statements. As set forth below, as a

participant in the scheme to defraud, Carmody committed acts of bankruptcy

fraud and obstruction of justice in violation of 18 U.S.C. §§ 152(2) 152(3), and

411

1503(a) in connection with the *AMR, AMF Bowling, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies; committed and aided and abetted acts of mail and wire fraud and money laundering in violation of 18 U.S.C. §§ 1341, 1343, and 1957, and aided and abetted acts of bankruptcy fraud and obstruction of justice in violation of 18 U.S.C. §§ 152(2), 152(3), and 1503(a) in connection with the *AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies; committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. 1512(b) in the *Alpha Natural Resources* and *SunEdison* bankruptcies; and committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c) in *Alpha Natural Resources*.

k. Yerian was a founder of and Practice Leader at McKinsey RTS and a Partner at McKinsey & Co. from 2011 to March 2016. Yerian submitted at least three knowingly and materially false and misleading Rule 2014(a) declarations under penalty of perjury on behalf of McKinsey RTS in furtherance of the Count 1 Defendants' fraudulent and unlawful scheme. Yerian had previously been employed by Alix Partners and had participated in the preparation of Rule 2014(a) declarations on Alix Partners' behalf which fully and lawfully disclosed Alix Partners' connections, and was required to be familiar with the compliance and disclosure obligations imposed on bankruptcy professionals. Accordingly, Yerian was fully aware of the deficient nature of McKinsey RTS's disclosure statements. As set forth below, as a participant in the Count 1 Defendants' unlawful scheme,

at a minimum, Yerian committed and aided and abetted acts of bankruptcy fraud, mail and wire fraud, obstruction of, justice, and money laundering in violation of 18 U.S.C. §§ 152(2), 152(3), 1341, 1343, 1503(a), and 1957 in connection with the *Edison Mission* bankruptcy.

1354.   The Count 1 Defendants' predicate acts of racketeering activity were all related in that they were all committed for the purpose of (1) concealing or obfuscating McKinsey's disqualifying conflicts of interest in order to enable McKinsey RTS to obtain bankruptcy consulting assignments and ill-gotten gains that it would not have received had the Count 1 Defendants behaved lawfully, and through offering unlawful "pay-to-play" arrangements to bankruptcy attorneys, advisory firms, and financial institutions. These acts, and others to be identified after further investigation and discovery herein, also shared a common or related result, participants, victim, and method of commission, which are described below.

c.   **RICO Predicate Acts**

1355.   Barton committed and aided and abetted the predicate acts described below in his capacity as Managing Partner of McKinsey & Co. and within the scope of his employment by or agency for McKinsey & Co.

1356.   Garcia committed and aided and abetted the predicate acts described below in his capacity as the President of McKinsey RTS, a Senior Partner of McKinsey & Co., a board member of MIO from 2006 through 2017, as well as a member of MIO's subcommittee on investments, and within the scope of his employment by or agency for those entities.

1357.   Proshan committed and aided and abetted the predicate acts described below in her capacity as a Senior Vice President of and Associate General Counsel to McKinsey & Co. with primary responsibility for providing legal services to McKinsey RTS, and within the scope of her employment by or agency for those entities.

1358.   Carmody committed and aided and abetted the predicate acts described below in his capacity as a Senior Partner and executive of McKinsey & Co. and executive of McKinsey RTS, and within the scope of his employment by or agency for those entities.

1359.   Goldstrom committed and aided and abetted the predicate acts described below in his capacity as a Senior Partner and executive of McKinsey & Co. and as an executive and board member of McKinsey RTS, and within the scope of his employment by or agency for those entities.

1360.   Sternfels committed and aided and abetted the predicate acts described below in his capacity as a Senior Partner and executive of McKinsey & Co., and within the scope of his employment by or agency for McKinsey & Co.

1361.   Yerian committed and aided and abetted the predicate acts described below occurring prior to April 2016 in his capacity as a Partner of McKinsey & Co. and Practice Leader at McKinsey RTS, and within the scope of his employment by or agency for those entities.

       i.   *False Declarations, Certifications, Verifications or Statements under Penalty of Perjury in Violation of 18 U.S.C. §§ 152(2) and 152(3).*

1362.   With respect to each of its engagements by debtors in bankruptcy, McKinsey RTS was obligated by Bankruptcy Rule 2014(a) to provide, as part of the application for employment that the debtors filed with the bankruptcy court in each case, "a verified statement of the person to be employed setting forth the person's connections with the debtor, creditors, any other party

in interest, their respective attorneys and accountants, the United States trustee, or any person employed in the office of the United States trustee." To satisfy its obligations under Rule 2014(a), McKinsey RTS was required to fully disclose all such connections or interrelationships regardless of materiality. As described below, each of the Count 1 Defendants submitted, caused McKinsey RTS to submit, and aided and abetted the submission of affidavits or declarations under penalty of perjury on behalf of McKinsey RTS which each of the Count 1 Defendants knew to be materially false or misleadingly incomplete, for the purposes of concealing McKinsey's disqualifying conflicts of interest, in violation of 18 U.S.C. §§ 152(2) and 153(3), in the 31 disclosure declarations submitted on behalf of McKinsey RTS in the *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies, which are identified as Nos. 9-39 in the chart attached hereto as Exhibit A. The individual false and misleading statements within each of those 31 submissions are identified in Exhibit B and Schedules 1-12, attached hereto.

1363.   Each of the 31 submissions constituted the knowing and fraudulent making of a false oath, declaration, certificate, verification, or statement under penalty of perjury pursuant to 28 U.S.C. § 1746, in or in relation to any case under the Bankruptcy Code, within the meaning of 18 U.S.C. §§ 152(2) and 152(3).

1364.   Each Count 1 Defendant committed and aided and abetted the aforementioned violations of 18 U.S.C. §§ 152(2) and 152(3) as follows, with the numbers below referring to the numbered declarations listed in Exhibit A hereto:

| Defendant | Committed Violations | Aided and Abetted Violations |
|---|---|---|
| McKinsey & Co. | 9-39 | 9-39 |
| McKinsey Holdings | 9-39 | 9-39 |
| McKinsey US | 9-39 | 9-39 |

| Garcia | | 9-39 |
|---|---|---|
| Proshan | 12-39 | 12-39 |
| Carmody | 12-39 | 12-39 |
| Goldstrom | 9-19, 29, 31-32, 34-35 | 9-39 |
| Sternfels | 29-, 31-32 | 9-39 |
| Barton | | 9-39 |
| Yerian | 20-22 | 20-22 |

1365.   Garcia aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C.

§§ 152(2) and 152(3) by knowingly causing and authorizing at least 31 false and misleading

declarations regarding McKinsey's connections to Interested Parties to be filed on behalf of

McKinsey RTS in the *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings,*

*Standard Register, Alpha Natural Resources, SunEdison,* and *GenOn* bankruptcies. Garcia was

President of McKinsey RTS and a Senior Partner of McKinsey & Co. at all relevant times and a

board member of MIO from 2006 to 2017. The nine aforementioned Chapter 11 bankruptcies

represent all, or nearly all, of McKinsey RTS's bankruptcy-related business in the United States

during the relevant period, and McKinsey RTS received tens of millions of dollars in fees in

connection with those bankruptcies. As President of McKinsey RTS, a Senior Partner of

McKinsey & Co., a member of MIO's board, and an experienced bankruptcy practitioner, Garcia

was aware of and/or willfully blind to McKinsey's many undisclosed conflicts and connections

to Interested Parties in those nine bankruptcies. As President of McKinsey RTS, Garcia was

aware of, and authorized, McKinsey RTS's deficient and unlawful disclosures in those

bankruptcies. Indeed, the detail for McKinsey RTS's fee application in the *Edison Mission*

bankruptcy explicitly shows that Proshan consulted with Garcia regarding McKinsey RTS's

disclosures in that case. Accordingly, at a minimum, Garcia aided and abetted the commission of

416

these predicate acts. Further evidence of Garcia's involvement is peculiarly within Defendants' knowledge and control and will be proven at trial following discovery.

1366.   Proshan committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly causing at least 28 false and misleading declarations regarding McKinsey's connections to Interested Parties to be filed on behalf of McKinsey RTS in the *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn* bankruptcies. At all relevant times, Proshan was employed as Associate General Counsel for McKinsey & Co. and served as in-house counsel to McKinsey RTS in connection with its bankruptcy disclosure declarations in the eight aforementioned bankruptcies.

1367.   As an experienced attorney working for bankruptcy consultancy McKinsey RTS, Proshan was aware of the requirements of Bankruptcy Rule 2014. As in-house counsel for McKinsey & Co. and McKinsey RTS, Proshan was also aware of McKinsey's numerous conflicts and connections that Defendants unlawfully failed to disclose in each of those bankruptcies. McKinsey RTS's fee applications in the first two of those bankruptcies, *AMR* and *AMF Bowling*, show Proshan played a lead role in drafting, revising, supervising, and gathering information for McKinsey RTS's disclosures in those cases and Proshan was in communication with the declarants (Goldstrom in *AMR* and Carmody in *AMF Bowling*) regarding disclosures in both cases. McKinsey RTS's fee applications for its six subsequent bankruptcy engagements (*Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn*) provide little detail regarding the preparation of McKinsey RTS's disclosures for those cases. However, McKinsey RTS's fee applications reveal that Proshan worked on and consulted with Garcia and Yerian regarding McKinsey RTS's disclosures in *Edison Mission*; with Sternfels

417

regarding McKinsey RTS's disclosures in *SunEdison*; and with Carmody regarding McKinsey

RTS's disclosures in *GenOn*. Proshan also worked closely with Carmody regarding McKinsey

RTS's false and incomplete declarations in *Alpha Natural Resources*. Thus, it is likely that

Proshan has played a key role in planning, drafting, and revising McKinsey RTS's false and

misleading disclosures in at least all eight bankruptcies beginning with *AMR*. Accordingly,

Proshan is liable as a principal for these predicate acts and aided and abetted their commission.

Further evidence of Proshan's involvement is peculiarly within Defendants' knowledge and

control and will be proven at trial following discovery.

    1368.  Carmody committed and aided and abetted acts of bankruptcy fraud in violation

of 18 U.S.C. §§ 152(2) and 152(3) by knowingly causing and authorizing at least 28 false and

misleading declarations regarding McKinsey's connections to Interested Parties to be filed on

behalf of McKinsey RTS in the *AMR, AMF Bowling, Edison Mission, NII Holdings, Standard

Register, Alpha Natural Resources, SunEdison,* and *GenOn* bankruptcies. At all relevant times,

Carmody was an executive of both McKinsey RTS and McKinsey & Co. and an experienced

bankruptcy practitioner. Carmody also worked closely with attorney Proshan in preparing his

Rule 2014(a) declarations, including the decision to disclose particular connections. Thus,

Carmody was aware of the requirements of Bankruptcy Rule 2014. Carmody signed and swore

to McKinsey RTS's false and misleading declarations in the *AMF Bowling, NII Holdings,

Standard Register, Alpha Natural Resources,* and *GenOn* bankruptcies. Additionally, the detail

for McKinsey RTS's fee applications in *AMR* and *SunEdison* shows Carmody played a

substantial role in those matters, including the preparation of McKinsey RTS's disclosures and

applications for retention. Therefore, it is likely that Carmody played a lead role in the

preparation of McKinsey RTS's false and misleading declarations in at least all eight

bankruptcies beginning with *AMR*. As an executive of both McKinsey & Co. and McKinsey

RTS, and as the declarant in *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha Natural

Resources*, and *GenOn*, Carmody was aware of the numerous McKinsey connections to

Interested Parties that were concealed or omitted from McKinsey RTS's declarations in all eight

bankruptcies beginning with *AMR*. Accordingly, Carmody is liable as a principal for these

predicate acts in at least the *AMR*, *AMF Bowling*, *NII Holdings*, *Standard Register*, *Alpha

Natural Resources*, *SunEdison*, and *GenOn* bankruptcies, and he aided and abetted their

commission in the *AMR*, *AMF Bowling*, *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha

Natural Resources*, *SunEdison*, and *GenOn* bankruptcies. Further evidence regarding the details

of Goldstrom's involvement is peculiarly within the knowledge and control of Defendants and

will be proven at trial after discovery.

1369.   Goldstrom committed and aided and abetted acts of bankruptcy fraud in violation

of 18 U.S.C. §§ 152(2) and 152(3) by knowingly causing and authorizing at least 15 false and

misleading declarations regarding McKinsey's connections to Interested Parties to be filed on

behalf of McKinsey RTS in the *Harry & David*, *AMR*, *AMF Bowling*, and *SunEdison*

bankruptcies, and by knowingly causing and authorizing false and misleading declarations

regarding McKinsey's connections to Interested Parties to be filed on behalf of McKinsey RTS

in the *Edison Mission*, *NII Holdings*, *Standard Register*, *Alpha Natural Resources*, and *GenOn*

bankruptcies. At all relevant times, Goldstrom was an executive of both McKinsey RTS and

McKinsey & Co., a member of McKinsey RTS's board of directors, and an experienced

bankruptcy practitioner. Thus, Goldstrom was aware of the requirements of Bankruptcy Rule

2014. Goldstrom signed and swore to McKinsey RTS's false and misleading declarations in the

*Harry & David* and *AMR* bankruptcies. The detail for McKinsey RTS's fee applications shows

419

Goldstrom also played a role in the preparation of McKinsey RTS's false and misleading declarations in at least *AMF Bowling* (in which he consulted with Proshan regarding McKinsey RTS's disclosures) and *SunEdison* (in which he consulted with Sternfels regarding McKinsey RTS's disclosures). As an executive of both McKinsey & Co. and McKinsey RTS, and as the declarant in *Harry & David* and *AMR*, Goldstrom was aware of the numerous McKinsey connections to Interested Parties that were concealed or omitted from McKinsey RTS's declarations in at least the *Harry & David*, *AMR*, *AMF Bowling*, and *SunEdison* matters. Moreover, given his continuous role as an executive of both McKinsey & Co. and McKinsey RTS and as a board member of McKinsey RTS, Goldstrom was likely aware of, and knowingly facilitated, McKinsey RTS's false and misleading declarations in all nine bankruptcies beginning with *Harry & David*. Accordingly, Goldstrom is liable as a principal for these predicate acts in the *Harry & David*, *AMR*, *AMF Bowling*, and *SunEdison* bankruptcies, and aided and abetted their commission in all nine bankruptcies beginning with *Harry & David*. Further evidence regarding the details of Goldstrom's involvement is peculiarly within the knowledge and control of Defendants and will be proven at trial after discovery.

1370. Sternfels committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly authorizing and causing at least four false and misleading declarations regarding McKinsey's connections to Interested Parties to be filed on behalf of McKinsey RTS in the *SunEdison* bankruptcy, and by knowingly authorizing false and misleading declarations to be filed on behalf of McKinsey RTS in the *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources*, and *GenOn* bankruptcies. At all relevant times, Sternfels was a Senior Partner of McKinsey & Co. and exercised significant executive authority over McKinsey RTS's President, Garcia. By

420

September 2014, Sternfels was indisputably aware of the deficient and unlawful nature of McKinsey RTS's bankruptcy disclosures. Despite that knowledge. Sternfels took no action to remediate McKinsey RTS's disclosure practices and McKinsey RTS went on to file fraudulent disclosures and obtain bankruptcy consultancy work in *NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn*. The detail for McKinsey RTS's fee applications in *SunEdison* shows that Sternfels played a significant managerial role in that engagement, including communications with Proshan, Carmody, and Goldstrom regarding McKinsey RTS's disclosures in that matter. As a longtime McKinsey & Co. executive and a key person in the SunEdison engagement (including on matters regarding McKinsey RTS's disclosures), Sternfels was aware of the numerous connections that McKinsey RTS unlawfully omitted or concealed in its disclosures in *SunEdison*. Additionally, given his senior executive role at McKinsey & Co. and executive authority over Garcia, and given his failure to remediate McKinsey RTS's unlawful practices after they were raised by AP, it is likely that Sternfels also knowingly authorized and facilitated McKinsey RTS's filing of false and misleading declarations in other bankruptcies, beginning with the *Harry & David* matter and continuing through the present. Accordingly, Sternfels aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in all nine of McKinsey RTS's bankruptcy matters, beginning with *Harry & David*, and committed acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in *SunEdison*. Further evidence regarding the details of Sternfels's involvement is peculiarly within the knowledge and control of Defendants and will be proven at trial after discovery.

1371.   Barton aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in connection with all of McKinsey RTS's nine bankruptcy matters beginning with *Harry & David*. As a longtime McKinsey & Co. executive, Barton was aware of

the numerous connections that McKinsey RTS unlawfully omitted or concealed in its disclosures in all nine bankruptcies beginning with *Harry & David* and continuing through *GenOn*. By September 2014, Barton was indisputably aware of the deficient and unlawful nature of McKinsey RTS's bankruptcy disclosures. Despite that knowledge, Barton took no action to remediate McKinsey RTS's disclosure practices and McKinsey RTS went on to file fraudulent disclosures and obtain bankruptcy consultancy work in *NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn*. Given his role as McKinsey & Co.'s Managing Partner from 2009 through mid-2018 and his executive authority over the other individual Defendants, including Sternfels and Garcia, and given his failure to remediate McKinsey RTS's unlawful practices after they were raised by Alix Partners, it is likely that Barton also knowingly authorized and facilitated McKinsey RTS's filing of false and misleading declarations in other bankruptcies, beginning with the *Harry & David* bankruptcy and continuing through the *GenOn* bankruptcy, and aided and abetted the commission of the violations of 18 U.S.C. §§ 152(2) and 152(3) in connection with those bankruptcies. Further evidence regarding the details of Barton's involvement is peculiarly within the knowledge and control of Defendants and will be proven at trial after discovery.

1372.   Yerian committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) knowingly causing at least three false and misleading declarations regarding McKinsey's connections to Interested Parties to be filed on behalf of McKinsey RTS in the *Edison Mission* bankruptcy. At all relevant times, Yerian was a Practice Leader at McKinsey RTS, a Partner of McKinsey & Co., and an experienced bankruptcy practitioner. Thus, Yerian was aware of the requirements of Bankruptcy Rule 2014. Yerian signed and swore to McKinsey RTS's false and misleading declarations in the *Edison Mission*

422

bankruptcy. The detail for McKinsey RTS's fee applications shows that Yerian also played a role in the preparation of McKinsey RTS's false and misleading declarations in the *Edison Mission* bankruptcy (in which he consulted with Proshan regarding McKinsey RTS's disclosures). As an executive of both McKinsey & Co. and McKinsey RTS, and as the declarant in *Edison Mission*, Yerian was aware of the numerous McKinsey connections to Interested Parties that were concealed or omitted from McKinsey RTS's declarations in that matter. Accordingly, Yerian is liable as a principal for these predicate acts and aided and abetted their commission. Further evidence regarding the details of Yerian's involvement is peculiarly within the knowledge and control of Defendants and will be proven at trial after discovery.

1373.   McKinsey & Co., McKinsey Holdings, and McKinsey US each committed and aided and abetted the aforementioned violations of 18 U.S.C. §§ 152(2) or 152(3) in each of McKinsey RTS's nine bankruptcies beginning with *Harry & David* because Garcia, Proshan, Carmody, Goldstrom, Sternfels, Barton, and Yerian each committed these predicate acts within the scope of their formal positions at, and for the benefit of, these entities, and in furtherance of deliberate corporate policy sanctioned and actively furthered by senior management.

ii.   *Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343.*

1374.   Each of the Count 1 Defendants engaged in a scheme to commit rapacious fraud on the bankruptcy court system through the false denial, concealment, and obfuscation of disqualifying conflicts of interest, which thereby generated ill-gotten gains for the hub-and-spoke conspirators. The Count 1 Defendants accomplished their scheme to defraud the bankruptcy court system by:

a. Causing McKinsey RTS to systematically file with various bankruptcy courts
31 Rule 2014(a) disclosure statements which the Count 1 Defendants each knew
to be materially false and misleading or incomplete in that such statements
omitted, concealed, or distorted facts which would necessitate disqualification of
McKinsey RTS in the *Harry & David*, *AMR*, *AMF Bowling*, *Edison Mission*, *NII
Holdings*, *Standard Register*, *Alpha Natural Resources*, *SunEdison*, and *GenOn*
matters. Those disclosure statements are identified as Nos. 9-39 in Exhibit A
hereto, and false and misleading statements contained therein are listed in Exhibit
B hereto.

b. Using fraudulently engineered "re-invoiced" and "round trip" payments from
non-debtor affiliates of *SunEdison* to avoid disqualification of McKinsey RTS
from the *SunEdison* engagement. This deception was likely furthered by an
undisclosed *quid pro quo* engineered by Sternfels pursuant to which SunEdison
CEO Chatila acceded to the scheme in exchange for McKinsey's assistance in
finding post-bankruptcy employment for Chatila.

c. Concealing voidable preferences, and thus avoiding disqualification of
McKinsey RTS in the *GenOn* bankruptcy, by falsely representing such
preferences as ordinary-course payments.

d. Offering exclusive referral relationships to one or more prominent attorneys
practicing in the United States, while failing to disclose these disqualifying
contacts to bankruptcy courts.

424

1375.   The Count 1 Defendants later fraudulently perpetuated their scheme when, confronted by Alix with evidence of their wrongdoing, Count 1 Defendants Barton and McKinsey & Co. repeatedly promised to cease their unlawful activity while secretly intending to continue it.

1376.   In furtherance of the scheme, and as described herein, the Count 1 Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343; and also caused matters and things to be placed in a post office or authorized depository or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier in violation of 18 U.S.C. § 1341. The Count 1 Defendants' specific mailings and interstate wirings in furtherance of the scheme to defraud include, but are not limited to, the following:

    a.   Each of the declarations under penalty of perjury identified as Nos. 9-19, 23-28, 30, 33, and 36-39 in the table set forth in Exhibit A hereto were transmitted by interstate wire, by United States mail, and/or by private interstate commercial carrier, as evidenced by the fact that each such affidavit or declaration was signed, or the affiant or declarant resided, in a state different from that in which the document was judicially filed, as evidenced by the locations indicated on the signature page and/or the fax numbers on the declarants' signature page:

| No(s). | Case | Declarant | Location of Declarant | Location of Case |
|---|---|---|---|---|
| 9, 10 | Harry & David | Goldstrom | Georgia | Delaware |
| 11 | Harry & David | Goldstrom | North Carolina or Georgia | Delaware |

| 12, 13 | AMR Corp. | Goldstrom | Texas | New York |
|---|---|---|---|---|
| 14-18 6-10 | AMR Corp. | Goldstrom | Georgia | New York |
| 19 | AMD Bowling | Carmody | Illinois | Virginia |
| 23-24 | NII Holdings | Carmody | Illinois | New York |
| 25 | Standard Register | Carmody | Illinois | Delaware |
| 26-28 30, 33 | Alpha Natural Resources | Carmody | Illinois | Delaware |
| 36-39 | GenOn | Carmody | Illinois | Texas |

b.  Additionally, each of the declarations under penalty of perjury enumerated in
items Nos. 9-11, 19-22, 25-28, 30, 33, and 36-39 in the table set forth in Exhibit
A hereto, or preliminary drafts thereof, were transmitted by interstate wire, by
United States mail, and/or by private interstate commercial carrier, given the
likelihood that they were prepared, reviewed, or edited by employees of
McKinsey in addition to the declarant, their respective legal counsel, and likely
other firms or individuals located in states other than that in which the documents
ultimately were judicially filed:

| No(s). | Case | Location of McKinsey employees or counsel preparing documents | Location of case |
|---|---|---|---|
| 1, 2 | *Harry & David* | New York | Delaware |
| 3 | *Harry & David* | New York | Delaware |
| 11 | *AMF Bowling* | New York | Virginia |
| 12-14 | *Edison Mission* | New York | Illinois |
| 17 | *Standard Register* | New York | Delaware |
| 18-20, 22, 25 | *Alpha Natural Resources* | New York; Ohio (debtors' counsel) | Delaware |
| 21, 23-24, 26-27 | *SunEdison* | New York; California | New York |
| 28-31 | *GenOn* | New York | Texas |

426

1377.   The specific false and misleading statements in each of McKinsey RTS's disclosure declarations are noted in Exhibit B to this Amended Complaint and the schedules thereto.

1378.   Accordingly, the following Count 1 Defendants committed and aided and abetted acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the following items from the chart set forth in Exhibit A hereto:

| Defendant | Violations Nos. |
|---|---|
| McKinsey & Co. | 9-39 |
| McKinsey Holdings | 9-39 |
| McKinsey US | 9-39 |
| Garcia | 9-39 |
| Proshan | 12-39 |
| Carmody | 12-39 |
| Goldstrom | 9-39 |
| Barton | 9-39 |
| Sternfels | 9-39 |
| Yerian | 20-22 |

1379.   Further, it is likely that each of the false and misleading declarations submitted by McKinsey RTS in each of its Chapter 11 bankruptcies was transmitted by mail and/or by interstate wire, particularly given that the individual Defendants are spread across different states. Accordingly, in addition to the foregoing instances of mail and wire fraud, it is likely that each of the Defendants committed and aided and abetted mail and/or wire fraud in connection with the false and misleading declarations submitted by McKinsey RTS in *SunEdison*, particularly given that Sternfels is located in California while the SunEdison bankruptcy and the declarant in that proceeding were located in New York.

1380.   Thus, McKinsey & Co., McKinsey Holdings, McKinsey US, Barton, Sternfels, Garcia, and Goldstrom each committed and aided and abetted acts of mail and wire fraud in

violation of 18 U.S.C. §§ 1341 and 1343 in connection with all nine of McKinsey RTS's

bankruptcy matters; Proshan and Carmody each committed and aided and abetted acts of mail

and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the *AMR, AMF*

*Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources,*

*SunEdison,* and *GenOn* bankruptcy matters; and Yerian committed and aided and abetted acts of

mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the *Edison*

*Mission* bankruptcy.

     1381.   Additionally, Barton, Sternfels, and McKinsey & Co. each committed and aided

and abetted further acts of mail and wire fraud. Barton and Sternfels, acting on behalf of

McKinsey & Co., used or caused the use of the interstate or international wires in

communications with Alix concerning his allegations of unlawful conduct by McKinsey. These

communications furthered the scheme by fostering in Alix the false impression that McKinsey

was pursuing corrective action in light of Alix's admonishments to Barton and Sternfels

concerning McKinsey's illegal bankruptcy consulting engagements. By stringing Alix along in

this fashion, Barton and Sternfels sought to (and did) forestall legal action by AP and thereby

prolonged their scheme. These communications include the following:

     **a.** August 20, 2014 e-mail from Barton's assistant in London, Katharine

     Bowerman, conveying to Alix a message from Barton concerning Alix's request

     for a meeting to discuss McKinsey's bankruptcy consulting activities;[686]

---

[686] All e-mails referenced in this paragraph 326 were sent to or from Alix at his e-mail address at Lakeview Capital Inc. (JAlix@lakeviewcapitalinc.com). Lakeview Capital's e-mail servers were hosted in the United States during the relevant time. Accordingly, any e-mail sent to or from JAlix@lakeviewcapitalinc.com would have been routed through the United States notwithstanding the geographical location of the device used by the sender or recipient to originate or read the e-mail. Upon information and belief, the e-mail server for Barton and Bowerman's e-mail addresses (Dominic_Barton@mckinsey.com and katharine_bowerman@mckinsey.com) as well as that of another Barton assistant, Charlotte Phillips (charlotte_phillips@mckinsey.com) were hosted in the United Kingdom or otherwise outside of the United States.

**b.** August 20, 2014 e-mail from Alix to Barton responding to Barton's earlier message and discussing the parameters of a meeting between representatives of the two firms;

**c.** August 20, 2014 e-mail from Bowerman in London to Alix concerning the contemplated meeting;

**d.** August 21, 2014 e-mail from Alix to Barton and Bowerman in Europe concerning the contemplated meeting;

**e.** August 24, 2014 e-mail from Barton in Krakow, Poland to Alix;

**f.** August 27, 2014 e-mail from Barton's assistant in London, Katharine Bowerman, to Alix in Michigan, conveying a message from Barton concerning the contemplated meeting;

**g.** September 3, 2014 telephone call between Sternfels in San Francisco and Alix and Barton in New York City, during which AP's concerns about McKinsey's bankruptcy consulting practices were conveyed and Alix received assurances from Barton that AP's concerns would be addressed and remedied by McKinsey;

**h.** September 4, 2014 e-mail from Barton in Canada to Alix in the United States;

**i.** September 4, 2014 e-mail from Barton's assistant, Charlotte Phillips, in London to Alix in the United States, conveying a message from Barton concerning a follow-up discussion of AP's concerns;

**j.** September 4, 2014 telephone call between Barton in Ireland and Alix and Sternfels in New York City during which AP's concerns about McKinsey's bankruptcy consulting practices were conveyed and Alix received assurances from Barton that Alix Partners' concerns would be addressed and remedied by McKinsey;

429

**k.** September 5, 2014 telephone call between Barton in Ottawa, Canada and Alix in

Boston, Massachusetts, during which Barton reiterated that AP's concerns about

McKinsey's bankruptcy consulting practices would be addressed and remedied;

**l.** September 24, 2014 e-mail from Bowerman in London to Alix conveying Barton's

enumeration of dates and times for a meeting to further address AP's concerns about

McKinsey's bankruptcy consulting practices;

**m.** June 15, 2015 e-mail from Alix in Michigan to Barton, requesting a follow-up

discussion to address Barton's promise to bring McKinsey into compliance with the

law.

1382.   Upon information and belief, the Count 1 Defendants (including specifically

McKinsey & Co.) also used the interstate wires, United States mail, or private interstate commercial

carrier to convey to one or more bankruptcy attorneys located in the United States offers of unlawful

exclusive referral agreements. Evidence of such transactions is peculiarly within Defendants'

knowledge and control and will be proven at trial following discovery.

1383.   The Count 1 Defendants also used the interstate wires, United States mail, or

private interstate commercial carrier to transfer illegally obtained funds within the United States

for the purpose of furthering the objectives of McKinsey RTS. These transfers include the

movement of funds in connection with McKinsey's "re-invoiced" and "round-trip" payments

from *SunEdison* and its affiliates in or about September 2015 through April 2016, as well as the

transmission of fees from various bankruptcy debtor-clients to McKinsey RTS throughout the

course of the scheme since 2010. Evidence of such transactions and others is peculiarly within

Defendants' knowledge and control and will be proven at trial following discovery.

1384.   Each of the Count 1 Defendants, through their direct or indirect corporate or

executive control of McKinsey RTS, knew of, and participated in, numerous acts of mail and

wire fraud. In particular, each of the Count 1 Defendants, through their control of and/or participation in McKinsey RTS, sent or caused to be sent numerous mail or wire communications, or acted with knowledge that mail or wire communications would follow in the ordinary operation of McKinsey RTS, or could reasonably have foreseen that the mails or wires would be used in the ordinary course of business as a result of the Count 1 Defendants' acts in furtherance of the transactions discussed above, including the uses of the mails and interstate wires enumerated above. Carmody, Goldstrom, and Yerian knew that their various Rule 2014(a) declarations or preliminary drafts thereof would be transmitted by the mails or interstate wires, as did Proshan, who oversaw the preparation of these documents, and Garcia, Barton, and Sternfels, who authorized and facilitated them; in addition to Proshan, Sternfels, Carmody, Garcia, and Goldstrom contributed directly to the creation of the false and misleading declarations described above, including in cases in which they were not the declarants. McKinsey & Co. committed the aforementioned acts of mail or wire fraud because Garcia, Proshan, Carmody, Goldstrom, Sternfels, Barton, and Yerian each committed these predicate acts within the scope of their formal positions at and for the benefit of McKinsey & Co., and in furtherance of deliberate corporate policy sanctioned and furthered by senior management. Each of the Count 1 Defendants committed numerous additional and similar acts of mail or wire fraud in furtherance of their scheme or artifice that will be proven at trial following discovery.

1385.   To the extent proof of reliance is legally required, in engaging in the aforementioned mail and wire fraud, the Count 1 Defendants knew and intended that their debtor-clients, the various bankruptcy judges, the Department of Justice, the U.S. Trustee, AP, and other McKinsey RTS competitors would reasonably rely on the Count 1 Defendants' misrepresentations and omissions, which would result in McKinsey RTS obtaining and retaining

consulting engagements to which it was not entitled and which would have otherwise been
secured by a competitor.

    *iii.   Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343.*

    1386.   In connection with the *Alpha Natural Resources* bankruptcy, McKinsey & Co.,
McKinsey US, McKinsey Holdings, Carmody and Proshan (collectively, the "*ANR* Obstruction
Defendants") violated 18 U.S.C. § 1503(a), which makes it unlawful to influence, obstruct, or
impede the due administration of justice, or to endeavor to do so, or to endeavor to influence or
impede any officer in or of any court of the United States. Garcia, Sternfels, Barton, and
Goldstrom aided and abetted those violations by authorizing and facilitating the *ANR* Obstruction
Defendants' acts of obstruction of justice.

    1387.   The *Alpha Natural Resources* bankruptcy was a judicial proceeding constituting
the administration of justice as required by 18 U.S.C. § 1503(a).

    1388.   The U.S. Trustee in the *Alpha Natural Resources* case is an officer in or of a
federal court for purposes of 18 U.S.C. § 1503(a).

    1389.   Defendants (including each of the *ANR* Obstruction Defendants), were aware of
or had notice of the *Alpha Natural Resources* case, as demonstrated by the following facts:
McKinsey RTS (which is owned by McKinsey US, McKinsey Holdings, and McKinsey & Co.)
was hired as a bankruptcy professional in that proceeding; Carmody (a Senior Partner of
McKinsey & Co.) filed sworn statements in connection with that engagement on behalf of
McKinsey RTS; Proshan (who served as in-house counsel for McKinsey RTS) assisted in
preparing declarations for filing in that proceeding; and Garcia was the President of McKinsey
RTS, as well a Senior Partner at McKinsey & Co.; Sternfels had significant executive
authority over McKinsey RTS, including Garcia; Barton had ultimate executive authority over

432

McKinsey RTS and the other Defendants; and both Sternfels and Barton had been made aware of McKinsey RTS's pattern of unlawful bankruptcy disclosures. Additionally, members of the McKinsey RTS team for the *Alpha Natural Resources* engagement were, at the time, employees of various McKinsey & Co. affiliates, including McKinsey US; McKinsey & Company, Inc. Canada; McKinsey & Company, Inc. France; McKinsey Solutions SPRL; McKinsey Knowledge Centre Belgium, Inc., LLC; McKinsey & Company CIS; McKinsey Knowledge Centre India Private Limited; McKinsey & C Inc. do Brasil Consultoria Ltda; McKinsey & Company, Inc. United Kingdom; McKinsey & Company, Inc. (Malaysia); and McKinsey & Consulting Company Inc., Shanghai.

1390.   The *ANR* Obstruction Defendants, acting through McKinsey RTS, acted with wrongful intent or improper purpose to influence the *Alpha Natural Resources* bankruptcy proceedings and corruptly intended to impede the administration of that judicial proceeding. Specifically, by representing to the bankruptcy court and the U.S. Trustee that McKinsey RTS's existing disclosures of its connections in *Alpha Natural Resources* were complete and truthful, the *ANR* Obstruction Defendants endeavored to, and did, fraudulently induce the U.S. Trustee to withdraw two court filings in which it sought to compel McKinsey RTS to disclose its connections as required by law.

1391.   336. Between August 24, 2015 and March 25, 2016, Carmody filed three disclosure declarations pursuant to Rule 2014(a) in Alpha Natural Resources. None of those declarations disclosed the names of any of McKinsey's connections to Interested Parties.

433

1392.   337. On May 3, 2016, in *Alpha Natural Resources*, the U.S. Trustee filed a

motion seeking an order compelling McKinsey RTS to comply with Rule 2014(a).[687] In the

"Introduction" to that motion, the U.S. Trustee stated

> *Bankruptcy Rule 2014 requires that professionals to be employed file a verified statement of "all of the person's connections" to the debtor, creditors, and other parties interest. The Debtors retained McKinsey RTS as their turnaround advisor,* **but its declarations disclosed only vague and amorphous connections** *to creditors and other major parties in interest—first lien lenders, other secured creditors, and the Debtors' major competitors. McKinsey RTS has neither identified these connections by name nor provided any insight into the nature of the connections. But Bankruptcy Rule 2014 requires that disclosures be sufficiently explicit for a court and other parties to determine whether a professional is disinterested or holds or represents an adverse interest.* **An indeterminate statement of connections with a creditor does not satisfy Bankruptcy Rule 2014.** *Rather, "complete and candid disclosure . . . is indispensable to the court's discharge of its duty to assure the [professional's] eligibility for employment under section 327(a) . . . ." In re eToys, Inc., 331 B.R. 176, 189 (Bankr. D. Del. 2005).* **Rigorous compliance with Rule 2014 is critical to the integrity and transparency required of the bankruptcy system***. And in the context of the debtors' current push toward major asset sales and plan confirmation, these disclosures are of particular and concrete importance. Accordingly,* **McKinsey RTS should be compelled to comply with Bankruptcy Rule 2014 like other professionals** *by filing a supplemental declaration stating,* **at a minimum***, (a)* **the identity** *of the entities on the Interested Parties List (as defined below) with which McKinsey RTS and any of its affiliates have a connection (even if unrelated to the Debtors or these chapter 11 cases) and (b) a general description of the connection with or work performed for these entities.*[688]

1393.   In response to the U.S. Trustee's motion to compel, on May 19, 2016, Carmody

filed, on behalf of McKinsey RTS, a Third Supplemental Disclosure, purportedly to satisfy the

U.S. Trustee and cure the deficiencies in his three prior declarations, in which he named a

---

[687] *Alpha Natural Resources*, Dkt. No. 2308.
[688] *Id.* at 1-2 (emphasis added; footnote omitted; ellipses and alteration in original).

434

handful of McKinsey's connections to Interested Parties—approximately nine months after McKinsey RTS first appeared in *Alpha Natural Resources*.

1394.   On July 1, 2016, the *Alpha Natural Resources* court compelled McKinsey RTS to produce, for *in camera* review, multiple items that Carmody had failed to provide in the several declarations he had filed over the past year, including the names and nature of McKinsey's "***121 undisclosed connections discussed at the hearing***"; "Identification of Interested Parties that manage investments for MIO Partners, Inc. or its investment affiliates"; "Identification of Interested Parties in which MIO owns securities"; and information and documents concerning McKinsey's alleged email surveys through which it purportedly conducted its bankruptcy conflict checks.[689]

1395.   The *Alpha Natural Resources* court also held: (a) generally, Bankruptcy 2014 requires professional persons to disclose their connections by name; and (b) ***there are no different standards of disclosure for lawyers and other professional persons***.[690]

1396.   In response to the *Alpha Natural Resources* court's July 1, 2016 Order, the U.S. Trustee's motion to compel, and the U.S. Trustee's recommendation, Carmody filed on August 5, 2016, on behalf of McKinsey RTS, a fourth supplemental disclosure, naming a few additional connections and purportedly curing the deficiencies in the four previous declarations he had filed over the past year in *Alpha Natural Resources*.

1397.   Proshan assisted in the preparation and drafting of Carmody's supplemental disclosures in *Alpha Natural Resources*, knowing of their false and misleading nature.

1398.   Garcia, as President of McKinsey RTS and a Senior Partner of McKinsey & Co., and Sternfels and Barton, as executives with authority over Garcia and McKinsey RTS and with

---

[689] *Alpha Natural Resources*, Dkt. 2895 at 2-3 (emphasis added).
[690] *Id.*

knowledge of McKinsey RTS's pattern of unlawful false disclosures, knowingly authorized Carmody's false and misleading declarations in the *Alpha Natural Resources* bankruptcy.

1399.   All of the *ANR* Obstruction Defendants and Garcia, Sternfels, and Barton were aware of Rule 2014's disclosure requirements and had access to information—including the identities of the McKinsey connections that Carmody failed to name—that would have enabled them to cause McKinsey RTS to file complete and truthful declarations in the *Alpha Natural Resources* case had they chosen to comply with the law. As bankruptcy practitioners and executives of both McKinsey RTS and McKinsey & Co., both Garcia and Carmody knew that all of Carmody's declarations in *Alpha Natural Resources* were intentionally false and misleading because they omitted and concealed numerous material connections between McKinsey and its affiliates and Interested Parties, and thus failed to comply with Rule 2014. As an experienced attorney at a sophisticated company specializing in bankruptcy, Proshan likewise knew that Carmody's declarations were intentionally false and misleading and did not comply with Rule 2014.

1400.   In reliance on the ostensible truthfulness and completeness of McKinsey RTS's fourth supplemental disclosure, which was attested to by Carmody under penalty of perjury and pursuant to a court order, the U.S. Trustee abandoned any further efforts at that time to compel McKinsey RTS to comply with Rule 2014(a) in *Alpha Natural Resources.*

1401.   In reality, however, the *ANR* Obstruction Defendants were knowingly and fraudulently continuing to conceal material connections between McKinsey and Interested Parties.

1402.   In knowingly causing multiple materially false and misleading declarations to be filed, the *ANR* Obstruction Defendants acted corruptly and with wrongful intent to mislead the

U.S. Trustee and the bankruptcy court so that McKinsey RTS's connections and disqualifying conflicts would not be discovered and so that McKinsey RTS could continue to profit from the bankruptcy engagement and avoid disqualification.

1403.   Through this fraudulent conduct, the *ANR* Obstruction Defendants corruptly endeavored to obstruct, influence, or impede an officer in or of the bankruptcy court, to wit, the U.S. Trustee, who was acting as an officer in or of the court in the discharge of her duty, in violation of 18 U.S.C. § 1503(a).

1404.   Additionally, certain Defendants also committed and aided and abetted further acts of obstruction of justice in violation of 18 U.S.C. § 1503(a) in the other Chapter 11 bankruptcies in which McKinsey RTS has been engaged, by knowingly and wrongfully authorizing and causing false and misleading declarations to be filed on behalf of McKinsey RTS:

> a. In *Harry & David*, McKinsey & Co., McKinsey Holdings, McKinsey US, and Goldstrom knowingly and wrongfully filed or caused to be filed three false and materially misleading disclosure affidavits by Goldstrom in support of McKinsey RTS's retention as a management consultant, and Garcia, Sternfels, and Barton each aided and abetted those violations by knowingly authorizing those filings;
>
> b. In *AMR*, McKinsey & Co., McKinsey Holdings, McKinsey US, Goldstrom, Carmody, and Proshan knowingly and wrongfully filed or caused to be filed seven false and materially misleading disclosure affidavits by Goldstrom on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates, in support of those entities' retention as management consultants, and Garcia,

437

Sternfels, and Barton each aided and abetted those violations by knowingly authorizing those filings;

c. In *AMF Bowling*, McKinsey & Co., McKinsey Holdings, McKinsey US, Goldstrom, Proshan and Carmody knowingly and wrongfully filed or caused to be filed a false and materially misleading disclosure affidavit by Carmody in support of McKinsey RTS's retention as a management consultant, and Garcia, Sternfels, and Barton each aided and abetted those violations by knowingly authorizing those filings;

d. In *Edison Mission*, McKinsey & Co., McKinsey Holdings, McKinsey US, Proshan, and Yerian knowingly and wrongfully caused to be filed three false and materially misleading disclosure affidavits by Yerian in support of McKinsey RTS's retention as a restructuring advisor, and Garcia, Sternfels, Barton, Goldstrom, and Carmody aided and abetted those violations by knowingly authorizing those filings;

e. In *NII Holdings*, McKinsey & Co., McKinsey Holdings, McKinsey US, Proshan, and Carmody knowingly and wrongfully filed or caused to be filed two false and materially misleading disclosure affidavits by Carmody in support of McKinsey RTS's retention as a turnaround advisor in that proceeding, and Garcia, Sternfels, Barton, and Goldstrom aided and abetted those violations;

f. In *Standard Register*, McKinsey & Co., McKinsey Holdings, McKinsey US, Proshan, and Carmody knowingly and wrongfully filed or caused to be filed a false and materially misleading disclosure affidavit by Carmody in support of McKinsey RTS's application to provide interim management services to the debtor and to designate Carmody as the debtor's Chief Restructuring Officer, and Garcia, Goldstrom, Sternfels, and Barton aided and abetted those violations;

438

g.  In **SunEdison**, McKinsey & Co., McKinsey Holdings, McKinsey US, and Proshan, Sternfels, Carmody, and Goldstrom knowingly and wrongfully caused to be filed five false and materially misleading disclosure affidavits by McKinsey RTS Practice Leader Mark Hojnacki in support of McKinsey RTS's retention as a restructuring advisor, and Garcia and Barton aided and abetted those violations; and

h.  In **GenOn**, McKinsey & Co., McKinsey Holdings, McKinsey US, Proshan, and Carmody knowingly and wrongfully filed or caused to be filed four false and materially misleading disclosure affidavits by Carmody on behalf of McKinsey RTS in support of its retention as a restructuring advisor in that proceeding, and Garcia, Goldstrom, Sternfels, and Barton aided and abetted those violations.

1405.   Barton, Sternfels, and Garcia each aided and abetted all of the foregoing violations of 18 U.S.C. §1503(a) by authorizing Proshan, Goldstrom, Carmody, Yerian, and others (and Barton and Sternfels by authorizing Garcia) to file documents which Barton, Sternfels, and Garcia each knew to be false and misleading and intended to obstruct the administration of justice by the bankruptcy courts and to impede the U.S. Trustee in the execution of its duties.

*iv.*   *Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343.*

1406.   Through their above-described conduct in the *Alpha Natural Resources* bankruptcy, the ANR Obstruction Defendants each committed violations of 18 U.S.C. § 1512(b) by knowingly and corruptly persuading another person and by knowingly engaging in misleading conduct toward another person, and attempting to do so, with an intent to influence, delay, or prevent testimony or cause any person to withhold a record, object, document, or testimony from an official proceeding; and Barton, Sternfels, Garcia, and Goldstrom aided and abetted those

violations by authorizing those actions by Carmody and Proshan (and Barton and Sternfels by authorizing Garcia).

1407. *First*, the *ANR* Obstruction Defendants each violated Section 1512(b) by engaging in misleading conduct in the *Alpha Natural Resources* bankruptcy by knowingly making false statements and intentionally omitting information or intentionally concealing materially facts concerning McKinsey's connections to Interested Parties and the completeness and truthfulness of McKinsey RTS's disclosures in that proceeding. This misleading conduct was directed at the U.S. Trustee and the *Alpha Natural Resources* court.

1408. *Second*, the *ANR* Obstruction Defendants attempted to, and did, persuade the U.S. Trustee to abandon its efforts in 2016 to seek further disclosures from McKinsey RTS in *Alpha Natural Resources*. In doing so, they acted corruptly and with the improper intent of deterring the U.S. Trustee from continuing to litigate against McKinsey RTS regarding its Rule 2014 disclosures.

1409. In each instance, each of the *ANR* Obstruction Defendants acted knowingly and with the wrongful intent that Carmody's false and misleading testimony on behalf of McKinsey RTS would obstruct the bankruptcy proceedings by allowing McKinsey RTS to avoid disqualification.

1410. In addition, McKinsey & Co., McKinsey Holdings, McKinsey US, Sternfels, Goldstrom, Carmody, and Proshan committed and aided and abetted acts of witness tampering in violation of Section 1512(b) by knowingly influencing or impeding truthful testimony by Mark Hojnacki and corruptly persuading Hojnacki to cause him to provide non-truthful or misleading testimony in the five false and materially misleading disclosure declarations filed by Hojnacki on behalf of McKinsey RTS in the *SunEdison* proceeding; and Barton, Sternfels, and Garcia aided

and abetted those violations by authorizing those actions by Goldstrom, Carmody, and Proshan (and Barton and Sternfels by authorizing Garcia). Barton, Sternfels, Garcia, and Goldstrom each aided and abetted the foregoing violations of 18 U.S.C. § 1512(b) in *Alpha Natural Resources* and *SunEdison* by authorizing Proshan and Carmody (and Barton and Sternfels by authorizing Garcia and Goldstrom) to file documents which Barton, Sternfels, Garcia, and Goldstrom each knew to be false and misleading and intended to obstruct the administration of justice by the bankruptcy courts and to impede the U.S. Trustee in the execution of its duties, and by authorizing Proshan and Carmody (and Barton and Sternfels by authorizing Garcia and Goldstrom) to influence or impede testimony by Mark Hojnacki in *SunEdison*.

*v.  Obstruction of Justice in Violation of 18 U.S.C. § 1512(c).*

1411.   Further, through their above-described conduct in *Alpha Natural Resources*, each of the *ANR* Obstruction Defendants violated 18 U.S.C. § 1512(c) by corruptly obstructing, influencing, and/or impeding the *Alpha Natural Resources* bankruptcy, and/or by attempting to do so; and Barton, Sternfels, Garcia, and Goldstrom each aided and abetted those violations.

1412.   Barton, Sternfels, Garcia, and Goldstrom each aided and abetted the foregoing violations of 18 U.S.C. § 1512(c) by authorizing Carmody and Proshan (and Barton and Sternfels by authorizing Garcia and Goldstrom) to file documents which Barton, Sternfels, Garcia, and Goldstrom each knew to be false and misleading and intended to obstruct, influence, or impede the *Alpha Natural Resources* bankruptcy.

*vi.  Unlawful Offers of Remuneration, Compensation, Reward, or Advantage in Violation of 18 U.S.C. § 152(6) and Felony Commercial Bribery under State Law.*

441

1413.  As part of the hub-and-spoke arrangement, McKinsey & Co., McKinsey Holdings, and McKinsey US offered to one or more major bankruptcy attorneys located in the United States, including Martin Bienenstock, [first name] Kilpatrick, and Luc Despins, among others, an arrangement under which McKinsey would introduce its clients to such attorneys on an exclusive basis in exchange for the attorneys exclusively recommending McKinsey RTS to the attorneys' bankruptcy debtor clients for bankruptcy consulting services.

1414.  McKinsey & Co., McKinsey Holdings, and McKinsey US made such offers knowing and intending that: neither they nor the recipient attorney(s) would disclose the arrangement to their mutual debtor-client or the bankruptcy court (via a Rule 2014(a) disclosure or otherwise); through such nondisclosure, McKinsey RTS would avoid disqualification as an advisor to the debtor(s); and such actions would operate as a fraud against the federal bankruptcy court system which would have denied such proposed retentions in the absence of the unlawful referral agreements between McKinsey & Co., McKinsey Holdings, and McKinsey US and the bankruptcy attorneys.

1415.  With respect to each such offer, McKinsey & Co., McKinsey Holdings, and McKinsey US knowingly and fraudulently gave, offered, or attempted to obtain money or property, remuneration, compensation, reward, advantage, or promise thereof (in the form of valuable exclusive referrals to high-level executives from McKinsey's coveted stable of corporate clients) for acting or forbearing to act in any case under the Bankruptcy Code, within the meaning of 18 U.S.C. § 152(6).

1416.  Additionally, the foregoing conduct constituted felony commercial bribery under the laws of Texas, New York, and Illinois:

a.  Texas Penal Code § 32.43(b) provides that "a person who is a fiduciary
commits an offense if, without the consent of his beneficiary, he intentionally
or knowingly solicits, accepts, or agrees to accept any benefit from another
person on agreement or understanding that the benefit will influence the
conduct of the fiduciary in relation to the affairs of his beneficiary." Pursuant
to Texas Penal Code § 32.43(d), a violation of § 32.43(b) is a felony offense.

b.  New York Penal Law § 180.03 provides: "A person is guilty of commercial
bribing in the first degree when he confers, or offers or agrees to confer, any
benefit upon any employee, agent or fiduciary without the consent of the
latter's principal's affairs, and when the value of the benefit conferred or
offered or agreed to be conferred exceeds one thousand dollars and causes
economic harm to the employer or principal in an amount exceeding two
hundred fifty dollars." A violation of § 180.03 is a felony offense.

c.  Illinois Criminal Code § 720 ILCS 5/29A-1 provides: "A person commits
commercial bribery when he confers, or offers or agrees to confer, any benefit
upon any employee, agent or fiduciary without the consent of the latter's
employer or principal, with intent to influence his conduct in relation to his
employer's or principal's affairs." Pursuant to Illinois Criminal Code § 720
ILCS § 5/29A-3, a violation of § 5/29A-1 is a felony offense if the value
conferred equals or exceeds $500,000.

1417.  The value offered by McKinsey & Co., McKinsey Holdings, and McKinsey US to
the bankruptcy attorneys that they sought to recruit for their "pay-to-play" scheme exceeded

$500,000, given the magnitude of fees that bankruptcy attorneys could expect from an engagement by one or more of McKinsey's Fortune 500-class clientele.

1418.   By making an offer of such a benefit to a fiduciary (a bankruptcy attorney) with the agreement or understanding that the benefit would influence the fiduciary's conduct in the affairs of the fiduciary's beneficiary (the bankruptcy attorney's debtor-client) and without the consent of the bankruptcy debtor-client in *GenOn* (venued in Texas); *SunEdison*, *NII Holdings*, and *AMR* (venued in New York); and *Edison Mission* (venued in Illinois), McKinsey & Co., McKinsey Holdings, and McKinsey US violated the aforementioned bribery statutes.

1419.   The particular details of the violations of 18 U.S.C. § 152(6) and state commercial bribery statutes by McKinsey & Co., McKinsey Holdings, and McKinsey US, including the specific details of such offers and the identities of the bankruptcy attorneys, are peculiarly within these Defendants' knowledge and will be proven at trial following discovery. At a minimum, Barton admitted to Alix at their October 16, 2014 meeting that McKinsey had, in fact, made one or more such "pay-to-play" offers.

*vii.   Money Laundering in Violation of 18 U.S.C. § 1957.*

1420.   As described below, McKinsey & Co., McKinsey Holdings, McKinsey US, Barton, Sternfels, Garcia, and Goldstrom each committed and aided and abetted acts of money laundering in violation of 18 U.S.C. § 1957 in connection with all nine of McKinsey RTS's bankruptcies beginning with Harry & David; Carmody and Proshan each committed and aided and abetted acts of money laundering in violation of 18 U.S.C. § 1957 in connection with McKinsey RTS's eight bankruptcies beginning with *AMR*; and Yerian committed and aided and abetted acts of money laundering in violation of 18 U.S.C. § 1957 in connection with the *Edison Mission* bankruptcy.

1421.   McKinsey RTS received tens of millions of dollars in fees for its bankruptcy consulting engagements. A substantial portion of those monies were remitted directly or indirectly to McKinsey RTS's parent, McKinsey US, to McKinsey Holdings and McKinsey & Co., and to one or more of the individual Count 1 Defendants, in amounts exceeding $10,000. The Count 1 Defendants' receipt of fees from McKinsey RTS's bankruptcy engagements described above and their subsequent deposit or other financial transfers of such monies constituted violations of 18 U.S.C. § 1957(a) in that the Count 1 Defendants each knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity within the meaning of 18 U.S.C. § 1957(f)(3) and 18 U.S.C. § 1956(c)(7). Such specified unlawful activity includes, without limitation, the violations of 18 U.S.C. §§ 152, 1341, and 1343 set forth above. The specific chains of monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

1422.   Additionally, the Count 1 Defendants' participation in "re-invoiced" and "round trip" payments from non-debtor affiliates of *SunEdison* constituted separate violations of 18 U.S.C. § 1957(a). The Count 1 Defendants' falsification of invoices issued to *SunEdison* constituted the knowing and fraudulent concealment, falsification, or false entry in recorded information relating to the property or financial affairs of SunEdison in contemplation of SunEdison's pending bankruptcy proceeding, in violation of 18 U.S.C. §152(8). The specific chains of monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial. Alternately, the Count 1 Defendants (and specifically, McKinsey & Co., McKinsey Holdings, McKinsey US, Garcia, Proshan, Sternfels, and Goldstrom) caused the submission of the June 6, 2016 and June 14, 2016 Hojnacki Rule

2014(a) declarations identified above in the *SunEdison* case, which declarations fraudulently mischaracterized McKinsey RTS's services and billing. These submissions violated 18 U.S.C. § 152(3) and 18 U.S.C. §§ 1341 and/or 1343, as shown above.

1423.   The Count 1 Defendants' violations of 18 U.S.C. §§ 152(3), 152(8), 1341, and/or 1343 constituted specified unlawful activity within the meaning of 18 U.S.C. §§ 1956(c)(7) and 1957(f)(3).

1424.   The Count 1 Defendants' receipt of the proceeds of these specified unlawful activities, totaling $3,563,167.78, and their subsequent deposit or other financial transfers of such proceeds violated 18 U.S.C. § 1957(a) in that the Count 1 Defendants each knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity within the meaning of 18 U.S.C. §§ 1956(c)(7) and 1957(f)(3). The specific details of the monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

d. **Scienter**

1425.   The Count 1 Defendants had the motive to commit the aforementioned violations of 18 U.S.C. §§ 152(2), 152(3), 152(6), 1503(a), 1512(b), 1512(c), and 2314 and acts of mail and wire fraud, as demonstrated by, inter alia the following facts:

a. McKinsey & Co., McKinsey Holdings, and McKinsey US, together with each of the individual Count 1 Defendants, stood to earn tens of millions of dollars in consulting fees in bankruptcy cases as a result of the Count Defendants' unlawful scheme. Bankruptcy consulting was and is a domain which, unlike McKinsey's general business consulting practices, requires complete disclosure of client identities and all other connections. McKinsey and the other Count 1 Defendants

446

would have been debarred from this domain had McKinsey's disqualifying conflicts been disclosed fully and honestly.

**b.** Bankruptcy consulting was one of the few areas of the business consulting domain in which McKinsey was a non-player, and its actions as detailed herein demonstrate the Count 1 Defendants' motivation for McKinsey to break into this new market and gain market dominance by any means necessary.

**c.** By adding bankruptcy consulting services to its roster of offerings, McKinsey obtained a firmer grip on its existing clients because they would not have to look elsewhere in the event of a bankruptcy. And by retaining such clients, McKinsey also obtained additional post-bankruptcy work from them. Accordingly, bankruptcy consulting services created a virtuous cycle for McKinsey and the other Count 1 Defendants.

**d.** McKinsey & Co., McKinsey Holdings, McKinsey US, and the individual Count 1 Defendants decided to continue with their pattern of unlawful conduct through McKinsey RTS even after Barton expressly acknowledged to Alix the unlawful nature of the conduct and falsely promised to desist and dissolve McKinsey RTS. This decision to proceed with known unlawful conduct in the face of good faith admonition by a well-known industry expert and peer suggests that McKinsey & Co., Barton, and the other Count 1 Defendants were powerfully motivated to break the law.

e. Barton's attempts to lull Alix and AP into forgoing corrective litigation permitted the Count 1 Defendants to continue their lucrative but unlawful scheme uninterrupted for at least another year.

447

1426.   Each of the Count 1 Defendants had the opportunity to commit the aforementioned violations of 18 U.S.C. §§ 152(2), 152(3), 152(6), 1503(a), 1512(b), 1512(c), and 2314 and acts of mail and wire fraud, as demonstrated by the fact that McKinsey's extreme and unjustified protection of client identities makes it exceedingly difficult for outsiders to identify disqualifying connections without full and honest disclosure by McKinsey and its employees and officers, including each of the Count 1 Defendants. And because of the fiduciary nature of McKinsey's advisory relationships, its clients were dependent on McKinsey's honesty.

1427.   Each of the Count 1 Defendants also had the opportunity to effectuate other components of the fraudulent scheme. Concerning the "pay-to-play" arrangement, the prospect of access to McKinsey & Co.'s unparalleled portfolio of clientele would have been almost irresistible to bankruptcy attorneys, while McKinsey would have gained an easy way to "jump start" its bankruptcy consulting practice in a way nearly undetectable by competitors or the authorities. And lulling Alix Partners into inaction by deceiving Alix concerning his efforts to dissuade McKinsey from unlawful conduct also afforded valuable breathing space to Defendants, given the accelerated growth of McKinsey RTS's bankruptcy practice in the last several years.

1428.   In addition, the circumstances surrounding the aforementioned violations of 18 U.S.C. §§ §§ 152(2), 152(3), 152(6), 1503(a), 1512(b), 1512(c), and 2314 and acts of mail and wire fraud demonstrate conscious misbehavior and knowledge by each of the Count 1 Defendants that they were engaging in a scheme to defraud AP as demonstrated by, inter alia the following facts:

>   a. McKinsey RTS, which is part of a global enterprise with a vast array of large, diversified companies as clients and an expansive network of McKinsey "alumni" connections, and which thus has a concomitantly large set of connections

448

requiring disclosure, nonetheless repeatedly filed grossly inadequate Rule 2014(a)

disclosures in comparison with its competitors;

b. McKinsey RTS's conflict-checking processes, as described in its Rule 2014(a)

submissions, are conspicuously amateurish and deficient in comparison with other

large, sophisticated professional institutions that submitted Rule 2014(a)

disclosures in the bankruptcy proceedings enumerated supra. The rudimentary

nature of these procedures, which is irreconcilable with McKinsey's claims to be

a global information management leader, indicates that the system represented a

deliberate attempt to conceal relevant connections by limiting internal inquiries in

a manner ensuring that relevant connections would be missed. At a minimum,

each of the Count 1 Defendants acted with willful blindness to disqualifying

conflicts.

c. The repeated failure of McKinsey RTS to meet its disclosure obligations over

the course of several years and nine different bankruptcies, and the combined

failure of McKinsey US and McKinsey RTS to meet their disclosure obligations

over the course of more than sixteen years and thirteen different bankruptcies,

despite external and internal access to the most sophisticated legal advice

available, demonstrates that this failure to disclose was systemic and intentional

rather than the result of sporadic lapses in judgment or execution.

d. By the time of McKinsey RTS's participation in the *NII Holdings* bankruptcy

in October 2014, McKinsey was on explicit notice at the highest executive

level—Barton—that McKinsey RTS's disclosure practices were unlawful and

afforded it an unfair and illegal competitive advantage over AP. Barton repeatedly

449

admitted to Alix that the disclosure practices of McKinsey US and McKinsey RTS and McKinsey's "pay-to-play" offers to bankruptcy attorneys were unlawful, and even promised to shutter McKinsey RTS and abandon bankruptcy consulting during his tenure. Sternfels also participated in these exchanges. That each of the Count 1 Defendants continued their unlawful conduct unabated demonstrates not only that their unlawful behavior was willful but also that their earlier unlawful conduct prior to Alix's conversations with Barton and Sternfels was not inadvertent or the result of mere sloppiness.

e. Barton's unusual offer to broker client introductions to AP, a proffered bribe intended to cause Alix and Alix Partners to remain silent, shows that the Count 1 Defendants knew they were engaging in illegal conduct and were determined to go to unusual lengths to silence a complainant.

f. Garcia, Goldstrom, and Proshan have legal training and/or have practiced law and, therefore, are highly sophisticated actors. Accordingly, they knew that McKinsey RTS's bankruptcy disclosures (and McKinsey RTS's and McKinsey US's bankruptcy disclosures in *AMR*) did not comply with the obligations imposed by law and that by failing to disclose relevant connections McKinsey RTS would avoid disqualification, to the prejudice of competitors such as Alix Partners.

g. Carmody had previously been employed by Alix Partners and had signed Rule 2014(a) declarations on Alix Partners' behalf that were far more robust than those he signed on behalf of McKinsey RTS. Carmody also worked closely with attorney Proshan in preparing his Rule 2014(a) declarations and in deciding which

450

of McKinsey's connections to disclose. Accordingly, Carmody knew the palpably deficient nature of McKinsey RTS's false and misleading disclosure statements.

h. Yerian had previously been employed by Alix Partners, had participated in the preparation of Rule 2014(a) declarations on Alix Partners' behalf that were far more robust than those he signed on behalf of McKinsey RTS, and was familiar with the disclosure and compliance obligations imposed on bankruptcy professionals. Accordingly, Yerian was fully aware of the deficient nature of McKinsey RTS's false and misleading disclosure statements.

1429. Each Count 1 Defendant committed and aided and abetted the foregoing predicate violations of 18 U.S.C. §§ 152(2), 152(3), 152(6), 1341, 1343, 1503(a), 1512(b), 1512(c), and 2314 with the specific intent to commit rapacious fraud against the bankruptcy court system and collected ill-gotten gains in the form of fees therefrom.

e. **Vicarious Liability**

1430. Each of the predicate acts by Barton, Sternfels, Garcia, Carmody, Goldstrom, Proshan, and Yerian were committed within the scope of their employment, officership, or directorship positions at, or agency relationship with, McKinsey & Co. Each of these individuals was a high-level member of McKinsey & Co.'s management, and each committed and aided and abetted the commission of predicate acts as described above. The predicate acts were each committed in furtherance of a scheme intended to and which did in fact benefit McKinsey & Co. and its subsidiaries by obtaining fees for bankruptcy engagements from which it was, in truth, disqualified. Accordingly, McKinsey & Co. is vicariously liable for the RICO violations of the individual defendants herein.

451

1431.   McKinsey & Co. orchestrated the Count 1 Defendants' unlawful scheme through its subsidiaries, McKinsey Holdings and McKinsey US, which in turn orchestrated the scheme through McKinsey RTS. Accordingly, McKinsey Holdings and McKinsey US are vicariously liable for RICO violations by their subsidiary, McKinsey RTS.

### f.   **Causation and Damages**

1432.   As a direct and proximate result of foregoing violations of 18 U.S.C. § 1962(c) by the Count 1 Defendants, the Plaintiff suffered an immediate and direct injury from the Count 1 Defendants' racketeering activity. Specifically, the Count 1 Defendants engaged in obstruction of justice and witness tampering by removing the Plaintiff – an officer of the court while in the discharge of his duties –  from his employment position, engaging in a program of defamation, and harassing the Plaintiff to such an extent he was forced to flee the State of New York.  As a consequence, he suffered significant loss of property related to his income, earning capacity and business reputation.  Had the Count 1 Defendants not implemented their scheme, forming McKinsey RTS to unlawfully obtain restructuring assignments in violation of Rule 2014 and perpetrating related predicate acts, the Plaintiff would remain gainfully employed with his earning capacity and business reputation intact.

1433.   It was a foreseeable, natural, direct, and intended consequence of the Count 1 Defendants' scheme that conspirators would need to engage in coverup and, in some cases, retaliate against employees who might expose the Count I conspiracy, such as the Plaintiff.

1434.   Therefore, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), the Plaintiff is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

## VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)

### Against Defendants Barton, Sternfels, Proshan, Garcia, Carmody, Goldstrom, and Yerian

1435.   The Plaintiff repeats and realleges paragraphs 1 through 1411 as if fully set forth herein.

1436.   This cause of action is asserted against Barton, Sternfels, Proshan, Garcia, Carmody, Goldstrom, and Yerian (collectively, the "Count 2 Defendants"), and is asserted in addition to and in the alternative to the all other causes of action.

1437.   At all relevant times, the Plaintiff was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

1438.   390. At all relevant times, each of the Count 2 Defendants was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

### a.   The Count 2 RICO Enterprise and Its Effect on Interstate Commerce

1439.   From December 27, 2001 (said date being approximate and inclusive) and continuing to the present, McKinsey & Co., McKinsey Holdings, McKinsey US, and (beginning in or about 2010) McKinsey RTS collectively have constituted an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) or, alternatively, an association-in-fact enterprise within the meaning of those provisions (the "Count 2 Enterprise").

1440.   The Count 2 Enterprise is structured through the formal corporate ownership relationships among McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS. At all relevant times, each of the Count 2 Defendants was, and is, a person that exists separate and distinct from the Count 2 Enterprise.

1441.   Beginning in or around 2001, the Count 2 Enterprise participated in the following bankruptcy proceedings, involving bankruptcy debtors with assets, liabilities, revenues, employee totals, and states of operations as indicated in the chart below:

| Matter | Assets (Millions) | Liabilities (Millions) | Revenue (Millions) | Employees | No. of Affected States |
|---|---|---|---|---|---|
| Hayes Lemmerz | $1,096 | $1,389 | $2,296 | 67,400 | 7 states[691] *(Plus state of filing:* Delaware) |
| UAL | $25,197 | $22,164 | $19,352 | 84,000 | 8 states and the District of Columbia[692] |
| Mirant | $19,415 | $21,440 | $6,436 | 7,000 | 8 states[693] *(Plus state of filing:* Texas) |
| Lyondell Chemical | $27,392 | $35,900 | $28,603 | 7,340 | 8 states[694] *(Plus state of filing:* New York) |
| Harry & David | $243 | $1,050 | $427 | 1,026 | 22 states[695] |
| AMR Corp. | $25,088 | $103,000 | $22,170 | 78,250 | 6 states and Puerto Rico[696] |
| AMF Bowling | $100,000 | $279,000 | $387,000 | 7,000 | 34 states[697] |
| Edison Mission | $8,323 | $12,304 | $9,321 | 1,783 | 12 states[698] |

[691] California, Georgia, Indiana, Kentucky, Michigan (debtors' headquarters), Ohio, and Texas.
[692] California, Colorado, Delaware, Hawaii, Illinois (debtor's headquarters and state of filing), New Jersey, Texas, Washington, and the District of Columbia.
[693] California, Georgia (debtors' headquarters) Maine, Maryland, Massachusetts, Michigan, New York, and Virginia.
[694] Illinois, Iowa, Louisiana, Michigan, New Jersey, Ohio, Tennessee, and Texas (debtors' headquarters).
[695] Alabama, California, Colorado, Delaware *(state of filing)*, Florida, Iowa, Illinois, Indiana, Massachusetts, Maryland, Michigan, Minnesota, Missouri, New Jersey, New York, Ohio *(debtors' headquarters and main distribution center)* Oregon *(debtors' headquarters)*, Pennsylvania, South Carolina, Tennessee, Virginia, and Wisconsin *(stores)*.
[696] Debtor's primary operations in New York (state of filing), California, Illinois, Florida, Missouri, Texas (debtor's headquarters), and Puerto Rico.
[697] Alabama, Arizona, California, Colorado, Connecticut, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Louisiana, Maryland, Massachusetts, Michigan, Minnesota, Missouri, Montana, Nebraska, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia (debtors' headquarters and state of filing), Washington, and Wisconsin.
[698] Debtors' headquarters in Illinois (state of filing) and California, and operations in 12 states total according to Plan Sponsor Agreement.

| | | | | |
|---|---|---|---|---|
| *NII Holdings* | $2,887 | $4,593 | $4,773 | 3,870 | One state: Virginia *(debtor's headquarters) (Plus state of filing:* New York) |
| *Standard Register* | $481 | $592 | $720 | 3,700 | 50 states[699] |
| *Alpha Natural Resources* | $10,736 | $9,834 | $4,955 | 8,900 | 6 states[700] |
| *SunEdison* | $11,500 | $16,100 | $2,484 | 7,260 | 20 states[701] |
| *GenOn* | $2,435 | $2,131 | $1,862 | 1,581 | 10 states[702] |
| **TOTAL** | **$134,893** | **$230,777** | **$103,784** | **279,110** | **All 50 states, plus the District of Columbia and Puerto Rico** |

1442.   Additionally, undisclosed connections and conflicts of interests disqualifying the Count 2 Enterprise and its constituent entities from serving the various debtor-clients typically arose from these entities' relationships with business entities located in states or nations other than those in which the debtor-clients operated.

1443.   Accordingly, at all relevant times, the Count 2 Enterprise was engaged in, and its activities affected, interstate and foreign commerce.

1444.   At all relevant times, the conduct of the Count 2 Defendants and their co-conspirators has taken place in and affected the interstate commerce of the United States.

---

[699] Debtors had operations in all 50 states according to plan documents, including Ohio (debtors' headquarters) and Delaware (place of filing).
[700] Kentucky, Pennsylvania, Tennessee, Virginia *(place of filing)*, West Virginia *(debtors' headquarters)*, and Wyoming.
[701] Arizona, California (debtors' operational and solar business headquarters), Hawaii, Idaho, Illinois, Maine, Maryland, Massachusetts, Minnesota, Missouri (debtors' corporate headquarters), Nebraska, Nevada, New York (place of filing), North Carolina, Ohio, Oregon, Texas, Utah, Vermont, and Washington.
[702] California, Florida, Maryland, Massachusetts, Mississippi, New Jersey (debtors' headquarters), New York, Ohio, Pennsylvania, and Texas (place of filing and headquarters of parent company, NRG Energy, Inc.).

1445.   The conduct of the Count 2 Defendants has directly, substantially, and foreseeably restrained such interstate trade and commerce.

### b.  **Pattern of Racketeering Activity**

1446.   Between at least 2010 and the present, the Count 2 Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5) and consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D) described in Count 1, paragraphs 308-17 (bankruptcy fraud), 319-30 (mail and wire fraud), 331-58 (obstruction of justice and witness tampering), 366-68 (inducement to interstate or foreign travel), and 369-73 (money laundering), and other predicate acts to be identified after further investigation and discovery herein.

1447.   Each of the Count 2 Defendants engaged in and aided and abetted two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Count 2 Defendants played the same roles in the scheme and pattern of racketeering activity as set forth in the First Cause of Action *above*. The predicate acts of racketeering activity were related in that they were committed for the purpose of (1) concealing or obfuscating McKinsey's disqualifying conflicts of interest in order to enable McKinsey US and McKinsey RTS to obtain bankruptcy consulting assignments that they would not have received had the Count 2 Defendants behaved lawfully, and by attempting to obtain such engagements by offering unlawful "pay-to-play" arrangements to bankruptcy attorneys, advisory firms, and financial institutions; (2) procuring illicit profits from the sale of securities after providing preferential treatment to claims held by McKinsey, through MIO, or co-conspirators; and (3) procuring illicit profits by engaging in the price-fixing of professional fees by agreement.

These acts, and others to be identified after further investigation and discovery herein, shared a common or related purpose, goal, result, participants, victim, and method of commission.

1448.   Through such patterns of racketeering activity, each of the Count 2 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 2 Enterprise in violation of 18 U.S.C. § 1962(c).

### c.   **RICO Predicate Acts**

1449.   Barton committed and aided and abetted the predicate acts described below and in Count 1, paragraphs 308-310 and 316 (bankruptcy fraud), 319-330 (mail and wire fraud), 331-358 (obstruction of justice and witness tampering), 366-368 (inducement to interstate or foreign travel), 369-373 (money laundering) in his capacity as Managing Partner of McKinsey & Co., and within the scope of his employment by or agency for McKinsey & Co.

1450.   Garcia committed and aided and abetted the predicate acts described below and in Count 1, paragraphs 308-311 (bankruptcy fraud), 319-325 and 327-330 (mail and wire fraud), 331-358 (obstruction of justice and witness tampering), and 369-373 (money laundering) in his capacity as President of McKinsey RTS, a Senior Partner of McKinsey & Co., and (from 2006 to 2017) a board member of MIO, and within the scope of his employment by or agency for those entities.

1451.   403. Proshan committed and aided and abetted the predicate acts described below and in Count 1, paragraphs 308-10 and 312 (bankruptcy fraud), 319-325 and 327-330 (mail and wire fraud), 331-358 (obstruction of justice and witness tampering), and 369-373 (money laundering) in her capacity as a Senior Vice President and Associate General Counsel to McKinsey & Co. with primary responsibility for the provision of legal services to McKinsey RTS, and within the scope of her employment by or agency for those entities.

1452.   Carmody committed and aided and abetted the predicate acts described below and in Count 1, paragraphs 308-310 and 313 (bankruptcy fraud), 319-325 and 327-330 (mail and wire fraud), 331-358 (obstruction of justice and witness tampering), and 369-373 (money laundering) in his capacity as a Senior Partner and executive of McKinsey & Co. and executive of McKinsey RTS, and within the scope of his employment by or agency for those entities.

1453.   Goldstrom committed and aided and abetted the predicate acts described below and in Count 1, paragraphs 308-310 and 314 (bankruptcy fraud), 319-325 and 327-330 (mail and wire fraud), 331-358 (obstruction of justice and witness tampering), and 369-373 (money laundering) in his capacity as a Senior Partner and executive of McKinsey & Co. and executive and board member of McKinsey RTS, and within the scope of his employment by or agency for those entities.

1454.   Sternfels committed and aided and abetted the predicate acts described below and in Count 1, paragraphs 308-310 and 315 (bankruptcy fraud), 319-330 (mail and wire fraud), 331-358 (obstruction of justice and witness tampering), 366-68 (inducement to interstate or foreign travel), 369-373 (money laundering) in his capacity as a Senior Partner of McKinsey & Co., and within the scope of his employment by or agency for McKinsey & Co.

1455.   Yerian committed and aided and abetted the predicate acts described in Count 1, paragraphs 308-310 and 317 (bankruptcy fraud), 319-325 and 327-330 (mail and wire fraud), 350(d) (obstruction of justice), and 369-373 (money laundering) in his capacity as a Partner of McKinsey & Co. and Practice Leader at McKinsey RTS, and within the scope of his employment by or agency for those entities.

      i.   *False Declarations, Certifications, Verifications or Statements under Penalty of Perjury in Violation of 18 U.S.C. §§ 152(2) and 152(3).*

1456.   The Count 2 Defendants' violations of 18 U.S.C. §§ 152(2) and 152(3) and aiding and abetting of same are set forth in Count 1, supra, in paragraphs [X-Y].

1457.   As set forth in Count 1, supra, in paragraphs [X-Y] and [Z], Barton and Garcia each aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly authorizing and facilitating the filing of false and misleading disclosure declarations to be filed on behalf of McKinsey RTS in the *Harry & David, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the *AMR* bankruptcy.

1458.   As set forth in Count 1, supra, in paragraphs 308-310 and 312, Proshan committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly causing false and misleading disclosure declarations to be filed on behalf of McKinsey RTS in the *AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the *AMR* bankruptcy.

1459.   411. As set forth in Count 1, paragraphs 308-310 and 314, Goldstrom committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly causing false and misleading disclosure declarations to be filed on behalf of McKinsey RTS in the *Harry & David, AMF Bowling*, and *SunEdison* bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the *AMR* bankruptcy; and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly authorizing and facilitating false and misleading disclosure declarations filed on

behalf of McKinsey RTS in the *Edison Mission, NII Holdings, Standard Register*, and *Alpha Natural Resources* bankruptcies.

1460.   As set forth in Count 1, paragraphs 308-310 and 315, Sternfels committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly causing false and misleading disclosure declarations to be filed on behalf of McKinsey RTS in the *SunEdison* bankruptcy; and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly authorizing and facilitating false and misleading disclosure declarations filed on behalf of McKinsey RTS in the *Harry & David, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources*, and *GenOn* bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the *AMR* bankruptcy.

1461.   As set forth in Count 1, paragraphs 308-310 and 313, Carmody committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly authorizing and causing false and misleading disclosure declarations to be filed on behalf of McKinsey RTS in the A*MF Bowling, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the *AMR* bankruptcy; and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly authorizing and facilitating false and misleading disclosure declarations filed on behalf of McKinsey RTS in the *Edison Mission* bankruptcy.

1462.   As set forth in Count, 1 paragraphs 308-310 and 317, Yerian committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in connection with the *Edison Mission* bankruptcy.

460

ii. _Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343._

1463. The scheme or artifice to commit rapacious fraud against the bankruptcy court system and the predicate acts of mail and wire fraud committed and aided and abetted by the Count 2 Defendants are set forth in Count 1, paragraphs 319-330.

1464. Specifically, as set forth in Count 1, paragraphs 319-325 and 327-330, Barton, Sternfels, Garcia, and Goldstrom each committed and aided and abetted acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the false and misleading disclosure declarations filed on behalf of McKinsey RTS in the _Harry & David, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison_, and _GenOn_ bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the _AMR_ bankruptcy.

1465. As set forth in Count 1, in paragraphs 319-325 and 327-330, Proshan and Carmody each committed and aided and abetted acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the false and misleading disclosure declarations filed on behalf of McKinsey RTS in the _AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison_, and _GenOn_ bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the _AMR_ bankruptcy.

1466. As set forth in Count 1, paragraphs 319-325 and 327-330, Yerian committed and aided and abetted acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the _Edison Mission_ bankruptcy.

1467. As set forth in Count 1, paragraph 326, beginning in or around September 2014 and continuing through 2015, Barton and Sternfels further committed and aided and abetted acts

of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with their

efforts to mislead Alix and prevent him from taking action to remediate McKinsey's unlawful

bankruptcy consulting practices.

1468.   Upon information and belief, one or more of the Count 2 Defendants also used the

interstate wires, United States mail, or private interstate commercial carrier to convey to one or

more bankruptcy attorneys located in the United States offers of unlawful exclusive referral

agreements. Upon information and belief, one or more of the Count 2 Defendants also used or

caused the use of the interstate wires, United States mail, or private interstate commercial carrier

to transfer illegally obtained funds within the United States for the purpose of furthering the

objectives of the Count 2 Enterprise. These transfers include the movement of funds in

connection with McKinsey's "re-invoiced" and "round-trip" payments from *SunEdison* and its

affiliates in or about September 2015 through April 2016, as well as the transmission of fees

from various bankruptcy debtor-clients to McKinsey RTS throughout the course of the scheme

since 2010. Each of the Count 2 Defendants committed numerous additional and similar acts of

mail or wire fraud in furtherance of their scheme or artifice. Evidence of such transactions and

others is peculiarly within Defendants' knowledge and control and will be proven at trial

following discovery.

### iii.   *Obstruction of Justice in Violation of 18 U.S.C. § 1503(a).*

1469.   The Count 2 Defendants' violations of 18 U.S.C. § 1503(a) and aiding and

abetting of the same are set forth in Count 1, paragraphs 331-351.

1470.   Specifically, as set forth in Count 1, paragraphs 331-351, Goldstrom committed

and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the

*Harry & David, AMR, AMF Bowling*, and *SunEdison* cases, including by knowingly swearing to

false and misleading disclosure declarations on behalf of McKinsey RTS in *Harry David* and on

behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in *AMR*; and aided and

abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *Edison Mission, NII*

*Holdings, Standard Register, Alpha Natural Resources*, and *GenOn* cases.

1471.   As set forth in Count 1, paragraphs 331-351, Carmody committed and aided and

abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *AMR, AMF*

*Bowling, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn*

cases, including by knowingly swearing to false and misleading disclosure declarations in the

*AMF Bowling, NII Holdings, Standard Register, Alpha Natural Resources*, and *GenOn* cases,

and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *Edison*

*Mission* bankruptcy.

1472.   As set forth in Count 1, paragraphs 331-351, Proshan committed and aided and

abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *AMR, AMF*

*Bowling, Edison Mission, Standard Register, NII Holdings, Alpha Natural Resources*,

*SunEdison*, and *GenOn* cases.

1473.   As set forth in Count 1, paragraph 350(d), Yerian committed and aided and

abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *Edison Mission*

bankruptcy, including by knowingly swearing to false and misleading declarations in that case.

1474.   As set forth in Count 1, paragraphs 331-351, Sternfels committed and aided and

abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *SunEdison* bankruptcy

and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *Harry &*

463

*David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources*, and *GenOn* cases.

1475.   As set forth in Count 1, paragraphs 331-351, Barton and Garcia each aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn* cases.

### iv.  *Witness Tampering in Violation of 18 U.S.C. § 1512(b).*

1476.   The Count 2 Defendants' violations of 18 U.S.C. § 1512(b) and aiding and abetting of the same are set forth, supra, in Count 1 in paragraphs 352-356.

1477.   Specifically, as set forth in Count 1, paragraphs 352-356, Proshan committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *SunEdison* and *Alpha Natural Resources* bankruptcies.

1478.   As set forth in Count 1, paragraphs 352-356, Carmody committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* bankruptcy and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *SunEdison* bankruptcy.

1479.   As set forth in Count 1, paragraphs 352-356, Sternfels committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *SunEdison* bankruptcy, and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* bankruptcy.

1480.   As set forth in Count 1, paragraphs 352-356, Barton, Garcia, and Goldstrom each aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *SunEdison* and *Alpha Natural Resources* bankruptcies.

**v.   *Obstruction of Justice in Violation of 18 U.S.C. § 1512(c).***

1481.   The Count 2 Defendants' violations of 18 U.S.C. § 1512(c) and aiding and abetting of the same are set forth in Count 1, paragraphs 357-358.

1482.   Specifically, as set forth in Count 1, paragraphs 357-358, Proshan and Carmody each committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c) in the *Alpha Natural Resources* bankruptcy.

1483.   435. As set forth in Count 1, paragraphs 357-358, Barton, Sternfels, Garcia, and Goldstrom each aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c) in the *Alpha Natural Resources* bankruptcy.

**vi.   *Money Laundering in Violation of 18 U.S.C. § 1957.***

1484.   McKinsey US and McKinsey RTS received tens of millions of dollars in fees for their bankruptcy consulting engagements. A substantial portion of those monies were remitted directly or indirectly to each of the individual Count 2 Defendants in amounts exceeding $10,000. These receipts of fees from McKinsey RTS's and McKinsey US's bankruptcy engagements described above and the subsequent deposit or other financial transfers of such monies constituted violations of 18 U.S.C. § 1957(a) in that the Count 2 Defendants each knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity within the meaning of 18 U.S.C. § 1957(f)(3) and 18 U.S.C. § 1956(c)(7) by virtue of their commission of, provision of assistance in the commission of, involvement in a conspiracy the object of which was the commission of, and

465

actual knowledge of the commission of, the specified unlawful activity through which such

proceeds were created; to wit, the Count 2 Defendants' unlawful scheme to fraudulently obtain

Chapter 11 bankruptcy assignments for McKinsey US and McKinsey RTS.

1485.   The Count 2 Defendants' violations of, *inter alia*, 18 U.S.C. §§152(3), 1341, and

1343 constituted specified unlawful activity within the meaning of 18 U.S.C. §§ 1956(c)(7) and

1957(f)(3).

1486.   The specific chains of monetary transactions are within Defendants' exclusive

knowledge and control and will be identified in discovery and proven at trial.

1487.   Additionally, the participation of the Count 2 Defendants (excluding Yerian) in

"re-invoiced" and "round trip" payments from non-debtor affiliates of *SunEdison* constitute

separate and further violations of 18 U.S.C. § 1957(a). Count 2 Defendants Proshan, Sternfels,

Goldstrom, and Carmody, authorized and aided and abetted by Barton and Garcia, caused the

McKinsey RTS to submit the June 6, 2016 and June 14, 2016 Hojnacki Rule 2014(a)

declarations (identified as items No. 31-32 in Exhibit A hereto) in the *SunEdison* bankruptcy,

which declarations fraudulently mischaracterized McKinsey RTS's services and billing. Each of

those submissions violated 18 U.S.C. §§ 152(3), 1341 and 1343, as shown above. The proceeds

of this particular specified unlawful activity totaling $3,563,167.78 were received by McKinsey

RTS and subsequently remitted directly or indirectly to one or more of the Count 2 Defendants in

the form of salary or other compensation in amounts exceeding $10,000 dollars. The Count 2

Defendants' receipt of those proceeds and their subsequent deposit or other financial transfers of

such proceeds violated 18 U.S.C. § 1957(a) in that the Count 2 Defendants each knew that such

financial transactions involved amounts exceeding $10,000 and that such monies were criminally

derived from specified unlawful activity within the meaning of 18 U.S.C. §§ 1956(c)(7) and

1957(f)(3) by virtue of their commission of, provision of assistance in the commission of, involvement in a conspiracy the object of which was the commission of, and actual knowledge of the commission of, the specified unlawful activity through which such proceeds were created. The specific details of the monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

### d. *Scienter*

1488.   Each of the Count 2 Defendants' scienter is demonstrated by the facts set forth in Count 1, supra, in paragraphs 374-378.

### e. *Vicarious Liability*

1489.   Each of the predicate acts by Barton, Sternfels, Garcia, Carmody, Goldstrom, Proshan, and Yerian were committed within the scope of their employment, officership, or directorship positions at, or agency relationship with, McKinsey & Co., McKinsey Holdings, McKinsey US, and/or McKinsey RTS. Each of these individuals was a high-level member of McKinsey management, and each committed and aided and abetted the commission of predicate acts as described above. The predicate acts were each committed in furtherance of a scheme intended to and which did in fact benefit McKinsey & Co. and its subsidiaries by obtaining fees for bankruptcy engagements from which these entities were disqualified. Accordingly, McKinsey & Co., McKinsey Holdings, McKinsey US, and/or McKinsey RTS are vicariously liable for the RICO violations of Barton, Sternfels, Garcia, Carmody, Goldstrom, Proshan, and Yerian.

### f. *Causation and Damages*

1490.   As a direct and proximate result of foregoing violations of 18 U.S.C. § 1962(c) by the Count 2 Defendants, the Plaintiff suffered an immediate and direct injury from the Count 2

Defendants' racketeering activity. Specifically, the Count 2 Defendants engaged in obstruction of justice and witness tampering by removing the Plaintiff – an officer of the court while in the discharge of his duties – from his employment position, engaging in a program of defamation, and harassing the Plaintiff to such an extent he was forced to flee the State of New York. As a consequence, he suffered significant loss of property related to his income, earning capacity and business reputation. Had the Count 2 Defendants not implemented their scheme, forming McKinsey RTS to unlawfully obtain restructuring assignments in violation of Rule 2014 and perpetrating related predicate acts, the Plaintiff would remain gainfully employed with his earning capacity and business reputation intact.

1491.   It was a foreseeable, natural, direct, and intended consequence of the Count 2 Defendants' scheme that conspirators would need to engage in coverup and, in some cases, retaliate against employees who might expose the Count 2 conspiracy, such as the Plaintiff.

1492.   Therefore, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), the Plaintiff is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

## THIRD CAUSE OF ACTION

## VIOLATIONS OF RICO, 18 U.S.C. § 1962(C)

**Against Defendants McKinsey, McKinsey RTS, MIO Partners,
Barton, Sternfels, Proshan, Garcia, Carmody, Goldstrom, and Yerian**

1493.   The Plaintiff repeats and realleges paragraphs 1 through 1469 as if fully set forth herein.

468

1494.   This cause of action is asserted in addition to and in the alternative to tall other causes of action, at all relevant times, the Plaintiff was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c).

1495.   At all relevant times, each of the Defendants was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

### a.   *The Count 3 Rico Enterprise and Its Effect on Interstate Commerce*

1496.   From December 27, 2001 (said date being approximate and inclusive) and continuing to the present, McKinsey and the bankruptcy consulting clients of McKinsey US and McKinsey RTS identified above have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (the "Count 3 Enterprise").

1497.   The Count 3 Enterprise is structured through (1) the formal corporate ownership relationships among McKinsey & Co., McKinsey Holdings, McKinsey US, and (after its formation in 2010) McKinsey RTS; (2) the terms of the retention agreements between McKinsey US and/or McKinsey RTS, on the one hand, and each bankruptcy consulting client, on the other; and (3) the interrelated management structure resulting from the assignment of McKinsey personnel to management positions in the bankruptcy consulting clients. Although the precise composition of the Count 3 Enterprise changed over time with the inception and termination of particular bankruptcy proceedings and the formation of McKinsey RTS in 2010, the overall character and purpose of the Count 3 Enterprise was consistent. The Count 3 Enterprise served as the "hub" in the Count 5 Enterprise, *i.e.*, the Hub-and-Spoke Enterprise.

1498.   At all relevant times, each of the Count 3 Defendants was, and is, a person that exists separate and distinct from the Count 3 Enterprise.

1499.   The Count 3 Enterprise was engaged in, and its activities affected, interstate and foreign commerce as demonstrated in, *inter alia*, paragraphs 294-295 and 393.

### b.   **Pattern of Racketeering**

1500.   Each of the Count 3 Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) and 18 U.S.C. § 1961(1)(D) described below and in Counts 1-6 and others to be identified after further investigation and discovery herein. Each of the Count 3 Defendants engaged in two or more RICO predicate acts, and each committed at least one such act after the effective date of RICO. The Count 3 Defendants played the same roles in the scheme and pattern of racketeering activity as set forth in the First and Second Causes of Action.

### c.   **RICO Predicate Acts**

1501.   Barton committed and aided and abetted the predicate acts described below and in Counts 1 and 2, in his capacity as Managing Partner of McKinsey & Co. from 2009 to mid-2018, and within the scope of his employment by or agency for McKinsey & Co.

1502.   Garcia committed and aided and abetted the predicate acts described below and in Counts 1 and 2, in his capacity as President of McKinsey RTS, a Senior Partner of McKinsey & Co., and (from 2006 to 2017) a board member of MIO, and within the scope of his employment by or agency for those entities.

1503.   Proshan committed and aided and abetted the predicate acts described below and in Counts 1 and 2, in her capacity as a Senior Vice President of and Associate General Counsel to McKinsey & Co. with primary responsibility for the provision of legal services to McKinsey RTS, and within the scope of her employment by or agency for those entities.

470

1504.   Carmody committed and aided and abetted the predicate acts described below and in Counts 1 and 2, in his capacity as a Senior Partner and executive of McKinsey & Co. and executive of McKinsey RTS, and within the scope of his employment by or agency for those entities.

1505.   Goldstrom committed and aided and abetted the predicate acts described below and in Counts 1 and 2, supra, in his capacity as a Senior Partner and executive of McKinsey & Co. and as an executive and board member of McKinsey RTS, and within the scope of his employment by or agency for those entities.

1506.   Sternfels committed and aided and abetted the predicate acts described below and in Counts 1 and 2, supra, in his capacity as a Senior Partner of McKinsey & Co. and within the scope of his employment by or agency for McKinsey & Co.

1507.   Yerian committed and aided and abetted the predicate acts described below and in Counts 1 and 2, supra, in his capacity as a Partner at McKinsey & Co. and Practice Leader at McKinsey RTS, and within the scope of his employment by or agency for those entities.

   i.   *False Declarations, Certifications, Verifications or Statements under*
        *Penalty of Perjury in Violation of 18 U.S.C. §§ 152(2) and 152(3).*

1508.   McKinsey RTS committed and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) by knowingly authorizing and causing to be filed 31 false and misleading declarations in nine bankruptcies: *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn*. Those specific declarations are identified as items No. 9-39 in the chart set forth in Exhibit A hereto, and false and misleading statements in those declarations are set forth in Exhibit B hereto.

471

1509.   As set forth in Count 1, Proshan committed and aided and abetted acts of
bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in the *AMR, AMF Bowling,
Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and
*GenOn* bankruptcies.

1510.   As set forth in Count 1, Goldstrom committed and aided and abetted acts of
bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in the *Harry & David, AMR,
AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources,
SunEdison*, and *GenOn* bankruptcies.

1511.   As set forth in Count 1, Sternfels committed and aided and abetted acts of
bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in the *SunEdison* bankruptcy,
and aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in
the *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register,
Alpha Natural Resources*, and *GenOn* bankruptcies.

1512.   As set forth in Count 1, paragraphs 308-310 and 313, Carmody committed and
aided and abetted acts of bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in the
*AMR, AMF Bowling, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*,
and *GenOn* bankruptcies, and aided and abetted acts of bankruptcy fraud in violation of 18
U.S.C. §§ 152(2) and 152(3) in the *Edison Mission* bankruptcy.

1513.   As set forth in Count 1, Yerian committed and aided and abetted acts of
bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in *Edison Mission*.

1514.   As set forth in Count 1, Barton and Garcia each aided and abetted acts of
bankruptcy fraud in violation of 18 U.S.C. §§ 152(2) and 152(3) in connection with the *Harry &*

*David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison,* and *GenOn* bankruptcies.

1515.   As described in Count 1, McKinsey & Co. McKinsey Holdings, and McKinsey US each committed and aided and abetted acts of bankruptcy fraud in 184 violation of 18 U.S.C. §§ 152(2) and 152(3) in the *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register. Alpha Natural Resources, SunEdison,* and *GenOn* bankruptcies.

1516.   McKinsey & Co., McKinsey Holdings, and McKinsey US each violated 18 U.S.C. §§ 152(2) and 152(3) and aided and abetted McKinsey RTS's violations of same in that the individual Defendants, acting at least in part in their capacities as employees and executives of McKinsey & Co., McKinsey Holdings, and/or McKinsey US, caused McKinsey RTS to file the Rule 2014(a) declarations described above and identified in Exhibit A hereto.

1517.   As described below, McKinsey & Co., McKinsey Holdings, and McKinsey US committed and aided and abetted further violations of 18 U.S.C. §§ 152(2) and 152(3) by causing to be filed at least eight false and misleading disclosure affidavits in the *Hayes, UAL, Mirant,* and *Lyondell* bankruptcies. Those specific affidavits are identified as items No. 1-8 in the chart set forth in Exhibit A hereto, and false and misleading statements contained in those affidavits are identified in Exhibit B hereto. Among other things, the Rule 2014(a) affidavits identified as Nos. 4, 6, and 7, in the chart set forth in Exhibit A falsely asserted that McKinsey US could not identify connections by name or provide other details of its engagements on account of "[McKinsey's] responsibility to maintain strict client confidentiality." In fact, McKinsey's engagement agreements with clients permit it to make all disclosures required by law.

ii.   *Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343*

1518.  McKinsey RTS committed and aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 by authorizing, facilitating, filing and causing to be filed the 31 false and misleading declarations filed on behalf of McKinsey RTS in the *Harry & David, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison,* and *GenOn* bankruptcies, and on behalf of McKinsey RTS, McKinsey US, and other McKinsey affiliates in the AMR bankruptcy. Those declarations are identified as items No. 9-39 in the chart set forth in Exhibit A hereto, and false and misleading statements contained in those declarations are identified in Exhibit B hereto.

1519.  As set forth in Count 1, Barton, Sternfels, Garcia, and Goldstrom each committed and aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison,* and *GenOn* bankruptcies.

1520.  As set forth in Count, Carmody and Proshan each committed and aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the *AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison,* and *GenOn* bankruptcies.

1521.  As set forth in Count 1, Yerian committed and aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the Edison Mission bankruptcy.

1522.  As set forth in Count 1, McKinsey & Co., McKinsey Holdings, and McKinsey US each committed and aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 in connection with the 31 false and misleading declarations filed on behalf of McKinsey RTS in the *Harry & David, AMF Bowling, Edison Mission, NII Holdings, Standard*

474

*Register, Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies, and on behalf of

McKinsey RTS, McKinsey US, and other McKinsey affiliates in the *AMR* bankruptcy.

1523.   As set forth in Count 1, beginning in or around September 2014 and continuing

through 2015, Barton and Sternfels each committed and aided and abetted numerous violations

of mail fraud and wire fraud in connection with their efforts to mislead Alix and prevent him and

AP from taking action to remediate McKinsey's unlawful bankruptcy consulting practices.

1524.   McKinsey & Co., McKinsey US, and McKinsey Holdings further committed and

aided and abetted acts of mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343

by knowingly authorizing and causing to be filed the eight false and misleading affidavits filed

on behalf of McKinsey US in the *Hayes, UAL, Mirant, and Lyondell* bankruptcies by individuals

acting within the scope of their employment by or agency for McKinsey & Co., McKinsey US,

and/or McKinsey Holdings. Those specific affidavits are identified as items No. 1-8 in Exhibit A

hereto and the specific false and misleading statements in those affidavits are identified in

Exhibit B hereto. The specific operational interrelationships between these three corporate

Defendants and the specific capacities in which the employees and/or agents acted in filing the

eight affidavits is within these Defendants' exclusive knowledge and will be identified after

further investigation and discovery herein.

> a.  Each of the affidavits or declarations under penalty of perjury identified in
>
> items No. 1-3 and 6-8 in the chart set forth in Exhibit A hereto were transmitted
>
> by interstate wire, by United States mail, and/or by private interstate commercial
>
> carrier, as evidenced by the fact that each such affidavit or declaration was signed,
>
> or the affiant or declarant resided, in a state different from that in which the
>
> document was judicially filed, as evidenced by the locations indicated on the

signature page and/or the fax numbers and/or the locations of the notaries

indicated on the declarants' signature pages:

| No(s). | Case | Declarant | Location of Declarant | Location of Case |
|--------|------|-----------|----------------------|------------------|
| 1 | *Hayes Lemmerz* | Sykes | Illinois (Notary) | Delaware |
| 2 | *Hayes Lemmerz* | Sykes | Michigan (Notary) | Delaware |
| 3 | *Hayes Lemmerz* | Sykes | Illinois (Notary) | Delaware |
| 6 | *Mirant* | Ostrowski | Georgia | Texas |
| 7-8 | *Lyondell* | Hundertmark | Texas | New York |

b. Additionally, it is likely that the affidavits submitted by McKinsey US in the

UAL bankruptcy were also mailed and/or wired across state lines, given that

McKinsey & Co., McKinsey US, and McKinsey Holdings and their respective

attorneys were based in New York, while the *UAL* bankruptcy was filed in

Illinois.

c. Further evidence regarding the details of these Defendants' acts of mail and

wire fraud is peculiarly within the knowledge and control of these Defendants and

will be proven at trial after discovery.

   iii.   *Obstruction of Justice in Violation of 18 U.S.C. § 1503(a).*

1525.   McKinsey RTS committed and aided and abetted obstruction of justice in

violation of 18 U.S.C. § 1503(a) by knowingly and wrongfully authorizing and filing or causing

to be filed the false and misleading disclosure declarations filed on behalf of McKinsey RTS in

the *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register,*

476

*Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies. Those specific declarations are identified as items No. 9-39 in Exhibit A hereto, and specific misleading and false statements therein are identified in Exhibit B hereto.

1526.   As set forth in Count 1, Barton and Garcia aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies.

1527.   As set forth in Count 1, Goldstrom committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *Harry & David, AMR, AMF Bowling,* and *SunEdison* bankruptcies, and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources*, and *GenOn* bankruptcies.

1528.   As set forth in Count 1, Carmody committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *AMR, AMF Bowling, NII Holdings, Standard Register, Alpha Natural Resources*, and *GenOn* bankruptcies, and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *Edison Mission* bankruptcy.

1529.   As set forth in Count 1, Proshan committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the *AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies.

1530.   As set forth in Count 1, Yerian committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in at least the Edison Mission bankruptcy.

477

1531.   As set forth in Count 1, Sternfels committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) the SunEdison bankruptcy and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources*, and *GenOn* bankruptcies.

1532.   As set forth in Count 1, McKinsey & Co., McKinsey Holdings, and McKinsey US each committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) in the *Harry & David, AMR, AMF Bowling, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies.

1533.   As described below, McKinsey & Co., McKinsey Holdings, and McKinsey US each further committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) by knowingly and wrongfully authorizing and filing or causing to be filed by McKinsey US personnel in on behalf of McKinsey US at least eight false and materially misleading disclosure affidavits to be filed the *Hayes, UAL, Mirant*, and *Lyondell* bankruptcy proceedings. Those specific affidavits are identified as items No. 1-8 in Exhibit A hereto, and the false and misleading statements contained therein are identified at pages 1-7 of Exhibit B hereto.

1534.   In the *Hayes* bankruptcy, McKinsey & Co., McKinsey Holdings, and McKinsey US each committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1503(a) by knowingly and wrongfully authorizing and filing or causing to be filed at least three false and materially misleading disclosure affidavits by McKinsey US principal Richard Sykes in support of McKinsey US's retention as a management consultant in that case. Those affidavits are identified as items No. 1-3 in Exhibit A hereto.

478

1535.   In the *UAL* bankruptcy, McKinsey & Co., McKinsey Holdings, and McKinsey

US each committed and aided and abetted obstruction of justice in violation of 18 U.S.C.

§ 1503(a) by knowingly and wrongfully authorizing and filing or causing to be filed at least two

false and materially misleading disclosure affidavits—one by McKinsey US executive Gerhard

Bette, and one by McKinsey in-house counsel Nikolaus Semaca—in support of McKinsey US's

retention as a management consultant in that case. Those affidavits are identified as items No. 4

and 5 in Exhibit A hereto.

1536.   In the *Mirant* bankruptcy, McKinsey & Co., McKinsey Holdings, and McKinsey

US each committed and aided and abetted obstruction of justice in violation of 18 U.S.C.

§ 1503(a) by knowingly and wrongfully authorizing and filing or causing to be filed at least one

false and materially misleading disclosure affidavit by McKinsey US executive Kenneth

Ostrowski in support of McKinsey US's retention as a management consultant in that case. That

affidavit is identified as item No. 6 in Exhibit A hereto.

1537.   In the *Lyondell* bankruptcy, McKinsey & Co., McKinsey Holdings, and

McKinsey US each committed and aided and abetted obstruction of justice in violation of 18

U.S.C. § 1503(a) by knowingly and wrongfully authorizing and filing or causing to be filed at

least two false and materially misleading disclosure affidavits by McKinsey US executive

Thomas Hundertmark in support of McKinsey US's retention as a management consultant in that

case. Those affidavits are identified as items No. 7 and 8 in Exhibit A hereto.

### iv.   *Witness Tampering in Violation of 18 U.S.C. § 1512(b).*

1538.   McKinsey RTS committed and aided and abetted acts of witness tampering in

violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* and *SunEdison* cases, by

knowingly and corruptly persuading another person and by knowingly engaging in misleading conduct toward another person, and attempting to do so, with an intent to influence, delay, or prevent testimony or cause any person to withhold a record, object, document, or testimony from an official proceeding. Specifically:

    **a.** In the *Alpha Natural Resources* bankruptcy, McKinsey RTS engaged in misleading conduct by knowingly submitting or causing to be submitted false and misleading statements, including disclosure declarations signed by Carmody, and intentionally omitting information or intentionally concealing materially facts concerning McKinsey's connections to Interested Parties and the completeness and truthfulness of McKinsey RTS's disclosures in that proceeding. This misleading conduct was directed at the U.S. Trustee and the Alpha Natural Resources court. McKinsey RTS attempted to, and did, persuade the U.S. Trustee to abandon its efforts in 2016 to seek further disclosures from McKinsey RTS in *Alpha Natural Resources*. In doing so, McKinsey RTS acted corruptly and with the improper intent of deterring the U.S. Trustee from continuing to litigate against McKinsey RTS regarding its Rule 2014 disclosures;

    **b.** In *SunEdison*, McKinsey RTS committed and aided and abetted acts of witness tampering in violation of Section 1512(b) by knowingly influencing or impeding truthful testimony by Mark Hojnacki and corruptly persuading Hojnacki to cause him to provide non-truthful or misleading testimony in the five false and materially misleading disclosure declarations filed by Hojnacki on behalf of McKinsey RTS in *SunEdison* proceeding;