**c.** In each instance, McKinsey acted knowingly and with the wrongful intent that the false and misleading testimony on behalf of McKinsey RTS would obstruct the bankruptcy proceedings by allowing McKinsey RTS to avoid disqualification in *Alpha Natural Resources* and *SunEdison*.

1539.   As set forth in Count 1, McKinsey & Co., McKinsey Holdings, McKinsey US, and Proshan each committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* and *SunEdison* cases.

1540.   As set forth in Count 1, Barton, Garcia, and Goldstrom each aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* and *SunEdison* cases.

1541.   As set forth in Count 1, Carmody committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* case and by aiding and abetting acts of witness tampering in the *SunEdison* case.

1542.   As set forth in Count 1, paragraphs 352-356, Sternfels committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *SunEdison* case and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) in the *Alpha Natural Resources* case.

1543.   McKinsey & Co., McKinsey US, and McKinsey Holdings each further committed and aided and abetted acts of witness tampering in violation of 18 U.S.C. § 1512(b) by knowingly influencing or impeding truthful testimony by the individuals who provided affidavits on behalf of *McKinsey US in the Hayes, UAL, Mirant* and *Lyondell* cases, and/or by corruptly persuading or misleading those individuals to cause them to provide non-truthful or misleading testimony in the above-described false and materially misleading disclosure affidavits that were

481

filed on behalf of McKinsey US in those proceedings, and by aiding and abetting each other's witness tampering. Those eight affidavits are identified as items No. 1-8 in Exhibit A hereto, and specific false and misleading statements therein are identified at pages 1-7 of Exhibit B hereto.

*v.   Obstruction of Justice in Violation of 18 U.S.C. § 1512(c).*

1544.   As set forth in Count 1, McKinsey & Co., McKinsey US, McKinsey Holdings, Proshan, and Carmody each committed and aided and abetted obstruction of justice in violation of 18 U.S.C. § 1512(c), and Barton, Sternfels, Garcia, and Goldstrom aided and abetted such obstruction of justice, in the *Alpha Natural Resources* bankruptcy.

1545.   McKinsey RTS committed and obstruction of justice in violation of 18 U.S.C. § 1512(c) by corruptly obstructing, influencing, and/or impeding the *Alpha Natural Resources bankruptcy* and/or by attempting to do so by filing or causing to be filed false and misleading declarations in that case which were intended to (and did) fraudulently induce the U.S. Trustee to withdraw its motion to compel in 2016; and McKinsey RTS aided and abetted the ANR Obstruction Defendants' violations of 18 U.S.C. § 1512(c) by authorizing and facilitating their unlawful conduct on behalf of McKinsey RTS in the Alpha Natural Resources bankruptcy.

*vi.   Unlawful Offers of Remuneration, Compensation, Reward, or Advantage in Violation of 18 U.S.C. § 152(6) and Felony Commercial Bribery under State Law.*

1546.   McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS offered to one or more major bankruptcy attorneys located in the United States an arrangement under which McKinsey would introduce its clients to such attorneys on an exclusive basis in exchange for the attorneys exclusively recommending McKinsey to the attorneys' bankruptcy debtor clients for bankruptcy consulting services.

1547.   McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS made such offers knowing and intending that: neither they nor the recipient attorney(s) would disclose the arrangement to their mutual debtor-client or the bankruptcy court (via a Rule 2014(a) disclosure or otherwise); through such nondisclosure, McKinsey would avoid disqualification as an advisor to the debtor(s); and such actions would operate as a fraud on various federal courts.

1548.   With respect to each such offer, McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS knowingly and fraudulently gave, offered, or attempted to obtain money or property, remuneration, compensation, reward, advantage, or promise thereof (in the form of valuable exclusive referrals to high-level executives from McKinsey's coveted stable of corporate clients) for acting or forbearing to act in any case under the Bankruptcy Code, within the meaning of 18 U.S.C. § 152(6).

1549.   Additionally, the foregoing conduct constituted felony commercial bribery under the laws of Texas, New York, and Illinois

> a. Texas Penal Code § 32.43(b) provides that "a person who is a fiduciary commits an offense if, without the consent of his beneficiary, he intentionally or knowingly solicits, accepts, or agrees to accept any benefit from another person on agreement or understanding that the benefit will influence the conduct of the fiduciary in relation to the affairs of his beneficiary." Pursuant to Texas Penal Code § 32.43(d), a violation of § 32.43(b) is a felony offense.

> b. New York Penal Law § 180.03 provides: "A person is guilty of commercial bribing in the first degree when he confers, or offers or agrees to confer, any benefit upon any employee, agent or fiduciary without the

483

consent of the latter's employer or principal, with intent to influence his

conduct in relation to his employer's or principal's affairs, and when the

value of the benefit conferred or offered or agreed to be conferred exceeds

one thousand dollars and causes economic harm to the employer or

principal in an amount exceeding two hundred fifty dollars." A violation

of § 180.03 is a felony offense.

c. Illinois Criminal Code § 720 ILCS 5/29A-1 provides: "A person commits

commercial bribery when he confers, or offers or agrees to confer, any benefit

upon any employee, agent or fiduciary without the consent of the latter's

employer or principal, with intent to influence his conduct in relation to his

employer's or principal's affairs." Pursuant to Illinois Criminal Code § 720

ILCS § 5/29A-3, a violation of § 5/29A-1 is a felony offense if the value

conferred equals or exceeds $500,000

1550.   The value offered by McKinsey & Co., McKinsey Holdings, McKinsey US, and

McKinsey RTS to the bankruptcy attorneys that they sought to recruit for their "pay-to-play"

scheme exceeded $500,000, given the magnitude of fees that bankruptcy attorneys could expect

from an engagement by one or more of McKinsey's Fortune 500-class clientele.

1551.   By making an offer of such a benefit to a fiduciary (a bankruptcy attorney) with

the agreement or understanding that the benefit would influence the fiduciary's conduct in the

affairs of the fiduciary's beneficiary (the bankruptcy attorney's debtor-client) and without the

consent of the bankruptcy debtor-client in *GenOn* (venued in Texas); *SunEdison, NII Holdings*,

and *AMR* (venued in New York); and *Edison Mission* (venued in Illinois), McKinsey & Co.,

McKinsey Holdings, McKinsey US, and McKinsey RTS violated the aforementioned bribery
statutes.

1552.   The particular details of the violations of 18 U.S.C. § 152(6) and state commercial
bribery statutes by McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS
including the specific details of such offers and the identities of the bankruptcy attorneys, are
peculiarly within Defendants' knowledge and will be proven at trial following discovery. At a
minimum, Barton admitted to Alix at their October 16, 2014 meeting that McKinsey had, in fact,
made one or more such "pay-to-play" offers.

> vii.   *Unlawful Offers of Remuneration, Compensation, Reward, or Advantage*
> *in Violation of 18 U.S.C. § 152(6) and Felony Commercial Bribery under*
> *State Law.*

1553.   The Count 3 Defendants' scheme to commit rapacious fraud against the federal
bankruptcy court system through concealment, obfuscation, and fraudulent misrepresentation of
disqualifying conflicts of interest, constitutes a scheme or artifice to defraud or for obtaining
money or property by means of false or fraudulent pretenses, representations, or promises, within
the meaning of 18 U.S.C. § 2314.

1554.   The Count 3 Defendants having devised or intending to devise such a scheme, by
which the Count 3 Defendants sought to defraud the federal bankruptcy court system and
thousands of innocent creditors, in execution or concealment of the scheme, Barton and
McKinsey & Co., aided and abetted by Sternfels, McKinsey US, McKinsey Holdings, and
McKinsey RTS, induced Jay Alix to travel in interstate or foreign commerce in violation of 18
U.S.C. § 2314. Specifically, in response to Alix's request for a meeting to discuss remediation of
McKinsey's continued unlawful bankruptcy consulting engagements, Barton and McKinsey &

485

Co. induced Alix to travel from Michigan to New York City to meet with Barton on October 15, 2015, at which meeting Barton offered business referrals from McKinsey to Alix Partners in exchange for Alix and Alix Partners dropping the issues concerning McKinsey's pay-to-play scheme and its illegal disclosure declarations.

1555.   Barton and McKinsey & Co. induced Alix to attend these meetings in order to foster the false impression that McKinsey was pursuing corrective action in light of Alix's admonishments to Barton and Sternfels concerning McKinsey US's and McKinsey RTS's illegal bankruptcy consulting engagements and McKinsey's pay-to-play scheme. By stringing Alix along in this fashion, Barton and McKinsey & Co. sought to (and did) forestall legal action by Alix Partners, and thereby prolonged the Count 3 Defendants' scheme.

viii.   *Money Laundering in Violation of 18 U.S.C. § 1957.*

1556.   McKinsey US and McKinsey RTS received tens of millions of dollars in fees for their bankruptcy consulting engagements. A substantial portion of those monies were remitted directly or indirectly to McKinsey RTS's parent, McKinsey US, and to McKinsey Holdings and McKinsey & Co., and to one or more of the individual Count 3 Defendants, in amounts exceeding $10,000. These receipts of fees from McKinsey RTS's and McKinsey US's bankruptcy engagements described above and the subsequent deposit or other financial transfers of such monies constituted violations of 18 U.S.C. § 1957(a) in that the Count 3 Defendants each knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from specified unlawful activity within the meaning of 18 U.S.C. § 1957(f)(3) and 18 U.S.C. § 1956(c)(7). Such specified unlawful activity includes, without limitation, the violations of 18 U.S.C. §§ 152, 1341, and 1343 set forth above. The specific

486

chains of monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial.

1557.   Additionally, McKinsey's participation in "re-invoiced" and "round trip" payments from non-debtor affiliates of SunEdison constituted separate violations of 18 U.S.C. § 1957(a). McKinsey's falsification of McKinsey RTS invoices issued to SunEdison constituted the knowing and fraudulent concealment, falsification, or false entry in recorded information relating to the property or financial affairs of SunEdison in contemplation of SunEdison's pending bankruptcy proceeding, in violation of 18 U.S.C. §152(8). The specific chains of monetary transactions are within Defendants' exclusive knowledge and control and will be identified in discovery and proven at trial. Alternately, the Count 3 Defendants (and specifically, McKinsey & Co., McKinsey Holdings, McKinsey US, McKinsey RTS, Proshan, Sternfels, Carmody and Goldstrom, authorized and facilitated by Garcia and Barton) caused the submission of the June 6, 2016 and June 14, 2016 Hojnacki Rule 2014(a) declarations identified above in the SunEdison case, which declarations fraudulently mischaracterized McKinsey RTS's services and billing. These submissions violated 18 U.S.C. § 152(3) and 18 U.S.C. §§ 1341 and/or 1343, as shown above.

1558.   The Count 3 Defendants' violations of 18 U.S.C. §§152(3), 1341, and/or 1343 constituted specified unlawful activity within the meaning of 18 U.S.C. §§ 1956(c)(7) and 1957(f)(3).

1559.   The Count 3 Defendants' receipt of the proceeds of these specified unlawful activities and their subsequent deposit or other financial transfers of such proceeds violated 18 U.S.C. § 1957(a) in that the Count 3 Defendants each knew that such financial transactions involved amounts exceeding $10,000 and that such monies were criminally derived from

specified unlawful activity within the meaning of 18 U.S.C. §§ 1956(c)(7) and 1957(f)(3). The

specific details of the monetary transactions are within Defendants' exclusive knowledge and

control and will be identified in discovery and proven at trial.

1560.   The Count 3 Defendants' predicate acts of racketeering activity were related in

that they were committed for the purpose of (1) concealing or obfuscating McKinsey's

disqualifying conflicts of interest in order to enable McKinsey US and/or McKinsey RTS to

obtain bankruptcy consulting assignments that they would not have received had the Count 3

Defendants behaved lawfully, and by attempting to obtain such engagements by offering

unlawful "pay-to-play" arrangements to bankruptcy attorneys; (2) thereby depriving AP of

remunerative bankruptcy consulting engagements; and, (3) after the scheme was discovered,

forestalling remedial litigation by Alix Partners and Alix by means of Barton's duplicitous

interactions with Alix. These acts, and others to be identified after further investigation and

discovery herein, shared a common or related purpose, goal, result, participants, victim, and

method of commission.

1561.   Through such patterns of racketeering activity, each of the Count 3 Defendants

conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 3

Enterprise in violation of 18 U.S.C. § 1962(c).

### d.  **Scienter**

1562.   McKinsey RTS had the motive to commit the aforementioned violations of 18

U.S.C. §§ 152(2), 152(3), 152(6), 1503(a), 1512(b), 1512(c), and 2314 and acts of mail and wire

fraud, as demonstrated by, inter alia, the following facts

> **a.** McKinsey RTS stood to earn tens of millions of dollars in bankruptcy
>
> consulting fees as a result of the Count 3 Defendants' unlawful scheme. Had

McKinsey RTS full disclosed its connections as required by bankruptcy law, McKinsey RTS would have been disqualified from acting as a bankruptcy professional in each of the nine Chapter 11 cases in which it was been employed.

**b.** McKinsey RTS was formed for the express purpose of skirting bankruptcy disclosure requirements.

**c.** By fraudulently obtaining bankruptcy assignments, McKinsey RTS was able to assist its parent companies, McKinsey & Co., McKinsey Holdings, and McKinsey US, and other McKinsey affiliates, including MIO Partners, in maintaining a firmer grip on existing clients and in obtaining, for McKinsey, additional post-bankruptcy work from bankruptcy clients. Accordingly, bankruptcy consulting services created a virtuous cycle for McKinsey RTS and the other Count 3 Defendants.

**d.** McKinsey RTS, along with the other Count 3 Defendants, continued with its pattern of unlawful conduct even after McKinsey's global Managing Partner Barton acknowledged and promised to put an end to McKinsey's unlawful bankruptcy practices, demonstrating that McKinsey RTS and the other Count 3 Defendants were powerfully motivated to break the law.

**e.** Barton's attempts to lull Alix and AP into forgoing corrective litigation permitted McKinsey RTS and the other Count 3 Defendants to continue their lucrative but unlawful scheme uninterrupted for at least another year

1563.  McKinsey RTS had the opportunity to commit the aforementioned violations of 18 U.S.C. §§ 152(2), 152(3), 152(6), 1503(a), 1512(b), 1512(c), and 2314 and acts of mail and wire fraud, as demonstrated by the fact that McKinsey's extreme and unjustified protection of

489

client identities makes it exceedingly difficult for outsiders to identify disqualifying connections without full and honest disclosure by McKinsey RTS and its employees and officers. And because of the fiduciary nature of McKinsey RTS's advisory relationships, its clients were dependent on its honesty.

1564.  McKinsey RTS also had the opportunity to effectuate other components of the Count 3 Defendants' fraudulent scheme. Concerning McKinsey's "pay-to-play" arrangement, the prospect of access to McKinsey's unparalleled portfolio of clientele would have been almost irresistible to bankruptcy attorneys, while McKinsey would have gained an easy way to "jump start" McKinsey RTS's bankruptcy consulting practice in a way nearly undetectable by competitors or the authorities. And lulling Alix Partners into inaction by deceiving Alix concerning his efforts to dissuade McKinsey from unlawful conduct also afforded valuable breathing space to Defendants, given the accelerated growth of McKinsey RTS's bankruptcy practice in the last several years.

1565.  In addition, the circumstances surrounding the aforementioned violations of 18 U.S.C. §§ §§ 152(2), 152(3), 152(6), 1503(a), 1512(b), 1512(c), and 2314 and acts of mail and wire fraud demonstrate conscious misbehavior and knowledge by McKinsey RTS that it, along with the other Count 3 Defendants, was engaging in a scheme to defraud AP as demonstrated by, inter alia the following facts:

> **a.** McKinsey RTS, which is part of a global enterprise with a vast array of large, diversified companies as clients and an expansive network of McKinsey "alumni" connections, and which thus has a concomitantly large set of connections requiring disclosure, nonetheless repeatedly filed grossly inadequate Rule 2014(a) disclosures in comparison with those of considerably

smaller, less interconnected firms such as AP. McKinsey RTS's conflict-checking processes, as described in its Rule 2014(a) submissions, are conspicuously primitive and deficient. The rudimentary nature of these procedures, which is irreconcilable with McKinsey's claims to be a global information management leader, indicates that the system represented a deliberate attempt to conceal relevant connections by limiting internal inquiries in a manner ensuring that relevant connections would be missed. At a minimum, McKinsey RTS acted with willful blindness to disqualifying conflicts.

**b.** McKinsey RTS's failure to meet its disclosure obligations over the course of several years and nine different bankruptcies, combined with the failure of McKinsey US to meet its disclosure obligations over the course of several years and four different bankruptcies, despite external and internal access to the most sophisticated legal advice available, demonstrates that this failure to disclose was systemic and intentional rather than the result of sporadic lapses in judgment or execution.

**c.** By the time of McKinsey RTS's participation in the *NII Holdings* bankruptcy in October 2014, McKinsey was on explicit notice at the highest executive level—Barton—that McKinsey RTS's disclosure practices were unlawful and afforded it an unfair and illegal competitive advantage over AP. Barton repeatedly admitted to Alix that the disclosure practices of McKinsey US and McKinsey RTS and McKinsey's "pay-to-play" offers to bankruptcy attorneys were unlawful, and even promised to shutter McKinsey RTS and abandon bankruptcy consulting during his tenure. That McKinsey RTS

491

continued its unlawful conduct unabated demonstrates not only that its

unlawful behavior was willful but also that its earlier unlawful conduct prior

to Alix's conversations with Barton and Sternfels was not inadvertent or the

result of mere sloppiness.

1566. The remaining Count 3 Defendants' scienter is demonstrated by the facts set forth

in Count 1.

1567. Each Count 3 Defendant committed and aided and abetted the foregoing predicate

violations of 18 U.S.C. §§ 152(2), 152(3), 152(6), 1341, 1343, 1503(a), 1512(b), 1512(c), and

2314 with the specific intent to commit rapacious fraud against the bankruptcy court system.

### e. **Vicarious Liability**

1568. Each of the foregoing predicate acts committed in connection with the filing of

false and misleading affidavits in the *Hayes, UAL, Mirant,* and *Lyondell* bankruptcies was

committed by individuals acting within the scope of their employment, officership, or

directorship positions at or agency relationship with McKinsey US. The acts were committed

with the knowledge of McKinsey US's upper management and in furtherance of a scheme

intended to and which did in fact benefit McKinsey US and its corporate parents by obtaining

fees for bankruptcy engagements from which it was disqualified. Accordingly, McKinsey US is

vicariously liable for RICO violations by its employees and agents.

1569. Each of the aforementioned predicate acts committed by Barton, Sternfels,

Garcia, Carmody, Goldstrom, Proshan, and Yerian was committed within the scope of their

employment, officership, or directorship positions at or agency relationship with McKinsey &

Co. Each of these individuals was a high-level member of McKinsey & Co.'s management, and

each either participated directly in and aided and abetted the commission of predicate acts as

described above. The predicate acts were each committed in furtherance of a scheme intended to and which did in fact benefit McKinsey & Co. and its subsidiaries by obtaining fees for bankruptcy engagements from which it and its subsidiaries were disqualified. Accordingly, McKinsey & Co. is vicariously liable for the RICO violations of each of the individual Defendants herein.

1570.   Alternatively, each of the aforementioned predicate acts by Barton, Sternfels, Garcia, Carmody, Goldstrom, Proshan, and Yerian was committed within the scope of their employment, officership, or directorship positions at or agency relationship with McKinsey RTS. Garcia and Proshan each was a high-level member of McKinsey RTS's management, and each committed and aided and abetted the commission of predicate acts described above. The predicate acts were each committed in furtherance of a scheme intended to and which did in fact benefit McKinsey RTS and its corporate parents by obtaining fees for bankruptcy engagements from which it was disqualified. Accordingly, McKinsey RTS is vicariously liable for the RICO violations of each of the individual Defendants herein.

1571.   In the *Hayes Lemmerz, UAL, Mirant*, and *Lyondell* bankruptcies, McKinsey & Co. and McKinsey Holdings orchestrated the scheme through their subsidiary, McKinsey US. Accordingly, McKinsey & Co. and McKinsey Holdings are each vicariously liable for RICO violations by their indirect or direct subsidiary, McKinsey US.

1572.   In the *Harry David, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies, McKinsey & Co. orchestrated the scheme through its subsidiaries, McKinsey Holdings and McKinsey US, which in turn orchestrated the scheme through McKinsey RTS. Accordingly, McKinsey & Co.,

McKinsey Holdings, and McKinsey US are vicariously liable for RICO violations by their indirect or direct subsidiaries.

1573.   In the *AMR* bankruptcy, McKinsey & Co. orchestrated the scheme through its subsidiaries, McKinsey Holdings and McKinsey US, which in turn orchestrated the scheme through McKinsey RTS, and through various other McKinsey & Co. subsidiaries. Accordingly, McKinsey & Co., McKinsey Holdings, and McKinsey US are vicariously liable for RICO violations by their indirect or direct subsidiaries.

f.   **Causation and Damages**

1574.   As a direct and proximate result of foregoing violations of 18 U.S.C. § 1962(c) by the Count 3 Defendants, the Plaintiff suffered an immediate and direct injury from the Count 3 Defendants' racketeering activity. Specifically, the Count 3 Defendants engaged in obstruction of justice and witness tampering by removing the Plaintiff – an officer of the court while in the discharge of his duties – from his employment position, engaging in a program of defamation, and harassing the Plaintiff to such an extent he was forced to flee the State of New York. As a consequence, he suffered significant loss of property related to his income, earning capacity and business reputation. Had the Count 3 Defendants not implemented their scheme, forming McKinsey RTS to unlawfully obtain restructuring assignments in violation of Rule 2014 and perpetrating related predicate acts, the Plaintiff would remain gainfully employed with his earning capacity and business reputation intact.

1575.   It was a foreseeable, natural, direct, and intended consequence of the Count 2 Defendants' scheme that conspirators would need to engage in coverup and, in some cases, retaliate against employees who might expose the Count 2 conspiracy, such as the Plaintiff.

494

1576.  Therefore, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), the

Plaintiff is thereby entitled to recover treble damages, together with the costs of this suit and

reasonable attorneys' fees.

### FOURTH CAUSE OF ACTION

### VIOLATIONS OF RICO, 18 U.S.C. § 1962(D)

**Against All Defendants**

1577.  The Plaintiff repeats and realleges paragraphs 1 through 1553 as if fully set forth

herein.

1578.  Defendants have each unlawfully, knowingly, and willfully combined, conspired,

confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described

above, in violation of 18 U.S.C. § 1962(d).

1579.  As described in each count, two or more people, including each of the

Defendants, agreed to (and did) commit numerous violations of 18 U.S.C. § 1962(c) and (d) to

further their unlawful schemes.

1580.  As described below, each Defendant agreed to further the unlawful endeavor

described in each RICO Count.

**a.  Count 1: McKinsey & Co., McKinsey US, and McKinsey Holdings**

1581.  With respect to the unlawful scheme described above in Count 1, McKinsey &

Co., McKinsey US, and McKinsey Holdings each agreed to further the scheme, as demonstrated

by, *inter alia*, the following facts: a) they each knew of the illegal activity—specifically, that

McKinsey RTS was not fully and truthfully disclosing its connections and disqualifying conflicts

of interest as required under Rule 2014, and McKinsey entities and employees were committing

numerous RICO predicate acts in support of the scheme; and b) they each facilitated and engaged in the illegal activity described in Count 1.

1582. Directly and through its agent officers, directors, board members, employees, and representatives, McKinsey & Co., and its wholly-owned and controlled subsidiaries McKinsey Holdings and McKinsey US, have been active participants and central figures in the formation and operation of McKinsey RTS and its affairs, and in the orchestration, planning, perpetuation, and execution of the unlawful scheme to commit rapacious fraud against the bankruptcy court system.

1583. As described above in Count 1, the RICO predicate acts alleged in Count 1 were performed by McKinsey & Co., McKinsey US, McKinsey Holdings, and/or one or more of the individual Defendants (Barton, Sternfels, Proshan, Garcia, Goldstrom, Carmody, and Yerian), each of whom was a McKinsey & Co. employee. In each of the *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison,* and *GenOn* bankruptcies, McKinsey RTS filed false declarations attested to by McKinsey & Co. employees, including Carmody and Goldstrom who were Senior Partners of McKinsey & Co., and Yerian, who was a Partner of McKinsey & Co. At all relevant times, Garcia was McKinsey RTS's President and a Senior Partner of McKinsey & Co., and Goldstrom sat on McKinsey RTS's board of directors. McKinsey RTS was formed by McKinsey & Co., McKinsey Holdings, and McKinsey US and their respective executives to fraudulently obtain bankruptcy engagements. The many disqualifying connections that McKinsey RTS unlawfully failed to disclose include connections of McKinsey & Co. and McKinsey US; and many individuals who were in fact employed by McKinsey & Co., McKinsey US, or another subsidiary of McKinsey & Co. performed work as part of the "McKinsey RTS teams" for the

Chapter 11 bankruptcies at issue in this litigation. Further, McKinsey & Co. initiated the "pay-to-play" scheme through which it offered commercial bribes to certain bankruptcy attorneys (which McKinsey RTS failed to disclose to the various bankruptcy courts in which it sought employment). Accordingly, there can be no question (and at a bare minimum, there is a strong inference) that McKinsey & Co., McKinsey US, and McKinsey Holdings each agreed to further the unlawful scheme described in Count 1, given that they each clearly had knowledge of the scheme and each facilitated and directly engaged in it.

### b. Count 3: McKinsey & Co., McKinsey US, and McKinsey RTS

1584. With respect to the unlawful scheme described above in Count 3, Defendants McKinsey & Co., McKinsey US, McKinsey Holdings, and (beginning in or about 2010) McKinsey RTS each agreed to further the scheme, as demonstrated by, inter alia, the following facts: a) they each knew of the illegal activity—specifically, that McKinsey US and McKinsey RTS were not fully and truthfully disclosing McKinsey's connections and disqualifying conflicts of interest as required under Rule 2014, and McKinsey entities and employees were committing numerous RICO predicate acts in support of the scheme; and b) they each facilitated and engaged in the illegal activity described in Count 3.

1585. As described above in Count 3, the RICO predicate acts alleged in Count 3 were performed by McKinsey & Co., McKinsey US, McKinsey Holdings, McKinsey RTS and/or one or more of the individual Defendants (Barton, Sternfels, Proshan, Garcia, Goldstrom, Carmody, and Yerian), each of whom was a McKinsey & Co., McKinsey US, and/or McKinsey RTS employee. In the *Hayes, UAL, Mirant*, and *Lyondell* bankruptcies, McKinsey US knowingly and corruptly filed false declarations attested to by McKinsey US employees; and in the *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural*

497

*Resources, SunEdison*, and *GenOn* bankruptcies. McKinsey RTS knowingly and corruptly filed false declarations attested to by McKinsey & Co. employees, including Carmody and Goldstrom, who were Senior Partners of McKinsey & Co., and Yerian, who was a Partner of McKinsey & Co. Additionally, McKinsey RTS's President at all times was Garcia, at all relevant times was a Senior Partner of McKinsey & Co. and who served on the MIO's from approximately 2006 to 2017. The many disqualifying connections that McKinsey US and McKinsey RTS unlawfully failed to disclose included connections to Interested Parties by McKinsey & Co., McKinsey US, and other McKinsey subsidiaries; current and former McKinsey employees; and MIO and its investments. Further, individuals who were in fact employed by other McKinsey entities, including, inter alia, McKinsey & Co. and McKinsey US, performed work as part of the "McKinsey RTS team" for nine of the Chapter 11 bankruptcies at issue in this litigation. Additionally, McKinsey & Co. initiated the "pay-to-play" scheme through which it offered commercial bribes to certain bankruptcy attorneys (which McKinsey RTS failed to disclose to the various bankruptcy courts in which it sought employment). Accordingly, there can be no question (and at a bare minimum, there is a strong inference) that McKinsey & Co., McKinsey US, McKinsey Holdings, and McKinsey RTS each agreed to further the unlawful scheme described in Count 3, given that they each clearly had knowledge of the scheme and each facilitated and/or directly engaged in it.

### c.   Count 1 through 3: Individual Defendants

1586.   Garcia agreed to further the unlawful schemes described above in Counts 1 through 3, as demonstrated by the fact that he clearly had knowledge of and facilitated and authorized the unlawful endeavors with respect to at least the *Harry & David, AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies. At the time of each of those bankruptcies, Garcia was both President of McKinsey RTS and a longtime Senior Partner of McKinsey & Co.; and from approximately 2006 to 2017 Garcia sat on the board of directors of MIO, McKinsey's investment arm whose connections McKinsey RTS has unlawfully failed to disclose in its bankruptcies. As President of McKinsey RTS, Garcia was aware of and responsible for McKinsey RTS's engagements—including its conflicts checks and disclosures of conflicts and Interested Party connections—in the nine Chapter 11 bankruptcies in which McKinsey RTS has been engaged since its formation. Indeed, the detail for McKinsey RTS's fee applications in the *Edison Mission* bankruptcy show that Proshan consulted with Garcia regarding McKinsey RTS's disclosures. As a longtime Senior Partner of McKinsey & Co., a member of MIO's board, and member of MIO's subcommittee on investments, *a body of which regularly ratified MIO's investments on at least a quarterly basis*, Garcia knew that McKinsey had many connections and disqualifying conflicts of interest which were being unlawfully concealed or omitted from McKinsey RTS's filings. Accordingly, there can be no question (and at a bare minimum, there is a strong inference) that Garcia agreed to further the unlawful schemes described in Counts 1 through 3, as he was clearly aware of the unlawful behavior and facilitated and/or directly engaged in it at least with respect to the nine Chapter 11 bankruptcies for which McKinsey RTS has been hired; and Garcia agreed to, and played a key role in, the commission of numerous RICO predicate acts described in Counts 1 through 3, beginning at least with the *Harry & David* bankruptcy.

1587.   Carmody agreed to further the unlawful schemes described in Counts 1 through 3, as demonstrated by the fact that he clearly had knowledge of and authorized, facilitated and directly engaged in the unlawful endeavors with respect to at least the *AMR, AMF Bowling, Edison Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies. At the time of those bankruptcies, Carmody was an executive of McKinsey RTS as well as a partner at McKinsey & Co. Moreover, Carmody had prior work experience at Alix Partners and thus was well aware of the requirements of Rule 2014. Despite knowing what Rule 2014 required, Carmody knowingly filed thirteen false and misleading declarations in the *AMF Bowling, NII Holdings, Standard Register, Alpha Natural Resources*, and *GenOn* bankruptcies. Further, the detail for McKinsey's fee applications in *AMR* and *SunEdison* reveals that Carmody played a key role in those matters, including with respect to McKinsey RTS's disclosures. For instance, McKinsey's fee applications in *AMR* reveal that Carmody (then an Executive Vice President at McKinsey & Co.) personally billed 1,350.2 hours on that matter, generating $962,515 in fees, and Proshan corresponded with Carmody regarding Goldstrom's disclosure declaration. In *SunEdison*, McKinsey RTS's fee applications reveal that Carmody billed dozens of hours to that matter in a management role as a Practice Leader. As an executive of both McKinsey RTS and McKinsey & Co., and as the declarant in *AMF Bowling, NII Holdings, Standard Register, Alpha Natural Resources*, and *GenOn*, Carmody knew that McKinsey US and McKinsey RTS had connections and disqualifying conflicts of interest that they were failing to disclose. Accordingly, there can be no question (and at a bare minimum, there is a strong inference) that Carmody agreed to further the unlawful schemes described in Counts 1 through 3, as he was clearly aware of the unlawful behavior and authorized, facilitated, and directly engaged in it at least with respect to the eight aforementioned bankruptcies; and

Carmody agreed to, and played a key role in, the commission of multiple RICO predicate acts as described in Counts 1 through 3.

1588.   Goldstrom agreed to further the unlawful schemes described in Counts 1 through 3, as demonstrated by the fact that he clearly had knowledge of and authorized and facilitated the unlawful endeavors with respect to at least all of McKinsey RTS's nine bankruptcies, he and directly engaged in the unlawful endeavors with respect to at least the *Harry & David, AMR, AMF Bowling*, and *SunEdison* bankruptcies. At the time of each of those bankruptcies, Goldstrom was a McKinsey RTS board member and a Senior Partner at McKinsey & Co. As an experienced bankruptcy practitioner, Goldstrom was well aware of the requirements of Rule 2014. Despite knowing what Rule 2014 required, Goldstrom knowingly filed at least ten false and misleading disclosure declarations in *Harry & David* and *AMR*. Moreover, the detail of McKinsey RTS's fee applications in *AMF Bowling* and *SunEdison* reveal that Goldstrom provided guidance regarding McKinsey RTS's disclosures in those matters. As an executive of both McKinsey RTS and McKinsey & Co., and as the declarant in *Harry & David* and *AMR*, Goldstrom knew that McKinsey US and McKinsey RTS had connections and disqualifying conflicts of interest that they were failing to disclose. Accordingly, there can be no question that Goldstrom agreed to further the unlawful schemes described in Counts 1 through 3, as he was clearly aware of the unlawful behavior, authorized and facilitated it, and directly engaged in it; and Goldstrom agreed to, and played a role in, the commission of multiple RICO predicate acts as described in Counts 1 through 3, beginning at least with the *Harry & David* bankruptcy.

1589.   Proshan agreed to further the unlawful schemes described in Counts 1 through 3, as demonstrated by the fact that she clearly had knowledge of and facilitated and directly engaged in the unlawful endeavors at least with respect to the *AMR, AMF Bowling, Edison*

*Mission, NII Holdings, Standard Register, Alpha Natural Resources, SunEdison*, and *GenOn* bankruptcies. Proshan, who is a Senior Vice President and Associate General Counsel to McKinsey & Co., also furnishes in-house legal services to McKinsey RTS, and knowingly participated in and supervised the drafting of materially false and incomplete Rule 2014(a) submissions by McKinsey RTS and McKinsey US in the aforementioned matters. At all relevant times, Proshan was an experienced in-house attorney and was well aware of the requirements of Rule 2014. Despite knowing what Rule 2014 required, Proshan knowingly prepared, supervised, and caused to be filed multiple false and misleading affidavits in the aforementioned bankruptcies. The detail for McKinsey's fee applications *in AMR, AMF Bowling*, and *Edison Mission* show that Proshan was the key person involved in preparing McKinsey US's and RTS's disclosures in those cases, and McKinsey RTS's fee applications for *SunEdison* and *GenOn* show that Proshan provided guidance regarding McKinsey RTS's disclosures in those matters as well. While McKinsey RTS's fee applications for *NII Holdings, Standard Register, and Alpha Natural Resources* do not indicate who prepared its disclosures for those cases or how they were prepared, it is highly likely that Proshan prepared and/or provided guidance regarding those unlawful disclosures as well, particularly given the detailed time entries showing Proshan driving that process in *AMR*, which preceded those matters, and her continued involvement in *SunEdison* and *GenOn*, which post-date those matters. Proshan also discussed McKinsey RTS's disclosures in *Alpha Natural Resources* with Carmody and others in which Proshan and Carmody acknowledged the requirements of Rule 2014 and agreed that they would find ways to circumvent that rule in preparing McKinsey RTS's disclosures in the proceeding. As an experienced attorney at both McKinsey RTS and McKinsey & Co., Proshan knew that McKinsey US and McKinsey RTS had connections and disqualifying conflicts of interest that they were

502

failing to disclose. Accordingly, there can be no question that Proshan agreed to further the unlawful schemes described in Counts 1 through 3, as she was clearly aware of the unlawful behavior and facilitated and directly engaged in it at least with respect to the bankruptcies beginning with *AMR*.

1590.   Sternfels agreed to further the unlawful schemes described in Counts 1 through 3, as demonstrated by the fact that he clearly had knowledge of and authorized and facilitated the unlawful endeavors with respect to at least the nine bankruptcies in which McKinsey RTS was engaged, and he directly engaged in the unlawful endeavors with respect to at least the *SunEdison* bankruptcy. At all relevant times, Sternfels was a Senior Partner of McKinsey & Co. and had a significant degree of executive authority over McKinsey RTS's bankruptcy consultancy activities. Sternfels became aware of the unlawful nature of McKinsey's scheme no later than September 2014, when Alix explained to Sternfels and Barton the illegality of McKinsey's conduct and its failure to comply with Rule 2014 in bankruptcies filed prior to that date. Despite this knowledge of the illegality of the scheme, Sternfels (to whom Garcia reported) knowingly caused, encouraged, and allowed the illegal scheme to continue in the bankruptcies in which McKinsey RTS was subsequently hired. At no time did Sternfels take any steps to stop the unlawful scheme or to ensure that McKinsey RTS complied with the law. Indeed, the detail for McKinsey RTS's fee application for the *SunEdison* case reflects that Sternfels had substantial involvement in that matter in a managerial capacity, including work regarding McKinsey RTS's insufficient and unlawful Rule 2014 disclosures in that case. Moreover, Sternfels' time entries in *SunEdison* show that he participated in multiple communications (including what appear to be one-on-one telephone calls) with former SunEdison CEO Chatila, with whom Sternfels had an undisclosed prior connection and with whom Sternfels likely engaged in an unlawful quid pro

quo obtaining Chatila post-bankruptcy employment in exchange for Chatila's acquiescence in McKinsey's concealment of voidable preferences through its "re-invoiced" and "round-trip" payments scheme. Accordingly, there can be no question (and at a bare minimum, there is a strong inference) that Sternfels agreed to further the illegal schemes described in Counts 1 through 3, given that he authorized and facilitated the schemes beginning at least with the Harry & David matter; he clearly knew about the schemes and authorized, facilitated, and directly engaged in the schemes, beginning at least by September 2014; and that Sternfels agreed to, and played a key role in, the commission of multiple RICO predicate acts, including those in connection with McKinsey RTS's continued filing of false declarations in bankruptcies filed beginning at least by September 2014 and including through his direct involvement in *SunEdison*.

1591. Barton agreed to further the unlawful schemes described in Counts 1 through 3, as demonstrated by the fact that he clearly had knowledge of and authorized, facilitated, and directly engaged in the unlawful endeavors at least with respect to the nine bankruptcies in which McKinsey RTS was engaged. From 2009 through mid-2018, Barton was Managing Partner of McKinsey & Co. and, given his senior-most executive position at McKinsey, had ultimate executive authority over McKinsey's bankruptcy consultancy activities as well as the other corporate and individual Defendants in this litigation. Barton became aware of the unlawful nature of McKinsey's scheme no later than September 2014, when Alix explained to Sternfels and Barton the illegality of McKinsey's conduct and its failure to comply with Rule 2014 in bankruptcies filed prior to that date. Despite this knowledge of the illegality of the schemes, and despite making unequivocal promises to Alix that he would stop McKinsey's schemes, Barton personally engaged in efforts to mislead Alix and to fraudulently deflect and delay Alix's

504

attempts to remediate McKinsey's bankruptcy consulting practices. Barton knowingly caused, encouraged, and allowed the illegal schemes to continue in the bankruptcies in which McKinsey RTS was subsequently hired. At no time did Barton take any steps to stop the unlawful schemes or to ensure that McKinsey RTS complied with the law. To the contrary, Barton actively misled Alix in order to prevent Alix from acting and to buy McKinsey RTS more time to engage in its unlawful schemes. Accordingly, there can be no question that Barton agreed to further the illegal schemes described in Counts 1 through 3, given that he clearly knew about the schemes and authorized and facilitated them, and directly engaged in them, beginning at least by September 2014; and Barton agreed, and played a key role in, the commission of multiple RICO predicate acts, including those in connection with McKinsey RTS's continued filing of false declarations in bankruptcies beginning at least in September 2014.

1592. By and through each of the Defendants' close business and employment relationships with one another, and their close coordination with one another in the affairs of McKinsey RTS, the Count 2 Enterprise, and/or the Count 3 Enterprise, each Defendant knew the nature of each of these enterprises and each Defendant knew that these enterprises extended beyond their own individual role. Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to commit predicate acts, including those set forth above, and that the predicate acts were part of a pattern of racketeering activity, and each agreed to pursue the same criminal objective.

1593. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the affairs of McKinsey RTS, the Count 2 Enterprise, and/or the Count 3 Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d). In particular, each Defendant was a knowing, willing, and active participant in one or more of

the three Enterprises and its affairs, and each of the Defendants shared a common purpose and agreed to further the same overall objective, namely, the orchestration, planning, perpetuation, and execution of the unlawful schemes to commit rapacious fraud against the federal bankruptcy court system.

1594.   Further evidence of an agreement among Defendants is peculiarly within the knowledge and control of Defendants.

1595.   The participation and agreement of each Defendant was necessary to allow the commission of this pattern of racketeering activity. Specifically, Carmody, Goldstrom, Yerian, McKinsey US, and McKinsey RTS played key roles by filing false and unlawful declarations; Proshan played a key role by preparing false and unlawful declarations; Sternfels, Garcia, Proshan, Goldstrom, and Carmody all provided guidance regarding the false declarations; and Barton, Sternfels Garcia, Goldstrom, Carmody, and the entity Defendants all authorized the schemes. McKinsey & Co., McKinsey US, McKinsey Holdings, McKinsey RTS, Garcia, Barton and Sternfels also played key roles because they all had knowledge of the unlawful scheme and given their executive authority over the affairs of McKinsey US and/or McKinsey RTS and their respective employees and executives, the schemes would not have been allowed to continue without their consent and active encouragement and participation.

### d.   **Vicarious Liability**

1596.   To the extent any one or more of the entity Defendants (McKinsey & Co., McKinsey Holdings, McKinsey US, and McKinsey RTS) is not directly liable for conspiring to

violate RICO's substantive provisions in violation of 18 U.S.C. § 1962(d), they are vicariously

liable for the Section 1962(d) violations of the other Defendants.

1597.   Each of the predicate acts by Barton, Sternfels, Garcia, Carmody, Goldstrom,

Yerian, and Proshan was committed within the scope of those individuals' employment,

officership, or directorship positions at or agency relationship with McKinsey & Co. Each of

these individuals was a high-level member of McKinsey & Co.'s management, and each

committed and aided and abetted the commission of RICO predicate acts as described above.

The predicate acts were each committed in furtherance of a scheme intended to and which did in

fact benefit McKinsey & Co. and its subsidiaries by obtaining fees for bankruptcy engagements

from which McKinsey entities were disqualified. Accordingly, McKinsey & Co. is vicariously

liable for the RICO violations of the individual Defendants herein with respect to Counts 1

through 4.

1598.   Each of the predicate acts by Barton, Sternfels, Garcia, Carmody, Goldstrom,

Yerian, and Proshan was committed within the scope of those individuals' employment,

officership, or directorship positions at or agency relationship with McKinsey RTS. Garcia,

Proshan, Carmody, Goldstrom, and Yerian, in particular, were each high-level members of

McKinsey RTS's management. Each of the individual Defendants either participated directly in

and aided and abetted the commission of predicate acts as described above. The predicate acts

were each committed in furtherance of schemes intended to and which did in fact benefit

McKinsey RTS and its corporate parents by obtaining fees for bankruptcy engagements for

which it was disqualified. Accordingly, McKinsey RTS is vicariously liable for the RICO

violations of each the individual Defendants herein.

507

1599.   McKinsey & Co. orchestrated the scheme through its subsidiaries, McKinsey
Holdings and McKinsey US, which in turn orchestrated the scheme through McKinsey RTS, and
through various other McKinsey subsidiaries. Accordingly, McKinsey & Co., McKinsey
Holdings, and McKinsey US are each vicariously liable for RICO violations by their indirect or
direct subsidiaries.

### e.  **Causation and Damages**

1600.   As a direct and proximate result of foregoing violations of 18 U.S.C. § 1962(d) by
the Count 4 Defendants, the Plaintiff suffered an immediate and direct injury from the Count 4
Defendants' racketeering activity. Specifically, the Count 4 Defendants engaged in obstruction
of justice and witness tampering by removing the Plaintiff – an officer of the court while in the
discharge of his duties –  from his employment position, engaging in a program of defamation,
and harassing the Plaintiff to such an extent he was forced to flee the State of New York.  As a
consequence, he suffered significant loss of property related to his income, earning capacity and
business reputation.  Had the Count 4 Defendants not implemented their scheme, forming
McKinsey RTS to unlawfully obtain restructuring assignments in violation of Rule 2014 and
perpetrating related predicate acts, the Plaintiff would remain gainfully employed with his
earning capacity undisturbed and business reputation intact.

1601.   It was a foreseeable, natural, direct, and intended consequence of the Count 4
Defendants' scheme that conspirators would need to engage in coverup and, in some cases,
retaliate against employees who might expose the Count 4 conspiracy, such as the Plaintiff.

1602.   Therefore, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), the Plaintiff is thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

1603.   Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), the Plaintiff is entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

## FIFTH CAUSE OF ACTION

## VIOLATIONS OF RICO, 18 U.S.C. § 1962(A), (B), (C), & (D)

### Against all Defendants

1604.   The Plaintiff repeats and realleges paragraphs 1 through 1580 as if fully set forth herein.

1605.   This cause of action is asserted against all Defendants (the "Count 5 Defendants") and is asserted in addition to and in the alternative to all other causes of action.

1606.   Subsection § 1962(a) of Title 18 makes it illegal for

> *any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code [18 USCS § 2], to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce. A purchase of securities on the open market for purposes of investment, and without the intention of controlling or participating in the control of the issuer, or of assisting another to do so, shall not be unlawful under this subsection if the securities of the issuer held by the purchaser, the members of his immediate family, and his or their accomplices in any pattern or racketeering activity or the collection of an unlawful debt after such purchase do not amount in the aggregate to one percent of the outstanding securities of any*

509

> one class, and do not confer, either in law or in fact, the power to elect one or more directors of the issuer.[703]

1607.  Subsection § 1962(b) of Title 18 makes it illegal for "any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."[704]

1608.  Section § 1962(c) of Title 18 of the United States Code makes it illegal for "any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."[705]

1609.  Subsection § 1962(d) of Title 18, makes it illegal for "any person to conspire to violate" subsections § 1962(a), (b) and (c).

1610.  At all relevant times, each of the Count 5 defendants was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).  The Count 5 Defendants includes each individual and entity listed below in subsection (s), paragraph 1601.

1611.  Defendants have each unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(a), (b) and (c) as described above, in violation of 18 U.S.C. § 1962(d).

1612.  As described in each count, two or more people, including each of the Defendants, conspired to (and did) commit numerous violations of 18 U.S.C. § 1962(a), (b), (c) and (d) to further their unlawful schemes.

---

[703] 18 US.C. § 1962(a) (emphasis added).
[704] 18 US.C. § 1962(b) (emphasis added).
[705] 18 US.C. § 1962(c) (emphasis added).

1613.   As described below, each Defendant agreed to further the unlawful endeavor described in each RICO Count.

1614.   At all relevant times, the Plaintiff was, and is, a person within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c) and (d).

a.   **The Count 5 RICO Enterprise and Its Effect on Interstate Commerce**

1615.   From its formation in or around 2001 and continuing to the present, the McKinsey Hub-and-Spoke has constituted an enterprise (the "Count 5 Enterprise") within the meaning of 18 U.S.C. § 1961(4). The McKinsey Hub-and-Spoke consists of

o   Entities:

   ▪   Advisors: McKinsey & Co., Rothschild, EY, KPMG, PwC, Conway MacKenzie, Ankura, FTI, Zolfo Cooper, Houlihan Lokey, Inc., Standard & Poor's, Moody's Investor Service, BDO Puerto Rico

   ▪   Banks: Citigroup,[706] BAML,[707] Deutsche Bank,[708] UBS,[709] Bank of New York Mellon, Barclays,[710] Banco Popular, Morgan Stanley, Goldman Sachs,[711] RBS,[712] Merrill Lynch, Pierce, Fenner & Smith Inc.

   ▪   Funds: Avenue Capital, Apollo Global Management,[713] BlackRock,[714] Oaktree Capital Management, L.P., State Street Global Advisors,[715] AIG

---

[706] Citibank; Citgroup Global Markets; Citigroup Incorporated
[707] Bank of America Merrill Lynch (US); Bank of America and affiliates; Bank of America, N.A.
[708] Deutsche Bank; Deutsche Bank AG; Deutsche Bank Securities Inc.; Deutsche Asset Management Investmentgesellschaft mbH (DeAM); Deutsche Bank Trust Company Americas; Deutsche Bank Luxembourg S.A.; Deutsche Bank AG; Deutsche Bank AG New York Branch; Deutsche Bank AG, London Branch
[709] UBS and affliates; UBS Stamford Branch TRS
[710] Barclays Bank PLC; Barclays Capital
[711] Goldman Sachs; Goldman Sachs & Company, Inc.; Goldman Sachs Bank USA; Goldman Sachs Group Inc; Goldman Sachs Credit Partners, LP
[712] Royal Bank of Scotland; Royal Bank of Scotland Group, P.L.C.
[713] Apollo Global Management, LLC; Apollo Liability Consortium
[714] BlackRock, Inc.; BlackRock Advisors LLC; BlackRock Fund Advisors; BlackRock Financial Management; BlackRock Institutional Trust Company, N.A.; K Special Opportunity Fund L.P.; BlackRock Allocation Target

Insurance Co, Cerberus,[716] Strategic Value Opportunities,[717] Whitebox
Advisors, Aristeia Capital, GoldenTree Asst Management LP, Monarch
Alternative Capital LP, Taconic Capital Advisors L.P., Davidson Kempner
Capital Management LP, Brigade Capital Management LP

- Law firms: Proskauer, Cleary Gottlieb, OMM, Quinn Emanuel, Sidley
  Austin, Paul Hastings, Greenberg Traurig, Skadden, Arps, Slate, Meagher
  & Flom LLP, Davis Polk & Wardwell LLP, Jones Day, Kirkland & Ellis
  LLP, Quinn Emanuel, White & Case LLP, Stroock & Stroock & Lavan
  LLP, LSE, Marini Pietrantoni Muniz, LLC, Kramer Levin Naftalis &
  Frankel, Akin Gump Strauss Hauer & Feld LLP, Jenner & Block LLP,
  Bennazar, García & Milián, Simpson Thacher & Barlett LLP, Norton
  Rose Fulbright US LLP, McDermott, Will & Emery LLP, Law Office of
  James G. McCarney

- Insurance: AIG Insurance Co.[718]

- Commercial Companies: Houston Astros

- Gov't Entities: AAFAF, GDB, Oversight Board

  o Individuals

---

Shares: Series E Portfolio; BlackRock California Municipal Opportunities Fund of BLK California Muni;
BlackRock High Yield Municipal Fund; BlackRock New York Municipal Opportunities Fund of BLK Multi-State
Muni; BlackRock Strategic Municipal Opportunities Fund of BlackRock Series Trust; and BlackRock MuniAssets
Fund, Inc.; Brighthouse Funds Trust II – BlackRock Bond Income Portfolio; Master Total Return Portfolio of
Master Bond LLC; BlackRock Strategic Income Opportunities Portfolio; Obsideian Master Fund – Trading Sleeve; .
[715] State Street Global Advisors (US); SSgA Funds Management, Inc.
[716] Cerberus; Cerberus Institutional Partners; Cerberus Institutional Partners VI, L.P.
[717] Strategic Value Opportunities Fund LP; Strategic Value Master Fund Ltd; Strategic Value Special Situations
Master Fund III LP; and Strategic Value Special Situations Master Fund IV LP
[718] AIG Insurance Co.; AIG Property Casualty Co.; AIG Specialty Insurance Co.; American International
Reinsurance Co Ltd

- **McKinsey**: D. Barton, Sternfels, Proshan, J. Garcia, Goldstrom, and Yerian, A. Bielenberg, S. O'Rourke, P. Bailinson, B. Chapuious, O. Shah, K. Carmody, S. Skeates, J. Reed, T. Duvall, T. Wintner, D. Udom;

- **Rothschild**: D. Mondell, B. Meisel, L. Weinberg, V. D'Agata, J. Kang

- **EY**: J. Porepa, A. Chepenik, S. Panagiotakis, J. Burr, S. Hurtado, G. Malhotra

- **CM**: J. York

- **Ankura**: F. Batlle, J. Batlle, D. Barrett

- **Zolfo**: C. Flaton, R. Bingham

- **Citigroup**: T. Green, J. Castiglioni, J. Gavin

- **BAML**: J. Rodriguez

- **Deutsche Bank Securities**: M. Weinstein, Shawn Faurot

- **EMSO Asset Management**: Rory McGregor

- **Farmstead Capital Management**: Michael Scott

- **FCO Advisors LP**:

- **First Pacific Advisors LP**: Eric R. Brown

- **Fir Tree Capital Management**: Brian Meyer

- **GoldenTree Asset Management LP**: Sasha Linney

- **Goldman Sachs Asset Management LP**: David Z. Alter

- **Marble Ridge Capital**: Kamand Daniels

- **Mason Capital Management LLC**: Richard Engman

- **Monarch Alternative Capital LP**: Adam R. Sklar

- **OM Foundation Limited**: Satish Karandikar

513

- **Sculptor Capital LP**: Wayne Cohen

- **Silver Point Capital LP**: Stephen P. Cho

- **Stonehill Capital Management LLC**: Michael Thoyer

- **Taconic Capital Advisors LP**: Marc Schwartz

- **Whitebox Advisors LLC**: Luke Harris

- **Proskauer**: M. Bienenstock, B. Rosen, E. Barak, L. Rappaport, M. Firestein

- **OMM**: J. Rapisardi, S. Uhland, P. Friedman, B. Sushon

- **Paul Hastings**: L. Despins, L. Plaskon, A. Tenzer, A. Bongartz, M. Comerford, J. Grogan

- **Greenberg Traurig**: N. Mitchell

- **LSE**: Michael Luskin

- **Marini Pietrantoni Muniz**:

- **Oversight Board**: N. Jaresko, C. Garcia, J. El Koury, K. Rifkind, S. Negron, S. Rodriguez, M. Tulla, M. Vizcarrondo, A. Wolfe, E. Arroyo, O Cuadrado, José B. Carrión III, Andrew G. Biggs, Carlos M. García, Arthur J. González, José R. González, Ana J. Matosantos

- **AAFAF**: G. Portela, M. Yassin, P. Soto, A. Mendez

- **Officials**: Ricardo Rosselló Nevares, Christian Sobrino Vega, Gabriel Olivera Magraner, Rafael L. Rovira Arbona, Jorge L. Padilla, Matthew Karp, David Pauker

- **Others:** Jose Coleman Tio

1616.   The McKinsey Hub-and-Spoke is an association in-fact and was formed for the purpose of facilitating, committing, perpetuating, and concealing the fraudulent and other

514

criminal conduct alleged herein with the aim of committing rapacious fraud against the bankruptcy system and generate unlawful profits therefrom.

1617.  Defendants listed *above* received income derived, directly or indirectly, from the established pattern of racketeering activity, both directly or indirectly, and used part of that income, or the proceeds of such income, in the acquisition of interests in bankruptcy entities engaged in, or the activities of which affect, interstate or foreign commerce, including when Valeant purchased Dendreon in the context of a chapter 11 bankruptcy, not on the open market, violating 18 U.S.C. § 1962(a).

1618.  The Defendants listed above acquired or maintained an interest in participating in the pay-to-play scheme, a pattern of racketeering activity.  The Hub-and-Spoke conspiracy was and is an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce, and thus violates 18 U.S.C. § 1962(b)

1619.  Alleged victims include the innocent creditors in numerous bankruptcies across the country whom were deprived of their rights and property as a result of the Count 5 Defendants' systemic fraud.  In the case of Title III and Title VI proceedings, the alleged victims include the intended beneficiaries of the CWSRF and DWSRF funds, *i.e.*, the citizens of Puerto Rico, American taxpayers as benefactors, and the Plaintiff.  The citizens of Puerto Rico were deprived of adequate water facilities which were capable of delivering life-sustaining water resources because the CWSRF and DWSRF funds were misappropriated and misused for unauthorized and unlawful purposes, e.g., make payments to bondholders.  American taxpayers, including Puerto Rico citizens, were also injured on account of having their tax dollars misused for unauthorized purposes.  The citizens of Puerto Rico have also suffered injuries to their right to having a functioning, noncorrupt local government and banking system, both of which have

been compromised as a result of bribery and various forms of extortion. The Plaintiff has also suffered injuries to his business as a restructuring attorney, including his income, earning capacity, and reputation, as a result of his retaliatory discharge, a program of defamation, being blacklisted by certain law firms, having to file for chapter 11 bankruptcy, and the serial harassment he was subjected to, causing him to flee from New York.

1620.   Count 5 is based on the following predicate statutes and acts under Title 18:

   i.   *18 U.S.C. § 1344 Bank Fraud*

1621.   AAFAF or GDB officer directing the transfer of the CWSRF and DWSRF funds, under false pretenses, to Banco Popular in order to pay GDB bondholders.

1622.   In or around 2016, McKinsey, Proskauer, Cleary Gottlieb, Guggenheim Partners (as successor to Millstein & Co.) directed that AAFAF or GDB director, officer, or agent to transfer such funds under false pretenses in furtherance of the scheme.

   ii.   *18 U.S.C. § 1341 Mail Fraud → Conspiracy to defraud United States 18 U.S.C. § 371*

1623.   Having devised a scheme to unlawfully obtain United States federal CWSRF and DWSRF funds by means of false or fraudulent pretenses, the Federal Water Fund Defendants, as part of the Count V Enterprise, mailed or caused to be mailed multiple fiscal plans incorporating the federal water funds scheme, including, without limitation, the Disclosure Statement to the proposed Title III Join Plan of Adjust of the Commonwealth of Puerto Rico, et al, which included the May 2019 Commonwealth Fiscal Plan.[719]

   iii.   *18 U.S.C. § 1341 Mail Fraud → Statements or entries generally 18 U.S.C. § 1001*

---

[719] *See* Disclosure Statement For The Title Iii Joint Plan Of Adjustment For The Commonwealth Of Puerto Rico, The Employees Retirement System Of The Government Of The Commonwealth Of Puerto Rico, And The Puerto Rico Public Buildings Authority, Case:17-03283-LTS Doc#:8766-11 Filed:09/27/19 Entered:09/27/19 09:44:05 Desc: Exhibit E - CW Fiscal Plan Page 1 of 156.

1624.   Having devised a scheme to commit rapacious fraud against the federal bankruptcy court system and to conceal McKinsey's disabling conflicts, including the drafting and submission of the fraudulent LSE McKinsey Report, Defendants mailed or caused to be mailed the LSE McKinsey Report and other letters and documents containing false statements.

   iv. *18 U.S.C. § 1343 Wire Fraud → Conspiracy to impede or injure officer 18 U.S.C. § 372*

1625.   Having devised a scheme to unlawfully discharge the Plaintiff, an officer of the Title III Court representing the UCC, in violation of 18 U.S.C. § 372, for learning of facts material to (i) the scheme to fix-legal outcomes; and (ii) the scheme to misappropriate the CWSRF and DWSRF funds, certain defendants used United States wires to make telephone calls in furtherance of the scheme, including, without limitation, on September 3, 2018, Mr. Bernstein (NY) called the Plaintiff (CA) and falsely represented that that the Plaintiff "had been fired" on August 22, 2018.  Bernstein, the chair of employment practice at Paul Hastings, knew (a) that such a discharge of duties may only occur upon notice and (b) that the Plaintiff had not received notice of firing until, at the earliest, August 26, 2018.

1626.   In addition, Despins, Plaskon, and perhaps others directed or otherwise caused Shlomo Maza to send to the Plaintiff the June 26, 2018 email falsely accusing him of attempting to omitting controlling authority, *i.e.*, the Maza Accusation.  The sending of the email containing this misrepresentation in furtherance of the scheme to retaliate against the Plaintiff constitutes wire fraud.

1627.   The purpose of the misrepresentations was to deceive and apply immense pressure on the Plaintiff into voluntarily resigning, and thereby waive his legal rights. It is also submitted that Paul Hastings and other co-conspirators defamed the Plaintiff in an effort to discredit him to other potential employers.  Such defamation injured the Plaintiff's income, earning capacity, and business reputation as a restructuring attorney.

v. _18 U.S.C. § 1343 Wire Fraud → Conspiracy to Defraud United States 18 U.S.C. § 371_

1628.   Having devised a scheme to unlawfully obtain United States federal CWSRF and

DWSRF funds by means of false or fraudulent pretenses, certain defendants made phone calls using

interstate wires to execute the scheme of wire fraud to defraud as follows:

| No. | Date | Defendants | Description |
|---|---|---|---|
| 3 | 2/9/2018 | Ankura (D. Barrett), McKinsey, Rothschild, DevTech, CM | Participate on telephone call…to discuss **federal funding bill allocation to Puerto Rico** to be included in the revised fiscal plan. |
| 8 | 2/26/2018 | Citi (T. Green) | Emails. calls re PRASA Fed creditors |
| 9 | 2/27/2018 | Citi (J. Gavin) | Prasa call re structure |
| 11 | 2/28/2018 | Citi (T. Green), Rothschild, BAML | PRASA Call with Rothschild, BAML |
| 12 | 2/28/2018 | Citi (T. Green), Rothschild, EY2 | **Calls re GDB RSA with Rothschild and EY** |
| 13 | 3/8/2018 | Citi (T. Green) | **EPA follow-up work and SRF calls** |
| 17 | 3/23/2018 | Paul Hastings (M. Comerford, L. Despins), Rothschild (D. Mondell), certain creditors | Review bi-weekly update regarding AAFAF, Commonwealth, PREPA and PRASA (.3); update call regarding same…(.3); follow-up correspondence with L. Despins regarding same (.2) |
| 18 | 3/23/2018 | Proskauer (M. Bienenstock), FOMB | Participate in Board calls regarding PRASA and Commonwealth fiscal plans. |
| 19 | 3/27/2018 | Ankura (F.Batlle) | Participate on call…to discuss status of fiscal plan and liquidity forecast. |
| 20 | 3/27/2018 | Rothschild, Bluhaus, CM, DevTech, Ankura (D. Barrett) | Participate on call…about financial model changes. |
| 21 | 3/27/2018 | CM (J. York), AAFAF (A. Mendez), Ankura (F. Batlle) | Participate in conference call…to discuss liquidity forecast and potential inclusion on fiscal plan. |
| 23 | 3/29/2018 | Ankura (F. Batlle), McKinsey (O. Shah), A. Mendez (AAFAF) | Participate on conference call…to discuss **cash position and next steps in identifying restricted/unrestricted cash** to be included in the revised fiscal plan. |
| 24 | 4/4/2018 | Citi (T. Green); Rothschild (D. Mondell); Proskauer (B. Rosen) | calls re PRASA; Teleconference…regarding classification issues |

| 25 | 4/4/2018 | Rothschild (D. Mondell), AAFAF, OMM | Call w/ AAFAF and counsel re CDL |
| 26 | 4/4/2018 | Ankura (D. Barrett), McKinsey, AAFAF | Participate on call…**about cost share assumptions and alignment between Commonwealth and PRASA plans.** |
| 29 | 4/5/2018 | OMM (J. Rapisardi), Ankura (F. Batlle, D. Barrett) | Participate on call…about differences in agency savings, government plan versus FOMB plan. |
| 31 | 4/10/2018 | Rothschild (Mondell), Ankura | Call w/ Ankura re forecast modeling |
| 32 | 4/10/2018 | Ankura (F. Batlle); McKinsey (S. O'Rourke, D. Udom, J. Reed, O. Shah) | Participate on call…to discuss general fund expenses build up and presentation in fiscal plan.[720] |
| 33 | 4/10/2018 | Ankura (D. Barrett), McKinsey (O. Shah) | Participate on call…to discuss general fund expenses build up and presentation in fiscal plan |
| 36 | 4/11/2018 | CM, AAFAF, Ankura (Barrett) | Participate on call…about comparison of expense measures between revised fiscal plan and FOMB fiscal plan **in addition to need to push expense measures into each of the agency budgets and line items.** |
| 37 | 4/12/2018 | Citi (T. Green) | PRASA call **re Federal Funding and Match** |
| 38 | 4/13/2018 | Ankura (F. Batlle), AAFAF (J. Mattei) | Participate on call with J. Mattei (AAFAF) **to discuss state revolving fund payment from General Fund.** |
| 39 | 4/16/2018 | Paul Hastings (L. Despins, M. Comerford), OMM (S. Uhland), N.Mitchell (Greenberg Traurig), Zolfo Cooper (C. Flaton) | Review background regarding **proposed loan from Commonwealth to PRASA** (.90); Call…regarding same (.50); post-mortem discussion with C. Flaton regarding same (.20) |
| 41 | 4/22/2018 | OMM (J. Rapisardi, S. Uhland, B. Sushon), Anukra (D. Barrett, T. Panciera, P. Nilsen), Greenberg Traurig (N. Mitchell), AAFAF (M. Yassin) | Participate in conference call…to discuss Section 205 letter strategy. |
| 43 | 4/24/2018 | Citi (J. Gavin) | Puerto Rico Budget powers call |
| 46 | 4/28/2018 | Rothschild, OMM, Ankura (D. Barrett) | Participate on call…to review status of 205 letter and discuss items to include in letter. |
| 47 | 4/29/2018 | OMM (J. Rapisardi S. Uhland), | Participate in conference call…to discuss COFINA/GO mediation and section 205 letters. |

---

[720] 3rd Ankura Fee Application, at 214 of 275.

| | | Greenberg Traurig (N. Mitchell), AAFAF (G. Portela, M. Yassin, P. Soto), Ankura | |
|---|---|---|---|
| 49 | 4/29/2018 | EY (A. Chepenik, J. Santambrogio, S. Panagiotakis, J. Burr, C. Loh); McKinsey (S. O'Rourke, O. Shah, T. Duval, A. Bielenberg, J. Reed, D. Udom, J. Davis); FOMB (M. Tulla, S. Negron, K. Rifkind) | Participate in call...to discuss mapping fiscal plan measures to the budget[721] |
| 50 | 4/29/2018 | Paul Hastings (L. Despins), OMM (J. Rapisardi S. Uhland), Rothschild (D. Mondell),Zolfo (C. Flaton) | Call...regarding [redacted][722] |
| 54 | 5/7/2018 | Ankura (F. Batlle), AAFAF (A. Mendez), CM | Participate on telephone call...to discuss FY19 budget process in anticipation of meeting with representatives of FOMB. |
| 58 | 5/9/2018 | Proskauer (M. Bienenstock), FOMB | Participate in call with Board [,] Commonwealth fiscal plan subcommittee **regarding budget and notice of violations**. |
| 59 | 5/9/2018 | Citi (J. Gavin), Ankura | [C]all with Ankura re restructuring |
| 61 | 5/9/2018 | Ankura (F. Batlle, P. Nilsen), McKinsey (O. Shah, J. Reed), CM (J. York) | Participate on telephone call...regarding the creditor mediation meeting on 5/15/18. |
| 63 | 5/11/2018 | Ankura (F. Batlle), FEMA (S. El Hage[723]) | Participate on telephone call...to review methodology used for build up of FEMA disaster recovery fund estimates. |
| 71 | 5/15/2018 | EY (J. Burr), McKinsey (D. Udom) | Participate in <u>cali</u>...**to discuss fiscal plan to budget mapping for OMB Custody**, 911 and Tourism |
| 80 | 5/17/2018 | Ankura (F. Battle), Rothschild, BAML, Ankura, AAFAF | Call "strategy session with FOMB board members to discuss governor and creditor proposal" |
| 83 | 5/19/2018 | Citi (T. Green), Rothschild | Rothschild calls re PROMESA debt |

[721]

[722]

[723] S. El Hage is currently an advisor at Horne Consulting.

| 84 | 5/20/2018 | Citi (T. Green), PRASA advisor | PRASA advisor call re next steps |
|----|-----------|--------------------------------|----------------------------------|
| 86 | 5/21/2018 | Proskauer (M. Bienenstock, S. Ma), McKinsey, EY | Attend conference call with McKinsey and Ernst & Young regarding best interest test analysis |
| 87 | 5/21/2018 | Rothschild (D. Mondell), Citi, BAML | Call w/ Citi and BAML re GO / COFINA and PRASA |
| 90 | 5/21/2018 | Ankura (F. Batlle), AAFAF (Mendez, M. Yassin), CM (J. York) | Participate on telephone call…to discuss FOMB/Government agreement and impact on FY19 budget |
| 92 | 5/21/2018 | Ankura (F. Batlle), AAFAF (Mendez, M. Yassin), CM (J. York) | Participate on telephone call with A. Mendez (AAFAF) and M. Yassin (AAFAF) and J. York (CM) to discuss FOMB/Government agreement and impact on FY19 budget. |
| 93 | 5/21/2018 | Ankura (F. Batlle), AAFAF (G. Loran) | **Participate on telephone call…to discuss treatment of state revolving funds in fiscal plan.** |
| 94 | 5/21/2018 | Ankura (F. Batlle), AAFAF (C. Yamín, M. Yassin), E. Trigo (O'Neill & Borges) | Participate on telephone call…to discuss retained revenues treatment in FY19 budget. |
| 95 | 5/22/2018 | Ankura (F. Batlle), McKinsey (O. Shah) | Participate on telephone call with O. Shah (MCK) to discuss budget and fiscal plan recertification. |
| 97 | 5/24/2018 | Citi (T. Green), AAFAF | PRASA call with AAFAF advisors |
| 99 | 5/24/2018 | Citi (T. Green) | PRASA Federal Creditors call |
| 100 | 5/24/2018 | Citi (T. Green) | PRASA post-call follow-ups |
| 101 | 6/5/2018 | Citi (T. Green, J. Castiglioni, G. Gavin) | Rothschild and Citi calls |
| 109 | 6/7/2018 | Citi (T. Green, J. Castiglioni, J. Gavin) | PRASA meetings and calls and prep |
| 120 | 6/12/2018 | McKinsey (J. Reed, T. Duvall, D. Uhum, P. Davidson), EY (J. Santambrogio, A. Chepenik, B. Yano, G. Malhotra), FOMB (N. Jaresko, K. Rifkind, A. Wolfe) | Participate in call…to discuss creditor best interest test analysis and scenario modeling. |
| 121 | 6/12/2018 | McKinsey, Proskauer, Citi EY (J. Santambrogio) | Participate in call with Proskauer, McKinsey and Citi to discuss best interest test analysis |
| 123 | 6/13/2018 | Citi (T. Green, J. Castiglioni, J. Gavin) | PRASA prep and post-meeting calls |

| 126 | 6/14/2018 | McKinsey (P. Bailinson), EY (S. Panagiotakis) | Participate in <u>call</u>...to discuss the files provided that detail changes to the FP for the budget. |
| 127 | 6/14/2018 | McKinsey (P. Bailinson, S. O'Rourke, T. Duvall, T. Wintner); EY (S. Panagiotakis, J. Santambrogio, A. Chepenik, J. Burr); FOMB (N. Jaresko, M. Tulla) | Participate in <u>call</u>...to discuss fiscal plan to budget estimate reconciliations. |
| 128 | 6/14/2018 | McKinsey, CM, FOMB, AAFAF, Ankura (F. Batlle) | Participate on <u>conference call</u>...to discuss and review implementation plan framework and reporting. |
| 129 | 6/14/2018 | Ankura (F. Batlle), AAFAF (G. Portela) | Participate on call with G. Portela (AAFAF) to discuss status of the plan of adjustment presentation. |
| 130 | 6/14/2018 | Rothschild; BAML; OMM; AAFAF; Ankura (F. Batlle) | Participate on <u>conference call</u>...to review first draft of plan of adjustment presentation. |
| 132 | 6/15/2018 | McKinsey (Bailinson, D. Udom, J. Reed); EY (S. Panagiotakis) | Participate in <u>call</u>...to go through the files we provided summarizing the **changes to the FP based on the budget and changes to individuals agencies and budgets**. |
| 133 | 6/15/2018 | Ankura (F. Batlle), AAFAF (A. Mendez) | Participate on call...to discuss summary of **revisions to proposed budget submitted by FOMB**. |
| 134 | 6/15/2018 | Rothschild, BAML, OMM, AAFAF, Ankura (F. Batlle) | Participate on conference <u>call</u>...**to discuss changes and status of plan of adjustment strategy presentation**. |
| 135 | 6/15/2018 | OMM, Ankura (F. Batlle) | Participate on <u>conference call</u>...to discuss changes to plan of adjustment strategy presentation. |
| 136 | 6/15/2018 | BAML, (J. Rodriguez); Ankura (F. Batlle) | Participate on <u>call</u>...**to discuss plan of adjustment presentation changes**. |
| 137 | 6/17/2018 | Rothschild (D. Mondell), BAML, Ankura | <u>Call</u> w/ BAML and Ankura re financial model scenario |
| 138 | 6/17/2018 | Rothschild (D. Mondell), AAFAF | <u>Call</u> w/ AAFAF team re financial analysis |
| 140 | 6/18/2018 | McKinsey, Citi, Proskauer, O'Neill, EY (. Chepenik, J. Santambrogio, G. Malhotra, J. Porepa, R. Tague), FOMB (N. Jaresko, S. Negron) | Participate in advisor <u>call</u> to discuss analysis and work being completed with S Negron (FOMB), N Jaresko (FOMB), McKinsey, Citi, Proskauer, O'Neill, A Chepenik (EY) G Malhotra (EY) J Santambrogio (EY), J Porepa (EY) and R Tague (EY). |
| 141 | 6/18/2018 | McKinsey, | Participate in Advisor <u>call</u> with N. Jaresko (FOMB), M. |

| | | Proskauer, EY (J. Porepa), FOMB (M. Tulla) | Tulla (FOMB), McKinsey, Proskauer, J. Porepa (EY) and S. Panagiotakis (EY) to discuss **progress on fiscal plan and budget**. |
|---|---|---|---|
| 145 | 6/18/2018 | Paul Hastings (M. Comerford), Zolfo (S. Martinez) | Review summary of creditor working group call <u>from S. Martinez</u> (Zolfo Cooper) regarding open issues to address for PREPA and PRASA (.2) |
| 146 | 6/19/2018 | McKinsey, EY (J. Burr, S. Panagiotakis) | Participate in <u>call</u>...to discuss the **budget comparison files prepared to explain variance between the EY and FOMB budgets.** |
| 147 | 6/20/2018 | Citi (T. Green, J. Castiglioni, J. Gavin) | **PRASA EPA term sheet review and <u>calls</u>** |
| 150 | 6/20/2018 | Rothschild, BAML, OMM, Ankura (F. Battle), AAFAF | Participate on <u>conference call</u>...to discuss plan of adjustment strategy and GO/Cofina settlement. |
| 155 | 6/22/2018 | McKinsey (P. Baliston, K. Hernandez, S. O'Rourke, D. Burr), EY (A. Chepenik, S. Panagiotakis, J. Burr, J. Santambrogio) | Participate in **call** on **fiscal plan reconciliations and adjustments with McKinsey.** |
| 160 | 6/22/2018 | McKinsey, CM, Ankura (D. Barrett), FOMB, AAFAF | Participate on <u>conference call</u>...to discuss and review implementation plan framework and reporting |
| 162 | 6/22/2018 | Rothschild, CM, Ankura (F. Battle) | Participate on <u>conference call</u>...to prepare for **meeting with representatives of McKinsey to discuss Miller Buckfire projections.** |
| 163 | 6/22/2018 | Greenberg Traurig (N. Mitchell), Ankura (F. Battle) | Participate on <u>call</u>...to discuss **PRASA restructuring status**. |
| 166 | 6/24/2018 | McKinsey (O. Shah), Ankura (F. Battle) | Participate on <u>call</u>...to discuss fiscal plan certification in light of latest update on Act 80. |
| 167 | 6/24/2018 | EY (J. Burr), FOMB (S. Rodriguez) | Participate in call <u>with</u>...to discuss **FY18 budget transfer impacts on the FP and how they will be incorporated** |
| 171 | 6/25/2018 | McKinsey, Ankura (F. Batlle), FOMB | Participate in weekly fiscal plan implementation status <u>call</u> with McKinsey and FOMB staff. |
| 172 | 6/25/2018 | Ankura (F. Batlle, D. Barrett) | Participate on <u>call</u>...to prepare for meeting with McKinsey and FOMB regarding fiscal plan implementation. |
| 187 | 6/26/2018 | Citi (T. Green, J. Castiglioni, J. Gavin), FOMB | FOMB <u>calls</u> re CW FP |
| 188 | 6/26/2018 | Rothschild (D. Mondell); EY (A. Chepenik); Ankura (F. Battle, J. Batlle) | Participate on conference <u>call</u>...**to discuss state revolving fund allocation in FY19 budget.** |
| 201 | 6/28/2018 | Ankura (F. Batlle), | Participate on <u>calls</u>...to **discuss state revolving fund** |

| | | AAFAF (J. Mattei) | **payment and inclusion in FY19 general fund budget**. |
|---|---|---|---|
| 206 | 6/29/2018 | Rothschild, BAML, OMM, Ankura (F. Batlle) | Participate on conference call…to discuss plan of adjustment materials. |
| 207 | 6/29/2018 | CM (J. York); Ankura (F. Batlle) | Participate on call with J. York (CM) to discuss assumptions in revenue forecast using FY18 actuals. |
| 213 | 6/30/2018 | EY (S. Panagiotakis) | Participate in call with S. Rourke (McKinsey) **to discuss the transfers from agency to agency** and their impact on the fiscal plan. |

    i.    _18 U.S.C. § 1343 Wire Fraud → Statements and entries generally in_
           _Furtherance of to Unlawful Professional Price-Fixing Scheme 18_
           _U.S.C. § 1001_

    1629.   Having devised a scheme to fix professional fees for bankruptcy related

consulting services. McKinsey, BAML, Ankura, and others listed below made the following

phone calls and send emails in furtherance of the scheme:

| No. | Date | Parties | Hours | Description |
|---|---|---|---|---|
| 1. | 3/1/18 | McKinsey (O. Shah), Ankura (Batlle, Fernando) | 0.1 | Participate on call with O. Shah (McK) to review professional services fees forecast.[724] |
| 2. | 3/3/18 | McKinsey (O. Shah), Ankura (Batlle, Fernando) | 0.1 | Participate on call with O. Shah (McK) to discuss professional fees projection.[725] |
| 3. | 3/6/18 | McKinsey (O. Shah), Ankura (P. Nilsen) | 0.7 | "Participate on a call with O. Shah (McK) to discuss the revised fiscal plan assumptions related to professional fees"[726] |
| 6. | 3/8/18 | McKinsey (O. Shah, J. Reed), Ankura (P. Nilsen) | 0.6 | Participate on a call with O. Shah (McK) and J. Reed (McK) regarding professional fees assumptions within the revised fiscal plan.[727] |
| 8. | 3/8/18 | Ankura (F. Batlle), others | 0.5 | Participate in conference call with representatives of McKinsey to discuss assumptions to related to professional fees to be incorporated in the revised fiscal plan.[728] |

---

[724] Third Interim Ankura Fee App, at 131.
[725] Id. at 133.
[726] Id. at 138.
[727] Id. at 146.
[728] Id. at 147.

| No. | Date | Parties | Hours | Description |
|-----|------|---------|-------|-------------|
| 10. | 3/9/18 | Ankura (Batlle, Fernando), AAFAF (G. Franco) | 0.2 | Participate on call with G. Portela (AAFAF) to discuss professional fees projection worksheet and assumptions.[729] |
| 11 | 3/13/18 | McKinsey, Ankura (F. Batlle) | 0.8 | Participate on conference call with representatives from McKinsey to discuss professional fee projections assumptions included in the revised fiscal plan.[730] |
| 12. | 3/15/18 | McKinsey, Ankura (F. Batlle, P. Nilsen) | 0.9 | Participate on phone call with F. Batlle (ACG) and representatives of McKinsey regarding the latest update to the professional fees forecast.[731] |
| 14. | 3/16/18 | McKinsey, Ankura (F. Batlle, P. Nilsen) | 0.8 | Participate on phone call with P. Nilsen (ACG) and representatives of McKinsey regarding the inclusion of the latest version of the professional fees forecast within the revised fiscal plan.[732] |
| 16. | 3/20/18 | McKinsey (O. Shah), Ankura (F. Batlle) | 0.4 | Participate on telephone call with O. Shah (McK) to discuss professional fee projection assumptions and status of open items in fiscal plan.[733] |
| 18. | 3/22/18 | McKinsey (O. Shah), Ankura (Nilsen, Patrick) | 0.3 | Correspond with O. Shah (McK) regarding FOMB professional fee assumptions.[734] |
| 23. | 4/4/18 | McKinsey (J. Reed), Ankura (F. Batlle) | 0.5 | Participate on call with J. Reed (McK) to discuss professional fees projections update.[735] |
| 24. | 4/4/18 | McKinsey (J. Reed), Ankura (F. Batlle) | 0.4 | Participate on call with J. Reed (McK) to review professional fees projection changes, disaster spend timing and other open items related to fiscal plan. |
| 25. | 4/3/18 | BAML, Ankura (P. Nilsen) | 0.3 | Correspond[736] with J. Rodriguez (BAML) regarding the methodology for BAML professional fees. |
| 26. | 4/4/18 | BAML, Ankura (P. Nilsen) | 0.4 | Correspond with J. Rodriguez (BAML) regarding the methodology for BAML professional fees.[737] |
| 29. | 4/5/18 | McKinsey (J. Reed), Ankura (F. Batlle) | 0.7 | Participate on telephone call with J. Reed (McK) regarding the professional fees estimate included in the revised fiscal plan. |

[729] Id. at 151.
[730] Id. at 155.
[731] Id. at 161.
[732] Id. at 164.
[733] Id. at 172.
[734] Id. at 178.
[735] Id. at 211.
[736] On information and belief, the term "correspondence" is in reference to an email exchange.
[737] Id. at 212.

| No. | Date | Parties | Hours | Description |
|---|---|---|---|---|
| 32. | 4/11/18 | McKinsey, Ankura (D. Barrett) | | Participate on call with representatives from Ankura and McKinsey about professional fee schedule in revised fiscal plan. |
| 36. | 10/5/18 | McKinsey (O. Shah), Ankura, Battle, Fernando) | 0.4 | Participate on call with O. Shah (MCK) to discuss professional fees build and FY19 budget in the fiscal plan. |
| 38. | 10/17/18 | McKinsey (O. Shah), Ankura (F. Battle) | 0.1 | Participate on call with O. Shah (MCK) to discuss professional fees included in revised fiscal plan. |
| 39. | 10/17/18 | Hacienda (O. Rodriguez), Ankura (F. Battle) | 0.1 | Participate on call with O. Rodriguez (Hacienda) to discuss revised professional fees budget. |
| 40. | 11/2/18 | AAFAF (S. Torres), Ankura (F. Battle) | 0.1 | Participate on call with S. Torres (AAFAF) regarding professional fees. |
| 41. | 11/2/18 | McKinsey (O. Shah), Ankura (F. Battle) | 0.1 | Participate on call with O. Shah (MCK) to discuss professional fee schedule. |
| 42. | 11/2/18 | Hacienda (O. Rodriguez), Ankura (F. Battle) | 0.1 | Participate on call with O. Rodriguez (Hacienda) to discuss professional fees budget. |
| 43. | 11/2/18 | Hacienda (O. Rodriguez), Ankura (F. Battle) | 0.1 | Participate on call with O. Rodriguez (Hacienda) to discuss revised professional fees schedule. |
| 44. | 11/6/18 | Hacienda (O. Rodriguez), Ankura (F. Battle) | 0.1 | Participate on call with O. Rodriguez (Hacienda) to discuss professional fees budget. |
| 45. | 12/10/18 | McKinsey (O. Shah), Ankura (F. Battle) | 0.2 | Participate on call with O. Shah (MCK) to discuss professional fees budget. |

ii. _18 U.S.C. § 1343 Wire Fraud → Conspiracy to impede or injure officer 18 U.S.C. § 372_

1630.   Having devised a scheme to unlawfully discharge the Plaintiff, an officer of the Title

III Court representing the UCC, on false pretenses and in violation of 18 U.S.C. § 372, certain

defendants made phone calls using interstate wires to execute the scheme of wire fraud to defraud,

including, without limitation, on September 3, 2018, Mr. Bernstein (NY) called the Plaintiff (CA)

526

and falsely represented that that the Plaintiff "had been fired" on August 22, 2018.  Bernstein,

the chair of employment practice at Paul Hastings, knew (i) that such a discharge of duties may

only occur upon notice and (ii) that the Plaintiff had not received notice of firing until, at the

earliest, August 26, 2018.

   *iii.* <u>*18 U.S.C. § 1503 Influencing or injuring officer or juror generally*</u>
     <u>*(Obstruction of Justice)*</u>

  1631.



  1632. Paul Hastings, the Law Office of James G. McCarney, and likely other McKinsey

Hub-and-Spoke Conspirators committed various acts of harassment against the Plaintiff,

including invasive and constate monitoring while in New York City, including, among other

things, (i) stalking the Plaintiff near and around his apartment complex and Grand Central

Station in August and September of 2018; (ii) sending an agent of the Law Office of James G.

McCarney on a fake date with the Plaintiff on or about September 23, 2018, which led to the

agent entering his private residence under false pretenses; and (iii) on February 9, 2018, sending

an agent, under the guise of a professional mover, to engage in surveillance, including the

breaking and entering into a sealed box storing the Plaintiff's personal belongings.

  1633. Paul Hastings and likely other co-conspirators intentionally injured the Plaintiff's

business reputation as a restructuring attorney by engaging in a program of defamation to other

attorneys and law firms specializing in restructuring and blacklisting.  This program includes (i)

527

the incident where Leslie Plaskon solicited negative comments about the Plaintiff, including from Danny Newman, by falsely representing that she and other Paul Hastings' partners had received "a series of negative reviews" about the Plaintiff's work, even though Plaskon knew that was untrue or materially false; (ii) conspirators have effectively blacklisted the Plaintiff from hire in his profession, including at the law firm Moore & Van Allen, which offered the Plaintiff an interview in October 2019, but then aided and abetted the conspiracy by repeatedly delaying the interview before ceasing communications with the Plaintiff altogether after having learned of the blacklisting from a defendant. The Plaintiff believes discovery will reveal further instances of defamation made by Paul Hastings' Partners and attorneys.

### iv.   *18 U.S.C. § 1951 Extortion*

1634.   Members of the Oversight Board, including José B. Carrión III, Andrew Biggs, Carlos M. García, Arthur J. González, Ana J. Matosantos, José R. González, David A. Skeel, Executive Director Natalie Jaresko, and Legal Counsel Jaime El Koury, as well as McKinsey, Rothschild, EY, Proskauer and all other Count V defendants attempted to coerce the Puerto Rico legislature into repealing Act 80 and assuming liability for the misappropriated water funds by threatening to make draconian cuts to the budgets of the legislature and the judiciary.

1635.   In addition, Paul Hastings, Despins, Plaskon, Bernstein, Saban, Harris, Kelloff and Feliu (i) applied undue pressure on the Plaintiff to sign the so-called "Confidential Transition and General Release Agreement," attempting to disguise the fact that such agreement was, in reality, a resignation agreement; (ii) intentionally and knowingly deprived the Plaintiff of his earned but unpaid salary, amounting to at least $1,009, in order to place the Plaintiff in financial distress and to increase Paul Hastings' negotiating leverage; (iii) intentionally and knowingly depriving the Plaintiff of his healthcare and access to medicine without notice for at least a

month after the fact; (iv) concocted the fiction that Paul Hastings had previously "fired" the

Plaintiff <u>after</u> Paul Hastings received the Plaintiff's 8-23-18 email in which he renewed his

request under the ADA for a reasonable accommodation (prior to the email dated 8-23-18, the

Plaintiff was not aware that there was uncertainty of the Plaintiff's legal employment status, as

things stood);[738] (v) refused to inform the Plaintiff whether or not he remained an employee of

Paul Hastings after August 22, 2018, the date of his purported dismissal; (vi) providing

inconsistent and deliberately misleading information to the Plaintiff, such as only telling the

Plaintiff on a September 3, 2018 phone call with Mr. Bernstein, that the Plaintiff "had been

fired" on August 22, 2018.  However, immediately following this phone call, Mr. Bernstein sent

the Plaintiff a seemingly contradictory email stating that the Plaintiff had been placed on

"inactive status" on August 22 and that his "formal employment" relationship with Paul Hastings

would end on September 14.  Further, Mr. Bernstein did not explain the legal difference between

that distinction, leaving the Plaintiff bewildered and uncertain about his legal status; (vii)

initiating and perpetuating bad faith negotiations where; (a) Paul Hastings refused to identify or

describe what particular "issues" it sought to resolve through the negotiations; (b) hired an

attorney licensed in the state of New York, but not California, attorney to represent it after

having been notified that the Plaintiff's employment agreement, pursuant to its terms, is to be

"governed and construed" under California law, (c) repeatedly and continuously distorted certain

statements made by the Plaintiff in what appeared to be attempts to undermine his position, (d)

refusing to respond to offers made by the Plaintiff in a timely fashion (and later admitting that it

never seriously considered those offers) and only responding when the Plaintiff pointed out the

absurdity that Paul Hastings initiated the negotiations but refused to make any offers or

---

[738] In fact, the last time the Plaintiff had asked, at the first 8/16/2018 meeting, both Ms. Plaskon and Mr. Despins
stated that the Plaintiff was not being fired.

counteroffers, (e) stating in its counteroffer, without explanation, that the Plaintiff did not have any valid claims under the ADA, or otherwise; (viii) sought to impose a wide-ranging nondisclosure provision in the proposed settlement agreements, which, among other things, sought to prohibit any negative comments about the firm, or any current or former partner or associate at Paul Hastings. The effect of the nondisclosure provision, sans statutory rights, would have prevented the Plaintiff from being able to enforce his valid claims RICO or the ADA; and (ix) intended to use this manufactured uncertainty, pressure and economic duress in order to obtain from the plaintiff something of value from the Plaintiff, *i.e.*, the release of his legal actions against Paul Hastings.

  v.   *18 U.S.C. § 1512 Tampering with a witness or victim*

1636.   The predicate acts recited under obstruction of justice *above* are repeated here.

  vi.   *18 U.S.C. § 1954 Influence Operation of Employee Benefit Plan*

1637.   In or around July 2017, AAFAF Director of Fiscal Agency Mohammad Yassin-Mahmud instructed ERS Administrator L. Rodriguez to transfer $190.48 million to the Department of the Treasury. It is asserted that these funds were transferred with the intent to replace the misappropriated CWSRF and DWSRF funds. The Plaintiff believes additional evidence of unlawful interference of Puerto Rico Employment Retirement System will emerge upon further discovery.

  vii.   *18 U.S.C. § 201 Bribery of Public Officials and Witnesses*

1638.   OMM, Davis Polk, Proskauer, McKinsey, Cleary Gottlieb, Rothschild, Ankura, Guggenheim Partners (successor to Millstein & Co.), Goldman Sachs, Lehman Brothers, and other co-conspirators offered Jorge Irizarry bribes in exchange for him authorizing the interest rate swaps and termination fees, and to further aid in the COFINA Ponzi scheme, as well as

making other bribes through the held under custody of the OMB, and other such budget
allocations, such as the $437,000 payment to fund the "operating expenses of the Luis Muñoz
Marin Foundation."

### f.   **Causation and Damages**

1639.   As a direct and proximate result of foregoing violations of 18 U.S.C. § 1962(d) by
the Count 5 Defendants, the Plaintiff suffered an immediate and direct injury from the Count 5
Defendants' racketeering activity. Specifically, the Count 4 Defendants engaged in obstruction
of justice and witness tampering by removing the Plaintiff – an officer of the court while in the
discharge of his duties – from his employment position, engaging in a program of defamation,
and harassing the Plaintiff to such an extent he was forced to flee the State of New York.  As a
consequence, he suffered significant loss of property related to his income, earning capacity and
business reputation.  Had the Count 4 Defendants not implemented their scheme, forming
McKinsey RTS to unlawfully obtain restructuring assignments in violation of Rule 2014 and
perpetrating related predicate acts, the Plaintiff would remain gainfully employed with his
earning capacity undisturbed and business reputation intact.

1640.   It was a foreseeable, natural, direct, and intended consequence of the Count 5
Defendants' scheme that conspirators would need to engage in coverup and, in some cases,
retaliate against employees who might expose the Count 4 conspiracy, such as the Plaintiff.

1641.   Therefore, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), the
Plaintiff is thereby entitled to recover treble damages, together with the costs of this suit and
reasonable attorneys' fees.

1642.   Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), the Plaintiff is entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION
### Cal. Civ. Code § 51(f)[739]
### (Discrimination based on failure to provide reasonable accommodation under 42 U.S.C. § 12112(a) as incorporated by Cal. Civ. Code § 51(f))

1643.   Paragraphs 1-1619 are incorporated by reference as if fully set forth herein.

1644.   Further, Cal. Civ. Code § 51(f) provides

*(f) A violation of the right of any individual under the federal Americans with Disabilities Act of 1990...shall also constitute a violation of this section.[740]*

1645.   The Americans with Disabilities Act of 1990 is codified within Title 42, Chapter 126, §§ 12101-12213.

1646.   Section 12112(a) of Title 42 of the United States Code provides

*No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.*

1647.   In pertinent, 42 U.S.C.A. § 12111(2) defines the term "covered entity" as "an employer, employment agency, labor organization, or joint labor-management committee."

1648.   In pertinent part, 42 U.S.C.A. § 12111(5) provides

---

[739] The Plaintiff and Paul Hastings selected California law to govern the resolution of disputes arising out of the employment agreement. Employee Confidentiality and Invention Assignment Agreement, at 10; Confidentiality/Work Product Retrieval, at 14.
[740] Cal. Civ. Code § 51(f).

> *The term "employer" means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person[.]*

1649.   Here, Paul Hastings is such "a person," as it is an international law firm employing over approximately 900 attorneys for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

1650.   In addition, the following partner and senior attorney defendants are agents of Paul Hastings: (i) Mr. Despins: (ii) Ms. Plaskon; (iii) Mr. Harris; (iv) Ms. Saban; (v) Mr. Bernstein; and (iv) Mr. Bongartz.

1651.   Thus, as "an employer," Paul Hastings and the reference partners and senior attorney each qualify as a "covered entity" for the purposes of 42 U.S.C.A. § 12112(a).

1652.   Further, 42 U.S.C.A. § 12111(8) states

> *The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.[741]*

1653.   Here, the Plaintiff is an individual who performed the essential functions of the employment position of a law clerk and first year associate, which primarily include the abilities to conduct legal research, prepare legal analysis, and draft legal documents.  Such abilities are demonstrated by the following evidence: (i) the affidavit signed by the Honorable Robert D. Drain stating the Plaintiff was an "excellent" judicial clerk from 2016-2017; (ii) the affidavit signed by Mr. Maza stating that the Plaintiff's work performance at Paul Hastings was

---

[741] 42 U.S.C.A. § 12111(8) (2018).

"satisfactory"; (iii) the fact that Paul Hastings has material relied upon research produced by the Plaintiff; (iv) the fact that Plaintiff was tasked with important assignments, including being assigned with writing the first drafts of a certain complaint, a certain objection, and certain correspondence with the Official Committee of Unsecured Creditors and the Oversight Board in the title III and title VI proceedings of the Commonwealth of Puerto Rico and its various instrumentalities, including the Government Development Bank (the "GDB"); and (v) the fact that the Plaintiff was published in a prestigious bankruptcy journal, *i.e.*, *Norton Journal of Bankruptcy Law and Practice*;[742] (vi) the complimentary email sent by the Editor-in-Chief of Norton Journal of Bankruptcy Law and Practice, Richard Lieb ("Mr. Lieb"); and (vii) the fact the Plaintiff was asked by the Editor-in-Chief to write another article for Norton.[743]

1654.   In addition, 42 U.S.C.A. § 12112(b)(5)(A) states that the term "discriminate against a qualified individual on the basis of disability" includes

> *not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.*

1655.   Here, the Plaintiff requested a reasonable accommodation of an individual office after experiencing considerably difficulty concentrating while stationed in the clustered cubicle area to Ms. Plaskon, Ms. Artese, and Ms. Savage.

1656.   The Plaintiff desired an office because he wished to minimize distractions and, based on his previous experience at the Federal Judiciary, he knew that having an office enabled

---

[742] Hereinafter, "*Norton*".
[743] Due to be published in April.

534

the Plaintiff to increase his productivity and the quality of his work product. The Plaintiff informed Ms. Plaskon, Ms. Artese, and Ms. Savage of said experience.

1657.    Paul Hastings, by and through Ms. Savage, refused to provide the Plaintiff a reasonable accommodation in providing an office because (i) there were ample vacant offices in the New York office throughout the Plaintiff's tenure at Paul Hastings, especially in the final four months; and, as such, (ii) providing an office to the Plaintiff could not have imposed an undue hardship on Paul Hastings.  Therefore, Paul Hastings committed acts of discrimination against the Plaintiff in violation of 42 U.S.C. § 12112(a) and therefore stands in violation of Cal. Civ. Code § 51(f).

**SEVENTH CAUSE OF ACTION**
Cal. Gov't Code § 12940(a)
(Discrimination based on failure to provide
reasonable accommodation under Cal. Gov't Code § 12940(a))

1658.    Paragraphs 1-1634 are incorporated by reference as if fully set forth herein.

1659.    In pertinent part, Cal. Gov't Code §§ 12940(a), (m), and (n)[744] provide

It is an unlawful employment practice, unless based upon a bona fide occupational qualification...

> *(a) For an employer, because of the...mental disability, [or] medical condition...of any person...to discharge the person from employment or... **to discriminate** against the person in*

---

[744] *See* Cal. Gov't Code § 12940.3 (providing, among other things, the legislative intent behind implementation of Americans with Disabilities Act through the enactment of the implementing FEHA provisions) (

> *The Legislature intends that all employers, including employers of 5 to 14, inclusive, employees, voluntarily comply with the requirements of Title 1 of the Americans with Disabilities Act of 1990 (Public Law 101-336) so that persons with mental disabilities can participate fully in the employment opportunities provided to all Californians.*

).

*compensation or in terms, conditions, or privileges of employment....*[745]

*(m)(1) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee. Nothing in this subdivision or in paragraph (1) or (2) of subdivision (a) shall be construed to require an accommodation that is demonstrated by the employer or other covered entity to produce undue hardship, as defined in subdivision (u) of Section 12926, to its operation.*

*(n) For an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition.*[746]

1660.   Further, Cal. Gov't Code § 12926(d) provides that the term "Employer," among other things, "includes any person regularly employing five or more persons, or any person acting as an agent of an employer, directly or indirectly[.]"[747] Here, Paul Hastings qualifies as an "employer" for the purposes of § 12940.

1661.   Under FEHA, a mental or psychological disorder or condition limits a major life activity if it makes the achievement of the major life activity difficult.

1662.   "Major life activities" shall be broadly construed and shall include physical, mental, and social activities and working.[748]

1663.   Additionally, the California legislature expressed its intent that, although the Americans with Disability Act "provides a floor of protection," FEHA was meant to liberally broaden those protection by "affording additional protections."

---

[745] Cal. Gov't Code § 12940(a).
[746] Cal. Gov't Code § 12940.
[747] Cal. Gov't Code § 12926(d).
[748] Cal. Gov't Code § 12926(j) (2018).

536

1664.   Here, the Plaintiff has ADHD, which is an intellectual disability that limits major life activities such as work.  These limitations include, among others, the ability to sustain concentration.  The Plaintiff's condition therefore makes it extremely difficult to create legal work-product in noisy environments.

1665.   Furthermore, Cal. Gov't Code § 12926(p) defines "[r]easonable accommodation" as including

> Making existing facilities used by employees readily accessible to, and usable by, individuals with disabilities.  Other accommodations include job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.[749]

1666.   Furthermore, Cal. Gov't Code § 12926(u) provides

> "Undue hardship" means an action requiring significant difficulty or expense, when considered in light of the following factors: [i] the nature and cost of the accommodation needed; [ii] the overall financial resources of the facilities involved in the provision of the reasonable accommodations, the number of persons employed at the facility, and the effect on expenses and resources or the impact otherwise of these accommodations upon the operation of the facility; [iii] the overall financial resources of the covered entity, the overall size of the business of a covered entity with respect to the number of employees, and the number, type, and location of its facilities; [iv] the type of operations, including the composition, structure, and functions of the workforce of the entity; and [v] the geographic separateness or administrative or fiscal relationship of the facility or facilities.[750]

1667.   Here, there was no undue hardship in prospect or reality because Paul Hastings New York Office had ample available offices and denied the Plaintiff's reasonable accommodation request based on its "policy" alone.  The nature of the accommodation was

---

[749] Cal. Gov't Code § 12926(p).
[750] Cal. Gov't Code § 12926(u).

reasonable, as it is standard practice, even sans disability, to provide attorneys with their own offices to ensure they remain undisturbed while performing their duties.  Further, the accommodation would have come at no cost since Paul Hastings had available offices which could have served as the Plaintiff's reasonable accommodation.  Moreover, Paul Hastings financial resources are immense, considering its revenues were around $1 billion in 2018. Finally, there were open offices on the 29th floor, which houses the bankruptcy group, but also on other floors which Paul Hastings occupies, so the administrative disturbance in facilitating the request would have been minimal if not nonexistent.  Thus, Paul Hastings would not have suffered an undue burden is providing the Plaintiff with his reasonable accommodation request. And, therefore, Paul Hastings unreasonably denied the Plaintiff's reasonable accommodation request, an act of discrimination, and thereby violated and continues to violate Cal. Gov't Code § 12940.

## EIGHTH CAUSE OF ACTION
### Cal. Gov't Code § 12940(i)
### (Aiding and abetting acts of discrimination and harassment)

1668.   Paragraphs 1-1645 are incorporated by reference as if fully set forth herein.

1669.   Cal. Gov't Code § 12940(i) makes it unlawful "for any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this part, or to attempt to do so."

1670.   Paul Hastings, by refusing to provide the plaintiff with information related to the invasive monitoring program, at a minimum, aided and abetted acts of discrimination and harassment.

538

## NINTH CAUSE OF ACTION
Cal. Gov't Code § 12940(j)(1)
(Failure to take all reasonable steps to prevent harassment
from occurring)

1671.   Paragraphs 1-1647 are incorporated by reference as if fully set forth herein.

1672.   Cal. Gov't Code § 12940(j) states that it is an "unlawful employment practice,

unless based upon a bona fide occupational qualification...

> *For an employer...or any other person, because of...mental
> disability, [or] medical condition...to harass an employee[.]
> Harassment of an employee... shall be unlawful if the entity, or its
> agents or supervisors, **knows or should have known of this
> conduct and fails to take immediate and appropriate corrective
> action**....In reviewing cases involving the acts of nonemployees,
> the extent of the employer's control and any other legal
> responsibility that the employer may have with respect to the
> conduct of those nonemployees shall be considered. **An entity shall
> take all reasonable steps to prevent harassment from occurring.**
> Loss of tangible job benefits shall not be necessary in order to
> establish harassment....An employee of an entity subject to this
> subdivision is personally liable for any harassment prohibited by
> this section that is perpetrated by the employee, regardless of
> whether the employer or covered entity knows or should have
> known of the conduct and fails to take immediate and appropriate
> corrective action.[751]*

1673.   Under California law, one indicia of discrimination is that other employees who

are not in a plaintiff's protected class were treated more favorably by the employer.[752]

1674.   Here, Paul Hastings refused to provide the Plaintiff with any information

concerning with whom it had disclosed information related to the Plaintiff's employment

dispute.  This refusal continued even after the Plaintiff informed managing partner Stephen

Harris that the Plaintiff felt under duress and that he was in harm's way as a result of the invasive

---

[751] Cal. Gov't Code § 12940
[752] Rubadeau v. M.A. Mortenson Co., No. 1:13-CV-339 AWI JLT, 2013 WL 3356883, at *5 (E.D. Cal. July 3,
2013)(citing Schechner v. KPIX–TV & CBS Broad., Inc. 686 F.3d 1018, 1023 (9th Cir.2012)).

monitoring program and the invasion of privacy committed by the Law Office of James G. McCarney.  Therefore, Paul Hastings violated and continues to violate Cal. Gov't Code § 12940(j)(1).

## TENTH CAUSE OF ACTION
Cal. Lab. Code § 1102.5(b)
(Retaliation for Whistleblowing pursuant to Cal. Lab. Code § 1102.5[753])

1675.   Paragraphs 1-1651 are incorporated by reference as if fully set forth herein.

1676.   Cal. Lab. Code § 1102.5(b) provides

> *An employer, or any person acting on behalf of the employer, shall not retaliate against an employee for disclosing information...to a person with authority over the employee or another employee who has the authority to investigate, discover, or correct the violation or noncompliance...if the employee has reasonable cause to believe that the information discloses a violation of state or federal statute, or a violation of or noncompliance with a local, state, or federal rule or regulation, regardless of whether disclosing the information is part of the employee's job duties.[754] [755]*

---

[753] Cal. Lab. Code § 1102.6 (

> *In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5.*

).

[754] Cal. Lab. Code § 1102.5 (West).

[755] *See also* Cal. Lab. Code § 1102.6 (

> *In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5.*

).

1677.   Here, the Plaintiff informed Defendants Andrew Tenzer and Zachary Zwillinger of his concerns that Paul Hastings, in its representation of the UCC in Puerto Rico, that it had failed to cite the controlling authority concerning violations of constitutional debt limits.  When the Plaintiff was unlawfully discharged, the decision to do so by the partners was made, in part, based on this episode and the Plaintiff's seeking to correct the legal and ethical violation.  The Plaintiff's unlawful discharge, therefore, was an act of retaliation in violation of Cal. Lab. Code § 1102.5(b).  In addition, Paul Hastings retaliated against the Plaintiff as a consequence of his sending the August 2018 Whistleblower Email as Paul Hastings, among other things, (i) concocted a false story that he had been previously fired on August 22, 2018, a falsehood communicated by Marc Bernstein to the Plaintiff during the September 3, 2018 phone call; (ii) refused to pay his earned but unpaid salary due to him; and (iii) either initiated or failed to take reasonable steps to end the invasive monitoring program.  These acts constitute retaliatory acts and, therefore, Paul Hastings violated and continues to violate Cal. Lab. Code § 1102.5(b).

### ELEVENTH CAUSE OF ACTION
Cal. Civ. Code § 52.1(a), (b)
(Violations of the Thomas Bane Act)

1678.   Paragraphs 1-1654 are incorporated by reference as if fully set forth herein.

1679.   In relevant part, Cal. Civ. Code § 52.1(a), (b) provides

> (a) If a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, [756]intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state, the Attorney General, or any district attorney or city attorney may bring a civil action for injunctive and other appropriate equitable relief in the name of the people of the State of California, in order to protect

541

*the peaceable exercise or enjoyment of the right or rights
secured....*

*(b) Any individual whose exercise or enjoyment of rights secured
by the Constitution or laws of the United States, or of rights
secured by the Constitution or laws of this state, has been
interfered with, or attempted to be interfered with, as described in
subdivision (a), may institute and prosecute in his or her own name
and on his or her own behalf a civil action for damages, including,
but not limited to, damages under Section 52, injunctive relief, and
other appropriate equitable relief to protect the peaceable exercise
or enjoyment of the right or rights secured, including appropriate
equitable and declaratory relief to eliminate a pattern or practice
of conduct as described in subdivision (a).*

1680.   As distilled by the California 4th District Court,

*The essence of a claim under the Tom Bane Civil Rights Act is that
the defendant, by the specified improper means of threats,
intimidation or coercion, tried to or did prevent the plaintiff from
doing something he or she had the right to do under the law or to
force the plaintiff to do something that he or she was not required
to do under the law. Cal. Civ. Code § 52.1.[757]*

1681.   Here, Paul Hastings violated or attempted to violate numerous statutory and

constitutional rights of the Plaintiff.  First, Paul Hastings sought to coerce the Plaintiff by means

of imposing financial distress into signing the so-called resignation agreement which included an

overbroad gag clause.  Pursuant to its express terms, the gag clause prohibits the Plaintiff from

ever making any negative comments in relation to any current or former partners, associates, or

employees.  The legal effect of such a gag clause would have interfered the Plaintiff's ability to

exercise freedom of expression.   Second, Paul Hastings, either intentionally or by gross

negligence, was complicit in a campaign of intimidation by means of the unlawful invasive

monitoring program described above.

---

[757] *Venegas v. County of Los Angeles*, 32 Cal.4th 820, 841–843, 11 Cal.Rptr.3d 692, 87 P.3d 1 (4th Dist. 2004).

## TWELFTH CAUSE OF ACTION
(Declaration that certain Defendants caused "oppression" by
subjecting the Plaintiff to cruel and unjust hardship in conscious disregard of
Plaintiff's rights pursuant to Cal. Civ. Code § 3294)

1682.   Paragraphs 1-1658 are incorporated by reference as if fully set forth herein.

1683.   Under Cal. Civ. Code § 3294(c)(2), "[o]ppression" is defined as "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights."

1684.   Based on the facts established in all other counts, it is submitted that certain Defendants oppressed the Plaintiff.

## THIRTEENTH CAUSE OF ACTION
(Conspiracy to commit slander pursuant to Cal. Civ. Code § 1714)

1685.   Paragraphs 1-1661 are incorporated by reference as if fully set forth herein.

1686.   Cal. Civ. Code § 1714 provides that

> *Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself.*

1687.   California courts have read this provision as creating a cause of action for conspiracy to commit libel.[758]

1688.   In order to establish liability based on conspiracy, the plaintiff must show the defendant and at least one other concurred in the tortious scheme with knowledge of its unlawful purpose.[759] The requisite concurrence and knowledge may be inferred from the nature of the acts

---

[758] Farr v. Bramblett, 132 Cal. App. 2d 36, 47, 281 P.2d 372, 379 (1955), disapproved of by Field Research Corp. v. Superior Court of City & Cty. of San Francisco, 71 Cal. 2d 110, 453 P.2d 747 (1969).
[759] *Ahrens v. Superior Court*, 197 Cal.App.3d 1134, 1150, 243 Cal.Rptr. 420 (Cal. 1988).

done, the relation of the parties, the interests of the alleged conspirators as well as other circumstances.[760]

1689.   Here, it has been established that Paul Hastings, and likely other co-conspirators, engaged in a program of defamation against the Plaintiff.  This program included, without limitation, Plaskon publishing to Newman that there had been "a series of negative reviews" about the Plaintiff, which she knew was substantively false.  It also includes defamatory statements made by Paul Hastings and other co-conspirators about the Plaintiff to other law firms, such as Moore & Van Allen, resulting in the withdrawal of interest in interviewing the Plaintiff.

## FOURTEENTH CAUSE OF ACTION
(Intentional Infliction of Emotional Distress)

1690.   Paragraphs 1-1666 are incorporated by reference as if fully set forth herein.

1691.   Under California law, to establish a prima facie claim for intentional infliction of emotion distress, the Plaintiff must plead the following: (1) *extreme and outrageous conduct* by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering *severe or extreme emotional distress*; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct...."

1692.   To satisfy the "extreme and outrageous" prong, the conduct alleged must "be so extreme as to exceed all bounds of that usually tolerated in a civilized community."[761]  In *Alcorn*

---

[760] *Chicago Title Ins. Co. v. Great Western Financial Corp.*, 69 Cal.2d 305, 316, 70 Cal.Rptr. 849, 444 P.2d 481 (Cal. 1968).

[761] *Light v. Dep't of Parks & Recreation*, 14 Cal. App. 5th 75, 102, 221 Cal. Rptr. 3d 668, 691 (Ct. App. 2017) ("The trier of fact could conclude this conduct was extreme and outrageous (especially in light of [the Defendant's] supervisory position), taken for purposes of retaliation prohibited by FEHA, and intended to cause [the Plaintiff] emotional distress.").

*v. Anbro Engineering, Inc.*, the California Supreme Court recognized that, owing to the employer's standing in a position or relation of authority over the plaintiff,

> *The cases and commentators have emphasized the significance of the relationship between the parties in determining whether liability should be imposed. Plaintiff's status as an employee should entitle him to a greater degree of protection from insult and outrage than if he were a stranger to defendants.*[762]

1693.  Here, Paul Hastings and certain partners and agents of Paul Hastings abused its position of authority by seeking to coerce the Plaintiff into resigning as part of a fraudulent and unlawful scheme to deprive the Plaintiff of his rights under disability and whistleblower statutes. Paul Hastings refused to tell the Plaintiff, after his apparent "last day" on August 22, whether or not he remained an employee of Paul Hastings.  This uncertainty generated much anxiety and stress in the Plaintiff, as a reasonable person might expect. The refusal for Paul Hastings to inform the Plaintiff of his employment status is particularly egregious given Paul Hastings was aware that the Plaintiff was admitted into NYU Emergency Room on August 22 as a result of a series of acute anxiety attacks.  In addition, it is further submitted that the following facts, taken together, demonstrate Paul Hastings "outrageous and extreme" conduct:

- Plaskon's act of defamation against the Plaintiff published to Mr. Newman;

- Plaskon's solicitation of negative comments about the Plaintiff in bad faith under the guise of conducting genuine performance reviews;

- Despins various misrepresentations at the August 15 and 16 meetings, including the blatant falsehood that the partners had not contacted any junior associates in forming their decision (which they had) and the falsehood that Despins and Plaskon had nothing to gain by forcing the Plaintiff to resign;

---

[762] *Alcorn v. Anbro Eng'g, Inc.*, 2 Cal. 3d 493, 499 FN. 2 (Cal. 1970).

- Paul Hastings unlawfully depriving the Plaintiff of his health care benefits without notice, especially considering Paul Hastings was aware that the Plaintiff had been admitted into NYU Emergency Room on 8/22/18 and was also aware that the Plaintiff saw a doctor and was on medication as part of his ADHD treatment;

- Paul Hastings knew the plaintiff was diagnosed and treated for ADHD and also knew that the Plaintiff had been treated on account of a series of acute anxiety attacks on August 22.[763];

- Certain partners and employees of Paul Hastings conceived and implemented a fraudulent narrative that the Plaintiff had received a "series of negative reviews," based in large part on a fabricated story that the Plaintiff had himself attempted to "hid controlling authority" ;

- Paul Hastings refused to provide the Plaintiff with information regarding the disclosure of their ongoing employment dispute to third parties, even after being told that the Plaintiff was convinced that he was subject to an aggressive surveillance program or programs.

- Bernstein's post hoc misrepresentation that the Plaintiff "had been fired" on August 22, despite the fact that Despins and Plaskon resolutely denied that the Plaintiff was being fired at the 8/15/18 meeting and despite the fact Paul Hastings did not notify the Plaintiff of such his "firing" until September 3;

- Paul Hastings, by and through Mark Bernstein and Alfred Feliu, initiated and perpetuated bad faith negotiations, which had the effect of protracting and intensifying the Plaintiff's economic distress; and

---

[763] *Alcorn*, 2 Cal. 3d at 499 (Cal. 1970) ("Plaintiff's susceptibility to emotional distress has often been mentioned as significant in determining liability.").

546

- Paul Hastings' deliberate imposition of economic distress caused the Plaintiff to seek chapter 11 protection.

1694.   It is submitted that, to a reasonable person, (1) the conduct of Defendant Paul Hastings, the Law Office of James G. McCarthy, and other involved defendants is *extreme and outrageous conduct*; (2) the defendants' conduct was animated with an intention of causing, or reckless disregard of the probability of causing, emotional distress to the Plaintiff to coerce the Plaintiff into signing the proposed resignation agreement and then the proposed settlement proposals; (3) the plaintiff's suffered *severe or extreme emotional distress* evinced by his visit to NYU's Emergency Room, that he had to flee New York, and that the Plaintiff was required to file for a chapter 11 petition for bankruptcy relief; and (4) but for the extreme and outrageous conduct, the Plaintiff would not have suffered the emotional distress described, and the emotional distress suffered by the Plaintiff is of the kind that the law seeks to protect against.

### FIFTEENTH CAUSE OF ACTION
(Promissory Estoppel)

1695.   Paragraphs 1-1671 are incorporated by reference as if fully set forth herein.

1696.   Under California law, a plaintiff may recover on a theory of promissory estoppel when the following elements – based on a preponderance of the evidence – are established: (1) a promise; (2) the promisor should reasonably expect the promise to induce action or forbearance on the part of the promisee or a third person; (3) the promise induces action or forbearance by the promisee or a third person; and (4) injustice can be avoided only by enforcement of the promise.[764]

---

[764] *See Newport Harbor Venutres, LLC v. Morris Cerullo World Evangelism*, 2016 WL 7427456 (Cal. App. 4th Dist. 2016).

1697.   Here, Paul Hastings, by and through its agent, Mr. Bongartz, stated that Paul
Hastings offered a market competitive clerkship bonus at the Plaintiff's job interview.   In
addition, Paul Hastings maintains a judicial clerk section of its website, which states "[i]n
recognition of a judicial clerk's experience, Paul Hastings provides a market competitive bonus
for U.S. Federal and State Supreme Court-based clerkships."   In contrast, decisions as to whether
the judicial clerk will also receive other benefits, such as "receiving class year credit" or a "Bar
Study Benefit and Bonus," are, respectively, made on a case-by-case basis or based upon an
(implied) eligibility criteria.   At the time the Plaintiff relied upon such promises when accepting
the job offer, the prevailing market clerkship bonus was $50,000 at the time the Plaintiff was
subject to these promises.   These promises induced the Plaintiff to withdraw his job application
for Arent Fox.   It is submitted that injustice can only be avoided by enforcement of these
promises to pay a market competitive bonus of $50,000 because Paul Hastings materially
benefitted from the Plaintiff's reliance on its promises to pay the market competitive bonus,
including the skills and knowhow that inures to an attorney during such a clerkship, as well as
the reputational[765] and goodwill[766] benefits of having a former federal bankruptcy clerk in its
restructuring group.

1698.   Objectively, this would serve to induce the promisor to accept the offer to hire
and to forebear (i.e., withdraw) from other job opportunities.   Third, the promise did induce the
plaintiff to withdraw his application from Arent Fox.   To avert injustice, the promise to pay the
clerkship bonus must be paid since an objective reasonable person would have been induced by
the promise and the plaintiff acted accordingly.

---

[765] It is generally known that judicial clerks are highly coveted by law firms as evidenced by judicial clerk specific
web pages, such as Paul Hastings.
[766] Given the experience, judicial clerks are presumed to have a high level of expertise and be well trained.

## FIFTHTEENTH CAUSE OF ACTION
(Conversion of vested property right in earned but unpaid salary)

1699.   Paragraphs 1-1675 are incorporated by reference as if fully set forth herein.

1700.   Under California law, a plaintiff establishes a prima facie case for conversion when by demonstrating the following elements: (i) allegations of plaintiff's ownership or right to possession of property; (ii) defendant's wrongful act toward or disposition of the property, interfering with plaintiff's possession; and (iii) damage to plaintiff.[767] Where there is "a specific, identifiable sum involved," money may be the subject of conversion cause of action.[768]

1701.   Here, assuming for the sake of argument that Kelloff's August 27, 2018, text messages put the Debtor on legal notice of his termination (a proposition not conceded here), then, at the very earliest, the Debtor's termination took place on August 27, 2018 and the Plaintiff is thus entitled, at a minimum, to the earned but unpaid salary through that date, which approximately amounts to $2,353.76.  Instead, the final payment of salary received by the Debtor from Paul Hastings on August 30, 2018, for that pay period was $1,009.98. Therefore, at a minimum, the Plaintiff has a vested property right in $1,343.78 in earned but unpaid salary that Paul Hastings is required to turnover.

1702.   Paul Hastings is currently in possession of and exercising control over property of the Plaintiff.[769]  Under California law, employees have a vested property right in earned but unpaid salary.[770]  While the actual amount is subject to change because a court must determine

---

[767] See McKell v. Washington Mut., Inc., 142 Cal. App. 4th 1457, 1491, 49 Cal. Rptr. 3d 227, 255 (Cal. App. 4th 2006) (citing Burlesci v. Petersen, 68 Cal.App.4th 1062, 1066, 80 Cal.Rptr.2d 704 (Cal. App. 4th 1998)).
[768] Id. at 1492.
[769] 11 U.S.C. § 541(a)(1) (providing that property of the estate includes "all legal or equitable interests of the debtor [wherever located and by whomever held] in property as of the commencement of the case").
[770] Cal. Lab. Code § 201(a) ("If an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."); see also Reyes v. Van Elk, Ltd., 148 Cal. App. 4th 604, 612, 56 Cal. Rptr. 3d 68, 73 (2007) ("Earned but unpaid salary or wages are vested property rights."); Loehr v. Ventura Cty. Cmty. Coll. Dist., 147 Cal. App. 3d 1071, 1080, 195 Cal. Rptr. 576, 581 (Ct. App. 1983) ("Earned but unpaid salary

549

on what exact day Paul Hastings legally terminated the employment relationship,[771] at a minimum, Paul Hastings is in possession of $1,343.78 in earned but unpaid salary of which the estate holds a vested property interest.

## SIXTEENTH CAUSE OF ACTION
(Tort for violation of implied duty of good faith in investigating claims)

1703.   Paragraphs 1-1679 are incorporated by reference as if fully set forth herein.

1704.   There is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.[772]  Under California law, a breach of the implied covenant of good faith and fair dealing is imposed by law, and is thus considered a tort.[773]

1705.   Here, Paul Hastings breached the implied covenant of good faith and fair dealing in relation to the Employment Agreement.  First, Paul Hastings willfully withheld payment of disability benefits owed to the Plaintiff.  Second, Paul Hastings acted in bad faith because (i) Paul Hastings knew or should of knew that the Plaintiff had valid disability claims since the Plaintiff informed Paul Hastings that he went to the emergency room for a series of acute anxiety attacks six days after the Second Meeting; (ii) Paul Hastings knew or should of knew of the extent and severity of the Plaintiff's injury once he provided pictures of Plaintiff's coughed up blood; and (iii) Paul Hastings managing partner, Mr. Harris, was informed by the Plaintiff of the

---

or wages are vested property rights, claims for which may not be properly characterized as actions for monetary damages."); *and Arceo v. Cty. of San Mateo*, 2010 WL 4609272, at *3 (N.D. Cal. Nov. 3, 2010) (following *Loehr*).
[771] Cal. Lab. Code § 2922 (2018 West) ("Termination at will upon notice…An employment, having no specified term, may be terminated at the will of either party on notice to the other.") (emphasis added).
[772] *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal. 2d 654, 658, 328 P.2d 198, 200 (Cal. 1958).
[773] *Richardson v. Employers Liab. Assur. Corp.*, 25 Cal. App. 3d 232, 239, 102 Cal. Rptr. 547, 552 (Ct. App. 1972), *disapproved of by on other grounds Gruenberg v. Aetna Ins. Co.*, 9 Cal. 3d 566, 510 P.2d 1032 (Cal. 1973) ("Breach of this duty is a tort.") (cited by *Wayne Merritt Motor Co. v. New Hampshire Ins. Co.*, 2011 WL 5025142, at *5 (N.D. Cal. 2011).

invasive monitoring program targeting the Plaintiff and failed to even respond to requests for

information relating to disclosures of the Employment Dispute with third parties.


## SEVENTEENTH CAUSE OF ACTION
(Negligence per se for failure to provide notification of coverage options
upon termination of employment in violation of Cal. Lab. Code § 2808(b))

1706.   Paragraphs 1-1682 are incorporated by reference as if fully set forth herein.

1707.   Cal. Lab. Code § 2808(a) provides

> *(b) All employers, whether public or private, shall provide to*
> *employees, **upon termination**, notification of all continuation,*
> *disability extension, and conversion coverage options under any*
> *employer-sponsored coverage for which the employee may remain*
> *eligible after employment with that employer terminates.[774]*

1708.   Here, Paul Hastings failed to provide such notification upon termination. Rather,

Paul Hastings belatedly mailed the Plaintiff notification of continuation and conversion coverage

on October 15. Moreover, the did not learn of the mailings existence until Mr. Feliu responded

to an informational request from the Plaintiff on December, 6, 2018. Further, Paul Hastings was

aware that the Plaintiff had relocated to California and made no effort to ensure that the mailing

would be sent to him in California rather than New York. Such a statute is enacted to protect

individuals made vulnerable from the abrupt termination of their employment from the kind of

uncertainty and anxiety that accompanies the unexpected loss of healthcare benefits. Plaintiff is

also one of the individuals, a discharged employee without other health care resources, that the

statute seeks to protect. More specifically, Paul Hastings abruptly discontinued the Plaintiff's

health care benefits. The Plaintiff was not provided 15-days notice in writing of the

discontinuation of Mr. Bernstein's dated September 3, 2018, the Plaintiff's employment

---

[774] Cal. Lab. Code § 2808(a) (emphasis added).

551

relationship with Paul Hastings ended on September 13.  Paul Hastings failed to pay the Plaintiff

for the period from August 23rd to September 13.  attempts to protect from such financial

distress.

## EIGHTHTEEN CAUSE OF ACTION
(Intrusion into private matters cause of action)

1709.   Paragraphs 1-1685 are incorporated by reference as if fully set forth herein.

1710.   Under California law, a plaintiff may recover on an intrusion-into-private-matters

cause of action when it is established that the defendant intentionally intruded into a private

place, conversation, or matter in a manner highly offensive to a reasonable person.[775] Further, "to

prove actionable intrusion, the plaintiff must show the defendant penetrated some zone of

physical or sensory privacy surrounding, or obtained unwanted access to data about, the plaintiff.

The tort is proven only if the plaintiff had an objectively reasonable expectation of seclusion or

solitude in the place, conversation, or data source."[776]

1711.   Here, the Plaintiff had the right of possession to his apartment.  The McCarney

Law Firm, by and through its agent,[777] entered into the Plaintiff's apartment under false pretenses

because she presented herself as a disinterested romantic interest when, in reality, her intent and

motive were to obtain information.

## NINTEENTH CAUSE OF ACTION
(Defamation with actual and implied malice by *per se* slander)

1712.   Paragraphs 1-1688 are incorporated by reference as if fully set forth herein.

---

[775] *Taus v. Loftus*, 40 Cal. 4th 683, 730, 151 P.3d 1185, 1215 (2007).
[776] See *Shulman v. Grp. W Prods., Inc.*, 18 Cal. 4th 200, 232, 955 P.2d 469, 490 (Cal. 1998), as modified on denial
of reh'g (Cal. July 29, 1998) (holding that there was no physical or sensory intrusion on the plaintiffs' seclusion
where the Plaintiff had no right of ownership or possession of the property where the or reasonable expectation of
seclusion given the circumstances).
[777] Ms. Pednovenic's linkedIn profile listed her employment as a legal assistant at the McCarney Law firm.

1713.   Under California law, defamation is a tort which imposes liability for acts amounting to "an invasion of the interest in reputation." Slander is a form of defamation.[778] "[O]nly statements of fact are actionable as defamation, while statements of opinion are constitutionally protected."[779] A slander per se cause of action does not require a showing of actual damages.[780]

1714.   Cal. Civ. Code § 46 provides a list of slander per se categories, which includes,

> *a false and unprivileged publication, orally uttered…which…[t]ends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to his office, profession, trade, or business that has a natural tendency to lessen its profits[.]*

1715.   Here, Ms. Plaskon published slander against the Plaintiff when she spoke with Mr. Newman and told him, as a matter of fact, "there have been a series of negative reviews about Andrew." In fact, there had not been a series of negative reviews, at least in any meaningful regard.

1716.   Rather, Ms. Plaskon created the specter that Plaintiff was plagued by "a series of negative reviews" by *actively soliciting negative comments* about the Plaintiff's work performance in a bad faith manner.

1717.   At least in the case of Mr. Newman, we know Ms. Plaskon first asked Mr. Newman about his general thoughts about the Plaintiff's work (answering, "fine," "satisfactory"). Ms. Plaskon then commented to Mr. Newman that "we have received a series of

---

[778] *See Regalia v. The Nethercutt Collection*, 172 Cal. App. 4th 361, 367-68 (Cal. App. 2nd 2009).
[779] *See Burrill v. Nair*, 217 Cal. App. 4th 357, 384, 158 Cal. Rptr. 3d 332, 352 (2013).
[780] *Id.*

553

negative reviews about [the Plaintiff]" and asked Mr. Newman whether his experience working with the Plaintiff had been similar (answering, "no").[781]

1718.   In sum, Ms. Plaskon published to Mr. Newman the falsehood that a "series" of *genuine* negative reviews had been made about the Plaintiff's work performance and that the resulting concern of the partners over the Plaintiff's ability and competency had reach such a threshold of seriousness as to merit formal investigation into the Plaintiff's work performance.[782] This sort of fictitious specter is the type of defamatory statement that "…[t]ends directly to injure him in respect to his office, profession, trade or business, either by imputing to him general disqualification in those respects which the office or other occupation peculiarly requires[.]"

1719.   Further, it is submitted that the Plaintiff is a restructuring attorney and this falsehood imputed to him "general disqualification" for work in the legal profession of restructuring.

## TWENTIETH CAUSE OF ACTION
(Negligence per se relating to the willful failure
to provide wages pursuant to Cal. Lab. Code § 203)

1720.   Paragraphs 1-1696 are incorporated by reference as if fully set forth herein.

1721.   Cal. Lab. Code § 203 relevantly provides

> *If an employer willfully fails to pay, without abatement or reduction, in accordance with Sections 201,[783]…[and] 202[784]…any wages of an employee who is discharged or who quits, the wages*

---

[781] At the 8/16/18 meeting, Ms. Plaskon stated "we spoke with Danny," but did not mention that his review of the Plaintiff's work performance was generally positive.

[782] Significantly, Ms. Plaskon had reached this conclusion before even speaking with the attorneys that the Plaintiff had worked with the most in the previous four months, Mr. Barron and Mr. Newman. Instead, Ms. Plaskon relied on the so-called opinions of Mr. Maza and Mr. Bongartz, who had not worked with the plaintiff in a material way since March. *See Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1455 (11th Cir. 1998) (discussing the solicitation of negative comments in bad faith).

[783] Cal. Lab. Code § 201 (2018) (providing for "Immediate payment of wages upon discharge or layoff; treatment of related benefits").

[784] Cal. Lab. Code § 202 (2018) (providing for "Immediate payment of wages upon resignation; treatment of related benefits).

> *of the employee shall continue as a penalty from the due date thereof at the same rate until paid or until an action therefor is commenced; but the wages shall not continue for more than 30 days. An employee who secretes or absents himself or herself to avoid payment to him or her, or who refuses to receive the payment when fully tendered to him or her, including any penalty then accrued under this section, is not entitled to any benefit under this section for the time during which he or she so avoids payment.[785]*

1722.   In addition, Cal. Lab. Code § 201 relevantly provides, "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately."[786]

1723.   Further, Cal. Lab. Code § 206 provides

> *In case of a dispute over wages, the employer shall pay, without condition and within the time set by this article, all wages, or parts thereof, conceded by him to be due, leaving to the employee all remedies he might otherwise be entitled to as to any balance claimed.[787]*

1724.   Here, Paul Hastings was per se negligent for failing to provide the Plaintiff with his earned wages, in violation of Cal. Lab. Code §§ 201.  Such a statute is enacted to protect individuals made vulnerable from the termination of their employment from the kind of panic-inducing financial distress experienced by the Plaintiff.  Plaintiff is also one of the individuals, a discharged employee without other sources of income, that the statute seeks to protect.  More specifically, Paul Hastings abruptly ceased payment of the Plaintiff's salary on August 22.  According to Mr. Bernstein's email dated September 3, 2018, the Plaintiff's employment relationship with Paul Hastings ended on September 13.  Paul Hastings failed to pay the Plaintiff

---

[785] Cal. Lab. Code § 203(a) (2018).
[786] Cal. Lab. Code § 201.
[787] Cal. Lab. Code § 206.

for the period from August 23rd to September 13. attempts to protect from such financial distress.

## TWENTY-FIRST CAUSE OF ACTION
### (Unjust enrichment under California law)

1725.  Paragraphs 1-1701 are incorporated by reference as if fully set forth herein.

1726.  Under California law, an individual may be required to make restitution if he is unjustly enriched at the expense of another.[788] A person is enriched when that person receives a benefit at another's expense.[789] The term "benefit" "denotes any form of advantage." Thus, a benefit is conferred not only when one adds to the property of another, but also when one saves the other from expense or loss. Even when a person has received a benefit from another, he is required to make restitution only if the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him to retain it.

1727.  Here, Paul Hastings was enriched at the expense of the Plaintiff. It was to Paul Hastings' financial benefit to not pay the Plaintiff $50,000 clerkship bonus as promised, the promise induced the Plaintiff to accept Paul Hastings' job offer, and the refusal to pay the clerkship bonus came at the Plaintiff's expense. Allowing Paul Hastings to retain the benefit would be unjust since (i) Mr. Bongartz said that Paul Hastings offered a market competitive bonus at the Plaintiff's job interview on July 12, 2017; (ii) Paul Hastings' website for judicial clerks states it offers a market competitive bonus; and (iii) the Plaintiff relied on the promise for a clerkship bonus and yet Paul Hastings received the benefit of the Plaintiff's services and that of the $50,000 bonus, unjustly.

---

[788] *See Ghirardo v. Antonioli*, 14 Cal. 4th 39, 51–52, 924 P.2d 996, 1003 (Cal. 1996)
[789]

## TWENTY-SECOND CAUSE OF ACTION
(Negligence for causing injury and failing to prevent further harm)

1728.   Paragraphs 1-1704 are incorporated by reference as if fully set forth herein.

1729.   Under California common law, one who negligently injures another and renders him helpless is bound to use reasonable care to prevent any further harm which the actor realizes or should realize threatens the injured person.[790]

1730.   Here, Paul Hastings, at a minimum, injured the Plaintiff when it subjected applied coercive measures in effort to induce the Plaintiff to sign the so-called "Confidential Transition and General Release Agreement." Paul Hastings knew that the Plaintiff was admitted to NYU Langone Emergency Room due to a series of acute anxiety attacks only six days after the Second Meeting. Paul Hastings also was informed that this caused the Plaintiff to cough of blood and was sent pictures of such on in October 2019. Paul Hastings was also aware that the Plaintiff's was on medication on account of his ADHD. It was not until October 15, 2018, that Paul Hastings mailed the Plaintiff a COBRA rights notice. Nevertheless, Paul Hastings sent the notice to the Plaintiff's New York residence, even though the Plaintiff had notified Paul Hastings that he had moved to California. It is submitted that Paul Hastings failed to exercise reasonable care to prevent future harm which it realized or should have realized threatened the Plaintiff following its various unlawful acts that left the Plaintiff injured.

## TWENTY-THIRD CAUSE OF ACTION
(Tortious employment termination under California law)

1731.   Paragraphs 1-1707 are incorporated by reference as if fully set forth herein.

---

[790] *See Brooks v. E. J. Willig Truck Transp. Co.*, 40 Cal. 2d 669, 678–79, 255 P.2d 802, 808 (Cal. 1953); *see also Carlisle v. Kanaywer*, 24 Cal. App. 3d 587, 592, 101 Cal. Rptr. 246, 248 (Ct. App. 1972) (stating the rule is "well settled"); *and Ramos v. Lankwan Pong*, 2017 WL 2793844, at *2 (Cal. Ct. App. 2017).

1732.   Under California law, an employment relationship may generally be terminated by either party "at will" upon notice.[791]  Notwithstanding this general rule, an employer may not discharge an at will employee for a reason that violates fundamental public policy.[792]  In *Stevenson v. Superior Court*, the California Supreme Court recognized that a cause of action arises for tortious employment termination when the following requirements are met: (1) It must be delineated in a statutory or constitutional provision, administrative regulation, or mandatory ethical rule; (2) It must be "public" in that it inures to the benefit of the public rather than to a particular employer or employee; (3) It must be well established at the time of the termination; and (4) It must be fundamental and substantial.[793]

1733.   Here, it is submitted that Paul Hastings' termination of the Plaintiff violated fundamental public policy.  First, the policy against disability discrimination is delineated by statute. Specifically, Cal. Gov't Code § 12920 provides

1734.   It is hereby declared as the public policy of this state that it is necessary to protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of...mental disability, [or] medical condition[.]

1735.   It is recognized that the practice of denying employment opportunity and discriminating in the terms of employment for these reasons foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advancement, and substantially and adversely affects the interests of employees, employers, and the public in general.[794]

---

[791] Cal. Lab. Code § 2922 (2018 West).
[792] Stevenson v. Superior Court, 16 Cal. 4th 880, 887, 941 P.2d 1157, 1160 (Cal. 1997)
[793] *City of Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1159, 959 P.2d 752 (Cal. 1998) (holding that termination based upon age discrimination in violation of FEHA constitutes tortious discharge).
[794] Cal. Gov't Code § 12920 (2018 West)

1736.   Further, Cal. Gov't Code § 12921(a) provides, "[t]he opportunity to seek, obtain, and hold employment without discrimination because of…mental disability, [or] medical condition…is hereby recognized as and declared to be a civil right."

1737.   Thus, the public policy against disability discrimination in the workplace is delineated by FEHA.  Second, the public policy against disability discrimination benefits society at large as there is a fundamental public interest in a workplace free from discrimination against individuals with disabilities.  In addition, the California Supreme Court in *Moorpark v. Superior Court*, found that "FEHA is just one expression of a much broader policy against disability discrimination that appears in a variety of legislative enactments."[795] Third, the public policy against disability discrimination has been embedded within FEHA since July 1, 1974[796] and the Plaintiff was discharged on September 13, 2018.  Finally, the public policy is "substantial" and "fundamental" because, among other reasons, disability discrimination may "attack the individual's sense of self-worth" even though the employee can perform job duties as effectively as nondisabled employees.[797]

## TWENTY-FOURTH CAUSE OF ACTION
(Declaration that certain Defendants are guilty of malice
by clear and convincing evidence under Cal. Civ. Code § 3294(c)(1))

1738.   Paragraphs 1-1714 are incorporated by reference as if fully set forth herein.

1739.   Under Cal. Civ. Code § 3294(c)(1), "malice" is defined as "conduct that is intended by the defendant to cause injury to the plaintiff or despicable conduct that is carried on by the defendant with a willful and conscious disregard of the rights or safety of others."

---

[795] *See City of Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1159, 959 P.2d 752 (Cal. 1998) (*citing* statutes).
[796] Stats. 1973, ch. 1189, §§ 6, 9, pp. 2501-2502.
[797] *City of Moorpark v. Superior Court*, 18 Cal. 4th 1143, 1161, 959 P.2d 752 (Cal. 1998) ("We conclude that disability discrimination can form the basis of a common law wrongful discharge claim.").

## TWENTY-FIFTH CAUSE OF ACTION
(Declaration that degree of reprehensibility is "so vile, base, contemptible, miserable, wretched, or loathsome that it would be looked down upon and despised by ordinary decent people" under Cal. Civ. Code § 3294(c)(3))

1740.   Paragraphs 1-1716 are incorporated by reference as if fully set forth herein.

1741.   To determine the degree of reprehensibility of the defendant's conduct, courts consider the following factors:

> *Whether the harm caused was physical as opposed to economic*

> *Whether the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others*

> *Whether the target of the conduct had financial vulnerability*

> *Whether the conduct involved repeated actions or was an isolated incident*

> *Whether the harm was the result of intentional malice, trickery, or deceit, or mere accident.*

1742.   Here, here, it is submitted that the conduct of Paul Hastings and the co-conspirators was "so vile, base, contemptible, miserable, wretched, or loathsome that it would be looked down upon and despised by ordinary decent people" based on the facts established in Count 5.

## TWENTY-SIXTH CAUSE OF ACTION
(Denial of civil rights as unlawful practice under Cal. Gov't Code § 12948)

1743.   Paragraphs 1-1719 are incorporated by reference as if fully set forth herein.

1744.   In pertinent part, Cal. Gov't Code § 12948 provides, "[i]t is an unlawful practice under this part for a person to deny or to aid, incite, or conspire in the denial of the rights created by Section 51…of the Civil Code.[798]

---

[798] Cal. Gov't Code § 12948 (2018 West).

560

1745.   Here, it is asserted that Paul Hastings – at the very least – aided the McCarney
Law Firm and/or other entities who subjected the Plaintiff to an invasive monitoring program
that aggressively followed the Plaintiff near and around the Plaintiff's apartment, while he went
to the local market or coffee shop, and during his comings and goings at and around Grand
Central Station.  The Plaintiff believes that these acts were motivated, in substantial part, to deny
the Plaintiff his rights under federal and state statute and common law by intimidating him into
signing proposed resignation agreement.  At a minimum, Paul Hastings aided such entities by
repeatedly failing to provide the Plaintiff with the identities of third parties with whom Paul
Hastings' disclosed information relating to the Plaintiff's employment dispute.   Paul Hastings,
by and through its attorney, has denied having contacted the McCarney Law Firm.

1746.   Notwithstanding such assurances, based on the above referenced circumstantial
evidence, the Plaintiff suspects Paul Hastings actually conspired with certain entities to invade
the Plaintiff's privacy in order to prevent him from enforcing his statutory and common law
rights.  In addition to what was previously mentioned, this intrusion involved causing the
McCarney Law Firm to send a paralegal under its employ on a date with the Plaintiff under false
pretenses and to ask the Plaintiff, among other things, whether he had ever taken drugs onto Paul
Hastings' premises or if the Plaintiff is homosexual.

1747.   Moreover, the Plaintiff informed Paul Hastings' managing partner, Mr. Harris, of
this invasion of privacy and Paul Hastings continued to refuse to provide the Plaintiff with the
identities of persons or entities it discussed the employment dispute with and, even worse,
refused to ever directly respond to the Plaintiff's inquiries.

## PRAYER FOR RELIEF

WHEREFORE, the Commonwealth respectfully requests judgment as follows:

A.    General and compensatory damages according to proof at trial;

B.    Treble damages pursuant to 18 U.S.C. § 1964(c);

C.    Punitive damages pursuant to 18 U.S.C. § 1964(c);

D.    Necessary and appropriate injunctive relief, including an injunction enjoining McKinsey RTS, McKinsey & Co., McKinsey Holdings, McKinsey US, and/or any other McKinsey affiliates from participating as an advisor in any ongoing bankruptcy proceedings in the United States (including the territories and possessions thereof) under Title 11 or PROMESA and any future such proceedings in which they may seek retention as a professional;

E.    Disgorgement of all moneys received by Defendants as a result of their unlawful activities and therefrom "making due provision for the rights of innocent persons"[799] pursuant to 18 U.S.C. § 1964(a);

F.    The dissolution of McKinsey RTS and MIO Partners for the purposes of "eradicating organized crime from the social fabric"[800];

G.    Granting such other and further relief as the court deems just and proper.

[SIGNATURE ON FOLLOWING PAGE]

---

[799] *United States v. Turkette*, 452 U.S. 576, 585, 101 S. Ct. 2524, 2529–30, 69 L. Ed. 2d 246 (1981).
[800] *Id.*

562

Dated: April 17, 2020          Respectfully Submitted,
        Los Angeles, California

By: _____
Andrew S. Hennigan, Esq.

563

### *List of Exhibits*

- Exhibit A – Listing of Affidavits Containing False and Misleading Disclosures by McKinsey
- Exhibit B – Identification of Those False and Misleading Statements
- Exhibit C – Transcript of the August 16, 2018 Meeting Involving the Plaintiff, Despins and Plaskon
- Exhibit D – Shlomo Email Controversy Emails [REDACTED]
- Exhibit E – FEHA Right to Sue Letter Dated April 25, 2019
- Exhibit F – Kelloff Email Exchange
- Exhibit G – Plaintiff's August 7, 2018 email send to himself containing notes from James Grogan phone call [REDACTED]
- Exhibit H – Email from Newman and Excerpt from Quinn Emanuel's Unfiled GDB RSA Brief [REDACTED]
- Exhibit I – Plaintiff's July 27, 2018 "Email Memo on Deposit Accounts and Loans re Title VI" [REDACTED]
- Exhibit J – Proof of Plaintiff's Earning Capacity

# EXHIBIT A

Case 1:18-cv-04141-JMF   Document 73-1   Filed 09/04/18   Page 2 of 11

**Rule 2014 Bankruptcy Disclosures Submitted by McKinsey, in Chronological Order**[1]

| No. | Date | Case | Document | No. of McKinsey Connections Identified by Name |
|---|---|---|---|---|
| 1 | 12/27/2001 | *Hayes* | Affidavit of Richard K. Sykes in Support of Debtors' Application for Order under 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a) Authorizing Employment and Retention of McKinsey & Company, Inc. United States as Management Consultant to the Debtors (Dkt. 103) | 0 |
| 2 | 2/13/2002 | *Hayes* | Supplemental Affidavit of Richard K. Sykes in Support of Debtors' Application For Order Under 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a) Authorizing Employment and Retention of McKinsey & Company, Inc. United States as Management Consultant To The Debtors (Dkt. 365) | 0 |
| 3 | 3/13/2002 | *Hayes* | Second Supplemental Affidavit of Richard K. Sykes Pursuant to Order under 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a) and 2016 Authorizing Employment and Retention of McKinsey & Company, Inc. United States as Management Consultant for Debtors-In Possession, Nunc Pro Tunc to the Petition Date (Dkt. 479) | 0 |

---

[1]  In this chart, the term "**McKinsey Connection**" refers to an individual or entity named at least once as an "Interested Party" in the relevant bankruptcy, with which McKinsey had one or more connections or relationships.

| No. | Date | Case | Description | No. |
|---|---|---|---|---|
| 4 | 12/9/2002 | UAL | Affidavit of Gerhard J. Bette in Support of Debtors' Application for Order under 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a) Authorizing Employment and Retention of McKinsey & Company, Inc. United States as Management Consultant to the Debtors (Dkt. 52) | 0 |
| 5 | 2/27/2003 | UAL | Supplemental Affidavit of Nikolaus D. Semaca in Support of Debtors' Application for Order under 11 U.S.C. §§ 327(a) and 328(a) and Fed. R. Bankr. P. 2014(a) Authorizing Employment and Retention of McKinsey & Company, Inc. United States as Management Consultant to the Debtors (Dkt. 1606) | 0 |
| 6 | 10/27/2003 | Mirant | Affidavit of Kenneth J. Ostrowski in Support of Debtors' Application to Retain McKinsey & Company, Inc. United States as Management Consultant to the Debtors (Dkt. 1457) | 10 |
| 7 | 6/17/2009 | Lyondell | Affidavit of Thomas Hundertmark in Support of Debtors' Application for Order under 11 U.S.C. §§ 327(a) and 328(a) and Federal Rule of Bankruptcy Procedure 2014(a) Authorizing Employment and Retention of McKinsey & Company, Inc. United States as Management Consultants to the Debtors² (Dkt. 2090) | 0 |

---

2    As noted in the Amended Complaint, McKinsey US's initial disclosure affidavit in *Lyondell* disclosed, in a footnote, that a McKinsey partner had been a summer associate at the law firm Skadden, Arps, Meagher & Flom LLP in 2001.

| No. | Date | Case | Document | New Names Outed by |
|---|---|---|---|---|
| 8 | 9/15/2009 | Lyondell | Affidavit of Thomas Hundertmark in Support of the Application of the Debtors Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code and Rule 2014 of the Federal Rules of Bankruptcy Procedure for Authorization to Expand the Scope of McKinsey & Company, Inc. United States' Retention as Management Consultant to the Debtors (Dkt. 2752) | 0 |
| 9 | 4/4/2011 | *Harry & David* | Declaration of Seth Goldstrom in Support of the Debtors' Application to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC as Management Consultants *Nunc Pro Tunc* as of the Petition Date (Dkt. 105) | 0 |
| 10 | 4/26/2011 | *Harry & David* | Supplemental Declaration of Seth Goldstrom in Support of the Debtors' Application to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC as Management Consultants Nunc Pro Tunc as of the Petition Date (Dkt. 208) | 0 |
| 11 | 6/20/2011 | *Harry & David* | Second Supplemental Declaration of Seth Goldstrom in Support of the Debtors' Application to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC as Management Consultants Nunc Pro Tunc as of the Petition Date (Dkt. 457) | 1 |
| 12 | 1/10/2012 | *AMR* | Declaration of Seth Goldstrom in Support of the Debtors' Application to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States, and McKinsey & Company, Inc. Japan as Management Consultants *Nunc Pro Tunc* as of December 12, 2011 (Dkt. 581) | 0 |

Case 1:18-cv-04141-JMF   Document 73-1   Filed 09/04/18   Page 5 of 11

| No. | Date | Case | Document | Number of Objections Received by Court |
|---|---|---|---|---|
| 13 | 1/20/2012 | AMR | Supplemental Declaration of Seth Goldstrom in Support of the Debtors' Application to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States, and McKinsey & Company, Inc. Japan Aa Management Consultants Nunc Pro Tunc as of December 12, 2011 (Dkt. 697) | 0 |
| 14 | 2/27/2012 | AMR | Second Supplemental Declaration of Seth Goldstrom in Support of the Debtors' Application to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States, and McKinsey & Company, Inc. Japan as Management Consultants Nunc Pro Tunc as of December 12, 2011 (Dkt. 1468) | 0 |
| 15 | 5/10/2012 | AMR | Third Supplemental Declaration of Seth Goldstrom in Support of the Debtors' Application to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States, and McKinsey & Company, Inc. Japan as Management Consultants Nunc Pro Tunc as of December 12, 2011 (Dkt. 2695) | 0 |
| 16 | 11/13/2012 | AMR | Fourth Supplemental Declaration of Seth Goldstrom in Support of the Debtors' Second Supplemental Application to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States, and McKinsey & Company, Inc. Japan as Management Consultants (Dkt. 5344) | 0 |

| No. | Date | Case | Document | No. of McKinsey Conflicts Identified by |
|---|---|---|---|---|
| 17 | 2/28/2013 | AMR | Fifth Supplemental Declaration of Seth Goldstrom in Support of the Debtors' Second Supplemental Application to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States, and McKinsey & Company, Inc. Japan, McKinsey & Company, Inc. Company Canada, McKinsey & Company, Inc. Belgium, McKinsey & Company, Inc. Italy, and McKinsey & Company, S.L. as Management Consultants Nunc Pro Tunc as of December 12, 2011 (Dkt. 6896) | 0 |
| 18 | 4/18/2013 | AMR | Sixth Supplemental Declaration of Seth Goldstrom in Support of the Debtors' Second Supplemental Application to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC, McKinsey & Company, Inc. United States, and McKinsey & Company, Inc. Japan, McKinsey & Company, Inc. Company Canada, McKinsey & Company, Inc. Belgium, McKinsey & Company, Inc. Italy, and McKinsey & Company, S.L. as Management Consultants Nunc Pro Tunc as of December 12, 2011 (Dkt. 7697) | 0 |
| 19 | 11/21/2012 | AMF Bowling | Declaration of Kevin Carmody in Support of the Application of the Debtors for Entry of an Order Authorizing the Employment and Retention of McKinsey Recovery & Transformation Services U.S., LLC, as Restructuring Advisor to the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date (Dkt. 125) | 0 |
| 20 | 12/28/2012 | Edison Mission | Declaration of Jared D. Yerian in Support of Debtors' Application to Employ and Retain McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date (Dkt. 175) | 0 |

| No. | Date | Client | Document | Number of Objections Raised By |
|---|---|---|---|---|
| 21 | 5/15/2013 | *Edison Mission* | First Supplemental Declaration of Jared D. Yerian in Support of Debtors' Application to Employ and Retain McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date (Dkt. 756) | 0 |
| 22 | 11/22/2013 | *Edison Mission* | Second Supplemental Declaration of Jared D. Yerian in Support of Debtors' Application to Employ and Retain McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date (Dkt. 1615) | 0 |
| 23 | 10/23/2014 | *NII Holdings* | Declaration of Kevin Carmody in Support of Application of Debtors and Debtors in Possession, Pursuant to Sections 327(a), 328, 330, 331 and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(b) and Local Bankruptcy Rules 2014-1 and 2016-1, for an Order Authorizing Them to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC as Turnaround Advisor for the Debtors *Nunc Pro Tunc* to October 23, 2014 (Dkt. 153) | 0 |
| 24 | 11/6/2014 | *NII Holdings* | Supplemental Declaration of Kevin Carmody in Support of Application of Debtors and Debtors in Possession, Pursuant to Sections 327(a), 328, 330, 331 and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(b) and Local Bankruptcy Rules 2014-1 and 2016-1, for an Order Authorizing Them to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC as Turnaround Advisor for the Debtors *Nunc Pro Tunc* to October 23, 2014 (Dkt. 196) | 0 |

Case 1:18-cv-04141-JMF   Document 73-1   Filed 09/04/18   Page 8 of 11

| No. | Date | Case | Document | Non-Monetary Contribution Value |
|---|---|---|---|---|
| 25 | 3/23/2015 | Standard Register | Declaration of Kevin Carmody in Support of Debtors' Motion for Order Authorizing the Debtors to (I) Employ and Retain McKinsey Recovery & Transformation Services U.S., LLC to Provide Interim Management Services Pursuant to 11 U.S.C. § 363 and (II) Designate Kevin Carmody as Chief Restructuring Officer Nunc Pro Tunc to the Petition Date (Dkt. 87) | 0 |
| 26 | 8/24/2015 | Alpha Natural Resources | Declaration of Kevin Carmody in Support of Application of the Debtors, Pursuant to Sections 327(A), 328(a) and 1107(b) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Bankruptcy Rule 2014-1, for an Order Authorizing Them to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC as Turnaround Advisor for the Debtors, Effective as of the Petition Date (Dkt. 212) | 0 |
| 27 | 11/9/2015 | Alpha Natural Resources | Supplemental Declaration of Kevin Carmody in Support of Application of the Debtors, Pursuant to Sections 327(A), 328(a) and 1107(b) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Bankruptcy Rule 2014-1, for an Order Authorizing Them to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC as Turnaround Advisor for the Debtors, Effective as of the Petition Date (Dkt. 865) | 0 |
| 28 | 3/25/2016 | Alpha Natural Resources | Second Supplemental Declaration of Kevin Carmody in Support of Application of the Debtors, Pursuant to Sections 327(A), 328(a) and 1107(b) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Bankruptcy Rule 2014-1, for an Order Authorizing Them to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC as Turnaround Advisor for the Debtors, Effective as of the Petition Date (Dkt. 1854) | 0 |

Case 1:18-cv-04141-JMF   Document 73-1   Filed 09/04/18   Page 9 of 11

| No. | Date | Case | Document | Prior Witness Identified by Name |
|---|---|---|---|---|
| 29 | 5/5/2016 | SunEdison | Declaration of Mark W. Hojnacki in Support of Debtors' Application for Order Pursuant to Sections 327(a), 328, 330, 331, and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(b) and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Employment and Retention of McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors, Nunc Pro Tunc to the Petition Date (Dkt. 202) | 23 |
| 30 | 5/19/2016 | Alpha Natural Resources | Third Supplemental Declaration of Kevin Carmody in Support of Application of the Debtors, Pursuant to Sections 327(A), 328(a) and 1107(b) of the Bankruptcy Code, Bankruptcy Rule 2014(a) and Local Bankruptcy Rule 2014-1, for an Order Authorizing Them to Retain and Employ McKinsey Recovery & Transformation Services U.S., LLC as Turnaround Advisor for the Debtors, Effective as of the Petition Date (Dkt. 2464) | 22 |
| 31 | 6/6/2016 | SunEdison | Amended Declaration of Mark W. Hojnacki in Support of Debtors' Application for Order Pursuant to Sections 327(a), 328, 330, 331, and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(b) and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Employment and Retention of McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors, Nunc Pro Tunc to the Petition Date (Dkt. 484) | 18 |

8

| No. | Date | Case | Document | No. of Clients Identified by MRTS |
|---|---|---|---|---|
| 32 | 6/14/2016 | SunEdison | Supplement to Amended Declaration of Mark W. Hojnacki in Support of Debtors' Application for Order Pursuant to Sections 327(a), 328, 330, 331, and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(b) and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Employment and Retention of McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors, Nunc Pro Tunc to the Petition Date (Dkt. 586) | 0 |
| 33 | 8/5/2016 | Alpha Natural Resources | Declaration of Kevin Carmody in Respect of Recommendation of United States Trustee Pursuant to Paragraph 'D' of Order Dated July 15, 2016 [Docket # 3055] (Dkt. 3233) | 72 |
| 34 | 12/21/2016 | SunEdison | Second Supplement to Amended Declaration of Mark W. Hojnacki in Support of Debtors' Application for Order Pursuant to Sections 327(a), 328, 330, 331, and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(b) and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Employment and Retention of McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors, Nunc Pro Tunc to the Petition Date (Dkt. 1958) | 17 |
| 35 | 3/20/2017 | SunEdison | Third Supplement to Amended Declaration of Mark W. Hojnacki in Support of Debtors' Application for Order Pursuant to Sections 327(a), 328, 330, 331, and 1107(b) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016(b) and Local Bankruptcy Rules 2014-1 and 2016-1 Authorizing the Employment and Retention of McKinsey Recovery & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors, Nunc Pro Tunc to the Petition Date (Dkt. 2614) | 2 |

Case 1:18-cv-04141-JMF   Document 73-1   Filed 09/04/18   Page 11 of 11

| No. | Date | Case | Document | No. of Varities Connections Identified by Name |
|---|---|---|---|---|
| 36 | 6/23/2017 | GenOn | Declaration of Kevin M. Carmody in Support of Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of McKinsey Restructuring & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors Nunc Pro Tunc to the Petition Date and (II) Granting Related Relief (Dkt. 123) | 25 |
| 37 | 7/13/2017 | GenOn | First Supplement to Declaration of Kevin M. Carmody in Support of Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of McKinsey Restructuring & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors Nunc Pro Tunc to the Petition Date and (II) Granting Related Relief (Dkt. 221) | 55 |
| 38 | 9/15/2017 | GenOn | Second Supplement to Declaration of Kevin M. Carmody in Support of Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of McKinsey Restructuring & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors Nunc Pro Tunc to the Petition Date and (II) Granting Related Relief (Dkt. 771) | 15 |
| 39 | 2/7/2018 | GenOn | Third Supplement to Declaration of Kevin M. Carmody in Support of Debtors' Application for Entry of an Order (I) Authorizing the Retention and Employment of McKinsey Restructuring & Transformation Services U.S., LLC as Restructuring Advisor for the Debtors Nunc Pro Tunc to the Petition Date and (II) Granting Related Relief (Dkt. 1429) | 17 |

# EXHIBIT B

| Case | Docket Number | Para-graph Number | Statement | Reason False or Misleading |
|---|---|---|---|---|
| | | | Hayes Lemmerz | |
| Hayes Lemmerz | 103-3 | 8 | McKinsey does serve certain lenders under the Debtors Prepetition Credit Facility (none of which are the agent for such facility) on matters including general review of their loan portfolios. | Failed to identify connections by name and to provide details of relationships. |
| Hayes Lemmerz | 103-3 | 11 | After its reasonable investigation, McKinsey concluded that it has served or currently does serve several of the Searched Parties on various matters, but does not serve and has not served such parties in connection with matters directly involving or adverse to the Debtors. | Failed to identify connection by name or to provide details of relationships, including connections with: 1. Bank One Corporation (Secured Creditors) 2. Bank One Trust Company, N.A. (Major bondholders) 3. Chase Bank of Texas, N.A. (Major bondholders) 4. Chase Manhattan Bank (Major bondholders) 5. MDFC/Boeing (Major Lessors) 6. Zurich Insurance Company (Underwriters/Premium Financing) |
| Hayes Lemmerz | 103-3 | 13 | Accordingly, I believe McKinsey is a "disinterested person" as that term is defined in section 101(14), as modified by section 1107(b) of the Bankruptcy Code. | McKinsey not disinterested, by virtue of undisclosed connections to: 1. Bank One Corporation (Secured Creditors) 2. Bank One Trust Company, N.A. (Major bondholders) 3. Chase Bank of Texas, N.A. (Major bondholders) 4. Chase Manhattan Bank (Major bondholders) 5. MDFC/Boeing (Major Lessors) 6. Zurich Insurance Company (Underwriters/Premium Financing) |

| Case | Docket Number | Paragraph Number | Statement | Reason False or Misleading |
|------|---------------|------------------|-----------|----------------------------|
| UAL | 52-1 | | 14. McKinsey has determined that it provides consulting services to certain other entities that are parties-in-interest in the Debtors' cases | Failed to identify connections by name or to provide details of relationship, including connections with:<br><br>1. Bank One Corporation (Significant Banking Relationship)<br>2. BP, plc (Significant Customers and Vendors)<br>3. The Boeing Company (Significant Customers and Vendors)<br>4. Gate Gourmet (Significant Customers and Vendors)<br>5. Hewlett Packard Company (Significant Secured Creditor)<br>6. JPMorgan Chase (Significant Unsecured Creditor, Noteholder)<br>7. KFW (Kreditanstalt für Wiederaufbau) (Significant Secured Creditor)<br>8. Microsoft Corp. (Significant Unsecured Creditor, Noteholder)<br>9. Wells Fargo & Company (Significant Banking Relationship)<br>10. Zurich American Insurance Co. (Significant Insurance Related Party ties)<br>11. Chase Manhattan Bank (Significant Unsecured Creditor, Noteholder)<br>12. Chase Manhattan Corporation (Significant Secured Creditor, Noteholder)<br>13. Chase Trust Company (Significant Unsecured Creditor, Noteholder)<br>14. Chase Trust Company of California (Significant Unsecured Creditor, Noteholder) |

UAL

Case 1:18-cv-04141-JMF   Document 73-2   Filed 09/04/18   Page 4 of 146

| UAL | 52-1 | | 17. Accordingly, I believe McKinsey US is a "disinterested person" as that term is defined in Section 101(14), as modified by Section 1107(b) of the Bankruptcy Code. | Falsely claimed disinterestedness despite connections with:<br>1. Bank One Corporation (Significant Banking Relationship)<br>2. BP, plc (Significant Customers and Vendors)<br>3. The Boeing Company (Significant Customers and Vendors)<br>4. Gate Gourmet (Significant Customers and Vendors)<br>5. Hewlett Packard Company (Significant Secured Creditor)<br>6. JPMorgan Chase (Significant Unsecured Creditor, Noteholder)<br>7. KFW (Kreditanstalt für Wiederaufbau) (Significant Secured Creditor)<br>8. Microsoft Corp. (Significant Unsecured Creditor, Noteholder)<br>9. Wells Fargo & Company (Significant Banking Relationship)<br>10. Zurich American Insurance Co. (Significant Insurance Related Party ties)<br>11.Chase Manhattan Bank (Significant Unsecured Creditor, Noteholder)<br>12. Chase Manhattan Corporation (Significant Secured Creditor)<br>13. Chase Trust Company (Significant Unsecured Creditor, Noteholder)<br>14. Chase Trust Company of California (Significant Unsecured Creditor, Noteholder) |